**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **QUYNH VU BAIN,** | ) |
| Plaintiff, | ) |
| v. | ) |
| **OFFICE OF THE ATTORNEY GENERAL**<br>U.S. Department of Justice, | ) |
| **OFFICE OF THE DEPUTY ATTORNEY GENERAL**<br>U.S. Department of Justice, | ) |
| **OFFICE OF PROFESSIONAL RESPONSIBILITY**<br>U.S. Department of Justice, | )   No. 21-Civ-1751 (RDM) |
| **EXECUTIVE OFFICE FOR IMMIGRATION**<br>**REVIEW**, U.S. Department of Justice, | ) |
| **OFFICE OF INFORMATION POLICY**<br>U.S. Department of Justice, | )   **Jury Trial Demanded**<br>**for Second and Third** |
| Defendants. | )   **Causes of Action** |

<u>**AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE,**</u>
<u>**AND MONETARY RELIEF**</u>

Plaintiff Quynh Vu Bain, proceeding *pro se*, brings this action against the United States

Department of Justice and its various named components, collectively referred to as "Defendants."

<u>**Nature of Action**</u>

1.     This action asserts three separate but related causes of action arising from

Defendants' September 17, 2020 decision to terminate Plaintiff's employment after 29 years of



1

exemplary service in the U.S. Department of Justice.  *See* Exhibit 1 (filed under seal, exempt from disclosure under FOIA Exemption 6).

**Parties**

2.      Plaintiff is a resident of the District of Columbia and a citizen of the United States. She is an Asian-American female of Vietnamese descent in her fifties.  She was employed as a career civil servant in the U.S. Department of Justice from October 1991 to September 2020.  Most recently, she served as an Immigration Judge in the Executive Office for Immigration Review for 12 years.  At various times, she was assigned to the Headquarters Immigration Court in Falls Church, Virginia and the Arlington Immigration Court in Arlington, Virginia.

3.      Until March 2021, Plaintiff was represented by attorneys who specialized in government investigations and labor and employment law.  At the present time, Plaintiff is representing herself.

4.      All of the offices and agencies collectively denoted as Defendants are components of the United States Department of Justice.

The Office of the Attorney General ("OAG") makes hiring, firing, and other personnel-related decisions concerning immigration judges.

The Office of the Deputy Attorney General ("ODAG") formulates and recommends disciplinary or adverse actions against immigration judges.

The Office of Professional Responsibility ("OPR") investigates allegations of misconduct involving Department attorneys, including immigration judges.

The Office of Information Policy ("OIP") adjudicates appeals from the decisions of individual DOJ components to withhold information that is requested under the Freedom of Information Act and the Privacy Act.

The Executive Office for Immigration Review ("EOIR") manages the operations of the Nation's 58 immigration courts through the Office of the Director, Office of the Deputy Director, and Office of the Chief Immigration Judge. At the time of Plaintiff's employment, the Office of the Chief Immigration Judge had three Deputy Chief Immigration Judges and approximately sixteen Assistant Chief Immigration Judges. The assistant chief judges ("ACIJ's") oversee the day-to-day work of non-supervisory immigration judges.

### Jurisdiction and Venue

5.     This civil action consolidates three separate but related causes of action arising from Defendants' decision to terminate Plaintiff's employment. This Court has subject matter jurisdiction under the following statutes:

The Freedom of Information Act and the Privacy Act, 5 U.S.C. §§ 552 & 552a;

The Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*;

The Civil Service Reform Act (CSRA) of 1978, 5 U.S.C. §§ 1204, 7701, 7702, and 7512;

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*;

The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*;

The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*;

The Whistleblower Protection Act of 1989, 5 U.S.C. § 2302(b);

The federal question statute, 28 U.S.C. § 1331;

The mandamus statute, 28 U.S.C. § 1361; and

The declaratory judgment act, 28 U.S.C. § 2201.

### First Cause of Action

6.     The first cause of action relates to Plaintiff's complaint under the Freedom of Information Act and Privacy Act, brought to challenge Defendants' willful failure to release

3

information in response to three FOIA requests that Plaintiff filed in September 2015, January 2018, and August 2019. *See* Exhibit 2.

7.     All of the FOIA requests seek information in the possession, control and custody of Defendants.

8.     Plaintiff has properly and timely exhausted each of the three FOIA requests. *See* 5 U.S.C. §§ 552(a)(4)(B).

9.     On September 13, 2021, Defendant OIP advised that it will not adjudicate the administrative appeal that Plaintiff filed on June 3, 2020, because Plaintiff has filed a district court action challenging the withholding of documents. *See* Exhibit 2.

10.     This cause of action is timely commenced within six years after Plaintiff became aware of the non-disclosure of the requested information and materials. *See* Spannaus v. U.S. Department of Justice, 824 F.2d 52, 56 (D.C. Cir. 1987).

11.     This Court has original jurisdiction over Plaintiff's complaint under the FOIA and Privacy Act and reviews *de novo* the Defendants' decisions regarding the withholding or release of information.  5 U.S.C. §§ 552a(g)(3).

12.     The first cause of action also challenges Defendants' willful failure to correct errors in Plaintiff's personnel records in a timely fashion, which contributed to the use of those erroneous personnel records in subsequent adverse actions brought against Plaintiff.  This Court has original jurisdiction and reviews *de novo* the Defendants' decisions to take or not to take corrective action. 5 U.S.C. §§ 552a(g)(1), 552a(g)(2)(A), and 552a(g)(5).

**Second Cause of Action**

13.     The second cause of action relates to Plaintiff's complaint of discrimination, retaliation for engaging in protected activity, and hostile work environment. The events underlying the discrimination complaint occurred between January 2015 and September 2020.

14.     Plaintiff has properly exhausted this cause of action with the administrative agencies authorized to adjudicate her discrimination complaint. Her administrative complaint was filed with the EEOC on December 10, 2015 and was amended on May 18, 2018. *See* Exhibit 3. It alleges discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973, regarding the events starting in January 2015 that directly led to her removal on September 17, 2020.

15.     On February 26, 2020, an EEOC administrative judge dismissed Plaintiff's discrimination complaint by summary judgment without a hearing. Plaintiff timely appealed the administrative judge's decision to the Justice Department's Complaint Adjudications Office (CAO). Thereafter, Plaintiff timely filed a Notice of Appeal and letter brief with the EEOC on May 1, 2020. *See* Exhibit 4.

16.     In her appeal to the CAO, Plaintiff advised that <u>one day</u> after the EEOC administrative judge dismissed her complaint by summary judgment, the Justice Department proposed her removal on February 27, 2020. *See* Exhibit 4. Plaintiff requested that the CAO hold the appeal in abeyance, pending the Attorney General's disposition of the proposal to terminate her employment. The CAO declined her request to hold the appeal. Plaintiff next requested that the EEOC vacate the administrative judge's decision, reopen the evidentiary record, and remand the matter for further discovery. *See id.*

17.     While her EEOC appeal was pending, the United States Attorney General issued a removal decision on September 17, 2020, terminating Plaintiff's employment in the Justice Department after 29 years. *See* Exhibit 1.

18.     On October 19, 2020, within 30 days after her discharge, Plaintiff timely filed a "mixed case appeal" with the Merit Systems Protection Board ("MSPB"), challenging her removal on the merits.   The appeal notice asserts that Defendants failed to prove the charges and, in selecting an appropriate penalty, failed to properly weigh the mitigating and aggravating factors in Douglas v. Veterans Administration, 5 M.S.P.R. 280 (1981).   In addition, the appeal notice asserts that the Removal Decision relied on information that Defendants refused to produce to Plaintiff, in violation of 5 U.S.C. §§ 7701(c)(2)(A) & (C).  *See also* 5 U.S.C. § 7701(c)(3).  Finally, the notice asserts two affirmative defenses to removal, one based on violations of federal anti-discrimination laws, and the other, on violations of the Whistleblower Protection Act.[1]  *See* Exhibit 5.

19.     Regarding her affirmative defense based on discrimination, the MSPB appeal notice asserts that her removal violates Title VII of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and the Anti-Age Discrimination in Employment Act.  *See* Exhibit 5.

20.     Regarding her affirmative defense based on whistleblower retaliation, the MSPB appeal notice asserts that Plaintiff's removal violates the Whistleblower Protection Act of 1989. *See* 5 U.S.C. §§ 2308 & 2309.  *See* Exhibit 5.

21.     By notice sent to Defendants on November 1, 2020, within 45 days of her removal, Plaintiff advised Defendants that she intends to pursue a "mixed case appeal" before the MSPB,

---

[1] A "mixed case appeal" is one in which a federal employee "alleges that an appealable agency action was effected in whole or in part because of discrimination." Kloeckner v. Solis, 568 U.S. 41, 44-45 (2012). *See also* 29 C.F.R. § 1614.302(a)(2); 5 C.F.R. § 1201.151 (2019).

6

in which discrimination and whistleblower retaliation are asserted as affirmative defenses to her removal. *See* Exhibit 7.

22.     On April 29, 2021, after the EEOC affirmed the administrative judge's decision to grant summary judgment to Defendants, Plaintiff filed a Motion for Reconsideration with the EEOC, advising the EEOC of her discharge from federal employment on September 17, 2020. *See* Exhibit 6. Plaintiff further advised the EEOC that she is pursuing a mixed case appeal before the MSPB, in which she asserts discrimination as an affirmative defense to her removal. Plaintiff requested that the EEOC reconsider its decision to dismiss her EEOC action by summary judgment, reopen the evidentiary record, and hold the EEOC proceeding in abeyance pending resolution of the MSPB mixed case appeal, to avoid any potential res judicata effect or issue preclusion that the EEOC decision might present in the MSPB proceeding.

23.     Thereafter, Plaintiff timely commenced this district court action on June 22, 2021, within 90 days of the EEOC's March 24, 2021 decision affirming the grant of summary judgment to Defendant EOIR, without a hearing.

24.     On August 17, 2021, after the instant action was commenced, the EEOC denied Plaintiff's April 29, 2021 Motion for Reconsideration. *See* Exhibit 6. In its decision, the EEOC acknowledged the new claim of discrimination and its underlying facts, including Defendants' February 27, 2020 Notice of Proposed Removal issued one day after the dismissal of Plaintiff's EEOC action, and Plaintiff's actual removal on September 17, 2020. Even though it had *de novo* review authority, the EEOC declined to address the new allegations of discrimination relating to Plaintiff's discharge. The EEOC instead limited the scope of its reconsideration to the original 39 allegations of discrimination. *See id.*

**Third Cause of Action**

25.     The third cause of action relates to Plaintiff's whistleblower retaliation claim brought under the Whistleblower Protection Act of 1989, 5 U.S.C. § 2302(b).   Plaintiff has properly and timely exhausted this cause of action with the administrative agencies responsible for adjudicating it.

