## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

QUYNH VU BAIN,

       *Plaintiff*,

  v.

OFFICE OF THE ATTORNEY GENERAL,
*et al.*,

       *Defendants*.

Civil Action No. 21-1751 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiff Quynh Vu Bain, proceeding *pro se*, is an Asian-American woman of Vietnamese descent and former Immigration Judge who was removed from her position on September 17, 2020. Dkt. 16 at 2 (Am. Compl. ¶ 2). She now brings this lawsuit against various components of the Department of Justice ("DOJ" or "Defendants").[1] *Id.* at 2–3 (Am. Compl. ¶ 4). She asserts a litany of claims, alleging violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.* and the Privacy Act of 1974, 5 U.S.C. § 552a, as well as race, sex, age, national origin, and disability discrimination, retaliation, and hostile work environment claims in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), the

---

[1] These components are: the Office of the Attorney General, the Office of the Deputy Attorney General, the Office of Professional Responsibility, the Executive Office for Immigration Review, and the Office of Information Policy. Dkt. 16 at 2–3 (Am. Compl. ¶ 4). The parties are hereby **ORDERED** to meet and confer regarding whether the Attorney General should be substituted as the proper defendant with respect to Bain's discrimination claims or any other of her claims.

Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the Whistleblower Protection Act of 1989, 5 U.S.C. § 2302(b) ("WPA").  *Id.*  Defendants move to dismiss Bain's complaint in part pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Dkt. 20.  They contend that Bain failed to administratively exhaust certain of her Privacy Act and discrimination and retaliation claims and that she failed adequately to plead certain of her other discrimination and retaliation claims as well as her hostile work environment claim.  Dkt. 20-1 at 1–2.  Defendants do not move to dismiss Bain's FOIA claims, her Privacy Act claims related to denial of access to or improper release of records, her claim under the WPA, or certain of her discrimination and retaliation claims, most notably those pertaining to her removal.  *Id.*

For the reasons that follow, the Court will **GRANT** Defendants' motion to dismiss in part and **DENY** it in part.

## I.  BACKGROUND

For purposes of evaluating Defendants' motion, the following allegations, which are taken from Bain's complaint, are accepted as true.  *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  In addition, because Bain is proceeding *pro se*, the Court will hold her pleadings to "less stringent standards than formal pleadings drafted by lawyers."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  To this end, the Court will consider all of her exhibits—and not merely her complaint—in evaluating the pending motion to dismiss.  *See Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007).  There are limits to this forbearance, however, and even when a plaintiff is proceeding *pro se*, a district court is not "obliged to sift through hundreds of pages . . . to make [its] own analysis and determination of what may[] or may not" support the plaintiff's claims.  *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988).  This is such a case, particularly so given the fact that Bain, although proceeding *pro se*, is a lawyer.  She

has also filed thousands of pages of attachments spread across thirty separate exhibits.  Dkt. 53.

The amended complaint often refers generally to an exhibit—*e.g.* "Exhibit 3"— without

including any citation to a specific page, even when the exhibit is hundreds of pages long.  *See,*

*e.g.*, Dkt. 16 at 6 (Am. Compl. ¶ 17); *id.* at 16 (Am. Compl. ¶ 58).  As a result, where the Court

can reasonably identify the relevant facts and the nature of Bain's claims from her complaint and

a reasonable review of the attachments thereto, the Court will address those facts and claims.

"But, where it can only speculate as to what [Bain] intends to allege, the Court will not, in effect,

assume the role of the advocate and fill in the gaps left in [Bain]'s complaint," nor will it scour

the record so that it can make Bain's case for her.  *Husain v. Smith*, No. 15-cv-708, 2016 WL

4435177, at *1 (D.D.C. Aug. 19, 2016) (internal quotation marks omitted).

## A.      Factual Background

Bain was a career Justice Department employee, serving for nearly thirty years.  Dkt. 16

at 2 (Am. Compl. ¶ 2).  From 2008 until her removal in September 2020, she was an

Immigration Judge in the Executive Office for Immigration Review ("EOIR").  *Id.*

Bain's troubles began in 2014, when she started to experience severe migraines while

conducting hearings by videoconference.  *Id.* at 10 (Am. Compl. ¶ 36).  To alleviate this

condition, she requested a permanent reassignment to the non-videoconference docket in the

Arlington, Virginia immigration court.  *Id.*  That request was denied, prompting Bain to file a

formal complaint with EOIR's Equal Employment Opportunity ("EEO") office in May 2014.  *Id.*

(Am. Compl. ¶ 37); Dkt. 53-4 at 6 (Pl.'s Ex. 3).[2]  Although Bain eventually withdrew her May

---

[2] Although the particulars of this complaint have no real bearing on the resolution of Defendants'
motion to dismiss, Bain's accounts of these events are not entirely consistent across her
submissions.  The amended complaint states that Bain filed an informal complaint in June 2014,
which she then withdrew in August of that year.  Dkt. 16 at 10 (Am. Compl. ¶ 37).  This
recounting, however, is at odds with Bain's own representations in her December 10, 2015

2014 complaint, she contends that her EEO activity precipitated a series of "discriminatory and retaliatory personnel actions" that culminated in her removal.  Dkt. 16 at 10 (Am. Compl. ¶ 38).
The first such action came in January 2015, when then-Chief Immigration Judge Mary Beth
Keller admonished Bain for "communicating by email in a 'rude' and 'disrespectful' manner,"
after Bain had complained about faulty videoconference equipment.  *Id.* (Am. Compl. ¶ 39).

Things escalated in February 2015, when Bain was assigned to a detail with the York,
Pennsylvania immigration court.  *Id.* at 11 (Am. Compl. ¶ 40).  She alleges that she experienced
numerous instances of improper treatment from her supervisor, Assistant Chief Immigration
Judge ("ACIJ") Christopher Santoro, while on detail.  *See id.* at 11–15 (Am. Compl. ¶ 40–55).
According to Bain, ACIJ Santoro assigned her "over 100 aged, detained" cases "from the
dockets of white male immigration judges" that Bain believed carried "heightened litigation risks
. . . to the Agency, as well as [to] her own professional and personal (Bivens) liability."  *Id.* at 11
(Am. Compl. ¶¶ 40–41).  ACIJ Santoro also allowed older white male judges to foist their
unwanted cases onto Bain's docket, and, when Bain concluded her work on these cases, he
returned them to the original judges who took credit for Bain's efforts.  *Id.* at 11–12 (Am.
Compl. ¶¶ 42–43).  When Bain raised concerns about her work assignments, ACIJ Santoro
"dismissed" those concerns.  *Id.* at 11 (Am. Compl. ¶ 41).  Not only that, he "thwarted" her

---

formal EEO complaint, in which she stated that she had filed a formal, rather than informal,
complaint on May 13, 2014, rather than in June, and withdrew it August 2014. Dkt. 53-4 at 6
(Pl.'s Ex. 3).  Defendants have submitted two documents that give credence to this latter account:
an EEO notice of acceptance of Bain's May 2014 formal complaint, as well as a letter from
EOIR's EEO Director to Bain in August 2014 acknowledging receipt of her request to withdraw
this complaint. Dkt. 20-3 at 2–3 (Def.'s Ex. B); Dkt. 20-4 at 2 (Def.'s Ex. C).  The Court will
not resolve disputed facts at the motion-to-dismiss stage, but because the difference between
whether Bain's complaint was formal or informal or submitted in May or June is not material to
the disposition of any of her claims, the Court accepts the version of events contained in Bain's
December 2015 formal complaint, which she submitted to the Court as an exhibit, and the EOIR
EEO office's correspondence with her, as submitted by Defendants.

efforts to adjudicate these cases, forbidding her from conducting bond hearings and denying her requests for additional time to prepare for hearings and to draft decisions.  *Id.* (Am. Compl. ¶ 42).

Presumably to alleviate her migraines, Bain began to travel to York to conduct hearings in person.  Dkt. 16 at 14 (Am. Compl. ¶ 50).  In her view, she had received all necessary approvals for this travel.  *Id.* at 14–15 (Am. Comp. ¶ 52).  But ACIJ Santoro disagreed, issuing her a "counseling letter" in June 2015 that accused her of traveling without appropriate authorization.  *Id.* at 14 (Am. Compl. ¶ 51).  He also revoked the authorizations she had received

A month after Bain's York detail began, ACIJ Santoro issued her a written reprimand for behaving "intemperate[ly]" toward him.  *Id.* at 12 (Am. Compl. ¶ 44).  Bain contends that this reprimand was the product of discrimination based on the temporary disability she was experiencing due to her migraines, as well as retaliation for protected whistleblowing activity— that is, concerns Bain had expressed to ACIJ Santoro regarding the "100 aged" cases that she was assigned to adjudicate, while denied authority to conduct bond hearings.  *Id.* at 13–14 (Am. Compl. ¶¶ 46, 48).  The reprimand was particularly galling, in Bain's view, because ACIJ Santoro and Chief Judge Kelly treated other (white male) judges more leniently, despite those judges' at times "egregious, highly inappropriate conduct."  *Id.* at 13 (Am. Compl. ¶ 47).  This reprimand was no mere slap on the wrist, according to Bain, because it rendered her ineligible for the accommodation she had previously (although unsuccessfully) sought: reassignment to the Arlington immigration court.  *Id.* at 14 (Am. Compl. ¶ 49).  As a result, she was forced to continue working via videoconference, which exacerbated her migraines.  *Id.*  She filed an informal EEO complaint in March 2015, several days after receiving the reprimand, but eventually withdrew that complaint.  Dkt. 53-4 at 8 (Pl.'s Ex. 3).

Presumably to alleviate her migraines, Bain began to travel to York to conduct hearings in person.  Dkt. 16 at 14 (Am. Compl. ¶ 50).  In her view, she had received all necessary approvals for this travel.  *Id.* at 14–15 (Am. Comp. ¶ 52).  But ACIJ Santoro disagreed, issuing her a "counseling letter" in June 2015 that accused her of traveling without appropriate authorization.  *Id.* at 14 (Am. Compl. ¶ 51).  He also revoked the authorizations she had received

from other agency personnel and denied her request for reimbursement of her travel expenses.
*Id.*  Bain maintains that the counseling letter, like the March 2015 reprimand, "was a pretext for discrimination and retaliation."  *Id.* (Am. Compl. ¶ 52).

ACIJ Santoro provided Bain a performance review in August 2015.  *Id.* at 15 (Am. Compl. ¶ 53).  The review credited her with "satisfactory work performance" but also stated that her professionalism "need[ed] improvement."  *Id.*  As support for this feedback, the performance rating referenced both the March 2015 reprimand and the June 2015 counseling letter.  *Id.*

Later that year, Bain made a second request for reassignment to the Arlington immigration court, but her request was again denied.  *Id.* at 15, 41 (Am. Compl. ¶¶ 54, 150).  Around this same time, in November 2015, DOJ also rejected an application Bain had submitted for a position on the Board of Immigration Appeals ("BIA").  *Id.* at 44 (Am. Compl. ¶ 161).  Bain then filed an informal EEO complaint on October 9, 2015, and eventually a formal complaint on December 10, alleging, among other things, that the March 2015 reprimand, June 2015 counseling letter, August 2015 performance rating, denial of her second reasonable accommodation request to be reassigned to Arlington, and rejection of her BIA application violated Title VII and the Rehabilitation Act.  Dkt. 53-4 at 3, 10 (Pl.'s Ex. 3); Dkt. 16 at 15 (Am. Compl. ¶ 54).

Shortly after Bain filed her December 2015 complaint, she was reassigned to the Arlington immigration court's non-videoconference docket.  Dkt. 16 at 15 (Am. Compl. ¶ 55).  She alleges that despite undertaking a new role with a new supervisor, she continued to face discrimination and retaliation.  *Id.* at 15–16 (Am. Compl. ¶¶ 55–56).  Much as ACIJ Santoro had allegedly done in York, Bain's new supervisor, ACIJ Deepali Nadkarni, allegedly assigned Bain an onerous quantity of long-pending cases from the dockets of white male judges and allowed

those other judges to shift their unwanted cases to Bain's docket.  *Id.* at 15–16 (Am. Compl. ¶ 56).  Bain expressed reservations about her caseload, but ACIJ Nadkarni responded in July 2016 by issuing her another counseling letter, this time criticizing her for unprofessional email communications with another immigration judge.  *Id.* at 16 (Am. Compl. ¶ 57); Dkt. 53-20 at 42 (Pl.'s Ex. 19).  In September 2016, ACIJ Nadkarni also provided Bain a performance review which, once again, concluded that Bain's work performance was satisfactory but that she exhibited a lack of professionalism, relying in part on the July 2016 counseling letter to support this latter conclusion.  Dkt. 16 at 16 (Am. Compl. ¶ 58); Dkt. 53-21 at 54 (Pl.'s Ex. 20).[3]

Several months later, in January 2017, Bain learned that EOIR had "released sensitive information from her personnel file to the American Immigration Lawyers Association ("AILA"), a voluntary bar association of immigration attorneys."  Dkt. 16 at 17 (Am. Compl. ¶ 60).  When Bain asked that EOIR "retract or claw back the information," EOIR allegedly declined.  *Id.*  According to Bain, the release of this information prompted three immigration attorneys, Eileen Blessinger, Carmen Boykin, and Paul Knight, to file a complaint with ACIJ Nadkarni alleging that Bain had mishandled certain hearings in which Blessinger and Boykin had appeared, verbally abusing and manifesting bias towards them.  *Id.* at 16–19 (Am. Comp. ¶¶ 61–65).  The attorneys filed a second complaint shortly thereafter, alleging, among other things, that Bain had wrongfully declined to recuse from their cases.  *Id.* at 21 (Am. Compl. ¶ 71).  In response to these complaints, on August 3, 2017, EOIR referred Bain to the Office of

---

[3] Bain's amended complaint and some of her exhibits say that this review occurred in October 2016.  Dkt. 16 at 16 (Am. Compl. ¶ 58); Dkt. 53-4 at 40 (Pl.'s Ex. 3).  Some of Bain's other exhibits, however, reference instead a September 30, 2016 review.  Dkt. 53-21 at 54 (Pl.'s Ex. 20).  Because Bain's materials as a whole suggest that the performance review in fact took place on September 30, 2016, the Court will refer to it by that date, rather than as the October 2016 performance review.

