## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **QUYNH VU BAIN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **OFFICE OF THE ATTORNEY GENERAL** ) | |
| U.S. Department of Justice, ) | |
| ) | |
| **OFFICE OF THE DEPUTY ATTORNEY GENERAL** ) | |
| U.S. Department of Justice, ) | |
| ) | **No. 21-Civ-1751 (RDM)** |
| **OFFICE OF PROFESSIONAL RESPONSIBILITY** ) | |
| U.S. Department of Justice, ) | |
| ) | |
| **EXECUTIVE OFFICE FOR IMMIGRATION** ) | |
| **REVIEW,** U.S. Department of Justice, ) | |
| ) | |
| **OFFICE OF INFORMATION POLICY** ) | |
| U.S. Department of Justice, ) | |
| ) | |
| Defendants. ) | |
| ) | |

# PLAINTIFF'S EXHIBIT 27

Filed Under Seal August 19, 2022

**INDEX – PLAINTIFF'S EXHIBIT 27**
**Bain v. USDOJ, No. 21-cv-1751 (RDM)**

Communications with the DOJ Office of Professional
Responsibility. ......................................................................................... Pages 1 to 62

Ethics and Professionalism Guide for Immigration Judges......................................... Pages 35 to 44

Plaintiff's Response to OPR Letter of Inquiry, dated November 15, 2017 ................. Pages 63 to 159

OPR Supplemental Letter of Inquiry, dated March 7, 2018......................................... Pages 160 to 161

Plaintiff's Response to OPR Supplemental Letter of Inquiry,
dated March 20, 2018. ................................................................................... Pages 162 to 173



**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue, N.W., Suite 3266*
*Washington, D.C. 20530*

AUG 2 9 2017

Jean King
General Counsel
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2600
Falls Church, VA  22041

Dear Ms. King:

     The Executive Office for Immigration Review (EOIR) advised the Office of Professional Responsibility (OPR) of allegations that Immigration Judge (IJ) Quynh Vu Bain engaged in professional misconduct by failing to demonstrate appropriate judicial temperament, and act with appropriate professionalism and impartiality in connection with removal proceedings in several cases.  OPR has initiated an inquiry into these matters.

     Specifically, in a letter dated March 1, 2017, a copy of which is attached hereto, ███████ ████ counsel for attorneys ███████ and ██████████ alleged that during a hearing on February 1, 2017, in ██████ IJ Bain went off the record and berated ███████ by making derogatory statements about ███████ professionalism and performance.  When IJ Bain went back on the record, she did not repeat all of her statements for the record.  ███ alleged that in another case, ████████████ on February 17, 2017, IJ Bain interrupted ███████ direct examination on several occasions and made statements mocking ████████.  IJ Bain again went off the record and further mocked, berated, and disparaged ███████.  When IJ Bain went back on the record, she refused to restate what she had said off the record despite ████████████ request that IJ Bain do so.  According to ███████ letter, IJ Bain also refused ████████ request for a brief recess so that ███████ could compose herself, and denied without explanation ████████ oral request that IJ Bain recuse herself from the proceedings.

     ██████████ March 1, 2017 letter also alleges that IJ Bain engaged in similarly intemperate and unprofessional conduct with regard to ████████████ represented respondent ██ and several family members involved in removal proceedings.  The individual family members' cases were initially before different judges and were proceeding at different speeds, and ███████ filed written motions to consolidate the various cases before a single immigration judge.  With regard to the consolidation of one of those matters, ███████ advised IJ Bain that another judge, IJ John M. Bryant, had granted the motion to consolidate.  ███████ claims that upon hearing this representation, IJ Bain walked out of the courtroom to have an off-the-record, *ex parte*

ᏮᏮᎾᏮᎾ

discussion about the case with IJ Bryant. After returning to the courtroom and while still off the record, IJ Bain accused ████████ of unethical conduct. According to ████████ during the subsequent merits hearing for ████████ client, IJ Bain made several additional intimidating and hostile comments about ████████ At the conclusion of the hearing and, again, while off the record, IJ Bain allegedly made further derogatory comments that demonstrated an intense personal dislike of ████████

In a subsequent letter dated March 28, 2017, ████████ alleged that IJ Bain had interfered with the administration of justice and had potentially obstructed justice with regard to her handling of a motion filed by ████████ seeking to have IJ Bain recuse herself from conducting hearings in cases where ████████ served as respondent's counsel. ████████ claims that IJ Bain required the Administrator of the Court to appear and testify under oath about the complaint, and has improperly confronted and intimidated several courthouse security officers who are potential witnesses with regard to the recusal issue.

Finally, EOIR advised OPR that on June 8, 2017, IJ Bain issued an Order Denying Motion for Recusal in response to motions to recuse filed by attorneys ████████ This order contains inappropriate personal commentary directed at ████████ and ████████ and demonstrates that IJ Bain conducted her own research about these individuals to assemble derogatory information that IJ Bain used to justify her decision. The personal commentary was not only derogatory, but also irrelevant and in some important respects false. The allegations are that:

1. IJ Bain falsely claimed that ████████ committed fraud in connection with bankruptcy proceedings in Norfolk, Virginia, even though ████████ is not the same "████████ who filed for bankruptcy;

2. IJ Bain falsely stated that ████████ law firm represented the government of Iran;

3. IJ Bain stated that ████████ had a "reputation for unscrupulous dealings" because of a change of venue motion ████████ filed in the San Antonio Immigration Court;

4. IJ Bain mocked ████████ membership in the Federal Bar Association and American Immigration Lawyers Association;

5. IJ Bain cited a *Washington Post* article as evidence that ████████ s someone "who pursued meritless complaints against government personnel to get what she wants";

6. IJ Bain noted that ████████ had previously represented an Assistant U.S. Attorney facing internal Department discipline for misusing government funds;

7. IJ Bain belittled ████████ employment history as showing no familiarity with the work of immigration judges and thus placing ████████ "in no position to pass

00000
PLAINTIFF'S EXHIBIT 27   0002

judgment on whether the undersigned judge, a 26-year veteran of the Justice Department, should be disciplined on patently false, outrageous, and malicious accusations that his client invented";

8.    IJ Bain accused ▮▮▮▮▮▮▮ of initiating improper *ex parte* communications by interviewing court personnel; and

9.    IJ Bain declared that ▮▮▮▮▮▮ "unseemly conduct" had caused "substantial disruption in court operations and hard feelings among court personnel."

To assist OPR in its inquiry, please ask IJ Bain to prepare a written response addressing the allegations detailed above. In particular, IJ Bain should address her reasons for going off the record in the above-described cases and her reasons for refusing to recount for the record the complete substance of all off-the-record discussions. IJ Bain should address the allegations that she behaved unprofessionally and intemperately by making repeated derogatory statements about counsel. IJ Bain should also describe what research she conducted regarding her Order Denying Motion for Recusal, including any contact she had with potential witnesses to the conduct alleged in the recusal motions and the reason for and relevance of her investigation into and comment on personal information concerning ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ IJ Bain should address whether her conduct comported with the legal and ethical standards applicable to IJs and Department attorneys.

Please note that IJ Bain's written response should be her personal account of the matter and should not be edited or revised by any Department employee. IJ Bain should provide OPR with all documents and tape recordings that would aid OPR in its review. IJ Bain may contact other personnel if necessary to obtain documents, but should refrain from discussing the matter with any potential witnesses. In her response, IJ Bain should identify any witnesses who would be able to provide relevant information and identify each such witness' role in this matter, but IJ Bain should not contact such witnesses for the purpose of obtaining any written or oral statement.

IJ Bain should provide OPR with information regarding her personal background and experience, including her length of service and positions held with the Department. In addition, to assist OPR in determining which ethical rules apply, IJ Bain should identify each state in which she is licensed to practice law and her category of membership (*e.g.*, active, inactive, associate, or some other membership category).

For your information and to assist IJ Bain in preparing her response, enclosed is a document describing the policies and procedures OPR follows in handling allegations of misconduct and judicial findings against Department attorneys.

Please ask IJ Bain to provide her written response and all responsive documents in electronic format – either as attachments to an e-mail, or on a disk sent by Federal Express – to Assistant Counsel Leslie Ann Gerardo by September 15, 2017. If it is not feasible for IJ Bain to do so, she should contact Assistant Counsel Gerardo. IJ Bain may, but is not required to, provide you with a courtesy copy of her response. In addition, OPR welcomes any information or comments you may wish to provide by September 15, 2017.

PLAINTIFF'S EXHIBIT 27   0003

Thank you for your assistance in this matter.  If you or IJ Bain has any questions, please contact Assistant Counsel Gerardo at (202) 514-0873, or by e-mail at leslie.a.gerardo@usdoj.gov.

Sincerely,

Robin C. Ashton
Counsel

Enclosures

cc:    Associate General Counsel Marlene Wahowiak
       (with enclosures)

PLAINTIFF'S EXHIBIT 27   0004

 **NOSSAMAN** LLP

ATTORNEYS AT LAW

1666 K Street, NW
Suite 500
Washington, DC 20006
T 202.887.1400
F 202.466.3215

March 1, 2017

Assistant Chief Judge for
  Conduct and Professionalism
Office of the Chief Immigration Judge
5107 Leesburg Pike, Suite 2500
Falls Church, VA  22041

Dear Assistant Chief Judge:

As a lawyer long involved in the representation and discipline of lawyers, and particularly Department of Justice attorneys, I was asked to assist two lawyers with their complaints who have been bullied and intimated by an Immigration Judge of the Arlington Court, Quynh Vu Bain.

My clients, ▮▮▮▮▮▮ and ▮▮▮▮▮▮ are dedicated and hardworking immigration attorneys trying to do their best in a difficult area of the law.  They were reluctant to make a complaint but they have no other alternative.  They and their clients deserve the opportunity to have full and fair hearings without intimidation by a presiding official.

The factual bases for these two complaints are summarized as follows:

1.    **Complaint on Behalf of Attorney** ▮▮▮▮▮▮

▮▮▮▮▮▮ is an attorney licensed to practice law in New York, New Jersey, Virginia, and the District of Columbia.  She has been licensed to practice law since 2008 and has been practicing in the area of immigration law since 2011.  She is currently an active member of the American Immigration Lawyers Association and the Federal Bar Association.  She has taught continuing legal education courses on various aspects of immigration law, including asylum law.

▮▮▮▮▮▮ has represented thousands of individuals in the Immigration Court, before the U.S. Citizenship and Immigration Services, before the Immigration and Customs Enforcement, before the Department of State, and in state court.  She has never before filed a complaint against an Immigration Judge.  She has never been criticized by any other immigration judge; in fact, she has received numerous compliments.

GC0905

March 1, 2017
Page 2

### A.    Experience with Judge Bain

██████████ has appeared before Judge Bain in several master calendar hearings and individuals hearings.  Before December 2016, Judge Bain treated ██████████ with respect in the courtroom; however, her demeanor toward██████████ as well as other immigration attorneys) became increasingly abusive in late 2016 and in 2017.

####     1.    First Demonstration of Bias

██████████ appeared before Judge Bain on February 1, 2017, in the ██████████ During the hearing, Judge Bain went off the record and berated ██████████ calling her, among other derogatory statements, unprofessional and inadequate.  When Judge Bain went back on the record, she repeated some of her statements on the record.  When ██████████ reserved appeal on the issue, Judge Bain snidely responded "good luck with that."  After the hearing, an individual who had been in the courtroom apologized to ██████████ and said the berating that she was given was uncalled for.  Witnesses present in the courtroom for Judge Bain's off-the-record comments can corroborate Judge Bain's abusive comments.  These parties include counsel for the Department of Homeland Security (hereinafter "DHS"), the interpreter, and the courtroom security guards.

####     2.    Second Demonstration of Bias toward Counsel

██████████ appeared for a continued individual hearing before Judge Bain on February 17, 2017, in the ██████████  At the previous hearing, Judge Bain questioned the client for over an hour and then continued the case for continued direct examination.  During the examination, Judge Bain interrupted ██████████ on several occasions, mockingly informed her that hearsay was not permitted in immigration court because "if [you] went to law school, [you] would know that hearsay is not reliable evidence."

When ██████████ raised an objection to cross-examination where the government had not laid a foundation for questions to a witness about whether the witness had sufficient personal knowledge to testify about certain events, Judge Bain overruled the objection, stating she "assumed the Respondent had personal knowledge" of an incident.  Judge Bain then went off the record and began berating ██████████ in a loud voice.  During the episode, ██████████ asked Judge Bain to refrain from chastising her off the record and requested that all communications from Judge Bain be placed on the record.  Judge Bain continued to scream at ██████████ for a period of over five minutes.  During the episode, Judge Bain accused ██████████ of threatening her with an appeal because counsel used the term "for the record."  Judge Bain then proceeded to mock and mimic ██████████  Judge Bain also called ██████ several disrespectful names and again referred to her as "unprofessional."  When Judge Bain finally went back on the record, after ██████████ repeated requests, Judge Bain again would not restate what she said off the record.

49176980_3

OCU006

March 1, 2017
Page 3

This berating not only caused ▮▮▮▮▮▮▮ to have a strong emotional reaction, but, also a visible, physical reaction, including red hives and uncontrollable hand shaking. When ▮▮▮▮▮▮ moved the court for a brief recess to compose herself, Judge Bain denied the motion. ▮▮▮▮▮▮ explained to the Court that she was having a physical reaction to the scolding and that she would be unable to focus on DHS' questioning because of her emotional state, the judge again denied her motion, and the hearing continued until DHS finished its cross examination.

When ▮▮▮▮▮▮ returned from the break, she moved the Court to recuse herself from the hearing because of what had just occurred. Without giving any reason, the Court denied the motion. ▮▮▮▮▮▮ stated, for the record, the request for the recusal was based on the judge's personal bias against her that had come to light during the course of the hearing. Judge Bain again denied the motion and asked ▮▮▮▮▮▮ if she was "attempting to set up an ineffective assistance of counsel claim because [she] was doing a good job." ▮▮▮▮ asked if the Court was making the finding that her representation was, in fact, ineffective; the Court responded that ▮▮▮▮▮▮ was simply creating a poor record.

After the hearing, several persons present in the courtroom commented on the judge's extreme behavior. The Immigration Court should interview the other parties present in the courtroom on February 17, 2017, for the hearing that began at approximately 2:00 p.m. These parties include, but are not limited to, the Assistant Chief Counsel, the interpreter, the security guards, a paralegal from ▮▮▮▮▮▮ office, and ▮▮▮▮▮▮▮▮▮▮ paralegal's affidavit describing what occurred is attached to this letter.

B.    **Violations of the Code of Conduct**

Immigration Judges are bound by the "Immigration and Professionalism Guide for Immigration Judges." This guide lists several provisions which are "binding on all Immigration Judges." As demonstrated in further detail below, Judge Bain has violated several provisions of this guide.

C.    **Acting with Judicial Temperament and Professionalism**

"An Immigration Judge should be patient, dignified, and courteous, and should act in a professional manner towards all ... lawyers ... with whom the Immigration deals in his or her official capacity, and should not, in the performance of official duties, by words or conduct, manifest improper bias or prejudice." The provision further notes that "[a]n immigration judge should be alert to avoid behavior, including inappropriate demeanor, which may be perceived as bias."[1]

In this case, Judge Bain clearly violated this provision. Specifically, the Judge accused ▮▮▮▮▮▮ of threatening her with an appeal when counsel was simply attempting to establish a record. The Judge also screamed at ▮▮▮▮▮▮ off the record, called her

---

[1] *See* Provision IX, Acting with Judicial Temperament and Professionalism

GCU007

March 1, 2017
Page 4

demeaning names, and was disrespectful. Following each incident, persons present in the courtroom acknowledged Judge Bain's unprofessional and disrespectful treatment of undersigned counsel. Since several individuals present in the courtroom noticed the biased, undignified manner in which Judge Bain addressed ▇▇▇▇▇ during off-the-record comments, Judge Bain's behavior was clearly biased in the mind of a reasonable person. The record and eyewitnesses will demonstrate that Judge Bain has violated this tenet of the Judicial Conduct Regulations.

### D.    Impartiality

"An Immigration Judge shall act impartially and shall not give preferential treatment to any organization or individual when adjudicating the merits of a particular case."

In this case, Judge Bain's behavior directed at ▇▇▇▇▇ provided DHS counsel at an unfair advantage and gave DHS counsel preferential treatment throughout the course of the case. The court's treatment of counsel demonstrated a hostile amicus toward Respondent. From the Respondent's perspective, while she may not have fully understood what was said, the hostility and loudness certainly conveyed the court's disdain for Respondent's counsel and generated concern about the fairness of her proceedings.

### E.    Witnesses to Judge Bain's Behavior

1.    ▇▇▇▇▇ interpreter at the February 1, 2017, hearing
2.    ▇▇▇▇▇ Assistant Chief Counsel at both the February 1, 2017 and the February 17, 2017 hearings
3.    ▇▇▇▇▇ interpreter at the February 1, 2017, hearing
4.    ▇▇▇▇▇ paralegal at ▇▇▇▇▇ who was present at the February 17, 2017, hearing and an affiant
5.    Courtroom security guards who were present for both hearings

### F.    Requested Action

Since Judge Bain has exhibited a repeated failure to maintain the required tenets of Immigration Judges, we respectfully request this Agency review Judge Bain's conduct as an Immigration Judge in the Arlington, Virginia Immigration Court and to take appropriate action.

## II.    Complaint on Behalf of Attorney ▇▇▇▇▇

During 2016 and up to the present, ▇▇▇▇▇ has been representing a family unit, all of whom were involved in removal proceedings. The lead Respondent was the mother ▇▇▇▇▇ [2] Included in this family unit were the mother's two daughters (who were both minors), the mother's two sons (who were both adults), and a grandson (born to one of the adult sons). While

---

[2] In the matter of ▇▇▇▇▇ .

0ᴄ0003

PLAINTIFF'S EXHIBIT 27   0008

March 1, 2017
Page 5

the family was before the Immigration Court, their cases were proceeding before different judges and at different speeds. ▉▉▉▉▉ strategy was to consolidate these cases before a single immigration judge.

Various family members admitted to the charges in the Notice to Appear and ▉ ▉▉▉▉ efforts shifted to the preparation of asylum applications. The applications were complicated. Some had separate but overlapping circumstances and claims for relief. While both minor daughters had overlapping derivative claims with Respondent, one daughter also had an independent application based on her own factual circumstance.

▉▉▉▉▉ had timely filed written motions to consolidate the various cases and to continue the proceedings in order to fully prepare. The consolidation motions became more and more heated as Judge Bain dealt with each one. With regard to the consolidation of the older daughter's case, ▉▉▉▉▉ advised the Court that the older daughter had appeared before Judge Bryant at the Arlington Immigration on July 28, 2016 for her initial Master Calendar. ▉ ▉▉▉▉▉ made an oral motion to consolidate the daughter's case with the mother's case on February 16, 2017. It was ▉▉▉▉▉ understanding that the motion to consolidate was granted at the July 28, 2016 Master Calendar as the daughter's case was set for the same day and time as her mother's case – February 16, 2017. While the hearing notice reflected that the matter was still assigned to Judge Bryant's docket, that appeared to ▉▉▉▉▉ to be a clerk's error since it was understood by her that Judge Bryant had granted the motion to consolidate.

Upon hearing ▉▉▉▉▉ representations concerning this consolidation, Judge Bain walked out of the courtroom, apparently to have an off-the-record discussion of this case with Judge Bryant. ▉▉▉▉▉ was not told                          that she had a right to be present on a matter affecting her clients.

When Judge Bain returned to the courtroom, she, while off the record, began making allegations of ethical misconduct by ▉▉▉▉▉ including advising that ▉▉▉▉▉ had a duty of candor to the court – as if she had violated that duty. The accusation was very unnerving.

During the merits hearing for the Respondent mother, Judge Bain made several intimidating and hostile comments towards ▉▉▉▉▉ showing a personal dislike. The Judge criticized ▉▉▉▉▉ by saying she was not prepared – which was not accurate. She interjected herself into the questioning of the witness so often and so forcefully that it was impossible for ▉▉▉▉▉ to make a record as to why a continuance was necessary to demonstrate the Respondents' issues.

Judge Bain's improper conduct got increasingly hostile. At the conclusion of the hearing and while off the record, Judge Bain told me to remain in her courtroom. She told DHS counsel to leave and she ordered all the observers in the courtroom to leave. Only the interpreter, ▉▉▉▉▉ remained in the courtroom. Two courtroom security guards, one of whom is ▉▉▉▉▉ also saw and heard the Judge criticize ▉▉▉▉▉ The DHS attorneys at the hearing were ▉▉▉▉▉ Jason Stern.

PLAINTIFF'S EXHIBIT 27   0009

March 1, 2017
Page 6

Judge Bain then began a very stern, critical lecture. "I do not know how long you have been practicing, but I have been practicing for 25 years" and that she felt ████████ efforts were a "shoddy representation. The Judge again warned ████████ about the Rules of Professional Conduct, especially as it relates to "candor ... diligence and competency." She lectured ████████ on her reputation and how a bad reputation would follow wherever she goes.

When Judge Bain finished, she would not look at ████████ or let her respond. She walked out of the courtroom as I was trying to speak to her. By her words and comments, Judge Bain has demonstrated an intense personal dislike for ████████ While ████████ certainly does not like being bullied and intimidated by any judge, her primary concern is that this dislike of her will impact her clients getting a full and fair hearing before Judge Bain. ████████ does not believe her clients can get a fair hearing because of Judge Bain's intense dislike of her. Judge Bain deliberately launched this verbal attack when she was off the record.

### III.    Full Cooperation

████████ and ████████ will fully cooperate with your inquiry and provide even more details as to Judge Bain's conduct. The fact that Judge Bain removes witnesses from the courtroom and goes off the record when she launches her personal attacks speaks volumes to her intent to bully these attorneys.

While certainly Section IX of the Ethics and Professionalism Guide for Immigration Judges mandating "Judicial Temperament" sets the basic standard of conduct, Judge Bain's actions are also subject to the Rules of Professional Conduct as a lawyer for the Department of Justice. Rule 1.1 requires her to demonstrate the necessary competence to preside over a proceeding and to adhere to the basic rules governing those proceedings, including staying on the record. Rules 3.4 and 3.5 require a lawyer to exercise fairness to the opposing party and counsel and to maintain the impartiality and decorum of the tribunal. Lastly, Rule 8.4(d) prohibits a lawyer from engaging in conduct that seriously interferes with the administration of justice.

As emphasized in *Matter of V-S-L-C*, 26 I&N Dec. 658 (BIA 2015), respondents and their lawyers should expect "dignity, respect, courtesy and fairness in a hearing before an Immigration Judge," *Cham v. Att'y Gen. of U.S.*, 445 F.3d 683, 690-91 (3rd Cir. 2006). Conduct by an Immigration Judge that is perceived to be bullying or hostile can affect the fairness of the entire proceeding. Judge Bain has been counseled in the past but that apparently has not been sufficient to instill the necessary dignity and decorum required in her proceedings.

Because ████████ and ████████ have been forced to file complaints against Judge Bain and Judge Bain's already hostile attitude towards them, we are asking that Judge Bain be recused from presiding over future hearings where ████████ and ████████ are representing respondents.

000010

PLAINTIFF'S EXHIBIT 27   0010

March 1, 2017
Page 7

Thank you for your attention to this matter.

Yours truly,

██████████████

of Nossaman LLP

████

Enclosure

000011

49176989_3

PLAINTIFF'S EXHIBIT 27   0011

**AFFIDAVIT OF** █████████

I, ███████████ swear under penalty of perjury that the following facts are correct and true to the best of my knowledge:

I am a paralegal at ███████████ In that role, I work closely with clients and with attorneys to prepare cases for filings before the Executive Office for Immigration Review ("EOIR"), the Asylum Office, U.S. Citizenship and Immigration Services, and other administrative agencies.

On Friday, February 17, 2017, I accompanied ██████████ (hereinafter "█ ███████ to a hearing at EOIR at 1901 South Bell Street, Suite 200, Arlington, Virginia 22202. The hearing was scheduled before the Honorable Quynh Vu Bain (hereinafter "Judge Bain") at 1:00PM. This was the first time I ever observed a hearing at the Arlington Immigration Court. My understanding was that this hearing was continued from a previous date. I was not present at the previous hearing.

I noticed the interactions between Judge Bain and █████████ Throughout the hearing, Judge Bain appeared very agitated and annoyed at █████████ and her client. For example, every time █████████ would speak, Judge Bain would purse her lips, roll her eyes, and/or check her watch as though she had somewhere else to be. Additionally, when █████████ addressed Judge Bain to clarify certain positions, Judge Bain would, on multiple occasions, chuckle to herself or rest her head on her hands as though exasperated.

About halfway through the hearing, █████████ objected to a question from the prosecutor. Judge Bain overrules the objection and stated she would assume the witness had certain knowledge. █████████ asked if the Court was making assumptions as to her client's knowledge. Judge Bain said she was.

At that point, Judge Bain took a deep breath and went off the record. During her off the record comments, Judge Bain viciously attacked, insulted, and demoralized █████████ When addressing █████████ Judge Bain used words such as "unprofessional," "rude," and "disrespectful." Judge Bain also mimicked █████████ voice and asked her if she was threatening the judge with an appeal. At that point, Judge Bain said "for the record" multiple times in different tones—attempting to mimic █████████ s voice.

█████████ interrupted Judge Bain and asked her to state everything on the record. Judge Bain continued her tirade and then informed █████████ that she was not allowed to speak for the rest of the cross examination. Judge Bain went back on the record and █████████ repeated her request for Judge Bain to state what she had said in her off-the-record- comments to █████████ Ms. Bain did not repeat everything she had stated.

█████████ then respectfully requested for a recess due to her inability to speak or concentrate as a result of being spoken to with excessive insults. In fact, █████████ showed Judge Bain, as well as everyone in the court, that her hand was shaking because of the shock.

1

000012

After the cross-examination was done, a ten minute recess was allowed. When everyone returned to the court room, ███████ asked the court to recuse itself. Judge Bain went off-the-record again and told ███████ that she was setting up a claim for "ineffective assistance of counsel" for her client. ███████ asked if she should continue representing the client if the Court felt she was ineffectively representing her and Judge Bain told her to "just ask your questions."

At the conclusion of the hearing, ███████ told everyone to have a good weekend and walked out of the room. Judge Bain did not respond to her. Once at the door, Judge Bain told the prosecutor and the interpreter to have a nice weekend. I observed, throughout the course of the hearing, that Judge Bain was pleasant toward the prosecutor and treated her with respect.

It was clear throughout the hearing that Judge Bain's dislike for Ms. Blessinger caused her to treat ███████ and her client in a different manner than the prosecutor. I believe that Judge Bain's personal bias towards ███████ caused her to deny the client's case.

Signed this 20ᵗʰ day of **February 2017.**

███████████████████

Sworn and Subscribed before me in the County of Fairfax, Commonwealth of Virginia. This 20ᵗʰ day of February 2017.

Kristen A Hallowell
Commonwealth of Virginia
Notary Public
Commission No. 7███
My Commission Expires ██████

*Kristen Hallowell*
**Notary Public**

████████████████

Falls Church VA 22042

2



ATTORNEYS AT LAW

1666 K Street, NW
Suite 500
Washington, DC 20006
T 202.887.1400
F 202.466.3215

March 28, 2017

Assistant Chief Judge for
  Conduct and Professionalism
Office of the Chief Immigration Judge
5107 Leesburg Pike, Suite 2500
Falls Church, VA  22041

Re:     **Supplement to March 1, 2017, Complaint Against the Honorable Quynh Vu Bain**

Dear Assistant Chief Judge:

On March 1, 2017, I filed a Complaint against Judge Bain on behalf of my clients, ██████
████████████████████  That Complaint described that, for unknown, reasons, Judge
Bain had chosen, both on and off the record, to belittle, mock, and intimidate my clients while
they were attempting to represent respondents appearing in court.  Out of concern that these
personal attacks are impacting the fairness and impartiality of the proceedings before Judge Bain
by denying due process to the aliens represented by my clients, I and my clients felt there was no
other alternative but to bring this lack of professionalism and improper conduct to your attention.

Rather than maintaining the *status quo* while you have the opportunity to investigate our
allegations, Judge Bain has chosen to exacerbate the problem by engaging in her own
investigation of these allegations.  By her conduct, Judge Bain is clearly interfering with the due
administration of justice and very possibly obstructing justice.

After the filing of the complaint on March 1, 2017, ██████████ filed a legally proper
sufficient and motion for Judge Bain to recuse herself from conducting further hearings where
████████ was representing a respondent. ██████ motion to recuse described
ample grounds for the recusal and was supported by affidavits.  Judge Bain was advised that ██
██████ herself may well be a witness on her complaint as Judge Bain did a great deal of her
chastisement of ██████ off the record. ██████████ paralegal was also a likely
witness against Judge Bain.

Rather than recusing herself as she was required to do, Judge Bain began to demand that
██████████ explain why she had filed the complaint and why she did not directly notify
Judge Bain of the complaint– a clear violation of the attorney-client privilege.  Judge Bain also
required the ██████████, ████████, to appear before her to testify

Assistant Chief Judge for
 Conduct and Professionalism
March 28, 2017
Page 2



under oath about her knowledge of the complaint. Judge Bain refused to recuse herself, failed to provide any reason for her failure to disqualify herself, and required ▮▮▮▮ to proceed on a contested matter.

Judge Bain has not stopped there. She has also improperly confronted and intimidated several courthouse security officers. Judge Bain left one courthouse security officer frightened and crying after directing this security officer into a conference room for a 20 to 25 minute interrogation and later attempted to force her to sign an affidavit. This security officer is a witness to Judge Bain's off-the-record berating of ▮▮▮▮ nd is now terrified that she could lose her job if she cooperates in an investigation against Judge Bain. This conduct by Judge Bain is so improper that it alone requires the lodging of another complaint because Judge Bain is usurping your role and trying to coerce witnesses to testify favorably for her.

We respectfully ask that you order Judge Bain to cease and desist her attempts to interfere with your investigation, that she should not attempt to interview any additional potential witnesses, and she turn over to you all of her notes and affidavits she has already created from potential witnesses. We further ask that you direct Judge Bain to recuse herself from further proceedings involving ▮▮▮▮ and ▮▮▮▮ until such time as you have concluded your investigation of these very serious matters. We do not want to appear to be telling you how to do your job, but in this instance, Judge Bain appears to be doing what she has to know is improper and what she knows you would not condone.

Thank you again for your time and attention. Our only goal is to make sure these respondents receive fair and impartial hearings in these difficult cases.

Yours truly



of Nossaman LLP

GU0316

PLAINTIFF'S EXHIBIT 27   0015

**Bain, Quynh (EOIR)**

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Wednesday, August 30, 2017 8:52 AM |
| **To:** | Gerardo, Leslie A. (OPR) |
| **Cc:** | Bain, Quynh (EOIR) |
| **Subject:** | FW: ███████ cases |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hello, Ms. Gerardo:

I am the immigration judge who is the subject of the complaint that attorney ███████ iled with OPR.  Would you have any time to talk by phone today?

Thank you.

Quynh Vu Bain
Immigration Judge
Arlington, Virginia

-----Original Message-----
From: Nadkarni, Deepali (EOIR)
Sent: Wednesday, August 30, 2017 12:33 AM
To: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
Cc: Bowyer, Cheri (EOIR) <Cheri.Bowyer@EOIR.USDOJ.GOV>; Castro, Deborah (EOIR)
<Deborah.Castro@EOIR.USDOJ.GOV>; Wahowiak, Marlene (EOIR) <Marlene.Wahowiak@EOIR.USDOJ.GOV>; King, Jean
(EOIR) <Jean.King@EOIR.USDOJ.GOV>; Cheng, Mary (EOIR) <Mary.Cheng@EOIR.USDOJ.GOV>; Keller, Mary Beth (EOIR)
<MaryBeth.Keller@EOIR.USDOJ.GOV>; Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>; McHenry, James
(EOIR) <James.McHenry@EOIR.USDOJ.GOV>
Subject: Re: ███████ cases

Judge Bain, the decision has been made.  Under these circumstances, OCIJ will reassign the cases pursuant to 8 C.F.R.
1003.9(b)(3).

Dee Nadkarni
Assistant Chief Immigration Judge
703.305.1247

Sent from my iPad

> On Aug 29, 2017, at 4:06 PM, Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV> wrote:
>
> Judge Nadkarni:
>
> I oppose the reassignments of cases in which recusal motions have been filed but to which I have not had time to
respond. As you know, I have been in court every day, five days a week, hearing cases.  I am requesting time off the
bench to prepare responses to the recusal motions as well as the OPR complaint. To reassignment the cases in which
attorneys ███████ have filed recusal motions without giving me a fair opportunity to respond would be

1

tantamount to making a ruling that whatever they allege in their recusal motions is true, and that whatever is said in the OPR complaint that their attorneys filed is also true.

>

> I do have the right and an obligation to respond to the recusal motions. I also have a right and an obligation to respond to the OPR complaint. As you know, OPPM 05:02 requires the sitting judge to respond to a recusal motion. The OPPM thus has established a procedure for resolving recusal issues, and that process is EOIR's current official policy concerning recusal. As you know, the attorneys have appealed some of my recusal decisions (denying recusal) to the Board. The Board should have an opportunity to rule on the interlocutory appeals before you decide, on your own, that the recusal motions have merit and disqualify me from hearing the cases. To interfere with the process that the OPPM has established by automatically reassigning cases before the judge has had an opportunity to rule on the recusal motion and before the Board has had an opportunity to rule on any appeals from my decisions would violate the agency's own procedures concerning recusal. To interfere with the process that OPR has established for fielding complaints against immigration judges by presuming that the complaint underlying the recusal motions has merit, thus warranting immediate recusal, is also improper and would violate my due process rights under the law to respond to disciplinary complaints whether made in recusal motions or directly to OCIJ and referred to OPR. Finally, it also would send the wrong message to the private bar community and reinforce further the notion that OCIJ automatically sides with the private bar whenever a complaint is filed, regardless of the merits of the complaint.

>

> Therefore, I ask that you not deprive me of an opportunity to defend myself against unsubstantiated and false allegations. Instead, I ask that you give me sufficient time off the bench to prepare responses to the recusal motions and the OPR complaint. In this regard, I renew my request to have time off the bench over the next two weeks, so that I could have time to prepare responses to the recusal motions and the OPR complaint.

>

> Thank you.

>

> Quynh Vu Bain, Arlington

>

>

>

>

> ---- Original Message

> From: Nadkarni, Deepali (EOIR)

> Sent: Tuesday, August 29, 2017 5:35 PM

> To: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>

> Cc: Bowyer, Cheri (EOIR) <Cheri.Bowyer@EOIR.USDOJ.GOV>; Castro, Deborah (EOIR) <Deborah.Castro@EOIR.USDOJ.GOV>; Wahowiak, Marlene (EOIR) <Marlene.Wahowiak@EOIR.USDOJ.GOV>; King, Jean (EOIR) <Jean.King@EOIR.USDOJ.GOV>

> Subject: Re: ████████████ cases

>

> Greetings, Judge Bain. The pending cases will be reassigned, so please do not respond to the pending motions. Deborah Castro will pick up the ROPs when she is back in the office on Tuesday. Thank you.

>

> Dee Nadkarni

> Assistant Chief Immigration Judge

> 703.305.1247

>

> Sent from my iPad

>

>> On Aug 29, 2017, at 3:13 PM, Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV> wrote:

>>

>> Judge Nadkarni:

>>

PLAINTIFF'S EXHIBIT 27   0017

>> I have those ROP's in my office. I will need them to respond to the OPR complaint that was generated as a result of the ACIJ's referral. I plan to work on the response this coming holiday weekend, since I am in court every day of the week, five days a week. In the meantime, I will give Cheri a list of the ███████████ cases that are in my office. I am unable to give them to her now, because I still need to respond to the attorneys' recusal motions.

>>

>> Thank you.

>>

>> Quynh Vu Bain

>>

>>

>>

>>

>>

>> -----Original Message-----

>> From: Nadkarni, Deepali (EOIR)

>> Sent: Tuesday, August 29, 2017 5:04 PM

>> To: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>

>> Cc: Bowyer, Cheri (EOIR) <Cheri.Bowyer@EOIR.USDOJ.GOV>; Castro, Deborah (EOIR) <Deborah.Castro@EOIR.USDOJ.GOV>

>> Subject: ███████████ cases

>>

>> Good afternoon, Judge Bain. Please take all ROPs in your office in which the respondent's attorney is ████ or ████████ o SLA Cheri Boyer. Cheri will scan them to herself. Thank you.

>>

>> Dee Nadkarni

>> Assistant Chief Immigration Judge

>> 703.305.1247

>>

>> Sent from my iPad

3

## Bain, Quynh (EOIR)

**From:** Gerardo, Leslie A. (OPR)
**Sent:** Wednesday, August 30, 2017 12:47 PM
**To:** Bain, Quynh (EOIR)
**Subject:** RE: ▇▇▇▇▇▇ cases

Judge Bain,

We prefer to communicate by e-mail.  Please send me any questions you have about the process, and I will respond as soon as possible.

Leslie Ann Gerardo

-----Original Message -- -
From: Bain, Quynh (EOIR)
Sent: Wednesday, August 30, 2017 12:16 PM
To: Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
Cc: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
Subject: RE: ▇▇▇▇▇▇ cases

Ms. Gerardo:

Thank you for your response.  I do have procedural questions.  When could we talk?

Thank you.

Quynh Bain


- -Original Message-- -
From: Gerardo, Leslie A. (OPR)
Sent: Wednesday, August 30, 2017 10:59 AM
To: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
Subject: RE: ▇▇▇▇▇▇ cases

Judge Bain,

As the letter to Ms. King indicated, OPR would like a written response from you to the allegations raised by ▇▇▇▇▇▇ After we receive your written response, we will determine whether it is necessary to conduct an in-person interview of you, and will provide further information about the circumstances of such an interview.  If you have any procedural questions about submitting your written response, please let me know.

Sincerely,

Leslie Ann Gerardo

-----Original Message-----
From: Bain, Quynh (EOIR)
Sent: Wednesday, August 30, 2017 8:52 AM

1

**Bain, Quynh (EOIR)**

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Wednesday, August 30, 2017 5:51 PM |
| **To:** | Gerardo, Leslie A. (OPR) |
| **Cc:** | Bain, Quynh (EOIR) |
| **Subject:** | FW: OPR Matter Re: IJ Quynh Vu Bain |
| **Attachments:** | OPR-#421663 v1-<br>OPR_letter_to_Jean_King_(EOIR)_re__Immigration_Judge_Quynh_Vu_Bain.pdf; OPR-#<br>382839-v1-OPR_Policies_and_Procedures_2015.pdf |

**Importance:**         High

Ms. Gerardo:

Since you were left off the email below, would you please confirm that the attached letters from OPR contain all the documents that I will need to have in order to respond to the OPR complaint that the Office of the Chief Immigration Judge referred to OPR?

As it is late in the day, I will send you the list of procedural questions tomorrow.

Thank you.

Quynh Bain, Arlington

**From:** Wahowiak, Marlene (EOIR)
**Sent:** Tuesday, August 29, 2017 3:45 PM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Cc:** Cheng, Mary (EOIR) <Mary.Cheng@EOIR.USDOJ.GOV>; Nadkarni, Deepali (EOIR)
<Deepali.Nadkarni@EOIR.USDOJ.GOV>
**Subject:** OPR Matter Re: IJ Quynh Vu Bain
**Importance:** High

Judge Bain:

The Office of the General Counsel received the attached correspondence from the Office of Professional Responsibility (OPR) advising that it was initiating an inquiry into allegations of misconduct made against you by ███████████ ███████ represents two attorneys who have appeared before you, ████████████ and ███████████ OPR is requesting a written response from you. Please carefully review the letter and attachment as they are self-explanatory.

If you have any questions, please direct them to the OPR attorney assigned to this matter. Her contact information appears in the letter. I am copying your first and second line supervisors for informational purposes.

Marlene Wahowiak
Associate General Counsel

1

PLAINTIFF'S EXHIBIT 27    0020

To: Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
Cc: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
Subject: FW: ████████████ cases

Hello, Ms. Gerardo:

I am the immigration judge who is the subject of the complaint that attorney ████████ filed with OPR. Would you have any time to talk by phone today?

Thank you.

Quynh Vu Bain
Immigration Judge
Arlington, Virginia

-----Original Message-----
From: Nadkarni, Deepali (EOIR)
Sent: Wednesday, August 30, 2017 12:33 AM
To: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
Cc: Bowyer, Cheri (EOIR) <Cheri.Bowyer@EOIR.USDOJ.GOV>; Castro, Deborah (EOIR)
<Deborah.Castro@EOIR.USDOJ.GOV>; Wahowiak, Marlene (EOIR) <Marlene.Wahowiak@EOIR.USDOJ.GOV>; King, Jean
(EOIR) <Jean.King@EOIR.USDOJ.GOV>; Cheng, Mary (EOIR) <Mary.Cheng@EOIR.USDOJ.GOV>; Keller, Mary Beth (EOIR)
<MaryBeth.Keller@EOIR.USDOJ.GOV>; Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>; McHenry, James
(EOIR) <James.McHenry@EOIR.USDOJ.GOV>
Subject: Re: ████████ cases

Judge Bain, the decision has been made.  Under these circumstances, OCIJ will reassign the cases pursuant to 8 C.F.R. 1003.9(b)(3).

Dee Nadkarni
Assistant Chief Immigration Judge
703.305.1247

Sent from my iPad

> On Aug 29, 2017, at 4:06 PM, Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV> wrote:
>
> Judge Nadkarni:
>
> I oppose the reassignments of cases in which recusal motions have been filed but to which I have not had time to respond.  As you know, I have been in court every day, five days a week, hearing cases.  I am requesting time off the bench to prepare responses to the recusal motions as well as the OPR complaint.  To reassignment the cases in which attorneys ████████████ have filed recusal motions without giving me a fair opportunity to respond would be tantamount to making a ruling that whatever they allege in their recusal motions is true, and that whatever is said in the OPR complaint that their attorneys filed is also true.
>
> I do have the right and an obligation to respond to the recusal motions.  I also have a right and an obligation to respond to the OPR complaint.  As you know, OPPM 05:02 requires the sitting judge to respond to a recusal motion.  The OPPM thus has established a procedure for resolving recusal issues, and that process is EOIR's current official policy concerning recusal.  As you know, the attorneys have appealed some of my recusal decisions (denying recusal) to the Board.  The Board should have an opportunity to rule on the interlocutory appeals before you decide, on your own, that the recusal motions have merit and disqualify me from hearing the cases.  To interfere with the process that the OPPM

PLAINTIFF'S EXHIBIT 27   0021

has established by automatically reassigning cases before the judge has had an opportunity to rule on the recusal motion and before the Board has had an opportunity to rule on any appeals from my decisions would violate the agency's own procedures concerning recusal. To interfere with the process that OPR has established for fielding complaints against immigration judges by presuming that the complaint underlying the recusal motions has merit, thus warranting immediate recusal, is also improper and would violate my due process rights under the law to respond to disciplinary complaints whether made in recusal motions or directly to OCIJ and referred to OPR. Finally, it also would send the wrong message to the private bar community and reinforce further the notion that OCIJ automatically sides with the private bar whenever a complaint is filed, regardless of the merits of the complaint.
>

> Therefore, I ask that you not deprive me of an opportunity to defend myself against unsubstantiated and false allegations. Instead, I ask that you give me sufficient time off the bench to prepare responses to the recusal motions and the OPR complaint. In this regard, I renew my request to have time off the bench over the next two weeks, so that I could have time to prepare responses to the recusal motions and the OPR complaint.
>

> Thank you.
>

> Quynh Vu Bain, Arlington
>
>
>
>

> -----Original Message-----
> From: Nadkarni, Deepali (EOIR)
> Sent: Tuesday, August 29, 2017 5:35 PM
> To: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
> Cc: Bowyer, Cheri (EOIR) <Cheri.Bowyer@EOIR.USDOJ.GOV>; Castro, Deborah (EOIR)
<Deborah.Castro.USDOJ.GOV>; Wahowiak, Marlene (EOIR) <Marlene.Wahowiak@EOIR.USDOJ.GOV>; King, Jean (EOIR) <Jean.King@EOIR.USDOJ.GOV>
> Subject: Re: ▮▮▮▮▮▮▮▮▮   cases
>

> Greetings, Judge Bain. The pending cases will be reassigned, so please do not respond to the pending motions. Deborah Castro will pick up the ROPs when she is back in the office on Tuesday. Thank you.
>

> Dee Nadkarni
> Assistant Chief Immigration Judge
> 703.305.1247
>

> Sent from my iPad
>

>> On Aug 29, 2017, at 3:13 PM, Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV> wrote:
>>

>> Judge Nadkarni:
>>

>> I have those ROP's in my office. I will need them to respond to the OPR complaint that was generated as a result of the ACIJ's referral. I plan to work on the response this coming holiday weekend, since I am in court every day of the week, five days a week. In the meantime, I will give Cheri a list of the ▮▮▮▮▮▮▮▮   cases that are in my office. I am unable to give them to her now, because I still need to respond to the attorneys' recusal motions.
>>

>> Thank you.
>>

>> Quynh Vu Bain
>>

3

PLAINTIFF'S EXHIBIT 27    0022

>>
>>
>>
>>
>> -----Original Message-----
>> From: Nadkarni, Deepali (EOIR)
>> Sent: Tuesday, August 29, 2017 5:04 PM
>> To: Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
>> Cc: Bowyer, Cheri (EOIR) <Cheri.Bowyer@EOIR.USDOJ.GOV>; Castro, Deborah (EOIR)
<Deborah.Castro@EOIR.USDOJ.GOV>
>> Subject: ▮▮▮▮▮▮▮ cases
>>
>> Good afternoon, Judge Bain.  Please take all ROPs in your office in which the respondent's attorney is ▮▮▮▮
▮▮▮▮ or ▮▮▮▮▮ to SLA Cheri Boyer.  Cheri will scan them to herself.  Thank you.
>>
>> Dee Nadkarni
>> Assistant Chief Immigration Judge
>> 703.305.1247
>>
>> Sent from my iPad

4

**Bain, Quynh (EOIR)**

| | |
|---|---|
| **From:** | Gerardo, Leslie A. (OPR) |
| **Sent:** | Tuesday, September 05, 2017 5:07 PM |
| **To:** | Bain, Quynh (EOIR) |
| **Subject:** | RE: OPR Matter Re: IJ Quynh Vu Bain |

Judge Bain,

My mailing address is as follows:

Leslie Ann Gerardo
Assistant Counsel
Department of Justice Office of Professional Responsibility
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

My direct phone line is (202) 514-0873
I believe you have my email address, but so that it is all in one place, it is: Leslie.A.Gerardo@usdoj.gov

A thumb drive would be fine, if that is easier for you.

Do not worry about supplying me with audio recordings or transcripts. I can obtain those directly from the agency. If you are having difficulty accessing the recordings, transcripts, or files necessary to complete your response, you will have to discuss that with your supervisors.

With regard to your last question, we would like you to address whether your conduct complied with or violated any legal/ethical standard that guides your conduct as a Department attorney and IJ, which includes standards of conduct that guide IJs, Department rules applicable to its attorneys, and state bar rules.

Leslie Ann Gerardo
Assistant Counsel


**From:** Bain, Quynh (EOIR)
**Sent:** Friday, September 01, 2017 2:36 PM
**To:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Cc:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** RE: OPR Matter Re: IJ Quynh Vu Bain

Ms. Gerardo:

Below please find the procedural questions that I have at this point.

(1) Please provide your mailing address at the DOJ building. Please also include telephone number and email address.

(2) Please indicate whether you would accept thumb drives instead of CD's, as I do not have a CD burner.

1

PLAINTIFF'S EXHIBIT 27    0024

(3)  Please indicate how you would like to have access to audio recordings, documents from case files, or other agency records if the agency refuses to give them to me.

    a.  The agency has denied my request for audio recordings of hearings involving ███████ and ███ ███ clients. I would need these audio recordings to disprove the attorneys' claims of in-court unprofessional conduct or professional misconduct.

    b.  Please indicate how you would like to have access to paper transcripts of hearings involving ███ ███ and ███████ clients if the agency refuses to give me access to the case files. I have been required to return all case files involving the two attorneys' clients that were, until yesterday, assigned to me. Those cases will be reassigned to other IJ's even before the OPR inquiry is completed.

    c.  Please indicate how you would like to have access to paper transcripts of hearings involving ███ ███ and ███████ cases that are on appeal. There is one case that has been completed, and my adverse ruling on the merits of the case is on appeal to the Board of Immigration Appeals. There are about 8 other cases on interlocutory appeal to the Board. I do not have access to those cases files, and thus cannot give you access to the audio recordings or the paper transcripts from those files.

(4)  On page 3 of the OPR inquiry letter, it is stated "IJ Bain should address whether her conduct comported with the legal and ethical standards applicable to IJ's and Department attorneys." Could you be more specific about the legal and ethical standards that the OPR letter refers to. For example, when you say "legal and ethical standards," are you referring to substantive and procedural standards of law governing case adjudications, or legal and ethical standards concerning professional conduct that are stated in the negotiated IJ Union contract, or the legal and ethical standards of the subject attorney's state bar(s)?

I might have additional questions for you when I began preparing a response.

Thank you in advance for answering the above questions.

Quynh Vu Bain
Immigration Judge
Arlington, Virginia

**From:** Bain, Quynh (EOIR)
**Sent:** Friday, September 01, 2017 10:11 AM
**To:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Cc:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** RE: OPR Matter Re: IJ Quynh Vu Bain

Correction: I meant to say June 8, 2017 order.

**From:** Bain, Quynh (EOIR)
**Sent:** Friday, September 01, 2017 10:08 AM
**To:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Cc:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** RE: OPR Matter Re: IJ Quynh Vu Bain

Ms. Gerardo:

PLAINTIFF'S EXHIBIT 27   0025

J-82

Thank you for responding and clarifying a few things.

(1) I have a copy of the complaint from ████████ dated March 1, 2017.
(2) I now have the supplemental March 28, 2017 letter, which came with the OPR letter.
(3) I do have a copy of the June 8, 2017 order that I issued.
(4) Thank you for confirming that you do not have the 200-page addendum to the June 8, 2017 order. That addendum contains the motion for recusal that ████████ filed in several of her cases. The addendum also contains an affidavit from ████████ that was initially attached to the March 1, 2017 ████ complaint. It appears that you do not have the ████████ affidavit.

Later today, I will email a separate list of procedural questions.

Regards,

Quynh Vu Bain
Immigration Judge
Arlington, Virginia


**From:** Gerardo, Leslie A. (OPR)
**Sent:** Friday, September 01, 2017 10:00 AM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** RE: OPR Matter Re: IJ Quynh Vu Bain

Judge Bain,

The request for written response references three things:

1) ████████ March 1, 2017 letter, which was appended to the request.
2) ████████ March 28, 2017, supplemental letter, which was also appended to the request.
3) Your June 8, 2017 Order Denying Motion for Recusal, which was not appended, but which you presumably have access to as you were the author of it. Are you indicating that you do not have a copy of your order?

The only allegations we are investigating are those in the two complaint letters, and concerns about the contents of the Order Denying Recusal which are laid out on pages 2-3 of the request for written response. These are merely allegations, not findings. OPR will make its appropriate findings after completing its work. OPR is not aware of any findings by OCIJ or EOIR OGC. OPR does not disclose its communications with a referring office.

I have not yet received the 200-page addendum to the June 8, 2017 order, but will do so as I proceed with this inquiry. If you would furnish a copy of it with your written response, that would be helpful.

Leslie Ann Gerardo
Assistant Counsel, OPR


**From:** Bain, Quynh (EOIR)
**Sent:** Thursday, August 31, 2017 4.49 PM
**To:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Cc:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** FE: OPR Matter Re: IJ Quynh Vu Bain

Dear Ms. Gerardo:

PLAINTIFF'S EXHIBIT 27   0026

Thank you for your response. I do not believe that I have all the documents that you were given. For example, I don't have the two additional allegations that you mentioned in your email below. To enable me to fully address the concerns that OPR pointed out in the letter, would you please send me the additional allegations as well as any communications between OCIJ or OGC and OPR about the referral of the complaint. In reading the OPR letter, it seems that OCIJ had made a referral based on certain findings that OCIJ had made. As of today, I am not aware of any such findings or the information on which the findings were based.

In addition, would you please confirm that you have received the 200-page addendum that accompanied the June 8, 2017 Order Denying the Motion for Recusal? It would help to know, since some of the questions that OPR asks in the letter can be answered by reference to those 200 pages of supporting documentation.

Thank you. I just got out of court after 8 hours of hearings, so I will find sometime tomorrow to follow up with you regarding this matter. By email, of course.

Regards,

Quynh Vu Bain, Arlington

**From:** Gerardo, Leslie A. (OPR)
**Sent:** Thursday, August 31, 2017 11:16 AM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** OPR Matter Re: IJ Quynh Vu Bain

Judge Bain,

The request for a written response refers to the allegations contained in the two attached letters from ███████ and to additional allegations relating to your June 8, 2017, Order Denying Motion for Recusal, a copy of which I assume is available to you and therefore was not attached to the request. You will certainly need to review those three items – ███████ two letters, and your Order Denying Motion for Recusal – to be able to prepare your response. Whether you will need additional materials I cannot say; that will be a decision you will have to make in determining how best to respond. If there are other documents that you believe elucidate any of the issues raised in this matter, please provide copies to OPR along with your written response.

Leslie Ann Gerardo
Assistant Counsel, OPR

**From:** Bain, Quynh (EOIR)
**Sent:** Wednesday, August 30, 2017 5:51 PM
**To:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Cc:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** FW: OPR Matter Re: IJ Quynh Vu Bain
**Importance:** High

Ms. Gerardo:

Since you were left off the email below, would you please confirm that the attached letters from OPR contain all the documents that I will need to have in order to respond to the OPR complaint that the Office of the Chief Immigration Judge referred to OPR?

As it is late in the day, I will send you the list of procedural questions tomorrow.

Thank you.

PLAINTIFF'S EXHIBIT 27   0027
J-84

Quynh Bain, Arlington

**From:** Wahowiak, Marlene (EOIR)
**Sent:** Tuesday, August 29, 2017 3:45 PM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Cc:** Cheng, Mary (EOIR) <Mary.Cheng@EOIR.USDOJ.GOV>; Nadkarni, Deepali (EOIR)
<Deepali.Nadkarni@EOIR.USDOJ.GOV>
**Subject:** OPR Matter Re: IJ Quynh Vu Bain
**Importance:** High

Judge Bain:

The Office of the General Counsel received the attached correspondence from the Office of Professional Responsibility (OPR) advising that it was initiating an inquiry into allegations of misconduct made against you by ███████ ███████ represents two attorneys who have appeared before you, ███████████ and ███████████ OPR is requesting a written response from you.  Please carefully review the letter and attachment as they are self-explanatory.

If you have any questions, please direct them to the OPR attorney assigned to this matter.  Her contact information appears in the letter.  I am copying your first and second line supervisors for informational purposes.

Marlene Wahowiak
Associate General Counsel

 PLAINTIFF'S EXHIBIT 27   00285



**U.S. Department of Justice**
**Office of Professional Responsibility**
Policies and Procedures

## Introduction

     The Office of Professional Responsibility (OPR) was established by order of the Attorney General to ensure that Department of Justice (DOJ) attorneys and law enforcement personnel perform their duties in accordance with the highest professional standards expected of the nation's principal law enforcement agency.   Pursuant to 28 C.F.R. § 0.39a, the Counsel for OPR reports directly to the Attorney General and Deputy Attorney General.   OPR is staffed by a Deputy Counsel, three Associate Counsels, and between 20-25 Assistant Counsels.

## The Role and Authority of OPR

     OPR has jurisdiction to investigate allegations of professional misconduct against Department attorneys that relate to the exercise of their authority to investigate, litigate or provide legal advice, including allegations of professional misconduct against Department immigration judges.   OPR also has jurisdiction to investigate allegations of misconduct against Department law enforcement personnel that relate to allegations of attorney misconduct within the jurisdiction of OPR.   The Office of the Inspector General has jurisdiction over all allegations of misconduct against Department attorneys that do not fall within OPR's jurisdiction.

     In addition to reporting its findings and conclusions in investigative reports, OPR provides advice to the Attorney General and Deputy Attorney General concerning the need for changes in policies and procedures that become apparent during the course of OPR's investigations.

## Reporting Allegations of Misconduct

     Pursuant to Chapter 1-4.100 of the United States Attorneys' Manual (USAM), all Department employees have a duty to report allegations of professional misconduct against a Department attorney that relate to the exercise of the attorney's authority to investigate, litigate, or provide legal advice, as well as allegations of misconduct against Department law enforcement personnel that relate to allegations of attorney misconduct within the jurisdiction of OPR.

Office of Professional
Responsibility
May 21. 2015

000017

PLAINTIFF'S EXHIBIT 27   0029

Department employees must report "any evidence or non-frivolous allegation of misconduct" to their supervisor. An employee may also refer the allegation directly to OPR. Supervisors are required, in turn, to report any evidence or non-frivolous allegation of serious misconduct to OPR. If the supervisor participated in the alleged misconduct, however, he or she must refer the matter to a higher-ranking official for review. Employees and supervisors are encouraged to contact OPR for assistance in determining whether a matter should be referred to OPR.

### Reporting Allegations of Misconduct During the Course of Judicial Proceedings

All judicial findings of attorney misconduct must be reported to a supervisor and to OPR, regardless of whether an attorney or supervisor agrees with the findings or considers them to be serious. Any statement by a judge or magistrate judge indicating that a Department attorney has engaged in professional misconduct, and any indication by a judge or magistrate judge that the court is taking under consideration an allegation of professional misconduct, must be reported to a supervisor. The supervisor must, in turn, report to OPR "any evidence or non-frivolous allegation of serious misconduct."

Except in extraordinary cases, judicial findings of misconduct are investigated by OPR without awaiting the outcome of further judicial proceedings. Thus, findings of misconduct must be reported to OPR regardless of whether an appeal is contemplated or has already been taken.

### The Review of Misconduct Allegations

OPR receives allegations against Department attorneys from a variety of sources, including U.S. Attorneys' Offices and DOJ litigating components, private individuals and attorneys, defendants and civil litigants, other federal agencies, state and local government agencies, judicial and congressional referrals, media reports, and self-referrals. OPR also regularly conducts searches of legal databases to identify opinions containing judicial findings of misconduct against Department attorneys.

OPR reviews each allegation and determines whether further review is warranted. The determination whether to close the matter or to obtain more information about the allegation is a matter of investigative judgment and involves many factors, including the nature of the allegation, its apparent credibility, its specificity, its susceptibility to verification, and its source. The majority of complaints received by OPR are determined not to warrant further review because, for example, the complaint is frivolous on its face, is outside OPR's jurisdiction, or is unsupported by any evidence. In such cases, OPR will close the matter without informing the subject attorney of the complaint.

When OPR needs more information to resolve a matter, OPR will initiate an inquiry. In such cases, OPR may request additional information from the complainant or from the subject attorney. Most inquiries are closed with no misconduct findings.

000013

PLAINTIFF'S EXHIBIT 27   0030

In cases that cannot be resolved based solely on the written record, OPR ordinarily initiates an investigation, which includes requesting and reviewing relevant documents and conducting interviews of witnesses and the subject attorney. The decision to conduct an investigation does not give rise to a presumption of professional misconduct. OPR makes misconduct findings only after conducting a full investigation.

· Even if the subject attorney resigns or retires from the Department during the course of an investigation, OPR ordinarily completes the investigation in order to better assess the litigation impact of the alleged misconduct and to permit the Attorney General and Deputy Attorney General to assess the need for changes in Department policies or practices. In certain cases, however, the Office of the Deputy Attorney General will approve termination of such investigations if it is in the best interest of the Department.

## The Investigative Process

OPR's inquiries and investigations involve a wide range of allegations, and the investigative methods used vary accordingly. In many cases, OPR initiates an inquiry because more information is needed to resolve the matter. In such cases, the first step is usually to request a written response from the attorney against whom the allegation has been made. Requests for written responses must be answered promptly and thoroughly. Supporting documentation and other relevant material should be included with responses, and other individuals with relevant information should be identified. However, the subject attorney should not interview other witnesses or ask them to prepare affidavits or written statements. In addition, the subject attorney's written response should not be edited or revised by any other Department attorney or official. If an attorney's trial schedule or other commitments preclude a timely response, an extension of time may be obtained by contacting OPR.

In requesting a written response, OPR asks the subject attorney to provide pertinent information regarding his or her professional background and experience, including his or her length of service and positions held with the Department. In order to determine what state bar rules may apply, OPR also asks the subject attorney to list each jurisdiction in which he or she maintains bar membership, regardless of his or her category of membership (e.g., active, inactive, associate, or some other membership category).

If OPR determines based on its review of the record that there is no reasonable likelihood of a professional misconduct finding, the subject attorney and the United States Attorney or component head are notified that further inquiry is unwarranted, and the matter is closed.

In cases that cannot be resolved based on a review of the written record, OPR initiates an investigation of the alleged misconduct. Interviews are ordinarily conducted by two OPR attorneys. The interview of the subject attorney is transcribed by a court reporter, and the interviews of other witnesses are digitally recorded. Neither the subject nor a witness is permitted to record the interview. Co-workers are not permitted to attend interviews.

Following preparation of the transcript, the subject attorney will be given an opportunity, pursuant to a confidentiality agreement, to review the transcript and, if necessary, submit a

009019

PLAINTIFF'S EXHIBIT 27   0031

supplemental written response. A confidentiality agreement signed by the subject attorney requires that all copies of the transcript be returned to OPR.

All Department employees have an obligation to cooperate with OPR investigations and must respond to questions posed during the course of an investigation upon being informed that their statements will not be used to incriminate them in a criminal proceeding. Employees who refuse to cooperate with OPR investigations may be subject to formal discipline, including removal. *See* Attorney General's April 12, 2002 Memorandum, "Duty to Report Misconduct and Cooperate with Investigations."

### Assistance of Counsel

· The majority of OPR investigations are administrative in nature, and employees are not entitled to counsel as a matter of law. However, counsel may be permitted if counsel does not interfere with or delay the interview. Counsel must be actually retained by the employee as a legal representative, not as an observer. Counsel is not permitted access to certain confidential criminal investigative information and may not be permitted access to grand jury information.

### Post-Investigation Procedures

At the conclusion of the investigation, OPR prepares a report of investigation in which it makes findings of fact and reaches conclusions as to whether the subject attorney committed professional misconduct. OPR may find the subject attorney committed professional misconduct by: (1) **intentionally** violating a clear and unambiguous obligation or standard imposed by law, applicable rule of professional conduct, or Department regulation or policy; or (2) **recklessly disregarding** his or her obligation to comply with that obligation or standard. OPR· may also find that the attorney exercised poor judgment, made a mistake, or acted appropriately. A poor judgment finding may lead to disciplinary action; a mistake finding does not.

Once OPR completes its report of investigation, the subject attorney and the United States Attorney or component head are officially notified of the results of the investigation. If OPR determines that the subject attorney committed professional misconduct, prior to issuing a final report, the subject attorney, pursuant to a confidentiality agreement, and the United States Attorney or component head may review the draft report, comment on the factual findings, and offer arguments as to why OPR should alter its conclusions. OPR will consider the comments and incorporate them into the final report, to the extent OPR considers it appropriate.

OPR may include in its report information relating to management and policy issues noted in the course of the investigation for consideration by Department officials.

Pursuant to 28 C.F.R. § 0.39a and OPR's routine uses under the Privacy Act, OPR also notifies the complainant of the results of the investigation.

GCD020

PLAINTIFF'S EXHIBIT 27 · 0032

officials responsible for imposing discipline.   However, if an official decides to impose discipline that is outside the range of discipline recommended by OPR (whether harsher or more lenient), the management official must notify the Office of the Deputy Attorney General before implementing that decision.

## Referral of Misconduct Findings to Bar Disciplinary Authorities

At the conclusion of the disciplinary process, OPR will notify state bar authorities of misconduct findings that involve the violation of a bar rule.   When the PMRU upholds an OPR finding of professional misconduct based on the violation of a state bar rule, OPR will, at the PMRU's request, notify state bar authorities of the misconduct finding within 30 days of the final disposition of the matter by the PMRU.

## Routine Uses of Investigative Information

In addition to the internal uses by Department officials, OPR's findings may be disseminated for the routine uses published at 76 Fed. Reg. 66752 (10/27/11).  These uses include disclosure to other government agencies and officials for law enforcement purposes; to individuals or agencies in order to elicit information relevant to the investigation or another pending proceeding; to a court, grand jury, or regulatory or administrative agency; to other federal agencies when requested in connection with the hiring or retention of an employee, the issuance of a security clearance, or the investigation of an employee; to complainants to inform them of the results of OPR's review of their complaints; and to the subjects of an inquiry or investigation.

## OPR Review of Proposals to Refer Non-DOJ Attorneys to Bar Disciplinary Authorities

Pursuant to Section 1-4.150 of the USAM, allegations of misconduct by non-DOJ attorneys and judges must be reported to OPR for a determination of whether to report the allegations to appropriate disciplinary officials.  The Department has established a protocol that accommodates the Department attorney's obligation to report the unethical conduct of an attorney to state bar disciplinary authorities, and the interest of the Department in protecting confidential information. *See* USAM § 1-4.150; 28 C.F.R. § 0.39(a) (9); ABA Model Rule 8.3(a). OPR will determine, in conjunction with the Department component that referred the matter to OPR, whether to report the allegations of unethical conduct of the non-Department attorney or judge to the appropriate disciplinary authorities.

000022

PLAINTIFF'S EXHIBIT 27    0033

DM Number 324017

000023

PLAINTIFF'S EXHIBIT 27   0034

## ETHICS AND PROFESSIONALISM GUIDE
## FOR IMMIGRATION JUDGES

*Preamble*

To preserve and promote integrity and professionalism, Immigration Judges employed by the Executive Office for Immigration Review (EOIR) should observe high standards of ethical conduct, act in a manner that promotes public confidence in their impartiality, and avoid impropriety and the appearance of impropriety in all activities.

### I. Introduction

The provisions in this Guide are binding on all Immigration Judges employed by the Executive Office for Immigration Review. Violations of these provisions may not be used to challenge the rulings of an Immigration Judge. These provisions do not create any rights or interests for any party outside of the Department of Justice, nor may violations of these provisions furnish the basis for civil liability or injunctive relief. The provisions in this Guide do not supersede the personnel or disciplinary rules, or management policies, of the Executive Office for Immigration Review, the Department of Justice, and/or the United States Government. Similarly, this Guide does not affect the applicability or scope of the provisions of the Standards of Ethical Conduct for Executive Branch Employees, or the rules or code(s) of professional responsibility applicable to an Immigration Judge. 5 C.F.R. § 2635.101.

### II. Standards of Conduct
(5 C.F.R. Parts 2635, 3801; 28 C.F.R. Part 45)

An Immigration Judge shall comply with the standards of conduct applicable to all attorneys in the Department of Justice, including the Standards of Ethical Conduct for Employees of the Executive Branch, codified in Title 5 of the Code of Federal Regulations, and the Department's supplemental regulations at 5 C.F.R. Part 3801 and 28 C.F.R. Part 45.

### III. Ethics Guidance
(5 C.F.R. § 2635.107(b))

Immigration Judges are encouraged to seek ethics opinions to ensure that their conduct comports with applicable rules and regulations. When an Immigration Judge requests ethics guidance from the Office of Government Ethics, the Departmental Ethics Office, the Office of General Counsel of the Executive Office for Immigration Review, or the Professional Responsibility Advisory Office, the Immigration Judge should endeavor to disclose all legally relevant facts. 5 C.F.R. § 2635.107(b).

000291

1

PLAINTIFF'S EXHIBIT 27   0035

*Note: Disciplinary action will not be taken against any Immigration Judge who has engaged in conduct in good faith reliance upon the advice of an agency ethics official provided that the employee, in seeking such advice, has made full disclosure of all relevant circumstances.*

## IV. Professional Competence

An Immigration Judge should be faithful to the law and maintain professional competence in it.

*Note: In order to "maintain professional competence" in the law, Immigration Judges should strive to be knowledgeable about immigration law, should be skillful in applying it to individual cases, and should attempt to engage in preparation that is reasonably necessary to perform an Immigration Judge's responsibilities.*

## V. Impartiality
### (5 C.F.R. § 2635.101(b)(8))

An Immigration Judge shall act impartially and shall not give preferential treatment to any organization or individual when adjudicating the merits of a particular case. An Immigration Judge should encourage and facilitate pro bono representation. An Immigration Judge may grant procedural priorities to lawyers providing pro bono legal services in accordance with Operating Procedures and Policies Memorandum (OPPM) 08-01.

## VI. Appearance of Impropriety
### (5 C.F.R. § 2635.101(b)(14))

An Immigration Judge shall endeavor to avoid any actions that, in the judgment of a reasonable person with knowledge of the relevant facts, would create the appearance that he or she is violating the law or applicable ethical standards.

## VII. Reporting Misconduct
### (5 C.F.R. § 2635.101(b)(11); 28 C.F.R. § 45.12)

An Immigration Judge shall disclose waste, fraud, abuse, and corruption to appropriate authorities, such as a supervisor, or to the Office of the Inspector General. Immigration Judges, like all Department employees, also have a duty to report allegations of misconduct by Department of Justice attorneys, as explained by Chapter 1-4.100 of the United States Attorneys' Manual (USAM). In addition, Immigration Judges have a duty to report allegations of

000792

PLAINTIFF'S EXHIBIT 27   0036

misconduct by non-Department attorneys or judges, as explained by Chapter 1-4.150 of the USAM.

### VIII. Acting in a Neutral and Detached Manner

An Immigration Judge should not be swayed by partisan interests or public clamor.

### IX. Acting with Judicial Temperament and Professionalism

An Immigration Judge should be patient, dignified, and courteous, and should act in a professional manner towards all litigants, witnesses, lawyers and others with whom the Immigration Judge deals in his or her official capacity, and should not, in the performance of official duties, by words or conduct, manifest improper bias or prejudice.

> Note: An Immigration Judge should be alert to avoid behavior, including inappropriate demeanor, which may be perceived as biased. The test for appearance of impropriety is whether the conduct would create in the mind of a reasonable person with knowledge of the relevant facts the belief that the Immigration Judge's ability to carry out his or her responsibilities with integrity, impartiality, and competence is impaired.

> Note: An Immigration Judge who manifests bias or prejudice in a proceeding impairs the fairness of the proceeding and brings the immigration process into disrepute. Examples of manifestations of bias or prejudice include but are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant reference to personal characteristics. Moreover, an Immigration Judge must avoid conduct that may reasonably be perceived as prejudiced or biased. Immigration Judges are not precluded from making legitimate reference to any of the above listed factors, or similar factors, when they are relevant to an issue in a proceeding.

> Note: An Immigration Judge has the authority to regulate the course of the hearing. See 8 C.F.R. §§ 1240.1(c), 1240.9. Nothing herein prohibits the Judge from doing so. It is recognized that at times an Immigration Judge must be firm and decisive to maintain courtroom control.

000293

3

PLAINTIFF'S EXHIBIT 27   0037

## X. Membership in Organizations

**An Immigration Judge should not hold membership in any organization that practices invidious discrimination on the basis of race, sex, religion, national origin, or disability.**

> *Note: Membership of an Immigration Judge in an organization that practices invidious discrimination may, at a minimum, give rise to perceptions that the Immigration Judge's impartiality is impaired. Whether an organization practices invidious discrimination is often a complex question to which Immigration Judges should be sensitive. The answer cannot be determined from a mere examination of an organization's current membership rolls but rather depends on the history of the organization's selection of members and other relevant factors, such as that the organization is dedicated to the preservation of religious, ethnic or cultural values of legitimate common interest to its members, or that it is in fact and effect an intimate, purely private organization whose membership limitations could not be constitutionally prohibited. See New York State Club Ass'n Inc. v. City of New York, 487 U.S. 1 (1988); Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537 (1987); Roberts v. United States Jaycees, 468 U.S. 609 (1984). Other relevant factors include the size and nature of the organization and the diversity of persons in the locale who might reasonably be considered potential members. Thus, the mere absence of diverse membership does not by itself demonstrate invidious discrimination unless reasonable persons with knowledge of all the relevant circumstances would expect that the membership would be diverse in the absence of invidious discrimination.*

## XI. Impartiality in Performing Official Duties
### (5 C.F.R. §§ 2635.501 to 2635.503)

**An Immigration Judge may not participate, without authorization, in a particular matter involving specific parties which the Immigration Judge knows is likely to have a direct and predictable effect on the financial interest of members of the Immigration Judge's household or in which the Immigration Judge knows a person with whom the Immigration Judge has a covered relationship is or represents a party.**

**An Immigration Judge has a covered relationship with: (a) a person with whom the Immigration Judge has or seeks a business, contractual, or other financial relationship that involves other than a routine consumer transaction; (b) a person who is a member of the Immigration Judge's household, or a relative with whom the Immigration Judge has a close relationship; (c) a**

000294

PLAINTIFF'S EXHIBIT 27   0038

present or prospective employer of a spouse, parent or child; or (d) an organization which the Immigration Judge now serves, or has served, as an employee or in another capacity, within the past year.

An Immigration Judge is banned from adjudicating any cases in which he/she participated personally and substantially prior to becoming an Immigration Judge. An Immigration Judge may not adjudicate a case if he/she: has personal knowledge of the disputed facts; participated as counselor or advisor in the case; or expressed an opinion concerning the merits of the particular case in controversy. A lawyer in a government agency does not ordinarily have an association with other lawyers employed by that agency within the meaning of the above provision. However, an Immigration Judge formerly employed by a government agency should disqualify himself or herself in a proceeding if the Immigration Judge's impartiality might reasonably be questioned because of such an association.

If a conflict of interest exists, in order for the Immigration Judge to participate in the matter, the EOIR Director or his/her designee must make a determination that the interests of the government in the Immigration Judge's participation outweigh the concern that a reasonable person may question the integrity of the Department's programs and operations. The determination must be made in writing.

If a conflict of interest exists, and the judge has obtained a determination from the EOIR Director or his/her designee that the judge may continue to participate in the matter, the conflict must be disclosed to the parties, either orally on the record or in writing. If an Immigration Judge disqualifies himself or herself from a case that has been assigned to him or her, he or she must do so in a decision in writing or orally on the record before the parties and otherwise follow all the procedures delineated in OPPM 05-02, Procedures for Issuing Recusal Orders in Immigration Proceedings, or any superseding OPPM.

### XII. Use of Public Office for Private Gain
(5 C.F.R. § 2635.702)

Immigration Judges may not use their public office for their own private gain or the gain of persons or organizations with which they are associated personally. An Immigration Judge's position or title should not be used: to coerce; to endorse any product, service or enterprise; or to give the appearance of government sanction. Regarding a request for a letter of reference or recommendation, an Immigration Judge may only use his or her official title and stationery for someone he or she has dealt with in the course of federal employment or someone he or she is recommending for federal employment.

000295

PLAINTIFF'S EXHIBIT 27   0039

### XIII. Use of Nonpublic Information
### (5 C.F.R. § 2635.703)

An Immigration Judge may not engage in a financial transaction using nonpublic information, nor allow the use of such information to further his or her private interests or those of another. Nonpublic information is information an Immigration Judge gains by reason of federal employment that he or she knows or reasonably should know has not been made available to the general public and is not authorized to be made available upon request.

### XIV. Use of Government Property
### (5 C.F.R. § 2635.704)

An Immigration Judge has a duty to protect and conserve government property and shall use government property only for authorized purposes.

> *Note: Department of Justice employees are generally authorized to make personal use of most office equipment and library facilities where the cost to the Government is negligible and on an employee's own time. 28 C.F.R. § 45.4. Under the Department's policy on the use of its electronic mail systems, an employee may send a short, personal message to another employee. However, personal messages sent to groups of people and messages to disseminate information on non-Government activities, such as charitable events, religious observances and personal businesses, are prohibited.*

### XV. Use of Official Time
### (5 C.F.R. § 2635.705)

An Immigration Judge shall use official time in an honest effort to perform official duties. Generally, personal activities should not be conducted during duty hours. An Immigration Judge may not use the official time of another employee for anything other than official business. This section does not apply to official time under section 7131 of the Federal Service Labor-Management Relations Statute.

### XVI. Conflicting Financial Interest
### (5 C.F.R. §§ 2635.401 to 2635.403)

An Immigration Judge is prohibited from participating in any matter in which he or she has a financial interest. In addition to an Immigration Judge's own financial interest, certain interests are considered his or hers (i.e., "imputed" to him or her), including those of a spouse, minor child, general partner or an organization for which the Immigration Judge serves as an officer, director,

6

000296

trustee, general partner, or employee. However, an Immigration Judge may participate in such a matter if he or she is granted a waiver. Immigration Judges should contact their Deputy Designated Ethics Officer about possible financial conflicts of interest.

If an Immigration Judge has a financial conflict of interest, remedies include disqualification, divestiture, or a waiver of the disqualification under 18 U.S.C. § 208. Before divesting, however, he/she should determine whether he/she is eligible for a Certificate of Divestiture from the Office of Government Ethics, which would allow him/her to defer paying capital gains tax on the sale of the asset. 5 C.F.R. §§ 2634.1001-1004. A waiver may be granted if the financial interest is found to be not so substantial as to affect the integrity of the Immigration Judge's services.

> *Note:  Immigration Judges (levels IJ-2 and above) employed by the Executive Office for Immigration Review are required to file public financial disclosure reports pursuant to statute every year. Financial disclosure reports are used to identify potential or actual conflicts of interest. If the ethics official charged with reviewing an Immigration Judge's report finds a conflict, the ethics official should, upon consultation with the Immigration Judge's supervisor, decide on the appropriate remedy.*

> *Note:  In order to comply with the applicable law and regulations regarding financial reporting and disqualification, Immigration Judges must inform themselves about their personal financial interests, as well as the personal financial interests of spouses and minor children.*

### XVII. Outside Employment and Activities
#### (5 C.F.R. §§ 2635.801 to 2635.803)

An Immigration Judge shall not engage in any outside employment or other outside activity that conflicts with his or her official duties. Immigration Judges should regularly reexamine their avocational activities and the organizations with which they are affiliated to ensure that they do not lead to the perception of partiality on the part of an Immigration Judge.

### XVIII. Representation before Federal Agencies
#### (5 C.F.R. § 2635.801)

An Immigration Judge may not represent anyone before a Federal agency or official, or any court, with or without compensation, on a matter in which the United States is a party or has a substantial interest. This prohibition applies whether the Immigration Judge renders the representation personally or

7

PLAINTIFF'S EXHIBIT 27   0041

(2) engage in political activity on duty, in a government office, wearing an official uniform, or using a government vehicle.

(3) solicit, accept or receive political contributions from another person - except as described in paragraph (5), above.

(4) solicit or discourage the political activity of anyone who has business with the Department.

(5) use official authority or influence to interfere with an election.

(6) wear political buttons while on duty.

*Note: In 1993, Congress amended 18 U.S.C. § 603, which governs political contributions by Federal employees to their employer or employing authority. The original statute had been interpreted as potentially prohibiting all Executive branch employees from making political contributions to the reelection campaign committee of an incumbent President. However, by memorandum dated May 2, 1995, the White House issued an opinion that states that based on the Hatch Act Reform Amendments of 1993, 18 U.S.C. § 603 would no longer prohibit employees from making contributions to the reelection campaign of an incumbent President.*

## XXXII. Ex Parte Communications

An Immigration Judge should not initiate, permit, or consider ex parte communications, or consider other communications made to the Immigration Judge outside the presence of the parties or their lawyers, concerning a pending matter, except as follows:

(1) When circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted, provided that the Immigration Judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication.

(2) An Immigration Judge may consult with court staff and court officials, including supervisors, whose functions are to aid the Immigration Judge in carrying out the Immigration Judge's adjudicative responsibilities, or with other Immigration Judges, provided the Immigration Judge makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility to personally decide the matter.

15

000299

(3) An Immigration Judge may initiate, permit, or consider any ex parte communication when expressly authorized by law to do so.

If an Immigration Judge inadvertently receives an unauthorized ex parte communication bearing on the substance of a matter, the Immigration Judge should make provision promptly to notify the parties of the substance of the communication and provide the parties with an opportunity to respond, or to recuse himself or herself if appropriate.

### XXXIII. Mechanism for Continuing Dialog

It is understood that the Agency will be providing Immigration Judges with examples relating to the provisions of the Guide. Within thirty (30) days of the effective date of this Guide, each of the parties will designate a person to act as a point of contact (POC) for any updates to the examples.

The NAIJ POC may communicate with the Agency POC any questions or topics about which it would be useful to have an example relating to the Guide. In addition, the NAIJ POC may submit for consideration for use as examples ethics inquiries and answers received by Judges which NAIJ believes would be of general interest.

The Agency POC will consider all suggestions submitted by the NAIJ POC and will notify the NAIJ's POC with the provisions of any updates at least one week prior to any updates. The designated NAIJ POC under this provision will be provided official time to perform a reasonable amount of work associated with these duties.

### XXXIV. Disciplinary Action or Action for Failure to Follow the Guide

In the event of conflicting requirements between the provisions of this Guide, the Standards of Ethical Conduct for Executive Branch Employees, the bar rules governing an Immigration Judge's conduct, and/or any oral or written instruction from the Agency, the Immigration Judge should seek appropriate guidance under Article III above. Disciplinary action will not be taken against an Immigration Judge who has engaged in good-faith reliance upon the advice of an agency ethics official in accordance with the Note in Article III. Further, if after consultation with an agency ethics official, the ethics official refers the Immigration Judge to a bar for guidance, compliance with that guidance shall be a defense to disciplinary action against an Immigration Judge.

An Immigration Judge against whom disciplinary or other employment action is taken as a result of an alleged violation of this Guide may avail himself/herself of any rights under the Collective Bargaining Agreement,

000299

PLAINTIFF'S EXHIBIT 27   0043

including but not limited to the grievance and arbitration procedures under Articles 8 and 9, or any other applicable provision of law or regulation.

The Agency will not cite the specific provisions of this Guide as a basis for disciplinary or other employment action until six months after ratification of the Guide by members of NAIJ and approval by the head of the Agency.

IN WITNESS WHEREOF, on this 26th day of January, 2011, the Executive Office for Immigration Review and the National Association of Immigration Judges have agreed to the provisions of this Ethics and Professionalism Guide for Immigration Judges.

FOR THE AGENCY:

Mary Beth Keller
Assistant Chief Immigration Judge
Office of the Chief Immigration Judge
Executive Office for Immigration Review

FOR NAIJ:

Denise Noonan Slavin   1/31/11
Denise Noonan Slavin
Vice President
National Association of Immigration Judges

17

000300

PLAINTIFF'S EXHIBIT 27   0044

**Gerardo, Leslie A. (OPR)**

| | |
|---|---|
| **From:** | Gerardo, Leslie A. (OPR) |
| **Sent:** | Thursday, June 21, 2018 12:03 PM |
| **To:** | Bain, Quynh (EOIR) |
| **Subject:** | OPR Interview on Friday, June 29 |
| **Attachments:** | Bain Confidentiality Agreement.docx |

| **Tracking:** | **Recipient** | **Delivery** |
|---|---|---|
| | Bain, Quynh (EOIR) | Delivered: 6/21/2018 12:03 PM |

Judge Bain,

I have received your phone message asking for logistical information for next Friday's interview. As previously noted, I prefer to communicate on such matters by email rather than by phone.

Please report to OPR's front office, room 3525, by 9:30 a.m. We will begin the interview promptly at 9:30 in OPR's conference room. It is difficult to predict how long the interview will last; my best estimate is 3 to 4 hours. However, the interview will continue as long as is necessary to cover all of the issues presented in this matter. You should therefore arrange to be available for the entire day.

In accordance with OPR policies, you will be placed under oath at the outset of the interview, and the interview will be recorded and transcribed by a court reporter. I will provide you with a standard OPR confidentiality agreement (a copy of which is attached to this e-mail), which you will be asked to execute before the interview begins.

If you do bring counsel with you, counsel is permitted to sit in the conference room during the interview as long as counsel's presence is not disruptive. Should counsel need to confer with you during the interview, we can take a short break to accommodate a private conversation, as long as doing so does not interfere with the flow of the interview or become so frequent as to be disruptive.

In addition to the matters identified in OPR's August 29, 2017, request for a written response, please be prepared to address the matters referenced in OPR's March 7, 2018, request for a second supplemental written response. In particular, even if previously furnished by you, please bring with you ALL documents relevant to item 2 of OPR's March 7, 2018 letter (i.e., documents supporting your claim to have conducted a "due diligence" inquiry regarding the identity of immigration attorney ▮▮▮▮▮▮▮ as a bankruptcy petitioner). Also, please bring with you documents showing the precise sequence of pages on EOIR's intranet site that you accessed in order to reach the page on which you located the immigration judge applications submitted by Jean King and Marlene Wahowiak that you appended to your supplemental written response.

I look forward to meeting with you on the 29th. If you have any additional questions in the meantime, please contact me by e-mail. Please be aware, however, that I will be out of the office on Monday, June 25 through Wednesday, June 27 and will have limited access to e-mail during that time.

Regards,

Leslie Ann Gerardo
Assistant Counsel
Office of Professional Responsibility
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

## Bain, Quynh (EOIR)

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Saturday, August 3, 2019 3:02 PM |
| **To:** | Gerardo, Leslie A. (OPR) |
| **Cc:** | Bain, Quynh (EOIR) |
| **Subject:** | RE: OPR Draft Report of Investigation -- CONFIDENTIAL COMMUNICATION WITH OPR -- CONTAINS PRIVACY PROTECTED INFORMATION AND INFORMATION EXEMPT FROM DISCLOSURE TO OTHER DOJ COMPONENTS |

| | |
|---|---|
| **Importance:** | High |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Ms. Gerardo:

This is in response to your email of July 29, 2019 at 4:15 p.m. below. I would like to let you know that I have substituted the redacted pages concerning Ms. Wahowiak and Ms. King for the pages that you initially placed in the Record of Investigation. I have destroyed those pages that you included in the original record provided to Ms. White.

I also would like to advise you that the Record of Investigation appears to be incomplete. The Record that I received from my former counsel (Heather White) contains approximately 485 pages. (Many of the pages are printed on both sides, while other pages have printing on just one side). The pages are not numbered, and I cannot tell whether certain documents in the Record came from the EOIR, the OPR, or me. I do recognize those documents that I previously produced to OPR as those documents were bates-stamped. I also recognize the Response and Supplemental Responses that I prepared for OPR. However, I do not recognize pages that came from internet sites such as www.peekyou.com, www.myspace.com, and mylife.com, and I do not know who provided them to OPR or whether OPR obtained those pages on its own.

In addition, none of the emails and memoranda referenced in the draft OPR report are included in the Record of Investigation. In your email below, you indicate that the email communications, letters, and memoranda OPR referenced in the draft report came from my disciplinary records. However, I must point out that – as far as I know – EOIR has not kept a separate "disciplinary records" file for me, because EOIR has denied that any such file exists. Furthermore, the only disciplinary records that EOIR has compiled for me are found in my personnel file, and that file does not contain all the documents that were mentioned in the OPR draft report. Thus, without knowing which email communications, letters, and memoranda comprised my disciplinary records and which of those documents were provided to OPR -- and whether OPR was given all of the relevant records including records that may contain mitigating or contradictory information, it is very difficult for me to address OPR's conclusions in a comprehensive and accurate manner. Moreover, I cannot tell whether OPR was given the entire compendium of email communications, or just portions thereof, because the draft report quotes only select portions of email communications, and even the quoted portions contain ellipses. Furthermore, the OPR draft report refers to a document but does not summarize or describe the document in sufficient detail, such that I cannot tell which document OPR is referring to. For this reason, and understanding OPR's concern about accuracy and truthfulness, I request that OPR provide a bates-stamped copy of the Record of Investigation as soon as possible. Knowing what is in the full record and having a paginated record in reviewing the draft report is critical, because I do not want to mislead or be accused of misleading OPR in discussing a particular fact or event that may or may not be found in the Record, as OPR has compiled it.

Finally, in preparing a response, I am disadvantaged by not having the witness interview records or the transcripts of the interviews that are mentioned in the OPR draft report. I was not present when those witness interviews took

1

PLAINTIFF'S EXHIBIT 27   0046

provided to OPR.  However, these pages were missing necessary redactions to remove personally identifying information (PII).  I am providing with this email substitute pages that OPR has redacted to remove PII.  Please destroy the corresponding originals and replace them with the attached redacted copies, and let me know by responsive email when you have done so.

Finally, IJ Bain has indicated in her email that she has retrieved from Ms. White the copy of the draft report and exhibits that OPR sent to Ms. White.  Ms. White, as you are no longer representing IJ Bain in this matter, OPR hereby requests that you confirm that you have not made any copies of those documents.  If you have made any copies of any of OPR's materials, OPR hereby requests, consistent with the confidentiality agreement that you signed, that any and all copies of OPR's draft report and accompanying exhibits be destroyed.  Ms. White, please notify OPR by email that you have retained no copies of OPR's materials or that you have destroyed any copies you may have made.

Regards,

Leslie Ann Gerardo

PLAINTIFF'S EXHIBIT 27   0047

## Bain, Quynh (EOIR)

| | |
|---|---|
| 'rom: | Gerardo, Leslie A. (OPR) |
| Sent: | Monday, August 05, 2019 2:16 PM |
| To: | Bain, Quynh (EOIR) |
| Subject: | CONFIDENTIAL:  Response to your August 3, 2019 e-mail |

Judge Bain:

I have received your August 3, 2019 e-mail, sent at 3:02 p.m. You informed me last week that Ms. White will not be representing you in this matter and that you intend to seek separate counsel to assist you in responding to OPR's Draft Report. However, I have not heard from you that you have obtained other representation. Accordingly, I am responding directly to you. I believe the following information will be of assistance to you as you prepare a response to OPR's Draft Report. As you know, OPR has requested that you submit any comments you may have by this Friday, August 9, 2019.

In the second paragraph of your e-mail, you state that the "Record of Investigation" appears to be incomplete. Please be advised that OPR does not prepare a designated "Record of Investigation." Rather, OPR includes as exhibits to its Draft Report documents compiled during the course of its investigation that OPR found of particular significance to the findings and conclusions made in its Report. Those documents are designated by exhibit number only. You may refer to them by exhibit number in preparing your response, and you may describe the contents of those materials, as well. OPR does not provide a "paginated record."

'Materials OPR referenced in its report that OPR did not include as exhibits are either publicly available, were provided to )PR by you in the first instance (thus obviating the need of providing you with a duplicate), or are materials that OPR does not disclose, such as witness interview recordings or transcripts. Although not included as exhibits, you will find, upon a careful and thorough reading of the Draft Report, that each of the documents OPR referenced in the Draft Report are described by OPR in a manner which makes clear the document's nature, content, and relevance.

You also indicate that it is unclear to you whether the documents attached to the Draft Report "came from the EOIR, the OPR, or me." OPR has indicated the source of documents where the source was important to OPR's findings or conclusions. For example, you note that you "do not recognize pages that came from internet sites such as www.peekyou.com, www.myspace.com, and mylife.com." On page 47 of the Draft Report and in footnote 313, OPR explains that the pages from mylife.com reproduced as Exhibit 15 to the Draft Report originated *from you*, and that *you* provided these pages to OPR during your OPR interview. (Please also see footnote 392 on page 62 of the Draft Report, and accompanying text.) Indeed, the pages in Exhibit 15 were printed on a sheet of paper that contains what appears to be an e-mail header with your name on it.

Similarly, in footnote 403 on page 66 of the OPR Draft Report and the accompanying text, OPR explained that the material reproduced as Exhibit 17 to the Draft Report was retrieved by OPR from its own independent Internet search of the mylife.com website, in an attempt to verify statements you made to OPR in your written responses and during your OPR interview. Although some of the 18 sequentially numbered pages bear the peekyou.com footer, you will note that the first page of that 18-page document bears the URL for mylife.com. All 18 sequentially numbered pages actually originated from OPR's search of mylife.com. There is no attachment to the Draft Report that came specifically from a search of peekyou.com, and no document at all from the myspace.com website.

In the third paragraph of your e-mail, you state that "none of the emails and memoranda referenced in the draft OPR .eport are included in the Record of Investigation." Again, OPR prepares no document or compilation that is designated as a "Record of Investigation." OPR has provided to you those e-mails and memoranda that it considers of particular

importance to understanding the basis for OPR's findings and conclusions and that OPR believes you do not otherwise have or cannot obtain.

In that regard, your e mail suggests that the documents and e-mails relating to your disciplinary history are unfamiliar to you. However, each of the documents cited by OPR were either authored by you, or were sent to you by the author of the document or e-mail, and therefore OPR does not find credible that you are unfamiliar with them. OPR asks that you specifically identify which, if any, of the following those documents you either do not have or cannot obtain (for example, from your e-mail, Outlook, Word, or other files):

1) The Letter from then-ACIJ Christopher A. Santoro *to you* dated March 16, 2015, bearing the subject line "re: Reprimand."
2) The warning issued by then ACIJ Mary Beth Keller *to you* in January 2015.
3) A memorandum written *by you* and sent to then-ACIJ Christopher A. Santoro, dated April 20, 2015, responding to the Reprimand.
4) A Letter of Counseling from then-ACIJ Christopher A. Santoro *to you*, dated June 25, 2015.
5) A Letter of Counseling from ACIJ Deepali Nadkami **to you**, dated July 28, 2016.
6) An e-mail from ACIJ Deepali Nadkami *to you*, sent on Feb. 22, 2018 at 11:26 a.m. EST.
7) An e-mail *from you* to ACIJ Deepali Nadkami, sent on Feb. 22, 2018 at 3:53 p.m. EST.

OPR referenced but did not cite with particularity in its report the specific e-mail correspondence OPR reviewed in reaching the conclusion that there was a factual basis for the March 2015 Reprimand you received from ACIJ Santoro (see Draft Report at page 6, n. 12). To be clear, that e-mail correspondence, again, was either authored by, or was sent to, you (in fact, in your April 20, 2015 memorandum to ACIJ Santoro, *you* cited this e mail correspondence in detail). To be specific, however, OPR reviewed the following e-mails that it considered relevant to this matter. Again, OPR asks that you specifically identify which of the following e mails you either do not have or cannot obtain:

1) An e-mail *from you* to Tina Barrow, sent on February 10, 2015 at 4:06 p.m. EST.
2) An e mail from Walter Durling *to you*, sent on March 4, 2015, at 4:25 p.m. EST, on which Tina Barrow was copied.
3) An e mail *from you* to Walter Durling, sent on March 4, 2015, at 4:58 p.m. EST, on which you copied Tina Barrow and Christopher A. Santoro (you also copied yourself).
4) An e-mail from Christopher A. Santoro *to you* and Walter Durling, sent on March 4, 2015 at 5:06 p.m. EST, on which Tina Barrow was copied.
5) An e-mail *from you* to Christopher A. Santoro and Walter Durling, sent on March 4, 2015, at 5:14 p.m. EST, on which Tina Barrow was copied (you also copied yourself).
6) An e mail from Christopher A. Santoro *to you*, sent on March 6, 2015, at 3:29 p.m. EST
7) An e mail *from you* to Christopher A. Santoro, sent on March 9, 2015 at 8:46 p.m. EST (you copied yourself).

OPR also referenced on pages 6-7 of its Draft Report, but did not cite with specificity, the e mail exchange between you and IJ Roxanne Hyladylowycz which resulted in the July 2016 letter of counseling you received from ACIJ Nadkarni. As with the other materials described above, that e mail correspondence again was either authored by, or was sent to, you. Accordingly, OPR asks that you specifically identify those e-mails which you either do not have or cannot obtain:

1) An e mail *from you* to Roxanne Hladylowycz, sent on July 8, 2016 at 4:50 p.m. EST.
2) An e mail from Roxanne Hladylowycz *to you*, sent on July 12, 2016 at 11:51 a.m. IJ Hladylowycz copied on that e-mail Deepali Nadkarni, Deborah Castro, Cheri Bowyer, Michael McGoings, and Print Maggard.
3) An e-mail *from you* to Roxanne Hladylowycz, sent on July 12, 2016 at 12:02 p.m. EST, on which you copied all of the same individuals IJ Hladylowycz had included in her earlier e mail to you that day.
4) An e mail from Deborah Castro *to you* and Roxanne Hladylowycz, sent on July 12, 2016 at 12:57 p.m. EST, on which Ms. Castro copied the other individuals you and IJ Hladylowycz had included in the e mails you exchanged earlier that day.

PLAINTIFF'S EXHIBIT 27   0049

5) An e-mail *from you* to Deborah Castro and Roxanne Hladylowycz, sent on July 12, 2016 at 12:58 p.m. EST, on which you copied the other individuals you and IJ Hladylowycz had included in the e-mails you exchanged earlier that day

6) An e-mail from Roxanne Hladylowycz *to you* and Deborah Castro, sent on July 12, 2016 at 1:02 p.m. EST, on which IJ Hladylowycz copied the other individuals included in all of the earlier e-mails exchanged that day.

7) An e-mail *from you* to Roxanne Hladylowycz and Deborah Castro, sent on July 12, 2016 at 3:33 p.m. EST, on which you copied the other individuals included in all of the earlier e-mails exchanged that day.

8) An e-mail from Roxanne Hlyadylowycz *to you*, Deborah Castro, and Juan Osuna, sent on July 12, 2016 at 5:28 p.m. EST, on which IJ Hladylowycz copied the other individuals included in all of the earlier e-mails exchanged that day.

9) An e-mail from Deepali Nadkarni *to you* and Roxanne Hladylowycz, sent on July 12, 2016 at 5:40 p.m. EST, on which ACIJ Nadkarni copied Michael McGoings, Print Maggard, and Juan Osuna.

You claim that to your knowledge EOIR has not kept a separate "disciplinary records" file for you and has denied to you that such a record exists. OPR has no involvement in any request by you for access to EOIR records and therefore cannot comment on the agency's representations to you that it does not have a disciplinary record relating to you. Regardless, however, of whether your agency does or does not maintain a compilation that it refers to as your "disciplinary records," OPR obtained and cited in its Draft Report documents that it considers to be of a disciplinary nature and which OPR considered relevant to the conclusions it reached (see Draft Report pp. 6-7). You purport to be unable to determine whether OPR "was given the entire compendium of email communications, or just portions thereof, because the draft report quotes only select portions" of those communications. To be clear, OPR read the entirety of the correspondence, memoranda, and e-mail exchanges relating to your personnel and disciplinary history that OPR referenced in its Draft Report, even if OPR only cited to portions of those materials or referenced them in a general way.

As I have previously advised you, OPR does not disclose transcripts or recordings of witness interviews. You claim that you are disadvantaged by not having the witness interview records because you "have no notes or records of the witness interviews that OPR relied on in reaching the ultimate conclusions it reached." To the contrary, OPR's Draft Report makes specific, detailed references to the witness statements relevant to OPR's findings and conclusions. You were a party to the events described in OPR's Draft Report. In preparing your response to the Draft Report, you can identify any witness statements described in the Draft Report and explain why you believe those statements do not accurately describe those events or do not support OPR's findings or conclusions.

Finally, you indicate in your August 3, 2019 e-mail that you have submitted a FOIA request for the release of OPR's records relating to the preparation of its Draft Report. Any FOIA request you make will be handled in the normal course, separately from the handling of OPR's investigation. Please understand that your request will be added to the existing queue of FOIA requests currently being processed by OPR, and it may be some time before that request is resolved. OPR will not delay the finalization of its Report while any FOIA request is pending. Accordingly, please be reminded that OPR continues to expect that you will provide any comments regarding OPR's Draft Report by this Friday, August 9, 2019.

Regards,

Leslie Ann Gerardo

PLAINTIFF'S EXHIBIT 27   0050

## Bain, Quynh (EOIR)

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Wednesday, August 7, 2019 4:33 PM |
| **To:** | Gerardo, Leslie A. (OPR) |
| **Cc:** | Bain, Quynh (EOIR) |
| **Subject:** | RE: CONFIDENTIAL: Response to your August 3, 2019 e-mail |

Dear Ms. Gerardo:

Thank you for your response. Your response provides a lot of additional information that was not stated in the draft report of 80 single-spaced pages and more than 400 footnotes. I will need to spend some time searching for the additional materials identified in your email below, because I do not necessarily have them at my disposal. I will also need to review the new materials identified in your email below, because they are not included in the 485-page record of exhibits that you provided. I am also concerned that you have attributed the pages containing internet sites such as peekyou.com and myspace.com to me, because I know that I did not provide those pages to you. Therefore, I will need time to discuss with my attorney the best approach to preparing a response, given the record of exhibits as compiled by OPR. While I appreciate your giving me two weeks to prepare a response and I appreciate your desire to finalize this two-year investigation soon, I will need more than two weeks to complete the process of hiring an attorney to assist me in preparing a response. As I am in court 5 days a week, for an average of 7 hours a day, I will need effective assistance of counsel.

Accordingly, this is to advise you that I will not be able to meet your August 9, 2019 deadline for filing a response to the OPR draft report of investigation. I also would like to advise you that I am requesting expedited handling of my FOIA request from OIP. In the coming days, I hope to retain an attorney and will put you in touch with that lawyer. For now, I would appreciate your directing all communications to me.

Thank you.

Respectfully,

Quynh Vu Bain
Immigration Judge
Arlington, Virginia

**From:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Sent:** Monday, August 05, 2019 2:16 PM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** CONFIDENTIAL: Response to your August 3, 2019 e-mail

Judge Bain:

I have received your August 3, 2019 e-mail, sent at 3:02 p.m. You informed me last week that Ms. White will not be representing you in this matter and that you intend to seek separate counsel to assist you in responding to OPR's Draft Report. However, I have not heard from you that you have obtained other representation. Accordingly, I am responding directly to you. I believe the following information will be of assistance to you as you prepare a response to OPR's Draft Report. As you know, OPR has requested that you submit any comments you may have by this Friday, August 9, 2019.

1

PLAINTIFF'S EXHIBIT 27   0051

OPR referenced but did not cite with particularity in its report the specific e-mail correspondence OPR reviewed in reaching the conclusion that there was a factual basis for the March 2015 Reprimand you received from ACIJ Santoro (see Draft Report at page 6, n. 12). To be clear, that e-mail correspondence, again, was either authored by, or was sent to, you (in fact, in your April 20, 2015 memorandum to ACIJ Santoro, *you* cited this e-mail correspondence in detail). To be specific, however, OPR reviewed the following e-mails that it considered relevant to this matter. Again, OPR asks that you specifically identify which of the following e-mails you either do not have or cannot obtain:

1) An e-mail *from you* to Tina Barrow, sent on February 10, 2015 at 4:06 p.m. EST.
2) An e-mail from Walter Durling *to you*, sent on March 4, 2015, at 4:25 p.m. EST, on which Tina Barrow was copied.
3) An e-mail *from you* to Walter Durling, sent on March 4, 2015, at 4:58 p.m. EST, on which you copied Tina Barrow and Christopher A. Santoro (you also copied yourself).
4) An e-mail from Christopher A. Santoro *to you* and Walter Durling, sent on March 4, 2015 at 5:06 p.m. EST, on which Tina Barrow was copied.
5) An e-mail *from you* to Christopher A. Santoro and Walter Durling, sent on March 4, 2015, at 5:14 p.m. EST, on which Tina Barrow was copied (you also copied yourself).
6) An e-mail from Christopher A. Santoro *to you*, sent on March 6, 2015, at 3:29 p.m. EST
7) An e-mail *from you* to Christopher A. Santoro, sent on March 9, 2015 at 8:46 p.m. EST (you copied yourself).

OPR also referenced on pages 6-7 of its Draft Report, but did not cite with specificity, the e-mail exchange between you and IJ Roxanne Hyladylowycz which resulted in the July 2016 letter of counseling you received from ACIJ Nadkarni. As with the other materials described above, that e-mail correspondence again was either authored by, or was sent to, you. Accordingly, OPR asks that you specifically identify those e-mails which you either do not have or cannot obtain:

1) An e-mail *from you* to Roxanne Hladylowycz, sent on July 8, 2016 at 4:50 p.m. EST.
2) An e-mail from Roxanne Hladylowycz *to you*, sent on July 12, 2016 at 11:51 a.m. IJ Hladylowycz copied on that e-mail Deepali Nadkarni, Deborah Castro, Cheri Bowyer, Michael McGoings, and Print Maggard.
3) An e-mail *from you* to Roxanne Hladylowycz, sent on July 12, 2016 at 12:02 p.m. EST, on which you copied all of the same individuals IJ Hladylowycz had included in her earlier e-mail to you that day.
4) An e-mail from Deborah Castro *to you* and Roxanne Hladylowycz, sent on July 12, 2016 at 12:57 p.m. EST, on which Ms. Castro copied the other individuals you and IJ Hladylowycz had included in the e-mails you exchanged earlier that day.
5) An e-mail *from you* to Deborah Castro and Roxanne Hladylowycz, sent on July 12, 2016 at 12:58 p.m. EST, on which you copied the other individuals you and IJ Hladylowycz had included in the e-mails exchanged earlier that day
6) An e-mail from Roxanne Hladylowycz *to you* and Deborah Castro, sent on July 12, 2016 at 1:02 p.m. EST, on which IJ Hladylowycz copied the other individuals included in all of the earlier e-mails exchanged that day.
7) An e-mail *from you* to Roxanne Hladylowycz and Deborah Castro, sent on July 12, 2016 at 3:33 p.m. EST, on which you copied the other individuals included in all of the earlier e-mails exchanged that day.
8) An e-mail from Roxanne Hlyadylowycz *to you*, Deborah Castro, and Juan Osuna on July 12, 2016 at 5:28 p.m. EST, on which IJ Hladylowycz copied the other individuals included in all of the earlier e-mails exchanged that day.
9) An e-mail from Deepali Nadkarni *to you* and Roxanne Hladylowycz, sent on July 12, 2016 at 5:40 p.m. EST, on which ACIJ Nadkarni copied Michael McGoings, Print Maggard, and Juan Osuna.

You claim that to your knowledge EOIR has not kept a separate "disciplinary records" file for you and has denied to you that such a record exists. OPR has no involvement in any request by you for access to EOIR records and therefore cannot comment on the agency's representations to you that it does not have a disciplinary record relating to you. Regardless, however, of whether your agency does or does not maintain a compilation that it refers to as your "disciplinary records," OPR obtained and cited in its Draft Report documents that it considers to be of a disciplinary nature and which OPR considered relevant to the conclusions it reached (see Draft Report pp. 6-7). You purport to be

PLAINTIFF'S EXHIBIT 27   0052

## Bain, Quynh (EOIR)

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Monday, August 5, 2019 8:54 AM |
| **To:** | OPR.FOIA |
| **Cc:** | Bain, Quynh (EOIR) |
| **Subject:** | FOIA request and request to expedite -- CONFIDENTIAL COMMUNICATION WITH OPR -- CONTAINS PRIVACY PROTECTED INFORMATION AND INFORMATION EXEMPT FROM DISCLOSURE TO OTHER DOJ COMPONENTS |
| **Importance:** | High |

Dear Sir or Madam:

I am a DOJ attorney (an immigration judge) who is in the process of drafting a response to a draft OPR report of investigation. I received the report on July 26, 2019. Ms. Leslie Gerardo of your office has requested a response by August 9, 2019.

This is a request under the FOIA for any and all information that OPR received, gathered, or compiled in the course of conducting the OPR inquiry and investigation, and in preparing the July 22, 2019 report of investigation. The term "information" includes paper and electronic documents, electronic or digital media, audio or digital recordings, and similar materials. Please include a privilege log (Vaughn Index) for any assertions of FOIA exemptions or if redactions are made to any responsive materials. Please refer to the attached email communication with Ms. Gerardo which provides the background for this FOIA request.

I would appreciate your expediting this request as the deadline for providing my response is at the end of this week.

Thank you very much.

Regards,

Quynh Vu Bain
Immigration Judge
Arlington, Virginia

**From:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Sent:** Saturday, August 03, 2019 3:02 PM
**To:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Cc:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** RE: OPR Draft Report of Investigation -- CONFIDENTIAL COMMUNICATION WITH OPR -- CONTAINS PRIVACY PROTECTED INFORMATION AND INFORMATION EXEMPT FROM DISCLOSURE TO OTHER DOJ COMPONENTS
**Importance:** High

Dear Ms. Gerardo:

This is in response to your email of July 29, 2019 at 4:15 p.m. below. I would like to let you know that I have substituted the redacted pages concerning Ms. Wahowiak and Ms. King for the pages that you initially placed in the Record of Investigation. I have destroyed those pages that you included in the original record provided to Ms. White.

1

PLAINTIFF'S EXHIBIT 27   0053

**From:** Gerardo, Leslie A. (OPR) <Leslie.A.Gerardo@opr.usdoj.gov>
**Sent:** Monday, July 29, 2019 4:15 PM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>; Heather White <HWhite@fedpractice.com>
**Subject:** OPR Draft Report of Investigation

IJ Bain and Ms. White,

I am in receipt of IJ Bain's email sent today, July 29, 2019, at 12:07 p.m.

IJ Bain, thank you for advising me that you intend to secure substitute counsel to represent you in this matter. Please be aware that any counsel you secure will be required to sign a confidentiality agreement before reviewing the draft report. Please also keep in mind that OPR has requested that you provide any comments to the draft report on or before August 9, 2019. I would therefore appreciate it if you could notify me of the identify of substitute counsel as soon as possible.

You have requested access to certain OPR investigatory materials. Please be advised that OPR does not share recordings or transcripts of witness interviews. The information derived from witness interviews that OPR considers relevant to OPR's analysis and conclusions is contained in the draft report itself, and you may comment on that information as you deem appropriate.

You have also requested access to your disciplinary records. The documents that OPR referenced in its draft report relating to prior disciplinary actions involving you were either created by you, such as email communications, letters, or memoranda to your supervisor or colleagues; or were furnished to you in due course by your agency, such as the March 16, 2015 formal reprimand and January 2105 warning letter. Accordingly, you are familiar with, and have access to, those materials.

Please be advised that OPR appended to the Draft Report within Exhibit 6, under the tab labeled "U," copies of information from Ms. Wahowiak's and Ms. King's personnel files. These are copies of documents that you previously provided to OPR. However, these pages were missing necessary redactions to remove personally identifying information (PII). I am providing with this email substitute pages that OPR has redacted to remove PII. Please destroy the corresponding originals and replace them with the attached redacted copies, and let me know by responsive email when you have done so.

Finally, IJ Bain has indicated in her email that she has retrieved from Ms. White the copy of the draft report and exhibits that OPR sent to Ms. White. Ms. White, as you are no longer representing IJ Bain in this matter, OPR hereby requests that you confirm that you have not made any copies of those documents. If you have made any copies of any of OPR's materials, OPR hereby requests, consistent with the confidentiality agreement that you signed, that any and all copies of OPR's draft report and accompanying exhibits be destroyed. Ms. White, please notify OPR by email that you have retained no copies of OPR's materials or that you have destroyed any copies you may have made.

Regards,

Leslie Ann Gerardo

3

## Bain, Quynh (EOIR)

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Wednesday, August 7, 2019 4:38 PM |
| **To:** | Pustay, Melanie A (OIP) |
| **Cc:** | Amundson, Corey (OPR) |
| **Subject:** | Request to expedite FOIA request |
| **Attachments:** | RE: OPR Draft Report of Investigation -- CONFIDENTIAL COMMUNICATION WITH OPR -- CONTAINS PRIVACY PROTECTED INFORMATION AND INFORMATION EXEMPT FROM DISCLOSURE TO OTHER DOJ COMPONENTS; FOIA request and request to expedite -- CONFIDENTIAL COMMUNICATION WITH OPR -- CONTAINS PRIVACY PROTECTED INFORMATION AND INFORMATION EXEMPT FROM DISCLOSURE TO OTHER DOJ COMPONENTS; RE: CONFIDENTIAL: Response to your August 3, 2019 e-mail |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Ms. Pustay:

Pursuant to 5 U.S.C. 552(a)(6)(E), I respectfully request expedited processing of my FOIA request. On July 26, 2019, I received an OPR draft report of investigation that was 80-pages, single-spaced and contained over 400 footnotes. OPR also provided a loose collection of 485 pages of documents that were not paginated but had exhibit markers. The 485 pages of documents were described as a record of exhibits that OPR considered and relied on, but the record did not contain all the evidentiary materials that OPR cited in its draft report of investigation. OPR has given me until August 9, 2019, in which to submit a response.

This request to expedite the FOIA request is based on a showing of compelling need. Without the requested records, I am unable to prepare a truthful, accurate, and complete response to the draft OPR report of investigation. By email dated August 3, 2019, I requested **that OPR provide a record of all the information, documents, materials, email communications, audio recordings, transcripts, interview notes and summaries that OPR relied on in preparing the draft report of investigation**. By email dated August 5, 2019, OPR denied the FOIA request and declined to expedite this FOIA request. OPR further advised that it expects my response by this Friday, August 9, 2019. Please see the attached email communications for reference.

Accordingly, to avoid defaulting on OPR's deadline for responding to the draft investigation, and in the interest of providing OPR with a truthful, accurate, and complete response, I respectfully request that OPR expedite the FOIA request and extend the response deadline to 30 days after the release of all materials responsive to the FOIA request.

This request is true and correct to the best of my knowledge and belief.

Thank you for your prompt attention to this matter.

Regards,

Quynh Vu Bain
Immigration Judge
Arlington, Virginia

Cc:     Copying Corey Amundson, Director of OPR

1

## Bain, Quynh (EOIR)

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Wednesday, August 7, 2019 4:38 PM |
| **To:** | Pustay, Melanie A (OIP) |
| **Cc:** | Amundson, Corey (OPR) |
| **Subject:** | Request to expedite FOIA request |
| **Attachments:** | RE: OPR Draft Report of Investigation -  CONFIDENTIAL COMMUNICATION WITH OPR   CONTAINS PRIVACY PROTECTED INFORMATION AND INFORMATION EXEMPT FROM DISCLOSURE TO OTHER DOJ COMPONENTS; FOIA request and request to expedite -- CONFIDENTIAL COMMUNICATION WITH OPR    CONTAINS PRIVACY PROTECTED INFORMATION AND INFORMATION EXEMPT FROM DISCLOSURE TO OTHER DOJ COMPONENTS; RE: CONFIDENTIAL: Response to your August 3, 2019 e mail |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Ms. Pustay:

Pursuant to 5 U.S.C. 552(a)(6)(E), I respectfully request expedited processing of my FOIA request.  On July 26, 2019, I received an OPR draft report of investigation that was 80-pages, single-spaced and contained over 400 footnotes.  OPR also provided a loose collection of 485 pages of documents that were not paginated but had exhibit markers.  The 485 pages of documents were described as a record of exhibits that OPR considered and relied on, but the record did not contain all the evidentiary materials that OPR cited in its draft report of investigation.  OPR has given me until August 9, 2019, in which to submit a response.

This request to expedite the FOIA request is based on a showing of compelling need.  Without the requested records, I am unable to prepare a truthful, accurate, and complete response to the draft OPR report of investigation.  By email dated August 3, 2019, I requested **that OPR provide a record of all the information, documents, materials, email communications, audio recordings, transcripts, interview notes and summaries that OPR relied on in preparing the draft report of investigation**.  By email dated August 5, 2019, OPR denied the FOIA request and declined to expedite this FOIA request.  OPR further advised that it expects my response by this Friday, August 9, 2019.  Please see the attached email communications for reference.

Accordingly, to avoid defaulting on OPR's deadline for responding to the draft investigation, and in the interest of providing OPR with a truthful, accurate, and complete response, I respectfully request that OPR expedite the FOIA request and extend the response deadline to 30 days after the release of all materials responsive to the FOIA request.

This request is true and correct to the best of my knowledge and belief.

Thank you for your prompt attention to this matter.

Regards,

Quynh Vu Bain
Immigration Judge
Arlington, Virginia

Cc:     Copying Corey Amundson, Director of OPR

1

PLAINTIFF'S EXHIBIT 27   0056

## Bain, Quynh (EOIR)

| | |
|---|---|
| **From:** | Bain, Quynh (EOIR) |
| **Sent:** | Thursday, September 19, 2019 8:58 AM |
| **To:** | Harrell Jr, Raymond (OPR) |
| **Cc:** | Bain, Quynh (EOIR) |
| **Subject:** | RE: FOIA request F19-00105 |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Good morning, Mr. Harrell:

This is to acknowledge your email of September 18, 2019 at 1:56 p.m.

Thank you for your inquiry. I have not retained a FOIA attorney yet, so please send the documents to me. Because I am requesting them for use in responding to an OPR report, I will share the documents with the attorneys who have been retained to represent me in the OPR matter, as well as any other attorney who has signed or will sign a confidentiality agreement with OPR. Given the confidentiality of the OPR matter, I request that OPR clearly mark each and every page with the notation "DO NOT RELEASE TO THIRD PARTIES UNDER FOIA." I also request that each page that is produced be paginated chronologically -- that is, in the order in which OPR received the document, and sequentially, with a notation that OPR is the source of the information (for example, "OPR 1," "OPR 2," "OPR 3," etc.). This would be in keeping with my understanding that the waiver of Exemptions 6(C) and 7 to which I have agreed is meant to provide for disclosure only to me (and, by extension, any attorney who represents me in the OPR matter), and <u>not</u> to any third party requestor. Finally, given the confidential nature of the OPR investigation, I request that the documents OPR produces in response to my FOIA request be mailed by FedEx to my home address, stated below:

Quynh Vu Bain
213 Third Street, SE
Washington, DC 20003
(202) 569-0942

I cannot guarantee confidentiality if you send them to my office address or to my office email, and I do not agree to waive Exemptions 6(C) and 7 if you choose to send them to my office.

Thank you for your attention to this matter.

Regards,

Quynh Vu Bain
Immigration Judge
Arlington, Virginia
(703) 603-1360

**From:** Harrell Jr, Raymond (OPR) <Raymond.HarrellJr@opr.usdoj.gov>
**Sent:** Wednesday, September 18, 2019 1:56 PM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** FOIA request F19-00105

PLAINTIFF'S EXHIBIT 27 0097

**Bain, Quynh (EOIR)**

| | |
|---|---|
| **From:** | Harrell Jr, Raymond (OPR) |
| **Sent:** | Wednesday, September 18, 2019 1:56 PM |
| **To:** | Bain, Quynh (EOIR) |
| **Subject:** | FOIA request F19-00105 |

Good Afternoon,

Judge Bain, are you represented for purposes of your FOIA request?  If so, please provide me the contact information for your attorney.

Respectfully,

**Raymond Harrell**
**FOIA Specialist**
**U.S. Department of Justice**
**Office of Professional Responsibility**
**950 Pennsylvania Ave., N.W. Room 3529**
**Washington, D.C. 20530**
**(202) 353- 9794 (office)**

1

PLAINTIFF'S EXHIBIT 27 - 7    0058

## Bain, Quynh (EOIR)

**From:** Bain, Quynh (EOIR)
**Sent:** Thursday, September 19, 2019 8:58 AM
**To:** Harrell Jr, Raymond (OPR)
**Cc:** Bain, Quynh (EOIR)
**Subject:** RE: FOIA request F19-00105

**Follow Up Flag:** Follow up
**Flag Status:** Completed

Good morning, Mr. Harrell:

This is to acknowledge your email of September 18, 2019 at 1:56 p.m.

Thank you for your inquiry. I have not retained a FOIA attorney yet, so please send the documents to me. Because I am requesting them for use in responding to an OPR report, I will share the documents with the attorneys who have been retained to represent me in the OPR matter, as well as any other attorney who has signed or will sign a confidentiality agreement with OPR. Given the confidentiality of the OPR matter, I request that OPR clearly mark each and every page with the notation "DO NOT RELEASE TO THIRD PARTIES UNDER FOIA." I also request that each page that is produced be paginated chronologically - that is, in the order in which OPR received the document, and sequentially, with a notation that OPR is the source of the information (for example, "OPR 1," "OPR 2," "OPR 3," etc.). This would be in keeping with my understanding that the waiver of Exemptions 6(C) and 7 to which I have agreed is meant to provide for disclosure only to me (and, by extension, any attorney who represents me in the OPR matter), and _not_ to any third party requestor. Finally, given the confidential nature of the OPR investigation, I request that the documents OPR produces in response to my FOIA request be mailed by FedEx to my home address, stated below:

Quynh Vu Bain
213 Third Street, SE
Washington, DC 20003
(202) 569-0942

I cannot guarantee confidentiality if you send them to my office address or to my office email, and I do not agree to waive Exemptions 6(C) and 7 if you choose to send them to my office.

Thank you for your attention to this matter.

Regards,

Quynh Vu Bain
Immigration Judge
Arlington, Virginia
(703) 603-1360

**From:** Harrell Jr, Raymond (OPR) <Raymond.HarrellJr@opr.usdoj.gov>
**Sent:** Wednesday, September 18, 2019 1:56 PM
**To:** Bain, Quynh (EOIR) <Quynh.Bain@EOIR.USDOJ.GOV>
**Subject:** FOIA request F19-00105

1

PLAINTIFF'S EXHIBIT 27   0059

**Bain, Quynh (EOIR)**

| | |
|---|---|
| **From:** | Harrell Jr, Raymond (OPR) |
| **Sent:** | Wednesday, September 18, 2019 1:56 PM |
| **To:** | Bain, Quynh (EOIR) |
| **Subject:** | FOIA request F19-00105 |

Good Afternoon,

Judge Bain, are you represented for purposes of your FOIA request?  If so, please provide me the contact information for your attorney.

Respectfully,

**Raymond Harrell**
**FOIA Specialist**
**U.S. Department of Justice**
**Office of Professional Responsibility**
**950 Pennsylvania Ave., N.W. Room 3529**
**Washington, D.C. 20530**
**(202) 353- 9794 (office)**

PLAINTIFF'S EXHIBIT 27    0060

**Bain, Quynh (EOIR)**

| | |
|---|---|
| **From:** | OPR NO-REPLY |
| **Sent:** | Friday, October 4, 2019 3:30 PM |
| **To:** | Bain, Quynh (EOIR) |
| **Subject:** | F19-00105 FOIA Request Acknowledgement Letter |
| **Attachments:** | F19-00105 signed Acknowledgement letter.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please see attached acknowledgement letter.

OPR FOIA

PLAINTIFF'S EXHIBIT 27 - 0091

## Bain, Quynh (EOIR)

| | |
|---|---|
| **From:** | OPR NO-REPLY |
| **Sent:** | Friday, October 4, 2019 3:30 PM |
| **To:** | Bain, Quynh (EOIR) |
| **Subject:** | F19-00105 FOIA Request Acknowledgement Letter |
| **Attachments:** | F19-00105 signed Acknowledgement letter.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please see attached acknowledgement letter.

OPR FOIA

1



To:·     Ms. Leslie Gerardo
        Assistant Counsel
        U.S. Department of Justice
        Office of Professional Responsibility

From:     Quynh Vu Bain
        Immigration Judge
        U.S. Department of Justice
        Executive Office for Immigration Review



Date:     November 15, 2017

Re:     Response to OPR Inquiry of August 29, 2017

---

At the request of the U.S. Department of Justice, Office of Professional Responsibility

(OPR), I respectfully submit this response to the OPR's inquiry letter, dated August 29, 2017.

Exhibit 1, Tab A.  In the inquiry letter, the OPR requested that I address the allegations that two

immigration lawyers, ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ made in an ethics complaint filed

with the Executive Office for Immigration Review, Office of the Chief Immigration Judge

(OCIJ) on March 1, 2017.  Exhibit 1, Tab B.

This response is divided into three sections.  The first section discusses my employment

history with DOJ, my bar admissions, and the training that I have received in my current job.

The second section addresses specifically the allegations of unprofessional or unethical conduct

that attorneys ▮▮▮ and ▮▮▮ made through their lawyer, ▮▮▮▮▮ Exhibit 1B.

The third section discusses the specific allegations to which the OPR has requested a response.

These allegations pertain to the information that is mentioned in and relied upon in my

decisions to deny the recusal motions that attorneys ███████ and ██████ filed in __ cases.[1] Exhibit 1, Tab C.

In addition, pursuant to OPR's request, I am providing specific information about my bar admissions. On December 19, 1991, I was admitted to the bar of the State of Pennsylvania. I am currently on inactive status in that jurisdiction. On May 22, 1994, I was admitted to the bar of the State of New York. I am currently on active status in that jurisdiction.

In preparing this response, I followed the guidance provided in the OPR Policies and Procedures Memorandum. Exhibit 1, Tab D. I also discussed the relevant rules of professional conduct that govern the work of immigration judges as attorneys employed by the U.S. Department of Justice: The Ethics Guide for Immigration Judges (Exhibit 1, Tab B), the Standards of Ethical Conduct for Executive Branch Employees (Exhibit 1, Tab C), and the rules of professional conduct of my state bars, New York and Pennsylvania (Exhibit 1, Tabs D & E).

I.   **Background**

   A.   **Work Experience**

In March 2008, I was appointed as an Immigration Judge and was assigned to the Headquarters Immigration Court in Falls Church, Virginia. Before coming to the Executive Office for Immigration Review ("EOIR"), Office of the Chief Immigration Judge, I had worked for 17 years in four other Department of Justice offices. My career with DOJ began in 1991, when I entered on duty as an Honor Law Graduate working for the former U.S. Immigration

---

[1] As of today, attorneys ██████ and █████ have filed 19 motions for recusal. Exhibit 1, Tab I. Of those, I have issued written orders denying recusal in 7 cases. Id. The attorneys have appealed the orders denying recusal, and the Board of Immigration Appeals (BIA) has dismissed the interlocutory appeals. Exhibit 1, Tab J. As for the 12 remaining motions for recusal, my supervisory judge, Assistant Chief Immigration Judge Dee Nadkarni, has instructed that I not respond to those motions. Exhibit 1, Tab I.

PLAINTIFF'S EXHIBIT 27    0064

and Naturalization Service.  In 1996, I joined the Civil Division's Office of Immigration Litigation, which represented the United States in federal court litigation involving immigration matters.  After the September 11 terrorist attacks in 2001, I was detailed to the Office of the Deputy Attorney General to work on the counter-terrorism investigation that a joint FBI-led task force conducted in the months following September 11.  When my detail concluded in 2003, I returned to the Civil Division and worked in the Torts Branch, Environmental Torts Section for three years.  Working in teams, I focused on developing new litigation skills and gaining trial experience.  During that three-year hiatus from the practice of immigration law, I continued to teach immigration law courses as an adjunct professor at the American University, Washington College of Law.  In 2006, I returned to the Civil Division's Office of Immigration Litigation to work on significant appellate litigation in the courts of appeals and the Supreme Court.

My responsibilities in the Headquarters Court included conducting court hearings in multiple jurisdictions by video-teleconference (VTC).  The Headquarters Court was designed to meet short-term staffing needs in local courts.  Headquarters judges conducted individual calendar hearings – evidentiary hearings focusing on the merits of relief applications – in jurisdictions that had heavy caseloads and not enough judges to handle them.  For the first four years of my employment in the Headquarters Court (from 2008 to 2012), I conducted hearings by VTC in the following jurisdictions:  Boston, New York, Detroit, Chicago, Kansas City, Dallas, Houston, San Antonio, Phoenix, Florence (Arizona), San Francisco, and Tacoma.  The hearings involved detained and non-detained individuals seeking to avoid removal from the United States.  In addition to my day-to-day responsibilities, I was appointed to serve as a liaison judge in 2014 and as a pro bono judge from 2008 to 2010, and from 2014-2015.  Exhibit

PLAINTIFF'S EXHIBIT 27   0065

1, Tab E.  I also served as a mentor judge for three classes of judicial law clerks.  In August

2009, I served as a speaker at the Immigration Judge national training conference, and the topic

of discussion was the use expert evidence in immigration court proceedings.

In 2012, the Headquarters Court was merged with the Arlington, Virginia, Immigration

Court.  After the merger, the six existing Arlington judges and the three existing Headquarters

judges moved to the court's current location in Crystal City.  The two courts combined their

personnel and other resources into a single entity.  Even though the courts had merged, I

continued to handle individual calendar hearings in other courts by VTC for four more years,

until March 2016.  During that four-year period, I did not have my own caseload.  Instead, I

handled individual (or evidentiary) hearings for other judges whose cases were assigned to me

temporarily for the limited purpose of completing evidentiary hearings that were assigned to

those judges.  Once the evidentiary hearings were completed, assignment of the cases reverted

to the other judges.  Most of the cases that I handled involved individuals who were detained in

immigration detention facilities, awaiting their day in court.  After five years of conducting

hearings exclusively by VTC, I requested a change in my assignment in February 2013 for

health reasons.

In March 2016, my request for a change in assignment was finally approved, and I

officially began hearing Arlington cases in person.  In just one year, my caseload has grown

from zero to more than 4,000 non-detained cases.  Exhibit 1, Tab E.  Most of these cases are

"surge" cases arising from the mass influx of Central American migrants beginning in January

2014.  I also have a small number of aged non-detained cases (i.e., cases that are older than five

years) that were transferred from other Arlington judges' dockets to mine.  In terms of

workload, the national average is 700 cases per judge.  The average workload of judges in the

4

Nation's busiest immigration court in New York City is 2,240 cases per judge. Compared to those statistics, my docket of 4,000 cases is almost six times the national average and nearly twice the New York court average.[2]

Even though my caseload is incredibly demanding, I give each litigant who comes into my courtroom fair and thorough consideration of his or her claims. Taking my responsibilities very seriously, I appreciate the gravity of every situation and devote my full attention to resolving the issues at hand. I approach each case as a neutral decision-maker with no vested interest in the outcome. My goal has always been to ensure fairness to all parties, private litigants as well as government representatives alike. Ensuring fairness means that I spend approximately seven hours a day conducting court hearings, and many more hours drafting written decisions that adhere to the complex body of immigration law and policies.

B.    Training

When my employment with EOIR began in 2008, EOIR's new IJ training program consisted of one week of substantive law training at Headquarters and two weeks of practical training in an immigration court. The practical training was most useful, since it focused on the use of courtroom technologies, docket management, courtroom control, and other tasks that judges were expected to master eventually. During the two weeks of practical training, I shadowed two experienced judges in the Arlington, Virginia and Baltimore, Maryland Immigration courts. Through observing their handling of master calendar and individual

---

[2] See http://trac.syr.edu/phptools/immigration/court_backlog/; http://www.america.aljazeera.com/articles/2015/7/7/a-week-in-the-countrys-busiest-immigration-court.html

PLAINTIFF'S EXHIBIT 27    0067

calendar hearings, I picked up good tips and advice on how to conduct hearings efficiently and fairly.

New IJ training also included a one-hour meeting with the ethics officer in the Office of General Counsel. I recall that the ethics training focused on the Hatch Act and additional restrictions placed on immigration judges' participation in political activities, the Standards of Ethical Conduct for Executive Branch Employees, and the EOIR OGC's role in rendering ethics advice. In 2008, the OGC had a "safe harbor" policy by which ethics advice that it gave judges could serve as a shield against disciplinary complaints. The ethics officer in OGC was Carolyn Picotti, an attorney with nearly 28 years of experiences in immigration law. After Ms. Picotti passed away in 2010 due to a serious illness, the "safe harbor" policy dissipated as the next ethics officer, an attorney with about three years of work experience, focused on matters that were of general concern to all EOIR employees, such as the gift rule or the financial disclosure requirement or the public speaking engagement policy. Without a dependable "safe harbor" in place, I directed my ethics queries to the DOJ's Professional Responsibility Advisory Office (PRAO). I contacted PRAO whenever the agency's ethics officer was unable to provide advice. For example, in April 2015 I asked PRAO for advice on how to introduce sealed evidence that the United States Attorney's Office in Brooklyn, New York sent to me in response to a subpoena that I issued, in a way that would not violate the prohibition on impermissible ex parte communications.

When my employment with EOIR began in March 2008, the agency did not have a formal complaint resolution process that I was aware of. Immigration Judges also did not undergo yearly performance evaluations. Two years after I began working for EOIR, I was selected to attend a one-week advanced immigration judge training conference in October 2010,

PLAINTIFF'S EXHIBIT 27   0068

at the National Judicial Law Center in Reno, Nevada. The purpose of that conference was to orient fairly new judges to significant, pressing matters that had arisen in recent years. During that conference, the then-Assistant Chief Immigration Judge for Conduct and Professionalism, Mary Beth Keller, introduced a new complaint resolution process by which complaints against immigration judges were referred to OCIJ and/or OPR for review, investigation, and resolution. I recall that the presentation did not focus on how the complaint resolution process worked. Rather, it focused on the nature of the complaints that the new process was designed to address. Judge Keller stated that the program's aim was to address serious instances of judicial misconduct. For instance, Judge Keller stated that intemperate behavior such as shouting, bullying, excoriating witnesses for lying under oath, and use of abusive language or verbal threats for the purpose of intimidation were the types of complaint that would land a judge in disciplinary proceedings. As I had come across such situations in hearing other judges' cases on remand, I understood the point that Judge Keller was trying to convey.

What was surprising, though, was Judge Keller's announcement that the agency would begin soliciting input from stakeholders such as the Office of Immigration Litigation, the BIA, and the Department of Homeland Security regarding immigration judge performance in court. She also stated that private bar attorneys and the public would be allowed to give input as well, in the form of disciplinary complaints. She referred to such input as "quality control" ensuring that judges were properly performing their jobs in a fair and efficient manner. I recalled this discussion very clearly because in my mind it raised a few red flags.

First, soliciting input from stakeholders who were litigants in court struck me as inviting impermissible ex parte communications concerning matters in litigation. The practice also had

7

PLAINTIFF'S EXHIBIT 27   0069

the potential to generate conflicts of interest between the agency's adjudicatory functions and its role as liaison to the public.

Second, based on my eight years of working in the Office of Immigration Litigation and defending the agency's decisions in federal court, I knew that the immigration court hearing process that the Immigration and Nationality Act (INA) prescribed was the "sole and exclusive procedure" for resolving immigration cases at the administrative agency level. 8 U.S.C. 1252(a)(5). The process gives each litigant in non-expedited removal proceedings a full-blown evidentiary hearing before an immigration judge; a right of direct appeal to the BIA; and a right to petition a federal court of appeals for review of the agency's decision. See 8 U.S.C. 1252(a); 8 C.F.R. 1003.1-1003.8 (2017). This tiered-case adjudication process was rooted in the Administrative Procedures Act, and for over 30 years the agency had used this process as the exclusive mechanism for adjudicating individual immigration cases. I worried that by allowing government and private litigants to complain about immigration judges' handling of court cases through the new EOIR complaint resolution program -- which falls outside the APA's and INA's "sole and exclusive procedure," the agency ran the risk of encouraging dissatisfied litigants to circumvent the INA's adjudicatory processes and air their grievances through unofficial channels that had no accountability to Congress or the federal judiciary. I also worried that this unaccountable process might run afoul of the rules of the Civil Service Reform Act. Thus, while I agreed that the agency should not condone inappropriate behavior of immigration judges and that some sort of disciplinary program was necessary, I did not think that the new complaint resolution process would work as intended. I also worried that it might be misused or abused to punish judges that the agency did not favor.

8

Third, the new complaint resolution program also allowed the BIA to make referrals of perceived due process violations to OCIJ for resolution, rather than to let the federal courts resolve such questions or make referrals to OPR. Since the APA and the INA do not give administrative agencies original jurisdiction to resolve constitutional questions arising from their administrative practices, policies, or case adjudications, I thought it was questionable that the agency was giving itself the authority to decide constitutional issues that it otherwise did not have. I worried that this would have the effect of usurping the federal courts' authority to resolve constitutional due process questions, such that the agency's decisions finding due process violations would be *ultra vires*. Further, I worried that litigants in immigration court might abuse the process by alleging due process violations that do not really exist, to enhance their chances of prevailing even if the Board or the federal courts ultimately ruled against them. I expressed these concerns to ACIJ Keller during the 2010 training conferences, but she did not seem to agree with my views. I decided not to press the matter for fear of offending ACIJ Keller who was in charge of the complaint resolution program.

As I recently discovered, a protocol that was finalized in 2010 contained general guidelines for processing and resolving complaints filed against immigration judges. See Exhibit 2, Tab J. To my knowledge, the 2010 protocol was not distributed to non-supervisory judges, and thus I did not receive a copy from OCIJ.[3] Entitled "Summary of OCIJ Procedure

---

[3] In August 2017, I received a copy of the 2010 protocol in response to a FOIA request that I filed two years ago in September 2015. Upon reading the 2010 protocol for the first time in August 2017, I realized the process by which supervisory immigration judges resolved complaints against judges under their supervision was secretive and often one-sided. I began to worry that this flawed disciplinary process may have been used to retaliate against judges, like me, who are politically conservative, are law-enforcement minded, and have high asylum denial rates. I am aware that other judges similarly situated have been the subject of disciplinary complaints that they considered retaliatory in some form or fashion.

PLAINTIFF'S EXHIBIT 27   0071

for Handling Complaints Against Immigration Judges," the 2010 protocol states that the OCIJ

or the ACIJ fielding a complaint may conduct an investigation.  The protocol states that a

complaint may be made orally or in writing, and the complaint may be anonymous.

Significantly, the protocol does not contain a precise definition of "complaint."  The protocol

provides that complaints need not be limited to violations of the Standards of Ethical Conduct

for Executive Branch employees, the Ethics Guide for Immigration Judges, or the individual

judges' state bar rules.  In fact, the protocol states that a complaint may be based on an "IJ's

alleged conduct that gave rise to concern" or "information that suggests an IJ may have engaged

in inappropriate conduct."  In a January 6, 2012 email exchange, a supervisory judge fielding a

complaint asked Judge Keller for a definition of "complaint."  Judge Keller, who was then in

charge of the complaint resolution program, confirmed that there was no concise, precise

definition:

> You've never seen it bc [because] it's bureaucratic gobbledygook.
> Bottom line:  It's pretty wide in order for us to capture any possible issues
> and handle/get rid of them asap.  That being said, I don't think we should
> 'create' a complaint against [Judge xxx] where one really doesn't exist. . .

Exhibit 2, Tab K.  Judge Keller's email confirmed that the agency had adopted a vague,

overbroad definition of "complaint" that swept in many more complaints than what Judge

Keller indicated during the 2010 advanced judge training conference.[4]

---

[4] Judge Keller's email was released in response to a FOIA lawsuit filed in federal district
court in 2012.  Beginning in 2010, EOIR maintained an electronic database that stored
information relating to the OCIJ's complaint resolution program.  In 2012, the American
Immigration Lawyers Association (AILA) and two other advocacy groups sued EOIR to obtain
release of electronically stored information from the database.  In 2013, EOIR responded with a
voluntary disclosure of complaints that had been resolved against judges between 2010 and
2013.  The information that was released to AILA showed that, for the past seven years since it
instituted the disciplinary complaint program in 2010, OCIJ employed a process that relied on

PLAINTIFF'S EXHIBIT 27   0072

Apart from the 2008 new judge training and the 2010 advanced judge training, I have attended every national training conference for immigration judges that the agency organized and hosted in Washington, DC. The purpose of the week-long national training conferences was to bring together all immigration judges for refresher courses on topics of substantive law and procedures that judges needed to know to perform their day-to-day work. In past years, the agency also used the national training conferences to orient judges to developing policies and emerging trends. In addition, ethics training was mandatory.

During the 2011 national conference, ethics training focused on use of social media. The presenter from PRAO discussed the manifold ways in which judges could get in trouble for communicating through social media. There was also mandatory training on the Standards of

---

informal email exchanges between OCIJ staff in resolving complaints, often without involving the judge who is the subject of the complaint, and usually without applying the standards of professional and ethical conduct that the agency and the DOJ adopted. See http://www.aila.org/infonet/eoir-records-relating-misconduct

AILA was dissatisfied with the 2013 disclosure, so it sued EOIR in federal district court to compel more disclosures, including personally identifying information about judges such as their names, court locations, gender, and time on the bench. In 2014, the United States District Court for the District of Columbia granted summary judgment in favor of immigration judges whose personnel and disciplinary records were the subject of the AILA lawsuit. The district court ruled the information AILA sought was privacy-protected and covered by FOIA Exemption 6. The district court was concerned that release of such information might allow the public to connect the dots and ascertain the judges' disciplinary records which, by law, are privacy protected given the judges' positions as low-level career public servants. In July 2016, the United States Court of Appeals for the D.C. Circuit affirmed the district court's decision prohibiting disclosure of personally identifying information from immigration judges' personnel files. The court of appeals concluded that because EOIR's complaint resolution process is not a formal agency adjudication, the public interest in disclosure of such information did not outweigh the judges' privacy interests.

Most notably, the court of appeals was critical of the agency's very broad definition of "complaint" and the one-sided nature of the complaint resolution process that has potentially serious ramifications. The court of appeals was also critical of the way in which the agency commingled responsive information with non-responsive information, so that the agency's claim of privilege or exemption from disclosure of non-responsive information was overbroad.

11

PLAINTIFF'S EXHIBIT 27    0073

Ethical Conduct for Executive Branch Employees and the Hatch Act. I do not recall any training on the standards of professionalism that specifically pertained to IJ's.

During the 2015 national training conference, judges were introduced to the new Ethics Guide for Immigration Judges, which EOIR had adopted in 2012.[5] I recall that the 2015 ethics presentation focused on the types of complaints and the percentages of complaints that the agency and OPR had resolved. There was little or no discussion of the referral process itself or OPR's role in resolving complaints that were referred to OPR. However, I recall that Judge Keller stated that a very large percentage of complaints that OCIJ received from the private bar, government counsel, or third parties had been resolved in favor of immigration judges. I believe that she made this point to assuage concerns expressed by certain judges that the complaint resolution process was being misused or abused.[6]

---

[5] Due to budgetary constraints, the agency held only four national conferences in the past nine years since I became a judge: in 2009, 2011, 2015, and 2016. No training conference was held in 2017. In those years when the agency did not have on-site, in-person conferences in Washington, DC, the agency distributed CD's containing webinars on selected topics of immigration law and procedures that judges viewed in their home courts, using their office desktop computers. The training topics were focused on emerging trends in substantive immigration law, such as asylum, criminal grounds for removal, and country conditions relative to claims of religious, gang-based, and gender-based persecution. There was also an hour-long ethics training webinar that focused on the Standards of Ethical Conduct for Executive Branch Employees, the Hatch Act, the No FEAR Act, and the Department's policy concerning sexual harassment in the workplace.

[6] Between 2013 and 2017, the number of complaints filed against judges increased by 30 percent, going from 124 opened complaints in FY 2013 to 179 opened complaints in FY 2017. See Exhibit 2, Tab L (U.S. Department of Justice, EOIR, OCIJ, "Complaints Against Immigration Judges, Fiscal Year 2017"). The largest percentage of complaints (35 percent) were made by respondent's attorneys, while 15 percent were made by respondents. A very small percentage of complaints (3 percent) were made by federal courts of appeals. In FY2017, no complaint was made by OPR or OIG or the media. Id. According to EOIR statistics, the 179 opened complaints in FY 2017 were filed against 30 percent of judges. About 68 percent of those complaints alleged in-court conduct; 64 percent alleged due process errors; 50 percent alleged legal errors; 39 percent alleged bias; 14 percent alleged out-of-court conduct; and 2 percent alleged incapacity. Id.

PLAINTIFF'S EXHIBIT 27   0074

During the 2016 national training conference, ethics training for immigration judges consisted of an hour-long presentation on the Standards of Ethical Conduct for Executive Branch Employees and a second hour of ethics training. The PRAO and OPR conducted the second hour of ethics training. According to the OPR presenters, DOJ was most concerned about two ethical breaches: (1) discrimination on the basis of race, ethnic and national origin, religion, disability, and other Title VII grounds; and (2) ex parte communications between judges and parties. With respect to ex parte communications, I recall that the OPR presenter stated that judges may not ask their legal assistants to communicate unilaterally with a party about any pending court matter. It was unclear to me whether the OPR would make an exception for communications that, consistent with the Ethics Guide for Immigration Judge, are only intended to facilitate scheduling, administrative, or emergency purposes that do not address substantive matters. See Exhibit 2, Tab 2. I recall asking my supervisor, Assistant Chief Immigration Judge Dee Nadkarni, to seek clarification from OPR.

C.     **General Courtroom Practices and Procedures**.

In my daily work, I continue to follow the ethical standards described above (i.e., the Ethics Guide for Immigration Judges; the Standards of Conduct for Executive Branch Employees, and the Hatch Act). I also follow the standards of professional conduct of my state bars, New York and Pennsylvania. Naturally, when conducting court hearings, I adhere to existing law and procedures that are established by statute and regulations, case law published by the Board of Immigration Appeals ("Board") and the federal courts, the OCIJ's Operating Policies and Procedures Memoranda, and the OCIJ's Immigration Court Practice Manual. Those four sets of substantive law and procedures guide the day-to-day work of immigration judges, and I closely follow them.

13

PLAINTIFF'S EXHIBIT 27   0075

First, the authorizing statute – the Immigration and Nationality Act (INA) – confers on immigration judges the authority to adjudicate removal proceedings brought under the INA. 8 U.S.C. 1101 et seq. The substantive provisions of the INA provide a general framework of law and procedures for removal proceedings. The corresponding implementing regulations prescribe specific rules and procedures that adjudicators apply in individual cases. 8 C.F.R. 1001 et seq. (2017).

Second, immigration judges adhere to precedential decisions that the Board and the federal courts issue on a case-by-case basis. The Board reviews immigration judge decisions for correct application of the law and procedures, legal sufficiency of fact findings, and proper exercise of discretion. The federal courts review the Board's decisions to ensure correct interpretation of the INA statute and corresponding regulations, as well as for constitutional fairness or infirmity in the procedures that the agency uses in adjudicating individual cases. Because there are many variables that can affect the outcome of an immigration court case, it is understood that Board and federal court decisions provide general guidance and do not necessarily address every situation.

Third, the OCIJ periodically issues Operating Policies and Procedures Memoranda (or OPPM) that serve as internal guidance for case adjudications in immigration court. OPPMs prescribe procedures or guidelines for implementation of policy directives. They do not have the force of law (i.e., they create no private right of action or cause of action against the agency) but nevertheless are binding on immigration judges. For the purpose of this OPR inquiry, the three most pertinent OPPMs are OPPM 05:02 which prescribes the substantive legal standards and procedure for adjudicating motions for recusal; OPPMs 98:02 and 03:06 which prescribe procedures for going off-the-record during proceedings; and OPPM 17:02 which supplements

14

an earlier OPPM and provides guidelines for efficient handling of motions for continuance. Exhibit 2, Tab H.

Fourth, in 2008 (the year I began working for EOIR), the agency published a uniform set of procedural rules for immigration court practitioners, known as the Immigration Court Practice Manual (or ICPM). The ICPM replaced local rules and practices that immigration judges had developed over time, by compiling existing best practices and committing them to a single set of procedural rules for nationwide application. For example, the ICPM provides firm filing deadlines for written pleadings, motions, and documentary evidence, but it also gives judges the discretion to excuse late filings when circumstances warrant. Training on the ICPM was provided during the national immigration judge conference in 2009, the first such training conference that I attended. On its face, the ICPM states that the manual does not extend the jurisdiction of immigration courts as established by law and regulation, and that nothing in the manual shall limit the discretion of immigration judges to act in accordance with law and regulation. The ICPM further provides that the requirements set forth in the manual are binding on parties who appear before the immigration courts, unless the immigration judge directs otherwise in a particular case. Exhibit 2, Tab I.

As the purpose of OPPM's and the ICPM is to supplement but not supplant the statutory and regulatory framework for adjudicating immigration cases, it is understood that OPPMs and the ICPM are to be read in conjunction with the statutory provisions or regulations that they supplement. When there is a conflict between an OPPM or the ICPM and a statute or regulation, it is understood that the statute or regulation having the force of law prevails.

Because immigration law is an ever-evolving, dynamic field of law, I recognize that I and other practitioners in this field must devote adequate time to research, reading, and

15

processing new information every day.  Especially in recent years, immigration has become such a matter of great public interest that it generates a steady stream of information that must be processed and applied in my daily work.  On any given day, I receive multiple email alerts about new case law from the court of appeals and Board of Immigration Appeals that are directly applicable to my work.  On a regular basis, operational and policy changes are disseminated through OPPMs and intra-agency email communications.  Occasionally, the OCIJ publishes changes to the ICPM that alter the way in which judges conduct court hearings.  Staying abreast of all the legal, policy, and procedural changes can be a daunting task, especially for judges like me who spend an average of seven hours a day in court conducting hearings.

To keep up with all the new information, I subscribe to alerts or news summaries that Westlaw and on-line legal news services such as Law360 publish.  The alerts are sent by email in short one-paragraph summaries that I organize and store in searchable electronic folders on my work computer.  The folders are easily accessible in the event that I need to locate the information quickly.  I also spend my lunch hour reading up on new case law, new OPPMs, new rules changes to the ICPM, and new policy changes that come down from the Director of EOIR or through OCIJ, because knowledge of such information is critical to my day-to-day work.  I also make a point of writing my own legal opinions in cases that present novel questions of law for which there is little, if any, legal precedent.  Doing this helps me stay current on legal developments in the immigration field and maintain my research, writing, and analytical skills.  Aside from training that the agency provides, I attend additional CLE classes to learn about substantive topics of immigration law that I need to know to do my job.  For instance, in April 2017 I attended an ABA-sponsored CLE seminar on unaccompanied alien minors.

PLAINTIFF'S EXHIBIT 27   0078

Although immigration court practice is a highly regulated area, there are still matters that are largely committed to the discretion of judges. One such area is "courtroom control." There are many variables affecting how judges conduct hearings in their courtrooms, such that regulating the judges' conduct of hearings is not practicable. For example, the Immigration Court Practice Manual contains no rules governing sequestration of witnesses, whether to allow telephonic testimony of lay and expert witnesses, whether to conduct status or pre-hearing conferences, and when to accept proffered witness testimony in lieu of oral testimony under oath. In the absence of such formal rules, judges have refined their own practices that help them complete hearings in an efficient and fair manner.

In conducting hearings involving ████████ and ████████ clients, I followed the routine that I have always followed. At the start of a hearing, I gave the parties some time to confer, to reach stipulations that narrow the issues or facilitate the admission of evidence. I have found it necessary and helpful to have the lawyers talk about the case off the record, so that they could refocus their attention to the case at hand. Immigration law is a high-volume practice. Many immigration practitioners, most government lawyers, and all immigration judges have multiple evidentiary hearings in the course of a work week. Thus, it is not unusual for practitioners to gloss over pre-hearing preparation and not give much thought to how they would try a case. Pre-hearing conferences are off-the-record for the simple reason that discussions between lawyers are not evidentiary and sometimes can lead to settlement of a matter before trial.

About ten minutes after the scheduled start time is when I go on the record to begin the hearing. When I begin an individual calendar hearing and turn on the audio recording equipment, I follow the prescribed format in OPPM 98:02 found in Exhibit 2, Tab H. I identify

17

myself, the parties, the lawyers, the date, the time, and the hearing location. Next, I identify the court interpreter and administer the interpreter's oath. After marking documentary exhibits and other record contents (see 8 C.F.R. 1003.36), I move on to the testimonial portion of the hearing. I sequester testifying witnesses, place the respondent or the first testifying witness under oath, and give the respondent or testifying witness an orientation as to how the hearing would progress, to put that witness at ease. Specifically, I advise the witness that respondent's counsel will question the witness first on direct-examination, government counsel would question the witness on cross- examination, and I would question the witness later in the hearing.[7] I often find it necessary to ask clarifying questions and elicit information that I need to know to rule on a particular issue. Although I usually wait until after cross examination or re-direct examination to ask questions, getting the information on the record right away is often necessary to prevent misunderstanding and confusion. I also ask questions in the middle of direct- or cross- examination to resolve evidentiary objections.

In the nine years that I have been a judge, the question of when to go on- and off-record is one that had not come up until now. OPPM 03:06 provides a procedure for going off-record during a court hearing. It states that except in cases involving classified information, IJ's "must maintain and preserve a thorough and complete record of the proceedings." See Exhibit 2, Tab H. The OPPM further provides that "a complete record shall be kept of all testimony and evidence produced at the proceeding."[8] Neither the statute, nor the regulation at 8 C.F.R.

---

[7] Section 240b of the INA provides that the immigration judge "shall" interrogate and cross-examine the respondent and other witnesses, to ensure that the hearing record is accurate and complete.

[8] The requirement that the IJ keep a complete record of proceedings comes from Section 240(b)(4)(C) of the Immigration and Nationality Act, which states that "a complete record shall be kept of all testimony and evidence produced at the proceeding." The regulation at 8 C.F.R.

PLAINTIFF'S EXHIBIT 27   0080

1240.9, nor OPPM 03:06 specifies the kinds of oral communications that a judge must record, other than to say that "all testimony and evidence" shall be included in the record of proceedings. In this way, the regulation gives judges wide latitude in deciding which off-record discussions are to be summarized on the record, by providing that a "hearing shall be recorded verbatim" except those off-the-record statements that are made with the permission of the immigration judge. 8 C.F.R. 1240.9. The regulation thus does not require the recording of all oral communications made in the course of a hearing. The regulation does not require recording of other off-record communications that fall outside the definition of a "record" as defined in 8 C.F.R. 1003.36 and ICPM 4.10. For example, casual conversations or off-record discussions between the parties to effect a settlement need not be recorded, since those matters are not considered testimonial or evidentiary.

As required in 8 C.F.R. 1240.9 and OPPM 03:06, I keep a record of "all testimony and evidence produced at the proceeding." Before going off-the-record, I usually state my reason for doing so, such as to take a short break or to locate a file or to photocopy a document or to permit the parties to confer off-record. When I summarize an off-the-record discussion, I give each side an opportunity to clarify, correct, amend, or supplement my summary. If I am not privy to an off-record conversation, I ask one of the parties to summarize the off-record

---

1003.36 assigns this responsibility to immigration judges, by providing that the IJ "shall create and control the record of proceeding." The regulation at 8 C.F.R. 1240.9 specifies the kinds of "testimony and evidence" that must be included in the record of proceeding. It states that the contents of the hearing record shall include "the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, all written orders, motions, appeals, briefs, and other papers filed in the proceedings." Id. The ICPM 4.10 recognizes that "[t]he contents of the Record of Proceedings vary from case to case." In addition to the regulation ICPM 4.10 states that the record should also contain the charging document, hearing notices, a lawyer's entry of appearance, change of address forms, and audio recordings. Id.

PLAINTIFF'S EXHIBIT 27   0081

discussion and any agreement that was reached.  I do not ask for a summary of any agreement

or stipulation that was not reached, because such information is not evidentiary and should

remain confidential.  Also, having a party summarize the off-record discussion facilitates the

recordation of "all testimony and evidence" that the party wishes to introduce.

In all cases, I strive for timely, accurate, and efficient use of court time in bringing about

resolutions of cases and controversies.  The agency has allotted three hours of hearing time per

individual calendar hearing, to include witness examinations and oral decisions.  Given the

complexities of the cases that I handle, which typically present myriad issues and multiple

witnesses, my court hearings typically last the entire duration of three hours, leaving little or no

time for oral decisions.  When there is not enough time to hear all witness testimonies, I adjourn

the hearing to another day for completion.  However, my practice is not to adjourn a hearing at

the eleventh hour, or even on the day of the hearing, if the reason for doing so is to give lawyers

additional preparation time.  Since lawyers are given ample time for hearing preparation, they

know ahead of time the hearing date, and they know that my hearing calendar is solidly booked

two years out, I expect lawyers to commit the necessary resources and time to pre-hearing

preparation.  For this reason, motions for continuance of an individual (evidentiary) hearing are

disfavored in my court, just as they are disfavored by the agency.  See Exhibit 2, Tab H (OPPM

17:01).

As will be explained, I recall that I followed the above rules and practices in conducting

court hearings involving ▮▮▮▮▮▮ and ▮▮▮▮▮▮ clients.  I did not deviate from

those rules or procedures or practices in a way that made the hearings unfair or the outcomes

unjust for their clients, as that is never my goal.  I adhered to the agency's mission of providing

20

case adjudications in a fair, efficient, and uniform manner.  In that regard, I closely paid
attention to the following policy priorities of the agency:

- Reducing the enormous 630,000 to 700,000 backlog of court cases by conducting
  hearings in a timely fashion and eliminating unnecessary delays.
- Effecting timely resolution of removal proceedings.
- Minimizing litigation risks by adhering to established rules, procedures, and policies.
- Resolving all contested issues before trial to the extent practicable.
- Creating and developing a full record of proceedings to facilitate dispute resolution
  at trial and on appeal.

D.    **Agency Disclosure of Privacy-Protected Information That Attorneys**
███████████████████████ **Used in Filing the Ethics Complaint.**

Before addressing the OPR's specific inquiry, I wish to advise OPR of information that
OPR should know.  The disciplinary complaint refers to privacy-protected information that
could only have come from my personnel file or from other agency personnel.  I believe that the
agency wrongfully disclosed privacy-protected information to retaliate against me for pursuing
two EEO complaints between 2014 and 2015.

The ethics complaint asserts that "Judge Bain was counseled in the past but that
apparently has not been sufficient to instill the necessary dignity and decorum required in her
proceedings."  Exhibit 1, Tab B, at p. 6.  The reference to counseling in the past came from a
reprimand letter that I received in March 2015 from my then-supervisor, ACIJ Christopher
Santoro, as well as an August 2015 performance evaluation from the same supervisor.  Both the
March 2015 reprimand letter and the August 2015 performance evaluation were privacy-

21

PLAINTIFF'S EXHIBIT 27    0083

protected information stored in my personnel file. They are also the subject of a pending EEO complaint that I filed in April 2015. I believe that the agency released that information to the American Immigration Lawyers Association (AILA) and two other advocacy organizations that sued the agency in 2013 to obtain information about the agency's complaint resolution program. I also believe that AILA members such as ████████ had access to the released information and have used it to their advantage. See http://www.aila.org/infonet/eoir-records-relating-misconduct. The agency's wrongful disclosure of privacy-protected information has put me in the untenable position of having to respond to an ethics complaint that is based on non-public information. To effectively respond to the allegations, I would have to divulge the very information that I have sought to keep private through an EEOC action and a FOIA appeal. Additionally, the agency's actions have caused irreparable harm to my professional reputation because some of the privacy-protected information that it released to AILA and the public is not true, thus making it difficult for me to continue doing my job.

The March 2015 reprimand that ACIJ Santoro issued was retaliation for an EEO complaint that I filed in 2014 after the agency refused to provide a reasonable accommodation. In February 2013, after the merger of the Headquarters and Arlington courts, I requested a reassignment to the Arlington court, for health reasons. By then, I had been using video-conference equipment every day for five years. I began to experience severe, debilitating headaches at work. A neuro-ophthalmologist at John Hopkins concluded that the headaches were caused, in part, by prolonged exposure to VTC equipment. The neuro-ophthalmologist recommended that I reduce my exposure to VTC equipment and the stress that came with using malfunctioning equipment, so I requested permission to conduct hearings in person in the

22

Arlington court. The agency through ACIJ Christopher Santoro denied the reasonable accommodation request as well as a transfer to the Arlington court.

By March 2014, there were two vacancies in the Arlington court, yet the agency still refused to grant my transfer request. That month, I filed an EEO complaint alleging discrimination on several grounds. In response, ACIJ Santoro assigned me to a different courtroom (one that had proper HVAC and air circulation), but he also assigned me more than 100 aged cases that were transferred from the dockets of other judges to mine. All of the aged cases involved aliens who had been detained in immigration custody for years without an evidentiary hearing. Many of them had filed habeas corpus petitions in federal district court seeking release from immigration custody. I had to complete their evidentiary hearings by VTC as fast as I could, so as to facilitate the resolution of their habeas corpus petitions.

When I protested the assignment and the working conditions, ACIJ Santoro issued a reprimand letter in March 2015, in which he criticized me for displaying intemperate behavior toward him. The March 2015 reprimand was the first disciplinary measure that I had received in all my years of employment with DOJ. The agency used that reprimand letter to deny my request to transfer to the Arlington court. After I filed a new EEO complaint in April 2015, ACIJ Santoro issued a June 2015 counseling letter and an unfavorable performance evaluation in August 2015 that was based on the reprimand and the counseling letter. To the best of my knowledge, all of these corrective and disciplinary actions were released to AILA in January 2017. See Exhibit 2, Tabs M & N. The agency has claimed that the January 2017 FOIA disclosure was inadvertent, but it has declined to retrieve or "claw back" the inadvertently released information. See Exhibit 2, Tab M.

23

Two months after the FOIA release of documents, ████████ and ████████ filed the ethics complaint, in which they cryptically referred to counseling "in the past." Exhibit 1, Tab B, p. 6. While I cannot make a direct connection between the filing of the complaint in March 2017 and the release of privacy-protected information from my personnel file in January 2017, a reasonable inference can be drawn that the privacy-protected information referenced in the complaint could only have come from my personnel file.

    **E.**    **February 1, 2017 Hearing in** ████████

            ████████, ████████

According to the OPR inquiry letter, during a February 1, 2017 hearing in ████████ ████████, I allegedly went off the record and made derogatory statements about ████ ████████ performance, including that she was unprofessional and inadequate. The OPR inquiry letter states that when I went back on the record, I allegedly did not repeat all of the statements on the record. Exhibit 1, Tab A, at p. 1. To prepare this response, I reviewed the audio of the hearings to refresh my recollection. Having reviewed the audio recordings of the two-and-a-half-hour hearing, I can say with reasonable confidence that any inappropriate conduct or remarks that ████████ has accused me of making did not occur.

The case ████████ involved an asylum seeker whose evidentiary hearing was scheduled to take place on February 1, 2017. On that date, ████████ sought to postpone the evidentiary hearing by claiming that the respondent was not mentally fit to proceed with the removal proceeding. ████████ tendered a letter that the respondent's mental health counselor prepared the day before, on January 31, 2017. The letter asserted that the client in case ██ needed mental health treatment before she could be considered fit to testify. Since government counsel objected to a further continuance, ████████ was asked to make the

24

counselor available for a mental competency hearing by telephone. The February 1, 2017 hearing was turned into a mental competency hearing, and both the respondent and the counselor were questioned about the respondent's mental competency. See Exhibit 1, Tab L.

In conducting the mental competency hearing, I followed the BIA's decisions in Matter of M-A-M- and Matter of J-S-S-, which assign to the immigration judge the responsibility of assessing mental competency when it is at issue. If a respondent is determined to be mentally incompetent, the judge must then prescribe adequate procedural safeguards to ensure that the respondent has a fair hearing. According to the BIA, the most important procedural safeguard is representation by a lawyer, a guardian, or next of kin who could speak for the respondent.

I began the mental competency assessment by questioning the counselor about her qualifications to testify about the respondent's mental competency. When it was her turn to question the counselor, ███████ declined to do so. Government counsel then questioned the counselor regarding her qualifications and training. After the counselor finished testifying, I made a preliminary determination that she was not qualified to testify about the respondent's mental competency, for four reasons. First, she had not completed her training to become a mental health counselor and was not yet licensed as a therapist. Second, she did not consult or work with a licensed clinical psychologist in preparing a diagnosis and prescribing treatment for the respondent. Third, as treatment had begun the preceding week, she had not treated the respondent long enough to be able to discuss the respondent's mental health and competency with any degree of certainty. Fourth, the counselor was unable to explain why she believed the respondent was not mentally fit to testify in immigration court. She also had not ruled out other causes of the respondent's anxiety or stress, including the birth of the respondent's second child a year after the respondent came to the United States. Therefore, I concluded that the

25

counselor's professional opinion regarding the respondent's mental competency was unreliable. Exhibit 1, Tab L.

After the counselor testified, I asked ████████ and government counsel to question the respondent regarding her mental health. ████████ questioned the respondent first. ████████ spent approximately 30 minutes asking questions that ascertained the respondent's understanding of the removal process, her role, the judge's role, and the lawyers' roles. After ████████ finished questioning the respondent, government counsel questioned the respondent concerning her medical and mental health history, use of medication, living arrangements with her new domestic partner, employment history, and her children's health and school attendance. After government counsel finished questioning the respondent, I asked her questions and let her know that she had certain rights in removal proceedings, including the right to counsel, to examine and present evidence, to appeal the judge's decision if she does not agree with it. I also questioned the respondent about any difficulty that she had in recalling significant facts and events relating to her asylum claim. I also questioned many questions about her biographical history. Exhibit 1, Tab L.

At the conclusion of the hearing, I ruled that there was not enough evidence to conclude that the respondent was mentally incompetent. I advised ████████ that she may reserve the respondent's right to appeal this ruling at the conclusion of the hearing, and she indicated that she would appeal. I then denied ████████ request for a lengthy postponement so that the respondent -- who by that time had been in the United States for over three years -- could obtain mental health counseling. However, I adjourned the asylum hearing to April 17, 2017, to give ████████ and the respondent additional preparation time. Exhibit 1, Tab L. After the hearing on February 1, 2017, ████████ filed a motion to withdraw her representation in

26

case ▮.  In that motion, she stated that her client had retained new counsel after the February 1, 2017 hearing.  Exhibit 1, Tab N.

The audio recordings of the February 1, 2017 hearing (Exhibit 1, Tab L) show that I did not berate ▮▮▮▮ or make derogatory statements about her professionalism and performance on the record.  I also did not go off-record to berate or admonish her in any way. The audio-recordings show that I went off the record just once for a brief 10-minute break. There was no off-record discussion of any kind that could support the claim that I had improperly berated or chastised her.  As recorded, my voice throughout the two-and-a-half-hour hearing was calm, at a normal pitch, and not inappropriate in tone and content.  A reasonable inference can be made that the atmosphere in the courtroom was not belligerent or hostile, as ▮▮▮▮ now claims.  I do not recall any off-the-record discussion that ought to have been summarized when we went back on the record.  The audio recordings do not show that ▮▮▮▮ was concerned enough about any off-record remarks that she asked for their summaries on-the-record.  ▮▮▮▮ affidavit in support of the complaint alleges that I "snidely" said "good luck" when she indicated that she wanted to appeal my mental competency ruling.  To the best of my recollection, that exchange did not happen.

F.  **February 17, 2017 Hearing in Matter of** ▮▮
▮▮▮▮, ▮▮▮▮

According to the OPR inquiry letter, the complaint alleges that "in another case, ▮▮▮▮, on February 17, 2017, IJ Bain interrupted ▮▮▮▮ direct examination on several occasions and made statements mocking ▮▮▮▮ IJ Bain again went off the record and further mocked, berated, and disparaged ▮▮▮▮ When IJ Bain went back on the record, she refused to restate what she had said off the record despite ▮▮▮▮

27

request that IJ Bain do so." According to the complaint, "IJ Bain also refused ████████ request for a brief recess so that ███████ could compose herself, and denied without explanation ██████ oral request that IJ Bain recuse herself from the proceedings." Exhibit 1A, at p. 1. The discussion below will endeavor to show that, consistent with the audio recordings and paper transcript of the removal hearing (Exhibit 1, Tabs O & P), the above allegations cannot be substantiated.

The removal proceedings in ████████████ involved two asylum seekers from El Salvador who arrived in the United States in July 2015. Like thousands of other Salvadoran nationals who came to the United States during the "surge" that began in 2014, they were allowed to enter the United States to attend regular removal proceedings under INA 240. Being in Section 240 removal proceedings was advantageous because they were given the full panoply of procedural rights, including the right to apply for asylum before an immigration judge and the right to appeal the immigration judge's order if they did not agree with it.

The respondents applied for asylum in immigration court, claiming that they feared being harmed or killed by members of the violent street gang MS-13 in El Salvador. They asserted that the MS-13 was motivated to harm them because of their familial relationship to a notoriously violent gang leader in the 18th Street gang, who had been serving a lengthy jail sentence for several murders. In addition, the lead respondent claimed that she was particularly vulnerable to retaliatory violence because she was suspected of having helped the 18th Street gang leader commit crimes from behind bars.

On May 16, 2016, ████████ appeared for the first master calendar hearing. She filed a written asylum application on behalf of the two respondents and represented that the

PLAINTIFF'S EXHIBIT 27   0090

application was ready for adjudication. An evidentiary hearing was scheduled for December 1, 2016, at 9:00 a.m. On the day of the December 1, 2016 hearing, ████████ arrived in court with the lead respondent and requested a continuance. She stated that she was not feeling well. I adjourned the hearing to December 22, 2016, at 9:00 a.m., to give her time to recuperate. Before I adjourned the hearing, ████████ requested that I admit into evidence an amended asylum application that she filed with the court the day before the December 1, 2016 hearing. Even though the amended application was filed late (i.e., less than 15 days in advance), I exercised my discretion and waived the filing deadline, to accommodate ████████ 8 C.F.R. 1003.31 (2017) ("The Immigration Judge may set and extend time limits for the filing of applications and related documents. . . .").

On December 22, 2016, ████████ and the adult respondent returned to court for the evidentiary hearing. ████████ asked to put off the hearing again through an oral motion for a continuance. I denied the motion because it was not based on a showing of good cause. 8 C.F.R. 1003.29 (2017) ("The Immigration Judge may grant a motion for continuance for good cause shown."). I instructed ████████ to proceed with the evidentiary hearing. By the end of that four-hour hearing, ████████ still had not completed direct examination of the lead respondent. ████████ and her clients were instructed to return to court on February 17, 2017 for a continuation of the hearing. Exhibit 1, Tab P, pp. 3-132. I do not recall any hostility or conflicts erupting during that hearing, and ████████ has not claimed any such occurrences.

At the start of the February 17, 2017 hearing, ████████ introduced a new paralegal in her office who she said came to court to observe the hearing. That paralegal was later identified as ████████ in the ethics complaint. Because ████████ was present as

29

an observer and not as a testifying witness, there was no need to identify him after we went on-the-record and began the hearing.  See 8 C.F.R. 1240.9 (specifying the kinds of information that constitute the record of proceedings).  The hearing on February 17, 2017 lasted about four hours and concluded at 6:15 p.m. that evening.

The hearing began with routine housekeeping matters, such as the marking of exhibits and identification of witnesses.  Exhibit 1, Tab P, Transcript pp. 133-135.  After I advised the respondent that she may provide additional testimony in support of her asylum application, ▇▇▇ ▇▇▇▇▇▇ proceeded to question the respondent.  Id. at 136.  ▇▇▇▇▇▇▇ first inquired about the reason that the respondent feared persecution in El Salvador.  Id.  The respondent stated that she feared retaliatory violence coming from the MS-13 gang because her uncle was a leader of the rival gang, the Mara 18.  Id. ▇▇▇▇▇▇ then asked whether the respondent had other reasons to fear persecution in her country.  Id.  Although the respondent's answers indicated that she did not have other reasons to fear persecution, ▇▇▇▇▇▇ continued that line of questioning by asking the respondent to talk about threats of harm that the sister of her fiancé had received after the sister came to the United States eight years ago.  ▇▇▇▇▇▇ asked the respondent why her fiancé did not want to return to El Salvador.  Transcript, p. 138.

As the respondent's fiancé was not an asylum applicant, I realized that this was a new line of questioning that asserted a new theory of the case not previously raised in the respondent's asylum application.  I viewed this line of questioning as going beyond the scope of the respondent's asylum application and the original claim.  But since government counsel did not object, I allowed ▇▇▇▇▇▇ to continue questioning the respondent concerning the new theory of the case.  At one point, however, the respondent's testimony became muddled.  The respondent used plural pronouns such as "they" and "them" when referring to groups of

30

individuals, instead of identifying the group or individuals by name.  Her answers to certain

questions were ambiguous, and ████████████ did not ask follow-up questions to flesh out the

facts.  Transcript, pp. 139-150.  Therefore, I decided to ask questions to clarify the respondent's

testimony and to elicit information that I needed to know to rule on her new asylum claim.

      The ethics complaint asserts that I interrupted ████████████ direct examination on

several occasions and made statements mocking ████████████  The transcript of the hearing

and the audio recordings confirm that I did interrupt ████████████s direct examination, but

they also show that I did not mock her.  I asked questions of the respondent to clarify

ambiguities in her testimony so I could understand it.  In my experience, the BIA remands cases

for new hearings when the record of evidence is incomplete or insufficient.  Without a detailed

record, the BIA is unable to perform its appellate function of reviewing IJ's fact findings for

clear error and conclusions of law de novo.  For that reason, I have gotten into the habit of

asking follow-up questions to create a full and complete record of the removal hearing.

      To the extent that the disciplinary complaint asserts that I acted inappropriately by

asking too many questions of the respondent, I note that both the Immigration and Nationality

Act and the federal courts have recognized the immigration judge's unique role in developing

the record of evidence.  The INA provides that the IJ "shall" receive evidence and "interrogate,

examine, and cross-examine the alien and any witness."  INA 240(b)(1); 8 U.S.C.

1229(a)(b)(1).  The federal courts have held that an IJ's questioning of a witness is statutorily

and constitutionally permissible if the IJ does not display hostility or indicate a predisposition

against the witness.  See, e.g., Juan Carlos Arragan-Ojeda v. Sessions, 853 F.3d 374 (7th Cir.

2017) (observing that "nothing in the record suggests that the IJ's conduct of [Arragan-Ojeda's]

hearing evinced the kind of impatience and bias that might be characterized as a violation of due

PLAINTIFF'S EXHIBIT 27   0093

process of law); id. ("When the IJ does not demonstrate impatience, hostility, or a predisposition against an alien's claim, and where the questions assisted in the development of the record on relevant points, the mere fact that the IJ elicited testimony is not inappropriate and certainly does not raise due process concerns); id. ("An IJ, unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record.").

In addition, as the February 17, 2017 hearing progressed, I realized that ▮▮▮▮▮▮ was relying solely on hearsay evidence to establish the new asylum claim. To show that the respondent might be harmed if she were to return to El Salvador, ▮▮▮▮▮▮ asked the respondent to recall messages that the respondent had read on the Facebook webpage of her fiancé's sister. The respondent stated that the messages were threats that were directed at her fiancé's sister, but the respondent still could not establish a firm connection between the threats that were directed at the sister and the respondent. As the respondent's testimony was imprecise and ambiguous, I asked ▮▮▮▮▮▮ to produce the threatening Facebook messages as corroborative evidence. Transcript, p. 150. The following exchange occurred:

| | |
|---|---|
| Judge: | I'd like to see those messages since they apparently exist and [the fiancé's sister] has them. |
| ▮▮▮▮▮▮ | Well, I don't have [the fiancé's sister's] login information for Facebook, but I can try to get them. |
| Judge: | Okay, this is triple hearsay, so. . . . |
| ▮▮▮▮▮▮ | I don't – as far as I know, I don't believe the Federal Rules of Evidence 803 – |
| Judge: | Oh they do. |
| ▮▮▮▮▮▮ | Okay. |
| Judge: | They do. |
| ▮▮▮▮▮▮ | My understanding was that the Federal Rules of Evidence 803 doesn't actually apply in immigration court, but I may be mistaken, Your Honor. I apologize for that. |

32

PLAINTIFF'S EXHIBIT 27   0094

| Judge: | They may or they may not apply, but some rules of evidence apply and as the Judge I have discretion to keep out hearsay evidence that is wholly unreliable.[9] |
|---|---|
| | Okay. Is that what Your Honor is doing at this time? |
| Judge: | Yes. |
| | Okay. |
| Judge: | I'm saying it's very unreliable because the person who has first-hand knowledge isn't even in court to testify. |
| | And Your Honor – |
| Judge: | And she's coming in to court to testify about something that she's been told by somebody who is obviously available to testify. And that person has told her about some messages that that person has read, it's triple hearsay, wholly unreliable. |
| | And Your Honor, just for the record, so the record is clear, my client did testify that she personally observed those messages, so while I understand – |
| Judge: | And where are they? |
| | Your Honor, I don't have access to someone's outside Facebook account, however, I can provide that my client is stating to the court that she personally observed them and witnessed them. |
| Judge: | Okay, and that's why we gave you two months for preparation of today's hearing. |
| | Just so the record is clear, I do not have access to – |
| Judge: | The record is very clear. You don't have to preface every threat to appeal this decision. |
| | I'm not threatening – |
| Judge: | With just so the record is clear. |
| | I apologize, Your Honor. |
| Judge: | Please state your objection and then move on. |

---

[9] See, e.g., Niam v. Ashcroft, 354 F.3d 652, 658 (7th Cir. 2004) (The Fed. R. Evid. can provide helpful guidance on whether evidence is probative and its admission is fundamentally fair. Felzcerek v. INS, 75 F.3d 112, 116 (2 Cir. 1996) (admissibility under the Fed. R. Evid. lends strong support to the conclusion that admission of the evidence in immigration proceedings comports with due process).

PLAINTIFF'S EXHIBIT 27    0095

████████████            Yes, Your Honor.  I object to the fact that this is reliable
                        information.  My client has stated to the Court that she has
                        personal first-hand knowledge of the information.

Judge:                  Okay, if it's cooperative – if it is corroborative of her testimony
                        then I want to see the messages.

Exhibit 1, Tab P, Transcript pp. 150-153.

Through requesting production of the Facebook messages, my intention was to put ████

████████ on notice that I considered the messages to be important corroborative evidence that

ought to be produced since they were reasonably available.[10]  I explained that corroboration

would help the respondent clear the hearsay hurdle.  Rather than accepting that explanation, ████

████████ stated her disagreement with the evidentiary ruling and argued that the respondent's

uncorroborated testimony should be sufficient.  She used phrases such as "Just for the record, so

the record is clear," and "Just so the record is clear" to make her point.  I picked up on her not-

so-subtle threat to file an appeal if the hearing did not go her way.

A moment later, ████████████ resumed questioning the respondent about the Facebook

threats, specifically what the Facebook messages said:

████████████            Ma'am, can you tell the Court what the messages stated?

Respondent:             Yes.

████████████            What did they say?

---

[10] See 8 U.S.C. 1158(b)(1)(B)(ii) ("The testimony of the applicant may be sufficient to
sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier
of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts
sufficient to demonstrate that the applicant is a refugee."  However, "[w]here the trier of fact
determines that the applicant should provide evidence that corroborates otherwise credible
testimony, such evidence must be provided unless that applicant does not have the evidence and
cannot reasonably obtain the evidence.").  See also Matter of L-A-C-, 26 I&N Dec. 516 (BIA
2015) (adopting the view of two courts of appeals that an IJ is not required to give advance
notice of an intent to deny a claim for failure to provide corroborative evidence, but the IJ may
do so).

PLAINTIFF'S EXHIBIT 27    0096

| Respondent: | That when [the fiancé's sister] goes back she's going to pay for what she said over here. |
| ████████ | Who were the messages from? |
| Respondent: | From the daughter of the pastor. |
| Judge: | And what is her name? |
| Respondent: | I don't remember her name. |
| Judge: | You remember what the messages said but you don't remember the author's name? |
| Respondent: | No. |
| Judge: | ████████ I'm not going to let you build a whole case on hearsay evidence, all right.  Hearsay, as you know because you're gone to law school is a very weak form of evidence, particularly when people who are eyewitnesses who had first-hand observations of the events in questions are available to testify.  If you want to take up the rest of today with hearsay evidence, that's fine, but I can't guarantee you that I'll give it much weight. |

Exhibit 1, Tab P, Transcript pp. 156-158.

Although I recall that it was tense, the above exchange shows that I did not mock or

berate or disparage ████████  My intent was to put her on notice that failure to produce

reasonably available corroborative evidence will likely result in the denial of her client's asylum

claim, because unreliable hearsay evidence is generally inadmissible, and, even if admissible,

the respondent's ambiguous testimony would garner very little weight.  My comments

concerning the weight of the evidence were meant to be instructive on the factual and legal

questions.  They were not intended to be a personal attack on any lawyer's professional

competence.

After spending five hours on direct-examination, ████████ rested and Government

counsel began cross-examination.  Exhibit 1, Tab P, Transcript p. 159-181.  On cross-

examination, the respondent made many incriminating statements concerning her role in aiding

PLAINTIFF'S EXHIBIT 27   0097

a relative who was a notorious 18th Street gang leader in committing crimes.  At one point, ███

███ lodged an objection based on lack of foundation.  The following exchange occurred:

| | |
|---|---|
| Ms. Tran: | Now you testified that your Uncle Manuel would give orders to the 18th Street Gang to protect you.  Right? |
| Respondent: | Yes, so that nothing happened to me. |
| Ms. Tran: | Did he ever order the gangs to threaten people to protect you? |
| Respondent: | He only told them to take care of me, that was it. |
| Ms. Tran: | What did that entail, them taking care of you? |
| Respondent: | Just if something happened to me or if I needed anything, to support me. |
| Ms. Tran: | But did they ever harm anyone to support you? |
| ███ | Objection, Your Honor.  We haven't stated whether my client has knowledge of this.  I mean we can ask if she knows if they ever harmed anyone, but I don't know that it's been established that she has personal knowledge of this. |
| Judge: | I guess it is assumed that she would have knowledge because she was the one who mentioned that he had instructed his subordinates in the gang to take care of her. |
| ███ | So it's assumed by the Court that she had knowledge as to what their subsequent actions were.  Correct?  So I understand? |
| Judge: | We're going off the record. |
| | [OFF THE RECORD] |

Exhibit 1, Tab P Transcript, pp. 181-182.

The ethics complaint alleges that the above exchange illustrates my alleged bias toward

government counsel and lack of impartiality toward ███ This is not true.  I went

off-the-record because I recognized that ███ was trying to impede government

counsel's astute, skillful questioning of the respondent, who by that point in the hearing had

PLAINTIFF'S EXHIBIT 27   0098

made many incriminating statements.  I went off-record to let ██████████ know that I found her behavior inappropriate.  See Exhibit 1, Tab P, Transcript p. 182.  ████████████ immediately demanded that I go back on-the-record and repeat what I said on the record.  Even though the rules of court did not require me to repeat my comments on-the-record and gave me discretion to decide what off-record discussions to summarize, I decided to go back on-the-record anyway so that ████████████ could lodge an objection on-the-record concerning what she heard off-the-record.  After going back on-the-record, I summarized the off-record comments as follows:

[ON THE RECORD]

| | |
|---|---|
| ██████████ | In any manner Your Honor would like.  I would just ask that it be put on the record. |
| Judge: | ████████████ we're back on the record.  In the future, please refrain from being disrespectful.  I expect full decorum in this courtroom. |
| ██████████ | Yes, Your Honor.  And if Your Honor – |
| Judge: | And that means you don't question the Judge about any particular finding that the Judge is inclined to make before the Judge makes that finding.  That is wholly inappropriate. |
| ██████████ | Yes, Your Honor.   And what were the other words that you used? |
| Judge: | Please make a note of that. |
| ██████████ | And Your Honor, the other words that you used previously, if we could put that on the record as well, to address me? |
| Judge: | I'm not going to put anything on the record.  If you want to put it on the record, go ahead. |
| ██████████ | Yes, Your Honor.  I believe that you stated that I was not professional in the courtroom.  Or I don't remember the exact words, but I would like to have them established on the record.  Your Honor, rather than just going off the record and chastising me. |

37

| Judge: | Okay, so noted. |
|---|---|
| Judge: | Please continue, Ms. Tran. |
| Ms. Tran: | Thank you, Your Honor. |

Exhibit 1, Tab P, Transcript pp. 182-183.

Though I do not recall saying anything more than what I had repeated on-the-record (i.e., that I thought ██████████ was disrespectful and acted inappropriately), I did summarize my off-record comments as ██████████ requested. My summary reflected my impressions of ██████████ at the time. Though ██████████ now claims that I did not summarize everything that I said off-record, I did give ██████████ an opportunity to complete or correct my summary if she did not agree with it. Consistent with my practice, I let the moving party summarize off-record comments because that party has a vested interest in "getting it right." ██████████ was given that opportunity and she took it. She stated that I had called her "not professional," but then she was not able to recall the "exact words" that I allegedly used. Transcript, p. 183. Of all the people in the courtroom that day, ██████████ would have had the greatest incentive to "get it right." That she could not remember the exact words 30 seconds after they were allegedly spoken may be an indication that no other words were spoken besides the words that were recorded. For the rest of the February 17, 2017 hearing, I focused on developing the evidentiary record since I knew there was going to be an appeal.

The ethics complaint also states that I refused to give ██████████ an off-record break to regain her composure. This statement is also incorrect. Below is the transcript excerpt showing that I did not refuse to give ██████████ a break. I did advise her that she needed to wait until the completion of cross-examination to take a break, since the witness's testimony

38

was still pending and government counsel was about to ask probing questions that went to the heart of the respondent's asylum claims. As soon as cross-examination was completed, I turned off the audio recording equipment and went off-the-record for 10 minutes. The following transcript excerpt captured that exchange.

| | |
|---|---|
| Judge: | Please continue, Ms. Tran. |
| Ms. Tran: | Thank you, Your Honor. |
| Ms. Tran: | Ma'am, at the last hearing you stated that the gang members targeted you as the main family member because you were your uncle's antenna. |
| Respondent: | Yes, that's right. |
| Ms. Tran: | By antenna, does that mean you helped your uncle communicate with other people? |
| Respondent: | No. According to [Mara Salvatrucha or MS], I was giving information to my Uncle Manuel, and that's why they wanted to kill me. |
| ██████████ | You're Honor, I do ask at this point – |
| Judge: | Is it an objection? |
| ██████████ | Your Honor, I'd ask for a break because of the way that I was just treated in the courtroom. I don't know that I can effectively represent my client right now given that I'm actually shaking from the way that the Judge had referred to me off the record. |
| Judge: | ██████████ request is denied. We'll take a break after cross-examination. |
| ██████████ | Okay, Your Honor, again, just for the record, I am not able to -- |
| Judge: | So noted. |
| ██████████ | -- effectively represent my client – |
| Judge: | So noted. |

PLAINTIFF'S EXHIBIT 27   0101

|  | -- at this time since I'm having a physical reaction to the manner in which the Court had addressed me. Thank you, Your Honor. |
| Judge: | ███████████ your objection is noted for the record. Don't interrupt her cross-examination again. |
| ██████████ | And I would like the Court to note that my hand is shaking from the manner in which the Court has addressed me. Thank you, Your Honor. |
| Judge: | ███████████ do not interrupt Ms. Tran in her cross-examination. |

Exhibit 1, Tab P, Transcript pp. 183-184.

After the 10-minute break, ███████████ orally moved for recusal. That request was denied. The ethics complaint asserts that I acted unreasonably in refusing to disqualify myself. The regulation at 8 C.F.R. 1240.1, however, does not require immediate recusal. It provides that the judge "assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified." Id. at 1240.1(b). The regulation thus gives a judge the discretion, at trial, to determine for herself whether immediate disqualification or recusal would be appropriate. As no automatic recusal grounds existed in cases 050/051, immediate recusal would have been inappropriate.

The ethics complaint further asserts that I denied the recusal motion without explanation. That assertion is incorrect. OPPM 05:02 does not require the judge to provide an explanation right away. Rather, it provides that a judge should consider the totality of the evidence in adjudicating a recusal motion. As it was late in the day and we were approaching the end of the proceeding, I did not want to take time off-the-record to consider all the evidence in support of the recusal motion. I also did not want to engage ███████████ in a debate about the recusal issue. Under the regulation, she would have the option of filing a written motion to

40

recuse if she wanted to. See 8 C.F.R. 1240.9 (In the conduct of a removal hearing, a judge "may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief."). Additionally, insofar as the parties may later challenge the recusal decision by interlocutory appeal or by appeal as of right, the denial of the oral recusal motion was not prejudicial to the respondent or to the government. Thus, while I denied her oral recusal motion "without explanation," the rules of court did not require that I immediately provide a justification for my ruling.

Before moving on, I note an exchange on-the-record that needs to be placed in the proper context.[11] During the exchange that followed the 10-minute break, █████████

---

[11] The exchange occurred after a 10-minute break that █████████ requested.

| Judge: | All right, as requested we're going to take a 10-minute break and when we come back we'll have redirect examination. We will complete the hearing today. |
| --- | --- |
| | [OFF THE RECORD]<br>[ON THE RECORD] |
| Judge: | We're now back on the record. |
| | ██████████ would you like to question the respondent on redirect? |
| ██████████ | Yes. Before doing so, Your Honor, I would move the Court for recusal in this case, given the manner in which it – |
| Judge: | Denied. |
| ██████████ | the Court has addressed me. |
| Judge: | Denied. |
| ██████████ | And I would note for the Court that the reason that I'm making that request is based on the statements both off the record as well as on the record that were previously made to me. Thank you, Your Honor. |
| Judge: | Motion is denied. |

41

PLAINTIFF'S EXHIBIT 27    0103

moved for recusal, and in response I asked whether she was moving to withdraw from the case

based on an ineffective assistance of counsel claim. I asked this question because, before the

10-minute break, ▓▓▓▓▓▓ stated that she felt incapable of effectively representing her

client. Exhibit 1, Tab P, Transcript p. 184. After the break, when she orally moved for recusal,

I asked whether she would be moving to withdraw since she felt that she was no longer

| | |
|---|---|
| ▓▓▓▓▓▓ | Thank you, Your Honor. |
| Judge: | If you're trying to set her up for an ineffective assistance of counsel claim, you are doing a very good job. |
| ▓▓▓▓▓▓ | Your Honor, may I ask why you're stating that I'm ineffectively representing my client? |
| Judge: | I'm saying that if you're trying to do that, you're trying to set her up for a claim, you're doing a very good job. Go ahead, question her. We're going to finish the hearing today. |
| ▓▓▓▓▓▓ | Well, if Your Honor is stating that I'm not effectively representing my client, I can't proceed. |
| Judge: | I'm not stating that. Please continue and question her. |
| ▓▓▓▓▓▓ | Your Honor just stated that I was ineffectively representing my client. I don't want to do something that's going to harm my client's case if that's how – |
| Judge: | Please finish the hearing. |
| ▓▓▓▓▓▓ | Your Honor views my representation then I should not be continuing with representation. |
| Judge: | Are you moving to withdraw from the case now? |
| ▓▓▓▓▓▓ | No, Your Honor. I am moving the Court to recuse itself if Your Honor – |
| Judge: | Then please continue. |
| ▓▓▓▓▓▓ | observes my representation as ineffective. |
| Judge: | Please, if you're not moving to withdraw from this case, then continue. |

Exhibit 1, Tab P, Transcript pp. 192-195.

42

PLAINTIFF'S EXHIBIT 27    0104

effective.  The reason I asked this question was to ascertain whether she felt that she ought to remove herself from the situation to avoid substantial prejudice to her client.  Since she did not move to withdraw, she could not have established the factual predicate for seeking recusal (i.e., judicial bias toward her that effectively prevented her from continuing her representation).  Stated another way, her disagreement with how I conducted the hearing, by itself, was not sufficient to establish that my conduct prejudiced her clients.  See 8 C.F.R. 1240.1(c) ("The immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.").

By the time the February 17, 2017 hearing ended, ███████ had spent a total of five hours on direct examination.  Government counsel only had 45 minutes for cross-examination.  ███████ then spent one more hour on redirect-examination after her oral recusal motion was denied.  After the respondent testified, the respondent's fiancé was allowed to testify even though he was not on the witness list, and the written affidavit that ██ ███████ paralegal prepared stated that he was not available for the court hearing because he lived in El Salvador.  The respondent's fiancé's testimony contradicted his affidavit in several respects, including the fact that he was living in another country and thus was unavailable to testify in support of the respondent's asylum application.  At the conclusion of his testimony on February 17, 2017 which lasted an hour, I issued an oral decision denying the respondent's asylum applications on the grounds that her testimony was not credible and her claim was not adequately corroborated by the testimony of her fiancé or by her documentary evidence.  Exhibit 1, Tab N.  The hearing ended at 6:15 p.m.  Since the court was closed, I walked with the security officer through the judges' chambers so she could access the security office and stow away her weapon.  I then left the court to go home for the Presidents' Day holiday weekend.

PLAINTIFF'S EXHIBIT 27   0105

Thereafter, on March 16, 2017, ███████ filed a notice of appeal with the Board of Immigration Appeals, challenging my decision to deny her clients' asylum application. The appeal is still pending. In the appeal, ███████ may raise all issues relevant to the immigration court proceeding and challenge all my rulings, including the decision to deny her oral recusal motion. Thus, ███████ will have at least two avenues of appeal (at the BIA and before the federal court of appeals) in which to vindicate her clients' right to a fundamentally fair hearing.

The following week, as I was preparing for the morning hearing, a court security officer named ███████ came into my chambers, uninvited at approximately 8:00 a.m. ███ was stationed in my courtroom during the February 17, 2017 hearing. She was the officer whom I accompanied through the judges' chambers after the hearing to stow away her weapon. ███████ was not supposed to be in the interior court space, but she made a point of going in there to tell me that ███████ was outside in the waiting room. ███████ advised me that she overheard ███████ canvassing other security officers in the waiting room to ascertain whether they were willing to serve as witnesses against me. ███████ then volunteered her impressions of ███████ n a way that was unfavorable. In response, I said nothing except to thank ███████ for her concern, did not ask her more questions, and did not invite her to serve as a witness on my behalf. After thanking her for the information, I suggested that she report the same information to her superior officer, for his or her situational awareness.

I had no further communication on this issue with ███████ until the second week of March 2017, when I began preparing the recusal Order in cases ███. I approached ███████ told her that ███████ had complained about my handling of the February

44

17, 2017 hearing, and asked whether the officer had been critical of my handling of that hearing.
██████ denied that she had said anything negative about me or my conduct of court hearings. I asked whether she was willing to provide an affidavit refuting the contentions in the complaint if it came to that. (A copy of the draft affidavit is found in Exhibit 2, Tab O). At first, she agreed but later she decided against committing to writing what she had shared with me in private. I respected her decision and have not communicated with her again since that time. I have seen her several more times in the hallways of the courthouse. Each time, she and I waved to each other and exchanged cordial greetings without engaging in any discussion or conversation.

The Ethics Guide for Immigration Judges states that an "immigration judge should be patient, dignified, and courteous, and should act in a professional manner towards all litigants, witnesses, lawyers and others with whom the judge deals with in his or her official capacity, and should not, in the performance of official duties, by words or conduct, manifest improper bias or prejudice." The Ethics Guide also states that judges have "the authority to regulate the course of the hearings" and that "at times an Immigration Judge must be firm and decisive to maintain courtroom control." Exhibit 2, Tab B. The hearing in cases ██████ was a situation that called for firm, decisive courtroom control.

Over the past three years, the Arlington Immigration Court has witnessed an explosion in the number of pending cases, going from a reported 20,000 pending cases in 2014 to 36,000 pending cases in 2017. Nationally, the number of pending cases increased by 22 percent in just one year, going from a total of 520,000 in FY 2016 to a total of 632,000 in FY2017. The

45

PLAINTIFF'S EXHIBIT 27   0107

immigration court backlog has tripled since 2009.[12]  Due to the prioritization of cases involving recent border crossers (known as "surge" cases), I was assigned to handle such cases almost exclusively beginning in March 2016.  The goal of prioritization was to expedite the completion of surge cases, some of which involved clients of ████████ and ████████  In that regard, attorneys handling weak claims are under tremendous pressure to help their clients avoid imminent removal from the United States, since removal is a realistic probability under the current Administration's policies.

While I am working under the same time pressures, I do not have any vested interest in the outcome of cases like ████████  I take my obligations to serve as a neutral decision-maker and to maintain impartiality very seriously.  My goal has always been to resolve disputes in an impartial and fair, but also efficient, manner.  That goal cannot be attained without the cooperation of both parties.  In any case, the respondents in cases ████ have filed an appeal from my decision to deny their asylum applications.  They will have an opportunity to argue the merits of their asylum claims on appeal, before another neutral decision-maker.

G.    **February 16, 2017 Hearing in** ████████ ████████

The cases of ████ involved a mother and her daughter, named Catherine, who arrived in the United States in 2015.  They jointly applied for asylum and an evidentiary hearing on the merits of their joint asylum applications was scheduled to take place on February 16, 2017.

---

[12] See http://www.washingtonpost.com/amphtml/local/immigration/doj-details-plan-to-slash-immigration-court-backlog/2017/11/03/03fcef34-c0a0-11e7-959c-fe2b598d8c00.story.html; http://trac.syr.edu/phptools/immigation/court_backlog.

PLAINTIFF'S EXHIBIT 27    0108

Before discussing the cases of ▇▇▇▇▇ clients, some background information might be helpful in understanding what I attempted to accomplish on the day of the February 16, 2017 hearing, why I declined to consolidate the cases of two of the lead's respondent's children (Nelson and Oscar), and why I declined to hear in tandem the case of one additional child (Cesar).

Between January 2014 and December 2016, a mass migration crisis unfolded along the Southwest border of the United States and Mexico. The mass migration began shortly after a federal court of appeals upheld the legality of an Executive Order issued in 2012 that established what has come to be known as the Deferred Action for Childhood Arrivals, or DACA, program. The original DACA program provided a temporary reprieve from deportation for the approximately 750,000 children and youth (known as "Dreamers") who were already in the United States as of 2007. Original DACA beneficiaries were those who arrived before 2007 and were less than 26 years old at the time of their arrival. In November 2014, by Executive Order the temporary deportation reprieve given to DACA recipients was expanded to include additional individuals who arrived before 2012 and were less than 31 years old at the time of their arrival. Also, through the November 2014 Executive Order temporary deportation reprieve was granted to parents of DACA beneficiaries who were in the United States as of November 20, 2014. The deportation reprieve for parents was known as Deferred Action for Parents of Childhood Arrivals (or DAPA) program. The intent of the expanded DACA and the DAPA programs was to absorb into the U.S. population an estimated one million DACA beneficiaries and 4.5 million DAPA beneficiaries. With deferral of deportation, they may come out of the shadows, remain in the United States without fear of apprehension, and be able to apply for employment authorization and pursue other immigration benefits.

47

PLAINTIFF'S EXHIBIT 27   0109

In the Arlington court, Judge John Bryant was assigned to handle all children's cases. His docket included cases involving unaccompanied alien children, or UACs, who were under the age of 18 when they arrived in the United States without an adult parent or guardian. Before the surge began, Judge Bryant's docket had approximately 300 UAC cases. After the surge began, an additional 6,000 children's cases were added to Judge Bryant's docket. Most of those cases involved children who came to the United States with a parent or adult guardian. To cope with this extremely large caseload, Judge Bryant treated UACs and accompanied children alike. He applied the same case processing model to both groups. That processing model entailed deferring the children's court proceedings so that they could pursue other forms of relief outside the immigration court system, such as Special Immigration Juvenile status in state court or affirmative asylum at the DHS's Arlington Asylum Office (or ZAR), where they stood a much greater chance of being granted asylum because the adjudicatory process is not adversarial. It was reported that the Arlington Asylum Office quickly became overwhelmed with asylum applications and was unable to process asylum applications in a timely fashion. Consequently, Judge Bryant has had to grant repeated continuances of the children's court cases while the children's affirmative asylum applications languished at the Arlington Asylum Office. Exhibit 2, Tab R.

While Judge Bryant was assigned the children surge cases, the other five Arlington judges were assigned the adult surge cases. At first, adult surge cases were put on hold on the assumption that they would qualify for amnesty through the expanded DACA and the DAPA programs. On February 16, 2015, however, a federal district court in Texas issued a nationwide preliminary injunction that halted the expanded DACA and the DAPA programs. The district court preliminary injunction effectively forced the agency to resume processing expanded

48

DACA and DAPA cases, while the United States Supreme Court considered whether to grant certiorari review.  On July 26, 2016, the Supreme Court declined to intervene and denied certiorari in a 4-4 split decision.  That meant that the agency had to continue processing adult and children surge cases.[13]

Pursuant to a new case processing model that ACIJ Santoro developed in February 2015, the agency reclassified surge cases into one large group known as Adult with Children/Alternatives to Detention (or AWC/ATD) cases.  (This category of surge cases refers to family cases in which one or both parents arrived in the United States with their children. Instead of detaining them, the DHS released them using alternatives to detention such as electronic monitoring or in-person reporting).  The AWC/ATD classification combined the removal proceedings of adults who arrived during the surge period with the removal proceedings of children who arrived with those adults.  Although the idea was to make court hearings in surge cases more efficient, the effect of combining the parents' and children's cases was quite the opposite.  Because in the Arlington court family units were split up and their cases were assigned among the five existing Arlington judges (a practice that has been aptly named "docket shuffling"), Headquarters judges handling AWC/ATD cases had to coordinate the consolidation of parents' and children's cases before they scheduled evidentiary hearings on the merits.  This task was laborious and time-consuming.  Additionally, before the district court's

---

[13] The five Arlington judges were the Hon. Paul Schmidt, Larry Burman, Thomas Snow, Rodger Harris, and Wayne Iskra.  Judge Iskra had retired two years earlier in 2012, but his docket was kept open as a place to "park" many of the adult surge cases until new judges could be hired to handle the rapidly growing Arlington backlog.  Once the agency resumed processing expanded DACA and DAPA cases in February 2015, it relied on existing Headquarters / VTC judges to handle the bulk of those cases.  The cases were assigned to Headquarters judges Robert Owens and Roxanne Hladylowycz.  A year later, after wrapping up my detail to York, Pennsylvania in March 2016, I began handling surge cases as well.

PLAINTIFF'S EXHIBIT 27   0111

February 2015 preliminary injunction, the task of consolidation was done on paper so that the cases would not show up in the agency's electronic database as consolidated cases.[14] Consequently, there was much confusion over whether the cases of family members were in fact consolidated, or whether the family cases were to remain in separate proceedings but they may be combined for an evidentiary hearing on the merits.

In February 2015, Judge Robert Owens of the Headquarters court began hearing AWC/ATD cases full-time. At the time, I was on an extended detail to the York, Pennsylvania Immigration Court, where I heard detained cases in person or by VTC. Although I was not assigned to the Arlington court or to handle children's cases, I was assigned to conduct a training session in February 2015 for approximately 100 new private bar attorneys who had signed up to represent children in immigration court. Those attorneys were employed by AmeriCorps which received $2 million in grant money from the Justice Department that was specifically earmarked for providing pro bono representation to unaccompanied alien children, or UAC's. Exhibit 1, Tab E.

In March 2016, after I completed a two-year detail to the York, Pennsylvania court, the agency approved my request to transfer to the Arlington court. I was assigned to handle AWC/ATD cases and became the second judge to hear those cases full-time. As I began handling those cases, I noticed that many of the AWC/ATD adults had missed the one-year

---

[14] As Arlington Court Administrator Deborah Castro once explained to me, the surge adult cases could not show up in the electronic database as consolidated cases because the adjournment code for consolidated cases -- code 30 -- would have prevented those adults from obtaining employment authorization. As many of the surge case adults were covered by the expanded DACA and DAPA eligible, they were eligible to obtain employment authorization under the Executive Order. After the district court enjoined the operation of expanded DACA and DAPA, the agency began processing such cases as family units.

PLAINTIFF'S EXHIBIT 27   0112

filing deadline for their asylum applications.  Either their cases had never been calendared for hearings in the Arlington court, or their cases were calendared for hearings on November 29, 2019, about four to five years after their arrivals in the United States.[15]  Without pending court cases, adults in the AWC/ATD category had no pathway for pursuing asylum in immigration court.  Without a pathway for pursuing asylum in immigration court, those surge adults who were not covered by the expanded DACA or DAPA programs were not able to apply for employment authorization unless they had a way to file an asylum application with the court. See 8 C.F.R. 274a.12(c)(8).  Nationwide litigation challenging the agency's handling of AWC/ATD cases ensued.  Many judges were specifically named in a class action lawsuit filed on July 1, 2016, that sought to enjoin them from applying the rules and regulations barring untimely filed asylum applications.

In handling AWC/ATD family cases, I have accepted as many late-filed asylum applications as I could justify accepting.  My goal was to avoid being snagged in the still pending nationwide class action lawsuit challenging immigration judges' handling of late-filed asylum applications.  I also believe that, as a matter of fairness, individuals who the DHS had allowed to come into the United States should be given their day in court, even if they had not been screened in as legitimate, bona fide asylum seekers when they first arrived at the border.

---

[15] The November 29, 2019 date was a placeholder date assigned to thousands of cases. When the surge began in January 2014, the agency was aware that the temporary deportation reprieve for DACA recipients was to expire on September 5, 2017, and that many of the AWC/ATD cases involved aliens who were covered by expanded DACA and DAPA.  To enable such individuals to obtain relief outside the immigration court system, the agency put their court cases on hold until November 29, 2019.  When in February 2015 the federal district court in Texas enjoined the expanded DACA and DAPA programs, the agency had to resume processing AWC/ATD cases in the immigration court system.  The cases of ▇▇▇▇▇ clients ▇▇▇▇ fell into this category.

PLAINTIFF'S EXHIBIT 27   0113

Upon accepting their late-filed applications, I scheduled individual hearings at the earliest opportunity to adjudicate the merits of their asylum applications. This would enable the "asylum clock" to start running, so that the adults could apply for employment authorization after waiting five months. If the parents filed written motions to consolidate their children's cases, as they were required to under ICPM 4.21(a) (see also footnote 6), my practice was to dispose of those motions before the evidentiary or merits hearings.[16]

Because the above-described practices were not committed to writing or made known to judges – at least not to me,[17] I had to reconstruct the agency's policies and practices to understand the extent of the problem and to figure out how to handle the AWC/ATD cases on my docket. Moreover, because the agency did not keep track of the surge cases that it had split up and assigned to various judges, the task of consolidating the cases of family members so that they could move through the court proceedings together as a family unit became very challenging. Using procedural mechanisms that already existed in the Immigration Court Practice Manual (ICPM), I first asked for motions to consolidate the cases of individual family

---

[16] Adding to this concern was the fact that many of the children in the AWC/ATD group who came to the United States with their parents had turned 21 years old while they underwent removal proceedings. Under the asylum regulations, they were considered to have "aged out" of derivative asylum eligibility and could not apply for asylum through their parents' applications. Their only option was to pursue asylum by right as adults, and, as adults, their applications generally had to be filed within one year after they arrived in the United States or within one year after they turned 21. See 8 U.S.C. 1158(a)(2)(B); 8 C.F.R. 1208.4(a)(2)(ii) (2017); ICPM 3.1(b)(iii). Because their parents' cases were put on hold until November 29, 2019, many "aged out" children missed the one-year filing deadline for filing their asylum applications. They also sued the agency when their untimely filed asylum applications were rejected.

[17] My supervisors during this time period were ACIJ Santoro and ACIJ Dee Nadkarni. ACIJ Santoro was my supervisor from May 2012 when he began working for EOIR until August 2015, when he was detailed to the Office of the Director to work on surge case policies. In August 2015, ACIJ Nadkarni became my first-line supervisor. Neither of the ACIJs had communicated to me the policies and practices governing surge cases.

52

members who wanted to consolidate their cases. Second, I gave blanket consent to the transfer of children's cases from other judges' docket to mine, so that the children's cases could be matched up with their parents' cases on my docket. It was important to me that the procedure for consolidation be followed, for the sake of maintaining comity between judges. Seasoned practitioners who were accustomed to handling family surge cases understood this process and had no difficulty complying with the requirement of moving for consolidation and transfer. Less experienced practitioners, such as ▇▇▇▇▇ did not.



▇▇▇▇▇ was ▇▇▇▇▇ very first evidentiary hearing before me in my courtroom. The hearing was scheduled to take place on February 16, 2017 and involved two respondents from El Salvador who had come to the United States together in 2014. Theirs were classified as AWC/ATD cases. On May 2, 2016 ▇▇▇▇▇ entered her appearance as the attorney of record for both respondents, a mother and her daughter. She sought a one-month period in which to prepare their joint asylum application. On June 20, 2016, ▇▇▇▇▇ ▇▇▇▇▇ returned to court and filed a single asylum application for both the adult applicant (case ▇▇▇ and the minor child (case ▇▇▇). I asked ▇▇▇▇▇ when she would like to have the asylum hearing, and she replied that she would like to have the hearing in February 2017, approximately seven months later. Accommodating her request, I scheduled an individual evidentiary hearing on the joint asylum application for February 16, 2017, at 9:00 a.m. ▇▇▇ ▇▇▇▇▇ agreed to that date. See Exhibit 1, Tab U, Transcript pp. 4-5.

Less than 15 days before the February 16, 2017 hearing, ▇▇▇▇▇ filed an emergency motion to continue the hearing, claiming that she needed more preparation time. Exhibit 2, Tab Y. In that motion, ▇▇▇▇▇ asserted that her clients needed more time to obtain a 2015 police report from El Salvador that they claimed they had not been able to obtain. As this was

53

the second continuance motion, the motion for continuance was denied because it was untimely filed and because government counsel objected to a continuance.

At the start of the February 16, 2017 hearing, ███████ orally moved to amend the adult respondent's asylum application that she filed seven months earlier, to correct the spelling of a relative's name. I permitted the correction. Exhibit 1, Tab U, Transcript pp. 6-7. She also asked to amend the lead respondent's asylum application to include four additional children as derivative asylum applicants. Id. at p. 8. The four children were in addition to Catherine (case ███), who was already listed as a derivative asylum applicant and had an evidentiary hearing scheduled for the same date and time. The February 16, 2017 evidentiary hearing was the first time ███████ mentioned the four additional children and requested to consolidate their cases. ███████ had not filed written motions to consolidate the children's cases with their mother's (lead respondent's) case before the asylum hearing on February 16, 2017.[18] She also did not file written motions to accept the untimely asylum applications of the lead respondent's children who were over 21 years old.[19] According to ███████ three of the four additional

---

[18] Immigration Court Practice Manual Rule 4.21(a) provides that "Consolidation of cases is the administrative joining of separate cases into a single adjudication for all of the parties involved. *Consolidation is generally limited to cases involving immediate family members. The Immigration Court may consolidate cases at its discretion* or upon motion of one or both of the parties. For example, the Immigration Court may grant consolidation when spouses or siblings have separate but overlapping circumstances or claims for relief. *Consolidation must be sought through the filing of a written motion that states the reasons for requesting consolidation. . .* The motion should be filed as far in advance of any filing deadline as possible." (emphasis added).

[19] Section 1158(a)(2)(B) of Title 8 of the United States Code provides that the right to apply for asylum generally "shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." See also 8 C.F.R. 1208.4(a)(2)(ii) (2017); ICPM 3.1(b)(iii) ("An alien filing an application for asylum should be mindful that the application must be filed within one year after the date of the alien's arrival in the United States, unless certain exceptions apply.").

PLAINTIFF'S EXHIBIT 27   0116

children were UAC's whose asylum applications were ready for filing but had not been filed.
Id. Those three additional children were Nelson, Oscar, and Karla. Id.

Next, ███████ presented a separate asylum application for the minor respondent,
Catherine (case ███). She asserted that Catherine would like to file her own application, in
addition to being included in her mother's application as a derivative asylum applicant. ███
███████ moved for admission of Catherine's asylum application in evidence even though it was
not timely filed nor was it served on government counsel.[20] Since Catherine's and the lead
respondent's asylum hearing was already scheduled for that morning, February 16, 2017, at
9:00 a.m., I accepted Catherine's separate asylum application and stated that I would consider it
along with the adult applicant's application. Exhibit 1, Tab U, Transcript pp. 9-10. Therefore, I
waived the 15-day filing requirement for Katherine's asylum application.

After I accepted Catherine's asylum application and marked it as an exhibit, ███████
moved to correct the surname that is listed in Catherine's asylum application, stating that the
Catherine's surname was not correctly denoted on the application form. I permitted the
correction because government counsel did not object. Exhibit 1, Tab U, Transcript pp. 11-12.

Next, ███████ renewed her motion for a continuance, the same one that I had denied
a few days earlier. She stated that she had an affidavit from the lead respondent that the court
ought to consider, that the lead respondent was trying to obtain additional affidavits from

---

[20] Immigration Court Practice Manual Rule 3.1(b) provides filing deadlines for written
motions, pleadings, documentary exhibits, and relief applications. Subparagraph (c) states the
agency's policy that motions to extend filing deadlines are disfavored: "In general,
conscientious parties should be able to meet filing deadlines. In addition, every party has an
*ethical obligation* to avoid delay." Id. (emphasis added). Rule 3.2 requires service of
documents that are filed with the court on the opposing party. See Exhibit 2, Tab I.

PLAINTIFF'S EXHIBIT 27   0117

neighbors in El Salvador, and that the lead respondent would like to provide evidence that she

sought witness protection from the Salvadoran government.  When asked whether the lead

respondent could testify about these matters, ██████████ said that she could.  Based on that

representation, I decided to proceed with the hearing, but I advised ██████████ that the motion

for continuance may be renewed at the conclusion of the hearing if she believed that she needed

additional corroborating evidence.  Exhibit 4, Tab U, Transcript, p. 12.

     Next, with respect to ██████████ request to include four additional children on the

lead respondent's asylum application, I advised both counsel that I only had jurisdiction over

Karla's asylum application because Karla was still under 21 years of age and thus was eligible

to apply as a derivative application on her mother's application.  Earlier, ██████████ had

represented that the four additional children had illegally entered the United States two or three

years before the lead respondent did.  Because I did not have the four additional children's case

files, did not know anything about them, and did not know that ██████████ was going to

request consolidation at the start of the February 16, 2017 hearing, I asked ██████████ for their

biographic information, birth certificates showing the adult applicant as their mother, and their

alien registration numbers.  ██████████ replied that she did not have any of the four children's

birth certificates translated into English.  She also did not seem to know much about the

children.  This made the task of consolidating the children's cases extremely difficult, even

though I was inclined to waive the requirement of a written consolidation motion.  See Exhibit

1, Tab U, Transcript, pp. 8, 13-15.  See also ICPM 4.21(a).

     In response to my questions, ██████████ stated that two of the four children (Nelson and

Oscar) had come to the United States in 2012.  A third child (Karla) had come to the United

States in 2013.  ██████████ also represented that Nelson, Oscar, and Karla were UAC's who

56

PLAINTIFF'S EXHIBIT 27   0118

were eligible to apply for asylum at the Asylum Office (the ZAR). I advised her that if Nelson and Oscar were over 21 years old, they could not apply for asylum as derivative applicants.[21] I further advised her that "For now, I'll consider both Karla and Catherine to be derivative applicants because they are still under 21, and they were listed in the lead respondent's asylum applications filed in court in 2016." Exhibit 1, Tab U, Transcript, p. 14. Referring to the lead respondent, I further stated that "Oscar and Nelson were over 21 when she filed her application, and they were already over 21 when she arrived in the United States, so there is no way that they could be considered derivative applicants on her application." Id. at p. 14. ████████ indicated that she understood and agreed with my explanations, by stating "That's correct, Your Honor." Id.[22]

---

[21] The regulation at 8 C.F.R. 1204 (2017) provides that for asylum matters, a "child" is defined as being unmarried and under 21 when his or her parent first filed an application for asylum. If an alien is above the age of 21, he or she must apply for asylum in his or her own right. Id. The same regulation provides that an alien who is not in removal proceedings must file his or her asylum application with the DHS Asylum Office. See also Immigration Court Practice Manual Rule 3.1(b)(iii) (A defensive asylum application is filed with the Immigration Court by an alien already in proceedings. An affirmative asylum application is filed with the Department of Homeland Security (DHS) Asylum Office by an alien not in removal proceedings. . . .). Under this regulation, Nelson and Oscar were not eligible to apply for derivative asylum status because they were over 21 years old. Nelson also was not eligible because of a 2015 assault conviction, and Oscar also was not eligible because – according to ████████ -- he was not in removal proceedings or not in the United States. Exhibit 1, Tab Z.

[22] I also advised ████████ that Nelson had a 2015 assault conviction, his case was not suitable for consolidation in that the assault crime could potentially bar him from receiving asylum. See 8 U.S.C. 1158(b)(2)(A)(ii) (an alien may not apply for asylum if "having been convicted by a final judgment of a particularly serious crime, [he] constitutes a danger to the community of the United States."). ████████ stated that Nelson had filed an asylum application in 2013 or 2014, and that Nelson's case was pending before the Hon. Larry Burman. Exhibit 1, Tab U, Transcript, pp. 15-16. She further stated that Nelson had filed a motion to consolidate that was pending, presumably before Judge Burman. However, a check of court records reveals that Nelson had not filed a written motion to consolidate. If he had filed such a motion, there was no record of a disposition by Judge Burman. There is a comment to the effect that a motion to consolidate was filed in Nelson's case on February 3, 2017, and that I had granted the consolidation motion on February 13, 2017. However, a check of the paper records

PLAINTIFF'S EXHIBIT 27   0119

With respect to Karla, ██████ asked to consolidate Karla's case with the lead

respondent's case, but she also wanted to file a separate asylum application for Karla, who was

20 years old. Exhibit 1, Tab U, Transcript, p. 14. Then, 45 minutes into the February 16, 2017

hearing, ██████ advised me that Karla had a hearing scheduled in Judge Bryant's

courtroom for 9:00 a.m. that morning. She also stated that Judge Bryant had granted her oral

motion to consolidate Karla's case with the lead respondent's case. Transcript, p. 18. Upon

hearing this, I became concerned that Karla might have missed her 9:00 a.m. hearing in Judge

Bryant's courtroom since it was already 9:45 a.m. I also wondered why Karla's case was still

on Judge Bryant's docket if, as ██████ stated, Judge Bryant had granted Karla's request to

consolidate Karla's case with her mother's case, which was on my docket. As I did not want

---

and the database reveals that no such motion was ever filed, and, if filed, it was not given to me
for disposition. Exhibit 1, Tab X.

    As for Oscar, court records indicated that he was ordered removed from the United
States in 2014 and was physically deported to El Salvador that year. Exhibit 1, Tab X. Since he
was not physically in the United States, he was not eligible to apply for asylum at all. See 8
U.S.C. 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in
the United States . . . may apply for asylum in accordance with this section."). Additionally,
Oscar would not be eligible to apply for asylum even if he were to be return to the United States.
See 8 C.F.R. 241.5 (2017) (an alien who has been physically removed from the United States is
not eligible to apply for asylum upon his return to this country). Therefore, even if I were to
accept ██████ representation that Oscar was physically in the United States, Oscar still
could not be included in the lead respondent's asylum application because he was over 21 years
old and had been ordered removed in absentia.

    Although ██████ already indicated that Oscar and Nelson did not want to be treated
as derivative asylum applicants (see Exhibit 1, Tab U, Transcript pp. 16-17), I made it clear that
I could not consider Nelson's and Oscar's applications at all. I advised ██████ 'I'm going
to strike them from the application form because they're not eligible as derivatives. And that
means your motion to consolidate will have to be denied even if it were to be renewed, because
the cases cannot be consolidated." Transcript, p. 17. See also Exhibit 1, Tab Z. In response,
██████ asked "They can only be consolidated if they are derivatives?" In response, I said:
"Yes. Now they may be heard in tandem if there are sufficient facts, but at this point I don't
think the facts are sufficient, I mean similar enough to have Nelson's case be heard in tandem
with his mother's." Transcript, p. 17.

PLAINTIFF'S EXHIBIT 27    0120

Karla to be ordered removed in her absence, I advised the parties that I would leave the courtroom to look for Karla's case file and to let Judge Bryant know that ███████ was in my courtroom. Before going off the record, I asked ███████ to show me the hearing notice for Karla. The hearing notice confirmed that Karla had a master calendar hearing in Judge Bryant's courtroom on the same date, at the same time. Exhibit 1, Tab U, Transcript, p. 18.

While out of the courtroom, I spoke briefly with Judge Bryant and advised him that ███ ███ was in my courtroom with Karla's mother and that Karla's mother had asked to include Karla as a derivative asylum applicant in her asylum application. I asked Judge Bryant whether he had granted Karla's motion to consolidate, and he said that he had not. I also advised Judge Bryant that if he were inclined to consolidate the cases, I would consent to the transfer of Karla's case to my docket so that the cases could be heard together. Judge Bryant indicated that he did not object to my handling Karla's case, but he noted that pleadings had not been taken. Judge Bryant further indicated that once Karla entered pleadings, her case would be transferred to my docket.

When I returned to the court room, I went back on the record and recounted for the parties the off-record conversation I had with Judge Bryant about the status of Karla's application.[23] I also advised the parties that Judge Bryant was waiting for Karla and ███

---

[23] After going back on the record, I summarized the off-record conversation as follows: "I just conferred with Judge Bryant. He did not have a record of ever orally granting the motion to consolidate Karla's case with the lead respondent's case. In fact, Karla's case is on his docket for a master calendar this morning. Pleadings have not been taken. Karla has not attended any immigration court hearing. ███████ you are expected to go over to Judge Bryant's courtroom with Karla to do pleadings. Once pleadings have been done, I have consented to Judge Bryant transferring Karla's case to my individual calendar docket this morning, so that Karla's case and her applications could be heard at the same time as her mother's." Exhibit 1, Tab U, Transcript, p. 18.

PLAINTIFF'S EXHIBIT 27   0121

██████ in his courtroom. I also advised the parties that Karla's case file was in Judge Bryant's courtroom and that Karla, who was under 21 years old, appeared eligible to apply for derivative asylum through her mother's application. As I was about to go off-record so that Karla could attend the master calendar hearing in Judge Bryant's courtroom, government counsel ██████ ██████ lodged an objection to consolidating Karla's case. ██████ stated that Karla had her own asylum application, and that her application asserted materially different claims than her mother's application. Exhibit 1, Tab U, Transcript p. 19. Given that Karla's asylum application was an independent application, and that I did not have Karla's case file, I decided to defer hearing Karla's asylum application to another day. Id. However, I still intended to include Karla in her mother's application as a derivative asylum applicant.

I then excused ██████ so that she could attend Karla's hearing in Judge Bryant's courtroom. Before she left my courtroom, I advised her that I consented to taking Karla's case if Judge Bryant were inclined to transfer the case to my docket. ██████ returned to my courtroom 30 minutes later. She said nothing about Karla's hearing in Judge Bryant's courtroom, but I assumed that by then Judge Bryant had granted Karla's consolidation request and had transferred Karla's case to my docket.

As soon as I went back on the record at approximately 10:30 a.m., ██████ requested to add yet another child, 5-year-old Cesar, to the lead respondent's asylum application. She identified Cesar as a grandchild of the lead respondent. I explained to ██████ that under the regulations, a grandchild cannot be included in the principal adult's application. ██████ ██████ stated several times that she understood and agreed that Cesar could not be included in the lead respondent's application, but she still asked that Cesar's case be heard in tandem with the lead respondent's case. I advised ██████ that I could not hear Cesar's case that day

60

PLAINTIFF'S EXHIBIT 27   0122

because Cesar's case was not on my docket. I stated: "Sorry, there's nothing I can do. If it's not on my docket, I can't hear it. I can't just pull a file and hear a case just because you want it to be heard today." ███████ responded by stating "I do understand." Exhibit 1, Tab U, Transcript p. 20.

Next, I asked the lead respondent to move to the witness stand and placed her under oath. I advised her that the court was ready for her to testify and told her the order in which ███ ███████ government counsel, and I would be questioning her. I then invited ███████ to question her client. Instead of asking questions about the lead respondent's asylum claim, however, ███████ began asking questions that showed an intent to renew her continuance motion. She asked the respondent about efforts that the respondent had made to obtain supporting documentation for her asylum application. I let ███████ continue questioning the respondent until she reached the point when the respondent stated that she had obtained a police report from El Salvador. Transcript, pp. 20-22. I then asked ███████ f she had the police report, ███████ replied that the report was not given to her in time and so she did not have it "here at the court." Then, I asked the lead respondent when she had received the report. She replied that she received the report in November 2016 and delivered it to ███████ in January 2017. Transcript, pp. 22-24. This portion of the respondent's testimony contradicted ███████ representation to the court that the respondent was still trying to obtain the police report. Because ███████ had not filed the police report as of the February 16, 2017 hearing, I decided to proceed with the asylum hearing rather than to postpone it, and I told ███████ so. Transcript, pp. 33.

For the rest of that three-hour hearing, ███████ appeared to have difficulty conducting direct examination. She seemed unfamiliar with the facts of her clients' cases and

PLAINTIFF'S EXHIBIT 27   0123

did not know how to frame questions to elicit important testimony. There were long pauses between some of the questions that she asked. She also asked many objectionable questions, and I had to sustain government counsel's objections. The hearing was adjourned at 12:00 p.m., and the parties were advised to return to court to complete the hearing in April 2017.

The ethics complaint alleges that ▆▆▆▆▆ filed written motions for consolidation in the four children's cases and that the written motions were pending before other judges. Exhibit 1, Tab B. See also Exhibit 2, Tab A. Contrary to this claim, court records show that ▆▆ ▆▆▆▆ filed no written motions to consolidate the four additional children's cases with the lead respondent's case. See Exhibit 1, Tab X. Moreover, when I explained to ▆▆▆▆▆ the reasons why Oscar's and Nelson's cases could not be consolidated even if she had filed consolidation motions, she indicated that she understood my explanations. With respect to Cesar, I explained that I could consider his asylum application because his case was not on my docket, I did not have his case file, and I did not have his A-number so that I could try to locate his case file. The transcript reflects the following exchange:

| | |
|---|---|
| Judge: | Sorry, there's nothing I can do. If it's not on my docket, I can't hear it. I can't just pull a file and hear a case just because you want it to be heard today. |
| ▆▆▆▆ | I do understand. |
| Judge: | If you were going to move to consolidate all of these cases, the time to do it was during the last master calendar hearing. |
| ▆▆▆▆ | I wasn't . . . Yes Your Honor. I wasn't representing all of the respondents during the last master calendar but I do understand. |

Exhibit 1, Tab U, Transcript, pp. 19-20.

The disciplinary complaint and OPR inquiry letter allege that, upon hearing that "another judge, IJ John M. Bryant, had granted the motion to consolidate," I walked out of my courtroom

62

to have an off-the-record, ex parte conversation about the case with Bryant. Both the complaint and the OPR letter intimated that I did not agree to consolidate the children's cases. This account of the events is not accurate, and the hearing record does not support it. The off-record discussion with Judge Bryant was about the consolidation and transfer of Karla's case to my docket, and it was not impermissibly ex parte.

Rule XXXII of the Ethics Guide for Immigration Judges provides that "A judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties or their lawyers." Exhibit 2, Tab B, pp. 15-16. The Ethics Guide further provides two exceptions in which ex parte communications would not be considered impermissible.

> (1) When circumstances require it, an ex parte communication for scheduling, administrative, or emergency purpose, which does not address substantive matters is permitted, provided that the immigration Judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication.

> (2) An Immigration Judge may consult with court staff and court officials, including supervisors, whose functions are to aid the Immigration Judge in carrying out the Immigration Judge's adjudicative responsibilities, or with other Immigration Judges, provided the Immigration Judge makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility to personally decide the matter.

Id.

The off-record conversation between Judge Bryant and me did not violate the above ethics rule. It was done for the purpose of scheduling a case and arranging for the transfer of Karla's case to my docket. No factual information was imparted during the conversation, such as the relative merits of Karla's asylum claims as compared to her mother's claim, that would

PLAINTIFF'S EXHIBIT 27   0125

have or could have made the evidentiary hearing in cases ▇▇▇ unfair to either party. The

conversation did not prejudice Karla's rights in any way because she was still included in her

mother's asylum application as a derivative applicant, and it did not prejudice the government's

right to have Karla's separate asylum application be heard separately in another hearing because

the issues were different.

In having the off-record conversation with Judge Bryant, I was arranging for the transfer

of Karla's case from Judge Bryant's docket to mine because I thought that ▇▇▇▇ wanted

Karla to be included in her mother's asylum application. Moreover, both parties had consented

to the transfer before I left the courtroom. Any potential for unfairness was alleviated by my

advising both parties of the reason that I was going off-record and leaving the courtroom.

Neither party objected to the proposed consolidation of Karla's case with her mother's case.

After I returned to my courtroom and after I went back on the record, I gave the parties a full

and complete summary of the off-record conversation that I had with Judge Bryant. Because

that summary was a contemporaneous recording of an off-record conversation, (see Exhibit 1,

Tab U, Transcript p. 18), I believe that it accurately captured my thought process and the

parties' agreement to consolidate and transfer Karla's cases.[25]

---

[25] Since it was my practice to consolidate children's and parents' cases if they could be
consolidated, I was ready to include Karla as a derivative applicant in her mother's asylum
application. Including Karla as a derivative asylum applicant would not have precluded her
from pursuing a separate application either in immigration court or at the Asylum Office. As I
explained to ▇▇▇▇ the successive asylum bar does not apply to asylum applicants who
are children under 21 years old. I also advised ▇▇▇▇ that I would not have time to hear
Karla's separate asylum application that same day because I did not have her case file and did
not have enough time. But that did not mean that I would not agree to include Karla as a
derivative on her mother's application.

PLAINTIFF'S EXHIBIT 27   0126

Furthermore, at no point during the February 16, 2017 hearing did ████████ express any reservation about my going off-record to locate Karla's case file and to confer with Judge Bryant about Karla's case. She seemed relieved that I agreed to take Karla's case. Thus, I was very surprised to learn upon reading her complaint and July 21, 2017 affidavit that she thought my conversation with Judge Bryant was impermissibly ex parte. Because the conversation was to take care of an administrative, housekeeping matter, and there was no discussion of the merits of Karla's case or any matter that was outcome-determinative, the conversation was not impermissible.

Additionally, in preparing this response to the OPR inquiry letter, I have listened to the audio-recordings of the February 16, 2017 hearings in my courtroom and in Judge Bryant's courtroom to verify the accuracy of this response. I also have listened to two audio recordings of master calendar hearings in Judge Bryant's courtroom in February and July 2016. Exhibit 1, Tab V. I was surprised to learn that Judge Bryant had previously granted consolidation of Karla's case but then changed his mind. I also was surprised to learn that Judge Bryant had attributed to me his decision not to consolidate and transfer Karla's case to my docket.

During a master calendar hearing in July 2016, Judge Bryant granted ████████ oral motion to consolidate Karla's case with the lead respondent. Exhibit 1, Tab V. Judge Bryant granted Karla a continuance of six months in which to apply for asylum at the Asylum Office. During the February 16, 2017 master calendar hearing in Karla's case, ████████ advised Judge Bryant that I was prepared to accept and handle Karla's case. Judge Bryant, however, declined to transfer Karla's case to my docket. In the audio recording, Judge Bryant attributed the decision to deny consolidation to me. Because Judge Bryant had earlier agreed to consolidate Karla's case with her mother's, I can only assume that Judge Bryant had forgotten

65

PLAINTIFF'S EXHIBIT 27   0127

that he had granted ███████ oral motion to consolidate Karla's case seven months earlier, in July 2016.

The audio-recordings of the February 16, 2017 hearing in Judge Bryant's courtroom also indicates that Judge Bryant did not transfer Karla's case to my docket because he wanted Karla to stay on his docket so that, as a UAC, she could continue pursuing asylum at the Asylum Office (which he called the "ZAR"). This would be consistent with his practice, as described in a USA Today article entitled "A Day In U.S. Immigration Court: Lots of Cases, Not Much Resolution," published on September 28, 2017. See Exhibit 2, Tab R. On February 16, 2017, Judge Bryant gave Karla another lengthy continuance of six months to file her asylum application at the ZAR. This was done on ███████ representation that Karla's asylum application was ready for filing but had not been filed with the ZAR. Exhibit 1, Tab V.

The audio-recordings of the February 16, 2017 hearing in my courtroom also show that after ███████ returned to my courtroom, she did not mention that Judge Bryant had declined to transfer Karla's case to my docket. Exhibit 1, Tab U, Transcript pp. 19-20. She also did not mention that Judge Bryant, instead, had granted Karla another lengthy continuance to apply for asylum at the Arlington Asylum Office. Therefore, the most reasonable conclusion that I could draw from the omissions is that ███████ was trying to keep Karla's cases on two judges' dockets, to enhance Karla's chances of getting two bites at the asylum apple. By staying on Judge Bryant's docket, Karla was able to pursue benefits conferred on UAC's, such as the right to apply for affirmative asylum in the Arlington Asylum Office. By being included in her mother's asylum application which was on my docket, Karla would receive derivative asylee status should her mother's application be approved. While this approach is not necessarily prohibited by the statute or regulation, ███████ did owe the court a duty of candor in how

66

she chose to press Karla's asylum claim. That she omitted to tell me that Judge Bryant had decided to keep Karla's case on his docket contributed to the misunderstanding that I had regarding the procedural status of Karla's case.

Finally, the complaint and ██████████ July 21, 2017 affidavit also allege that I accused her of being unethical after I returned to my courtroom after I conferred with Judge Bryant, but before I went back on the record. I do not recall that I said anything at all before going back on the record. However, I do recall feeling annoyed with ██████████ during the hearing because she seemed so ill-prepared and unknowledgeable. I also was annoyed with her misrepresentations concerning Oscar's immigration status (i.e., she claimed that his case was on Judge Burman's docket when in fact Oscar had been ordered removed). I did not call her on the carpet for that misrepresentation, choosing instead to ignore it and move on. ██████████ also misrepresented the reason that she sought a continuance of the February 16, 2017 hearing. In the motion for continuance filed on February 3, 2017, she stated that she needed more time to obtain a police report from El Salvador that she said her client had not been able to obtain. Exhibit 1, Tab Y. During the February 16, 2017 hearing, she claimed that the respondent gave her the police report so late that she was unable to bring it to the hearing. Yet, the respondent's testimony contradicted this claim. The respondent testified that she received the police report from El Salvador in November 2016 and gave the report to ██████████ in January 2017. The respondent further confirmed that ██████████ had the report for a month before the February 16, 2017 hearing. Exhibit 1, Tab U, Transcript pp. 20-27.

Though I was annoyed with her, I did not admonish ██████████ that moment because there was still two hours left in the hearing. Instead, I decided to wait until the end of the hearing to do that. If I had said anything at all before going back on the record, my comments

67

would have been along the lines of what I said <u>on-the-record</u> during the third hour of the

hearing:

> ██████████ it is very clear to me that you're not prepared to go forward today.
> It's not for a lack of preparation time. What you gave me was a bare-bones
> application in June 2016. I accepted it because I wanted the respondent to have
> an opportunity to apply for a work permit six months after, and I assume that she
> has. But please do not take my lack of insistence that the application you file in
> court be detailed and complete as a lack of interest in maintaining decorum in
> this courtroom. I have an expectation that lawyers be prepared to proceed on a
> matter when they have agreed that they would be available on a certain date at a
> certain time. I do not favor emergency motions for continuance. I do not favor
> motions for continuance, period. When you say that you are available on a
> certain date, I expect you to be available and prepared, not just available.

Exhibit 1, Tab U, Transcript, p. 28.

After I turned off the audio recording equipment and went off the record, I asked ████

████ to stay behind in the courtroom for a few minutes. I also asked the court interpreter to

stay in the courtroom while I spoke with ████████ I asked the interpreter to stay in the

courtroom because I sensed that I would need a witness who was a neutral third-party should

questions arise later about what was said and not said. For this reason, I did not ask government

counsel or ████████ clients to stay in the courtroom. I did not want to embarrass ████

████ in front of opposing counsel or her clients. During the off-record conversation that

lasted about four minutes, I advised ████████ that I was not pleased with her apparent lack of

preparation for the hearing and her misrepresentation concerning the reason that she requested a

continuance. I reminded her that she owed a duty of competence to her clients and a duty of

candor to the court. I kept my comments general and brief, to avoid turning the discussion into

an ex parte conversation about the merits of her client's cases. I also sensed that a detail-

specific discussion was unnecessary, because she already knew what I was trying to do. She

nodded in agreement and said that she understood. During that brief conversation, I was calm

PLAINTIFF'S EXHIBIT 27   0130

and my voice was soft. I did not hurl accusations or insults, as that is not my style. I also did not want to say anything that could have been perceived as denigrating or humiliating, since I firmly believe that there is nothing to be gained from belittling or shaming other people.

The OPR inquiry letter asks that I state my reasons for having that conversation with ████████ in the first place. As part of my duties and responsibilities as a judge, I am always mindful of the need to create a good evidentiary record for appellate review, because the Board often remands cases for further proceedings if the hearing record is incomplete or insufficient. I was also concerned that the large number of cases that inexperienced attorneys such as ███ ████ take on might compromise the quality of their legal representation in individual cases. On February 16, 2017, I related those concerns to ████████ in general terms, without getting into the specifics of her clients' cases, in the hope that she would be better prepared for the next hearing in April 2017. Because my comments called into question her lawyering abilities, I communicated them off-the-record so that my comments could not be used in a subsequent disciplinary action or malpractice action against her. I also believed that if I had remained silent and said nothing at all, ████████ would have had no incentive to be prepared for the next hearing. Since immigration is a fast-paced, high-volume practice, I do have to be clear when communicating with counsel so we could work toward completing hearings in a fair and efficient manner.

Furthermore, in nine years of serving as an immigration judge, I have come across many respondents who did not tell the truth; but I rarely came across attorneys whose candor I questioned. Most lawyers who come to court do abide by the duty of candor. I also have come across lawyers who were ill-prepared for hearings but whose skills and years of courtroom experiences made up for their lack of preparation. Most lawyers who practice in immigration

69

court do live up to the duty of competence, no matter how busy they are.  However, the case of

████ and her daughters, Catherine and Karla, were different.  I felt that ████████

apparent lack of experience, knowledge, and effort in preparing their cases for evidentiary

hearings was prejudicial to her client's interests.  For that reason and only that reason, I wanted

to put her on notice that if she was not prepared for the next hearing in ████ case, I would

have no choice but to deny ████, Catherine's, and Karla's asylum applications.  That I had

concerns about her work did not mean that I intensely disliked her on a personal level.  The

February 16, 2017 hearing was the very first evidentiary hearing that she handled in my court,

and, therefore, my comments could not have been the result of pre-existing bias.

Finally, the ethics complaint and ████████ late-filed affidavit of July 21, 2017 also

assert, incorrectly, that I had unreasonably denied the respondents' motions to consolidate their

cases.  Although ████████ affidavit alleges that she had filed written consolidation motions

in all the children's cases and that those motions were still pending before other Arlington

judges, a record search reveals that ████ filed no written consolidation motions in any of

the cases.  Had she filed consolidation motions, there was a good chance that I would have ruled

on them before the February 16, 2017 hearing.  Furthermore, even if she had filed motions for

consolidation, I would have had to deny three of the four motions for ineligibility.  As those

three children (Oscar, Nelson, and Cesar) were not eligible to consolidate their cases with the

lead respondent's, no prejudice could have resulted from the denial of consolidation in those

cases.  Moreover, even if ████ had asked that Nelson's and Oscar's cases be heard in

tandem with the lead's respondent case, the fact that ████ did not timely file asylum

applications for the two oldest children who were now over 21 years old (Oscar and Nelson)

was an oversight on her part that would have been difficult to remedy.  Remedying the error

70

would require her to persuade the judge that there was an extra-ordinary circumstance excusing the late filings of Nelson's and Oscar's asylum applications. Not remedying the error could expose her to claims of effective assistance of counsel, or for malpractice, or for disciplinary action.

After the February 16, 2017 hearing, ███████ filed a motion in cases ███████ seeking my recusal. That motion relied entirely on the March 1, 2017 letter of her counsel which is the ethics complaint; the affidavit of ███████ paralegal, ███████ in alleging bias or lack of impartiality. ███████ did not submit an affidavit of her own, and I thought that was curious. I denied the recusal motion, and she filed an interlocutory appeal. On September 28, 2017, the Board dismissed the interlocutory appeal. Exhibit 1, Tab W. The Board stated that it exercises jurisdiction over interlocutory appeals that present significant issues of law, or concerns about immigration judges' adjudications of cases. The Board dismissed ███████ interlocutory appeal, upon finding that the interlocutory appeal did not identify any significant issues of law or any recurring concerns about immigration judges' conduct of removal proceedings. Id.

**H.   The March 7, 2017 Hearing in ███████**
**███████**

The ethics complaint alleges that during and after a hearing on March 7, 2017 which involved another client of ███████ I allegedly interfered with the administration of justice and potentially obstructed justice with regard to my handling of the motion to recuse that ███████ filed in court that day in cases ███████. This claim is also inaccurate and cannot be substantiated.

71

The March 7, 2017 hearing in cases ████ relates to an asylum applicant who, like the asylum applicant in ████████ in cases ████, alleged that she was related to a gang member and feared retaliatory violence coming from the opposing, rival gang. At the start of that hearing, ████████ presented a motion for recusal and demanded that I immediately recuse myself. When I asked why she did not file the motion at least 14 days in advance, as required by court rules, ████████ replied that it was based on a disciplinary complaint that she had filed with OCIJ only a week earlier, on March 1, 2017. I asked whether the complaint was still pending or whether it had been resolved, and ████████ stated that it was still pending. She also volunteered that she had emailed a copy of the complaint to the ████ ████████████████████ the day before the March 7, 2017 hearing. When asked why she had emailed a copy of the complaint to ████████ but not the judge, ████████ stated that she felt that ████████ "had a need to know" about the complaint. She stated that the day before the hearing, she telephoned ████████ to let her know that she would be filing the recusal motion and offered to send ████████ a copy of the disciplinary complaint. Exhibit 1, Tab Q.

I spent the first 20 minutes of the hearing reading the recusal motion and the disciplinary complaint that ████████ introduced at the start of the March 7, 2017 hearing. After I finished reading the documents, I went back on the record and stated that the motion for recusal would be denied, because it was filed late, on the day of the hearing. I also stated that as the disciplinary complaint was still pending, I did not want to take that matter out of the agency's hands by recusing myself prematurely. I also felt that recusing myself prematurely would be tantamount to admitting unmitigated bias toward ████████ After discussing the rules and regulations governing recusal motions, I advised the parties that I harbored no bias against ████

72

PLAINTIFF'S EXHIBIT 27   0134

███████ or her clients since I did not know them and the clients had never been before me.  I also advised them that I wanted to give the agency time to address and resolve the complaint. Therefore, I deferred ruling on the recusal motion and informed the parties that I would proceed with the hearing, as scheduled.  Exhibit 1, Tab Q.

Upon hearing this, ███████ asked that I continue the March 7, 2017 hearing because OPPM 05:02, the procedure governing recusal motions, requires that I issue a written decision before proceeding with the matter.  I responded that a written decision would issue after the hearing.  My reading of the OPPM 05:02 was that it does not require me to act on the recusal motion before proceeding with the hearing.  Rather, the OPPM provides that the judge should rule on the motion before proceeding with the matter, if doing so is practicable.  Since ███████ did not file the motion at least 14 days in advance of the hearing, and otherwise did not give me notice of the recusal motion, I felt that I did not owe her the courtesy of continuing the hearing so that I could issue a written recusal decision before proceeding further with the case.  Again, a court interpreter was in the courtroom and was ready to proceed.  Given the chronic shortages of qualified interpreters, I felt compelled to move forward with the hearing because a cancellation would have cost the agency as much money.  I also was concerned that cancelling the hearing would have resulted in a postponement of two years or more.  Exhibit 1, Tab Q.

Next, ███████ requested that I immediately rule on the recusal motion so she could appeal that decision.  When I denied that request, she requested a continuance so that she could appeal my decision not to act on the recusal motion and not to continue the hearing. Having already ruled, after a few more minutes, I cut off the ███████ continuing

73

objections and instructed her to begin the hearing by taking her client's testimony and the testimonies of other witnesses.

As the hearing progressed, I learned that ████████ did receive an email communication from ████████ the day before the March 7, 2017 hearing. Concerned that ████████ had unwittingly engaged in an improper ex parte communication with one of the parties, I asked ████████ to step into the courtroom and testify under oath about the communication that took place the day before the hearing. This was done for ████████ and my protection. See Exhibit 2, Tab B, pp. 15-16 (Ethics Guide for Immigration Judges, Rule XXXII).

Under oath, ████████ stated that ████████ had called her the day before the hearing to let her know that ████████ would be sending ████████ a copy of the ethics complaint. ████████ stated that later that day (March 6, 2017), ████████ sent ██ ████ a copy of the complaint by email. ████████ also stated that ████████ did not send a copy of the recusal motion in cases ████ by email nor did she give ████████ a paper copy. ████████ stated that she did not know when the recusal motion in cases ████ would be filed, but she assumed that the motion that was filed on the day of the March 7, 2017 hearing was filed at the clerk's window. ████████ also said she was aware that ████████ would be filing a recusal motion at some point in time, but she did not know when and in which case the motion would be filed. In response to my question, ████████ confirmed that she did not tell me about the complaint or the recusal motion in cases ████ nor did she forward that email exchange to me because she did not think that I had a need to know about the ethics complaint. Finally, I asked ████████ if she knew why ████████ had sent a copy of the complaint to ████████ but not to me. (I asked this question because ████████, as a ████

74

█████████ did not have the responsibility of enforcing ethics rules or handling ethics

complaints filed against judges). █████████ responded that I would have to talk to ACIJ

Nadkarni, who was aware of this matter.  Before thanking ████████ for her testimony, I

advised the parties of my conclusion – at that time – that the communications between ███

██████ and ███████████ were not ex parte.

In the back of my mind, I suspected that the ex parte communications between ███

█████ and ███████████ were impermissible because the complaint <u>was</u> the basis of the

recusal motion; thus, the complaint was a matter in litigation that I should have been made

aware of.  But I also did not want ████████████ to claim that I knew about the complaint and

the recusal motion because she had alerted █████████ to those matters before the March 7,

2017 hearing.  I also did not want ████████████ to have an excuse, on appeal, to argue that I

should have known about the recusal motion and the complaint because those matters were

communicated to ██████████  I also wanted to preempt any argument that I acted unreasonably

in refusing to consider the recusal motion in cases ██████ at first.  To preserve the record of

proceedings in the event of an appeal, during a break I retrieved the email that █████████ said

she received from ██████████ on March 6, 2017.  To make a record that █████████████ had

not provided the recusal motion to █████████ the day before the hearing, and that she only

provided the complaint, I placed a copy of that email exchange between █████████████ and ███

██████ into the record of proceedings.  See Exhibit 1, Tab N.

After the March 7, 2017 hearing, I sent an email advising ██████████ not to engage in

any more one-sided communications with ████████████ (or any other lawyer, for that matter)

concerning a matter that is in litigation.  Since the Ethics Guide appears to treat communications

with court staff as communications with judges, I advised ██████████ to be careful not to engage

in any ex parte or one-sided communications in a pending matter.  I also advised ████████ that she must immediately bring to my attention any matter having the potential to affect my work, whether or not she believed that I have a need to know.  Exhibit 1, Tab H.  Given the adversarial nature of immigration court hearings and the Ethics Guide which generally restricts ex parte communications, my conversation with ████████ was meant to be cautionary.

The OPR inquiry letter refers to the March 28, 2017 supplemental ethics complaint and ask that I respond to the allegation that I had "improperly confronted and intimidated several courthouse security officers" after the March 7, 2017 hearing.  Exhibit 1, Tabs B & C.  This accusation is not true.  When this allegation first surfaced in the supplemental letter of March 28, 2017, I did not recall any interactions that I had had with court personnel following the March 7, 2017 hearing.  Subsequently, in addressing ████████ motion for recusal in cases ████, I recalled the conversation that I had with ████████ following the February 17, 2017 hearing.

On February 21, 2017 (the next business day after the February 17, 2017 hearing), Office Assuah came into my office uninvited and informed me that ████████ had arrived at the court to pick up CD's containing the audio recordings of the February 17, 2017 hearing in ████████████████).  It was during that conversation that ████████ advised me that she had overheard ████████ canvassing other security officers and asking whether they were willing to testify against me.  I did not know what to make of ████████ comments since I did not know her at all.  When she shared with me the fact that she ducked into the judges' chambers to avoid ████████ then recounted the ways in which ████ annoyed her, and then stated that she did not care for ████████ I thanked her for her the information and suggested that she relate that information to her supervisor for the

76

supervisor's situational awareness. I was not going to use any information that ███████████ gave me during that conversation. However, that changed when ACIJ Nadkarni instructed me to respond to the recusal motion in cases ██████ and then the ethics complaint.

On March 8, 2017, ACIJ Nadkarni instructed me to respond to the recusal motion by April 14, 2017. Then, on March 29, 2017, ACIJ Nadkarni requested that I prepare a response to the ethics complaint. By then, the supplemental ethics complaint dated March 28, 2017 had been filed with the court, but ACIJ Nadkarni did not alert me to it. Exhibit 1, Tab I. I subsequently saw the supplemental complaint in another one of ████████ recusal motions filed after March 28, 2017. In addressing the recusal motion in cases ██████, I decided that I needed to know what, if anything, ████████ had said to ████████ or ████████ so I could address the officer's statements in my response.

I approached ████████ on a Wednesday and asked if I could meet with her that Friday afternoon when I knew she was not busy. I asked her if she was aware of the complaint which implicated her as a potential witness. She said that she did not know about the complaint and had not spoken with ████████ or anyone about it. I asked if she still recalled the February 17, 2017 hearing, and she said that she recalled a tense exchange between ███ ████████ and me during the hearing. However, she was unable to recall what exactly was said during that tense exchange, because, she said, she did not understand legal terminology. She then confirmed that what she had told me during the private conversation in my office on February 21, 2017 was still true. I asked ████████ whether she would be willing to sign an affidavit stating what she had observed in court on the day of the February 17 2017 hearing. She agreed to meet with me to go over the affidavit.

PLAINTIFF'S EXHIBIT 27   0139

When she and I met on Friday, March 10, 2017, I had prepared a draft affidavit summarizing what ▮▮▮▮▮▮ had told me. I showed her the affidavit. Exhibit 2, Tab O. At first, she agreed to sign the affidavit after making a few changes, but upon further reflection she changed her mind. She stated that she did not want to get involved because she was afraid of getting in trouble with her supervisor. I told her that I understood and respected her decision. I have had no further communications with her. Contrary to the assertions in ▮▮▮▮▮ letter, I did not confront or try to intimidate any witnesses. Such conduct would have been wholly inappropriate. I was reasonably confident that the evidentiary records would vindicate my recusal decisions on appeal, and that anyone viewing this situation objectively would think the complaint was just another litigation tactic. Therefore, I did not ruminate or get upset over the complaint. To me, it was just another day at the office.

In the last eight years, AILA has filed dozens of lawsuits challenging virtually every facet of agency operations. The agency's eagerness to settle the lawsuits by paying out millions of dollars in attorneys' fees has only fanned the flames. Frankly, I was getting tired of having to look over my shoulders to see who was coming at me. But that mentality did not necessarily translate into hard feelings toward AILA or its members. I was confident that 26 years of litigation experience in the Justice Department would help me steer clear of trouble no matter what form it came in. For that reason, I had no incentive to attack AILA or anyone working with AILA to bring down the agency.

Moreover, there is every reason to believe that ▮▮▮▮▮ and ▮▮▮▮▮ had acted to hinder an investigation. They interviewed security officers, court personnel, contract interpreters and other potential witnesses in building a case for my removal. This was troubling to me, because many of the witnesses on their list were court or federal government employees.

78

Even more troubling is the fact that they seemed to have access to non-public information that no one but agency personnel could have provided. A good example of this point is their access to privacy-protected information in my personnel file. Another example is the ex parte communication that ████████ and ████████ had the day before the March 7, 2017 hearing in ████████ In that regard, I am grateful for the opportunity to share these thoughts with OPR. If ultimately there is an investigation, it will assist DOJ in revamping the agency's complaint resolution process, to make the process more transparent and fair.

IV.    **Allegations Relating to the June 8, 2017 Order Denying Recusal.**

On March 7, 2017, ████████ arrived in court for a 1:00 p.m. hearing in cases ████ . Before the hearing began, ████████ advised me, off-the-record, that she had an important motion to make. I began the hearing by following my ordinary practice of going on the audio record, placing the Spanish interpreter under oath, marking documentary evidence as exhibits, asking the lead respondent to confirm that the information in her asylum application was correct. When ████████ requested leave to amend the asylum application that was filed several months earlier, I permitted her to make the amendments. I also granted ████ ████████ motion to accept untimely filed documentary exhibits that she filed a few days before the hearing.

After I took care of the housekeeping matters, I turned to the motion for recusal that ████ ████████ filed on the day of the March 7, 2017 hearing. On the record, I made it clear that I did not know that a complaint had been filed since ████████ did not alert me to it. ████ ████████ responded that she had sent to ████████ an electronic copy of the complaint by email the day before the hearing. Asked if there was a disposition of the disciplinary complaint, ████████ stated that as of the date of the hearing, OCIJ had not ruled on the complaint.

79

██████████ then asked for a two-minute recess to print out the receipt from OCIJ acknowledging receipt of the complaint, using her portable printer. I agreed to go off-record for that purpose but advised her to be back in 10 minutes, because we needed "to get going on this case." By that point, the respondent's removal proceedings had been pending for 3 years. After going back on the record, I admitted the receipt which was an email dated March 2, 2017 and attached the receipt to the motion to recuse. I then marked the recusal motion as Exhibit 22. Exhibit 1, Tab Q, Track 9, at 1:50.

Next, I advised the parties that I was not inclined to recuse myself or postpone the hearing. First, I stated that the agency needed to investigate the complaint, and that "To recuse myself at this point would be to take the complaint out of the agency's hands" and would interfere with OCIJ's adjudication of the complaint. Second, I stated that recusing myself before OCIJ has ruled on the complaint would be tantamount to an admission of unmitigated bias. Third, I stated that I have not had an opportunity to respond to the complaint, and that I did not know whether I would have an opportunity to respond to the complaint. Fourth, as I was not aware that ██████████ had filed a recusal motion and a disciplinary complaint until the day of the hearing, "I was caught off-guard" and could not have ruled on the recusal motion in advance of the hearing. Finally, I stated that the rules and regulations concerning recusal of immigration judges required that I make an independent assessment of any bias or lack impartiality toward the respondents or the respondents' lawyers. Since the March 7, 2017 hearing was the first time I came across the respondents, I could not have had any bias or

80

PLAINTIFF'S EXHIBIT 27   0142

prejudice against them. I also confirmed that "coming into the hearing, I had no bias toward
███████████ either.[29]

As I was about to place the lead respondent under oath, ███████████ interposed an
objection. She stated that EOIR's memorandum (presumably OPPM 05:02) required that I
issue a written ruling on the recusal motion before I proceeded with the evidentiary hearing that
was scheduled for that day. Denying her request, I explained to ███████████

Judge to counsel:   I didn't know about the motion for recusal until you brought it to court,
so you can't possibly expect me to take time off the record to issue a
written decision. I'll tell you what, I will issue a written decision after
the hearing today. We have an interpreter who is available to assist your
client over the next three hours, government counsel is ready to proceed,
I am ready to proceed, and I assume that your client is ready to proceed
as well. So, I will issue a written decision after the hearing. If it is
required, I will issue a written decision [on the motion] to disqualify. But
in the future, please know that any motion that you would like to have
resolved before a hearing should be filed at least 14 days in advance of
the hearing.

                    ****

---

[29] I further stated:

This is litigation. This is an adversarial hearing. The parties have burdens to
meet, and I anticipate and expect that they would be able to meet their burdens
during the evidentiary hearing, especially if I granted them four months to
prepare for the individual hearing. So, we will move on. The motion for recusal
will not be ruled on. I would like to give the Office of the Chief Immigration
Judge a sufficient opportunity to rule on the complaint. To recuse myself right
now would be to substitute my judgment for that of the Office of the Chief
Immigration Judge. And I also believe that there is always recourse by filing an
appeal with the Board of Immigration Appeals. If the parties are not happy with
my decision, they know that they have the right to appeal my decision to a higher
court, actually to two or three higher courts, if they so choose. And so there is no
need to engage in extra-judicial processes in order to obtain the resolutions that
they desire. So, let's just move forward with the hearing today.

Exhibit 1, Tab Q, Track 8, at 00:20 to Track 10, at 3:10.

PLAINTIFF'S EXHIBIT 27   0143

Exhibit 1, Tab Q, Track 10 at 3:20 to Track 11 at 1:15.

███████████ then requested a continuance so she could appeal my decision not to rule

on her motion to recuse. I also denied that request. The following exchange occurred:

███████████  Your Honor, I would respectfully request that this court to rule on that motion to recuse so that we can appeal that decision.

Judge:  Your motion is denied.

****

███████████  Your Honor, I respectfully request a continuance today, then, because we need to have that decision, because that's what the regulation or the EOIR memo . . . .

Judge:  You can appeal after the hearing today, and I will give you a written decision in full. All right?

Judge:  Let's not. . . . ███████████ I'm going to stay on the record to say this, and I am going to say it as delicately as I can. This is an adversarial process. Your client has the burden of proof. It is a very difficult burden to meet. So, let's not complicate the matter for her. If she can meet her burden of proof, and if you have confidence in her case, then we should go forward today. I'm ready. I'm not about to put it off just because you walk into the courtroom at the beginning of the hearing and drop a motion to recuse on me and government counsel, and then demand a written decision. And then demand a continuance so that I could issue my written decision.

Id.

As the above exchange indicates, I declined to rule on the motion for recusal during the

March 7, 2017 hearing because it was filed late, and it pertained to a matter that was within

OCIJ purview. After the hearing, ACIJ Nadkarni asked that I rule on the recusal motion as well

as the complaint. Even though I had very limited time, I decided not to respond right away

because I needed some time to cool off and to think about the proper way to respond. I had

become upset upon reading the offensive remarks and comments that ███████████

82

paralegal, ███████████ made in his affidavit.[30] ██████████ affidavit was

inappropriate, because it made fun of my physical appearance, relied on negative stereotypes of

Asian women, and otherwise depicted his observations of the February 17, 2017 hearing in

███████████ in a grossly inaccurate way.  Although he gave many detailed descriptions of

my demeanor and facial expressions while characterizing my behavior as hostile and belligerent

toward ████████ his affidavit did not quote any inappropriate statements that I allegedly

made off-the-record.

In responding to the recusal motion, I followed the policy of non-disqualification that is

articulated in OPPM 05:02.  That policy provides that a judge has a duty not to disqualify

herself without a reasonable basis.[31]  OPPM 05:02, at pp. 3-4, note 5.  I also applied the

---

[30] Although the OPR inquiry letter does not request that I respond to ██████████
affidavit, a brief response is provided, as follows.

As stated in his affidavit, the February 17, 2017 hearing was the very first court hearing
that he attended.  Yet, ████████ affidavit is filled with details upon details suggesting a
greater level of familiarity with me and my work habits than what a first-time court observer
could reasonably expect to have.  His affidavit purports to describe my physical demeanor
during the hearing in a way that conformed to the ethics complaint.  But his description is based
on stereotypes of Asian people that are offensive.  For example, he claims that I frequently
rolled my eyes when ████████ spoke as though I was being rude, but omits to mention
that I wear eyeglasses that sit low on my nose, and that I often peer above them to look out into
the courtroom.  I also have almond-shaped droopy eyelids that can make me look sad or angry
even when I am not.  Furthermore, ████████ pointed out that I pursed my lips which he
speculated was a sign of anger or meanness.  What he did not know is that I have dry lips that
are normal for people my age.  To prevent them from drying out, I frequently press them
together to moisten them.  Additionally, ████████ claimed that I constantly looked down at
my watch to check the time.  He did not explain how, sitting in the gallery 15 to 20 feet away,
he was able to look up and over the bench to observe what I was doing.  In any case, I rarely if
ever wear watches or hand jewelry to work because they interfere with my typing, which I do in
court to capture the oral testimonies of witnesses and my impressions of them.  Regardless of
what ████████ believed he saw in the courtroom that day, I do not condone implicit bias or
explicit prejudice.  I am very aware that facial features and expressions of Asian people can be
easily misunderstood, and that individuals who are not around many Asian people can
misconstrue facial expressions and demeanor of Asian people.

[31] The OPPM 05:02 states:

PLAINTIFF'S EXHIBIT 27    0145

standards for recusal set forth in OPPM 05:02. The recusal standard that applies to immigration judges is the same objective standard set forth in 28 U.S.C. 455, the federal statute governing recusal of federal court justices, judges, and magistrates. The OPPM specifically incorporates the standard for automatic disqualification found in 28 U.S.C. 455(b). Section 455(b) mandates recusal in a limited number of situations, such as (1) when the alien demonstrates that he was denied a constitutionally fair proceeding; (2) when the immigration judge has a personal bias stemming from an "extrajudicial source;" and (3) when the immigration judge's judicial conduct demonstrates "such pervasive bias and prejudice" as to deny the alien a fair hearing. OPPM 05:02 at p. 2, citing Matter of Exame, 18 I&N Dec. 303, 305 (BIA 1982). The Board's Exame decision defines the term "extrajudicial bias" to mean "a personal, rather than judicial, bias stemming from an 'extrajudicial' source which resulted in an opinion on the merits on some basis other than what the immigration judge learned from his [or her] participation in the case." 18 I&N Dec. at 306.

The Board in Exame also provided examples of what it does not consider to be bias justifying recusal. For example, the Board stated that an alien is not denied a full and fair hearing simply because the judge subscribes to a different point of view than his attorney about the law or policy in question. Id., 18 I&N Dec. at 306. Similarly, the fact that the judge has

---

Disqualification for lack of impartiality must have a reasonable basis. Nothing in [28 U.S.C. 455] should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. Id. Accordingly, **judges continue to have a duty not to disqualify themselves without a reasonable basis**.

Id. at pp. 3-4, note 5 (emphasis in original).

84

PLAINTIFF'S EXHIBIT 27    0146

rendered unfavorable rulings in similar cases is not "a basis upon which to allege bias." Id.

Furthermore, to prevail on a claim of bias based on an "extrajudicial source," it must be shown

that the judge acquired knowledge of the case through performing investigative or prosecutorial

functions involving that particular case.  Id.  Finally, personal bias that does not stem from an

extra-judicial source must be "so pervasive as to result in an unfair proceeding."  Id. (citing

Davis v. Board of School Commissioners, 517 F.2d 1044 (5th Cir. 1975), cert. denied, 425 U.S.

944 (1976)).

      OPPM 05:02 identifies several situations that do not require recusal.  For example,

recusal is not permitted when the party's underlying intent is clearly to engage in "judge or

forum shopping."  OPPM 05:02, at p. 5 (citing, *inter alia*, Martin-Tregona, 573 F. Supp. at 1243

(claiming the "right to an impartial judge cannot be advanced so broadly as to permit the parties

to engage in 'judge shopping' under the guise of a motion to recuse. . . or to permit the parties

to disqualify without reasonable grounds a succession of judges for the apparent purpose of

impeding the administration of justice."); see also Greenough, 782 F.2d at 1558 ("If

[unsubstantiated recusal] occurred, the price of maintaining the purity of the appearance of

justice would be the power of litigants or third parties to exercise a veto over the assignment of

judges.")).  Further, the OPPM provides that an immigration judge "should not recuse himself

merely because a party sues or threatens to sue him."  OPPM 05:02, at p. 4.

      Applying the recusal standards in OPPM 05:02, I interpreted ▮▮▮▮▮▮ affidavit

as arguing for permissive recusal under 28 U.S.C. 455(a), which provides that recusal is

permissible when "it would appear to a reasonable person, knowing all the relevant facts, that a

judge's impartiality might reasonably be questioned."  See Exhibit 2, Tab H.  I interpreted ▮▮▮

▮▮▮ complaint to arise under the automatic recusal standard of 28 U.S.C. 455(b), which is

PLAINTIFF'S EXHIBIT 27   0147

based on a showing of pervasive bias stemming from an extra-judicial source. After reviewing

the record evidence and audio recordings of the cases referenced in the ethics complaint (i.e.

cases ██████████████████████ ), I concluded that other motives such as judge

shopping or a desire to delay the proceedings could not be ruled out. Thus, I stated that

conclusion in my Order denying ████████████ recusal motion in cases ██████, issued on

June 8, 2017. See Exhibit 1, Tab M. Similarly, I denied ████████ recusal motion in an

Order issued on June 21, 2017 in cases ██████.

The OPR inquiry letter specifically asks that I address the nine contentions that the

attorneys alleged were inappropriate or unethical conduct on my part. Those nine contentions

will be addressed in the order in which they were presented in the OPR inquiry letter. In

addressing the specific allegations stated in the ethics complaint, I researched thoroughly the

evidentiary records in each of the subject cases to confirm that the factual statements set forth in

my June 8, 2017 Order denying recusal were correct. In addition, because the attorneys relied

on extrinsic evidence to impugn my character and professional reputation, I found it necessary

to refute their allegations through use of extrinsic evidence of their character and reputation for

truthfulness and veracity.[32] Such evidence was generally admissible in immigration court

proceedings. The regulation at 8 C.F.R. 1240.7 (2017) provides, as follows:

> (a)    Use of prior statements. The immigration judge may
> receive in evidence any oral or written statement that is material
> and relevant to any issue in the case previously made by the
> respondent or by any other person during any investigation,
> examination, hearing, or trial.

---

[32] Extrinsic evidence in this context means the use of information that is not legitimately
before the court, that is, evidence that is other than the questions asked to the testifying witness
and the answers that she gives. Extrinsic evidence often includes written or oral witness
testimony, an audio recording, or a document. The use of extrinsic evidence is a permissible
examination tool in court. Thus, the question is not whether extrinsic evidence can be used at
all, but whether the extrinsic evidence introduced was relevant and probative.

PLAINTIFF'S EXHIBIT 27    0148

Id.

In addition, I relied on several Federal Rules of Evidence to determine the propriety of using extrinsic evidence that did not directly relate to the court proceedings but rather to the attorneys and ██████████ For example, I relied on Fed. R. Evid. 401 which provides that "[r]elevant evidence means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Additionally, Rule 806 of the Federal Rules of Evidence provides that "evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it" is admissible to impeach the hearsay declarant. This rule explicitly permits the use of extrinsic evidence going to the declarant's out-of-court conduct. Similarly, Rule 608 provides that "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." This rule, a corollary to Rule 806, permits the use of extrinsic evidence in court to attack a witness's or declarant's testimony reputation in her community. As will be explained, Rule 806 was the rule on which I relied in using extrinsic evidence going to the character and reputation for truthfulness of the attorneys and ██████████ Rule 608 was the rule on which attorneys ██████████ relied to assail my reputation and character, by specifically calling on the written testimony of their lawyer, ████████ and the testimony of ████████ as constituting "an opinion about that character."

A.    **Allegation Number 1 concerning** ████████

At the time that I issued the first Order denying recusal in cases ████, ████████ had not submitted a sworn affidavit in support of her recusal motion. Her affidavit was not filed

87

until July 21, 2017, three months after she filed the recusal motion in cases ██████ . ██████ ██████ complaint against me, as asserted through her attorney's letter, alleged a lack of impartiality stemming from an "intense personal dislike" of ██████ I understood ██████ ██████ argument to be an argument based on the automatic recusal standard of 28 U.S.C. 544(b). Specifically, she claimed that my speaking with her off-record about the duties of candor and duty of competence went beyond courtroom control and manifested "such pervasive bias and prejudice" as to deny her clients a fair hearing. OPPM 05:02 at p. 2, citing Matter of Exame, 18 I&N Dec. 303, 305 (BIA 1982).

Since ██████ initially did not submit a sworn affidavit and instead relied on her attorney's representations in the ethics complaint, I decided that refuting ██████ complaint meant that I must address each and every allegation in ██████ complaint letter. Thus, I treated ██████ complaint letter as evidence because it was attached as an exhibit to ██████ motion to recuse in cases ██████ . I had to show that ██████ account of the facts and events was deeply flawed. Exhibit 1, Tab S. I also had to show that because ██████ did not submit a written affidavit, choosing instead to speak through her lawyer, her lawyer's statements were unreliable hearsay because ██████ was not a percipient witness. I also had to question the veracity and accuracy of ██████ statements as set forth in the complaint letter. Finally, I needed to address ██████ assertions that numerous witnesses had been interviewed and would corroborate his clients' versions of the events. I also needed to address ██████ reference to privacy-protected information that could only have come from my personnel records. The release of such information was very troubling and upsetting to me, because the records were privacy-protected and their release was in violation of the FOIA statute. The unauthorized release of information occurred on January 5, 2017, two

88

months before the first recusal motion in cases ▮▮▮ surfaced on March 7, 2017.  Given ▮▮▮

▮▮▮ use of information that was obtained in violation of law as character evience, I felt that

it was fair and necessary to use character evidence to impeach the credibility of ▮▮▮

and her putative witness, ▮▮▮

   In addressing ▮▮▮ allegations, I relied on extrinsic evidence that went to her

character for truthfulness.  Fed. R. Evid. 608(a) & (b).  In the absence of an affidavit or any

intrinsic evidence from ▮▮▮ in cases ▮▮▮, I had to go beyond the record of

proceedings to address her allegations of bias and intemperate behavior.  What I uncovered was

an on-line resume that stated very little employment history.  I researched Westlaw to find

caselaw that was issued in the cases she handled, but found no decisional case law.  The only

information concerning ▮▮▮ professional reputation was available through a fee-based

data search engine, pacer.org, for which I had a personal account.  I relied on pleadings such as

affidavits that she filed in other court records in which she was a litigant, to shed light on her

character for truthfulness and veracity.  At the time, I believed that the information concerning

the bankruptcy proceedings related to her.  I exercised due diligence in cross checking the

information to confirm that I had the right person.  I made sure that her date of birth which was

public information matched her date of birth as indicated in the bankruptcy records.  If the

information has turned out to be incorrect and did not pertain to her, I apologize to ▮▮▮

for the error and my good faith reliance on that information.   It was not my intent to accuse ▮▮▮

▮▮▮ of a crime or fraud that she had not committed.

   Since ▮▮▮ filed her affidavit on July 21, 2017, I have come across intrinsic

evidence in that affidavit and in records of proceedings that support my conclusion that ▮▮▮

▮▮▮ was not candid with the court.  Her July 21, 2017 affidavit incorrectly claims that she

89

had filed written motions for consolidation in all the cases of ████ children.  But according to the court's database, no such motions were ever filed.  Since she has made this claim several times, i.e., the claim that she did file multiple written motions for consolidation in the subject cases, I assume that she made the claim intentionally.  That she had misled the court in claiming that she had filed written consolidation motions when she had not supports my conclusion that she was not being honest in her dealings with the court and opposing counsel.

B.        Allegations 2, 6, 7, 8, and 9 Relating to ████████

In addressing ████████ complaint letter, I addressed various claims that ████████ made concerning his employment history, which he provided to establish that he had relevant experience in attorney discipline matters.  He also relied on his lengthy employment history in showing that he was well-positioned to represent clients such as ████████ and ██ ████ and that he was sufficiently familiar with the rules and regulations governing immigration court hearings as to be in the position to file a legally sufficient ethics complaint against an immigration judge.  Since his complaint letter was used as "Exhibit A" in each of the recusal motions, ████████ also had to show that he possessed first-hand knowledge of the events in question as to give a credible, reliable account of the facts that he knew would be used as evidence in recusal motions filed with the court.

The public source information concerning ████████ that I relied on came from Westlaw and other reliable sources of information such as pacer.org.  I have included as much of the information in the 200-page Addendum, for verification purposes.  Exhibit 1, Tab N.  The information pertaining to ████████ shows that he represented DOJ attorneys in disciplinary actions.  The information also refutes his claim of being familiar with the various immigration court processes, such that he was in the position to offer an opinion on my conduct of the

90

removal proceedings, i.e., an opinion on the propriety of my decision not to immediately recuse myself, an opinion on the propriety of my decision not to rule on the late-filed recusal motion before proceeding with the hearings, and the propriety of my decision to call █████████ as an eyewitness to testify about the ex parte communication that she had with ███████ which was very much relevant to the recusal motion. In that way, examining ███████ work experience was a relevant permissible inquiry, just as my work experience was relevant in analyzing the recusal motion, the complaint, and this OPR inquiry.

Since ████████ did not initially provide a written affidavit in support of her recusal motion, choosing instead to rely on the words of her counsel as stated in the complaint, Rule 806 permitted the introduction of extrinsic character evidence to refute her allegations by refuting ███████ allegations. It was not my intent to disparage ████████ work in representing criminal defendants and agents of a foreign government in criminal proceedings. I merely wished to point out that he had not practiced immigration law and thus could not reasonably opine on the propriety of immigration judges' conduct. As indicated in his firm bio, his current work includes white collar criminal defense and he has represented numerous defendants in criminal proceedings alleging violations of export control laws, including individuals who acted on behalf of or interfaced with the Government of Iran. This information was true, and I was careful to say nothing in the June 8, 2017 Order denying recusal that would misrepresent his employment history. If the publicly available information that I uncovered turned out to be false, then I apologize to ████████ for my good faith reliance on such information. The use of such information was merely to refute his claim of familiarity with immigration law procedures, his accusations relating to my conduct in court and out-of-court which he did not observe but had an ethical duty to investigate before asserting them in a court

91

pleading or in documentary evidence (see Fed. R. Civ. P. 11(a) & 8 C.F.R. 1240.9). These were

my justifications for using the information I uncovered about ███████████ It was my intent only

to use the information to attack his allegations (see Fed. R. Evid. 806), not to attack him or his

professional standing.[33]

### C.   Allegations 3, 4, and 5 pertaining to ███████████

███████████ introduced extrinsic evidence in support of the recusal motion in cases

███████ Such evidence came in the form of her attorney's letter, which asserted that she was a

preeminent, highly-regarded, and distinguished immigration lawyer who got along well with the

---

[33] The information concerning ███████████ professional background and employment
history was relevant, in that it showed that he had no immigration law practice experience and
thus did not fully understand the unique circumstances in which judges like me make rulings
affecting his clients' clients. Fed. R. Evid. 401. Those unique circumstances include frequent
policy changes without notice, an absence of clear written rules and policies guiding the
agency's work, and a culture of sowing discord through disparate treatment of groups and
individuals. For example, ███████████ apparently was unaware that immigration judges are
authorized by statute to ask questions and examine witnesses, and that in discharging their
responsibility for creating a complete and sufficient hearing record, they "shall" examine, cross-
examine, and interrogate witnesses to elicit information they need to know. Such lack of
knowledge about basic operations certainly affected his ability to analyze a claim of
professional misconduct. In fact, he complained that I asked too many questions during the
hearings involving ███████████ and ███████████ clients.

The areas of ███████████ practice were also relevant to understanding his expertise and
qualifications. He was serving not only as the lawyer for ███████████ and ███████ but
also as a witness weighing in on the question of professional misconduct, and a percipient
witness acting on behalf of ███████████ until she filed her own affidavit on July 21, 2017. I can
no longer remember why I stated that ███████████ and his firm had represented foreign and
domestic entities, including the Government of Iran. A perusal of his firm profile and cases
published through Westlaw, however, confirms that he practices criminal law/white collar
defense and has represented individuals who violated export control laws prohibiting the sale of
sensitive technologies to Iran. Given the existing trade sanctions, it would not have been
unreasonable to conclude that the individuals ███████████ represented had worked for the
Government of Iran. Given his lack of expertise in the immigration field, it was reasonable to
question his credentials. In any case, the information concerning ███████████ was publicly
available, and I relied on it to illustrate the above points without intending to slander or
denigrate his professional reputation.

PLAINTIFF'S EXHIBIT 27   0154

other judges of the Arlington court, who had no need to complain about any judge until the February 1, 2017 hearing in my courtroom.  Addressing these allegations and disproving them required that I delve into █████████ reputation for honesty and truthfulness in the immigration law community.

The extrinsic evidence concerning █████████ professional reputation came in two forms.  First, I culled records from the case files in which motions for recusal have been filed, to show that she repeatedly has misled the court in pleadings and motions.[34]  Second, the extrinsic evidence came from reliable public sources such as her firm's website, the affidavits and pleadings that she filed in court cases, and a Washington Post article in March 2017 that documented her effort to bring down a company doing business with DHS.  Again, my intent in using the extrinsic evidence was to cast doubt on the veracity of █████████ accusations against me, not necessarily to denigrate or impugn her professional reputation.  I believe that Fed. R. Evid. 806 permitted the use of this information as character evidence.

Concerning allegation number 5 in the OPR inquiry letter, the Washington Post article quotes █████████ in a matter in which she pursued fraud allegations against a local company that provided electronic monitoring devices (commonly referred to as ankle bracelets) to individuals who otherwise would have to be detained pending the completion of their removal proceedings.  Exhibit 1, Tab N.  The article quoted █████████ and suggested that her motive in pursuing the fraud allegations was not that she thought the company had

---

[34] For example, in case ███ she filed a motion for change of venue in which she misrepresented the proper venue or hearing location.  In case ███████, one of her paralegals prepared a sworn affidavit claiming that a key witness was unavailable for in-court testimony because the witness was out of the country.  However, on the day of the February 17, 2017 hearing, the witness came to court and sought permission to testify.  In the course of his testimony, he stated that he had been in the country for at least four years.

PLAINTIFF'S EXHIBIT 27   0155

committed fraud, but that she felt that it was overcharging her clients for use of the electronic ankle bracelets.  In that ▮▮▮▮▮▮▮▮ was quoted in the article as claiming that the fees the company assessed was exorbitant, and that she continued to pursue criminal charges against the company even after the Fairfax County and Fairfax City police declined to initiate an investigation, the article cast doubt on the veracity of her allegations of unethical conduct against me.

Concerning allegation number 3 in the OPR inquiry letter, I introduced the information concerning ▮▮▮▮▮▮▮ to show that she did not have a reputation for honesty or fair dealings.  The information came from affidavits and pleadings that she filed in court cases, and the Washington Post article in March 2017 described above.  The records in some of the cases in which she has filed recusal motions undercut her credibility, in that they show that she had made numerous misrepresentations of fact in pleadings, had filed motions for change of venue with the wrong court, and had made frivolous motions to delay the proceedings or to gain a litigation advantage over her opponent.  For example, in case ▮▮▮▮, one of her paralegals prepared a sworn affidavit claiming that a key witness was unavailable for in-court testimony because the witness was out of the country.  However, on the day of the February 17, 2017 hearing, the witness came to court and sought permission to testify.  In the course of his testimony, the witness admitted that he had not been living in El Salvador, as his affidavit claimed, but rather illegally in the United States.  Again, my intent in using the extrinsic evidence was to cast doubt on the veracity of ▮▮▮▮▮▮▮ accusations against me, not to denigrate or impugn her professional reputation.

Concerning allegation number 4 in the OPR inquiry letter, I did not mock ▮▮▮ ▮▮▮▮▮ membership in the Federal Bar Association and AILA, as that was not my intent.  I

94

used that information to show that ███████████ membership in those organizations alone does not make her statements credible or deserving of substantial weight. To the contrary, I introduced information to show that her membership in the Federal Bar Association created a potential conflict, or an appearance of conflict, since she routinely appeared before some of the immigration judges in the Arlington court, such as Judges Paul Schmidt (ret.) and Larry Burman, who happened to chair the FBA's Immigration Law Section. Exhibit 1, Tab N.

Similarly, I had to address the affidavit of paralegal ███████████ which accused me of yelling, screaming, bullying, and sarcastic behavior as displayed through my choice of words and body language during the February 17, 2017 hearing. I was angry when I read the ███████ affidavit. His blatant use of stereotypes that cast Asian women in a negative light offended me. I also resented his making fun of my physical traits and demeanor in a way that was not just unflattering, but also offensive. Even though I felt personally attacked, I decided not to respond to ███████ affidavit in kind. Instead, I tried to show that he was a biased witness. Therefore, in preparing the recusal order, I addressed ███████ observations by pointing out that ███████ was his employer and that he may have had an ulterior motive in recalling the facts and events in a way that conformed to ███████ affidavit. That ulterior motive was to gain or keep his employment with the ███████. See Exhibit 1, Tab N.

i recognize that the attorneys and I work in an imperfect system that has many flaws. Instead of complaining about the people who work in it, each participant should think about ways to fix the brokenness of this system, so that it works well in the ways that it was intended, benefiting the people that it was intended to benefit. If I had to go through this process again, I

95

in the grant of relief to ███████████ client. (An audio-recording of the hearing in this case,
████████████ will be provided as soon as it becomes available).

By the same token, I firmly believe that instead of complaining about the people who
work in this imperfect system, each participant should think about ways to fix the brokenness,
so that the system works well in the ways that it was intended, benefiting the people that it was
intended to benefit. If I had to go through this process again, I would have referred myself and
the ethics complaint to OPR and waited for further instructions from OPR.

Since the June 8, 2017 Order was issued in the context of a court proceedings, and ███
████████ and ███████████ have filed interlocutory appeals challenging the denials of their
recusal motions, the matter is officially in litigation. On October 6, 2017, the Board issued
decisions in 7 cases, dismissing ████████████ interlocutory appeals. Earlier, on September
28, 2017, the BIA dismissed ████████████ interlocutory appeals in cases ██████. See Exhibit
1, Tabs J & K. The BIA orders stated that it exercises jurisdiction over interlocutory appeals
only when there are significant jurisdictional questions about the administration of the
immigration laws, or to correct recurring problems in the handling of cases by immigration
judges.

In closing, I am prepared to address any additional concerns or questions that OPR
might have. I also am ready to provide OPR with a list of character witnesses who are prepared
to attest to my integrity, judicial temperament, judgment, and good character. Since these
individuals have worked with me at the agency or in the Department of Justice, I hesitate to
name them at this time. Upon request, I would provide OPR with a list of those character

/

/

96

PLAINTIFF'S EXHIBIT 27   0158

references.

  Thank you for your fair and thorough consideration of my response to OPR's inquiry.

        Respectfully submitted,

        Quynh Vu Bain

97

PLAINTIFF'S EXHIBIT 27   0159



**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue, N.W., Suite 3266*
*Washington, D.C. 20530*

MAR 0 7 2018

<u>By E-mail</u>

Quynh Vu Bain
Immigration Judge
Quynh.Bain@EOIR.USDOJ.GOV

Dear Judge Bain:

As you are aware, the Office of Professional Responsibility (OPR) is investigating allegations that you engaged in professional misconduct by failing to demonstrate appropriate judicial temperament and to act with appropriate professionalism and impartiality in connection with removal proceedings in several cases. OPR has previously received your written response dated November 15, 2017, and a supplemental written response you voluntarily furnished on February 11, 2018, to these allegations.

After reviewing your written response and supplemental written response, OPR has identified several areas in which it requires additional information from you. Accordingly, OPR requests that you provide a second supplemental written response, addressing the following:

(1)   On page 27 of your November 15, 2017 written response, you indicate that the audio recording of the February 1, 2017 hearing in ▮▮▮▮ demonstrates that you "went off the record just once, for a brief 10-minute break." You further assert that you do not recall any off-the-record discussion "that ought to have been summarized" after returning on the record. The audio recording, however, indicates that you went off the record twice during that proceeding, at 25:31 for reasons unspecified on the audio recording, and again at 1:08:25 for a brief break. In your second supplemental response, please explain why you asserted in your written response that you went off the record only once during the proceeding. In addition, provide a complete description of the content of any discussions or conversations with counsel that occurred during each off-the-record segment.

(2)   On page 89 of your November 15, 2017 written response, you indicate that you discovered information on pacer.org regarding bankruptcy proceedings that, you believed, related to attorney ▮▮▮▮ who appeared before you in the Arlington Immigration Court. You further assert that you exercised "due diligence" by "cross checking the information" to make sure "that her date of birth which was public information matched her date of birth as indicated in the bankruptcy

PLAINTIFF'S EXHIBIT 27   0160

records." Please provide OPR with a copy of all documents you reviewed in conducting the "due diligence" review you describe on page 89 of your November 15, 2017 written response, including both the publicly available documents concerning ▮▮▮▮▮▮ that you examined, as well as the specific bankruptcy records from which you derived the bankruptcy petitioner's birth date.[1]

(3)     You appended to your February 11, 2018 supplemental response documents relating to applications for the position of Immigration Judge submitted in December 2012 by Marlene Wahowiak and Jean King. In your second supplemental response, please explain how you came to be in possession of these documents. In addition, please explain why you believe that these five-year-old applications are currently pending before the Arlington Immigration Court and have relevance to OPR's investigation. Finally, identify the legal authority that authorizes you to use these non-public documents concerning other EOIR employees in connection with OPR's investigation of your conduct.

Please provide your second supplemental written response and all responsive documents in electronic format – either as attachments to an e-mail, or on a disk sent by Federal Express – to Assistant Counsel Leslie Ann Gerardo by March 21, 2018. If it is not feasible for you to do so, or if you have any questions about this request for a second supplemental written response, please contact Assistant Counsel Gerardo at (202) 514-0873, or by e-mail at leslie.a.gerardo@usdoj.gov.

Thank you for your assistance in this matter.

Sincerely,

Robin C. Ashton
Counsel

---

[1]     You provided documents from the bankruptcy court as an exhibit to your November 15, 2017 written response. Those documents, however, do not contain birth date information for the bankruptcy petitioner, nor did you provide the publicly available documents from which you claim to have derived the birth date of attorney ▮▮▮▮ who appeared before you in the Arlington Immigration Court.

- 2 -

PLAINTIFF'S EXHIBIT 27   0161

To:          Leslie Gerardo
                 Assistant Counsel
                 U.S. Department of Justice
                 Office of Professional Responsibility

From:       Quynh Vu Bain
                 Immigration Judge
                 U.S. Department of Justice
                 Executive Office for Immigration Review

Date:       March 20, 2018

Re:         Response to OPR's Request for a Second Supplemental Written Response,
                 dated March 7, 2018

---

By letter dated March 7, 2018, the Office of Professional Responsibility requested that I provide additional information concerning the complaint that attorneys ███████████ and ███████████ filed on March 1, 2017 with the EOIR, Office of the Chief Immigration Judge. This Second Supplemental Response will incorporate by reference the information that I previously provided in the November 15, 2017 Response to the OPR's August 29, 2017 Inquiry Letter, as well as the First Supplemental Response filed with the OPR on or about February 12, 2018. For convenience, I have attached the running Exhibits list.

**(1)**     **February 1, 2017 Hearing in** ███████████


███████, ███████████

The OPR letter of March 7, 2018 requests an explanation of why I stated in my November 15, 2017 Response to OPR's inquiry that I went off-the-record only once during the

1

PLAINTIFF'S EXHIBIT 27   0162

hearing in ▆▆▆▆▆▆▆ when – according to OPR – the audio recordings indicate that I went off-record twice, the first time at 25:31 and the second time at 1:08:25.

In responding to this particular inquiry, I listened to the audio recordings of the entire hearing two more times. Although the DAR recordings contain a digital time stamp indicating that I did go off the record at 25:31 for approximately three minutes, I could not find any indication in the audio recordings that I actually went off-the-record at that point in the hearing. There are no apparent breaks or pauses in the audio recordings themselves. I do recall that early in the hearing, ▆▆▆▆▆▆▆ wanted to leave the courtroom to communicate with her paralegal by mobile phone. I do not recall that I turned off the audio-recording equipment at that point in the hearing. It is possible that I did not turn off the audio recorder, because the recordings indicate that ▆▆▆▆▆▆▆ was able to communicate with her paralegal while still inside the courtroom. In any case, if I did turn off the audio recorder, I am certain that no off-record conversation took place between ▆▆▆▆▆▆▆ and me, since she was communicating with another individual by mobile phone -- her paralegal.

Alternatively, the Digital Audio Recording (DAR) equipment may have paused momentarily at 25:31. This tends to happen when the volume of high-speed data transmissions overwhelms the DAR equipment. When this happens, the audio recorder stalls so that voice data can be backed-up into the benchtop computer. At the end of the workday, any audio recordings that are stored temporarily in the benchtop computer's hard drive are downloaded onto servers housed off-site. Since the 2014 migration "surge" began, the number of hearings in the Arlington court has increased by 30 percent (going from 26,000 cases before the surge to 39,000 cases at this time). This unprecedented increase in the number of cases, combined with the prioritization of all surge cases during the three-year period 2014 to 2017, has doubled the

2

PLAINTIFF'S EXHIBIT 27   0163

caseloads of judges like me who are assigned to handle "surge" cases almost exclusively. See November 15, 2017 Response, pp. 47-53. Consequently, the number of hearings conducted in the Arlington court every day can overwhelm the court's limited data transmission capability. This, in turn, can slow the pace at which voice data is recorded and uploaded onto the server after hours. In 2014, the Arlington court experienced this problem on a large scale, when Arlington judges conducted an unusually large number of hearings by video-teleconference (VTC). At the time, the Arlington court had insufficient bandwidth to record and back up all audio recordings on-site before they could be downloaded onto off-site servers. The insufficient bandwidths caused a large number of audio-recordings to be lost.

Additionally, it is important to note that there are times when the audio-recording equipment shuts off by itself for reasons that have nothing to do with an off-record exchange, or with voice data backing up onto the temporary server. Electrical surges running through GFCI outlets can cause equipment in the courtroom to shut off temporarily. There are at least 5 power sources that connect directly to the DAR equipment: the judge's benchtop computer; the video-teleconferencing equipment; the audio control module that has conference call capability; the microphones dedicated to the judge's bench, the microphones dedicated to counsel's tables, the interpreter's microphone, and the witnesses' microphones. In addition, other equipment that is not connected to the DAR equipment but uses the courtroom's data transmission network includes the legal assistant's desktop computer, DHS counsel's laptop computer which is connected to a high-speed internet port in the courtroom, and a printer/facsimile machine. Electrical currents running through any of the above equipment can cause the DAR to stall or shut off automatically, or to fail to stay turned on. This is a common problem.

3

PLAINTIFF'S EXHIBIT 27   0164

Finally, it should be emphasized that turning on or off the audio-recording equipment is a judgment call that should not be strictly regulated as a matter of ethical or professional conduct. This exercise of judgment is in the province of "courtroom control" over which judges must have discretion. On this topic judges' practices vary widely. Some judges leave the audio recorder turned on even during lengthy breaks, because they do not want to be accused of omitting off-record conversations that ought to be recorded. In my view, leaving the audio recorder turned on at all times would capture small talk or non-evidentiary communications that are not "record evidence" and should not be recorded. See INA 240(b)(4)(C); 8 C.F.R. 1240.9 (requiring the judge to keep a record of "all testimony and evidence produced at the proceeding."). Leaving the audio recorder turned on also runs the risks of capturing off-record discussions between the parties or attorney-client communications that are meant to be confidential. For this reason, I do not leave the audio-recorder turned on during breaks or when it is necessary to turn off the audio recorder. In any case, I do not recall having an off-record discussion or exchange with ██████ ██████████ at any point during the February 1, 2017 hearing in ██████████████.

According to the OPR's inquiry letter of August 29, 2017, ████████████ maintains that an unpleasant or hostile exchange took place off-the record while the audio-recording equipment was turned off at 25:01 and 1:08:01. This argument can easily be dismissed by examining the recorded exchanges that bookend the allegedly hostile off-record exchanges. The recorded exchanges reveal no animosity or hostility between ██████████ and me. While ██████████ might have resented my decision not to put off the hearing one more time at her request, her assertion that I berated her off-the-record twice during that hearing cannot be substantiated with any objective evidence. In fact, after the February 1, 2017 hearing in this matter, ██████████ filed a motion to withdraw her representation. In the motion, she stated

4

that her client had retained new counsel after the February 1, 2017 hearing and no longer desired her representation.  See November 15, 2017 Response, pp. 24-27; Exhibit 1, Tab N.  She provided no other reason for moving to withdraw from ▮▮▮▮▮ case.

    **(2)**    **Information Relating to** ▮▮▮▮▮▮▮

    The OPR's March 7, 2018 letter requests that I provide all documents relating to the bankruptcy proceedings of ▮▮▮▮▮ In response to the OPR's initial inquiry letter of August 29, 2017, I provided docket sheets showing two bankruptcy proceedings, one in 2013 and the other in 2017.  I did not print any other document and thus do not have anything more to share with the OPR.  As stated in my November 15, 2017 Response to the OPR' inquiry letter, I did cross check information that was publicly available to make sure that I had the right person.  If it turns out that I mistook ▮▮▮▮▮▮ for another individual of the same name, then I apologize to ▮▮▮▮ for this mistake.  It was not made with the intention to cast aspersions on her professional reputation, but only to refute her claim of judicial bias and unprofessional conduct, using evidence that was publicly available and admissible under Federal Rules of Evidence 806 and 608.  See November 15, 2017 Response, pp. 79-96.

    In this regard, it is important to note that ▮▮▮▮▮ initially did not offer any evidence to support her contentions that I conducted the February 16, 2017 hearing in ▮▮▮▮▮▮ (cases ▮▮▮▮ ) in an unprofessional manner.  See November 15, 2017 Response, pp. 87-90.  She relied solely on the non-evidentiary assertions of her then-attorney, ▮▮▮▮▮ and the affidavits of ▮▮▮▮ and ▮▮▮▮▮ paralegal, ▮▮▮▮▮  In the Complaint, ▮▮▮▮ asserted that I went off the record during the February 16, 2017 hearing in cases ▮▮▮ to engage a fellow immigration judge (John M. Bryant) in an impermissible ex parte conversation about another client of ▮▮▮▮  But ▮▮▮▮ failed to acknowledge

5

that the other client had a hearing scheduled before Judge Bryant on the same day and at the same time, and that I was actually trying to accommodate ███████ request that I combine the two hearings. As explained in the February 5, 2018 Motion to Reconsider, that off-the-record conversation with Judge Bryant was the direct result of ███████ failure to apprise the court, in advance, that she had two hearings before two different immigration judges on the same date and at the same time. See Exhibit 2, Tab F, pp. 3-4. She apparently was aware of the schedule conflict but deliberately did not tell me about it until 45 minutes into the hearing in cases ███████, when it became abundantly clear to her that I would not put off the merits hearing in cases ███████ to give ███████ additional time for preparation. See November 15, 2017 Response, pp. 55-60. At that point in the hearing, she asserted that Judge Bryant had agreed to consolidate case ███████ which was on his docket with cases ███████ which were on my docket. Accepting her representation as true, I agreed to take on the case on Judge Bryant's docket so that it could be heard in tandem with cases ███████ that morning. I then turned off the audio recorder and left the courtroom to arrange for the transfer of Judge Bryant's case to my docket. ███████ now asserts that I left the courtroom to have an ex parte conversation with Judge Bryant about her client's case. While it is true that I did have an off-record conversation with Judge Bryant, the purpose for doing so was to facilitate the transfer of Karla's case to my docket and to retrieve her case file for the hearing that morning. In other words, the off-record conversation was not impermissibly ex parte. It was necessitated by ███████ own failure to apprise the court of the schedule conflict of which she was clearly aware.

When ███████ finally introduced evidence to support her contention that I had acted unprofessionally toward her during the February 16, 2017 hearing, she filed a sworn declaration on July 21, 2017, claiming that she felt intimidated because of the aggression and hostility that I

6

allegedly displayed during the February 16, 2017 hearing.  As explained in the November 15, 2017 Response, the hearing record belies this claim.  The audio recordings show that ▮▮▮▮▮ was extremely ill-prepared for the hearing and asked to put it off once again, to await the arrival of additional evidence.  Her client's testimony later in the hearing would contradict ▮▮▮▮▮ claim.  Her client stated that ▮▮▮▮▮ already had the evidence (police records) that she claimed she did not have.  Even more, ▮▮▮▮▮ sworn declaration claims that she had filed separate <u>written</u> motions seeking to consolidate four additional cases with cases ▮▮▮▮▮, and that those motions were still pending before other judges when I denied her consolidation request.  This claim is also belied by court records, which show that she did not file written consolidation motions.  See Exhibit 1, Tab X.  Furthermore, the audio recordings of the February 16, 2017 hearing show that I explained to her why three of the four individuals were not eligible for consolidation.  I also offered to consolidate the fourth individual's case (case ▮▮▮) after determining that that case could be consolidated with the lead cases ▮▮▮▮▮.  I then went-off-the-record to let Judge Bryant know that I had agreed to consolidate case ▮▮▮ with cases ▮▮▮▮▮.  Because ▮▮▮▮▮ sworn declaration omits mention of the above critical facts, it clearly constitutes serious misrepresentations for which disciplinary action would be appropriate.  Nothing in the record of proceedings supports her claim that I had displayed belligerence or hostility toward her, or that my refusal to consolidate all of her clients' cases for same-day hearings had violated a standard of ethical or professional conduct.

Because ▮▮▮▮▮ waited until July 21, 2017 to file her errant sworn declaration – long after I responded to her April 17, 2017 recusal motion in cases ▮▮▮▮▮, she cannot complain that the Board erred in dismissing her interlocutory appeal.  See Exhibit 1, Tab W.

7

**(3)     Information Relating to Ms. Marlene Wahowiak's Application for an Immigration Judge Position.**

The OPR's March 7, 2018 Request for Supplemental Information requests that I explain why I introduced information relating to Ms. Wahowiak's and Ms. Jean King's applications for immigration judge positions in the Arlington Immigration Court. To answer OPR's question about where the information came from and whether it was publicly available, I acknowledge that I found the information on the EOIR's Intranet. It was published on the Office of the Chief Immigration Judge's webpage. The webpage is accessible by all OCIJ employees and EOIR management. Though I do not know exactly why this information was published on the EOIR Intranet, I believe that it was required to be published in the aftermath of the DOJ's Office of Inspector General's report, dated November 20, 2014. In that report, the DOJ Office of Inspector General found that EOIR senior management officials had engaged in prohibited personnel practices such as nepotism. The OIG report found that such practices violated both federal law and the Office of Government Ethics' Standards of Conduct for Executive Branch Employees. After the Office of Inspector General's report was published, the OCIJ webpage posted immigration judge applications from the two-year period 2012 to 2014. Among the published applications were Ms. Wahowiak's and Ms. King's.

Ms. Wahowiak is not the OGC's or the agency's ethics officer. She is a non-managerial attorney assigned to the OGC's Employee and Labor Relations (ELR) Unit. See Exhibit 2, Tab U (attached). To my knowledge, her responsibilities include representing EOIR management against actions brought by EOIR employees. As such, she should not have responsibility for handling or resolving disputes between EOIR employees and members of the general public, for such an assignment would likely bring her into conflict with her duties as a management

8

representative.  Also, the 2010 protocol implementing the OCIJ's Complaint Resolution Program provides that the OCIJ is solely responsible for fielding, investigating, and resolving complaints that are filed against immigration judges under that program.  For these reasons, I am particularly concerned about Ms. Wahowiak's involvement in resolving the ███████████ complaint on behalf of OCIJ and her apparent role in referring the complaint to OPR.  Her involvement in this matter presents a potential conflict of interests, for several reasons.

First and most obviously, Ms. Wahowiak was an unsuccessful candidate for an immigration judge position in the Arlington Immigration Court, where I work.  Her application coincided with the two-year period (from 2012 to 2014) during which I tried to secure a transfer to the Arlington Immigration Court, for health reasons.  Although I was already hearing cases out of the Arlington court, I had to apply for an official transfer to the Arlington court because my then-supervisor, ACIJ Christopher Santoro, did not agree to take me off an all-video conference docket to alleviate my medical condition.  My application for a transfer to the Arlington court was a request for a reasonable medical accommodation.  When the reasonable accommodation request was denied, I filed an EEO complaint against the agency in 2014.  The OGC's Labor and Employee Relations Unit handled that complaint and assigned attorneys to defend EOIR management against the EEO complaint.  An ELR attorney prepared my performance evaluation for the year 2015; the evaluation was unfavorable and was used to disqualify me from a transfer to the Arlington court.  A year later (in 2016), the agency reversed course and transferred me to the Arlington Immigration Court.  That same year, the ELR attorney who prepared my 2015 performance evaluation that was used to disqualify me from a transfer was appointed an immigration judge.  Two other OGC attorneys were also appointed as immigration judges in the Arlington court.

9

Although I have secured a reassignment to the Arlington court, the agency has continued to retaliate against me for engaging in prior EEO activity (i.e., for filing the 2014 EEO complaint).[1] On August 1, 2017, the agency issued another unfavorable performance evaluation. That evaluation was based, in part, on a vague and unsubstantiated assertion of "unprofessional exchanges" in court proceedings. The problem with the 2017 performance evaluation, however, was that the allegations of professional misconduct had not yet been proven. The OPR inquiry was not initiated until August 29, 2017. Because the 2017 performance evaluation preceded the OPR inquiry, the most logical conclusion is that the referral to OPR was meant to buttress the allegation of misconduct that OCIJ has already made in my most recent performance evaluation.

Second, Ms. Wahowiak's involvement in referring the ███████████ complaint to OPR may have violated statutes and policies governing discipline of immigration judges. Since its inception in 2010, the OCIJ Complaint Resolution Program (CRP) has existed outside of any statutory or regulatory process for the resolution of immigration court cases. The flawed CRP encourages dissatisfied litigants to eschew the statutory and regulatory case adjudication processes, in favor of securing informal resolutions of their court cases by the OCIJ. Statistics from the 4-year period between 2013 and 2017 show that an astonishing 50 percent of complaints were filed by respondents or their attorneys, while only 3 percent of complaints originated in the federal courts, and no complaints were initiated by the OPR or the OIG or the media. These remarkable numbers illustrate that OCIJ's definition of "complaint" is unconstitutionally overbroad and vague, sweeping in many more complaints than what the federal courts and the OPR would consider to be legitimate. Through the CRP, the OCIJ

---

[1] As noted in the November 15, 2017 Response, p. 9, note 3, other retaliatory motives, such as political affiliation and a high asylum denial rate, cannot be ruled out.

10

PLAINTIFF'S EXHIBIT 27   0171

exercised disciplinary authority that properly belonged to the OPR and the OIG, but unlike the OPR's and OIG's processes, the CRP is so fundamentally flawed that its potential to ruin a judge's career cannot be understated. When the OCIJ finds that a judge has committed "inappropriate conduct," the OCIJ not only can overturn the judge's decision in individual cases, it also can impose disciplinary sanctions to include suspension and termination, with minimal or no civil service protections. Beyond damage to one's professional reputation, the haphazard manner in which the CRP is operated has resulted in the disclosure of privacy-protected information that is compiled and stored in the CRP database. As a result of FOIA litigation in federal court, the agency in 2016 was forced to disclose privacy-protected information concerning 30 percent of immigration judges, without giving the affected judges notice or an opportunity to respond.

What is more troubling in this situation is that OCIJ has abdicated its responsibility to properly investigate and resolve the ▮▮▮▮▮▮▮ complaint. Ms. Wahowiak has no supervisory authority over me, is not in my chain-of-command, and can have no oversight or disciplinary authority because she is a lower-ranking GS-14 employee. As such, Ms. Wahowiak should not have participated in this disciplinary matter. I recognize that Ms. Wahowiak had worked in OPR for 17 years and, during that time, her specialty was to investigate immigration judges for professional misconduct and unethical behavior. Nevertheless, because her current role as an ELR attorney is to represent management in employment-related disputes with EOIR employees, her involvement in the referral of the ▮▮▮▮▮▮▮ complaint to OPR is highly unusual. Nothing in the CRP protocol assigns an ELR attorney the authority to investigate, adjudicate, or refer a CRP complaint to OPR. That Ms. Wahowiak was copied on the August 29,

11

2017 letter of inquiry that the OPR Counsel sent to the EOIR General Counsel strongly suggests her involvement in the OPR inquiry even before it was initiated on August 29, 2017.

For these reasons and for the reasons stated in my November 15, 2017 Response and February 7, 2017 Supplemental Response, I respectfully request that the OPR dismiss the complaint. Alternatively, for the reasons stated in this Second Supplemental Response and in my February 5, 2017 Motion for Reconsideration filed with the Board of Immigration Appeals (see Exhibit 2, Tab S), I request that the OPR refer this matter to the Attorney General for resolution.

Respectfully submitted,


Quynh Vu Bain
Immigration Judge
Arlington, Virginia

12

**Bain, Quynh (EOIR)**

| | |
|---|---|
| **From:** | Tabaddor, A. Ashley (EOIR) |
| **Sent:** | Friday, October 4, 2019 8:19 PM |
| **To:** | All of Judges (EOIR) |
| **Subject:** | The IJ Complaint Process |
| **Attachments:** | PRAO Opinion.pdf |

Dear Colleagues,

As you may be aware, EOIR maintains a *Complaint Process* in which it solicits complaints from all sources against Immigration Judges.  The process is set forth in the following documents which are accessible through the public DOJ website.

> *Process for Handling Complaints Against EOIR Adjudicators*
> EOIR Adjudicator Complaint Process Summary (PDF)
> EOIR Adjudicator Complaint Process Flowchart (PDF)

The NAIJ has a longstanding concern about the nature of this program for a host of reasons including that:

> (a) the complaint process is inconsistent with any judicial model
> (b) the Agency definition of "complaint" is so broad to include registering random comments, public posts, or media coverage about judges as "complaints";
> (c) the review process lacks transparency and fails to provide adequate due process to Immigration Judges who often are not even provided a copy of the full complaint to respond to the allegations against them.

More troubling, the Agency trolls the Internet in search of "complaints" against judges, and *solicits* "complaints" from DHS, the public, and court personnel.

Further compounding the issues, the Agency routinely forwards "complaints" that are *ex parte* in nature to the Immigration Judge for his or her response.  As was highlighted during the IJ training, there are serious ethical implications related to a judge's role with *ex parte* communications.  Taken together with the Agency's recently announced PM 19-14, the IJ Complaint Process creates serious potential pitfalls for judges who may not be aware of the conflicting position the judges may find themselves when the IJ Complaint process intersects with their ethical duties as judges and government employees relating to *ex parte* communications.

Accordingly, we wanted to ensure that all judges are aware of these issues.  *See e.g.*, attached Legal Advice provided by the DOJ Professional Responsibility Advisory Office (PRAO).  We are here to help.  Please feel free to contact us with any questions or concerns.

Sincerely,


Ashley Tabaddor

1

PLAINTIFF'S EXHIBIT 27   0174

*The Honorable A. Ashley Tabaddor, President*
National Association of Immigration Judges
606 S. Olive St., 15th floor
www.naij-usa.org
213-534-4491 (direct office line)
BEST E-MAIL: ashleytabaddor@gmail.com

**DISCLAIMER**: The author is the President of the National Association of Immigration Judges. The views expressed here do not necessarily represent the official position of the United States Department of Justice, the Attorney General, or the Executive Office for Immigration Review. The views represent the author's personal opinions, which were formed after extensive consultation with the membership of NAIJ.

**From:** Morgulec, James A. (PRAO) <jamorgulec@jmd.usdoj.gov>
**Sent:** Friday, June 28, 2019 6:10 PM
**To:** Tsankov, Mimi (EOIR) <Mimi.Tsankov@EOIR.USDOJ.GOV>
**Cc:** Zeleke, Quadira (PRAO) <qzeleke@jmd.usdoj.gov>; Cash, Michael (PRAO) <mcash@jmd.usdoj.gov>
**Subject:** PRAO Inquiry


Hi Mimi:

This e-mail memorializes and supplements, with citation to applicable legal authority, the oral advice provided to you in response to your inquiry on June 25, 2019.

**I.      Summary of Advice.**

Issue: The issue you raise concerns what steps are appropriate when a litigating attorney in an immigration proceeding complains about an immigration judge to the judge's supervisor, who then relates, ex parte, the substance of the complaint to the judge while the matter still is pending?

Answer:  Remediation by disclosure to all parties may be a remedy. More egregious instances may be reported to OPR and/or EOIR management. Recusal might be appropriate in certain situations.

**II.     Facts.**

You are an Immigration Law Judge and Grievance Chair for the National Association of Immigration Judges.  On June 25, 2019, you forwarded to PRAO Senior Legal Advisor Kandi Wilcox the following email inquiry:

*Dear Ms. Wilcox:*

*Thank you for your informative presentation on June 20, 2019 to the Immigration Judges at the annual EOIR training.*

*I serve as both an Immigration Judge and as Grievance Chair of the National Association of Immigration Judges ("NAIJ"). In my NAIJ capacity, I have received a follow-up inquiry from our Immigration Judge membership about a Judge's responsibilities when the Judge learns about a party's displeasure regarding the Judge's handling of a pending case by way of EOIR's complaint process.  A copy of the internal complaint process, developed as required by regulation at 8 C.F.R. § 1003, is attached here for ease of access.*

*While the regulations require that the process "respect[] [the Judges'] roles as adjudicators" (8 C.F.R. § 1003.10(b)(v)), as a practical matter, the process often results in supervisory Judges __furthering__ ex parte communications about pending cases to Judges, frequently where a Judge has not yet made a final ruling in a case.*

*Based on your presentation, where a supervisory Judge (usually an Assistant Chief Immigration Judge ("ACIJ")) communicates the substance of such ex parte communication to a Judge, what should be the response?*
*(1) Should the Judge report the ACIJ's ex parte communication to the Professional Responsibility Advisory Office ("PRAO"), DOJ's Office of Professional Responsibility ("OPR"), the ACIJ's state bar, or the bar of the controlling jurisdiction?*
*(2) Does the __Supervisory__ Judge, if directed to bring such ex parte communication to the attention of the Judge by the ACIJ's supervisor, such as a Deputy Chief Immigration Judge ("DCIJ")), have a duty to report the communication to PRAO, OPR, the DCIJ's state bar, or the bar of the controlling jurisdiction?*
*(3) Should the parties to the case be informed of the ex parte communication?*
*(4) Should the Judge recuse him/herself from the affected case?*
*Thank you in advance for your assistance. I am cc'ing additional NAIJ leadership on this email and invite your response to include them as cc's, as well.*

*Respectfully,*

*Mimi Tsankov*

I was on duty and agreed to handle your inquiry. I called you to seek clarification and we discussed your inquiry over the phone. The situations that caused you and your colleagues concern generally occurred along the following lines:

An attorney representing a litigant, perhaps a DHS attorney (though it could be a private attorney), formally or informally registers a complaint regarding an immigration judge's conduct in an ongoing proceeding with the judge's supervisor, the Assistant Chief Immigration Judge (ACIJ). The ACIJ then communicates the substance of the complaint to the judge, before the judge has made a final ruling on the case at hand.

The pattern of communication from litigant to ACIJ to immigration judge results in an indirect ex parte communication with the court concerning a pending proceeding. The judge may be influenced by the communication with respect to the matter; the other side likely is wholly unaware of it.

Upon listening to Kandi's presentation, it occurred to you and your fellow judges that engaging in such communications could constitute ex parte communication in violation applicable rules of professional conduct.

### III.    Choice of Law.

Because your inquiry applied to a pattern of practice that was occurring in immigration courts in many jurisdictions, I applied the ABA Model Rules of Professional Conduct.

### IV.    Advice/Analysis

I advised that, because immigration judges, supervisory judges, and practicing attorneys appearing in immigration courts all are practicing attorneys who are admitted to a state bar and are required to abide by their state's rules of professional Conduct, your inquiry implicated Model Rule 3.5, which states, in relevant part:

> A lawyer shall not:
>
>> (a)  seek to influence a judge, juror, prospective juror or other official by means prohibited by law;
>>
>> (b)  communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order.

ABA Model R. Prof'l Conduct 3.5(a) and (b).

As immigration judges, you also are prohibited from engaging in ex parte communications, with limited exceptions. The Ethics and Professionalism Guide for Immigration Judges is specific. It states:

> An Immigration Judge should not initiate, permit, or consider ex parte communications, or consider other communications made to the Immigration Judge outside the presence of the parties or their lawyers, concerning a pending matter, except as follows:
>
>> (1)  When circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted, provided that the Immigration Judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication.
>>
>> (2)  An Immigration Judge may consult with court staff and court officials, including supervisors, whose functions are to aid the Immigration Judge in carrying out the Immigration Judge's adjudicative responsibilities, or with other Immigration Judges, provided the Immigration Judge makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility to personally decide the matter.
>>
>> (3)  An Immigration Judge may initiate, permit, or consider any ex parte communication when expressly authorized by law to do so.

PLAINTIFF'S EXHIBIT 27    0178

> If an Immigration Judge inadvertently receives an unauthorized ex parte
> communication bearing on the substance of a matter, the Immigration Judge
> should make provision to promptly notify the parties of the substance of the
> communication and provide the parties with an opportunity to respond, or to
> recuse himself or herself if appropriate.

The Ethics and Professionalism Guide for Immigration Judges III, Section XXXII, Ex Parte
Communications.  Though the Code of Conduct for U.S. Judges is not specifically
applicable to immigration judges, it nevertheless provides useful guidance.  Canon 3(A)(4)
states:

> A judge should accord to every person who has a legal interest in a proceeding,
> and that person's lawyer, the full right to be heard according to law. Except as set
> out below, a judge should not initiate, permit, or consider ex parte
> communications or consider other communications concerning a pending or
> impending matter that are made outside the presence of the parties or their
> lawyers.

The litigating attorneys' conduct also implicates Model Rule 8.4(f), which prohibits a
lawyer from engaging in conduct that might cause a judge to run afoul of the judge's
professional responsibilities.  *See* Model R. Prof'l Conduct 8.4(f) ("A lawyer shall not . . .
knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules
of judicial conduct or other law").

There is authority to support the proposition that administrative tribunals are covered by the
ex parte rule.  *See, e.g. Matthew Zaheri Corp. v. Mitsubishi Motor Sales of Am.*, 64 Cal.
Rptr. 2d 705 (Cal. Ct. App. 1997) (there is no principled distinction between a judge and an
administrative law judge for purposes of the ethical strictures against *ex parte* contacts); *In
re Smith*, 670 P.2d 1018 (Or. 1983) (the *ex parte* contacts rule applies to administrative
hearing officers just as it applies to judges); *In re Burrows*, 629 P.2d 820 (Or. 1981)
(Oregon's *ex parte* rule applies to administrative hearing officers).

Although I did not locate any authorities specifically opining that ex parte communications
with a judge's supervisor breached the ex parte rule, there are cases and bar opinions
making clear that the rule covers communications beyond those between the presiding
judge and the parties appearing before the judge.  *See, e.g. In re J.B.K.*, 931 S.W.2d 581
(Tex. App. 1996) (lawyer's attempt to solicit or receive information about the merits of a
pending case from an appellate court staff member regarding whether he should settle the
case prior to the issuance of the opinion constituted an impermissible *ex parte*
communication with chambers); *In Re Tesmer*, 580 N.W.2d 307 (Wisc. 1998) (in judicial
disciplinary proceedings, the Supreme Court held that judge's misconduct in having
ongoing and persistent discussions of dispositive motions in cases pending before her with
a law professor and friend unconnected with the judicial system, and her use of his
assistance to draft opinions in those matters, warranted a reprimand); Ass'n of the Bar of
the City New York Comm. on Prof'l and Judicial Ethics, Formal Op. 96-95 (1996) (letter
written to a judge by a bar association concerning a pending proceeding should not be
considered by the judge and, under the circumstances presented, should be sent to
defendant's lawyer, the District Attorney and the Presiding Justice of the Appellate

Division. Clearly, the letter is a communication "made to the judge outside the presence of the parties or their lawyers concerning a pending or impending proceeding.")

*In sum, the pattern of practice you described is problematic, and may be considered a violation of Model Rule 3.5 and Section XXXII of the Ethics and Professionalism Guide for Immigration Judges.*

## Disclosure to all the Parties

In your email above, you asked whether disclosure to the parties is a suitable remedy to such ex parte contacts. I said yes. I advised that, in circumstances like those you described, disclosure of the communication by the immigration judge to all parties generally will be the appropriate remedial measure. *See,* Ethics and Prof'l Guide XXXII ("If an Immigration Judge inadvertently receives an unauthorized ex parte communication bearing on the substance of a matter, the Immigration Judge should make provision to promptly notify the parties of the substance of the communication and provide the parties with an opportunity to respond, or to recuse himself or herself if appropriate."). Any statement by the immigration judge to one party must be made to all parties. Notification to all parties provides everyone with an opportunity to respond. *See also, e.g.* Code of Conduct for U.S. Judges, Canon 3(A)(4) ("If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.").

## Reporting Obligations

You specifically inquired whether an immigration judge had a duty to report the ex parte communication from the supervisory judge to PRAO, or to OPR, or to the supervisory judge's state bar, or the state bar in which the particular immigration tribunal sits.

I note here that, in many circumstances, disclosure to all the parties might be a sufficient form of remediation and no further "reporting" is required.

I advised that no "report" was necessary to PRAO. I said that PRAO is an advisory office only, although an immigration judge could (but is not required to) contact PRAO for advice in ascertaining whether a given set of circumstances warranted remedial action or reporting on their part.

In circumstances in which remediation by disclosure is not deemed to be an adequate remedy, or where a violation appears to be egregious, I advised that, in accordance with Department policy, the immigration judge should not contact either state bar directly, but rather should contact OPR. I explained that OPR would determine whether a complaint to the disciplinary committee of a state bar was warranted, and would assume responsibility for filing the complaint or inquiry.

With respect to the question of egregiousness, and determining when reporting to an authority becomes a professional obligation, we turn to Model Rule 8.3, which provides:

PLAINTIFF'S EXHIBIT 27    0180

(a) A lawyer who knows that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate disciplinary authority.

(b) A lawyer who knows that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority.

Model R. Prof'l Conduct 8.3(a) and (b).

Though we did not discuss it, I note here that the reporting obligation under Model Rule 8.3 is reserved for violations that raise a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer. Comment [3] following Model Rule 8.3 states:

If a lawyer were obliged to report every violation of these rules, the failure to report any violation would itself be a professional offense. Such a requirement existed in many jurisdictions but proved to be unenforceable. This Rule limits the reporting obligation to those offenses that a self-regulating profession must vigorously endeavor to prevent. A measure of judgment is, therefore, required in complying with the provisions of this Rule. The term "substantial" refers to the seriousness of the possible offense and not the quantum of evidence of which the lawyer is aware.

I mentioned during our conversation that, for a Department Attorney, notification to OPR is sufficient for this purpose. This conclusion is buttressed by additional language in Model Rule 8.3 Comment [3]:

A report should be made to the bar disciplinary agency unless some other agency, such as a peer review agency, is more appropriate in the circumstances. Similar considerations apply to the reporting of judicial misconduct.

Model R. Prof'l Conduct 8.3 Cmt. [3].

Generally, Department attorneys have an obligation to abide by Department policies, such as those found in the Justice Manual. *See, e.g.,* Model R. Prof'l Conduct 1.2(a) (requiring an attorney to abide by a client's decisions regarding the objectives and general methods of representation). One such policy involves reporting to a supervisor any non-frivolous allegation of misconduct. *See* Just. Manual § 1-4.300. ("Department employees shall report to their supervisor any evidence or non-frivolous allegation that a Department attorney engaged in professional misconduct. Department employees also shall report to their supervisor any evidence or non-frivolous allegations of misconduct against Department law enforcement personnel that relate to allegations of attorney misconduct within the jurisdiction of OPR. Misconduct constitutes professional misconduct when it relates to an attorney's responsibility to investigate, litigate, or provide legal advice. The supervisor

shall evaluate whether the allegation is non-frivolous and the misconduct is of a serious nature; if so, the supervisor shall report the allegation to OPR through the component. An employee may also report misconduct allegations directly to OPR.").

PRAO does not provide advice about Department policies or substantive law matters. That said, in the situation you describe, if an immigration judge wished to report potential misconduct by their ACIJ, or that involved their ACIJ, it may be appropriate to report the contact to the supervisory judge's supervisor (e.g., the Deputy Chief Immigration Judge (DCIJ)) or to OPR directly. As noted above, Department policy allows reporting to OPR directly.

Though we did not discuss it, I note here that there may be circumstances falling within the hypothetical situation you described in which a lawyer's duty of confidentiality enters into the equation. Model Rule 1.6 governs a lawyer's duty of confidentiality. It provides that:

> A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b).

Model R. Prof'l Conduct 1.6(a). The lawyer's duty of confidentiality is broad, and includes both privileged and non-privileged information acquired by a lawyer in the course of his representation of a client. In the present case, because immigration judges are Department lawyers, they represent the United States, even though their role is not as an advocate for the United States. An issue arises whether, if an immigration judge wishes to disclose ex parte communications to which he is privy to all the parties, or to disclose the communications in reporting to OPR, he has a duty to obtain the consent of his or her client, which in this case likely would be the head of EOIR, or perhaps the Chief Immigration Judge or his or her designee.

I note here that sharing information with OPR does not violate Rule 1.6; OPR is part of the Department of Justice, and that office, together EOIR management, could decide what disclosure to a bar is permissible or appropriate. As an aside, I note that a report of misconduct is not required where it would involve a violation of Rule 1.6. Model R. Prof'l Conduct 8.3(c). I also believe that, in the context of remedial disclosure to all parties of an ex parte contact by a single party, an argument can be made that disclosure to all parties is "impliedly authorized" as part of an immigration judge's job; as noted above, disclosure of ex parte contacts is required by the Ethics and Professionalism Guide that Immigration Judges are required to follow.

<u>Recusal</u>

Finally, you asked whether recusal of the immigration judge from the proceeding is necessary. My answer is that it might be an appropriate remedial measure in certain circumstances. I note that Section XXXII of the Ethics and Professionalism Guide provides that an immigration judge should recuse himself or herself if "appropriate." The Guide does not spell out what this means.

The Code of Conduct for U.S. Judges, which provides useful guidance even if not expressly applicable, states:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Code of Conduct for U.S. Judges, Canon 3(C)(1)(a).

If, because of the ex parte contact, a judge's impartiality might reasonably be questioned, i.e., the judge may have a personal bias or prejudice concerning a party, recusal may be appropriate.

Likewise, recusal might be appropriate if the general conflict of interest provision applicable to all attorneys becomes relevant. Model Rule 1.7 states, in relevant part:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. *A concurrent conflict of interest exists if:*

> . . .

> *(2) there is a significant risk that the representation of [a] client[] will be materially limited by . . . a personal interest of the lawyer.*

> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

> (2) the representation is not prohibited by law;

> . . . and

> (4) each affected client gives informed consent, confirmed in writing.

If an immigration judge believes that his or her performance as a judge will be "materially limited" by a "personal interest," recusal may be appropriate. In the situation you described, if the immigration judge is so angry at an attorney in a matter as a result of a complaint lodged against him or her with the judge's supervisor that the judge cannot be objective, recusal may be appropriate. Likewise, if, because of the complaint, the immigration judge feels an incentive to attempt to garner favor with the complaining attorney, recusal might be appropriate on this basis as well.

Where this situation appears to exist, but the judge believes he or she can be objective and competent, informed consent confirmed in writing from the Chief Immigration Judge or a designee within EOIR may be obtained. Model R. Prof'l Conduct 1.7(b).

If you have questions, please do not hesitate to contact me.

Best regards,

*Jim*
James A. Morgulec
Legal Advisor
U.S. Department of Justice
Professional Responsibility Advisory Office (PRAO)
1425 New York Avenue, N.W., Suite 12000
Washington, D.C.  20530
Main: (202) 514-0458

This advice is based on the facts presented.  If the facts are different or change, further analysis may be required.  In that event, please contact PRAO by e-mail at DOJ.PRAO@usdoj.gov or by telephone at (202) 514-0458.  Finally, this memorandum is confidential and is protected by the attorney-client privilege, the work product doctrine, and the deliberative process privilege.  It is only for the use of Department of Justice attorneys and any necessary use by their legal staff during their tenure at the Department and should not be disseminated to any other individuals, whether they are employed by the Department of Justice or elsewhere.



OOD
PM 19-14

Effective: August 16, 2019

To:        All of EOIR
From:      James R. McHenry III, Director
Date:      August 16, 2019

## ALLEGATIONS OF MISCONDUCT BY EOIR ADJUDICATORS
## AND *EX PARTE* COMMUNICATIONS

| | |
|---|---|
| PURPOSE: | Provides clarity regarding communications with EOIR regarding allegations of adjudicator misconduct. |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | None |

The Executive Office for Immigration Review (EOIR) takes seriously allegations of adjudicator misconduct, especially when such allegations concern the integrity of the hearing process.[1] EOIR, therefore, provides a procedure through which government entities or the public, including parties to proceedings, may report allegations of misconduct.[2] Stakeholders also periodically raise issues of adjudicator conduct directly with EOIR supervisors and management, which may, in turn, be treated as complaints.

To promote the integrity and professionalism of immigration adjudications, including immigration court proceedings, appellate reviews, and administrative hearings, EOIR expects all of its adjudicators, including immigration judges, members of the Board of Immigration Appeals, and administrative law judges, to adhere to the highest standards of ethical conduct and professionalism and to maintain impartiality in order to ensure public confidence regarding proceedings before the agency.

Such conduct includes the general avoidance of *ex parte* communications, defined as contact between an adjudicator presiding over a proceeding and one party to the proceeding during which the opposing part is not present or included. *See Ethics and Professionalism Guide for Immigration*

---

[1] *See* Department of Justice, *Summary of EOIR Procedure for Handling Complaints Concerning EOIR Adjudicators* (Oct. 15, 2018), https://www.justice.gov/eoir/page/file/1100946/download.
[2] *Complaints Regarding EOIR Adjudicators*, Department of Justice, https://www.justice.gov/eoir/complaints-regarding-eoir-adjudicators (last visited May 3, 2019).

EOIR closely scrutinizes formal written complaints or government referrals that attempt to harass, threaten, intimidate, or retaliate against its adjudicators. Coercing or attempting to coerce an adjudicator through a retaliatory complaint or willfully threatening an adjudicator may subject a practitioner to disciplinary sanction. Similarly, coercing or attempting to coerce an adjudicator through a government referral may subject the referrer to corrective action.

EOIR expects both adjudicators and parties to its proceedings to comport themselves with professionalism and integrity. It expects adjudicators to act in a neutral and detached manner, to be faithful to the law and to maintain professional competence in it, and to refrain from giving preferential treatment to any organization or individual when adjudicating cases. It also expects parties and stakeholders to raise legitimate concerns about conduct, rather than simply make *ad hominem* attacks against adjudicators or express disagreement with the outcome of a particular case. Mutual respect and professionalism between adjudicators and parties is essential for ensuring that EOIR continues to fulfill its mission.

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please contact your supervisor if you have any questions.

---

PLAINTIFF'S EXHIBIT 27   0187