## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **QUYNH VU BAIN,** | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| **OFFICE OF THE ATTORNEY GENERAL** U.S. Department of Justice, | ) | |
| **OFFICE OF THE DEPUTY ATTORNEY GENERAL** U.S. Department of Justice, | ) | **No. 21-Civ-1751 (RDM)** |
| **OFFICE OF PROFESSIONAL RESPONSIBILITY** U.S. Department of Justice, | ) | |
| **EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**, U.S. Department of Justice, | ) | |
| **OFFICE OF INFORMATION POLICY** U.S. Department of Justice, | ) | **Jury Trial Demanded for Second and Third Causes of Action** |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

Plaintiff Quynh Vu Bain, proceeding *pro se*, brings this action against the United States Department of Justice and its various named components, collectively referred to as "Defendants."

### Nature of Action

1.     This action asserts two separate but related causes of action arising from Defendants' September 17, 2020 decision to terminate Plaintiff's employment after 29 years of

1

exemplary service in the U.S. Department of Justice. *See* Exhibit 1 (ECF No. 53-2 at 195-223) (Sealed).

**Parties**

2.     Plaintiff is a resident of the District of Columbia and a citizen of the United States. She is an Asian-American female of Vietnamese descent in her fifties. She was employed as a career civil servant in the U.S. Department of Justice from October 1991 to September 2020. Most recently, she served as an Immigration Judge in the Executive Office for Immigration Review for 12 years. At various times, she was assigned to the Headquarters Immigration Court in Falls Church, Virginia and the Arlington Immigration Court in Arlington, Virginia.

3.     Until March 2021, Plaintiff was represented by attorneys who specialized in government investigations and labor and employment law. At the present time, Plaintiff is representing herself.

4.     All of the offices and agencies collectively denoted as Defendants are components of the United States Department of Justice.

The Office of the Attorney General ("OAG") makes hiring, firing, and other personnel-related decisions concerning immigration judges.

The Office of the Deputy Attorney General ("ODAG") formulates and recommends disciplinary or adverse actions against immigration judges.

The Office of Professional Responsibility ("OPR") investigates allegations of misconduct involving Department attorneys, including immigration judges.

The Office of Information Policy ("OIP") adjudicates appeals from the decisions of individual DOJ components to withhold information that is requested under the Freedom of Information Act and the Privacy Act.

The Executive Office for Immigration Review ("EOIR") manages the operations of the Nation's 58 immigration courts through the Office of the Director, Office of the Deputy Director, and Office of the Chief Immigration Judge.  At the time of Plaintiff's employment, the Office of the Chief Immigration Judge had three Deputy Chief Immigration Judges and approximately sixteen Assistant Chief Immigration Judges.  The assistant chief judges ("ACIJ's") oversee the day-to-day work of non-supervisory immigration judges.

### Jurisdiction and Venue

5.      This civil action consolidates two separate but related causes of action arising from Defendants' decision to terminate Plaintiff's employment.  This Court has subject matter jurisdiction under the following statutes:

The Freedom of Information Act and the Privacy Act, 5 U.S.C. §§ 552 & 552a;

The Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*;

The Civil Service Reform Act (CSRA) of 1978, 5 U.S.C. §§ 1204, 7701, 7702, and 7512;

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*;

The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*;

The federal question statute, 28 U.S.C. § 1331;

The mandamus statute, 28 U.S.C. § 1361; and

The declaratory judgment act, 28 U.S.C. § 2201.

### Factual Background

6.      After performing her job satisfactorily for seven years, Plaintiff became the target of an agency scheme to take away her immigration judge position, so that it could be given to an immigration judge candidate Defendants favored.  This scheme began in January 2015 and ended with Plaintiff's wrongful termination in September 2020.  It targeted Plaintiff for removal after

she became ill as a result of using malfunctioning video-conference equipment to conduct court hearings.

7.     To carry out the scheme, Plaintiff's supervisors in the agency where she worked, the Executive Office for Immigration Review ("EOIR"), undertook a series of discriminatory and retaliatory adverse personnel actions that created a hostile work environment for Plaintiff.  Those highly questionable and illegal maneuvers put tremendous pressure on her to quit her job or accept a demotion so that her full-time employment position could be given to a favored immigration judge candidate.  The hostile personnel actions were also meant to retaliate against Plaintiff for pursuing an EEO complaint against EOIR in 2014 and again in December 2015, after her request to transfer to the Arlington court was denied for the second time.  Those discriminatory and retaliatory actions are well-documented in Plaintiff's December 2015 Complaint of Discrimination, August 2016 first amendment, and May 2018 second amendment to the complaint. *See* Exhibit 3 (ECF 63-3 at 14).  They are discussed further below.

**The Campaign to Purge Plaintiff From EOIR**

8.     In January 2015, former Chief Immigration Judge Mary Beth Keller admonished Plaintiff for communicating by email in a "rude" and "disrespectful" manner, after Plaintiff complained about persistently malfunctioning tele-videoconference ("VTC") equipment that had prevented her timely completion of assigned court hearings in detained cases and made her sick with migraine headaches.  *See* Exhibit 13 (ECF No. 64-2 at 9-18, 21-29).

9.     In February 2015, Plaintiff's then-supervisor, Assistant Chief Immigration Judge Christopher A. Santoro, assigned Plaintiff to an indefinite detail to the Immigration Court in York, Pennsylvania.  *See* Exhibit 13 (ECF No. 64-2 at 35-38).  He also reassigned over 100 aged, detained York cases from the dockets of white male immigration judges to Plaintiff's docket and

directed her to complete those hearings expeditiously. *See* Exhibit 13 (ECF No. 64-2 at 30-35). *See also* Exhibit 3 (ECF 63-3 at 5). As many of the detainees in those 100 cases had filed habeas corpus petitions seeking immediate release from immigration custody, Plaintiff was concerned about the heightened litigation risks that their cases posed to the agency, as well as her own professional and personal (Bivens) liability. *Id.*

10.     In March 2015, ACIJ Santoro issued a reprimand letter that criticized Plaintiff for displaying intemperate behavior toward him after she objected to a work assignment that would have caused her to violate the law governing immigration detention. *See* Exhibit 3 (ECF 63-3 at 5-6). *See also* Exhibit 13 (ECF No. 53-14 at 38-80, 81-82) (Sealed).

11.     At that time, Plaintiff had been employed with DOJ for 24 years and as an immigration judge for seven years. Never before had she been the subject of a reprimand, nor did she have a disciplinary record.

12.     The effect of the reprimand letter was to bar Plaintiff from securing a reassignment to the Arlington court for a period of three years. *See* Exhibit 3 (ECF 63-3 at 9-10).

13.     During that three-year period, ACIJ Santoro assisted a friend and colleague in applying for an immigration judge position in the Arlington court. The same month that ACIJ Santoro issued the reprimand letter to Plaintiff (March 2015), his friend and colleague, Vance Spath, applied for an immigration judge position. *See* Exhibit 21 (ECF No. 63-13 at 55).

14.     Upon receiving the reprimand letter, Plaintiff promptly requested that ACIJ Santoro amend or rescind the March 2015 reprimand, but he refused. Under the Collective Bargaining Agreement (CBA) that governed the work of immigration judges, Plaintiff's only options at that point was to file a union grievance or to pursue an EEOC action if she believed that the reprimand

was a discriminatory or retaliatory adverse personnel action.  She opted to pursue an EEO claim because she believed that the reprimand was a discriminatory and retaliatory adverse action.

15.    In December 2015, Plaintiff filed a formal EEO complaint with the EEOC after learning that the March 2015 reprimand was the reason that her court transfer request had been denied a second time.  *See* Exhibit 3 (ECF 63-3 at 1-14).  In the December 2015 EEO complaint, she requested that the EEOC rescind the March 2015 reprimand as a discriminatory or retaliatory adverse action.  *Id.* at 24.

16.     In June 2015, ACIJ Santoro issued a counseling letter that accused Plaintiff of traveling without his authorization to the York, Pennsylvania Immigration Court, where she conducted her assigned court hearings in person.  Upon his return from a two-week vacation, he revoked the travel authorization that Plaintiff had received from other agency personnel and denied her request for travel reimbursement.  *See* Exhibit 15 (ECF No. 63-11 at 2-4) (Sealed).

17.    Plaintiff promptly requested that ACIJ Santoro amend or rescind the June 2015 counseling letter, but he refused.  *See* Exhibit 15 (ECF No. 63-11 at 4-103).  Plaintiff then filed a union grievance in accordance with the terms of the CBA.  *See id.* at 2.  However, the agency never acted on the grievance.  *See* Exhibit 3 (ECF 63-3 at 9).  Thus, in December 2015, when Plaintiff filed a formal EEO complaint with the EEOC, she requested that the EEOC amend or rescind the June 2015 counseling letter as a discriminatory or retaliatory adverse action.  *Id.* at 24.

18.    In August 2015, ACIJ Santoro issued an annual performance rating that – while crediting Plaintiff with satisfactory work performance – rated her professionalism as needing improvement.  *See* Exhibit 3 (ECF 63-3 at 9).  *See also* Exhibit 18 (ECF No. 53-19 at 13-39) (Sealed).  The performance rating referenced the March 2015 reprimand and June 2015 counseling letter as justification for the downgraded performance rating.  *Id.*

19.     Plaintiff promptly requested that ACIJ Santoro amend or rescind the August 2015 performance rating.  *See* Exhibit 3 (ECF 63-3 at 9).  He made one minor change to the rating but otherwise retained the inaccurate information in it.  Under the CBA that governed the work of immigration judges, Plaintiff's only options at that point was to file a union grievance or to pursue an EEOC action if she believed that the performance rating was a discriminatory or retaliatory adverse personnel action.  In December 2015, when Plaintiff filed a formal EEO complaint with the EEOC, she requested that the EEOC treat the August 2015 performance rating as a discriminatory or retaliatory adverse personnel action.  She requested the remedy of an amendment or rescission of the performance rating.  *See* Exhibit 3 (ECF 63-3 at 17).

20.     In her formal EEO complaint, Plaintiff asserted that all of the adverse personnel actions that ACIJ Santoro had taken against Plaintiff in 2015 were discriminatory or retaliatory conduct that contributed a hostile work environment in the Arlington court.  *See* Exhibit 3 (ECF 63-3 at 1-14).

21.     Within a month of filing her EEO complaint, Plaintiff was suddenly reassigned to the Arlington court's non-videoconference docket.  However, over the next four years she continued to experience progressively worse acts of discrimination and retaliation that eventually culminated in her wrongful discharge in September 2020.

22.     From 2016 to 2019, Plaintiff's next supervisor, ACIJ Deepali Nadkarni, continued the purge campaign that ACIJ Santoro had begun in 2015.  The harassment occurred on almost a weekly basis.

23.     First, ACIJ Nadkarni assigned Plaintiff a substantially heavier caseload than those of her colleagues.  Many of the cases she assigned to Plaintiff were aged, non-detained cases that had been on the dockets of three white male judges for as long as 15 to 20 years, and Plaintiff was

to complete those cases expeditiously.  *See* Exhibit 3 (ECF 63-3 at 27).  ACIJ Nadkarni also permitted white judges to dump their unwanted cases on Plaintiff's hearing calendar, causing numerous scheduling conflicts.  *Id.  See also* Exhibit 20 (ECF No. 64-3 at 23-24, 34-35).

24.     Second, ACIJ Nadkarni assigned Plaintiff to conduct hearings in approximately 200 new or reassigned "family unit" cases a week, while her colleagues received a much smaller share of those cases.  *See* Exhibit 3 (ECF 63-3 at 26); Exhibit 20 (ECF No. 64-3 at 20-23).  At one point, her non-detained docket exceeded 6,000 cases, which was three to six times the dockets of other Arlington court judges.  *See* Exhibit 3 (ECF 63-3 at 26); Exhibit 20 (ECF No. 64-3 at 27, 63).  In addition to handling a burgeoning Arlington court caseload, Plaintiff had to continue hearing detained cases out of the detention facility in York, Pennsylvania using tele-videoconference equipment that frequently malfunctioned and caused Plaintiff to experience recurring migraine headaches.  *See* Exhibit 20 (ECF No. 64-3 at 61-62, 3-14, 26, 36).