26.     Through her timely Notice of Appeal filed with the MSPB on October 19, 2020, Plaintiff asserted the whistleblower retaliation claim as an affirmative defense to her removal. *See* Exhibit 5.

27.     Through a communication dated November 1, 2020, Plaintiff provided courtesy notice of the election of remedy to Defendant EOIR. *See* Exhibit 7.

28.     Through her April 29, 2021 Motion for Reconsideration filed with the EEOC, Plaintiff provided courtesy notice of the same to the EEOC. *See* Exhibit 6.

29.     Soon after Plaintiff filed her October 19, 2020 MSPB appeal, Defendants filed a "Motion to Reassign/Dismiss" asserting that the MSPB judge assigned to Plaintiff's appeal lacked Constitutional authority to hear her mixed case appeal, because that judge had not been duly appointed in accordance with the Appointments Clause of Article II, Section 2, Clause 2 of the United States Constitution. *See* Lucia v. Securities and Exchange Commission. 138 S. Ct. 2044 (2018).  Plaintiff opposed the dismissal motion.

30.     By Order dated November 16, 2020, the MSPB granted Defendants' motion to dismiss for lack of jurisdiction without prejudice to reinstatement, based on the reasoning of Lucia. The Order of Dismissal provides that Plaintiff's appeal will automatically be reinstated within 180 days of the date of the Order. *See* Exhibit 8.

31.     On May 18, 2021, the MSPB reinstated Plaintiff's appeal in accordance with its November 16, 2020 Order of Dismissal.  The MSPB, however, stated that it still lacks jurisdiction

over Plaintiff's appeal and would again dismiss the appeal without prejudice to reinstatement, unless both parties were to consent to the MSPB's exercise of jurisdiction by June 7, 2021. *See* Exhibit 9.

32.     Thereafter, the MSPB issued a second Order of Dismissal without prejudice to reinstatement. Dated June 8, 2021, the second Order provides that Plaintiff's MSPB appeal will be automatically reinstated on December 21 13, 2021. *See* Exhibit 10.

33.     Upon information and belief, the MSPB has operated without a full quorum of Board Members since 2017. Without a quorum of Board Members, the MSPB lacks authority to appoint individual administrative judges in accordance with the Supreme Court's decision in Lucia.

34.     In view of the MSPB's continuing lack of jurisdiction over Plaintiff's mixed case appeal, this district court may exercise subject matter jurisdiction over the MSPB mixed case appeal and adjudicate it in the first instance. *See* Perry v. MSPB, 137 S. Ct. 1975, 1979 (2017) (holding that when the MSPB dismisses a mixed case appeal for lack of subject matter jurisdiction, the plaintiff may appeal her removal to the federal district court); Kloeckner v. Solis, 568 U.S. 41, 46 (2012) (holding that a federal employee who claims that an agency action appealable to the MSPB violates an anti-discrimination statute listed in 5 U.S.C. § 7702(a)(1) should seek judicial review of the dismissal of her complaint in federal district court, not in the Federal Circuit). *See id.* at 604 (stating that under 5 U.S.C. § 7703(b)(2), the federal district court has original jurisdiction to review *de novo* the EEOC's decision on the merits of a complaint of discrimination, where the complaint invokes an anti-discrimination statute listed in § 7702 and is commenced within 90 days after the issuance of the EEOC decision).

35.     Personal jurisdiction and venue are proper in the District of Columbia, because this is the district in which Plaintiff resides and in which a substantial number of the acts or omissions giving rise to Plaintiff's claims occurred.  5 U.S.C. § 552(a)(4)(B); 5 U.S.C. § 552a(g)(5); and 28 U.S.C. § 1391.

**Factual Allegations**

36.     After six years of successful service as an immigration judge, Plaintiff began to experience severe, debilitating migraine headaches while conducting court hearings by tele-videoconference.  At the urging of her physicians, she requested a reasonable accommodation of her medical condition.  The requested accommodation was a permanent reassignment to the Immigration Court in Arlington, Virginia, and, specifically, to that court's non-videoconference docket. As Plaintiff was already working in the Arlington court location (but was still assigned to the Headquarters court's tele-videoconference court), a reassignment to the Arlington court's non-videoconference docket would have been a most suitable accommodation. *See* Exhibit 12 (filed under seal, exempt from disclosure under FOIA Exemption 6).

37.     When her first reasonable accommodation request was denied, Plaintiff filed an informal EEO complaint with Defendant EOIR in June 2014, challenging the reasonable accommodation denial as violating Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. Shortly thereafter, Plaintiff began to experience severe harassment that prompted her to withdraw the internal complaint in August 2014.

38.     The harassment continued even after Plaintiff withdrew her informal EEO complaint.  The harassment took the form of discriminatory and retaliatory personnel actions that were intended to oust her from the agency, so that her immigration judge position could be given to an external or internal immigration judge candidate the agency favored.

39.     In January 2015, former Chief Immigration Judge Mary Beth Keller[2] admonished Plaintiff for communicating by email in a "rude" and "disrespectful" manner, after Plaintiff complained about persistently malfunctioning tele-videoconference ("VTC") equipment that had prevented her timely completion of assigned court hearings in detained cases and made her sick again. *See* Exhibit 13 (filed under seal, exempt from disclosure under FOIA Exemptions 6).

40.     In February 2015, Plaintiff's then-supervisor, ACIJ Christopher A. Santoro, assigned to Plaintiff to an indefinite detail to the Immigration Court in York, Pennsylvania. He also reassigned over 100 aged, detained York cases from the dockets of white male immigration judges to Plaintiff's docket and directed her to complete those hearings expeditiously. *See* Exhibit 13.

41.     All of the 100 cases had been pending past the 60-day case completion goal. Many involved detainees who had been in immigration custody for as long as three to four years, well past the time period that was considered Constitutionally permissible under federal law. As many detainees had filed habeas corpus petitions seeking immediate release from immigration custody, Plaintiff was concerned about the heightened litigation risks that their cases posed to the Agency, as well as her own professional and personal (Bivens) liability. When she expressed this concern to ACIJ Santoro, he dismissed it. *See* Exhibit 13.

42.     ACIJ Santoro then thwarted Plaintiff's effort to complete the 100 cases at every turn. He refused to send her the 100 case files in advance. He disallowed bond hearings even in cases that did not involve mandatory detention. He denied Plaintiff's request for administrative time off-the-bench to prepare for hearings and write judicial decisions. He allowed the resident

---

[2] The former Chief Immigration Judge is a white female in her fifties. Upon information and belief, she left the Defendants' employ in July 2019.

judge in the York, Pennsylvania Immigration Court (a white male in his sixties) to assign his unwanted cases to Plaintiff. Most of the 100 aged, detained cases came from that resident judge's docket. *See* Exhibit 13.

43.     At ACIJ Santoro's direction, the York court administrator repeatedly reshuffled the order of Plaintiff's hearings to accommodate the York resident judge's preferences. The York resident judge set up an assembly line of cases, in which he reserved for himself the perfunctory hearings (*i.e.*, bond and master calendar hearings), while assigning evidentiary hearings in the most complex cases to Plaintiff. *See* Exhibit 13. Cases that Plaintiff completed were then reassigned to the resident judge, who took credit for her work.

*44.*    In March 2015, ACIJ Santoro issued a written reprimand that accused ~~accusing~~ Plaintiff of displaying "intemperate behavior" toward him. The reprimand was issued after Plaintiff returned a three-year-old case that the York resident judge had handled but, without justification, reassigned to Plaintiff for completion. *See* Exhibit 13. In the same reprimand, ACIJ Santoro also falsely accused Plaintiff of treating former Chief Judge Keller with disrespect during the VTC malfunction incident that occurred four months earlier, in November 2014. *See id.*

45.     The reprimand was the very first disciplinary action that Plaintiff received in her then 24th year of service in the Justice Department. Until that point, Plaintiff's employment record with DOJ was unassailable. *See* Exhibit 16 (filed under seal, exempt from disclosure under FOIA Exemption 6). Over a 24-year period from 1991 until 2015, Plaintiff consistently received outstanding, excellent, or fully successful performance ratings while working in five different DOJ offices including EOIR. For the first six years of her service as an immigration judge (2008 to 2014), Plaintiff received an overall satisfactory performance rating – the highest possible rating for an immigration judge – every year. She also received a satisfactory rating in each of the three

critical elements:  legal ability, accountability for organizational results, and professionalism. Furthermore, six months before he issued the March 2015 reprimand, ACIJ Santoro had rated Plaintiff's work performance as being "at least satisfactory" in each of the critical elements.  Given that positive assessment and Plaintiff's pristine employment record, the March 2015 reprimand was highly suspect.  Five years later, Plaintiff would realize that the reprimand was part of an orchestrated effort to take away her job and give it to someone who did not possess the necessary qualifications or work experience for the job.

46.     The March 2015 reprimand was discrimination on account of Plaintiff's temporary disability (migraine headaches) triggered by prolonged use of malfunctioning VTC equipment. An email communication between ACIJ Santoro and Chief Judge Keller makes clear their contempt for Plaintiff and their desire to get rid of her.  *See* Exhibit 14 (filed under seal, subject to EEOC Protective Order).

47.     The severe penalty that they meted out to Plaintiff stood in sharp contrast to the lenient treatment that ACIJ Santoro and Chief Judge Keller gave to her white male colleagues. Documents from the "BAIN FOIA 2015" folder show that during the same time frame, they repeatedly tolerated egregious, highly inappropriate conduct on the part of her white male colleagues. One particular white male judge was repeatedly counseled for inappropriate comments and behavior in court, but to Plaintiff's knowledge no disciplinary action was ever taken against that judge. *See* Exhibit 14. He remains on the bench today.

48.     The March 2015 reprimand also was retaliation for Plaintiff's protected whistleblowing activity.  In the weeks leading up to the reprimand, Plaintiff had expressed concern to ACIJ Santoro about her ability to resolve expeditiously the 100 aged, detained cases since she did not have the authority to conduct bond hearings that the York resident judge reserved for

himself. After he issued the reprimand, Plaintiff advised ACIJ Santoro that she would go public with her concern. In response, he reluctantly agreed to let her conduct bond hearings as she deemed necessary. *See* Exhibit 17. He did not rescind the reprimand, however, and continued to use it to harass Plaintiff and deny her a well-earned reassignment to the Arlington court's non-videoconference docket, special work opportunities, and career advancement.

49.     The March 2015 reprimand had the effect of barring Plaintiff from obtaining a reassignment to the Arlington Immigration Court for a period of three years. *See* Exhibits 14. As a result, she continued using faulty VTC equipment that frequently malfunctioned and exacerbated her medical condition. In April 2015, Plaintiff took Family Medical Leave Act (FMLA) leave to recuperate from debilitating migraine headaches after the VTC equipment in her courtroom malfunctioned for several consecutive days.

50.     Upon her return to the office, Plaintiff began traveling to the York, Pennsylvania Immigration Court to conduct hearings in person.