Professional Responsibility ("OPR") for an investigation of her conduct in numerous cases over which she had presided. *Id.* at 21–22 (Am. Compl. ¶¶ 73–74). Around the time that OPR commenced its investigation, in August 2017, ACIJ Nadkarni provided Bain with another performance review. *Id.* at 23 (Am. Compl. ¶ 80). For a third time, Bain's performance was rated satisfactory, but she was told to improve her professionalism. *Id.*

On January 2, 2018, the BIA issued an order vacating Bain's decision in one of the Blessinger cases that OPR was investigating. *Id.* at 24 (Am. Compl. ¶ 85). The BIA found that Bain had "displayed unprofessional behavior" toward Blessinger while conducting a hearing in the case and remanded the case for reconsideration before another Immigration Judge. *Id.* Bain filed a motion for reconsideration with the BIA on her own behalf, which the BIA denied because Bain lacked standing to seek reconsideration in a case in which she was the judge, and not a party. *Id.* (Am. Compl. ¶ 86).

OPR released its Report of Investigation (the "OPR Report") in September 2019, and based on its findings Bain was placed on administrative leave. *Id.* at 26, 27 (Am. Compl. ¶¶ 95, 97). On February 26, 2020, the EEOC granted EOIR's motion for summary judgment regarding the claims Bain had asserted in her October 2015 informal complaint, December 2015 formal complaint, and her amendments thereto—that is, her discrimination, retaliation, and hostile work environment claims. *Id.* at 27 (Am. Compl. ¶ 98). The following day, EOIR issued Bain a notice of proposed removal based on the results of OPR's investigation. *Id.* (Am. Compl. ¶ 99). An attorney in the Office of the Deputy Attorney General subsequently issued a decision proposing to remove Bain from federal service, and then-Attorney General William Barr signed a formal removal decision, terminating Bain's employment on September 17, 2020. *Id.* at 29–30 (Am. Compl. ¶ 105–06).

**B.     Administrative Proceedings**

The procedural history of Bain's various claims is complicated but necessary to the

resolution of the instant motion, which argues that Bain failed to exhaust her administrative

remedies with respect to many of her claims.  The Court will first address Bain's discrimination,

retaliation, and hostile work environment claims, as well as her WPA claim, before turning to her

Privacy Act and FOIA claims.

1.     *Discrimination, Retaliation, Hostile Work Environment, and WPA Claims*

As noted above, Bain engaged in considerable EEO activity during her final years with

DOJ.  After her first request for reassignment to Arlington was denied, she filed a formal EEO

complaint in May 2014, alleging disability discrimination in violation of the Rehabilitation Act

as well as race, national origin, and sex discrimination in violation of Title VII.  Dkt. 16 at 10

(Am. Compl. ¶ 37); Dkt. 53-4 at 6 (Pl.'s Ex. 3); Dkt. 20-4 at 2 (Def.'s Ex. C); Dkt. 20-5 at 2

(Def.'s Ex. D).  She withdrew this complaint several months later.  *Id.*  Then, in March 2015,

Bain filed an informal EEO complaint "alleging discrimination, reprisal for prior EEO activity,

and a hostile work environment."  Dkt. 53-4 at 8 (Pl.'s Ex. 3).  She subsequently withdrew this

complaint as well.  *Id.*  On October 9, 2015, Bain filed another informal EEO complaint.  Dkt.

53-4 at 10 (Pl.'s Ex. 3).

Finally, on December 10, 2015, Bain filed a formal EEO complaint.  Dkt. 16 at 15 (Am.

Compl. ¶ 54).  The issues accepted for investigation were: "Whether management discriminated

against [Bain] by subjecting [her] to disparate treatment and a hostile work environment based

on [her] race, sex, national origin, disability (perceived medical condition), and for engaging in

prior EEO activity."  Dkt. 53-4 at 15 (Pl.'s Ex. 3); Dkt. 20-2 at 9 (Def.'s Ex. A).  Bain amended

her EEO complaint in August 2016 to add claims that certain July 2016 work assignments and

the July 2016 counseling letter that she received were retaliatory and contributed to a hostile work environment.  Dkt. 53-4 at 15–16 (Pl.'s Ex. 3).  She moved to amend her complaint again in May 2018, seeking to allege, among other things, numerous other adverse actions in support of her hostile work environment claim, as well as several FOIA claims.  Dkt. 53-4 at 23–30 (Pl's Ex. 3); Dkt. 20-7 at 4 (Def.'s Ex. F); Dkt. 16 at 25 (Am. Compl. ¶ 89).  The EEOC granted Bain's motion with respect to the new adverse action claims but denied it as to the FOIA claims, over which the EEOC lacked jurisdiction.  Dkt. 53-4 at 34–42 (Pl.'s Ex. 3).

In its June 5, 2018 Order granting in part and denying in part Bain's second motion to amend her complaint, the EEOC summarized the claims ultimately accepted for adjudication.  *Id.* at 36–42.  There were thirty-nine in total, four of which Bain and the EEOC characterized as "discrete acts raising individual claims for relief" and the other thirty-five of which were treated as "background evidence for the hostile work environment claim" and "additional examples of harassment in support of [Bain's] hostile work environment claim."  *Id.* at 36.  The four discrete disparate treatment claims pertained to (1) Bain's August 2015 performance evaluation; (2) ACIJ Santoro's use of the August 2015 performance evaluation as a basis for denying Bain permission to "participate in special work opportunities, including serving as a guest speaker at a training conference and serving as a pro bono liaison judge;" (3) the denial of Bain's application to the BIA; and (4) the July 2016 counseling letter.  *Id.* at 38.

The EEOC granted summary judgment to DOJ on all claims on February 26, 2020.  Dkt. 53-5 at 113 (Pl.'s Ex. 4).  As before, the EEOC treated thirty-five of Bain's thirty-nine allegations as part of her hostile work environment claim and four as discrete disparate-treatment claims.  *Id.* at 113–18.  Bain appealed this decision to DOJ's Complaint Adjudication Office, which accepted the EEOC's decision in a Final Agency Order.  Dkt. 20-9 at 6 (Def.'s Ex. H).

Bain again appealed, this time to the EEOC's Office of Federal Operations ("OFO"), Dkt. 53-5 at 370 (Pl.'s Ex. 4), which also affirmed, Dkt. 53-7 at 3, 26 (Pl.'s Ex. 6); Dkt. 20-10 (Def.'s Ex. I).  Bain moved for reconsideration, but OFO denied her request on August 19, 2021.  Dkt. 53-7 at 26 (Pl.'s Ex. 6).

Separate from this EEO process, Bain challenged her termination with the Merit Systems Protection Board ("MSPB") on October 19, 2020.  Dkt. 16 at 6 (Am. Compl. ¶ 18); Dkt. 53-6 (Pl.'s Ex. 5).  She alleged that her removal was unjustified on the merits and that, in making its decision, DOJ wrongfully relied on information not made available to her.  Dkt. 16 at 6 (Am. Compl. ¶ 18); Dkt. 53-6 at 16 (Pl.'s Ex. 5).  She also asserted as affirmative defenses that her removal violated Title VII, the Rehabilitation Act, the ADEA, and the Whistleblower Protection Act.  Dkt. 16 at 6 (Am. Compl. ¶¶ 18–21); Dkt. 53-6 at 16 (Pl.'s Ex. 5).

DOJ moved to dismiss Bain's appeal before the MSPB for lack of jurisdiction, and the MSPB granted that motion and dismissed her appeal without prejudice on November 16, 2020. Dkt. 16 at 8 (Am. Compl. ¶¶ 29–30); Dkt. 53-9 at 4–5 (Pl.'s Ex. 8).  DOJ argued that under the logic of the Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), the MSPB Administrative Law Judges ("ALJs") had been improperly appointed and therefore lacked power to decide cases until properly appointed.  Dkt. 16 at 8 (Am. Compl. ¶¶ 29–30); Dkt. 53-9 at 4–5 (Pl.'s Ex. 8).  At the time of DOJ's motion, that question was pending before the full MSPB Board, so the ALJ presiding over Bain's appeal concluded that "judicial economy" favored dismissal for 180 days, or until the Board decided the *Lucia* issue.  Dkt. 53-9 at 5 (Pl.'s Ex. 8); Dkt. 16 at 8 (Am. Compl. ¶¶ 29–30).  After 180 days, Bain's appeal was automatically reinstated but immediately dismissed without prejudice once again for 180 days or until a Board decision on the *Lucia* question.  Dkt. 16 at 8–9 (Am. Compl. ¶¶ 31–32); Dkt. 53-10 (Pl.'s Ex. 9); Dkt. 53-

11 (Pl.'s Ex. 10).  The pattern repeated itself a third time in December 2021, with the MSPB

reinstating the appeal and then indicating its intent to dismiss it pending resolution of the *Lucia*

issue or the mutual and irrevocable consent by the parties to MSPB jurisdiction.  Dkt. 34 at 61–

63.  This holding pattern persists, according to Bain, because, at least at the time she filed her

amended complaint in this Court, the MSPB was without a quorum and was therefore unable to

decide the status of MSPB ALJs under *Lucia*.  Dkt. 16 at 9 (Am. Compl. ¶ 33).

      2.   *Privacy Act and FOIA Claims*

According to the amended complaint and the attachments thereto, Bain submitted three

dual FOIA and Privacy Act requests for information to DOJ.  Dkt. 16 at 3–4 (Am. Compl. ¶ 6).

The first, submitted in September 2015, requested, among other things, a variety of documents

from Bain's personnel files, records of ACIJ Santoro's communications related to Bain's

reprimand and performance evaluation, personnel information for other Immigration Judges, and

various other DOJ personnel policy documents.  Dkt. 53-3 at 3–6 (Pl.'s Ex. 2).  According to

Bain, her second FOIA and Privacy Act request, made in January 2018, "sought substantially the

same information as her September 2015 FOIA request," as well as information related to the

BIA decision finding that Bain had acted improperly toward Blessinger.  Dkt. 16 at 32 (Am.

Compl. ¶ 119).  Bain made her final FOIA and Privacy Act request in August 2019, seeking all

of OPR's investigative records pertaining to its investigation into her alleged misconduct.  Dkt.

16 at 26, 32 (Am. Compl. ¶¶ 92, 121).  Defendants have not moved to dismiss any of Bain's

claims related to these FOIA/Privacy Act requests.  Bain also brings several Privacy Act claims

requesting the amendment of certain records and objecting to EOIR's release of information

from her personnel file.  Dkt. 16 at 33–35 (Am. Compl. ¶¶ 128–33).  Her complaint and the

accompanying exhibits contain no information suggesting that she has exhausted these claims, beyond stating that ACIJ Santoro refused to correct several records upon request.  *Id.*

**C.    The Present Lawsuit**

Bain initiated this lawsuit on June 22, 2021, Dkt. 1, and filed an amended complaint on September 27, 2021, Dkt. 16.  The amended complaint nominally contains three counts, but embedded within each count are a host of allegations.

Count I alleges violations of FOIA and the Privacy Act.  Dkt. 16 at 30.  Bain asserts that DOJ has improperly withheld records responsive to all three of her FOIA and Privacy Act requests.  *Id.* (Am. Compl. ¶ 109).  She alleges with respect to each request that DOJ released certain documents but withheld others under a general claim of privilege and without specifically identifying the withheld records or providing a *Vaughn* index.  *Id.* at 30, 32 (Am. Compl. ¶¶ 113, 120, 122).  She further contends that DOJ failed to process her requests on a timely or expedited basis.  *Id.* at 30 (Am. Compl. ¶¶ 111–12).

In addition to Bain's unlawful withholding claims, Count I alleges that DOJ violated the Privacy Act by failing to amend certain erroneous records pertaining to Bain.  These records are: (1) the March 2015 reprimand letter, (2) the June 2015 counseling letter, (3) the August 2015 performance rating, (4) the July 2016 counseling letter, (5) the BIA's January 2, 2018 decision vacating Bain's decision and finding that Bain had acted improperly in the case at issue, (6) the OPR report of investigation, and (7) the Attorney General's September 17, 2020 decision to remove Bain from federal service.  *Id.* at 33–38 (Am. Compl. ¶¶ 128, 129, 131, 132, 140).  In addition, construed liberally, Count I encompasses a third variety of Privacy Act violation: the unauthorized release of information from Bain's personnel file to AILA.  *Id.* at 16 (Am. Compl. ¶ 60).