25.     When Plaintiff voiced concern about the very burdensome assignments, scheduling conflicts, and abusive case dumping practices, ACIJ Nadkarni issued a counseling letter on July 28, 2016 that criticized Plaintiff for acting unprofessionally toward a white female judge.  *See* Exhibit 3 (ECF 63-3 at 20-23, 26) (Sealed).  The counseling letter threatened to terminate Plaintiff's employment.  *Id.* at 22, 27.  At the time, Plaintiff did not know that, on the same date, the supervisor had issued a similarly worded counseling letter to the white female judge, faulting that judge for acting unprofessionally toward Plaintiff.  *See* Exhibit 20 (ECF No. 53-21 at 28-31) (Sealed); Exhibit 4 at 792-794 (ECF No. 53-5 at 797-799).

26.     Upon receiving the July 2016 counseling letter, Plaintiff promptly requested that ACIJ Nadkarni amend or rescind the letter, but she refused.  *See* Exhibit 20 (ECF No. 64-3 at 32).  Since Plaintiff's EEOC action was still pending, she filed an amendment to her formal EEO

8

complaint to challenge the discriminatory July 2016 counseling letter.  *See* Exhibit 3 (ECF 63-3 at 15-17).  The EEOC administrative judge accepted the amendment and treated the counseling letter as a discrete act of disparate treatment.  Exhibit 3 (ECF No. 63-3 at 38-39).

27.     In September 2016, ACIJ Nadkarni issued a performance rating that – while crediting Plaintiff with satisfactory work performance – criticized her for a lack of professionalism.  *See* Exhibit 3 (ECF No. 63-3 at 28); Exhibit 1 at 337-340 (ECF No. 53-2) (Sealed).   The performance rating referenced the July 2016 counseling letter that she had issued to Plaintiff.  *Id.*  However, it did not mention the July 2016 counseling letter that she had issued to the white female judge.  The performance rating also referenced anonymous complaints that the supervisor claimed to have received during the rating period.  When asked to reveal the identities of the complainants and the substance of their complaints, the supervisor refused to do so.  *Id.*

28.     After issuing the July 2016 counseling letter, ACIJ Nadkarni escalated the harassment by subjecting Plaintiff to onerous working conditions that her co-workers did not experience.  In September 2016, she assigned Plaintiff to spend two days a week on hearing aged cases on the dockets of two white male judges.  *See* Exhibit 3 (ECF No. 63-3 at 28).  While requiring Plaintiff to write her own legal opinions, ACIJ Nadkarni wrote legal opinions for white male judges or assigned judicial law clerks to write opinions for them.  *Id.  See also* Exhibit 20 (ECF No. 64-3 at 33). When Plaintiff requested additional time off-the-bench to write legal opinions, ACIJ Nadkarni criticized her for being inefficient.  *See* Exhibit 3 (ECF No. 63-3 at 28). Like ACIJ Santoro, ACIJ Nadkarni refused to give Plaintiff eight hours of administrative time per pay period, but she freely granted time off the bench to other judges or assigned them light duty.  *Id.* at 24.

29.    ACIJ Nadkarni also solicited negative feedback from the court administrator and court staff concerning Plaintiff's work performance and conduct. *See* Exhibit 3 (ECF No. 63-3 at 27).    She used the negative feedback to prepare Plaintiff's performance ratings. *See* Exhibit 20 (ECF No. 64-3 at 64).    In exchange for giving negative feedback about Plaintiff, the court staff received promised promotions or court transfers or better work assignments.    ACIJ Nadkarni also tried to turn Plaintiff's trusted and loyal legal assistant against Plaintiff.    Once, ACIJ Nadkarni falsely accused Plaintiff of taking leave without approval and instructed the legal assistant to document Plaintiff's absence.    That scheme backfired, however, when Plaintiff was able to show that she had received prior approval take the leave from ACIJ Nadkarni. *See* Exhibit 3 (ECF No. 63-3 at 30).

30.    In August 2017, ACIJ Nadkarni again rated Plaintiff's work performance as satisfactory but noted that her professionalism needed improvement. *See* Exhibit 20 (ECF No. 53-2 at 53-60) (Sealed).    Like the September 2016 performance rating, the August 2017 rating was based on anonymous sources that ACIJ Nadkarni refused to divulge. *See* Exhibit 20 (ECF No. 64-3 at 64-66).

31.    In October 2017, Plaintiff requested that ACIJ Nadkarni amend or rescind the September 2016 and August 2017 performance ratings, but she refused. *See* ECF No. 43-1.    In response, Plaintiff filed a second amendment to the EEO complaint that she had filed with the EEOC in December 2015. *See* Exhibit 3 (ECF 63-3 at 23-33).    The second amendment asserted that the September 2016 and August 2017 performance ratings were additional instances of harassment that contributed to a hostile work environment in the Arlington court. *Id.* at 28-29.

32.    In February 2018, ACIJ Nadkarni violated the regulation that prohibited supervisory judges from dictating case outcomes to subordinate judges. *See* 8 C.F.R. § 1003.9(d)

10

(2017). In several cases, she directed Plaintiff to grant asylum relief after Plaintiff concluded that such a decision would be unwise because of security concerns. Plaintiff opposed this harassment by sending a strongly worded email to ACIJ Nadkarni, on which she copied the former Chief Immigration Judge and the former EOIR Director. *See* Exhibit 20 (ECF No. 64-3 at 70).

33. In December 2018, ACIJ Nadkarni once again stepped up her harassment campaign by inviting the ICE Chief Counsel to register a complaint of misconduct against Plaintiff. *See* Exhibit 20 (ECF No. 64-3 at 73). In response, Plaintiff advised defense counsel of the *ex parte* complaint that the ICE Chief Counsel had filed. This was done to comply with her disclosure obligations under the Immigration Judges' Ethics and Professionalism Guide. *See* Exhibit 27 (ECF No. 62-3 at 44-45). In response, Defense counsel filed a letter defending Plaintiff's conduct of the court hearing as a proper exercise of courtroom control. *See* Exhibit 20 (ECF No. 64-3 at 75-76).

### The OPR Investigation

34. Beginning in January 2017, ACIJ Nadkarni and other EOIR officials advocated for an OPR investigation of Plaintiff. They saw an OPR investigation as the "nail on the coffin" that they needed to bury Plaintiff's DOJ legal career once and for all. They found four willing accomplices in a white collar criminal defense attorney named Paul L. Knight, two immigration bar attorneys named Eileen P. Blessinger and Carmen A. Boykin, and one of Blessinger's paralegal, Nicolas Ahumada.

35. In January 2017, Plaintiff learned from ACIJ Nadkarni that EOIR had released sensitive, privacy-protected information from Plaintiff's personnel file to the American Immigration Lawyers Association ("AILA"), a voluntary bar association of immigration attorneys. Plaintiff immediately demanded that EOIR retract or claw back the information, but EOIR refused. *See* Exhibit 3 (ECF 63-3 at 28-29); Exhibit 14 (ECF No. 64-4 at 4-30).

11

36.     Less than two months later, attorneys Blessinger and Boykin, who were AILA members, used the leaked information to file two judicial misconduct complaints against Plaintiff. *See* Exhibit 3 (ECF 63-3 at 28).  Their legal representative, attorney Paul L. Knight, filed the first of two complaints on March 1, 2017, with the Office of the Chief Immigration Judge ("OCIJ"). *See* Exhibit 27 (ECF No. 62-3 at 7-15).  The complaint alleged that Plaintiff mishandled four court hearings that she conducted in February and March 2017, and that she manifested improper judicial bias, demeanor, and incompetence in those hearings.  *Id.* at 12.

37.     Notably, the complaint stated that "Judge Bain has been counseled in the past but that apparently has not been sufficient to instill the necessary dignity and decorum required in her proceedings."  *See* Exhibit 27 (ECF No. 62-3 at 12).  Plaintiff understood this comment to be a reference to the privacy-protected information that EOIR had released to AILA two months earlier. *See* Exhibit 3 (ECF 63-3 at 28-20).

38.     The March 1, 2017 complaint was the first such complaint filed against Plaintiff, then in her ninth year of service as an immigration judge.

39.     Plaintiff's supervisor, ACIJ Nadkarni, did not apprise Plaintiff of the Knight March 1, 2017 complaint.  Plaintiff learned about the complaint at the start of a March 7, 2017 court hearing, when attorney Blessinger presented a Motion for Recusal that attached the Knight complaint as the main exhibit.  *See* Exhibit 30 at EOIR 772-804 (ECF No. 53-31) (Sealed).  Ms. Blessinger informed Plaintiff that a copy of the complaint had been emailed to the court administrator, Deborah Castro, the day before the hearing, and that she expected Plaintiff to immediately recuse.

40.     Concerned that the court administrator might have engaged in an impermissible *ex parte* communication, Plaintiff asked the court administrator to testify concerning that

12

communication in open court. The court administrator's testimony served two purposes: (1) to cure the *ex parte* nature of the communication by divulging it to government counsel; and (2) to confirm that, prior to the March 7, 2017 court hearing, Plaintiff did not receive from the court administrator the Knight March 1, 2017 complaint or the motion for recusal. Calling the court administrator to testify openly about the *ex parte* communication satisfied Plaintiff's disclosure obligations under the Immigration Judges' Ethics and Professionalism Guide.

41.    On March 28, 2017, attorney Knight filed a second complaint with Plaintiff's supervisor. *See* Exhibit 27 (ECF No. 62-3 at 16-17) (the "second Knight complaint"). The second complaint alleged that Plaintiff abused her judicial authority by refusing immediately to recuse from all Blessinger and Boykin cases, and by requiring the court administrator to testify about the *ex parte* communication with attorney Blessinger. The second complaint also falsely accused Plaintiff of witness intimidation because she had invited a court security officer to submit an affidavit describing the officer's impressions of Blessinger's conduct during a February 17, 2017 court hearing.

42.    Plaintiff's supervisor directed Plaintiff to respond to the recusal motion and the underlying Knight complaints. Exhibit 20 (ECF No. 64-3 at 40). While on work-related travel to New Mexico, Plaintiff prepared a response without the benefit of her paper records or access to her courtroom's audio-recordings. *See* Exhibit 3 (ECF 63-3 at 29).

43.    Upon her return to the office, Plaintiff issued an order dated June 8, 2017, in which she responded to the recusal motion and the two Knight complaints. *See* Exhibit 1 (ECF 53-2 at 2-23) (Sealed); Exhibit 30 at EOIR 100-122 (ECF No. 53-31) (Sealed).

44.    The Recusal Order applied the recusal procedure and standards prescribed in EOIR's policy memorandum, known as OPPM 05:02. Promulgated in 2005, OPPM 05:02 was

13

modeled after the recusal procedure for federal judicial officers in 28 U.S.C. § 455(a) & (b), and the United States Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994). In addition, Plaintiff's Recusal Order applied the Immigration Judges' Ethics and Professionalism Guide, which is a code of judicial ethics and conduct for immigration judges. *See* Exhibit 30 at EOIR 1298-1307 (ECF No. 53-31) (Sealed. The Recusal Order was subsequently affirmed by the Board of Immigration Appeals ("BIA") in seven different cases. *See* Exhibit 25 (ECF No. 63-15).

45.    In early August 2017, ACIJ Nadkarni worked with other agency officials to refer Plaintiff to OPR for an investigation, based on attorney Knight's recommendation. The referral email was prepared by an EOIR OGC attorney named Marlene Wahowiak. *See* Exhibit 30 at EOIR 83-85 (ECF No. 53-31) (Sealed). Ms. Wahowiak had supervised the litigation of Plaintiff's EEOC action since its inception in December 2015. Upon information and belief, Ms. Wahowiak had worked in OPR for 12 years and had applied for an immigration judge position in the Arlington Immigration Court at the same time that Plaintiff had applied for a reassignment to that court. *See* Exhibit 30 at EOIR 281-284 (ECF No. 53-31) (Sealed). She used her contacts in OPR to initiate the investigation.