51.     In late June 2015, ~~the same supervisor~~ ACIJ Santoro issued a counseling letter, accusing Plaintiff of traveling without his authorization to the York Immigration Court, ~~a court location where she conducted her assigned court hearings in person~~. Upon his return from a two-week vacation, he revoked the travel authorization that Plaintiff had received from other agency personnel and denied her request for travel reimbursement. *See* Exhibit 15 (filed under seal, exempt from disclosure under FOIA Exemption 6).

52.     Like the March 2015 reprimand, the June 2015 counseling letter was a pretext for discrimination and retaliation. ACIJ Santoro was well aware that the York court administrator had arranged for Plaintiff to conduct her assigned court hearings in person, after the VTC equipment in her Virginia courtroom malfunctioned. A new software program (E2 Solutions) that the Agency

used to process travel authorization requests had glitches that prevented the proper routing of Plaintiff's request to ACIJ Santoro. In addition, other Agency officials were aware of Plaintiff's travel plan and had authorized it in ACIJ Santoro's absence. *See* Exhibit 15.

53.     In August 2015, ACIJ Santoro issued an annual performance rating that–while crediting Plaintiff with satisfactory work performance–rated her professionalism as needing improvement. The performance rating referenced the March 2015 reprimand and June 2015 counseling letter as justification for the downgraded performance rating. *See* Exhibit 18 (filed under seal, exempt from disclosure under FOIA Exemption 6).

54.     On December 10, 2015, upon learning that her second reasonable accommodation request was denied because of the March 2015 reprimand, Plaintiff timely filed a formal complaint of discrimination with the EEOC. *See* Exhibit 3. Plaintiff alleged that the March 2015 reprimand, the June 2015 counseling letter, the August 2015 performance rating, and the denial of her second reassignment request and her Board Member application violated Title VII of the Civil Rights Act of 1964 and the 1973 Rehabilitation Act. *See* Exhibit 3.

55.     Within a month of filing her EEO complaint, Plaintiff was suddenly reassigned to the Arlington Immigration Court's non-videoconference docket. However, over the next four years she continued to experience progressively worse acts of discrimination and retaliation that eventually culminated in her discharge in September 2020.

56.     From 2016 to 2019, Plaintiff's next supervisor ("ACIJ Deepali Nadkarni")[3] assigned her to complete aged, non-detained cases on the dockets of three white male judges. Many of the cases had been pending for as long as 15 to 20 years, and Plaintiff was to complete

---

[3] ACIJ Nadkarni is an Asian-American female of Indian descent in her forties. In July 2019, she resigned from her position as supervisory judge and began working in the Arlington Immigration Court as a non-supervisory judge.

the cases expeditiously. Plaintiff's supervisor also permitted white judges to dump their unwanted cases on Plaintiff's hearing calendar, causing numerous scheduling conflicts. During that same period, Plaintiff's supervisor assigned her two to three times the number of new cases as were assigned to white judges. In addition to handling a burgeoning Arlington court caseload, Plaintiff had to continue hearing detained cases out of the detention facility in York, Pennsylvania by tele-videoconference. *See* Exhibit 3, 19.

57.    When Plaintiff voiced concern about the very burdensome assignments and scheduling conflicts, her supervisor issued a counseling letter in July 2016 criticizing Plaintiff for an email communication with a white female judge. The counseling letter threatened to terminate Plaintiff's employment. At the time, Plaintiff did not know that, on the same date, the supervisor issued a similarly worded counseling letter to the white female judge, faulting that judge for acting unprofessionally toward Plaintiff. *See* Exhibit 19 (filed under seal, exempt from disclosure under FOIA Exemption 6).

58.    In October 2016, ACIJ Nadkarni issued a performance rating that – while crediting Plaintiff with satisfactory work performance – criticized her for a lack of professionalism. The performance rating referenced the July 2016 counseling letter that the supervisor had issued the previous month. However, it did not mention the July 2016 counseling letter that she issued to the white female judge. The performance rating also referenced anonymous complaints that the supervisor claimed to have received during the rating period. When asked to divulge the identities of the complainants and the substance of their complaints, the supervisor refused to do so. *See* Exhibit 20 (filed under seal, exempt from disclosure under FOIA Exemption 6).

59.    Sometime in 2016, ACIJ Nadkarni became involved in the hiring and onboarding of Vance Spath, an external immigration judge candidate who designated the Arlington

Immigration Court as his one and only choice of court.  Upon information and belief, Spath was a former colleague and friend of ACIJ Santoro.  At the time he applied for an immigration judge position, Spath was presiding over a military commission trial at Guantanamo Bay.  Public records indicate that ACIJ Santoro facilitated the processing of Spath's job application starting in 2015, and that ACIJ Nadkani had obtained job references for Spath in June 2016.  His onboarding, scheduled for the end of 2016, was delayed.  *See* Exhibit 22.

60.     In late January 2017, Plaintiff learned through ACIJ Nadkarni that Defendant EOIR had released sensitive information from her personnel file to the American Immigration Lawyers Association ("AILA"), a voluntary bar association of immigration attorneys.  Plaintiff immediately demanded that EOIR retract or claw back the information, but EOIR refused.  *See* Exhibit 24.

61.     On March 1, 2017, two immigration bar attorneys named Eileen Blessinger and Carmen Boykin filed a complaint with Plaintiff's supervisor.  *See* Exhibit 30, at EOIR 87-95 (filed under seal, subject to OPR confidentiality agreement).   The complaint alleged that Plaintiff mishandled four court hearings between February and March 2017, and that she manifested improper judicial bias, demeanor, and incompetence in those hearings.  Notably, the complaint stated that "Judge Bain has been counseled in the past but that apparently has not been sufficient to instill the necessary dignity and decorum required in her proceedings." *See* Exhibit 30, at EOIR 92.  Plaintiff understood this comment to be a reference to the privacy-protected information that EOIR had released to AILA two months earlier.

62.     The complaint filed with Plaintiff's supervisor was prepared by attorney Paul L. Knight.  According to his law firm profile, Mr. Knight practiced criminal and white-collar defense with the Nossaman law firm.  The firm's profile indicates that it has represented individuals facing criminal prosecutions for violating the Iran sanctions:

"Nossaman attorneys have significant experience in the defense of these prosecutions. They have represented clients charged with the transshipment of goods to Iran, including the acquittal of one such client in a jury trial."

Given the broad definition of "Government of Iran" in the various sanctions regimes, Plaintiff believed that the individuals his firm represented were connected to that government.



63.     In his March 1, 2017 complaint filed with EOIR ("the first Knight complaint"), Mr. Knight claimed to be an expert on attorney discipline issues, having represented Justice Department attorneys in disciplinary proceedings. One of those cases apparently put him in the path of EOIR's former Acting Deputy Director, Marlene Wahowiak. Ms. Wahowiak oversaw the litigation of Plaintiff's EEOC proceeding at EOIR. In August 2017, at Mr. Knight's urging, Ms. Wahowiak referred Plaintiff to OPR for an investigation. *See* Exhibit 30, at EOIR 83-85.

64.     The March 1, 2017 Knight complaint claimed that Plaintiff verbally abused and manifested improper bias toward his clients, Ms. Blessinger and Ms. Boykin, in a manner that

warranted an investigation. Among other things, he asserted that Plaintiff manifested judicial bias and incompetence. He claimed that Plaintiff belittled Ms. Blessinger when, in ruling on an evidentiary objection, Plaintiff said:

> Um, Ms. Blessinger, I'm not going to let you build a whole case on hearsay evidence. All right? Hearsay, as you know, *because you've gone to law school*, is a very weak form of evidence. Particularly when people who are eyewitnesses and who have firsthand observations of the events in question are available to testify. If you want to take up the rest of today with hearsay evidence, that's fine, but I can't guarantee you that I'll give it much weight.

65.     Mr. Knight also claimed that his other client, Ms. Boykin, was a seasoned immigration lawyer who was subjected to a humiliating tongue-lashing by Plaintiff during an off-record exchange following a February 16, 2017 court hearing. OPR, however, would later determine that this allegation has no merit. As Ms. Boykin was ill-prepared for the court hearing, Plaintiff was justified in admonishing her to be prepared for the next court date. *See* Exhibit 30, at EOIR 79 n. 407, 293.

66.     Attached to the March 1, 2017 complaint that Mr. Knight filed with EOIR was a sworn affidavit by Ms. Blessinger's paralegal, Nicolas Ahumada. *See* Exhibit 30, at EOIR 791-792. The affidavit recounted Mr. Ahumada's impressions of the February 17, 2017 court hearing, the very first court hearing he ever attended. Though he professed not to know Plaintiff, Mr. Ahumada's affidavit expressed disconcerting familiarity with her demeanor and work habits.[4] He

---

[4] When asked to describe why he thought Plaintiff's lips were pursing as though she was angry and not because they were dry, Mr. Ahumada replied:

> Sure. I mean, I understand how that could be perceived, or could come across, or that could be an option, but it was one of those where you were very -- it's not where you're trying to moisten your lips and like put the lips on the inside of your mouth, it's more so like your lips are still on the exterior and you're clenching them very tightly to the point where there's like little wrinkles on your lip, you know, like – (EOIR 1638).

described Plaintiff's behavior in a grotesquely exaggerated manner, putting her in a false light and playing up negative stereotypes of middle-aged Asian women. During his OPR interview, Mr. Ahumada often made sarcastic and inappropriate comments about Plaintiff, for example, that "it seemed as though she didn't have her cup of coffee that morning." *See* Exhibit 30, at EOIR 1636.

67.     Mr. Ahumada falsely claimed that Plaintiff screamed and yelled at Ms. Blessinger for a period of *five to ten minutes* during an off-the-record heated exchange, causing Ms. Blessinger's hands to tremble. *See* Exhibit 30, at EOIR 1647. As OPR would later determine, however, the off-record exchange lasted "only 31 seconds," not "over five minutes" as Ms. Blessinger claimed, and certainly not "five to ten minutes" as Mr. Ahumada recounted. *See* Exhibit 30, at EOIR 305-306, 28, 1122, 1647. OPR also determined that Plaintiff did not abuse Ms. Blessinger by denying her a break in the middle of her client's cross-examination. *See id.*

68.     The March 1, 2017 complaint was the first such complaint filed against Plaintiff, then in her ~~seventh~~ ninth year of service as an immigration judge.

69.     Plaintiff's supervisor, ACIJ Nadkarni, did not apprise Plaintiff of the Knight March 1, 2017 complaint. Plaintiff learned about the complaint at the start of a March 7, 2017 court hearing, when Attorney Blessinger presented a Motion for Recusal that attached the Knight March 1, 2017 complaint as an exhibit. *See* Exhibit 30, at EOIR 772-804. Attorney Blessinger informed Plaintiff that a copy of the complaint had been emailed to the court administrator, Deborah Castro, the day before the hearing, and that she expected Plaintiff to immediately recuse.