Count II alleges "Discrimination, Retaliation for Protected Activity, and Hostile Work Environment." *Id.* at 40.  It is not always obvious which of the many agency actions catalogued in Bain's 207 paragraph complaint are intended to constitute distinct legal claims and which simply provide background information or evidence of discriminatory or retaliatory intent.  But, construing Bain's complaint generously, she alleges that the following incidents constituted distinct acts of disparate treatment or retaliation in violation of Title VII, the Rehabilitation Act, and the ADEA.

| **DISCRETE DISPARATE TREATMENT AND RETALIATION CLAIMS** |
| --- |
| |
| **Admonishment, Counseling, and Performance Evaluation Claims** |
| Chief Judge Keller's January 2015 admonishment of Bain for communicating in a "rude" and "disrespectful" manner.  Dkt. 16 at 11 (Am. Compl. ¶ 39) |
| The June 2015 counseling letter accusing Bain of traveling without authorization and the related revocation of her travel privileges.  Dkt. 16 at 14–15 (Am. Compl. ¶¶ 51–52) |
| Bain's August 2015 performance rating that credited her with satisfactory performance but stated that her professionalism needed improvement.  Dkt. 16 at 15 (Am. Compl. ¶ 53) |
| The July 2016 counseling letter ACIJ Nadkarni issued to Bain accusing her of unprofessional email communication with another judge.  Dkt. 16 at 16 (Am. Compl. ¶ 57) |
| Bain's September 2016 performance rating that "criticized her lack of professionalism."  Dkt. 16 at 16 (Am. Compl. ¶ 58); Dkt. 53-21 at 54 (Pl.'s Ex. 20). |
| Bain's August 2017 performance rating that "noted a deficiency in professionalism."  Dkt. 16 at 23 (Am. Compl. ¶ 80) |
| **Reprimand Claim** |
| The March 2015 reprimand accusing Bain of "intemperate behavior."  Dkt. 16 at 12 (Am. Compl. ¶ 44) |
| **Work Assignment Claims** |
| ACIJ Santoro's assignment to Bain of a high volume of "aged" cases, permission to other judges to give their unwanted cases to Bain, and actions thwarting Bain's efforts to complete her work.  Dkt. 16 at 11–12 (Am. Compl. ¶¶ 40–43) |

ACIJ Nadkarni's assignment to Bain of an undue quantity of "aged, non-detained cases" from the dockets of other judges and toleration of other judges placing their cases on Bain's hearing calendar.  Dkt. 16 at 15–16 (Am. Compl. ¶ 56)

### Denial of Reasonable Accommodation Claims

The 2014 denial of Bain's request to be reassigned to the Arlington immigration court's non-videoconference docket.  Dkt. 16 at 10 (Am. Compl. ¶¶ 36–37)

The 2015 denial of Bain's second request to be reassigned to the Arlington immigration court.  Dkt. 16 at 15, 41 (Am. Compl. ¶¶ 54, 150)

### Non-Selection and Denial of Opportunity Claims

The rejection of Bain's application to the BIA.  Dkt. 16 at 15, 44 (Am. Compl. ¶¶ 54, 161)

ACIJ Santoro's denial of permission for Bain to "participate in special work opportunities, including serving as a guest speaker at a training conference and serving as a pro bono liaison judge."  Dkt. 53-4 at 38 (Pl.'s Ex. 3); Dkt. 16 at 14 (Am. Compl. ¶ 48).

### Release of Information Claim

The January 2017 release of sensitive information from Bain's personnel file to the AILA and EOIR's refusal to "retract or claw back the information."  Dkt. 16 at 17 (Am. Compl. ¶ 60)

The "publication" of the BIA's January 2, 2018 Order "to the media."  Dkt. 16 at 25 (Am. Compl. ¶ 88)

### Investigation Claim

EOIR's August 3, 2017 referral of Bain to OPR for investigation.  Dkt. 16 at 22 (Am. Compl. ¶ 74)

### BIA Decision Claim

BIA's January 2, 2018 Order vacating Bain's decision in an immigration matter because BIA found that Bain had acted unprofessionally in a hearing in the case.  Dkt. 16 at 24–25 (Am. Compl. ¶¶ 85–86, 89)

### EEOC Misconduct Claim

EOIR's alleged misconduct before the EEOC, including the "deliberate concealment of adverse evidence."  Dkt. 16 at 42 (Am. Compl. ¶ 155)

### Removal Claim

Bain's removal from federal service.  Dkt. 16 at 30, 43 (Am. Compl. ¶¶ 106, 158)

Although Bain does not say so clearly, the Court understands her position to be that all of the above discrete acts also support her hostile work environment claim. *See* Dkt. 16 at 5, 40 (Am. Compl. ¶¶ 13, 148).

Finally, Count III alleges that DOJ's removal of Bain violated the WPA.[4]  Again construing Bain's complaint liberally, it alleges the following protected activity:

- Bain's March 2015 objection to a work assignment that she believed would have caused her to violate the law and posed "heightened litigation risks."  Dkt. 16 at 45–46 (Am. Compl. ¶¶ 169–71);

- Bain's July 2016 expression of concern over ACIJ Nadkarni's allegedly "abusive case assignment practices."  Dkt. 16 at 47 (Am. Compl. ¶ 174);

- Bain's November 2017 disclosure to OPR of her concerns regarding what she perceived to be constitutional infirmities with EOIR's Immigration Judge complaint resolution program.  Dkt. 16 at 49 (Am. Compl. ¶ 181);

- Bain's February 2018 objection to ACIJ Nadkarni's instruction that Bain "grant relief in several pending cases, against her best judgment."  Dkt. 16 at 48 (Am. Compl. ¶ 178).

---

[4] Although Bain's amended complaint is not entirely clear on this score, it appears that she may also intend to allege that several other personnel actions apart from her removal also violated the WPA.  The Court, however, will not construe her complaint to raise these additional claims.  The reason is that the Court would have to *sua sponte* dismiss any WPA claims unrelated to Bain's removal for failure to exhaust.  Administrative exhaustion is a jurisdictional prerequisite to bringing a WPA claim, *Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002), meaning that Bain bears the burden of pleading it, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  There are three ways to exhaust a WPA claim, one of which is to raise it as an affirmative defense in an MSPB appeal of an otherwise appealable action.  5 C.F.R. § 1209.2; *see also Sabersky v. Dep't of Just.*, 91 M.S.P.R. 210, ¶¶ 6–8 (2002), *aff'd*, 61 Fed. App'x 676 (Fed. Cir. 2003).  Bain pursued this route with respect to her removal, but only with respect to her removal.  Dkt. 16 at 6 (Am. Compl. ¶¶ 18–20).  The other two paths involve raising a WPA claim initially with the Office of the Special Counsel.  *See* 5 U.S.C. § 1214; *Serrao v. Merit Sys. Prot. Bd.*, 95 F.3d 1569, 1574 (Fed. Cir. 1996); *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 268–69 (D.D.C. 2017).  Bain makes no allegation that she filed a complaint with the Office of the Special Counsel (or that the Office of the Special Counsel made its own determination that prohibited retaliation had likely occurred), so to the extent that she intends to assert WPA claims unrelated to her removal, they fail in any event.

Defendants contend that Bain's amended complaint should be dismissed in part because (1) Bain has failed to exhaust administrative remedies with respect to her Privacy Act record-amendment claims; (2) Bain has failed to exhaust administrative remedies with respect to all but four of her disparate treatment discrimination and retaliation claims; (3) Bain has failed to allege adverse employment actions with respect to her disparate treatment and retaliation claims related to work assignments, admonishments, counseling letters, and performance evaluations; and (4) Bain has failed to state a hostile work environment claim because she did not suffer adverse actions for the majority of the discrete acts that she alleges support her hostile work environment claim and because she has improperly attempted to bootstrap her discrete disparate treatment claims into a hostile work environment claim without independently meeting the hostile work environment standard.  *See* Dkt. 20-1.

## II.  LEGAL STANDARD

Defendants' motion implicates two distinct legal standards.

First, a motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to hear the claim and may raise a "facial" or "factual" challenge to the Court's jurisdiction.  A facial challenge asks whether the plaintiff has pleaded facts sufficient to establish the court's jurisdiction, while a factual challenge asks the court to "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  A facial challenge, in other words, is confined to the four corners of the complaint. A factual challenge, in contrast, permits the court to look beyond the complaint to satisfy itself that it has jurisdiction to hear the suit.

Whether a motion to dismiss is facial or factual, the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "[I]n passing on a motion to dismiss" for lack of jurisdiction, however, "the allegations of the complaint should be construed favorably to the pleader."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  Here, for the reasons explained below, Defendants' jurisdictional challenges are to Bain's Privacy Act and Rehabilitation Act claims, and they are both facial.  Defendants offer no jurisdictional evidence and, instead, merely assert that Bain has not pleaded facts establishing this Court's jurisdiction over those claims.

Second, to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (internal citations omitted).  Hence, although "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" *id.* at 556 (quoting *Scheuer*, 416 at 236), the "threshold requirement" of Federal Rule of Civil Procedure 8(a)(2) is "that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief,'" *id.* at 557

(alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).  In considering a Rule 12(b)(6) motion, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) (internal quotation marks omitted).

### III.  ANALYSIS

**A.    Privacy Act Claims**

"The Privacy Act regulates the 'collection, maintenance, use, and dissemination of information' about individuals by federal agencies."  *Wilson v. Libby*, 535 F.3d 697, 707 (D.C. Cir. 2008) (quoting *Doe v. Chao*, 540 U.S. 614, 618 (2004)).  It is designed "to allow individuals on whom information is being compiled and retrieved the opportunity to review the information and request that the agency correct any inaccuracies."  *Henke v. U.S. Dep't of Com.*, 83 F.3d 1453, 1456–57 (D.C. Cir. 1996).  To that end, it imposes certain restrictions on federal agencies related to the collection, retention, maintenance, and disclosure of records and grants individuals a variety of rights related to records maintained by government agencies about them.  *See* 5 U.S.C. § 552a.  Bain's claims implicate the right of an individual to access records that an agency maintains pertaining to such individual, *id.* § 552a(d)(1); the right of an individual to request that an agency amend records pertaining to such individual insofar as such records are inaccurate, *id.* §§ 552a(d)(2)–(3); and the restriction, with certain exceptions not relevant here, on any agency disclosing records pertaining to an individual without that individual's prior written consent, *id.* § 552a(b).  Defendants, however, have moved to dismiss only Bain's Privacy Act claims related to her requests to amend certain agency records.  Dkt. 20-1 at 13–15. Defendants do not acknowledge anywhere in their briefing that Bain also brings access and

wrongful disclosure claims.  *See* Dkt. 20-1.  The Court, accordingly, will address only Bain's

claims relating to her requests to amend those records.

At the outset, the Court notes that it has construed Bain's requests under the Privacy Act

for the Court to "correct . . . the BIA's January 2, 2018 decision," to rescind the OPR Report, and

to "rescind the Attorney General's Removal Decision" as requests to amend those records.  Dkt.

16 at 34, 38 (Am. Compl. ¶¶ 131–32, 140).  To the extent that Bain is seeking collaterally to

attack the substance of these agency actions, rather than to correct specific factual inaccuracies in

the records themselves, the Privacy Act is not a proper vehicle for such an effort.  *See, e.g.*,

*Kleiman v. Dep't of Energy*, 956 F.2d 335, 338 (D.C. Cir. 1992) (rejecting the use of the Privacy

Act as a means of "collateral attack" on a "personnel decision"); *Lee v. Geren*, 480 F. Supp. 2d

198, 206 (D.D.C. 2007) (same); *Doe v. U.S. Dep't of Just.*, 660 F. Supp. 2d 31, 42 (D.D.C. 2009)

(same); *Reinbold v. Evers*, 187 F.3d 348, 361 (4th Cir. 1999) ("[T]he Privacy Act does not allow

a court to alter records that accurately reflect an administrative decision, or the opinions behind

that administrative decision."); *Albright v. United States*, 732 F.2d 181, 190 (D.C. Cir. 1984)

("[T]he Privacy Act was not intended to shield these employees from the vicissitudes of federal

personnel management decisions.").

In any event, Defendants move to dismiss Bain's record-amendment claims on three

grounds.  First, they argue that she failed to exhaust her administrative remedies with respect to

these claims.  *Id.* at 13–14.  In particular, they contend that she did not comply with DOJ

regulations governing Privacy Act record-amendment requests.  *Id.*  Second, they submit that

certain records Bain seeks to have amended are exempt from amendment under the Privacy Act

and DOJ regulations.  *Id.* at 14.  Finally, they assert that Bain's claims are untimely.  *Id.* at 14–

15.  The Court agrees that Bain has failed to exhaust her administrative remedies, although for somewhat different reasons than Defendants posit.

The Privacy Act requires government agencies to permit any individual to "request amendment of a record pertaining to him" and, upon receipt of such request, either to make the requested amendment or to inform the individual that it has refused to amend the record and to explain its reasons why.  5 U.S.C. § 552a(d)(2).  The Act also mandates that agencies "permit [an] individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal," *id.* § 552a(d)(3), and notify individuals whose requests are refused about the procedures the agency has established for such review, *id.* § 552a(d)(2).  If, after this second-level review, the agency still refuses to amend the record, it must permit the individual seeking the amendment to file a statement of disagreement with the agency and must notify the individual of "the provisions for judicial review" of the agency's determination.  *Id.* § 552a(d)(3).

In addition to establishing statutory exhaustion requirements, the Privacy Act instructs agencies to promulgate regulations that, among other things, set forth procedures for reviewing amendment requests and for adjudicating appeals from "initial adverse agency determination[s]." *Id.* § 552a(f)(4).  DOJ has done so, and its regulations provide that an individual "may make a request for amendment or correction . . . by writing directly to the Department component that maintains the record" and "sen[ding] or deliver[ing]" that request "to the component's Privacy Act Office."  28 C.F.R. § 16.46(a); *id.* § 16.41(a).  Such a request must identify each record in question, state the amendment or correction desired, and explain why the individual believes the record is "not accurate, relevant, timely, or complete."  *Id.* § 16.46(a).  If a request for amendment is denied, the requestor may appeal in writing to DOJ's Office of Information and

Privacy ("OIP").  *Id.* § 16.46(c); *id.* § 16.45(a).  If OIP denies an appeal, the requestor may then file a statement of disagreement with "the component involved," *id.* § 16.46(d), and, having exhausted administrative remedies, may seek judicial review.

Administrative exhaustion is a doctrine of many stripes.  It can be jurisdictional or non-jurisdictional.  *Avocadoes Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004).  Non-jurisdictional exhaustion can be mandatory or subject to equitable exceptions.  *See Ross v. Blake*, 578 U.S. 632, 639 (2016); *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985); *see also Fleming v. USDA*, 987 F.3d 1093, 1099 (D.C. Cir. 2021) (explaining the difference between mandatory and jurisdictional exhaustion).  And exhaustion can be statutory, regulatory, or both.  *See Doak v. Johnson*, 798 F.3d 1096, 1103–05 (D.C. Cir. 2015).  Different consequences attend each of these permutations.

The Privacy Act's cause of action for record-amendment claims incorporates the administrative exhaustion process described above.  It reads:

> Whenever any agency makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection . . . the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1)(A).  A plaintiff must therefore allege either that the agency made a determination under subsection (d)(3) not to amend a record or that the agency failed to conduct the review subsection (d)(3) contemplates.  Subsection (d)(3), moreover, is itself a second-level review provision that comes into play only after the agency has denied an initial request to amend under subsection (d)(2).  *See id.* § 552a(d)(2)–(3).  Because this process is part of the cause of action, a plaintiff who does not plead facts demonstrating that she has gone through the (d)(2) and (d)(3) process has failed to state a claim.