46.    Ms. Wahowiak's August 3, 2017 email to OPR Deputy Counsel William C. Birney stated that ACIJ Nadkarni had met with and interviewed Mr. Knight, Ms. Blessinger, and Ms. Boykin before EOIR referred the Knight complaints to OPR for an investigation. According to her email, Ms. Wahowiak was aware of OPR's policy of not intervening in pending litigation; however, she pleaded with OPR to initiate and expedite an investigation of Plaintiff, asserting – without any factual basis – that Plaintiff had made false statements about the complaining attorneys in responding to the recusal motion and Knight complaints, and that an OPR investigation was necessary to prevent further reputational harm to them. *See* Exhibit 30 at EOIR 83-85 (ECF No.

14

53-31) (Sealed). Though she was careful not to implicate Knight in the referral, her email revealed the real motivation for her request: She anticipated that the Board of Immigration Appeals would soon affirm Plaintiff's June 8, 2017 Recusal Order on interlocutory appeal. *See id.* If that were to happen, there would be no reason to open an investigation.

47.    As Wahowiak predicted, the BIA did affirm all seven of Plaintiff's Recusal Orders that were on interlocutory appeal when Wahowiak recommended an investigation of Plaintiff. See Exhibit 25 (ECF No. 63-15). In affirming the recusal order, the BIA expressed no concerns about Plaintiff's handling of court hearings or her response to the two Knight complaints. *Id.* By that point in time, however, OPR had already accepted the Knight complaints and initiated an inquiry that quickly devolved into an investigation by late 2017.

48.    On August 29, 2017, Plaintiff received a Letter of Inquiry from former OPR Director and Chief Counsel Robin Ashton. *See* Exhibit 27 (ECF No. 62-3 at 3-6). Framed in a caustic and confrontational tone, the letter accused Plaintiff of inappropriately responding to the Knight complaints. *Id.* The letter directed her to submit a response to the inquiry within two weeks' time. *See id.*

49.    Plaintiff prepared a response to the OPR Letter of Inquiry while on work-related travel to Louisiana, where she did not have access to her counsel or her paper records or her courtroom audio-recordings. *See* Exhibit 20 (ECF No. 64-3 at 44).

50.    Upon her return to the office, Plaintiff filed a 97-page written response to the OPR Letter of Inquiry on November 15, 2017. *See* Exhibit 27 (ECF No. 62-3 at 65-161). Thereafter, Plaintiff sat for a rather hostile seven-hour interview with OPR investigative counsel, Leslie A. Gerardo, on June 29, 2018. *See* Exhibit 30 at EOIR 349-770 (ECF No. 53-31) (Sealed). Upon information and belief, Ms. Gerardo had worked with Mr. Knight and Ms. Ashton in the United

States Attorneys Office. Upon information and belief, Associate Deputy Attorney General G. Bradley Weinsheimer did as well.

51.     In her November 2017 written response, Plaintiff documented the abuse of EOIR's Immigration Judge Complaint Resolution Program ("CRP") by which Plaintiff was referred to OPR for an investigation. *See* Exhibit 27 (ECF No. 62-3 at 71-74). Plaintiff described the structural and Constitutional infirmities of the program and explained how litigants had misused it to gain a litigation advantage over their opponents. Using hearing records from the four court cases that OPR was investigating, Plaintiff showed that her referral to OPR for an investigation lacked sufficient predication, because the BIA had affirmed her Recusal Order in seven of the attorneys' cases. Plaintiff also discussed the dilatory tactics that attorneys Blessinger and Boykin employed to manipulate the outcomes of court hearings.

52.     Soon thereafter, the BIA adjudicated an appeal in one of the four cases that OPR was investigating. On January 2, 2018, the Board issued an order vacating Plaintiff's decision on the merits and remanded the case to another immigration judge for a new hearing. *See* Exhibit 30 at EOIR 225-229 (ECF No. 53-31) (Sealed). According to the BIA, Plaintiff had displayed unprofessional behavior toward attorney Blessinger while conducting a February 17, 2017 court hearing. The BIA found that Plaintiff had berated and screamed at attorney Blessinger during an off-record exchange that lasted "at least five minutes." *Id*. The BIA also found that Plaintiff unreasonably denied attorney Blessinger's request for a break in the middle of her client's cross-examination. *See id*.

53.     Plaintiff promptly filed a Motion for Reconsideration, asserting that the BIA's findings and conclusions were erroneous. The BIA, however, denied the motion upon concluding that Plaintiff lacked standing to bring it. *See* Exhibit 30 at EOIR 266-278 (ECF No. 53-31)

(Sealed).  The BIA also denied Plaintiff's request to certify the matter to the Attorney General for his review.  *Id.*

54.    Plaintiff subsequently called OPR's attention to the BIA's erroneous January 2, 2018 decision.  After completing its investigation, OPR agreed that two of the BIA's findings were clear errors.  First, OPR determined that Plaintiff did not berate and scream at attorney Blessinger for five minutes during the off-record exchange, because the courtroom's audio recordings indicated that Plaintiff went off-the-record for only 31 seconds.  *See* Exhibit 30 at EOIR 305-306, 28 (ECF No. 53-31) (Sealed).  Second, OPR determined that Plaintiff did not mistreat attorney Blessinger by denying her request for a recess in the middle of her client's cross-examination.  OPR concluded that it was reasonable to make the attorney wait until after cross-examination was completed to take a break.  *See id.* at EOIR 28 (Sealed).

55.    Notwithstanding these clear errors, the Board's January 2, 2018 unpublished decision was swiftly dispatched to the news media.  It was published in a Law360 news article on January 5, 2018.  *See* Exhibit 26 (ECF No. 62-2 at 48).  The publication has caused much embarrassment and mental anguish to Plaintiff, because she has been unable to obtain its retraction or rescission.  The publication of the errant January 2, 2018 decision has harmed Plaintiff's professional reputation and has impeded her ability to find another job.  Moreover, the Defendants' eventual decision to terminate Plaintiff's employment rested, in part, on a mistaken belief that Plaintiff herself had disseminated the BIA's January 2, 2018 decision to the news media.  *See* Exhibit 1 at 217 (ECF No. 53-2 at 197-225) (Sealed).

56.    The two-year investigation that OPR undertook was concluded in July 2019, with the issuance of an OPR draft report of investigation.  OPR investigative counsel gave Plaintiff two weeks to prepare a response.  Upon reviewing the very lengthy draft report, Plaintiff noticed that

17

it cited, referenced, incorporated, or discussed evidence that Plaintiff did not have. Plaintiff requested that OPR investigative counsel immediately release the full OPR investigative record, so that Plaintiff could prepare a fulsome response to the draft report. *See* Exhibit 2 (ECF No. 63-2 at 21). OPR investigative counsel denied the request, stating that OPR had not "designated" a Record of Investigation. *Id*. at 33. OPR counsel further stated that OPR does not release records of witness interviews. *Id.* Finally, in response to Plaintiff's specific request for access to the transcripts or audio recordings of witness interviews, OPR counsel stated that "OPR does not disclose transcripts or recordings of witnesses interviews." *Id.* at 35. "In preparing your response to the draft, you could identify any witness statements described in the draft report and explain why you believe those statements are not accurate." *Id.*

57.     Without the full OPR record of evidence, Plaintiff was unable to provide a fulsome response to the EOIR Notice of Proposed Removal, even with exceptional legal representation by very able counsel.

58.     On September 27, 2019, OPR issued its final Report of Investigation. The Report spanned 80 single-spaced pages and contained 475 footnotes. *See* Exhibit 30 at EOIR 1-81 (ECF No. 53-31) (Sealed). The OPR Final Report quoted, referenced, or discussed the testimonies of 13 eyewitnesses whom OPR or EOIR had interviewed in the course of the two-year investigation. The 13 eyewitnesses included the two complaining attorneys (Blessinger and Boykin); their attorney Paul L. Knight; Plaintiff's immediate supervisor, ACIJ Deepali Nadkarni; the Arlington court administrator, Deborah Castro; two government attorneys; three court interpreters; and at least one court security officer. Of the 13 interviews, OPR released to Plaintiff only one interview transcript – Plaintiff's. *See* Exhibit 30 at EOIR 349-770 (ECF No. 53-31) (Sealed).

59.    OPR found that Plaintiff did not knowingly or intentionally violate any statute, regulation, rule of court, or the Immigration Judges' Ethics and Professionalism Guide in conducting the four court hearings that OPR investigated.  *See* Exhibit 30 at EOIR 130 (ECF No. 53-31) (Sealed).  OPR found that Plaintiff was not biased against Blessinger or Boykin.  *Id.* at 130 n. 460.  In addition, OPR did not substantiate Knight's other misconduct allegations, such as the allegation that Plaintiff had mistreated Blessinger in the February 1 and March 7, 2017 court hearings.  *Id.* at 130 n. 445.  OPR also rejected the allegation that Plaintiff had mistreated Boykin during a February 16, 2017 hearing.  *Id.* at 130 n. 467, n. 448.  Moreover, OPR did not find that Plaintiff had engaged in witness intimidation or evidence tampering when she invited a court security officer to prepare an affidavit describing that officer's observations of Blessinger's conduct in the February 17, 2017 court hearing.  *Id.* at 130 n. 475.  Finally, OPR did not find that Plaintiff had engaged in professional misconduct when she called the Arlington court administrator to testify about an *ex parte* communication between the court administrator and Blessinger that occurred one day before the March 7, 2017 hearing, and the communication concerned that pending court hearing.  OPR, however, did conclude that Plaintiff exhibited poor judgment in calling the court administrator to testify in open court about the *ex parte* communication.  *Id.* at 132.  OPR's opinion in this regard directly contradicted an advisory opinion of the DOJ Professional Responsibility Advisory Office (PRAO), which stated that a complaint of misconduct that one party files against an immigration judge is an *ex parte* communication that must be disclosed to the other party at the earliest possible moment, to avoid prejudice to the opposing party.  *See* Exhibit 27 (ECF No. 62-3 at 176-186).

60.    OPR's lack-of-candor finding rests on a refusal to accept Plaintiff's explanations as credible or reasonable.  It dismissed Plaintiff's claim that she simply failed to recall certain facts

19

and events that OPR inquired about because they had occurred months earlier, while she was handling a very full caseload and demanding work schedule.  OPR insisted that Plaintiff had to have lied about the facts and events that formed the bases of her written statement or her recusal order, because no reasonable person could have concluded that those facts and events were real.  This finding is truly confounding, because OPR also concluded that Plaintiff did not purposefully or knowingly include the allegedly false information in her recusal order.  Exhibit 1 at 124 (ECF No. 53-2 at 129) (Sealed).  OPR thus erred in applying a reasonable person standard in finding lack of candor.  The proper inquiry is whether Plaintiff had made a false statement with the intent to deceive.  *Id*. at 170 (Sealed).

### The September 2020 Removal Decision

61.     On February 26, 2020, using the OPR Report as the basis of its recommendation, EOIR proposed to terminate Plaintiff's employment.  Exhibit 1 at 133-145 (ECF No. 53-2 at 138-150) (Sealed).  The two charges were "conduct unbecoming an immigration judge" and lack of candor.