70.     Concerned that the court administrator might have engaged in an impermissible *ex parte* communication, Plaintiff asked the court administrator to testify concerning that communication in open court. The court administrator's testimony served two purposes: (1) to cure the *ex parte* nature of the communication by divulging it to government counsel; and (2) to

confirm that, prior to the March 7, 2017 court hearing, Plaintiff did not receive from the court administrator the Knight March 1, 2017 complaint or their joint Motion for Recusal.

71.     On March 28, 2017, Mr. Knight filed a second complaint with Plaintiff's supervisor. *See* Exhibit 30, at EOIR 97-98 ("the second Knight complaint"). The second complaint alleged that Plaintiff abused her judicial authority by refusing immediately to recuse from all of their cases, and by requiring the court administrator to testify about the *ex parte* communication with Attorney Blessinger. The second complaint also falsely accused Plaintiff of witness intimidation.

72.     Plaintiff's supervisor directed Plaintiff to respond to both the recusal motion and the underlying March 1, 2017 and March 28, 2017 complaints. While on extended work-related travel to New Mexico, Plaintiff prepared a response without the benefit of her paper records or access to her courtroom's audio-recordings.

73.     Through an order dated June 8, 2017, Plaintiff responded to the recusal motion and the two underlying complaints. *See* Exhibit 30, at EOIR 100-122. The Recusal Order applied the recusal procedure and standards prescribed in EOIR's policy memorandum, known as OPPM 05:02. Promulgated in 2005, OPPM 05:02 was modeled after the recusal procedure for federal judicial officers in 28 U.S.C. § 455(a) & (b), and the United States Supreme Court's decision in Liteky v. United States, 510 U.S. 540 (1994). In addition, Plaintiff's Recusal Order applied the Immigration Judges' Ethics Guide, which is a code of judicial ethics and conduct for immigration judges. *See* Exhibit 30, at EOIR 1298-1307. The Recusal Order was subsequently affirmed by the Board of Immigration Appeals ("BIA") in seven different cases. *See* Exhibit 25 (filed under seal, subject to asylum confidentiality rules).

74.     Nevertheless, in early August 2017 EOIR referred Plaintiff to OPR for an investigation.  The referral email was prepared by the former EOIR Deputy Director, Marlene Wahowiak.[5]  See Exhibit 30, at EOIR 83-85.  The former Deputy Director had supervised the litigation of Plaintiff's EEOC action.  Upon information and belief, she had worked in OPR for 12 years and had applied for an immigration judge position in the Arlington Immigration Court at the same time that Plaintiff applied for a reassignment to that court.  See Exhibit 30, at EOIR 281-284.

75.     Ms. Wahowiak's August 3, 2017 email states that ACIJ Nadkarni had met with and interviewed Mr. Knight, Ms. Blessinger, and Ms. Boykin.  Based on the interview, EOIR determined that the matter should be referred to OPR.  The email indicates that Ms. Wahowiak was aware of OPR's policy of not intervening in pending litigation; however, she pleaded with OPR to initiate and expedite an investigation of Plaintiff, asserting – without any factual basis – that an OPR investigation would prevent further harm to Mr. Knight's and the two complaining attorneys' reputation.  See Exhibit 30, at EOIR 83-85.

76.     The records of ACIJ Nadkarni's interviews of Mr. Knight, Ms. Blessinger, and Ms. Boykin were never turned over to Plaintiff, despite requests made to OPR and later, to the Office of Information Policy (OIP).  See Exhibit 2.  Nor were the records of her pre-referral interviews of other eyewitnesses such as court interpreter Cherilyn Varela, who was interviewed the day of the February 17, 2017 court hearing.  See Exhibit 30, at EOIR 1616.

77.     After the referral to OPR, ACIJ Nadkarni became a witness against Plaintiff but remained Plaintiff's direct supervisor until July 2019, the month in which OPR issued its draft report and ACIJ Nadkarni assumed a non-supervisory judge position in the Arlington court.

---

[5] The former EOIR Deputy Director is a white female in her fifties.  Upon information and belief, she left the Defendants' employ in 2019 or 2020.

78.     As a witness against Plaintiff, ACIJ Nadkarni provided OPR with an incomplete, inaccurate set of records from Plaintiff's personnel file, including the July 2016 counseling letter that she issued to Plaintiff.  Yet, she withheld the July 2016 counseling letter that she issued to the white female judge whom she faulted for escalating a conflict with Plaintiff to senior management. *See* Exhibit 30, at EOIR 7-8, Exhibit 2.

79.     ACIJ Nadkarni was interviewed by OPR investigative counsel sometime in 2018. Her testimony was used to support OPR's seriously flawed finding of judicial misconduct and lack of candor.  OPR, however, has flatly refused to release ACIJ Nadkarni's OPR interview transcript. *See* Exhibit 2.

80.     In August 2017, ACIJ Nadkarni issued a performance rating that again credited Plaintiff with satisfactory work performance but noted a deficiency in professionalism. The performance rating referenced the July 2016 counseling letter that she had issued to Plaintiff; however, it did not reference the counseling letter that he had issued to her white female colleague, which faulted that colleague for unprofessional behavior toward Plaintiff. *See* Exhibit 21.

81.     On August 29, 2017, Plaintiff received a Letter of Inquiry from OPR that directed her to respond to the two immigration bar attorneys' March 2017 complaints. *See* Exhibit 29.

82.     Plaintiff prepared a response to the OPR Letter of Inquiry while on extended work-related travel to Louisiana, where she did not have access to her counsel or her paper records or her courtroom audio-recordings.

83.     In November 2017, Plaintiff filed a 97-page written response to the OPR Letter of Inquiry. *See* Exhibit 30, at EOIR 124-220.  Thereafter, Plaintiff sat for a seven-hour interview with OPR investigative counsel on June 29, 2018. *See* Exhibit 30, at EOIR 349-770.

84.     In her November 2017 written response, Plaintiff documented the abuse of EOIR's Immigration Judge Complaint Resolution Program ("CRP") by which Plaintiff was referred to OPR for an investigation.  *See* Exhibit 30, at EOIR 806-810, 1308.  Plaintiff described the structural and Constitutional infirmities of the program and explained how litigants misused it to gain a litigation advantage over their opponents.  Using hearing records from the four court cases that OPR was investigating, Plaintiff showed that her referral to OPR for an investigation lacked sufficient predication, because the BIA had already affirmed her Recusal Orders in seven of the attorneys' cases.

85.     Soon thereafter, the BIA adjudicated an appeal in one of the four cases that OPR was investigating.  On January 2, 2018, the Board issued an order vacating Plaintiff's decision on the merits and remanded the case to another immigration judge for a new hearing.  *See* Exhibit 30, at EOIR 225-229.  According to the BIA, Plaintiff displayed unprofessional behavior toward Attorney Blessinger while conducting a February 17, 2017 court hearing.  The BIA found that Plaintiff had berated and screamed at Attorney Blessinger during an off-record exchange that lasted at least five minutes.  The BIA also found that Plaintiff unreasonably denied Attorney Blessinger's request for a break in the middle of her client's cross-examination.  *See id.*

86.     Plaintiff promptly filed a Motion for Reconsideration, asserting that the BIA's findings and conclusions were erroneous.  The BIA, however, denied the motion upon concluding that Plaintiff lacked standing to bring it.  *See* Exhibit 30, at EOIR 266-278.

87.     Plaintiff subsequently called OPR's attention to the BIA's erroneous January 2, 2018 decision.  After completing its investigation, OPR agreed that two of the BIA's findings were clear errors.  First ~~In particular,~~ OPR determined that Plaintiff did not berate and scream at Attorney Blessinger for five minutes during the off-record exchange, because the courtroom's

audio recordings indicated that Plaintiff went off-the-record for only 31 seconds. *See* Exhibit 30, at EOIR 305-306, 28. Second, OPR determined that Plaintiff did not mistreat Attorney Blessinger by denying her request for a recess in the middle of her client's cross-examination. OPR concluded that it was reasonable to make the attorney wait until after cross-examination was completed to take a break. *See id.,* at EOIR 28.

88.     Notwithstanding the clear errors, the Board's January 2, 2018 unpublished decision was swiftly dispatched to the news media. It was published in a news article on January 5, 2018. *See* Exhibit 26. The publication has caused much embarrassment and mental anguish to Plaintiff, because she has been unable to obtain its retraction or rescission. The publication of the errant January 2, 2018 decision has harmed Plaintiff's professional reputation and has impeded her ability to find another job. Moreover, the Defendants' eventual decision to terminate Plaintiff's employment rested, in part, on a mistaken belief that Plaintiff herself had disseminated the BIA's January 2, 2018 decision to the media. *See* Exhibit 1.

89.     In May 2018, Plaintiff amended her pending EEO complaint to add allegations of discrimination, retaliation for engaging in protected activity, and hostile work environment. The additional allegations asserted that Plaintiff's referral to OPR for an investigation in August 2017 and the BIA's January 2, 2018 decision were motivated by discriminatory and retaliatory animus. *See* Exhibit 3.

90.     After discovery in the EEOC action closed and in April 2019, Defendant EOIR moved for dismissal by summary judgment. *See* Exhibit 4.

91.     On July 22, 2019, while Defendants' Motion for Summary Judgment was pending before the EEOC, OPR issued a draft Report of Investigation after completing its two-year investigation of Plaintiff. As the draft Report cited, referenced, incorporated, or discussed

evidence that Plaintiff did not have, Plaintiff requested that OPR investigative counsel immediately release the full OPR investigative record, so that she could prepare a fulsome response to the draft Report. *See* Exhibit 2.   OPR investigative counsel denied the request, stating that OPR had not "designated" a Record of Investigation.   OPR counsel further stated that OPR does not release records of witness interviews. *See id.*

92.     On August 5, 2019, Plaintiff filed a request for release of information under the FOIA and Privacy Act.   This was Plaintiff's third FOIA request, and it was directed to the OPR FOIA Office.   The third FOIA request sought the full OPR record of investigative evidence.   It also requested expedited processing, citing as the reason the short time frame Plaintiff was given to respond to the draft OPR Report. *See* Exhibit 2.

93.     The OPR FOIA Office did not respond to Plaintiff's FOIA request until after the deadline for responding to the OPR Report had passed.

94.     Without access to the full OPR evidentiary record, Plaintiff filed a cursory response to the draft Report of Investigation on September 6, 2019, citing only evidence that was available to her at the time.   Her response strenuously objected to OPR's refusal to produce the full record of evidence. *See* Exhibit 1.

95.     On September 27, 2019, OPR issued a final Report of Investigation. *See* Exhibit 30, at EOIR 1-81.   The OPR Final Report quoted, referenced, or discussed the testimonies of 13 eyewitnesses whom OPR or EOIR had interviewed in the course of the two-year investigation. The 13 eyewitnesses included the two complaining attorneys; their attorney; Plaintiff's immediate supervisor; the Arlington court administrator; two government attorneys; three court interpreters; and at least one court security officer.