Many judges in this district have read § 552a(g)(1) to create a jurisdictional exhaustion requirement.  *See e.g.*, *Sandoval v. U.S. Dep't of Just.*, 296 F. Supp. 3d 1, 13 (D.D.C. 2017); *Mulhern v. Gates*, 525 F. Supp. 2d 174, 183 (D.D.C. 2007); *Stein v. SEC*, 266 F. Supp. 3d 326, 336 (D.D.C. 2017).  *But see Doe v. U.S. Dep't of Lab.*, 451 F. Supp. 2d 156, 168–69 (D.D.C. 2006), *vacated pursuant to settlement*, *Doe v. U.S. Dep't of Lab.*, No. 05-2449, 2007 WL 1321116 (D.D.C. Mar. 22, 2007).  But the D.C. Circuit has never gone that far.  It has instead called exhaustion of the Privacy Act's administrative process a "prerequisite to bringing civil suit to compel amendment," *Nagel v. U.S. Dep't of Health, Educ., and Welfare*, 725 F.2d 1438, 1441 (D.C. Cir. 1984), and a "requirement[]" that has been "incorporate[d]" into the "cause[] of action," *Haase v. Sessions*, 893 F.2d 370, 373 (D.C. Cir. 1990).  Declining to dub Privacy Act exhaustion jurisdictional makes sense in light of the language of § 552a(g)(1)(A), which does not contain the type of "clear, unequivocal" statement "that the judiciary is barred from hearing an action until the administrative agency has come to a decision" that is usually necessary to establish a jurisdictional requirement.  *Avocadoes Plus*, 370 F.3d at 1248 (quoting *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.*, 727 F.2d 1204, 1208 (D.C. Cir. 1984)).

Reading § 552a(g)(1) in context, moreover, confirms that the exhaustion requirement is non-jurisdictional.  It states in full:

Whenever any agency

> (A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;
>
> (B) refuses to comply with an individual request under subsection (d)(1) of this section;
>
> (C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications,

character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1).  For each subparagraph, the right to sue is contingent on the agency's failure to comply with the dictates of the Act—for example, the agency's failure to amend a record, failure to maintain accurate records, or failure "to comply with any other provision" of the Act.  *Id.*  Although some of these duties are triggered by a request made by the plaintiff, not all of them are.  More importantly, none of the operative subparagraphs employ any jurisdiction-limiting language.[5]

But whatever other labels might apply, the text of the statute and *Haase* both make clear that administrative exhaustion is an element of the Privacy Act's record-amendment cause of action.  *Haase*, 893 F.2d at 373.  And because Bain has not alleged that she made *any* Privacy Act request to amend records before bringing this lawsuit, she has not stated a claim.  Her complaint asserts that DOJ "willful[ly]" failed to correct various records and that ACIJ Santoro in particular created records replete with errors that he refused to correct.  Dkt. 16 at 33 (Am. Compl. ¶¶ 126, 128).  That falls well short of an allegation that she submitted a Privacy Act request and sought administrative review of the denial of that request.  And even if Bain's allegations of willful "refusal[s]" to correct records imply that some kind of request was made,

---

[5] Indeed, not all of these causes of action even contain an exhaustion requirement, jurisdictional or otherwise.  For example, § 552a(g)(1)(C), does not.  *Hubbard v. U.S. Env't Prot. Agency Adm'r*, 809 F.2d 1, 4 (D.C. Cir. 1986).

*id.* (Am. Compl. ¶ 128), her complaint is devoid of any factual allegations even suggesting that any such request complied with DOJ Privacy Act regulations, which require initial requests to be directed to the "Privacy Act Office" of the relevant DOJ component and requests for review to be made in writing to OIP, 28 C.F.R. § 16.41(a); *id.* § 16.46(a).  As a result, the allegation that Bain asked ACIJ Santoro to correct certain records is unavailing.

The further arguments that Bain makes in her opposition to Defendants' motion to dismiss do nothing to change this conclusion.  Most fundamentally, a plaintiff may not amend her complaint through her opposition to a motion to dismiss, so the Court cannot consider the new allegations in Bain's opposition that she failed to properly assert.  *Sai v. Transp. Sec. Admin.*, 326 F.R.D. 31, 33 (D.D.C. 2018).  But even if Bain were to amend her complaint to include the new allegations, those allegations would not suffice to state a Privacy Act claim.  Although her opposition purports to describe how she exhausted each of her claims, it instead makes plain that she failed to make a requisite Privacy Act request pursuant to § 552a(d).  Starting with the March 2015 reprimand, she states that she asked ACIJ Santoro to rescind the reprimand but that he declined to do so and "did not inform [her] of the procedures established by the agency" for her to request "review of that refusal by the head of the agency or an officer designated by the head of the agency."  Dkt. 34 at 44–45.  Thus, by her own account, Bain made an informal request to her supervisor to take back a personnel action, not a Privacy Act request to amend a record—and certainly not one compliant with the governing regulations.  *See* 28 C.F.R. § 16.41(a); *id.* § 16.46(a).  And, having failed to make a first-level Privacy Act request, she did not then seek second-level agency review under subsection 552a(d)(3).  The same is true for Bain's allegations related to every one of the records she seeks to have amended.  None of what she describes as "exhaustion" has any bearing on the Privacy Act.  Similarly, the motion for

reconsideration that she filed with the BIA regarding its January 2, 2018 decision was not a request to amend a record under the Privacy Act. *Id.* at 48–49.[6]

In sum, because Bain has not alleged an essential element of the relevant Privacy Act cause of action, she has not stated a claim for relief.[7]  The Court will, accordingly, dismiss those claims for failure to state a claim.

**B.      Discrimination and Retaliation Claims**

Defendants move to dismiss the majority of Bain's discrimination and retaliation claims for two reasons.  They first argue that Bain failed to exhaust administrative remedies with respect to most of her claims for discrete acts of discrimination and retaliation.  Dkt. 20-1 at 15–17.  They further contend that Bain's work assignment, admonishment, counseling, and performance evaluation claims should be dismissed because Bain has failed to allege that she suffered any adverse action related to these claims, a necessary element of a disparate treatment claim under all of the anti-discrimination statutes under which she sues.  *Id.* at 17–21.  The Court agrees in part and disagrees in part with these arguments.

1.      *Administrative Exhaustion*

Bain brings her discrimination and retaliation claims under Title VII, the ADEA, and the Rehabilitation Act.  Dkt. 16 at 3–7 (Am. Compl. ¶¶ 5–24).  Before bringing suit under any of these statutes, a plaintiff must exhaust administrative remedies.  *See Coleman v. Duke*, 867 F.3d

---

[6] The Court notes that even if Bain could somehow overcome her failure to allege any facts indicating that she satisfies the elements of a Privacy Act amendment claim, at least her request to amend the BIA opinion would have to be dismissed, because DOJ regulations specifically exempt BIA opinions from amendment.  28 C.F.R. § 16.84.

[7]  Because Bain has failed to state a claim, her argument in her surreply that the Court should waive the Privacy Act's exhaustion requirements misses the mark.  Dkt. 55 at 19–22.  The Court cannot waive an element of a cause of action.  And, even if it could, there would be no basis for doing so here.

204, 206 (D.C. Cir. 2017) (administrative exhaustion required under Title VII and the ADEA);
*Doak*, 798 F.3d at 1099 (same for Rehabilitation Act).  The exhaustion requirements for these
statutes overlap in significant ways but are not entirely coextensive.  In all cases, the purpose of
the requirements is "to give federal agencies an opportunity to handle matters internally
whenever possible and to ensure that the federal courts are burdened only when reasonably
necessary."  *Brown*, 777 F.2d at 14.

Start with Title VII.  To initiate the exhaustion process for a Title VII claim, a federal
employee must contact her agency's EEO counselor within forty-five days of the allegedly
discriminatory incident.  *See* 29 C.F.R. § 1614.105(a)(1); *Green v. Brennan*, 578 U.S. 547, 549–
50 (2016).  A claim arising out of a "discrete discriminatory act[]" that is not brought to the
attention of an EEO counselor within forty-five days of the act's occurrence generally cannot be
pursued, even when the act is "related to acts alleged in timely filed charges."  *Nat'l R.R.
Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  The reason is that "[e]ach discriminatory
act starts a new clock for filing charges alleging that act."  *Id.*  The rule is different, however, for
hostile work environment claims, because a hostile work environment claim by its very nature
"involves repeated [instances of] conduct" that can occur "over a series of days or perhaps years"
and that "collectively constitute one 'unlawful employment practice.'"  *Id.* at 115, 117 (quoting
42 U.S.C. § 2000e–5(e)(1)).  As long as one of the acts that created the hostile work environment
occurred within forty-five days of the employee contacting her EEO counselor, other acts that
"are part of the same actionable hostile work environment practice" remain actionable with
respect to that claim, even if they occurred outside of the forty-five-day period.  *Id.* at 120.

If the employee and the EEO counselor cannot resolve the claim within thirty days, the
counselor must notify the employee of her right to file a formal discrimination complaint, and the

employee may then file an administrative complaint with the agency within fifteen days.  29

C.F.R. § 1614.105(d); *id.* § 1614.106(b).  This complaint must "describe generally the action(s)

or practice(s) that form the basis of the complaint," *id.* § 1614.106(c), and the scope of the

administrative complaint determines the scope of exhaustion and, hence, the claims that the

employee may eventually pursue in federal court.  Although an administrative complaint need

not "presage[]" "every detail of the eventual complaint" that the employee files in court, it must

identify the allegedly discriminatory acts at issue.  *Marshall v. Fed. Express Corp.*, 130 F.3d

1095, 1098 (D.C. Cir. 1997).

    Historically, the D.C. Circuit permitted a Title VII plaintiff—and by implication, an

ADEA or Rehabilitation Act plaintiff—to bring a lawsuit asserting claims that were

administratively exhausted or that were "like or reasonably related to the allegations" contained

in the administrative complaint or that grew "out of such allegations."  *Park v. Howard Univ.*, 71

F.3d 904, 907 (D.C. Cir. 1996) (internal quotation marks omitted).  The Supreme Court's

decision in *Morgan*, however, undercut the "like or reasonably related to" rule.  *Morgan*

considered whether discrete "acts that fall outside of the statutory time period for filing charges"

with the EEOC "are actionable under Title VII."  536 U.S. at 108.  It answered that question in

negative.  *Id.* at 110.  In so doing, it drew a line between each individual act of discrimination

that an employee experiences, holding that each one "constitutes a separate actionable unlawful

employment practice" for purposes of Title VII.  *Id.* at 114 (internal quotation marks omitted).

Because *Morgan* rejected a relatedness rule for timeliness purposes, since *Morgan* was decided,

most judges in this district have declined to rely on the "like or reasonably related to" standard

for exhaustion more generally.  *Rashad v. WMATA*, 945 F. Supp. 2d 152, 165–66 (D.D.C. 2013).

Instead, they have held that "plaintiffs alleging discrete acts of discrimination . . . must exhaust

the administrative process regardless of any relationship that may exist between those discrete claims and any others." *Id.* at 166 (internal quotation marks omitted). "[A] handful of decisions," however, "have continued to apply the 'reasonably related' rule." *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274, at *6 (D.D.C. Feb. 8, 2016). The D.C. Circuit, for its part, has thrice declined to decide whether its pre-*Morgan* regime retains any vitality. *See Webster v. Del. Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022); *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010); *Weber v. Battista*, 494 F.3d 179, 183–84 (D.C. Cir. 2007).

For the reasons explained at greater length in *Hargrove v. AARP*, 205 F. Supp. 3d 96 (D.D.C. 2016), the Court concludes (once again) that "the reasonably related rule no longer reflects the state of the law." *Id.* at 119 (internal quotation marks omitted). In short, *Morgan* embraces the notion that the procedural requirements of Title VII—and the ADEA and Rehabilitation Act—must be assessed on a claim-by-claim basis and that satisfaction of these requirements for a "relate[d]" act of discrimination is insufficient, except in those cases, such as hostile work environment cases, in which the "very nature" of the claim "involves repeated conduct." *Morgan*, 536 U.S. at 114–15.

Once an employee has filed an administrative Title VII complaint, one of two things happens: the agency either provides her a final agency decision regarding her complaint within 180 days, or it does not. If it does, "the employee has either 30 days to appeal to the Equal Employment Opportunity Commission (EEOC), or 90 days to file suit in federal court." *In re James*, 444 F.3d 643, 644 (D.C. Cir. 2006) (internal citations omitted); *see also* 29 C.F.R. §§ 1614.401(a), 1614.402(a); 42 U.S.C. § 2000e-16(c). If it does not, the employee may then proceed to federal court without further delay. 29 C.F.R. § 1614.407(b); *see also Wilson v. Pena*, 79 F.3d 154, 166 (D.C. Cir. 1996).

Administrative exhaustion under the Rehabilitation Act and the ADEA follows the same process, with one exception under the ADEA. *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 172 (D.D.C. 2016); *Doak*, 798 F.3d at 1099–1100. In addition to the path described above, a federal employee with an ADEA claim may "bring [that] claim directly to federal court so long as, within 180 days of the allegedly discriminatory act, [the employee] provides the EEOC with notice of [her] intent to sue at least 30 days before commencing suit." *Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003) (citing 29 U.S.C. §§ 633a(c), (d)). "An employee who elects this path need not file an administrative complaint." *Achagzai*, 170 F. Supp. 3d at 172.