62.     On August 17, 2020, G. Bradley Weinsheimer, a career Associate Deputy Attorney General in the Office of the Deputy Attorney General, issued a decision proposing to terminate Plaintiff's 29-year employment with the Justice Department.  The decision acknowledged that this was Plaintiff's first encounter with the attorney discipline process in nearly 29 years of employment.  It further acknowledged that Defendants failed to maintain a Table of Penalties and to keep complete records of disciplinary and adverse actions involving immigration judges.  Nevertheless, the decision found that Plaintiff's removal from federal service was the most appropriate sanction.  The decision further acknowledged that Plaintiff was denied access to the

20

OPR record of evidence.  However, it concluded that Plaintiff suffered no resulting prejudice.  *See* Exhibit 1 at 192-220 (ECF No. 53-2 at 196-224) (Sealed).

63.    On September 17, 2020, former Attorney General William Barr signed the proposed Removal Decision to indicate his concurrence.  *See* Exhibit 1 (ECF No. 53-2 at 224) (Sealed).  The decision took effect immediately.  In terminating Plaintiff's DOJ employment, the Attorney General also authorized the Department of Justice to refer Plaintiff to her state bars for further disciplinary proceedings, but he conditioned the referral on Plaintiff's succeeding on the merits of her appeal of the Removal Decision.  *Id.* at 219 n. 64 (Sealed).  This thinly veiled threat to take away Plaintiff's sole means of livelihood amounted to an unconstitutional infringement on her protected property interest in maintaining her professional licensing, and her protected liberty interest in continuing to practice law as her chosen profession.

## The MSPB Mixed Case Appeal

64.    On October 19, 2020, within 30 days after her wrongful termination, Plaintiff timely filed a "mixed case appeal" with the Merit Systems Protection Board ("MSPB"), challenging her removal on the merits.  Exhibit 5 (ECF No. 63-4 at 2-15).  The appeal notice asserted that Defendants failed to prove the charges by a preponderance of the evidence, and, in selecting an appropriate penalty, failed to properly weigh the mitigating and aggravating factors in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981).  In addition, Plaintiff asserted that the Attorney General's Removal Decision relied on information that Defendants refused to produce to Plaintiff, in violation of 5 U.S.C. §§ 7701(c)(2)(A) & (C).  *See also* 5 U.S.C. § 7701(c)(3). Finally, Plaintiff asserted two affirmative defenses to removal, one based on violations

of federal anti-discrimination laws, and the other, on violations of the Whistleblower Protection Act.[1]

65.      Regarding her affirmative defense based on discrimination, Plaintiff asserted that her removal violated Title VII of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and the Anti-Age Discrimination in Employment Act.[2]  *See* Exhibit 5 (ECF No. 63-4 at 2-15).  .

66.      Regarding her affirmative defense based on whistleblower retaliation, Plaintiff asserted that her removal violated the Whistleblower Protection Act of 1989.  *See* 5 U.S.C. §§ 2308 & 2309.  *See* Exhibit 5 (ECF No. 63-4 at 2-15).

67.      Defendants immediately moved to dismiss the MSPB appeal, arguing that the MSPB judges assigned to hear the appeal had not been properly appointed in accordance with *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018).  Plaintiff opposed the dismissal motion.

68.      On November 16, 2020, the MSPB granted Defendants' motion to dismiss for lack of jurisdiction without prejudice to reinstatement, based on the reasoning of *Lucia.*  The Order of Dismissal provided that Plaintiff's appeal will automatically be reinstated within 180 days of the date of the Order.  *See* Exhibit 8 (ECF No. 63-6 at 3-13).  Thereafter, the MSPB reinstated and dismissed the mixed case appeal twice more.  *See* Exhibit 9 (ECF No. 63-7 at 3-5); Exhibit 10 (ECF No. 63-8 at 3-12).

69.      Most recently, the MSPB re-calendared the appeal for a hearing after it regained a quorum.  Defendants, however, again moved to dismiss the MSPB appeal.  Citing *Perry v. MSPB*, 137 S. Ct. 1975, 1979 (2017).  Defendants argued that Plaintiff must voluntarily dismiss this

---

[1] Plaintiff is not pursuing a whistleblower complaint retaliation claim.

[2] Plaintiff is not pursuing an age-based discrimination claim.

22

district court action with prejudice, if she wished to proceed before the MSPB.  Because Plaintiff did not consent to voluntary dismissal of this action, the MSPB administrative judge granted Defendants' second motion to dismiss on.  *See* Attachment A.

70.    Recognizing that Plaintiff has properly exhausted her administrative remedies at the EEOC and the MSPB, this Court recently assumed jurisdiction *sub silentio* over all of the causes of action that Plaintiff has presented to those agencies before filing suit in this Court.  *See* December 23, 2022 Decision and Order (ECF No. 56).  Going forward, the Court's preference is to focus on the three adverse personnel actions that the Court characterized as "a piece" – that is, the January 2, 2018 BIA decision, the September 27, 2019 OPR Report of Investigation, and the September 17, 2020 Removal Decision.  *See* ECF No. 56 at 57.  In the paragraphs below, Plaintiff discusses her claims in Counts I and II as affirmative defenses to the Attorney General's Removal Decision.

71.    Personal jurisdiction and venue are proper in the District of Columbia, because this is the district in which Plaintiff resides and in which a substantial number of the acts or omissions giving rise to Plaintiff's claims occurred.  5 U.S.C. § 552(a)(4)(B), 5 U.S.C. § 552a(g)(5), and 28 U.S.C. § 1391.

### COUNT  I:  Violations of the Freedom of Information Act and the Privacy Act

72.    This cause of action arises under the Freedom of Information Act and Privacy Act. Plaintiff challenges Defendants' denial of record access and failure to maintain adequate records for Plaintiff which resulted in adverse determinations.  *See* 5 U.S.C. § 552a(g)(1)(B), (C)-(D).

73.    Section 552a(e)(5) of Title 5 of the United States Code requires a government agency to maintain accurate, relevant, timely, and complete records for an individual.  *See also* 5 U.S.C. § 552a(g)(1).

74.     Section 552a(e)(6) requires a government agency to ensure the dissemination of records about an individual that are accurate, relevant, timely, and complete.  *See also* 5 U.S.C. § 552a(g)(1).

75.     Section 552a(g)(1)(A) provides for amendment of records that are not "accurate or complete as to ensure its fairness to [the individual]."  *Holz v. Westphal*, 217 F. Supp. 2d 50, 56-57 (D.D.C. 2022).

76.     Section 552a(g)(1)(B) provides a right of access to records that the government maintains about an individual.

77.     Section 552a(g)(1)(C) provides a cause of action for civil remedies when the government's failure to maintain any record with "such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual."  *See also* 5 U.S.C. § 552a(e)(5) & (g)(4).

78.     Section 552a(g)(1)(D) provides a cause of action for civil remedies when the government fails to comply with any other provision of Section 552a(g)(1) in such a way as to have an adverse effect on an individual.  *See also* 5 U.S.C. § 552a(e)(5) & (g)(4).

79.     Plaintiff has satisfied the administrative exhaustion requirement for purposes of 5 U.S.C. §§ 552a(g)(1)(C) & (D).  She apprised the responsible agency officials of the inaccuracies and errors in her personnel records, requested amendment thereof, and appealed their decisions in accordance with the procedures afforded by agency regulation or the Collective Bargaining Agreement.

80.     Plaintiff has satisfied the two-year statute of limitations for purposes of 5 U.S.C. §§ 552a(g)(1)(C) & (D).  She filed this suit on June 22, 2021, within two years after OPR refused to amend the erroneous records (September 27, 2019), after EOIR based its proposal to terminate her employment on the OPR Report of Investigation (February 27, 2020), and after the Attorney General issued the Removal Decision on September 17, 2020.

81.     This Court has original jurisdiction over Plaintiff's complaint under the FOIA and Privacy Act and reviews *de novo* the Defendants' decisions regarding the withholding or release of information.  5 U.S.C. § 552a(g)(3).

82.     This Court also has jurisdiction over Plaintiff's claims arising under the denial of substantive and procedural due process under the Civil Service Reform Act and the Fifth Amendment of the United States Constitution.  *See* 28 U.S.C. § 1331; 5 U.S.C. § 702.  *See also Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 n. 12 (1972).

### EOIR's and OPR's Failure to Maintain Accurate Records For Plaintiff and Denial of Access to Records About Her

83.     Plaintiff filed three FOIA and Privacy Act requests in *September* 2015, January 2018, and August 2019, seeking information that she needed to prosecute her EEOC complaint and to oppose the proposed termination of her employment in September 2020.

84.     All of the FOIA and Privacy Act requests seek information in the possession, control and custody of Defendants.

85.     Defendants failed to process Plaintiff's three FOIA requests on a timely basis.

86.     Defendants failed to process Plaintiff's three FOIA requests on an expedited basis.

87.     Plaintiff has properly and timely exhausted each of the three FOIA and Privacy Act requests.  *See* 5 U.S.C. § 552(a)(4)(B).

25

88.     This cause of action is timely commenced within six years after Plaintiff became aware of the non-disclosure of the requested information and materials.  *See* <u>Spannaus v. U.S. Department of Justice</u>, 824 F.2d 52, 56 (D.C. Cir. 1987).

89.     Defendants have the burden to show that their searches for responsive records are adequate, but they have not met their burden of showing that all responsive, non-exempt records have been released to Plaintiff.  *See Light v. DOJ*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013) (holding that the Privacy Act provides a separate path to receive certain documents for first-party record requestors, and that under its terms, an "agency that maintains a system of records" must let an individual get access to "any information pertaining to [her] which is contained in the system" so long as no exception applies.  5 U.S.C. § 552a(d)(1)).

90.     Defendants also have the burden to show that they addressed the accuracy of a record before using it to make a determination about an individual.  5 U.S.C. § 552a(g)(1)(C) & (g)(4).  *See also Deters v. United States Parole Commission*, 85 F.3d 655, 658 n. 2 (D.C. Cir. 1996); *Dickson v. OPM*, 828 F.2c 32 (D.C. Cir. 1987).

**Defendants' Denial of Record Access and Failure to Maintain
Adequate Records Caused the Dismissal of Plaintiff's EEOC Action.**

91.     In September 2015, Plaintiff filed a FOIA and Privacy Act request that sought EOIR records relating to three separate adverse personnel actions that Plaintiff's former supervisor, ACIJ Christopher Santoro, had issued earlier that 2015.  *See* Exhibit 2 (ECF No. 63-2 at 3-6).  Those three adverse personnel actions were the March 2015 reprimand, the June 2015 counseling letter, and the August 2015 performance rating.  Plaintiff needed those records to challenge EOIR's decision to deny Plaintiff a court transfer in October 2015.

92.     In response to Plaintiff's September 2015 FOIA and Privacy Act request, EOIR released only 100 pages of records in four separate installments.  *See* Exhibit 2 (ECF No. 63-2 at

26

4-10, 62-63).  EOIR's release of records was clearly inadequate and non-responsive.  EOIR did not identify those materials that it withheld, and it did not provide a Vaughn Index.  *Id.*

93.     Plaintiff subsequently discovered that EOIR had withheld approximately 500 pages of records that were responsive to her September 2015 FOIA and Privacy Act request.  *See* Exhibit 3 (ECF No. 63-3 at 30).

94.     In early January 2018, while taking an on-line ethics training course, Plaintiff found an electronic document folder labeled as "BAIN FOIA 2015."  *See* Exhibit 3 (ECF No. 63-3 at 3-6).  The folder was placed on an EOIR shared drive that was mapped to Plaintiff's office computer.  *Id.* at 56.  The folder was not password protected and contained no markings indicating that it was privileged or privacy-protected.  *See* Exhibit 2 (ECF No. 63-2 at 57-65).

95.     In that folder, Plaintiff discovered approximately 500 pages of records that appeared responsive to her 2015 FOIA and Privacy Act request.  *See* Exhibit 2 (ECF No. 63-2 at 62-63).  Those documents had never been released to her.  *Id.* at 63.