Of the 13 interviews, OPR released to Plaintiff only one interview transcript – Plaintiff's. *See* Exhibit 30, at EOIR 349-770.

96.     On October 4, 2019, OPR formally acknowledged receipt of Plaintiff's August 5, 2019 FOIA request.  OPR assigned the request a processing number but declined to expedite it. Between October 2019 and March 2020, OPR took no further action. *See* Exhibit 2.

97.     On October 8, 2019, Plaintiff was placed on administrative leave as a result of the OPR Report of Investigation.  She would remain on paid administrative leave until her removal on September 17, 2020.  During that time, Plaintiff attempted to find another job but was unable to do so, she suspects, because the BIA's January 2, 2018 decision had been published in the news media.

98.     Thereafter, and on February 26, 2020, the EEOC administrative judge granted Defendant EOIR's Motion for Summary Judgment without a hearing. *See* Exhibit 4.

99.     The day after the EEOC administrative judge dismissed Plaintiff's EEO complaint, Defendants proposed Plaintiff's removal from the career federal service.  The February 27, 2020 Notice of Proposed Removal was explicitly predicated on the OPR Final Report of Investigation. *See* Exhibit 1.

100.     Along with the Notice of Proposed Removal, EOIR released 1801 pages of documents that comprised the "EOIR Removal Record." *See* Exhibit 30.  The EOIR Removal Record, however, contained only four of the 13 interview transcripts or audio recordings referenced in the OPR Final Report.  Omitted from the EOIR Removal Record were the interview transcripts of the following nine individuals:

- Attorney Carmen Boykin, complaining attorney;

- Attorney Paul L. Knight;

- Deborah Castro, the Arlington Court Administrator;

- ACIJ Deepali Nadkarni;

- Thais Haller, a court Spanish interpreter;

- Olga Girola, a court Spanish interpreter;

- Thai Tran, government counsel;

- Julianna Bae, government counsel; and

- Dorcas Assuah, court security officer.

101.   On March 30, 2020, seven months after Plaintiff filed her August 5, 2019 FOIA request, OPR finally responded to the FOIA request and released 45 pages of documents.   OPR withheld 530 pages on a claim of exemption but did not provide a Vaughn Index.   *See* Exhibit 26. The 45 pages of record materials were not part of the 1801-page EOIR Removal Record.   As of today, OPR has continued to withhold the nine remaining OPR witness interview transcripts that it referenced, quoted, or discussed in the Final Report of Investigation.

102.   Without the full OPR record of evidence, Plaintiff was unable to provide a fulsome response to the EOIR Notice of Proposed Removal.   In her response filed with the Office of the Deputy Attorney General on May 12, 2020, Plaintiff argued that Defendants' refusal to release the full OPR record of evidence was a denial of due process and a violation of the CSRA's pre-termination procedures.   *See* Exhibit 1.

103.   On June 3, 2020, Plaintiff filed an appeal with the Justice Department's Office of Information Policy ("OIP"), requesting that it release the remaining records of the OPR investigation and provide a Vaughn Index, so that she could prepare for the July 16, 2020 pre-termination hearing.   OIP did not respond.   *See* Exhibit 2.

104.    Following the pre-termination hearing, Plaintiff submitted a Supplemental Response on August 11, 2020 that called out the most significant factual and legal errors in the OPR Final Report of Investigation.  The supplemental response also explained why the penalty of removal would be grossly disproportionate to the alleged misconduct, even if the charges against Plaintiff could be proven.  *See* Exhibit 1.  An accompanying 150-page compilation of documents shows that Plaintiff's white male colleagues routinely received preferential treatment on such matters as case assignment, court assignment, special work opportunities, promotion, retention, and discipline.  They had been subjects of misconduct complaints that were far more serious than what Plaintiff was charged with.  Yet, they received very lenient treatment.  They were not disciplined at all, let alone removed from federal service.  *See* Exhibit 28.

105.    On August 17, 2020, G. Bradley Weinsheimer, a career Associate Deputy Attorney General in the Office of the Deputy Attorney General, issued a decision proposing to terminate Plaintiff's 29-year employment with the Justice Department.[6]  The decision acknowledged that this was Plaintiff's first encounter with the attorney discipline process in nearly 29 years of employment.  It further acknowledged that Defendants failed to maintain a Table of Penalties and to keep complete records of disciplinary and adverse actions involving immigration judges. Nevertheless, the decision found that Plaintiff's removal from federal service was the most appropriate sanction.  The decision further acknowledged that Plaintiff was denied access to the full OPR record of evidence.  However, it concluded that Plaintiff suffered no resulting prejudice. *See* Exhibit 1.

---

[6] Upon information and belief, Mr. Weinsheimer is a white male in his fifties. Previously, he served as an associate counsel and deputy chief counsel in OPR.  He also served as Chief of Staff of the National Security Division from 2016 until July 2018, when he was promoted to the position of Associate Deputy Attorney General by then-Attorney General Jeff Sessions.

106.    On September 17, 2020, former Attorney General William Barr signed the proposed Removal Decision to indicate his concurrence.  *See* Exhibit 1.

## COUNT I:  Violations of the FOIA and Privacy Act
## for Failure to Make Records Available; Correction of Personnel Records

107.    Plaintiff repeats and realleges the factual allegations in the foregoing paragraphs 1 to 60 107, as if fully set forth herein.

108.    The FOIA statute confers on the district court sole and exclusive jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld."  5 U.S.C. § 552(a)(4)(B).

109.    Plaintiff seeks immediate disclosure of improperly withheld records that are responsive to her three FOIA and Privacy Act requests, filed in September 2015, January 2018, and August 2019, respectively.

110.    The three FOIA requests sought records that were exclusively within Defendants' custody and control.

111.    Defendants failed to process Plaintiff's three FOIA requests on a timely basis.

112.    Defendants failed to process Plaintiff's three FOIA requests on an expedited basis.

113.    In response to Plaintiff's September 2015 FOIA request, Defendant EOIR released a total of 100 pages of documents, on a rolling basis.  The last release was in August 2017.  EOIR asserted a general claim of privilege over the remaining documents, but it refused to identify the withheld records or provide a Vaughn Index.

114.    As Plaintiff would later discover, EOIR improperly withheld approximately 1,000 pages of documents that were responsive to her September 2015 FOIA request.  While taking an ethics training course, she came upon the 1,000 pages which were stored in an electronic folder labeled "BAIN FOIA 2015."  The folder was found in an EOIR shared drive that was mapped to

her office computer. Plaintiff promptly reproduced the 1,000 pages to EOIR during discovery in the EEOC action and expressed her intention to use the documents as evidence of the agency's discriminatory actions. A time-consuming, costly, and protracted discovery battle ensued.

115.    Initially, the EEOC administrative judge determined that she lacked the authority to compel EOIR's release of the "BAIN FOIA 2015" documents. However, after EOIR moved for sanctions in October 2018, the administrative judge determined that EOIR had failed to demonstrate that Plaintiff acted improperly or engaged in misconduct when she obtained and reproduced the documents in the "BAIN FOIA 2015" folder for use in the EEOC litigation. *See* Exhibit 2.

116.    Subsequently, in April 2019 the administrative judge determined that the "BAIN FOIA 2015" documents were not privileged, because any privilege that EOIR might have asserted had been waived by the posting of those documents on its shared drive, which was accessible by many EOIR employees. *See* Exhibit 2.

117.    Plaintiff brought the EEOC judge's determinations to OPR's attention. However, there is no indication in the Final Report of Investigation that OPR had considered any of the "BAIN FOIA 2015" documents.

118.    On February 26, 2020, the same date on which the EEOC administrative judge granted summary judgment to Defendant EOIR, she issued a Protective Order that covered the documents in the "BAIN FOIA 2015" folder. The Protective Order requires special handling to preserve EOIR's right to assert privilege over those documents. The Protective Order further states that the use of those documents is not restricted in any non-EEOC proceeding. *See* Exhibit 2. Accordingly, in this district court action, Plaintiff intends to use some – if not all – of the "BAIN FOIA 2015" documents as direct evidence of the agency's discriminatory and retaliatory motives.

119.   Plaintiff's January 2018 FOIA request sought substantially the same information as her September 2015 FOIA request.  In addition, it sought information relating to the BIA's January 2, 2018 decision finding that Plaintiff manifested improprieties in conducting the February 17, 2017 court hearing.  *See* Exhibit 2.

120.   In response to the January 2018 FOIA request, Defendant EOIR released 34 pages of non-responsive records.  After Plaintiff appealed to the OIP, EOIR released additional records that were not responsive.   EOIR asserted a general claim of privilege over the remaining documents, but it refused to identify the withheld materials or provide a Vaughn Index.  *See* Exhibit 2.

121.   Plaintiff's August 5, 2019 FOIA request sought release of the entire compilation of OPR investigative evidence.  *See* Exhibit 2.

122.   In response to the August 5, 2019 FOIA request, OPR released 45 pages of documents.  It withheld the remaining 530 pages on a general claim of exemption but failed to provide a Vaughn Index.  The 45 pages of documents that OPR released to Plaintiff were not included in the EOIR Record of Removal.  *See* Exhibit 26.  Thus, at the time of Plaintiff's removal from federal service in September 2020, OPR had continued to withhold nine of the 13 witness interview transcripts or records that OPR cited, discussed, or incorporated into its draft and final Reports of Investigation.

123.   Plaintiff has exhausted all administrative remedies available to her under the FOIA and Privacy Act, with respect to the three FOIA requests filed in September 2015, January 2018, and August 2019.

124.     Plaintiff has a legal right under FOIA and the Privacy Act to obtain the requested records, and there exists no legal basis for Defendants to refuse to promptly identify and make the records available to Plaintiff.

125.     Defendants' failure to promptly identify and release the requested records to Plaintiff violates the FOIA statute.  *See* 5 U.S.C. § 552(a)(3)(A).  *See also* Bartko v. U.S. Department of Justice, 898 F.3d 51 (D.C. Cir. 2018), and Jefferson v. U.S. Department of Justice, 284 F.3d 172 (D.C. Cir. 2002) (holding that DOJ is legally obligated to release records of OPR investigations to a first-party requestor, where the information was not compiled for law enforcement purposes but rather for managerial-supervision purposes).

126.     Through the first cause of action, Plaintiff also challenges Defendants' willful failure to correct her personnel records.  Because they remained uncorrected, the use of those records in subsequent adverse personnel actions has harmed her professional reputation; deprived her fair consideration of her claims; and ultimately robbed her of her well-earned right to continued employment.

127.     This Court has authority to order Defendants to correct Plaintiff's personnel records.

128.     The records ACIJ Santoro created contained numerous errors that he refused to correct.  They included the March 2015 reprimand letter, the June 2015 counseling letter, and the August 2015 performance rating.  *See* Exhibits 14, 17, and 18 (all filed under seal, exempt from disclosure under FOIA Exemption).  OPR relied on them to find professional misconduct, even though they predated OPR's investigation and bore no relevance to the Knight complaint allegations.  *See* Exhibit 30, at EOIR 7 n. 13.