Exhaustion of Title VII and ADEA claims is non-jurisdictional. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). As a result, Title VII and ADEA plaintiffs need not plead exhaustion; instead, a defendant must raise exhaustion as an affirmative defense and bears the burden of proof. *Id.* For the same reason, an agency can raise an exhaustion defense at the motion-to-dismiss stage only if it is clear from the face of the complaint or any materials that are attached to or incorporated into the complaint that the plaintiff failed to exhaust and that no exception is available. *See Trudeau*, 456 F.3d at 183. The same is not always true under the Rehabilitation Act. At least in some circumstances, a plaintiff's failure to exhaust a Rehabilitation Act claim can deprive a court of subject-matter jurisdiction over the claim. For present purposes, it suffices to note that courts lack jurisdiction over Rehabilitation Act claims when the employee has failed to satisfy the Act's statutory exhaustion requirement—that is, if the plaintiff is not "aggrieved by the final disposition" of her administrative "complaint" or "by the failure [of the agency] to take final action on such complaint," the court is without jurisdiction to consider her claim. 29 U.S.C. § 794a(a)(1); *Spinelli v. Goss*, 446 F.3d 159, 162

(D.C. Cir. 2006).  But courts do not lack jurisdiction over Rehabilitation Act claims when the plaintiff has simply failed to comply with all requirements specified in the governing EEOC regulations, such as certain timeliness requirements.  *See Doak*, 798 F.3d at 1103–04.  The consequence of this distinction is that a Rehabilitation Act plaintiff bears the burden of pleading facts showing that she complied with the *Act*'s exhaustion requirement—*i.e.*, that she is aggrieved by a final agency disposition of a complaint that she filed or the agency's failure to act on that complaint.  *See Williams v. Brennan*, 320 F. Supp. 3d 122, 127–28 (D.D.C. 2018).  But, as with Title VII and the ADEA, the defendant bears the burden of establishing noncompliance with any *non-statutory* exhaustion requirement.  *Id.*

The D.C. Circuit has understandably described the exhaustion procedures for employment discrimination claims by federal employees as, among other things, "labyrinthine," a "maze," a "gauntlet," and "extremely complicated."  *Niskey v. Kelly*, 859 F.3d 1, 5 (D.C. Cir. 2017); *Crawford v. Duke*, 867 F.3d 103, 105 (D.C. Cir. 2017); *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999).  But with those procedures in mind, the Court turns to the instant case.

Defendants first argue that most of Bain's discrimination and retaliation claims must be dismissed because she failed to raise them at the administrative level.  Dkt. 20-1 at 15–17.  They observe that in the only EEO action that Bain did not ultimately withdraw—the October 9, 2015 informal complaint that became a December 10, 2015 formal complaint, which was then twice amended—Bain raised thirty-nine allegedly discriminatory acts but treated only four of these acts as discrete claims of discrimination.  *Id.* at 8–9, 17.  She framed the other thirty-five as elements of her hostile work environment claim, or at least that is how the EEOC ALJ interpreted her submissions.  *Id.*  In Defendants' view, Bain is bound to this framing; she can bring only discrete disparate treatment claims that correspond to the four claims she asserted as

such before the EEOC.  *Id.* at 17.  Any acts that she raised before the EEOC only as part of her hostile work environment claim must be dismissed, except to the extent that they constitute part of her hostile work environment claim.  *Id.*

But the requirements of administrative exhaustion are not as stringent as Defendants suggest.  Administrative exhaustion often takes place without the benefit of counsel, *Crawford*, 867 F.3d at 108, and a federal employee is not forever bound by the precise manner in which she framed her administrative complaint, so long as the relevant facts and the nature of the asserted discrimination is reasonably evident to those involved in the administrative process, *see, e.g.*, *Maryland v. Sodexho*, 474 F. Supp. 2d 160, 162 (D.D.C. 2007) (explaining that "the law does not hold an employee to the use of magic words to make out a proper discrimination charge" so long as the employee "alert[s] the EEOC and the charged employer with the nature of the alleged wrongdoing"); *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980) ("Title VII's exhaustion requirement should not be read to create useless procedural technicalities.").  Notably, Defendants do not cite any authority that requires more than this.  Dkt. 20-1 at 17; Dkt. 32 at 4–5.  As discussed above, under *Morgan* an employee need only administratively exhaust "[e]ach incident of discrimination"—each discrete discriminatory act—before pursuing it in court.  *See Morgan*, 536 U.S. at 114; *see also Webster*, 49 F.4th at 567; *Clark v. Johnson*, 206 F. Supp. 3d 645, 658 (D.D.C. 2016).  That rule is satisfied when a plaintiff raises an act with her agency's EEO counselor, files an administrative complaint based on that act in due course, and pursues that complaint through the administrative adjudication process.  *Morgan* does not require that a plaintiff's *legal theory* remain fixed for all time.  All that is required is that an employee identify the alleged incident of discrimination in a manner sufficient to put the agency on notice of the alleged wrongdoing.

This conclusion best accords with the purpose of administrative exhaustion requirements: "to put the agency on notice of [a plaintiff's] claim and to 'enable the agency to investigate it,'" *Crawford*, 867 F.3d at 109 (quoting *Artis v. Bernanke*, 630 F.3d 1031. 1034 (D.C. Cir. 2011)), not to "place a heavy technical burden on 'individuals untrained in negotiating procedural labyrinths,'" *Park*, 71 F.3d at 907 (quoting *Loe v. Heckler*, 768 F.2d 409, 417 (D.C. Cir. 1985)). The general goals of notice and efficiency are amply served with respect to a given act of discrimination when a plaintiff informally raises and then formally complains about the act and identifies the nature of the alleged discrimination. At that point, the agency is on notice of what allegedly occurred, understands its potential legal exposure, and is aware of what records it needs to create and to preserve in anticipation of judicial review. The Court, accordingly, will not dismiss any of Bain's discrete disparate treatment claims as unexhausted merely because they were asserted under a hostile work environment label in her administrative process.

That determination, however, does not entirely settle the exhaustion issue. Although labels are not dispositive, facts are, and thus Bain cannot bring any claims in this case based on conduct that she failed to identify in her EEO complaint (unless they are ADEA claims arising out of acts that occurred no more than 180 days before she filed her complaint in this Court). Nor can she bring any claim that was not timely asserted. Any discrete discrimination claim concerning conduct that occurred more than forty-five days before Bain initiated contact with EOIR's EEO counselor on October 9, 2015—*i.e.*, before August 25, 2015—is untimely, because the regulatory schemes governing Title VII, ADEA, and Rehabilitation Act exhaustion "bar discrimination claims that an employee does not first bring to the attention of an agency's EEO

counselor within forty-five days of the alleged conduct." *Vickers v. Powell*, 493 F.3d 186, 198 (D.C. Cir. 2007).[8]

The Court begins with Bain's untimely claims: her claims related to the 2014 denial of her request to be reassigned to the Arlington immigration court's non-videoconference docket, Dkt. 16 at 10 (Am. Compl. ¶¶ 36–37), the January 2015 admonishment, *id.* at 11 (Am. Compl. ¶ 39), the March 2015 letter of reprimand, *id.* at 12 (Am. Compl. ¶ 44), and the June 2015 letter of counseling, *id.* at 14 (Am. Compl. ¶ 51–52), all concern conduct that occurred before August 25, 2015. It is evident from Bain's complaint and the exhibits she provided that although she timely initiated EEO actions with respect to the 2014 denial of her request to be reassigned to Arlington, her January 2015 admonishment, and the March 2015 letter of reprimand, she subsequently withdrew these actions, thereby abandoning her claims. Dkt. 16 at 10 (Am. Compl. ¶ 37); Dkt. 53-4 at 6–8 (Pl.'s Ex. 3); *see also* Dkt. 20-4 at 2 (Def.'s Ex. C); Dkt. 20-5 at 2 (Def.'s Ex. D); *see Marshall*, 130 F.3d at 1098 (explaining that exhaustion requires "filing an EEOC charge *and giving [the] agency a chance to act on it*" (emphasis added)); *Brown v. Hayden*, No. 18-2561, 2020 WL 6392746, at *12 (D.D.C. Nov. 2, 2020) (same). In an effort to avoid this time bar, Bain contends that these incidents were related to and to some extent formed the predicate for subsequent acts of discrimination that she did timely raise. Dkt. 34 at 27–31. As she would have it, each time, for example, the March 2015 reprimand was "incorporated" into another allegedly adverse action, the clock for exhausting the March 2015 reprimand was reset. *Id.* at 28–29. The problem with this argument is that it is exactly what the Supreme Court

---

[8] Because Defendants have not moved to dismiss any part of Bain's hostile work environment claim on exhaustion grounds, the Court does not address whether any component act for that claim was not timely asserted under the particular rules applicable to hostile work environment claims. *See Morgan*, 536 U.S. at 115–17.

disapproved in *Morgan*.  As the Court explained in *Morgan*, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  536 U.S. at 113.  The Court will therefore dismiss these discrete claims as untimely.[9]

Bain also entirely failed to raise certain of her claims during the administrative process, so these claims too must be dismissed.[10]  The first is the 2015 denial of her second reasonable accommodation request to be assigned to the Arlington immigration court.  Dkt. 16 at 15, 41 (Am. Compl. ¶¶ 54, 150).  This claim does not appear, at least in terms that the Court can discern, in Bain's December 2015 formal complaint or in any of the amendments to that complaint, and the EEOC did not consider it to be one of Bain's claims in its decision granting summary judgment to DOJ.  Dkt. 53-4 at 1–42 (Pl.'s Ex. 3); Dkt. 53-5 at 113–18 (Pl.'s Ex. 4).  The one possible reference to this action in Bain's December 2015 administrative complaint states that on March 20, 2015 she requested "[o]ne day of in-person hearings in the Arlington court each week," and ACIJ Santoro denied that request.  Dkt. 53-4 at 8 (Pl.'s Ex. 3).  If this is the same action that Bain now seeks to challenge, it was not timely exhausted in any event, requiring dismissal for that reason if not for a complete failure to assert.  Bain also failed to raise the following claims in the administrative process:

- EOIR's August 3, 2017 referral of Bain to OPR for investigation.  Dkt. 16 at 22 (Am. Compl. ¶ 74);

---

[9] The Court notes that whether any of the claims that Bain asserted for the first time in the administrative process through amendments to her original complaint were untimely presents a more complicated question.  *See Laughlin v. Holder*, 923 F. Supp. 2d 204, 215–16 (D.D.C. 2013).  Because the government has not raised this sort of argument, the Court need not address the question today.

[10] Although the Court rejects Defendants' argument that Bain was obligated to exhaust her claims under a particular legal label, it considers implicit in that argument the proposition that Bain was obligated to exhaust her claims under *some label*, and thus that claims Bain did not raise at all in the administrative process must be dismissed as unexhausted.

- BIA's January 2, 2018 Order vacating Bain's decision in an immigration matter because BIA found that Bain had acted unprofessionally.  *Id.* at 24–25 (Am. Compl. ¶¶ 85–86, 89);

- The publication of that Order to the media.  *Id.* at 25 (Am. Compl. ¶ 88);

- EOIR's alleged misconduct before the EEOC, including through the "deliberate concealment of adverse evidence."  *Id.* at 42 (Am. Compl. ¶ 155).

Dkt. 53-4 at 1–42 (Pl.'s Ex. 3); Dkt. 53-5 at 113–18 (Pl.'s Ex. 4).  Nor did any of these incidents occur 180 days or less before Bain filed this lawsuit, thus foreclosing the ADEA's alternative path to judicial review.  29 U.S.C. §§ 633a(c), (d).

Although these latter four alleged incidents occurred after Bain filed her EEO complaint, that did not relieve her of the exhaustion requirement.  As an initial matter, all of these incidents, except perhaps EOIR's alleged misconduct before the EEOC, occurred before the final time Bain amended her administrative complaint in May 2018.  Dkt. 53-4 at 23 (Pl.'s Ex. 3); Dkt. 16 at 25 (Am. Compl. ¶ 89).  She had a clear opportunity to add these claims to her action at that time.[11] And even if Bain had never amended her administrative complaint, she was still obligated to exhaust all administrative remedies.  This is just another application of the rule that every discrete act of discrimination must be exhausted, whenever it arises.  Although Bain argues in her surreply that later occurring acts of discrimination need not separately be exhausted if they are predicated on prior discriminatory acts that have been exhausted, *see* Dkt. 55 at 13–15, as

---

[11] Bain attempted to assert a claim related to the alleged 2017 improper release of information from her personnel file in her May 2018 motion to amend her EEO complaint, Dkt. 53-4 at 28 (Pl.'s Ex. 3), but the EEOC denied leave to amend with respect to that claim, because it construed it as a Privacy Act claim over which the EEOC lacked jurisdiction, *id.* at 35.  The Court agrees that this claim appears most naturally to arise under the Privacy Act, but it understands Bain also to assert that this release of information was intentionally done for discriminatory reasons.  As a result, and because Bain attempted to exhaust this claim, the Court will treat it as exhausted for purposes of this litigation.  *See Bowden*, 106 F.3d at 437.

explained above, that argument is at odds with *Morgan*.  The Court will therefore dismiss these claims as unexhausted.

      2.     *Failure to State a Claim: Discrete Discriminatory and Retaliatory Acts*

Defendants next argue that the Court should dismiss Bain's discrete discrimination and retaliation claims related to work assignments, admonishments, counseling letters, and performance evaluations because Bain did not suffer an adverse employment action—a prerequisite to a successful disparate treatment claim—in connection with any of these incidents. Dkt. 20 at 17–21.  Bain's only "admonishment" claim arises out of the January 2015 admonishment, and because the Court has already held that this claim was not exhausted, it need not further address it here.  As for Bain's claims related to work assignments, counseling letters, and performance evaluations, Defendants' argument is persuasive as to some of these claims but not as to others.

Bain alleges that her work assignments, counseling letters, and performance evaluations were discriminatory and retaliatory, in violation of Title VII, the ADEA, and the Rehabilitation Act.  For both types of claims, and under all three statutes, an adverse action is required.  But what constitutes an adverse action varies depending upon whether a claim is for discrimination or retaliation.

Beginning with Bain's discrimination claims, "[u]nder Title VII, the ADEA, and the Rehabilitation Act, the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *see* 42 U.S.C. § 2000e–16(a); 29 U.S.C. § 621 *et seq.*; 29 U.S.C. § 701 *et seq.*; *see also Chambers v. Dist. of Columbia*, 35 F.4th 870, 873 (D.C. Cir. 2022) (en banc) (sex discrimination

under Title VII); *Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (age discrimination

under the ADEA); *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002) (disability

discrimination under the Rehabilitation Act).  "A plaintiff must prove both elements to sustain a

discrimination claim," *Baloch*, 550 F.3d at 1196, but Defendants' motion focuses on only the

first: an adverse employment action.