96.     Because the "BAIN FOIA 2015" folder was accessible to many EOIR employees, Plaintiff immediately realized that any privilege or exemption that might have attached to the information in the "BAIN FOIA 2015" folder had been waived by Defendants' placement of the "BAIN FOIA 2015" folder on the shared drive.  *See* Exhibit 2 (ECF No. 63-2 at 3-6).  Plaintiff also realized that since many of the 500 pages of documents pertained to her and only her, any privacy protection that she was entitled to claim over those personnel records had also been destroyed.  At that point, Plaintiff decided to print the 500 pages of documents using her office computer.  Through her former employment counsel, Plaintiff produced the printed pages to EOIR in response to its discovery request in the EEOC action.  *Id.* at 56.

97.     A bitter, time-consuming, and costly discovery battle ensued.

98.     EOIR immediately moved for sanctions.  The EOIR motion for sanctions falsely accused Plaintiff of improperly accessing the EOIR shared drive and taking the "BAIN FOIA 2015" documents for her own personal use.  *See* Exhibit 2 (ECF No. 63-2 at 56, 63-65).  Plaintiff opposed this outrageous maneuver and complained to the Justice Department's Office of Inspector General.  *Id.* at 64.  At that point, EOIR backed down and admitted that it was solely responsible for the invasion of Plaintiff's privacy, which it caused by placing the "BAIN FOIA 2015" documents without password protection or security markings on an open, accessible shared drive.

99.     In light of Plaintiff's opposition to the sanctions motion, The EEOC administrative judge denied it.  She found that Plaintiff committed no wrongdoing when she accessed the "BAIN FOIA 2015" folder, and that any privacy protection that EOIR might have claimed over those records had long been waived by their placement on a shared drive that was accessible to many EOIR employees, including Plaintiff.  Exhibit 4 at 169-170 (ECF 53-5 at 98-99) (to be refiled with court permission).

100.    In defiance of the judge's ruling, EOIR immediately renewed its motion for sanctions.  Exhibit 4 at 109 (ECF No. 53-5 at 109) (to be refiled with court permission).  It did this to prevent Plaintiff from using the "BAIN FOIA 2015" documents to oppose its motion for summary judgment, which was filed on April 6, 2019.  *See* Exhibit 4 at 386-435 (to be refiled with court permission).

101.    The renewed sanctions motions which Plaintiff opposed served the purpose of deferring the EEOC administrative judge's ruling on the admissibility of the "BAIN FOIA 2015" documents until she had ruled on EOIR's summary judgment motion.  *See* Exhibit 2 (ECF No. 63-2 at 51-52); Exhibit 4 (ECF No. 53-5 at 109).

102.    On February 26, 2020, the EEOC administrative judge granted EOIR's motion for summary judgment without a hearing.  *See* Exhibit 4 at 107-120 (ECF No. 53-5 at 112-125) (to be refiled with court permission).  The decision does not indicate that the EEOC judge had considered any of the evidence in the "BAIN FOIA 2015" folder.  It did find that Plaintiff had not produced legally sufficient evidence to show that the adverse actions that EOIR managers had taken against her were motivated by discrimination or retaliation.

103.    On the same day that she issued the summary judgment decision, the EEOC judge issued a protective order placing all of the "BAIN FOIA 2015" documents under protection.  *See* Exhibit 2 (ECF No. 63-2 at 77-86).  The protective order, however, does not prohibit the use of those documents in non-EEOC proceedings such as the instant civil action.  *See* this Court's Decision 28, 2022 Order allowing public disclosure of the "BAIN FOIA 2015" documents) (ECF No. 57).

104.    EOIR's frivolous sanctions motion amounted to a denial of access to the "BAIN FOIA 2015" folder.  It prevented Plaintiff from demonstrating that the unfavorable performance ratings, counseling letters, and reprimand that she received in 2015 were part of a scheme to purge her from EOIR, and that EOIR managers had a discriminatory or retaliatory motive in issuing those adverse personnel records.

105.    The "BAIN FOIA 2015" documents showed that EOIR managers intentionally used Plaintiff's reprimand to disqualify her from a court transfer, under the terms of the Collective Bargaining Agreement.  *See* Exhibit 14 (ECF No. 63-10 at 140-141).  The denial of a court transfer was discriminatory and retaliatory, in that 20 other immigration judges (mostly white males and white females) were granted transfers to their courts of choice, while four minority women judges including Plaintiff were denied court transfers.  Some of the white male judges who received court

transfers had not officially requested reassignments, such that their transfers violated the terms of the CBA. *Id.* at 169, 172, 175-176.

106. The "BAIN FOIA 2015" documents also show that ACIJ Santoro's reason for issuing the March 2015 reprimand was pretextual. Email communications between ACIJ Santoro and ACIJ Keller showed that they despised Plaintiff and wanted to get rid of her, to make room for other judge candidates that they wanted to hire or place in the Arlington court. *See* Exhibit 14 (ECF No. 63-10 at 22, 29, 31, 36, and 47). One particular email from ACIJ Keller indicated that the March 2015 reprimand was the first step in that scheme. *Id.* at 64.

107. Other documents in the "BAIN FOIA 2015" folder illustrated the discriminatory and retaliatory animus that Plaintiff's supervisors harbored toward her. While issuing the reprimand and counseling letters to Plaintiff, EOIR managers treated her colleagues who were white male judges with leniency. One white male judge was repeatedly counseled for making inappropriate comments to litigants who appeared in his courtroom. *See* Exhibit 14 (ECF No. 63-10 at 187, 191-195, 199-201, 207-209). Another white male judge was counseled for comments that indicated judicial approval of illegal activities. *Id.* at 190. A third white male judge had been the subject of misconduct complaints that were far more serious than what Plaintiff was charged with. *Id.* at 179-180, 181-182, 183-186, 205. He was not disciplined at all, let alone removed from federal service. *See* Exhibit 28.

108. The "BAIN FOIA 2015" documents show that EOIR managers failed in their duty to make performance ratings in a fair and objective manner. They did not apply the performance standards in 5 U.S.C. § 4302 to the fullest extent feasible and thus failed to evaluate job performance on the basis of objective criteria, in violation of Article 22 of the CBA. *See* Exhibit 1 at 241-351 (ECF No. 63-1 at 5).

30

109.     After EOIR initiated an OPR investigation using the Knight complaints, it violated Plaintiff's right to privacy in her personnel records.  Plaintiff's next supervisor, ACIJ Deepali Nadkarni, provided OPR investigative counsel direct access to Plaintiff's personnel records, without her knowledge or consent.  In doing so, EOIR violated the privacy provision at Section 552a(e)(5) and the CBA Article 22.  *See* Exhibit 1 (ECF No. 63-1 at 11).  And OPR violated its obligation under Section 552a(e)(2) to elicit information directly from Plaintiff to the greatest extent possible.  *See Waters v. Thornburgh*, 888 F.2d 870, 872 (D.C. Cir. 1989) (liability is established under Section 552a(e)(2) when (1) the agency failed to elicit information directly from the plaintiff; (2) the violation of the Privacy Act was intentional or willful; and (3) the violation had an adverse effect on the plaintiff).

110.     On July 28, 2016, ACIJ Nadkarni issued a counseling letter that accused Plaintiff of acting unprofessionally toward a white female judge.  Exhibit 20 (ECF No. 53-21 at 28-31) (Sealed).  The counseling letter threatened to terminate Plaintiff's employment.  At the time, Plaintiff did not know that, on that same date, the same supervisor had issued a similarly worded counseling letter to the white female judge, which accused that judge of behaving unprofessionally toward Plaintiff and ACIJ Nadkarni.  EOIR, however, deliberately withheld the white female judge's July 28, 2016 counseling letter from Plaintiff, in response to her January 2018 FOIA and Privacy Act request.  Plaintiff appealed the withholding of that counseling letter to OIP, but OIP refused to release it.  *See* Exhibit 2 (ECF No. 63-2 at 18-19, 26-27, 28).

111.     EOIR's withholding from Plaintiff the other judge's July 2016 counseling letter, which was mitigating evidence, violated Plaintiff's statutory right to record access under the Privacy Act.  *See* 5 U.S.C. 552a(g)(1)(B) & (d)(1).  *See Voelker v. IRS*, 646 F.2d 332, 334 (8th Cir. 1981) (Where the requested information contained in a system of records and retrieved by the

requestor's name is "about" that requestor within the meaning of subsection (a)(4)'s definition of "record," all such information is subject to the subsection (d)(1) access provision).

112.    The other judge's counseling letter was probative and persuasive evidence that ACIJ Nadkarni harbored discriminatory and retaliatory animus toward Plaintiff, which directly contributed to the dismissal of Plaintiff's EEOC action.

113.    In moving for summary judgment in April 2019, EOIR belatedly slipped the other judge's counseling letter into its 450-page addendum that was filed with the summary judgment motion.  *See* Exhibit 4 at 792-794 (ECF No. 53-5 at 797-799) (to be filed with court permission). This sleight-of-hand, of course, was not compliant with its discovery obligations, nor did it counteract the damage that ACIJ Nadkarni's July 28, 2016 counseling letter had  already inflicted.

114.    In finding that Plaintiff had engaged in general misconduct, OPR relied on Plaintiff's July 28, 2016 counseling letter to support its finding that Plaintiff did mistreat the white female judge.  *See* Exhibit 1 at 59 (ECF 53-2 at 64) (Sealed).  OPR reached this erroneous conclusion because ACIJ Nadkarni did not give OPR the other judge's counseling letter. Similarly, in ordering the termination of Plaintiff's employment, the Attorney General remarked that Plaintiff's counseling letter was an aggravating factor.  *See* Exhibit 1 at 216 (ECF 53-2) (Sealed).

115.    In January 2017, Plaintiff learned that EOIR had released her privacy-protected personnel records to AILA.  *See* Exhibit 3 (ECF No. 63-3 at 28-29); Exhibit 14 (ECF No. 64-4 at 4-30).  The release of privacy-protected information caused emotional distress for Plaintiff, triggering fears about misuse of the leaked information, and heightening undeserved scrutiny of her work performance and conduct.   When she demanded that EOIR claw back the information, it refused.  *Id.*

116.    In March 2017, two AILA members used the improperly released information to file two complaints of judicial misconduct against Plaintiff.  Blessinger emailed a copy of the first complaint to the court administrator, who did not have a need to know about the complaint.  In doing so, Blessinger violated Plaintiff's right to privacy.  *See* 5 U.S.C. 552a(e)(5) & 552a(g)(1)(C).

117.    The Knight complaints, as they were known, were referred to OPR for an investigation in August 2017.

118.    After referring the Knight complaints to OPR for an investigation, EOIR used them to defeat Plaintiff's pending EEOC action and to set her up for removal.

119.    First, EOIR took away all 19 Blessinger and Boykin cases that were on Plaintiff's docket and reassigned them to other Arlington court judges for handling.  Exhibit 20 (ECF No. 64-3 at 45-50).  This was done over Plaintiff's objection, in an open and hostile manner.  *Id.*  As the reassignment occurred on the same day that OPR initiated the inquiry, the premature and improper reassignment of cases violated the regulatory presumption that cases may not be reassigned among sitting judges except in cases of death or disability.  *Id.* It also caused Plaintiff to suffer embarrassment and humiliation among her co-workers and court staff.

120.    Next, EOIR permitted Blessinger to present the two Knight complaints to the Board of Immigration Appeals as evidence supporting her appeal in case 050/051, a case that Plaintiff had heard on February 17, 2017.  Exhibit 30 (ECF No. 53-31).  On appeal, Blessinger argued that Plaintiff must be disqualified from all Blessinger and Boykin cases, because Plaintiff had manifested improper bias and demeanor toward Blessinger in conducting that court hearing.  Agreeing with Blessinger, the Board issued an order on January 2, 2018 that remanded the case to another immigration judge for handling, without reaching the merits of the underlying asylum application.  In so doing, the Board assumed that all of the Knight complaint allegations were true.