129.    The personnel records that ACIJ Nadkarni generated contained information that she knew was false. She had deliberately created the conflict situation for which she criticized Plaintiff in the July 2016 counseling letter. She had directed a white female judge to schedule hearings directly on Plaintiff's hearing calendar, causing numerous scheduling conflicts. When Plaintiff requested that her colleague take back the cases, ACIJ Nadkarni issued a counseling letter threatening to terminate Plaintiff's employment. *See* Exhibit 19 (filed under seal, exempt from disclosure under FOIA Exemption 6).

130.    ACIJ Nadkarni then incorporated Plaintiff's July 2016 counseling letter into an October 2016 and an August 2017 performance rating. OPR used the ratings to support its finding of judicial misconduct, even though they bore no relevance to OPR's investigation. *See* Exhibit 30, at EOIR 7-8.

131.    This Court may exercise its authority under the Privacy Act to correct agency adjudicatory records, such as the BIA's January 2, 2018 decision. The BIA found that Plaintiff went off-the-record for at least five minutes to berate and bully Ms. Blessinger, but OPR determined that the off-record time was only 31 seconds. The BIA found that Plaintiff abused her judicial authority when she denied Ms. Blessinger a break. OPR, however, determined that it was reasonable to make Ms. Blessinger wait until the conclusion of her client's cross-examination. Since these material errors of fact are prejudicial, the BIA's decision should be rescinded and remanded for a new decision, taking into consideration the record of evidence in this district court proceeding.

132.    This Court also has authority to rescind the OPR Report of Investigation. The Report fails to apply correct courtroom procedures and practices. OPR also overlooks the peculiarities of an immigration law practice and the adversarial nature of immigration court

hearings which often require diligent and resourceful courtroom management. Upon finding that Plaintiff did not knowingly violate the Immigration Judges' Ethics Guide (a code of ethics for immigration judges), OPR defaults to the two rules of professional responsibility that it usually applies to DOJ attorneys, Model Rules 8.4 and 4.4. Those rules, however, do not govern the work of immigration judges because they are quasi-judicial decision-makers, not advocates. The misapplication of Model Rules 8.4 and 4.4 yields misconduct findings having ill-fitting rationales that cannot be reconciled with federal court case law. *See, e.g.*, Liteky v. United States, 510 U.S. 510 (1994); Hassan v. Holder, 640 F.2d 915 (6th Cir. 2010) (court of appeals rejected a similar claim of judicial bias and misconduct filed against a female judge of color).

133.    OPR's fact findings are flimsy and deficient. The Report of Investigation is full of conjectures and speculations that bend the arc of truth toward a miscarriage of justice. Typical background noises are skewed as improprieties. The sound of keystrokes transforms into chuckling. Throat clearing becomes inappropriate laughter. Questions abound about the significance of lips pursing and eyes rolling. By asking leading, suggestive questions, OPR deduces demeanor evidence that is shockingly insulting and denigrating, while downplaying conflicting testimonies of eyewitnesses whose interview transcripts it would not release.[7]

---

[7] Of court interpreter Cherilyn Varela, OPR counsel asked:

- What made you feel the tension? Was it anything about their tone of voice? Was it their – (EOIR 1617).

- Did you notice -- let me ask you this, did you notice anything else about -- besides Judge Bain's voice sounding angry and being a little elevated, did you notice anything else about her physical demeanor? Like, did she, did she roll her eyes? Did she make any facial expressions? Did she make any, you know, like – (EOIR 1618).

- How did that strike you, Judge Bain imitating what Ms. Blessinger was saying? Did you think that that was appropriate or inappropriate, or did you think it was sort of mocking or belittling or just maybe a little bit – (EOIR 1620).

134.    OPR makes no pretense of reconciling the conflicting witness testimonies. Inconvenient testimony is discarded.   Countervailing evidence *is* picked apart and dismissed. Against this backdrop, it is easy to appreciate how innocuous comments are blown up into verbal assault of epic proportions, so egregious that they warrant the most severe discipline possible.

135.    OPR's lack-of-candor finding also rests on pure speculation and unwarranted assumptions.   OPR lowered the standard of proof for itself, requiring only a finding that Plaintiff "knew or should have known" the information she conveyed was false.   This objective standard is ill-suited to a "lack of candor" finding.   The former requires only a false statement.   The latter demands actual knowledge of the falsity of the statement and an intent to deceive.

136.    Plaintiff did not falsely accuse the Nossaman law firm of representing the Government of Iran.   Her reasonable belief rested on the firm's profile, which boasted of having represented individuals from North Korea and Iran who faced criminal prosecution for violating export controls and sanctions regimes.   *See* Exhibit 23.   Plaintiff believed the statement was true when she made it.   Her point was that Mr. Knight was neither an administrative judge nor an immigration practitioner; he was not well-positioned to the task of disqualify Plaintiff from hearing Blessinger and Boykin cases.   In any event, Mr. Knight suffered no reputational injury.   The

---

Of Mr. Ahumada, OPR counsel asked:

> Q:    Is there any chance that, you know, what you perceived as her pursing her lips, for example, was simply her trying to moisten them? . . . Moisten them, like my lips are dry, I'm trying to –
>
> A:    Sure. I mean, I understand how that could be perceived, or could come across, or that could be an option, but it was one of those where you were very -- it's not where you're trying to moisten your lips and like put the lips on the inside of your mouth, it's more so like your lips are still on the exterior and you're clenching them very tightly to the point where there's like little wrinkles on your lip, you know, like – (EOIR 1638).

36

Removal Decision acknowledges that representing a foreign government is not prohibited by law, so the point is moot.

137.    Plaintiff did not falsely accuse Ms. Boykin of bankruptcy fraud.  Available public source information connects Ms. Boykin to a 2013 bankruptcy proceeding.  *See* Exhibit 23. Plaintiff did not hide this information from OPR.  She did not confess error during the OPR interview because, at the time, she was not sure that she had erred.  *See* Exhibit 30, at EOIR 660- 665.  Since there was a reasonable factual basis for the statement, Plaintiff violated no code of conduct in using the bankruptcy information as impeachment evidence or to discredit Ms. Boykin. *See* Fed. R. Evid. 806 & 608.  Furthermore, the information had limited impact.  It was disseminated through Recusal Orders issued in 19 cases, and those orders were not published.  *See* Exhibit 25.  Finally, Ms. Boykin suffered no prejudice.  OPR ultimately rejected her misconduct complaint, finding that Plaintiff did not manifest hostility or improper bias toward Ms. Boykin during the February 16, 2017 hearing.  *See* Exhibit 30, at EOIR 79 n. 607.

138.    Plaintiff did not falsely accuse Ms. Blessinger of unethical behavior.  She used publicly available information to discredit Ms. Blessinger's complaint of judicial misconduct. According to a March 2017 Washington Post article, Ms. Blessinger filed a complaint against a bail bonding company that she claimed charged her clients excessive fees.  The Department of Homeland Security investigated the complaint that but found no wrongdoing.  Ms. Blessinger then pursued the same complaint with Fairfax County Police; however, that authority declined to investigate.  *See* Exhibit 23.  Though ODAG claims that others had complained as well, that is beside the point.  The news article speaks for itself.  It was reputational evidence, and its use was permissible under Fed. R. Evid. 806 and 608.

37

139.    Plaintiff did not falsely accuse Mr. Ahumada of having an ulterior motive for testifying against her. His motive was a relevant consideration in her adjudication of the recusal motions, and Plaintiff really did have that belief. The February 17, 2017 court hearing was the very first court hearing Mr. Ahumada attended, and it was also his last. Two weeks after the hearing, he executed a sworn affidavit that was used to disqualify Plaintiff from all Blessinger and Boykin cases. During her OPR interview, Ms. Blessinger admitted that she was upset with Plaintiff's handling of her client's case, and that, going into the February 17, 2017 hearing, she was prepared to confront Plaintiff if she had to, to make a record for appeal. *See* Exhibit 30, at EOIR 1514-1517, 1536. From that admission a reasonable inference can be drawn that Mr. Ahumada's presence as an eyewitness that day was not coincidental. It served to buttress Ms. Blessinger's contentions on appeal.

140.    This Court has authority to rescind the Attorney General's Removal Decision on the following grounds.

141.    The Removal Decision misapplies the law governing the work of immigration judges. It ignores the presumption of impartiality that is accorded to administrative judges. It wholly overlooks commonly applied court rules and the recusal procedure in OPPM 05:02. In fact, the Decision cites not a single immigration statute, regulation, or policy. Completely divorced from the immigration court context, it makes no attempt to balance the immigration judge's interest in maintaining decorum and order in the courtroom, against the litigant's interest in having his day in court.

142.    As OPR concluded, Plaintiff did not knowingly or intentionally violate the Immigration Judges' Ethics Guide. The Removal Decision thus defaults to two rules of professional responsibility that OPR typically applies, Model Rules 8.4 and 4.4. Even then, the

rules are inapplicable to this situation. Mr. Weinsheimer admits that Plaintiff's conduct implicated, but did not necessarily violate, some of the rules. But rather than dismissing the charges of removal, he presses forward with a finding that Plaintiff's conduct – whether or not violative of Rules 8.4 and 4.4. – was misconduct so outrageous it warranted her removal from federal service.

143.    The <u>Douglas</u> factors weigh against terminating Plaintiff's otherwise exceptional 29-year career with the Justice Department. EOIR had not kept complete and accurate records of disciplinary actions against immigration judges. There is no Table of Penalties to ensure uniformity. The eight anonymized scenarios of immigration judge discipline bear this out. Though the precise contours of those cases are unknown, none of the judges was removed.

144.    Defendants tethers the Removal Decision to one particular case involving an EOIR senior executive who was not an immigration judge. He was terminated for sexually abusing his co-workers, demanding favors and gifts from subordinates, and seeking *quid pro quo* treatment from contractors. Defendants' reliance is misplaced. Plaintiff's situation is not analogous, and drawing an analogy – as Mr. Weinsheimer did – is highly insulting. Plaintiff was a public servant of 29 years. She labored for each day's wages and spoke the truth even when it was unpopular. She excelled in her job because she was dedicated and worked hard at it. She earned her stripes honestly, building a solid reputation among her peers as someone who goes the extra mile and gets the job done. She treats others with kindness. She does not need adulation or admiration. It is enough that people know she is conscientious, decent, and fair. *See* Exhibit 16.

145.    The termination of Plaintiff's 29-year DOJ career speaks volumes about discriminatory treatment of women of color at DOJ. White male judges over 40 years of age who have engaged in far more serious misconduct have remained on the bench, drawing their full pay

and employment benefits even when they are investigated. Female judges of color, on the other hand, have suffered unjustifiable denials of accommodations, leave, fair evaluations of their work performance, work opportunities, and career advancement. *See* Exhibit 22.