Until recently, plaintiffs in this circuit were required to allege that they had suffered

"objectively tangible harm" in order to plead an adverse action under all three statutes.  *Brown v.*

*Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (Title VII), *overruled by Chambers*, 35 F.4th 870;

*Drielak v. Pruitt*, 890 F.3d 297, 300 (D.C. Cir. 2018) (ADEA); *Mack v. Strauss*, No. 01-2122,

2001 WL 1286263, at *1 (D.C. Cir. Sept. 28, 2001) (per curiam) (citing *Brown*, 199 F.3d 446, in

the context of a Rehabilitation Act claim); *Baloch*, 550 F.3d at 1196–97 (treating Title VII,

ADEA, and Rehabilitation Act alike for purposes of adverse action); *Savage v. Azar*, 301 F.

Supp. 3d 114, 124 (D.D.C. 2018) (same).  This requirement was a judicial gloss on the statutory

text, which prohibits employers from discriminating against their employees with respect to the

"terms, conditions, or privileges of employment" on the basis of the relevant protected

characteristic.  42 U.S.C. § 2000e–2(a)(1) (Title VII); 29 U.S.C. § 623(a)(1) (ADEA); 29 U.S.C.

§ 791(f) (explaining that claims under the Rehabilitation Act should be reviewed by "apply[ing]"

the standards used for claims under the Americans with Disabilities Act of 1990, 42 U.S.C.

§ 12101 *et seq.*, which mirror in relevant part the standards in Title VII and the ADEA).  The

objectively-tangible-harm test was intended to separate "[m]ere idiosyncrasies of personal

preference" from "materially adverse consequences," only the latter of which were "actionable."

*Brown*, 199 F.3d at 457.

Earlier this year, the en banc D.C. Circuit dispensed with this limitation on Title VII claims in *Chambers v. District of Columbia*, 35 F.4th 870.  *Chambers* held that under Title VII, a plaintiff need not allege that she suffered an "objectively tangible harm" in order to state a claim; rather, the statutory text requires only discrimination with respect to an employee's "terms, conditions, or privileges of employment"—no more and no less.  *Id.* at 872, 874–75 (quoting 42 U.S.C. § 2000e–2(a)(1)).  This standard, the court said, is "capacious," *id.* 874, and "evince[s] a[] [congressional] intent to strike at the entire spectrum of disparate treatment . . . in employment," *id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (internal quotation marks omitted)).

But what of the ADEA and the Rehabilitation Act?  The D.C. Circuit has long interpreted the relevant portions of these statutes *pari passu* with Title VII.  *See, e.g.*, *Baloch*, 550 F.3d at 1196–97; *Drielak*, 890 F.3d at 300; *Mack*, 2001 WL 1286263, at *1; *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (noting that "Title VII of the Civil Rights Act . . . contains anti-discrimination and retaliation provisions that are indistinguishable from those of the ADA" (as incorporated into the Rehabilitation Act)); *Savage*, 301 F. Supp. 3d at 124.  Pre-*Chambers*, this meant applying the "objectively tangible harm" gloss.  Indeed, courts have for decades assumed the analytical interchangeability of these provisions without hesitation (or even discussion).  *See supra*.  After all, the statutes contain essentially the same language, and "when Congress uses the same language in [multiple] statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in [each] statute[]."  *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005); *see also id.* at 233–34 ("We have consistently applied that presumption to language in the ADEA that was 'derived *in haec verba* from Title VII.'" (quoting *Lorillard v. Pons*, 434

U.S. 575, 584 (1978))); *cf. Forman v. Small*, 271 F.3d 285, 297 (D.C. Cir. 2001) ("Sections 633a and 2000e–16 use identical language in creating a cause of action for federal employees under the ADEA and Title VII, respectively, and thus should be interpreted consistently.").  But post-*Chambers*, the Court must make a choice: Does it conform its interpretation of the ADEA and the Rehabilitation Act to the interpretation of Title VII set forth in *Chambers* and thereby hew to the pre-*Chambers* authorities that interpret the materially identical adverse action provisions of the three statutes to mean the same thing?  Or does it follow the pre-*Chambers* principle requiring objectively tangible harm under the ADEA and the Rehabilitation Act, since *Chambers* did not say anything about those statutes?  The Court must, in effect, select which of two once-harmonious but now-inconsistent lines of D.C. Circuit authority to follow.

Although it is a close question, the Court concludes that applying *Chambers* to the ADEA and Rehabilitation Act is the better approach.  The primary reason is that *Chambers* rested on textual grounds, namely, a determination of what the words "terms, conditions, or privileges of employment" mean.  35 F.4th at 874–75 (quoting 42 U.S.C. § 2000e–2(a)).  The court explained that this language provides no basis for the imposition of a "judicial gloss" requiring an additional "objectively tangible harm."  *Id.* at 875.  Notably, the Court did not rely on legislative history or other matters that could vary from statute to statute, notwithstanding overlapping language; it rested its decision on text alone.  *Id.*  The key language in the ADEA and the Rehabilitation Act is identical in relevant part to the Title VII language *Chambers* interpreted.  29 U.S.C. § 623(a)(1) (making it unlawful under the ADEA "to . . . otherwise discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's age"); 29 U.S.C. § 791(f) (incorporating the protections of the ADA, which prohibits "discriminat[ion] against a qualified individual on the

40

basis of disability in regard to . . . [that employee's] terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a)).  So although *Chambers* did not explicitly overrule the decisions applying the "objectively tangible harm" rule to the ADEA and the Rehabilitation Act, *Chambers*' import for the words of those statutes seems unmistakable.

The Court recognizes that "[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court," *Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979), and that it is for the D.C. Circuit, and not this Court, to harmonize circuit precedent and to say when D.C. Circuit decisions are and are not overruled, *see Critical Mass Energy Proj. v. Nuclear Reg. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (noting that circuit court decisions "bind the circuit 'unless and until overturned by the court en banc or by Higher Authority'" (quoting *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 54 (D.C. Cir. 1987), *vacated in part en banc*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc))).  In recognition of this principle, one district court decision issued after *Chambers* declined to apply *Chambers* to the ADEA, absent an express overruling of the pre-*Chambers* ADEA precedents.  *Blackmon v. Garland*, No. 21-cv-34, 2022 WL 4130815, at *11 n.9 (D.D.C. Sept. 12, 2022).  But in this unique context, where the D.C. Circuit has rejected the objectively-tangible-harm standard as inconsistent with the text of Title VII and also repeatedly held that the same language in the ADEA and Rehabilitation Act should be construed in the same manner as Title VII, the Court better honors its obligation of fidelity by applying *Chambers* to cases brought under those other statutes.

Nor is the Court simply speculating about what the D.C. Circuit might hold in a future case.  *Chambers* expressly overruled *Brown v. Brody*.  That is significant because the D.C. Circuit precedent applying the objectively-tangible-harm test to cases brought under the ADEA

and Rehabilitation Act is (or was) premised on *Brown*.  Because those cases based their holdings on a now-abrogated precedent, they have not merely been called into question; they are no longer good law as far as adverse actions go.  As a result, the Court need not predict what the D.C. Circuit will do.  By overruling *Brown*, the court of appeals has already abrogated its progeny.

Two further points bear mention.  First, although Bain raised the ADEA and Rehabilitation Act issues in her *Chambers* notice of authority, Dkt. 46 at 3 n.1, the government did not take issue with that aspect of her notice.  So no argument for maintaining the pre-*Chambers* test for the ADEA and the Rehabilitation Act has been made in this case.  Second, recent activity from the D.C. Circuit at least suggests that *Chambers* has something to say about statutes beyond Title VII.  At the time *Chambers* was decided, the court was holding in abeyance *Townsend v. United* States, No. 19-5259 (D.C. Cir.), which raised the same adverse action issue in the Rehabilitation Act context.  It has since remanded that case for further proceedings in light of *Chambers*.  *Townsend v. United States*, No. 19-5259, 2022 WL 4769075, at *1 (D.C. Cir. Sept. 27, 2022) (per curiam).  Of course, nothing definitive can be gleaned from this remand.  But it is safe to conclude that the D.C. Circuit is—at the very least—open to the possibility that *Chambers* has some application beyond Title VII.  For all of these reasons, the Court will not apply the objectively-tangible-harm test to any of Bain's disparate treatment claims.

There is an additional consideration that complicates the analysis for Title VII and the ADEA, although it does not change the Court's conclusion.  Only the statutory provisions of Title VII and the ADEA applicable to non-federal employees contain the language the D.C. Circuit addressed in *Chambers*—"terms, conditions, or privileges of employment."  42 U.S.C. § 2000e–2(a)(1); 29 U.S.C. § 623(a)(1).  The provisions that extend anti-discrimination protections to federal employees are differently worded and state in relevant part that "all

personnel actions" in "executive agencies" "shall be made free from any discrimination" based

on the relevant protected characteristics.  42 U.S.C. § 2000e–16(a); 29 U.S.C. § 633a(a).  The

"usual rule . . . when the legislature uses certain language in one part of the statute and different

language in another," is for courts to "assume[] different meanings were intended" thereby.

*DePierre v. United States*, 564 U.S. 70, 83 (2011) (internal quotation marks omitted) (quoting

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)).  The D.C. Circuit and many other

courts, however, have not applied that usual rule to these statutes.  They have instead long and

repeatedly held that the federal-sector provisions are coterminous with their private-sector

counterparts as far as the standard for an adverse action goes.[12]

---

[12] *See, e.g.*, *George v. Leavitt*, 407 F.3d 405, 410–11 (D.C. Cir. 2005) (noting that "[d]espite the differences in language between the [private-sector and federal-sector] provisions, we have held that 'Title VII places the same restrictions on federal and District of Columbia agencies as it does on private employers, and so we may construe the latter provision in terms of the former'" (quoting *Singletary v. Dist. of Columbia*, 351 F.3d 519, 523–24 (D.C. Cir. 2003))); *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) (same); *Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977) ("To be sure, the language of the 1964 Act in reference to private employees differs somewhat from that of the 1972 Act respecting federal employees.  But it is beyond cavil that Congress legislated for federal employees essentially the same guarantees against sex discrimination that previously it had afforded private employees.  We thus proceed to an examination of appellant's claim with the assurance that anything constituting sex discrimination in private employment is equally interdicted in the federal sector."); *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012) (same); *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) ("Although [Title VII's federal-sector] language differs from that of the provision governing private employers, we have held that the two contain identical prohibitions." (citation omitted)); *Figueroa v. Pompeo*, 923 F.3d 1078, 1083 (D.C. Cir. 2019) ("[U]nder [Title VII's] disparate treatment theory, [a federal plaintiff] may challenge any 'personnel actions affecting employees' and involving 'any discrimination based on race, color, religion, sex, or national origin.'  Such actions include hiring, firing, and the provision of 'compensation, terms, conditions, or privileges of employment.'" (first quoting 42 U.S.C. § 2000e–16(a); then quoting *id.* § 2000e–2(a)(1))); *Brown*, 199 F.3d at 457 (stating, in a case involving a federal employee plaintiff, that she "does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm"); *Baloch*, 550 F.3d at 1196 (applying *Brown*'s rule in a Title VII, ADEA, and Rehabilitation Act case brought by a Bureau of Indian Affairs employee against her federal employer); *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002) (stating in a case

Defendants argue that, in light of *Chambers*, the Court should break from this approach and construe Title VII and the ADEA's federal-sector provisions on their own terms.  The Court declines the invitation.  The D.C. Circuit may someday revisit its practice of reading Title VII and the ADEA's private- and public-sector provisions as interchangeable, but it did not do so in *Chambers*.  True, *Chambers* announced an interpretive return to Title VII's plain text as far as the private-sector adverse-action standard is concerned.  But it did not so much as hint that the private-sector and federal-sector discrimination provisions should no longer be construed alike. If anything, it affirmed the status quo.

To begin with, in the per curiam panel opinion that invited en banc rehearing, the same two judges who ultimately authored the en banc decision stated that Title VII's federal-sector

---

involving a federal employee of the FDIC that the standard under Title VII is whether an employer has discriminated against "any individual with respect to his compensation, terms, conditions, or privileges of employment" (quoting 42 U.S.C. § 2000e–2(a)(1))); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (similar); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (same for Department of Veterans Affairs employee); *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (same); *Youssef v. F.B.I.*, 687 F.3d 397, 401 (D.C. Cir. 2012) (same); *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002) (same for Department of Transportation employee in a case under the Rehabilitation Act); *see also Morton v. Mancari*, 417 U.S. 535, 547 (1974) ("In general, it may be said that the substantive anti-discrimination law embraced in Title VII was carried over and applied to the Federal Government."); *Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 294 (3d Cir. 2019) ("Although the language of § 2000e–16(a) differs from the language of the private-sector antidiscrimination and antiretaliation provisions, many courts have consistently interpreted § 2000e–16(a) 'to give federal employees the same rights as private employees.'" (quoting *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. 1981))); *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35–36 (1st Cir. 2010) (same); *Terry v. Perdue*, No. 20-2016, 2021 WL 3418124, at *1 (4th Cir. Aug. 5, 2021) (equating the two provisions); *Jordan v. Clark*, 847 F.2d 1368, 1373 n.3 (9th Cir. 1988) (same, at least in the sexual harassment context); *Coles v. Post Master Gen. U.S. Postal Serv.*, 711 F. App'x 890, 894 (11th Cir. 2017) (same); *Thomas v. Miami Veterans Med. Ctr.*, 290 F. App'x 317, 319 (11th Cir. 2008) (same).  *But see Caldwell v. Johnson*, 289 F. App'x 579, 588–89 (4th Cir. 2008) (rejecting the prior practice of interpreting the private-sector and federal-sector standards for adverse action identically in the retaliation context in light of the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), but concluding that the statutes "prohibit[] substantive discrimination in an identical fashion").

and private-sector provisions "contain identical prohibitions." *Chambers v. Dist. of Columbia*,

988 F.3d 497, 500 (D.C. Cir. 2021), *rev'd en banc*, 35 F.4th 870 (D.C. Cir. 2022) (quoting

*Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007)).  Although that panel opinion has now

been vacated, the en banc court gave no indication that it took issue with that piece of the panel's

analysis.  Notably, moreover, *Chambers* also overruled *Brown*, which itself involved a federal-

employee plaintiff.  *Brown*, 199 F.3d at 452.  It stands to reason that a case abrogating and

replacing a standard initially announced as an interpretation of Title VII's federal-sector

provision should itself control as to that provision.  Finally, although the facts are not entirely

clear, it appears that the *Chambers* plaintiff herself might have been subject to the federal-sector

provision, yet the Court's analysis focused entirely on the language of the private-sector

provision.  *See* En Banc Opening Brief for Appellant Mary E. Chambers 14 n.2, *Chambers*, 35

F.4th 870 (No. 19-7098) (noting that Title VII's federal-sector provision applies to employees

"in those units of the Government of the District of Columbia having positions in the competitive

service," 42 U.S.C. § 2000e–16(a), that Chambers is "not aware of any statute" designating her

position as part of the competitive service, and that "the District has never maintained in this

litigation that Chambers held a competitive-service position"); *Chambers*, 35 F.4th at 874

(stating only that "*[t]he parties agree* that Chambers's claim is covered by the antidiscrimination

provision of Title VII, section 703(a)(1)" (emphasis added)).  Given all of this, it is not

surprising that judges in this district have uniformly applied *Chambers* to federal-sector cases.