33

It found that Plaintiff's conduct of the February 17, 2017 court hearing did not conform to the high standards expected of immigration judges. Thereafter, the Board refused to entertain Plaintiff's February 5, 2018 Motion to Reconsider its January 2, 2018 decision. The Board also denied Plaintiff's alternative request to certify the case to the Attorney General for his review. The Board's January 2, 2018 decision violated Section 552a(e)(2), in that the Board did not elicit information directly from Plaintiff and then denied her a reasonable opportunity to present her side of the story.

121. Although the Board's January 2, 2018 decision was unpublished and non-precedential, it was swiftly dispatched to the press, which published the decision in a Law360 article on January 5, 2018. Exhibit 26 (ECF No. 62-2 at 48). The publication of that news article caused extreme embarrassment and humiliation for Plaintiff, especially because the article mischaracterized the BIA's findings in an exaggerated and false manner. The publication of the news article violated Plaintiff's right to privacy and further damaged her professional reputation by casting her in a false light. *See* 5 U.S.C. 552a(e)(5) & (6) (requiring record to be kept and disseminated in an accurate manner).

122. Next, EOIR used the two Knight complaints to defeat Plaintiff's then-pending EEOC action. *See* Exhibit 3 (ECF No. 63-3 at 3-14). Commenced in December 2015, the EEOC action challenged a series of adverse personnel actions that EOIR had taken against Plaintiff beginning in January 2015. Those adverse actions included her March 2015 reprimand, June 2015 counseling letter, August 2015 performance rating, July 2016 counseling letter, September 2016 performance rating, and August 2017 performance rating. Plaintiff argued before the EEOC that those adverse personnel actions were discriminatory and retaliatory treatment under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.

123.    In April 2019, at the close of discovery in the EEOC action, EOIR moved for summary judgment, arguing that there was no genuine dispute of material facts and that the law clearly favored a grant of summary judgment.  Exhibit 4 at 386-437 (ECF No. 53-5 at 391-442) (to be refiled with court permission).  In support of the motion, EOIR filed a Statement of Undisputed facts that actually contained numerous disputed facts.  *Id.* at 442-499.  EOIR attached to its motion a compilation of 450 pages of supporting documents that EOIR introduced, for the first time, in the litigation.  Id. at 500-945.

124.    To demonstrate that the adverse personnel actions were not pretextual, EOIR introduced confidential materials from the pending OPR investigation into the EECO record.  They included the two Knight complaints and Plaintiff's recusal order into evidence as part of the 450-page compilation.  Exhibit 4 at 867-875, 876-877, 909-945 (ECF No. 53-5 at 872-880, 881-882, 915-950) (to be refiled with court permission).  The two Knight complaints were intended to show that Plaintiff had been the subject of multiple complaints of misconduct that OPR was investigating.  By introducing the highly prejudicial Knight complaints, EOIR put its thumb on the scale and tipped the balance in its favor.

125.    This move violated Plaintiff's right to privacy under the Privacy Act and her right to confidentiality as the subject of an OPR investigation.  Because she was required to sign an OPR confidentiality agreement, Plaintiff was prohibited from using any information that she had acquired through her participation in the investigation to refute the Knight complaint allegations, or to show that the OPR investigation itself was a form of harassment.

126.    EOIR also withheld material evidence that would have demonstrated there were genuine disputes of material fact.  For example, it failed to advise the EEOC administrative judge that OPR was still investigating the Knight complaints and the recusal order.  EOIR also failed to

35

advise the EEOC administrative judge that the June 8, 2017 Recusal Order had been affirmed on interlocutory appeal by the Board of Immigration Appeals in seven cases. *See* Exhibit 25 (ECF 63-25). As a direct result of those material omissions, the EEOC administrative judge found that EOIR management officials did not act with discriminatory or retaliatory intent. *See* Exhibit 4 at 196 (ECF No. 53-5 at 205) (to be refiled with court permission).

127. On February 26, 2020, the EEOC granted summary judgment to EOIR without holding a hearing. Exhibit 4 at 107-120 (ECF No. 53-5 at 112-125) (to be filed with court permission). In doing so, the EEOC adopted wholesale the arguments made in EOIR's motion for summary judgment and incorporated the entire 450-page compilation of documents that EOIR introduced for the first time in the EEOC proceeding, as uncontested evidence that supported the EEOC's summary judgment decision. See Exhibit 4 at 438-975 (ECF No. 53-5 at 443-980).

128. EOIR's violation of Section 455a(g)(1)(C) deprived Plaintiff of a fair adjudication of her EEO complaint. Moreover, because EOIR moved to terminate her employment one day after the EEOC judge dismissed the EEO action, its retaliatory action further deprived Plaintiff of her Constitutionally protected property interest in continued federal employment.

### Defendants' Denial of Record Access and Failure to Maintain Adequate Records Directly Resulted in Plaintiff's Removal.

129. Plaintiff asserts a second cause of action under Section 552a(g)(1)(B) & (D), based on OPR's denial of records access and Defendants' failure to properly and adequately maintain Plaintiff's personnel records which directly resulted in Plaintiff suffering an adverse determination. These violations of the Privacy Act and Plaintiff's due process rights under the CSRA directly led to the wrongful termination of her employment.

130. The two-year investigation that OPR undertook beginning in 2017 was concluded in July 2019, with the issuance of an OPR draft report of investigation. OPR investigative counsel

gave Plaintiff two weeks to prepare a response. Upon reviewing the very lengthy draft report, Plaintiff noticed that it cited, referenced, incorporated, or discussed evidence that Plaintiff did not have. Plaintiff requested that OPR investigative counsel immediately release the full OPR investigative record, so that Plaintiff could prepare a fulsome response to the draft report. *See* Exhibit 2 (ECF No. 63-2 at 31). OPR investigative counsel denied the request, stating that OPR had not "designated" a Record of Investigation. *Id.* at 33. OPR counsel further stated that OPR does not release records of witness interviews. *Id.* Finally, in response to Plaintiff's request for access to the transcripts or audio recordings of witness interviews, OPR counsel stated that "OPR does not disclose transcripts or recordings of witness interviews." *Id*. at 35. "In preparing your response to the draft report, you could identify any witness statements described in the draft report and explain why you believe those statements are inaccurate." *Id.* OPR investigative counsel's response establishes that OPR failed to maintain accurate, relevant, timely, and complete records for Plaintiff, as required under 5 U.S.C. § 552a(e)(5).

131.    Because OPR investigative counsel refused to release the record of evidence to Plaintiff, Plaintiff filed a FOIA and Privacy Act request with the OPR FOIA office on August 5, 2019. *See* Exhibit 2 (ECF No. 63-2 at 39-40, 41).

132.    On October 4, 2019, after OPR had finalized and issued its Report of Investigation, OPR formally acknowledged receipt of the August 5, 2019 FOIA and Privacy Act request. OPR assigned the request a processing number but declined to expedite it. Between October 2019 and March 2020, OPR took no further action. *See* Exhibit 2 (ECF No. 63-2 at 44-45).

133.    On March 30, 2020, seven months after Plaintiff filed her August 5, 2019 FOIA and Privacy Act request, OPR finally responded to the FOIA request and released 45 pages of documents. OPR withheld 530 pages on a claim of exemption but did not provide a Vaughn Index.

*See* Exhibit 2 (ECF No. 63-2 at 47-48). The 45 pages of record consisted of email communications between Plaintiff and her counsel and OPR investigative counsel. This release of information about Plaintiff was clearly inadequate.

134. On May 12, 2020, Plaintiff filed a response to the EOIR Notice of Proposed Removal with the Office of the Deputy Attorney General. In that response, Plaintiff argued that Defendants' refusal to release the full OPR record of evidence was a denial of due process and a violation of the Civil Service Reform Act's pre-termination procedures. *See* Exhibit 1 at 177 notes 3 & 4 (ECF No. 53-2) (Sealed).

135. To prepare for a July 16, 2020 pre-termination hearing, Plaintiff filed an appeal with the Justice Department's Office of Information Policy ("OIP") on June 3, 2020. *See* Exhibit 2 (ECF No. 63-2 at 49-50). The appeal requested that OIP release the remaining records of the OPR investigation and provide a Vaughn Index. OIP did not respond.

136. After filing this lawsuit, Plaintiff continued to press for access to the full OPR record of investigation. In April 2022, she sent a Rule 26(a) request for initial disclosures to defense counsel. In response, counsel declined to turn over any documents and stated that he had no obligation to do so. Plaintiff then requested a status conference with the Honorable Judge Moss.

137. During a status conference held on July 25, 2022, Defendants advised the Court and Plaintiff, for the first time, that OPR had identified approximately 14,000 pages of record documents in response to Plaintiff's August 5, 2019 FOIA and Privacy Act request. Pursuant to the Court's order, Defendants began processing those records and releasing them in September 2022. As of today, however, Defendants have released only 1,050 pages of documents, or less than 8 percent of the total number of pages that they have admittedly withheld. Moreover, many of the released documents contain substantial redactions that render the documents

incomprehensible. *See Robbins Tire Co. v. NLRB*, 563 F.2d 724, 735-37 (5th Cir. 1997), *rev'd on other grounds*, 437 U.S. 214 (1978) (a government attorney may not protect a verbatim witness statement from disclosure either under the FOIA or in civil discovery merely by including its text in a memorandum prepared for use in litigation). Defendants also have refused to provide a Vaughn Index. Without an index or privilege log, Plaintiff is unable to determine whether Defendants are properly withholding records that they claim are exempt or privileged, and whether the redactions of segregable information have been properly made.

138.    Plaintiff has a legal right under FOIA and the Privacy Act to obtain the requested records, and there exists no legal basis for Defendants to refuse to promptly identify and make the records available to Plaintiff. The Privacy Act's access provision at Subsection 552a(g)(1)(B) simply permits an individual to gain access to "his record or to any information pertaining to him" that is contained in a system of records and retrieved by his name or personal identifier. 5 U.S.C. 552a)(d)(1). Where the requested information contained in a system of records and retrieved by the requestor's name is "about" that requestor within the meaning of subsection (a)(4)'s definition of "record," all such information is subject to the subsection (d)(1) access provision. *Voelker v. IRS*, 646 F.2d 332, 334 (8th Cir. 1981).

139.    Under the laws of this Circuit, Plaintiff indisputably has a right to access OPR records pertaining to her that were compiled for managerial-supervision purposes. *See also Bartko v. U.S. Dept. of Justice*, 898 F.3d 51 (D.C. Cir. 2018); *Jefferson v. U.S. Dept. of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002) (holding that DOJ is legally obligated to release records of OPR investigations to a first-party requestor, where the information was not compiled for law enforcement purposes but rather for managerial-supervision purposes).

140. Defendants' failure to promptly identify and release the requested records to Plaintiff violated Plaintiff's right to access records that pertain to her. *See* 5 U.S.C. §§ 552(a)(3)(A), 552a(d)(1), and 552a(g)(1)(B). *See also* 5 U.S.C. § 7701(c)(2)(A) & (C).

141. Defendants' failure to maintain an accurate and complete set of records for Plaintiff had directly resulted in her wrongful termination. *See* 5 U.S.C. § 552a(g)(1)(C).

142. In conducting the investigation, OPR compiled a voluminous record that it has failed to process and release to Plaintiff in a timely fashion. The failure to release the full record of evidence has substantially prejudiced Plaintiff. As a direct result of the denial of record access, Plaintiff was unable to refute OPR's findings of misconduct and lack of candor. *See* 5 U.S.C. § 552a(g)(1)(B). Those findings provided the basis for EOIR to recommend Plaintiff's removal in February 2020. Those findings also provided the basis for the Attorney General's Removal Decision of September 2020. *See* 5 U.S.C. § 552a(g)(1)(C)-(D).