146.   In Plaintiff's case, the penalty of removal is grossly disproportionate to the penalties imposed on other immigration judges. OPR statistics indicate that, in the past ten years, no immigration judge has been discharged for failing to maintain impartiality, displaying improper demeanor, or using impeachment evidence that turned out to be wrong. Even when such misconduct is established, the sanction imposed is relatively lenient, ranging from oral counseling to light suspension. *See* Exhibit 22. When viewed against this backdrop, the penalty of removal raises the specter of discrimination simply because it is so disproportionate. *See* Exhibit 22.

147.   If not corrected, Plaintiff's personnel records will continue to impede her ability to find new employment in the federal government or in the private sector. Plaintiff's termination has already caused irreparable harm: Her health insurance coverage and her life insurance coverage of the past 29 years were cut off in the midst of the raging covid-19 pandemic. In addition, she stands to lose approximately six years of retirement pension payments and associated benefits. She also will have to expend additional resources, time, and money on fighting disciplinary bar proceedings that are premised on grounds so weak even the Defendants hesitate to sustain them.

<u>**COUNT II: Discrimination, Retaliation for Protected Activity, and Hostile Work Environment**</u>

148.   Plaintiff repeats and realleges the factual allegations in the foregoing paragraphs 1 to 147, as if fully set forth herein.

**Past and Continuing Discrimination**

149.   Plaintiff's removal from the federal service was the direct result of past and continuing discrimination that began in January 2015 and ended with her removal in September 2020.  By undertaking a series of discriminatory "materially adverse actions" during that time period, Defendants laid the groundwork for her removal.  These discriminatory adverse actions are described in preceding Paragraphs 6 to 106.  They are summarized below.

150.   The March 2015 reprimand letter, June 2015 counseling letter, and August 2015 performance ratings contained significant factual errors that EOIR managers refused to correct.  In 2015, EOIR used these personnel actions to justify denying Plaintiff's second request for a reassignment to the Arlington Immigration Court.  As a result, Plaintiff's medical condition was exacerbated by the continuing use of frequently malfunctioning videoconference equipment.

151.   The July 2016 counseling letter and September 2016 performance rating were discriminatory and retaliatory personnel actions that Defendants undertook to punish Plaintiff for pursuing the December 2015 EEOC action.  They exacerbated her medical condition by requiring her to handle an extremely heavy caseload as compared to her white colleagues' caseloads, and to suffer their abusive case dumping practices.

152.   The January 2017 release of privacy-protected information from Plaintiff's personnel file to AILA, and the inclusion of that information in the AILA attorneys' March 2017 complaints, constituted retaliation for Plaintiff's pursuit of legal redress for the discrimination through her EEOC action.  The release of privacy-protected information caused emotional distress for Plaintiff, triggering fears about misuse of the leaked information, and heightening undeserved scrutiny of her work performance and conduct.

153.   Plaintiff's referral to OPR for an investigation in August 2017 was improperly predicated on the questionable, false claims of EOIR's former Deputy Director.  As a result,

Plaintiff had to devote an enormous amount of time, energy, and money to defending herself against the charges and to dealing with the fall-out.

154.    EOIR's discriminatory motive was manifested throughout the OPR investigation. A time-consuming, costly, and protracted discovery battle it orchestrated in the EEOC litigation prevented Plaintiff from using approximately 1,000 pages of documents stored the shared drive folder "BAIN FOIA 2015." Although the documents were accessible by many EOIR employees, EOIR falsely accused Plaintiff of hacking into the shared drive, stealing the information, and replicating it for use in her EEOC action. Ultimately, the administrative judge determined that Plaintiff did not improperly access the "BAIN FOIA 2015" folder, and that any privilege EOIR could have asserted over those documents had been waived. *See* Exhibit 2. The protracted discovery dispute, in turn, prevented proper factual development in the EEOC action, allowing EOIR to move for summary judgment as soon as discovery closed.

155.    EOIR's deliberate concealment of adverse evidence in the EEOC action contributed to its dismissal by summary judgment. The evidence EOIR withheld included the BIA's decisions affirming Plaintiff's Recusal Orders in seven cases. Those documents created a genuine dispute of material fact concerning the propriety of Plaintiff's Recusal Order. Because that key piece of evidence was withheld, the administrative judge was left with the mistaken impression that Plaintiff's Recusal Order was so highly improper that it would justify an OPR investigation.

156.    Similarly, EOIR's failure to divulge key evidence to OPR skewed the investigation in its favor. The OPR Report was predicated on the highly improper, misleading claim of the former EOIR Deputy Director that Plaintiff's Recusal Order warranted an investigation. Had she disclosed the BIA's affirmance of the Recusal Order in seven cases, OPR would have been hard pressed to justify the investigation.

42

157.    In the end, the misplaced OPR investigation, which was motivated by discriminatory and retaliatory animus, cost Plaintiff her job, left her without health or life insurance in the midst of the raging COVID-19 pandemic, irreparably damaged her professional reputation, and diminished her future employment prospects.

### New Claim of Discrimination

158.    Plaintiff further asserts that her removal from federal service in September 2020 is a discrete, new act of discrimination that violates federal anti-discrimination statutes, as well as the Whistleblower Protection Act.   She properly raised this new claim of discrimination and whistleblower retaliation to the Office of the Deputy Attorney General through her May 12, 2020 Response and August 11, 2020 Supplemental Response to the Notice of Proposed Removal.   *See* Exhibit 1.

159.    Regarding the new claim of discrimination, the materially adverse actions described above are also discriminatory "prohibited personnel practices" that contributed to Plaintiff's removal.   Defendants undertook those discriminatory personnel practices for the purpose of ousting Plaintiff from the Arlington Immigration Court and replacing her with an external white male immigration judge candidate whom Defendants favored.   *See* 5 U.S.C. §§ 2302(b)(8) & (9).   Below is a summary of those discriminatory personnel practices.

160.    In March 2015, the judge candidate, Vance Spath, submitted his first immigration judge application to EOIR, at a time when there was no vacancy in the Arlington Immigration Court.   That same month, Plaintiff received a reprimand from her supervisor for intemperate behavior.   The reprimand effectively barred her from obtaining a reassignment to the Arlington court for three years. *See* Exhibit 21.

161.     In November 2015, Vance Spath resubmitted his application after a vacancy was announced. That month, Plaintiff learned that her request for a reassignment to the Arlington court was denied, as was her application for a Board Member position. *See* Exhibit 21.

162.     In March 2017, the judge candidate was offered an immigration judge position in the Arlington Immigration Court, at a time when courtroom space was insufficient to accommodate him. That same month, two immigration bar attorneys filed a complaint of improper conduct with Plaintiff's supervisor, alleging that Plaintiff's treatment of them warranted an investigation. *See* Exhibit 21.

163.     In June 2018, former Attorney General Jefferson Sessions appointed Vance Spath to the Arlington Immigration Court. That month, Plaintiff sat for a hostile, seven-hour interview with OPR investigative counsel and was later found to have lacked candor in answering two questions. *See* Exhibit 21.

164.     In September 2018, Vance Spath was invested as an immigration judge on the same day that Attorney General Sessions resigned. The new judge began his employment in the Arlington Immigration Court. He was assigned his own courtroom, while Plaintiff had to share her courtroom with one or two other female judges. *See* Exhibit 21.

165.     In April 2019, a federal court of appeals determined that the new judge had violated the rules of judicial ethics and professional responsibility, in the manner in which he pursued his immigration judge appointment. While pursuing the appointment, the judge presided over a military commission trial in which Justice Department lawyers from the National Security Division served as prosecutors, and the judge refused to disclose his immigration judge application to defense counsel, despite being asked to do so. To remedy this serious ethical violation, the court

of appeals tossed the judge's rulings going back four years, to the time when he first began pursuing an immigration judge position in March 2015. *See* Exhibit 21.

166.    Despite this very serious ethical breach, Vance Spath's employment was not terminated while he was still on probation. Instead, in September 2020, after he completed his two-year probationary term, Defendants terminated Plaintiff's employment after 29 years of exemplary public service to the Justice Department.

167.    The discriminatory and retaliatory personnel practices that Defendants undertook over the course of those five years directly resulted in Plaintiff's removal. She was replaced by an external white male judge candidate who, by Defendants' admission, had virtually no prior immigration practice experience when he was appointed an immigration judge. *See* Exhibit 21. That the new judge was not discharged – and, indeed, was subsequently promoted to a supervisory position – after a federal court of appeals found that he violated the rules of ethical and judicial conduct further underscores the disparate and discriminatory hiring, promotion, disciplinary and retention practices at EOIR.

## COUNT III:  Whistleblower Retaliation

168.    Plaintiff repeats and realleges the factual allegations in the foregoing paragraphs 1-167, as if fully set forth herein. Plaintiff's claim of whistleblower retaliation is based on the following allegations of discriminatory "prohibited personnel practices" that Defendants undertook to punish Plaintiff for making disclosures of violations of law; gross mismanagement; and fraud, waste, and abuse. The disclosures directly contributed to her removal in September 2020.

169.    In March 2015, Plaintiff objected to a work assignment that would have caused her to violate the law governing immigration detention.

45

170.    At the time, Plaintiff was detailed to the York, Pennsylvania Immigration Court and was to conduct hearings in over 100 aged, detained cases by tele-videoconference.  Most of the cases involved detainees who had been detained for three to four years pending completion of their court proceedings.  After they were denied bond hearings, many detainees filed habeas corpus petitions seeking immediate release from immigration custody.

171.    When Plaintiff expressed concern about the heightened litigation risks that prolonged detentions without bond hearings presented to the agency as well as to Plaintiff, her supervisor (ACIJ Santoro) retaliated by issuing a March 2015 reprimand that criticized her for displaying intemperate behavior toward him.  The reprimand was effective for a period of three years, and it barred Plaintiff from obtaining a reassignment to the Arlington Immigration Court's non-videoconference docket.  The reprimand forced Plaintiff to continue hearing aged, detained cases out of the York Immigration Court, using dated tele-videoconference equipment that frequently malfunctioned and caused her to suffer migraine headaches.

172.    Within a month of the disclosure to her supervisor, EOIR replaced failing videoconference equipment in her courtroom.  The new equipment, however, also failed because of deficient infrastructure.  Plaintiff then received authorization to travel to the York Immigration Court to conduct her assigned court hearings in person.  However, in June 2015 her supervisor issued a counseling letter accusing Plaintiff of traveling without his permission.  He revoked the travel authorization that Plaintiff had received from other EOIR personnel, which resulted in Plaintiff being denied approximately $400 in travel expense reimbursement.