*Fruge v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 20-cv-2811, 2022 WL 5166031, at *16

(D.D.C. Oct. 5, 2022); *Bell v. Fudge*, No. 20-cv-2209, 2022 WL 4534603, at *3–5 (D.D.C. Sept.

28, 2022); *cf. Xie v. Chao*, No. 21-cv-1289, 2022 WL 3585669, at *4 n.3 (D.D.C. Aug. 22, 2022)

(noting that a demotion would constitute an adverse employment action under the pre-*Chambers*

standard, under *Chambers*, and under the text of Title VII's federal-sector provision).  The Court

will therefore follow what remains the law in this circuit and treat the federal-sector provisions

of Title VII and the ADEA as imposing "identical prohibitions" as do the private-sector

provisions.  *Czekalski*, 475 F.3d at 363.  To do otherwise would be to move well ahead of the

court of appeals in a direction there is little reason to believe it plans to go.

  The adverse action standard is different for retaliation claims—a standard the D.C.

Circuit expressly left alone in *Chambers*.  *See Chambers*, 35 F.4th at 876 (explaining that the

court's conclusion about Title VII's antidiscrimination provision is consistent with the prevailing

interpretation of the antiretaliation provision in light of the "fundamental differences between the

antidiscrimination and antiretaliation provisions").  "To prove retaliation, the plaintiff generally

must establish that he or she suffered (i) a materially adverse action (ii) because he or she had

brought or threatened to bring a discrimination claim."  *Baloch*, 550 F.3d at 1198; *see also* 42

U.S.C. § 2000e–3(a); 29 U.S.C. § 621 *et seq.*; 29 U.S.C. § 701 *et seq.*  A "materially adverse

action" is one that would have "dissuaded a reasonable worker from making or supporting a

charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)

(internal quotation marks omitted).  This standard is objective and captures only "significant,"

rather than "trivial," harms.  *Id.*  It does not reach every "[m]inor and even trivial employment

action[] that an irritable, chip-on-the-shoulder employee did not like," *Bridgeforth v. Jewell*, 721

F.3d 661, 663 (D.C. Cir. 2013), and an adverse action for this purpose "[t]ypically . . . involves

'a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing significant

change in benefits,'" *id.* (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  This

standard applies under Title VII, the ADEA, and the Rehabilitation Act.  *See Baloch*, 550 F.3d at 1198.

The Court will now apply these rules to those of Bain's work assignment, counseling letter, and performance evaluation claims that it has not already dismissed on other grounds. These claims concern: (1) Bain's work assignments in York in 2015; (2) her August 2015 performance rating; (3) her work assignments in Arlington from 2016-2019; (4) the counseling letter she received in July 2016; (5) her September 2016 performance rating; and (6) her August 2017 performance rating.

The Court first concludes that Bain has adequately alleged that she suffered adverse actions in connection with her work assignments under the discrimination standard.  She asserts that both ACIJ Santoro in York and ACIJ Nadkarni in Arlington assigned her a disproportionately burdensome workload of difficult, long-pending cases from the dockets of other, primarily white and male judges, and that other judges were permitted to dump their unwanted cases onto her docket.  Dkt. 16 at 11–12, 15–16 (Am. Compl. ¶¶ 40–43, 56–57).  At least at the pleading stage, that is sufficient under *Chambers*.  An employee who receives a manageable amount of desirable work has superior working conditions to those of an employee assigned a crushing load of unpleasant work.  Under the pre-*Chambers* regime, "changes in assignments and work-related duties d[id] not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."  *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997).  But *Chambers* rejected that notion, holding that the "unadorned wording" of Title VII "admits of no distinction between 'economic' and 'non-economic' discrimination or 'tangible' and 'intangible' discrimination," nor does it give a free pass to discrimination that might be considered "garden variety."  35 F.4th at 874.

Perhaps not all changes in work assignments necessarily constitute adverse actions even under *Chambers*.  But allegations regarding work assignments that are disproportionately burdensome and unpleasant plainly suffice.

The same is true for Bain's work assignment retaliation claims.  Retaliatory work assignments are a "classic" and "'widely recognized' example of 'forbidden retaliation.'"  *White*, 548 U.S. at 71 (quoting 2 EEOC 1991 Manual § 614.7, pp. 614–31 to 614–32).  The Supreme Court has recognized that because "[a]lmost every job category involves some responsibilities and duties that are less desirable than others," "[c]ommon sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."  *Id.* at 70–71.  That is more or less what Bain alleges happened here.  According to the complaint, she was loaded up with "arduous duties"—reassigned from other judges, no less—in response to her EEO activity.  *See* Dkt. 16 at 11–12, 15–16 (Am. Compl. ¶¶ 40–43, 56–57).

To be sure, not every undesired change in work assignments or workload constitutes a materially adverse action in the retaliation context.  "It is not out of the ordinary for an employee to have been expected to shoulder an extra load on occasion over a two-year span, or to have been asked to step in if there were unexpected staff shortages."  *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 45 (D.D.C. 2001).  As a result, "shortened deadlines or increased work must be frequent or particularly onerous to be material."  *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 198 (D.D.C. 2014).  But Bain does not allege an occasional unpleasant case or extra assignment.  She alleges that in York she was assigned "over 100" cases that had been pending long past their target completion date and that presented particularly difficult and fraught legal issues.  *See* Dkt. 16 at

11–12 (Am. Compl. ¶¶ 40–43).  She further alleges that ACIJ Santoro "thwarted" her efforts to complete these cases by restricting her ability to conduct hearings and to take time to write decisions.  *Id.* at 11 (Am. Compl. ¶ 42).  And she avers that in Arlington, "[f]rom 2016 to 2019," ACIJ Nadkarni "assigned her two to three times the number of new cases as were assigned to white judges."  *Id.* at 15–16 (Am. Compl. ¶ 56).  These allegations satisfy the adverse action requirement.

Things are not so clear with respect to Bain's counseling letter and performance evaluation discrimination claims.  It is not obvious whether or under what circumstances receiving a counseling letter or a somewhat less positive review for a discriminatory reason affects one's "terms, conditions, or privileges of employment."  But on a motion to dismiss, the burden is on Defendants to show why these actions did not do so, and Defendants have failed to carry that burden under governing law.  Defendants' arguments were singularly focused on reinvigorating the text of the federal-sector Title VII and ADEA provisions, and, significantly, Defendants failed to make any argument for why these claims should be dismissed under *Chambers*—to say nothing of their failure to make any argument of any kind with respect to the Rehabilitation Act.  What is more, Defendants' approach has left the Court without briefing on the novel and important question of how to interpret "terms, conditions, and privileges of employment" in a post-*Chambers* world.  If Defendants wish to raise adverse-action arguments with respect to these claims at summary judgment, they are free to do so.  Deferring the adverse-action determination until summary judgment is already common practice for certain categories of claims, such as reprimands.  *Bell*, 2022 WL 4534603, at *6 ("[M]any courts, including this one, have deferred consideration of letters of reprimand until summary judgment.").  In this case, it is appropriate for counseling letters and performance evaluations as well.

The Court will, however, dismiss these claims under the retaliation standard.  In the retaliation context, letters of counseling and performance reviews typically do not constitute materially adverse actions absent some further "tangible job consequences," *Baloch*, 550 F.3d at 1199 (quoting *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005)), such as "financial harms" or impacts related to an employee's "position, grade level, salary, or promotion opportunities," *id.*  Conversely, if such acts do precipitate "tangible job consequences," *id.*, or create a predictable and direct prospect of such consequences, they might well "dissuade[] a reasonable worker from making or supporting a charge of discrimination," which is all that is required for purposes of a retaliation claim, *White*, 548 U.S. at 68 (internal quotation marks omitted).  Accordingly, when it comes to letters of counseling and performance reviews in a retaliation case, there is no categorical rule, and the inquiry depends on the particular allegations.  Mere speculation that some unspecified future harm might occur as a result of a performance review or letter of counseling is typically insufficient.  *See Bridgeforth*, 721 F.3d at 663–64.  But where an employee alleges, for instance, that an employer "g[i]ve[s] performance awards upon . . . the basis of the employee's rating of record," or premises a similar type of action on the employee's performance review, that allegation might satisfy the adverse action requirement for purposes of a retaliation claim.  *Weber*, 494 F.3d at 185.

Bain has not sufficiently tied the performance evaluations and counseling letters she received to any "tangible job consequences," *Baloch*, 550 F.3d at 1199 (quoting *Whittaker*, 424 F.3d at 648), or, indeed, any consequence that would "dissuade[] a reasonable employee from making or supporting a charge of discrimination," *White*, 548 U.S. at 68.[13]  She contends

---

[13] Although, as discussed, the D.C. Circuit has at least at times suggested that some additional tangible job consequence is generally required to support a retaliation claim arising out of a performance evaluation, it has also repeatedly held, consistent with the Supreme Court's holding

otherwise, because she has alleged that each of these occurrences became part of her record and that DOJ relied on them when taking more tangible actions against her, most notably terminating her.  Dkt. 16 at 29, 33, 34, 41 (Am. Compl. ¶¶ 104–05, 128, 130, 151); Dkt. 34 at 20; Dkt. 53-2 at 145–46, 218 (Pl.'s Ex. 1).  But whether tangible job consequences eventually occurred is not the question.  The question is whether these consequences were foreseeable at the time the challenged actions occurred.  If the rule were otherwise, each instance of retaliation that fell short of an adverse action on its own would linger like some kind of Schrödinger's cat, either actionable or unactionable based on some future event that may or may not transpire.  Here, at the time Bain received the evaluations and counseling letters at issue, there was no reason to believe that these actions would provide support for her later dismissal.  After all, when Bain initially raised these claims in the administrative process, her termination was still years in the future.  *See* 53-4 at 4, 15–16, 23 (Pl.'s Ex. 3).  Even when it happened, Bain's removal was predicated on her conduct in certain immigration hearings with no connection to her evaluations and counseling letters.  Dkt. 53-2 at 135–47, 194–222 (Pl.'s Ex. 1).  The letters and evaluations came into play only when DOJ considered Bain's record to identify aggravating and mitigating factors—including whether she was on notice "regarding the expectations of professional behavior"—for  purposes of imposing a sanction.  *Id.* at 145–46, 218.  The connection between the events is thus apparent only in hindsight and would have been entirely speculative at the time Bain received the letters and evaluations.  That does not suffice.

---

*White*, that the inquiry ultimately focuses on whether a reasonable person would be dissuaded from "making or supporting a charge of discrimination."  *Mogenhan*, 613 F.3d at 1166 (quoting *White*, 548 U.S. at 68).  The Court need not decide today whether some circumstance might arise in which a performance evaluation on its own could meet this threshold.

There are further reasons, doctrinal and practical, to reject the rearview-mirror understanding of adverse actions that Bain advances.  For one thing, the notion that retaliatory acts that do not lead predictably and directly to tangible job consequences persist indefinitely as inchoate adverse actions pending some future conduct cannot be reconciled with *Morgan*'s admonition that discrete retaliation claims are just that: discrete.  536 U.S. at 113–14.  They therefore "occur" at a definite and knowable time, and the merits of those discrete claims do not turn on whether they may be "related to" any future acts.  *Id.*  Nor is any such theory necessary to provide relief to plaintiffs.  A retaliatory act that is not cognizable when it occurs provides an employee no entitlement to relief at that time.  If, at a later date, an adverse action occurs that was caused by the prior retaliatory act, the employee can challenge that latter action.  That may be so even in cases in which the second action—the action that is cognizably adverse—is not itself retaliatory.  Under the cat's paw theory of discrimination, for example, a plaintiff can challenge an adverse action that was not motivated by retaliatory animus, but that was proximately caused by a previous retaliatory act intended to cause an adverse action.  *See Burley v. Nat'l Pass. Rail Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015).  And no matter what, a prior, non-cognizable retaliatory act can still provide evidence to support later claims based on acts that *are* sufficiently adverse.  Here, Bain is free to use her counseling letters and performance evaluations as evidence in support of her claim related to her termination, among others.

*Weber*, which contains perhaps the D.C. Circuit's most expansive articulation of the adverse action standard, is consistent with this position.  There, the court of appeals held that summary judgment for an employer was not warranted on the issue of whether a performance evaluation constituted an adverse action, because the employee had demonstrated a direct link between her review and her nonreceipt of a monetary performance award.  494 F.3d at 184–86.

Critically, however, and distinct from this case, it was the employer's stated policy to make performance award determinations based on employees' performance evaluations. *Id.* So it would have been apparent to employees at the time of the evaluation that tangible consequences might have been forthcoming. *Id.* at 185. As just explained, that was not the case here.

The Court will, accordingly, dismiss Bain's discrete retaliation claims related to her August 2015, September 2016, and August 2017 performance evaluations and her July 2016 counseling letter.

## C.    Hostile Work Environment Claim

Finally, Defendants urge the Court to dismiss Bain's hostile work environment claim for failure to state a claim. Dkt. 20-1 at 21–24. They argue that she did not suffer an adverse action for a majority of the discrete acts on which that claim is predicated and further maintain that she "cannot bootstrap discrete acts into a hostile work environment claim." *Id.* at 21.