143. OPR's denial of record access further prevented Plaintiff from participating meaningfully in a pre-termination hearing before the Office of the Deputy Attorney General. Plaintiff apprised ODAG officials of the denial of OPR record access, but they concluded that Plaintiff did not suffer resulting prejudice. Considering that the OPR records have been in Defendants' exclusive possession, custody, and control for over three years; the voluminous records that OPR compiled (14,000 pages); and the length of the OPR Report (80 pages with 475 footnotes), the denial of access to the OPR record of evidence was most certainly prejudicial. *See* 5 U.S.C. § 552a(g)(1)(B); 5 U.S.C. § 552a(g)(1)(C)-(D). The unreasonable delay in giving Plaintiff access to her records amounted to a denial of record access. It deprived Plaintiff of her statutory and Constitutional right to due process to confront the evidence against her. Without access to the full record of OPR evidence, Plaintiff was unable to defend herself against the charges

of removal which were based on the OPR Report of Investigation.  As a direct result of the denial

of access to OPR records, Plaintiff's 29-year legal career was terminated.

144.    In conducting the investigation, OPR investigative counsel also relied on Plaintiff's

personnel records as evidence of past misconduct.  EOIR released her personnel records to OPR,

without Plaintiff's knowledge or consent.  EOIR thus violated Plaintiff's right to privacy under the

Privacy Act and the CBA.  *See* Exhibit 1 (ECF No. 63-1 at 231) ("An immigration judge will be

advised each time an appraisal is used in a personnel action.").

145.    The personnel records that EOIR released to OPR were incomplete or inaccurate.

ACIJ Nadkarni gave OPR a copy of the July 28, 2016 counseling letter that she had issued to

Plaintiff, but she withheld the similarly worded counseling letter that she had issued to a white

female judge on the same date, over the same incident, which accused that judge of behaving

unprofessionally toward Plaintiff.  *See* Exhibit 1 (ECF No. 53-2 at 341-344) (Sealed).  As a result

of this material omission, OPR made an erroneous finding that Plaintiff had acted unprofessionally

toward the white female judge.  Exhibit 1 at 59 (ECF No. 53-2) (Sealed).

146.    As a direct result of Defendants' failure to maintain an adequate set of personnel

records for Plaintiff, she suffered the denial of due process in her pre-termination proceeding and

was terminated from her career civil service position.  Plaintiff lost a job that she performed

satisfactorily for 12 years and was deprived of her Constitutionally protected liberty interest in

maintaining her professional reputation and licensing, as well as her property interest in continuing

civil service employment and continuing the practice of law.

### Defendants' Denial of Record Access Directly Resulted in the
### Revocation of a Job Offer That Plaintiff Received in October 2022.

147.    Plaintiff asserts a third cause of action under Section 552a(g)(1(C)-(D) based on

events that transpired after the termination of her employment in September 2020.  Plaintiff asserts

that Defendants failed to exercise reasonable care in maintaining her personnel records, to ensure fairness in determinations by third parties that affect Plaintiff's interests. In this instance, Defendants' failure to properly and adequately maintain Plaintiff's personnel records caused a prospective employer to revoke a job offer that Plaintiff had accepted in May 2022.

148. In May 2022, Plaintiff received a conditional job offer from another federal agency after undergoing three rounds of interviews, followed by a five-month background investigation.

149. During the interviews and background investigation, Plaintiff provided information to the prospective employer about this lawsuit and the reasons she was terminated from DOJ. However, because she did not have access to the OPR record of evidence, she was unable to demonstrate that she had not engaged in the serious misconduct that the Attorney General's Removal Decision indicated.

150. In October 2022, the prospective employer approved Plaintiff for employment. However, the employer informed Plaintiff that it had received negative feedback from her last employer to the effect that Plaintiff had engaged in "misconduct and negligence" while employed at DOJ. The prospective employer required Plaintiff to sign a letter acknowledging that she had engaged in such "misconduct and negligence" or that she could be fired if she engages in such conduct. The letter was phrased in such as a way as to make Plaintiff vulnerable to termination if she signed the letter, so she declined. *See* Attachment B.

151. Because she declined to sign the letter, the conditional offer of employment was revoked. This job loss amounted to a denial of Plaintiff's statutory rights to proper record maintenance, which, in turn, infringed her Constitutionally protected liberty and property interests in maintaining her professional reputation and in continued federal employment or in practicing law.

152.    Plaintiff's termination has already occasioned innumerable professional and economic hardships.  Her health insurance coverage and her life insurance coverage were cut off amid the very lethal Covid-19 pandemic.  She stands to lose approximately six years of retirement pension payments and associated benefits.  In addition, she will likely have to expend additional resources, time, and money on fighting disciplinary bar proceedings that are premised on charges so weak even Defendants hesitated to sustain them.

153.    Through this cause of action, Plaintiff requests that the Court rescind the Attorney General's Removal Decision, the EOIR Director's Notice of Proposed Removal, and the OPR Report of Investigation.  If not rescinded or amended, those records will continue to impede her ability to find new employment in the federal government, the private sector, or the non-profit sector.  The records have already impeded her ability to volunteer for pro bono assignments that require her to carry professional liability insurance.   The records will also subject her to unnecessary bar disciplinary proceedings in the event she does not prevail in this lawsuit.

## COUNT  II:  Discrimination, Retaliation, and Hostile Work Environment

154.    The second cause of action relates to Plaintiff's complaint of discrimination, retaliation for engaging in protected activity, and hostile work environment that she initiated on December 10, 2015 through the filing of a formal EEO complaint with the EEOC.

155.    Plaintiff has properly exhausted this cause of action with the administrative agencies authorized to adjudicate her discrimination complaint.  Her administrative complaint was filed with the EEOC on December 10, 2015 and was amended twice on August 25, 2016 and May 18, 2018, respectively.  *See* Exhibit 3 (ECF No. 63-3 at 3-42).  The complaint challenges EOIR's discriminatory and retaliatory practices that began in January 2015, which contributed to a hostile work environment in the Arlington court and led to her removal from the Justice Department on

September 17, 2020. Plaintiff argued before the EEOC that these discriminatory and retaliatory practices violated Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.

156. The EEOC action that commenced in December 2015 lasted five years. The EEOC action overlapped with the OPR investigation by two years (between August 2017 and September 2019). Discovery in the EEOC action was very contentious, time-consuming, and costly. At the close of discovery in March 2019, many factual disputes remained unresolved.

157. Nevertheless, in April 2019, EOIR moved for summary judgment, arguing that there was no genuine dispute of material facts and that the law clearly favored a grant of summary judgment. In support of the summary judgment motion, EOIR filed a Statement of Undisputed Facts that actually contained many disputed facts. Exhibit 4 at 442-499 (ECF No. 447-504) (to be filed with court permission). EOIR attached this statement to its 450-page compilation of supporting documents that EOIR introduced, for the first time, in support of its summary judgment motion. *Id.* at 438-975 (ECF No. 53-5 at 443-980).

158. In opposing EOIR's Motion for Summary Judgment, Plaintiff filed a Statement of Disputed Material Facts and an Amended Statement of Disputed Material Facts. Exhibit 4 at 143-221, 222-301 (ECF No. 53-5 at 148-226, 227-306) (to be filed with court permission). The two Statements highlighted the genuine disputes of material facts that needed to be resolved before the EEOC administrative judge could dispose of EOIR's Summary Judgment Motion. Plaintiff also requested a hearing to address some of the evidentiary disputes.

159. On February 26, 2020, the EEOC administrative judge granted EOIR's Motion for Summary Judgment without a hearing. Exhibit 4 at 107-120 (ECF No. 53-5 at 112-125) (to be refiled with court permission). The same day, the EEOC administrative judge issued a protective

order that placed all of the "BAIN FOIA 2015" documents under seal.  Thus, Plaintiff did not use those documents in appealing the judge's decision.  *See* Exhibit 14 (ECF No. 63-14).

160.    Plaintiff timely appealed the administrative judge's decision to the Justice Department's Complaint Adjudications Office (CAO).  In her appeal to the CAO, Plaintiff advised that <u>one day</u> after the EEOC administrative judge dismissed her complaint by summary judgment, the Justice Department proposed her removal on February 27, 2020.  *See* Exhibit 4 at 356-364 (ECF No. 53-5 at 361-369 (to be refiled with court permission).  Plaintiff requested that the CAO hold the appeal in abeyance, pending the Attorney General's disposition of the proposal to terminate her employment.  The CAO declined her request to hold the appeal.

161.    On May 1, 2020, Plaintiff filed a timely appeal to the full EEOC Commission.  *See* Exhibit 4 at 365-369 (ECF No. 53-5 at 370-374) (to be refiled with court permission).  She notified the Commission that her employing agency, EOIR, had proposed to terminate her employment one day after the EEOC administrative judge dismissed her EEO complaint by summary judgment.  Plaintiff requested that the EEOC vacate the administrative judge's decision, reopen the evidentiary record, and remand the matter for further discovery pending the Attorney General's consideration of the proposed termination of Plaintiff.

162.    While her EEOC appeal was pending, the United States Attorney General issued a removal decision on September 17, 2020, terminating Plaintiff's employment in the Justice Department after 29 years.  *See* Exhibit 1 at 192-220 (ECF No. 53-2 at 197-224) (Sealed).

163.    On October 19, 2020, Plaintiff timely filed a mixed case appeal with the MSPB that asserted two affirmative defenses: Employment discrimination under Title VII and the Rehabilitation Act, and whistleblower retaliation under the Whistleblower Protection Act of 1989, as amended.  *See* Exhibit 5 (ECF No. 63-5).

164.    After her MSPB mixed case appeal was put on hold as a result of Defendants' motion to dismiss, Plaintiff requested that the EEOC reconsider its decision to dismiss her EEOC action.  *See* Exhibit 6 (ECF No. 64-1 at 3-18).  Plaintiff further advised the EEOC that she was pursuing a mixed case appeal before the MSPB, in which she asserted discrimination as an affirmative defense to her removal.  Plaintiff requested that the EEOC reconsider its decision to dismiss her EEOC action by summary judgment, reopen the evidentiary record, and hold the EEOC proceeding in abeyance pending resolution of the MSPB mixed case appeal, to avoid any potential *res judicata* effect or issue preclusion that the EEOC decision might present in the MSPB proceeding.

165.    On June 22, 2021, Plaintiff filed the instant civil action within 90 days after receiving the EEOC's March 24, 2021 decision to affirm the EEOC administrative judge's dismissal of the EEOC action.  In filing this civil action, Plaintiff sought judicial review of the EEOC's decision and Plaintiff's affirmative defense to the Attorney General's Removal Decision that rested on a claim of discrimination, retaliation, and hostile work environment.

166.    On August 17, 2021, after the instant action was commenced, the EEOC denied Plaintiff's April 29, 2021 Motion for Reconsideration.  *See* Exhibit 6 (ECF No. 64-1 at 19-29).

167.    On September 22, 2021, Plaintiff amended the original complaint by right, to include additional allegations of discrimination, retaliation, and hostile work environment that directly related to the Attorney General's Removal Decision of September 17, 2020.  *See* ECF No. 16.

168.    Through this cause of action, Plaintiff now advances that new discrimination and retaliation claim in accordance with the Court's December 23, 2022 decision and order, which

Plaintiff understands expresses the Court's desire to confine judicial review to this new claim.  *See* ECF No. 56 at 37-44, 47-48.

### New Retaliation Claim

169.    To establish a claim of retaliation, Plaintiff must establish that she suffered (1) a materially adverse action; (2) because she had brought or threatened to bring a discrimination claim.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008).  *See also* 42 U.S.C. 2000e-3(a).  A "materially adverse action" is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53, 68 (2006).

170.    Plaintiff timely and properly exhausted this retaliation claim through her March 4, 2020 appeal to the Justice Department's Complaint Adjudications Office (CAO), and her May 1, 2020 appeal to the full EEOC Commission.  *See* Exhibit 4 at 356-364, 361-369 (ECF No. 53-5 at 361-369, 370-374) (to be refiled with court permission).