173.    After OPR commenced an investigation of Plaintiff on unrelated charges, Defendants retaliated against her by providing the March 2015 reprimand and June 2015 counseling letter to OPR.  The OPR Final Report cited those personnel actions as evidence of

46

Plaintiff's alleged tendency toward insubordination and lack of professionalism.  Thereafter, the former EOIR Director[8] used the March 2015 reprimand and June 2015 counseling letter to propose her proposed removal.

174.    In July 2016, Plaintiff voiced concern about the abusive case assignment practices that her next supervisor (ACIJ Nadkarni) employed.  The supervisor had transferred fifteen-to-twenty-year-old, problematic cases from the dockets of white male judges to Plaintiff's docket and required Plaintiff to expeditiously complete those cases.  The supervisor also allowed other non-supervisory judges to dump their unwanted cases on Plaintiff's docket, which caused numerous scheduling conflicts.  Finally, the supervisor assigned Plaintiff two to three times the number of new cases as she assigned to other judges.

175.    When Plaintiff expressed concern about her unsustainable workload, the supervisor issued a July 2016 counseling letter that criticized Plaintiff for sending an email to another judge, demanding that the other judge stop scheduling court hearings directly on Plaintiff's hearing calendar.  The counseling letter threatened to terminate Plaintiff's employment.  The counseling letter was then used to justify a downgrade of her October 2016 and August 2017 performance ratings.  It was released to AILA in January 2017, which *cited* the counseling in the two attorneys' March 1, 2017 complaint filed with Plaintiff's supervisor.

176.    After Plaintiff amended her EEO complaint in May 2018 to oppose these gross and abusive management practices, EOIR officials changed the regulation concerning case assignment.  The new regulation provides that only the EOIR Director or the Chief Immigration Judge may direct the deferral of adjudication of any case or cases by an immigration judge.  *See* 8 C.F.R. 1003.10(b) (2019).  It augments a pre-existing regulation that limited case reassignments among

---

[8] The former EOIR Director was a white male in his forties.

sitting judges to circumstances such as disability, retirement, or death of the originally assigned judge.

177.    Notwithstanding the regulatory change, EOIR continued to use the disingenuous August 2016 counseling letter to justify Plaintiff's removal.  The counseling letter was released to OPR, which used the letter to support its finding of improper courtroom conduct.[9]  The EOIR Director cited the counseling letter to propose Plaintiff's removal and in moving for summary judgment in her EEOC action.  The Office of the Deputy Attorney General also cited the counseling letter as justification for her removal.

178.    In February 2018, Plaintiff objected to her supervisor's (ACIJ Nadkarni's) instruction that she grant relief in several pending cases, against her best judgment.  Plaintiff's objection rested on the regulation at 8 C.F.R. 1003.9 (2018), which prohibits a supervisory judge from dictating case outcomes to subordinate judges.  When the supervisor continued pressuring Plaintiff to grant relief, Plaintiff copied EOIR senior management on the email correspondence. In her email, Plaintiff objected to the supervisor's interference with her work, and asked that the supervisor respect her decisional independence.

179.    Soon thereafter, EOIR revised the regulation to make it clear that a supervisory judge may not dictate case outcomes to a line judge.  A new regulation at 8 C.F.R. 1003.10 (2019)

---

[9] Throughout the two-year OPR investigation, Plaintiff apprised OPR counsel of developments in her EEOC case, to the extent they were relevant to the OPR investigation.  For example, Plaintiff called OPR counsel's attention to the illegal disclosure of privacy-protected information from her personnel file to AILA two months before the filing of the immigration attorneys' March 2017 complaint with Plaintiff's supervisor.  In response, OPR investigative counsel stated that the unauthorized disclosure was not harmful to Plaintiff, because in conducting the investigation, OPR had to consider that information anyway.  In 2018, Plaintiff advised OPR counsel that she had located the "BAIN FOIA 2015" documents in the agency's shared drive and asked that OPR counsel examine those documents for evidence of discrimination and retaliation. There is no indication in the OPR Final Report of Investigation that OPR counsel did so.

provides that in deciding the individual cases before them, "immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases." *Id.*

180.    Notwithstanding the regulatory change, EOIR used Plaintiff's February 2018 email communication with the supervisor to justify her removal.  A copy of that email was provided to OPR, which quoted the email out of context to support its finding of insubordination.  The former EOIR Director referred to the email in his affidavit supporting the agency's Motion for Summary Judgment in the EEOC action.  Based on that affidavit and other evidence EOIR provided, the EEOC concluded that Plaintiff had failed to show that her supervisors' actions were motivated by discrimination or retaliation.

181.    In November 2017, Plaintiff disclosed to OPR her concerns about EOIR's Constitutionally infirm Immigration Judge Complaint Resolution Program.  Plaintiff disclosed the structural flaws in the program that litigants exploited to their advantage.  Using statistical evidence, she described how the program encouraged dissatisfied litigants to engage in judge shopping, by misusing the recusal procedure to obtain immediate disqualification of a disfavored judge.

182.    As a result of this disclosure, EOIR immediately revamped its process for investigating misconduct complaints.  The first draft of the new immigration judge complaint resolution protocol was circulated in November 2017.  The second draft was published in April 2018.  As of today, EOIR has not implemented a final version of the new complaint resolution protocol.

183.   This disclosure by Plaintiff to OPR apparently triggered another disclosure:  The Justice Department's view on *ex parte* communications between immigration judges and litigants. On October 8, 2019, the Justice Department's Professional Responsibility Advisory Office ("PRAO") issued an advisory opinion that contradicts EOIR's April 2018 version of the complaint resolution protocol.  According to the PRAO advisory opinion, an *ex parte* complaint of judicial misconduct filed with a supervisory immigration judge should be disclosed to the judge who is the subject of the complaint, as well as to the opposing party, as soon as practicable.  According to PRAO, this would disincentivize the use of *ex parte* complaints by immigration court litigants to gain an unfair advantage over their opponents.

184.   Defendants' response to Plaintiff's disclosure of this abuse of process was to ignore it.  OPR concluded that Plaintiff exhibited poor judgment in asking the court administrator to testify about her *ex parte* communication with Attorney Blessinger, even though it triggered Plaintiff's disclosure obligation under the Immigration Judges Ethics Guide and the PRAO advisory opinion.  The EOIR Director ignored the PRAO advisory opinion and found that Plaintiff engaged in "conduct unbecoming an immigration judge" when she asked the court administrator to testify about the *ex parte* communication.  In the Removal Decision, the Associate Deputy Attorney General did, too.

185.   As described above, Plaintiff's protected disclosures effectuated meaningful changes in EOIR regulation, policy, and practices.  However, rather than crediting Plaintiff with the improvements, EOIR terminated her employment in retaliation for the disclosures.

## **Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court award the following declaratory and injunctive relief:

## Count I:  Violation of the FOIA and Privacy Act

186.    Declare that Defendants violated the FOIA by failing to identify the requested information and materials;

187.    Declare that Defendants violated the FOIA by unlawfully withholding the requested information and materials;

188.    Declare that Plaintiff has a legal right to access the entire OPR record of investigative evidence, including all OPR witness interview records that are cited, discussed, or incorporated into the OPR Final Report of Investigation;

189.    Declare that the approximately 1,000 pages of documents that were stored in the agency's shared drive, in a folder labeled as "BAIN FOIA 2015," are admissible in this district court action and may be used in any related judicial or administrative proceeding;

190.    Order Defendants to release immediately the requested information and materials to Plaintiff in a suitable format without charge for any search or duplication fees.  In the alternative, provide for expedited proceedings to adjudicate Plaintiff's rights under the FOIA and Privacy Act;

191.    As to any requested information and materials responsive to Plaintiff's requests that Defendants wish to withhold or redact as being exempt from disclosure, Order Defendants to provide Plaintiff with an itemized, indexed inventory thereof, accompanied by a statement of justification explaining each such withholding or redaction, in accordance with the requirements of Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974);

192.    Award Plaintiff her reasonable costs and attorneys' fees;

## Count II:  Discrimination

193.    Declare that Plaintiff has a due process right under the Fifth and Fourteenth Amendments to be from interference in the discharge of her duties.

194.    Declare that Defendants' materially adverse personnel actions injured Plaintiff's liberty or property interest in her continued employment, and that they also interfered with the lawful discharge of the duties of her office. *See* 42 U.S.C. § 1985(1).

195.    Declare that Defendants committed harmful errors in arriving at the September 17, 2020 Removal Decision, in violation of 5 U.S.C. §§ 7701(c)(2)(A) & (C), 7701(c)(3).

196.    Declare that Defendants have not proven the charges by a preponderance of the evidence, and that they improperly weighed the Douglas mitigating and aggravating factors;

197.    Declare that Plaintiff experienced severe discrimination and retaliation for engaging in protected EEO activity as well as a hostile work environment, in violation of anti-discrimination statutes.

198.    Declare that Defendants evaluated Plaintiff's performance and conduct in a discriminatory and retaliatory manner, and that the records of such personnel evaluations contain significant mistakes of fact requiring correction;

199.    To remedy the substantial interference with Plaintiff's Constitutional and statutory rights in her employment:

a.    Order the rescission and sealing of the Attorney General's September 17, 2020 Removal Decision.

b.    Order the rescission and sealing of OPR's draft Report of Investigation and Final Report of Investigation;

c.    Order the rescission of the BIA's erroneous January 2, 2018 decision and its retraction from all internet and media outlets.

d.    Order correction of the errors in Plaintiff's official personnel file, performance rating files, and similar record files in a manner consistent with 5 U.S.C. § 552a. The

personnel actions that require correction include the March 2015 reprimand, June 2015 counseling letter, August 2015 performance rating, July 2016 counseling letter, October 2016 performance rating, and August 2017 performance rating.

200.    Award Plaintiff reasonable attorneys' fees, costs, and other consequential damages;

201.    Award Plaintiff compensatory damages for pain and suffering, emotional distress, damage to professional reputation that resulted from Defendants' discriminatory employment actions between March 2015 and September 2020, to include full back pay, interest, and loss of employment-related benefits;

202.    Award compensatory damages for the mental anguish and public humiliation that Plaintiff has suffered as a result of the public dissemination of the January 2, 2018 BIA decision.

### Count III:  Whistleblower Retaliation

203.    Declare that Plaintiff experienced severe and discriminatory retaliation for engaging in protected whistleblower activity, and that her protected disclosures contributed to her discharge on September 17, 2020, in violation of the Whistleblower Protection Act.

204.    Award Plaintiff her reasonable costs and attorneys' fees;

205.    Award Plaintiff compensatory damages for pain and suffering caused by the severe harassment and retaliation that she experienced on account of her protected disclosures;

206.    Reinstate Plaintiff to the position she held before her removal, or, in the alternative, reassign her to a comparable position at the same pay level and in the same commuting area.

207.    Any other relief as the Court deems just and proper.

Dated:  September 17, 2021

Respectfully submitted,

Quynh Vu Bain
Plaintiff, *pro se*
213 Third Street, SE
Washington, DC  20003