The Court notes at the outset that, although neither the Supreme Court nor the D.C. Circuit has expressly held that hostile work environment claims are cognizable under the ADEA or the Rehabilitation Act, other circuits have so held, and numerous decisions in this circuit, including of the court of appeals, have generally assumed the same. *See, e.g.*, *Kuraner v. Mineta*, No. 00-5416, 2001 WL 936369, at *1 (D.C. Cir. July 10, 2001) ("Our decision assumes, without deciding, that the Rehabilitation Act creates a cause of action for hostile work environment."); *Baloch*, 550 F.3d at 1201 (assuming that plaintiff could allege a hostile work environment claim under the ADEA and Rehabilitation Act); *Carter v. Carson*, 715 F. App'x 16, 17 (D.C. Cir. 2018) (same with respect to Rehabilitation Act); *Webster v. U.S. Dep't of Energy*, 443 F. Supp. 3d 67, 81 (D.D.C. 2020) ("The ADA and the Rehabilitation Act also cover claims for hostile work environment based on disability."); *Moore v. Castro*, 192 F. Supp. 3d 18, 47–48

(D.D.C. 2016) (holding that a plaintiff had stated a hostile work environment claim under the

ADEA).  Defendants do not argue to the contrary, so the Court will make the same assumption at

this stage of the litigation.

Turning to the merits, "[a] plaintiff asserting a claim based on a hostile work environment

faces a high hurdle." *Fields v. Vilsack*, 207 F. Supp. 3d 80, 92 (D.D.C. 2016).   She must allege

facts sufficient to "show that [her] employer subjected [her] to 'discriminatory intimidation,

ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting

*Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).  By its nature, this is not a "mathematically

precise test," and courts consider factors such as "the frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S.

at 22, 23.  In most cases, a hostile work environment claim requires "a course of conduct—as

distinct from a discrete act—often 'occur[ing] over a series of days or perhaps years.'"  *Fields*,

207 F. Supp. 3d at 93 (quoting *Morgan*, 536 U.S. at 115); *see also Aldrich v. Burwell*, 197 F.

Supp. 3d 124, 136 (D.D.C. 2016) (explaining that, to state a hostile work environment claim, a

plaintiff "must either allege a connected series of incidents that are 'sufficiently continuous and

concerted to be considered pervasive' or set forth facts showing that 'a single episode is severe

enough to establish a hostile working environment'" (quoting *Brennan v. Metro. Opera Ass'n*,

192 F.3d 310, 318 (2d Cir. 1999))).

The principle that "[d]iscrete acts constituting discrimination or retaliation claims . . . are

different in kind from a hostile work environment claim" looms large in this case.  *Franklin v.*

*Potter*, 600 F. Supp. 2d 38, 77 (D.D.C. 2009) (alteration and omission in original) (quoting

*Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003)).  Hostile work environment claims

address workplaces that are "permeated with 'discriminatory intimidation, ridicule, and insult.'"

*Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB*, 477 U.S. at 65).  Simply experiencing

even several adverse and allegedly discriminatory "'work-related actions by supervisors' acting

within the scope of their official duties"—however objectionable that might be, and however

actionable under discrete disparate treatment theories—does not necessarily mean that the

employee was subjected to a hostile work environment.  *Fields*, 207 F. Supp. 3d at 95 (quoting

*Grosdidier v. Chairman, Broad. Bd. Of Governors*, 774 F. Supp. 2d 76, 110–11 (D.D.C. 2011)));

*Aldrich*, 197 F. Supp. 3d at 138 ("[C]ourts typically do not find . . . work-related actions by

supervisors to be sufficient for a hostile work environment claim." (internal quotation marks

omitted)).  The "nature of a hostile work environment claim" is distinct.  *Grosdidier*, 774 F.

Supp. 2d at 110.  For instance, not being promoted for a discriminatory reason is actionable

under a disparate treatment theory, but, standing alone, does not create a hostile work

environment, even if it happens more than once.

     To preserve the distinction between discrete disparate treatment claims and hostile work

environment claims, court have often cautioned that "[u]se of the same discrete acts, upon which

[a] plaintiff bases his discrimination and retaliation claims, to support a hostile work

environment claim is disfavored."  *Townsend v. United States*, 236 F. Supp. 3d 280, 312 (D.D.C.

2017).  A contrary rule would risk "significantly blur[ring] the distinctions between both the

elements that underpin each cause of action and the kinds of harm each cause of action was

designed to address," *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 57 (D.D.C. 2011) (quoting

*Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007)), and could ultimately "transform

virtually every discrimination or retaliation case involving more than one challenged action into

a hostile work environment case," *Fields*, 207 F. Supp. 3d at 95.  This is not to suggest that the same set of discriminatory actions can never give rise to both discrete claims and a hostile work environment claim; it can if the actions are "connected in [a] pervasive pattern of severe harassment." *Wade v. Dist. of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011).  But the Court must keep in mind that the two types claims often address distinct kinds of conduct, and an array of discrete discrimination and retaliation claims does not necessarily translate into a hostile work environment claim.

Bain's hostile work environment claim fails because it constitutes little more than an additional label that she has placed on a series of discrete discrimination and retaliation claims. Her complaint says nothing to support a hostile work environment claim independent from her allegations regarding her discrete claims of discrimination and retaliation.  It instead contains a perfunctory indication that Bain is also bringing hostile work environment claim alongside her discrete claims, Dkt. 16 at 52 (Am. Compl. ¶ 197), a telltale sign of a plaintiff seeking impermissibly to "bootstrap alleged retaliatory incidents into a broader hostile work environment claim," *Franklin*, 600 F. Supp. 2d at 76 (quoting *Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005)).  Nor are the actions Bain alleges that she faced, even those that are independently actionable, indicative of a hostile work environment.  Although her admonishment, counseling, performance evaluation, and reprimand claims are connected in one sense—they all arise out of allegations that Bain acted intemperately or unprofessionally—they do not appear to constitute a pattern of "discriminatory intimidation, ridicule, and insult." *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21).  Rather, even assuming, as the Court must, that these actions were motivated by discrimination or retaliation, they are no more than the "ordinary tribulations of the workplace." *Aldrich*, 197 F. Supp. 3d at 138 (quoting *Faragher v. City of Boca Raton*, 524 U.S.

775, 788 (1998)).  This conclusion does not minimize these discrete actions; it merely recognizes that they are not the sort of continuous and abusive conduct that characterizes a hostile work environment.

The same is true for Bain's work assignment claims.  The Court has already held that these are actionable as discrete discrimination and retaliation claims.  But simply because Bain asserts that she was repeatedly given more onerous or less desirable cases—by two different bosses in two different courts during two different time periods—does not mean that there was a hostile work environment in either workplace.  These are, again, ordinary workplace actions.  Because Bain alleges that they were discriminatory—and because they impacted Bain's terms, conditions, or privileges of employment in discrete instances—they may ultimately provide her a basis for relief.  But not under a hostile work environment theory.  *See Grosdidier*, 774 F. Supp. 2d at 110; *Aldrich*, 197 F. Supp. 3d at 138.

Bain's other discrimination and retaliation claims—the BIA opinion, the OPR investigation, and her termination—are of a piece.  They address discrete acts that may be independently actionable—Bain's termination obviously is.  But they are prototypical workplace actions, and Bain fails to connect them to any pervasive pattern of offensive, harassing, intimidating, or abusive conduct.

In short, Bain has brought a slew of individual discrimination and retaliation claims, some of which may provide a basis for relief in their own right and some of which do not.  But despite asserting numerous claims, she has failed to allege the type of conduct necessary to plead a hostile work environment.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' partial motion to

dismiss, Dkt. 20, is **GRANTED** as to:

- Bain's Privacy Act record amendment claims

- The following discrete discrimination claims:

  o The 2014 denial of Bain's request to be reassigned to the Arlington Immigration
    Court's non-videoconference docket.  Dkt. 16 at 10 (Am. Compl. ¶¶ 36–37);

  o Chief Judge Keller's January 2015 admonishment of Bain for communicating in a
    "rude" and "disrespectful" manner.  Dkt. 16 at 11 (Am. Compl. ¶ 39);

  o The March 2015 reprimand accusing Bain of "intemperate behavior."  Dkt. 16 at
    12 (Am. Compl. ¶ 44);

  o The June 2015 counseling letter accusing Bain of traveling without authorization
    and related revocation of her travel privileges.  Dkt. 16 at 14–15 (Am. Compl. ¶¶
    51–52);

  o The 2015 denial of Bain's second request to be reassigned to the Arlington
    Immigration Court.  Dkt. 16 at 15, 41 (Am. Compl. ¶¶ 54, 150)

  o EOIR's August 3, 2017 referral of Bain to OPR for investigation.  Dkt. 16 at 22
    (Am. Compl. ¶ 74);

  o BIA's January 2, 2018 Order vacating Bain's decision in an immigration matter
    because BIA found that Bain had acted unprofessionally.  Dkt. 16 at 24–25 (Am.
    Compl. ¶¶ 85–86, 89);

  o The publication of the BIA's January 2, 2018 Order to the media.  Dkt. 16 at 25
    (Am. Compl. ¶ 88);

  o EOIR's alleged misconduct before the EEOC, including through the "deliberate
    concealment of adverse evidence."  Dkt. 16 at 42 (Am. Compl. ¶ 155).

- The following discrete retaliation claims:

  o The 2014 denial of Bain's request to be reassigned to the Arlington Immigration
    Court's non-videoconference docket.  Dkt. 16 at 10 (Am. Compl. ¶¶ 36–37);

  o Chief Judge Keller's January 2015 admonishment of Bain for communicating in a
    "rude" and "disrespectful" manner.  Dkt. 16 at 11 (Am. Compl. ¶ 39);

- o The March 2015 reprimand accusing Bain of "intemperate behavior." Dkt. 16 at 12 (Am. Compl. ¶ 44);

- o The June 2015 counseling letter accusing Bain of traveling without authorization and related revocation of her travel privileges. Dkt. 16 at 14–15 (Am. Compl. ¶¶ 51–52);

- o The 2015 denial of Bain's second request to be reassigned to the Arlington Immigration Court. Dkt. 16 at 15, 41 (Am. Compl. ¶¶ 54, 150);

- o Bain's August 2015 performance rating that credited her with satisfactory performance but stated that her professionalism needed improvement. Dkt. 16 at 15 (Am. Compl. ¶ 53);

- o The July 2016 counseling letter ACIJ Nadkarni issued to Bain, accusing her of unprofessional email communication with another judge. Dkt. 16 at 16 (Am. Compl. ¶ 57);

- o Bain's September 2016 performance rating that "criticized her for a lack of professionalism." Dkt. 16 at 16 (Am. Compl. ¶ 58);

- o Bain's August 2017 performance rating that "noted a deficiency in professionalism." Dkt. 16 at 23 (Am. Compl. ¶ 80);

- o EOIR's August 3, 2017 referral of Bain to OPR for investigation. Dkt. 16 at 22 (Am. Compl. ¶ 74);

- o BIA's January 2, 2018 Order vacating Bain's decision in an immigration matter because BIA found that Bain had acted unprofessionally. Dkt. 16 at 24–25 (Am. Compl. ¶¶ 85–86, 89);

- o The publication of the BIA's January 2, 2018 Order to the media. Id. at 25 (Am. Compl. ¶ 88);

- o EOIR's alleged misconduct before the EEOC, including through the "deliberate concealment of adverse evidence." Dkt. 16 at 42 (Am. Compl. ¶ 155);

- Bain's hostile work environment claim.

Defendants' motion is otherwise **DENIED**. The claims that remain are Bain's FOIA and Privacy Act access claims, her Privacy Act release of information claim, her WPA claim, and the discrimination and/or retaliation claims corresponding to the following acts:

| **DISCRETE DISPARATE TREATMENT AND RETALIATION CLAIMS** |
|---|
| |
| **Admonishment, Counseling, and Performance Evaluation Claims (discrimination only, not retaliation)** |
| Bain's August 2015 performance rating that credited her with satisfactory performance but stated that her professionalism needed improvement.  Dkt. 16 at 15 (Am. Compl. ¶ 53) |
| The July 2016 counseling letter ACIJ Nadkarni issued to Bain, accusing her of unprofessional email communication with another judge.  Dkt. 16 at 16 (Am. Compl. ¶ 57) |
| Bain's September 2016 performance rating that "criticized her for a lack of professionalism." Dkt. 16 at 16 (Am. Compl. ¶ 58) |
| Bain's August 2017 performance rating that "noted a deficiency in professionalism."  Dkt. 16 at 23 (Am. Compl. ¶ 80) |
| **Work Assignment Claims** |
| ACIJ Santoro's assignment to Bain of a high volume of "aged" cases, permission to other judges to give their unwanted cases to Bain, and actions thwarting Bain's efforts to complete her work. Dkt. 16 at 11–12 (Am. Compl. ¶¶ 40–43) |
| ACIJ Nadkarni's assignment to Bain of an undue load of "aged, non-detained cases" from the dockets of other judges and toleration of other judges placing their cases on Bain's hearing calendar.  Dkt. 16 at 15–16 (Am. Compl. ¶ 56) |
| **Non-Selection and Denial of Opportunity Claims** |
| The rejection of Bain's application to the BIA.  Dkt. 16 at 44 (Am. Compl. ¶ 161) |
| ACIJ Santoro's denial of permission for Bain to "participate in special work opportunities, including serving as a guest speaker at a training conference and serving as a pro bono liaison judge."  Dkt. 53-4 at 38 (Pl.'s Ex. 3); *see* Dkt. 16 at 14 (Am. Compl. ¶ 48). |
| **Release of Information Claim** |
| The January 2017 release of sensitive information from Bain's personnel file to the AILA and refusal to "retract or claw back the information."  Dkt. 16 at 17 (Am. Compl. ¶ 60) |
| **Removal Claim** |
| Bain's removal from federal service.  Dkt. 16 at 30, 43 (Am. Compl. ¶¶ 106, 158) |

**SO ORDERED**

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: December 23, 2022