171.    This Court has jurisdiction to consider this retaliation claim.  Plaintiff timely filed this civil action within 90 days after the EEOC affirmed the dismissal of her EEOC action and within 30 days after the EEOC denied her motion for reconsideration.  *See* 28 U.S.C. § 1331; 5 U.S.C. § 7703(b)(2).  *See also Perry v. MSPB*, 137 S. Ct. 1975, 1979 (2017) (holding that when the MSPB dismisses a mixed case appeal for lack of subject matter jurisdiction, the plaintiff may appeal her removal to the federal district court); *Kloeckner v. Solis*, 568 U.S. 41, 46 (2012) (holding that a federal employee who claims that an agency action appealable to the MPSB violate an anti-discrimination statute listed in 5 U.S.C. § 7702(a)(1) should seek judicial review of the dismissal of her complaint in federal district court, not in the Federal Circuit).

172.    Plaintiff asserts that Defendants' February 27, 2020 proposal to terminate her 29-year employment at the Justice Department was a new act of retaliation that was motivated by her protected characters of race (Asian), sex (female), national origin (Vietnamese), medical condition or disability status, and reprisal.

173.    The proposal to terminate her employment constituted retaliation for her having engaged in EEOC activity immediately before EOIR proposed to terminate her employment.  The clearest evidence of this retaliatory action is that the proposal to terminate her employment came just <u>one day</u> after the EEOC administrative judge dismissed the EEOC action by granting EOIR's motion for summary judgment without a hearing.  *See* Exhibit 3 (ECF No. 53-2 at 137-149); Exhibit 1 at 133-145 (ECF No. 53-2) (Sealed).

**New Discrimination Claim**

174.    To establish a prima facie case of disparate treatment, Plaintiff must show that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Douglas v. Pierce*, 707 F. Supp. 567, 571 (D.D.C. 1998), *aff'd sub nom. Douglas v. Kemp*, 906 F.2d 783 (D.C. Cir. 1990) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13 (1973)).  *See also Chambers v. District of Columbia*, 35 F.4th 870, 873 (D.C. Cir. 2022) (*en banc*). A reasonable inference of unlawful discrimination can be drawn from disparate treatment of Plaintiff as compared with others who are not members of her protected class who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Roberts v. Segal Company*, 125 F. Supp. 2d

545 (D.D.C. 2000) (quoting *Phillips v. Holladay Property Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996)).

175.    Plaintiff timely and properly exhausted this new discrimination claim through her Motion to Reconsider the EEOC's March 24, 2021 decision to affirm the dismissal of Plaintiff's EEO complaint by summary judgment.  In that decision, the EEOC acknowledged the new claim but declined to consider it.  Instead, the EEOC confined its review of the reconsideration motion to the original 39 allegations of disparate treatment, retaliatory action, and hostile work environment that the EEOC administrative judge accepted and considered.

176.    As Plaintiff timely appealed from the EEOC's March 24, 2021 decision and timely amended her civil complaint within 30 days after the EEOC denied her reconsideration motion, this Court has jurisdiction to consider the new discrimination claim under 28 U.S.C. 1331 and 5 U.S.C. § 7703(b)(2).

177.    Plaintiff asserts that Defendants' September 17, 2020 Removal Decision was a new act of discrimination that was motivated by Plaintiff's protected characters of race (Asian), sex (female), national origin (Vietnamese), medical condition or disability status, and reprisal.

178.    Defendants terminated Plaintiff's employment so that her full-time position could be given to an immigration judge candidate they favored.  The favored judge candidate does not fall into Plaintiff's protected class.  He was a white male named Vance Spath.  He had virtually no prior immigration knowledge or practice experience when he was hired for the Arlington Immigration Court in 2016 or 2017.  The timing of his job application and appointment to the Arlington Immigration Court closely correlated with the timing of the various adverse personnel actions that Plaintiff's former supervisors undertook to lay the groundwork for her removal.

179. In March 2015, Plaintiff received a reprimand from ACIJ Santoro the same month that Vance Spath applied for an immigration judge position in the Arlington court. Exhibit 1 (ECF No. 53-2 at 245-267) (Sealed); Exhibit 21 (ECF 63-13 at 5-7). The reprimand prevented her from obtaining a transfer to the Arlington court for a period of three years.

180. During that three-year period, EOIR processed Vance Spath's job application with the goal of onboarding him quickly. Spath interviewed for a job in March 2016. *See* Exhibit 21 (ECF No. 63-13 at 55).

181. In June 2016, ACIJ Nadkarni obtained references for Spath from his co-workers. *See* Exhibit 21 (ECF No. 63-13 at 5-7).

182. In March 2017, former Attorney General Jeff Sessions signed papers that authorized Spath's appointment as an immigration judge. *See* Exhibit 21 (ECF No. 63-13 at 8, 56). That month, Plaintiff became the subject of a complaint of judicial misconduct filed by attorney Paul L. Knight. This was the first such complaint that Plaintiff had received, then in her ninth year of service as an immigration judge and her twenty-fourth year of employment with DOJ.

183. In August 2017, Spath requested an enter-on-duty date of May 2018. *See* Exhibit 21 (ECF No. 63-13 at 9). That same month, EOIR referred both of the Knight complaints that were filed against Plaintiff to OPR for an investigation.

184. In May 2018, Attorney General Sessions signed an order officially appointing Spath to the Arlington Immigration Court. *See* Exhibit 21 (ECF No. 63-13 at 10, 56). That month, Plaintiff sat for a hostile seven-hour OPR interview.

185. In September 2018, Spath was invested as an immigration judge and began conducting court hearings in the Arlington Court. *See* Exhibit 21 (ECF No. 63-13 at 59).

186. When Spath onboarded in September 2018, there were not enough courtrooms in the Arlington court to accommodate him. *See* Exhibit 21 (ECF No. 63-13 at 14-15); Exhibit 20 (ECF No. 64-3 at 38). Nevertheless, he was assigned a courtroom of his own, while Plaintiff had to share a courtroom with another judge.

187. In April 2019, barely seven months into his two-year probationary period, a federal court of appeals found that Vance Spath had violated the rules of ethical conduct and professional responsibility in the most fundamental way: He pursued the immigration judge position while presiding over a military commission trial in which Justice Department lawyers from the National Security Division served on the prosecution team. *See* Exhibit 21 (ECF No. 63-13 at 16-17, 18-48). The court of appeals determined that Spath's failure to divulge his job application to defense counsel was a serious ethical breach, as well as conduct that was prejudicial to the administration of justice. The court of appeals further concluded that Spath's failure to divulge his job application to defense counsel constituted a lack of candor.

188. Upon information and belief, Spath was never investigated or disciplined for those serious ethical violations. When Spath completed his probationary period in September 2020, he not only kept his job but was promoted to supervisory immigration judge.

189. By contrast, after OPR found that Plaintiff had engaged in misconduct and lacked candor in answering two of hundreds of questions posed by OPR counsel, Defendants terminated her employment in September 2020, the same month that they promoted Spath.

190. There could be no other explanation for this disparate treatment than that the decision was based on Plaintiff's race and sex. Defendants kept Spath because he is a white male and fired Plaintiff because she is not.

191.    A comparison of OPR's past investigations into the conduct of immigration judges supports this finding.  In similarly situated cases, OPR did not find misconduct on the part of immigration judges who manifested improper demeanor, or used impeachment evidence that turned out to be wrong, or made statements that were considered impolite or untoward a litigant. And in no such case did EOIR recommend termination.  Such race-and-sex-neutral decisions confirm that the penalty Plaintiff received was grossly disproportionate to the penalty that similarly situated immigration judges received after they underwent OPR investigations.

192.    The penalty that Plaintiff received was also grossly disproportionate to the penalty that other similarly situated immigration judges received.  Documents from the "BAIN FOIA 2015" folder confirm that when similarly situated (white male) judges make comments in the court setting that are inappropriate, they are not disciplined at all, let alone discharged.  Some of those judges were repeat offenders who were well-known throughout the agency for their outrageous behavior, which EOIR management did not bother to keep in check.  *See* Exhibit 14 (ECF No. 63-14).

193.    Further confirmation of this conclusion can be found in the Attorney General's Removal Decision which tethers Plaintiff's situation to that a corrupt Senior EOIR Executive who was not an immigration judge.  He was terminated for sexually abusing his co-workers, demanding favors and gifts from subordinates, and seeking *quid pro quo* treatment from contractors. Comparing Plaintiff to that individual is highly insulting and disingenuous.  Plaintiff's situation is not analogous, and drawing an analogy – as the Removal Decision did – is going beyond the pale. *See* Exhibit 1 at 174 (ECF No. 53-2) (Sealed).

194.    Plaintiff was a dedicated public servant of 29 years.  She labored for each day's wages and spoke the truth even when it was unpopular.  She excelled in her job because she was

dedicated and worked hard at it. She earned her stripes earnestly, building a solid reputation among her peers as someone who goes the extra mile and gets the job done. She treats others with kindness. She does not need adulation or admiration. It is enough that people know she is conscientious, decent, and fair. *See* Exhibit 16 (ECF No. 53-17) (Sealed).

195.   The termination of Plaintiff's 29-year DOJ career speaks volumes about discriminatory treatment of women of color at DOJ. White male judges over 40 years of age who have engaged in far more serious misconduct have remained on the bench, drawing their full pay and employment benefits even when they are investigated. Female judges of color, on the other hand, have suffered unjustifiable denials of accommodations, leave, fair evaluations of their work performance, work opportunities, and career advancement. *See* Exhibit 14 (ECF No. 63-14).

196.   As a result of her wrongful discharge, Plaintiff was deprived of an immigration judge position that she had performed satisfactorily for 12 years. Her 29-year DOJ legal career was extinguished, and her life has been in shambles. The life and health insurance that she had been carrying for 29 years were cut off amid the raging covid-19 pandemic. Approximately six years' worth of retirement benefits were forfeited, because she was fired one year shy of accruing minimum retirement eligibility (*i.e.*, at age 55, with 30 years of service). She had spent more than $287,000 in attorneys fees to defend herself against the discrimination, retaliation, and hostile work environment as well as the OPR investigation. This was a devasting loss from which she is still trying to recover.

197.   Furthermore, not only was her livelihood taken away so discriminately and cruelly, but her future earning potential is also threatened. Although the Attorney General's letter of termination acknowledged that her conduct of the court hearings and ruling on the Motion for Recusal merely implicated, but did not necessarily violate, her state bar rules, DOJ has pledged to

53

refer her to her state bars for disciplinary action if she does not prevail in this civil action. Exhibit 1 (ECF No. 53-2 at 197, 219 n. 64) (Sealed). All of this is premised on its highly flawed analysis of the facts and law that govern the work of immigration judges, as well as its very questionable lack-of-candor finding which does not meet legal and evidentiary standards.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court award the following declaratory, injunctive, and monetary relief:

198.    Order the rescission and sealing of the Attorney General's September 17, 2020 Removal Decision.

199.    Order the rescission and sealing of OPR's draft Report of Investigation and Final Report of Investigation.

200.    Order the rescission of the BIA's erroneous January 2, 2018 decision and its retraction from all internet and media outlets.

201.    Order correction of the errors in Plaintiff's official personnel file, performance rating files, and similar record files in accordance with 5 U.S.C. § 552a(g)(1), (4) & (5). The personnel actions that require correction or rescission include the March 2015 reprimand, June 2015 counseling letter, August 2015 performance rating, July 2016 counseling letter, October 2016 performance rating, and August 2017 performance rating.

202.    Award Plaintiff reasonable attorneys' fees, costs, and other consequential damages;

203.    Award Plaintiff compensatory damages for pain and suffering, emotional distress, damage to professional reputation that resulted from Defendants' discriminatory employment actions and practices between March 2015 and September 2020.

204.    Reinstate Plaintiff to her prior position at DOJ or reassign her to a comparable full-time position in the Washington, DC area, and award full back pay and interest.

205.    Any other relief that the Court deems just and proper.

Dated:  February 25, 2023

Respectfully submitted,

Quynh Vu Bain
Plaintiff, *pro se*
213 Third Street, SE
Washington, DC  20003