**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                            )
**QUYNH VU BAIN,**                            )
                                                            )
Plaintiff,                                            )          **No. 21-Civ-1751 (RDM)**
                                                            )
            v.                                          )
                                                            )
**OFFICE OF THE ATTORNEY GENERAL**  )          **Jury Trial Demanded**
**U.S. Department of Justice, et al.**       )          **for Second And Third**
                                                            )          **Causes of Action**
Defendants.                                       )
_____)

**[PROPOSED] SECOND AMENDED COMPLAINT FOR**
**DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF**

Plaintiff Quynh Vu Bain, proceeding *pro se*, brings this action against the United States

Department of Justice and its various named components, collectively referred to as "Defendants."

**Nature of Action**

1.      This action asserts three separate but related causes of action arising from

Defendants' September 17, 2020 decision to terminate Plaintiff's employment after 29 years of

exemplary service in the U.S. Department of Justice.  *See* Exhibit 1 (ECF No. 53-2 at 195-223)

(Sealed).

**Parties**

2.      Plaintiff is a resident of the District of Columbia and a citizen of the United States.

She is an Asian-American female of Vietnamese descent in her fifties.  She was employed as a

career civil servant in the U.S. Department of Justice from October 1991 to September 2020.  Most

recently, she served as an Immigration Judge in the Executive Office for Immigration Review for

12 years.  At various times, she was assigned to the Headquarters Immigration Court in Falls Church, Virginia and the Arlington Immigration Court in Arlington, Virginia.

3.      All of the offices and agencies collectively denoted as Defendants are components of the United States Department of Justice.

The Office of the Attorney General ("OAG") makes hiring, firing, and other personnel-related decisions concerning immigration judges.

The Office of the Deputy Attorney General ("ODAG") formulates and recommends disciplinary or adverse actions against immigration judges.

The Office of Professional Responsibility ("OPR") investigates allegations of misconduct involving Department attorneys, including immigration judges.

The Office of Information Policy ("OIP") adjudicates appeals from the decisions of individual DOJ components to withhold information that is requested under the Freedom of Information Act and the Privacy Act.

The Executive Office for Immigration Review ("EOIR") manages the operations of the Nation's 58 immigration courts through the Office of the Director, Office of the Deputy Director, and Office of the Chief Immigration Judge.

## Factual Background

4.      After performing her job satisfactorily for seven years, Plaintiff became the target of an agency scheme to take away her immigration judge position, so that it could be given to an immigration judge candidate Defendants favored.  This scheme began in January 2015 and ended with Plaintiff's wrongful termination in September 2020.  It targeted Plaintiff for removal after she became ill as a result of using malfunctioning video-conference equipment to conduct court hearings.

5.      To carry out the scheme, Plaintiff's supervisors in the agency where she worked, the Executive Office for Immigration Review (EOIR), undertook a series of discriminatory and retaliatory adverse personnel actions that created a hostile work environment for Plaintiff.  Those highly questionable and illegal maneuvers put tremendous pressure on Plaintiff to quit her job or to accept a demotion so that her full-time employment position could be given to a favored immigration judge candidate.  The hostile personnel actions were also meant to retaliate against Plaintiff for pursuing an EEO complaint against EOIR after her requests to transfer to the Arlington, Virginia Immigration Court were denied.  Those discriminatory and retaliatory actions are well-documented in Plaintiff's December 2015 Complaint of Discrimination, August 2016 first amendment, and May 2018 second amendment to the complaint.  *See* Exhibit 3 (ECF 63-3 at 14). They are discussed further below.

## The Campaign to Purge Plaintiff From EOIR

6.      In March 2015, Plaintiff's then-immediate supervisor, Assistant Chief Immigration Judge Christopher A. Santoro issued a reprimand letter that criticized Plaintiff for displaying intemperate behavior toward him after she objected to a work assignment that would have caused her to violate the law governing immigration detention.  *See* Exhibit 3 (ECF No. 63-3 at 5-6).  *See also* Exhibit 13 (ECF No. 53-14 at 38-80, 81-82) (Sealed).

7.      At that time, Plaintiff had been employed with DOJ for 24 years and as an immigration judge for seven years.  Never before had she been the subject of a reprimand, nor did she have a disciplinary record.

8.      The effect of the reprimand letter was to bar Plaintiff from securing a reassignment to the Arlington court for a period of three years.  *See* Exhibit 3 (ECF 63-3 at 9-10).

9.     During that three-year period, ACIJ Santoro assisted a friend and colleague in applying for an immigration judge position in the Arlington court.  The same month that ACIJ Santoro issued the reprimand letter to Plaintiff (March 2015), his friend and colleague, Vance Spath, applied for an immigration judge position in the Arlington, Virginia Immigration Court. *See* Exhibit 21 (ECF No. 63-13 at 55).

10.     Upon receiving the reprimand letter, Plaintiff promptly requested that ACIJ Santoro amend or rescind the March 2015 reprimand, but he refused.  *See* Exhibit 13 (ECF No. 53-14 at 38-80, 81-82) (Sealed).

11.     In late June 2015, ACIJ Santoro issued a counseling letter that accused Plaintiff of traveling without his authorization to the York, Pennsylvania Immigration Court, where she conducted her assigned court hearings in person.  Upon his return from a two-week vacation, he revoked the travel authorization that Plaintiff had received from other agency personnel and denied her request for travel reimbursement.  *See* Exhibit 15 (ECF No. 63-11 at 2-3) (Sealed).  Plaintiff requested that ACIJ Santoro rescind the counseling letter, but he refused.  *Id.* at 4-7.

12.     In August 2015, ACIJ Santoro issued an annual performance rating that – while crediting Plaintiff with satisfactory work performance – rated her professionalism as needing improvement.  *See* Exhibit 3 (ECF No. 63-3 at 9).  *See also* Exhibit 18 (ECF No. 53-19 at 13-39) (Sealed).  The performance rating referenced the March 2015 reprimand and June 2015 as reasons to downgrade her performance rating.  Plaintiff requested that ACIJ Santoro rescind or amend the errors in the performance rating, but he refused.

13.     In December 2015, Plaintiff filed a formal EEO complaint with the EEOC, she requested that the EEOC treat the March 2015 reprimand, June 2015 counseling letter, and August

2015 performance rating as discriminatory or retaliatory adverse personnel actions.  She requested the remedy of rescission of those adverse actions.  *See* Exhibit 3 (ECF 63-3 at 17).

14.     Within a month of filing her EEO complaint, Plaintiff was suddenly reassigned to the Arlington court's non-videoconference docket.   However, over the next four years she continued to experience progressively worse acts of discrimination and retaliation that eventually culminated in her wrongful discharge in September 2020.

15.     From 2016 to 2019, Plaintiff's next supervisor, ACIJ Deepali Nadkarni, continued the purge campaign that ACIJ Santoro had begun in 2015.  The harassment occurred on almost a weekly basis.

16.     ACIJ Nadkarni assigned Plaintiff a substantially heavier caseload than those of her colleagues.  *See* Exhibit 3 (ECF 63-3 at 27).  ACIJ Nadkarni permitted white judges to dump their unwanted cases on Plaintiff's hearing calendar, causing numerous scheduling conflicts.  *Id.* at 27-28.  ACIJ Nadkarni assigned Plaintiff to hear detained cases out of the detention facility in York, Pennsylvania using tele-videoconference equipment that frequently malfunctioned and caused Plaintiff to experience recurring migraine headaches.  *See* Exhibit 20 (ECF No. 64-3 at 61-62, 3-14, 26, 36).

17.     When Plaintiff voiced concern about the very burdensome assignments, scheduling conflicts, and abusive case dumping practices, ACIJ Nadkarni issued a counseling letter on July 28, 2016 that criticized Plaintiff for acting unprofessionally toward a white female judge.  *See* Exhibit 3 (ECF 63-3 at 20-23, 26) (Sealed).   The counseling letter threatened to terminate Plaintiff's employment.  *Id.* at 22, 27.

18.     Upon receiving the July 28, 2016 counseling letter, Plaintiff promptly requested that ACIJ Nadkarni amend or rescind the letter, but she refused.  *See* Exhibit 20 (ECF No. 64-3 at

32).  Since Plaintiff's EEOC action was still pending, she filed an amendment to her formal EEO complaint to challenge the discriminatory July 2016 counseling letter.  *See* Exhibit 3 (ECF 63-3 at 15-17).  The EEOC administrative judge accepted the amendment and treated the counseling letter as a discrete act of disparate treatment.  Exhibit 3 (ECF No. 63-3 at 38-39).

19.     In September 2016, ACIJ Nadkarni issued a performance rating that – while crediting Plaintiff with satisfactory work performance – criticized her for a lack of professionalism.  *See* Exhibit 3 (ECF No. 63-3 at 28); Exhibit 1 at 337-340 (ECF No. 53-2) (Sealed).  The performance rating referenced the July 2016 counseling letter that she had issued to Plaintiff.  *Id.* At the time, Plaintiff did not know that, on the same date, a similarly worded counseling letter was issued to the white female judge, faulting that judge for acting unprofessionally toward Plaintiff.  *See* Exhibit 20 (ECF No. 53-21 at 28-31) (Sealed).

20.     In August 2017, ACIJ Nadkarni again rated Plaintiff's work performance as satisfactory but noted that her professionalism needed improvement.  *See* Exhibit 20 at 34-40 (ECF No. 53-2 at 53-60) (Sealed).  The performance rating again referenced Plaintiff's July 2016 counseling letter.  In October 2017, Plaintiff requested that ACIJ Nadkarni amend or rescind the September 2016 and August 2017 performance ratings, but she refused.  *See* Exhibit 3 (ECF 63-3 at 23-33).

21.     In February 2018, ACIJ Nadkarni violated the regulation that prohibited supervisory judges from dictating case outcomes to subordinate judges.  *See* 8 C.F.R. § 1003.9(d) (2017).  In at least two cases, she directed Plaintiff to grant asylum relief after Plaintiff concluded that such a decision was unwise.  Plaintiff opposed this harassment by sending a strongly worded email to ACIJ Nadkarni, on which she copied the former Chief Immigration Judge and the former EOIR Director.  *See* Exhibit 20 (ECF No. 64-3 at 70).

22.     On September 27, 2019, the DOJ Office of Professional Responsibility issued a report of investigation that relied on all of the above-described adverse personnel actions as evidence supporting its finding of general misconduct.  *See* Exhibit 30 (ECF No. 53-31 at 3-85) (Sealed).

23.     On February 26, 2020, the EEOC administrative judge presiding over Plaintiff's EEOC action dismissed her employment discrimination complaint by summary judgment without a hearing.  *See* Attachment F at 28-41.

24.     The very next day, on February 26, 2020, the former EOIR Director recommended that the Attorney General terminate Plaintiff's 29-year employment in DOJ.  *See* Exhibit 1 (ECF No. 63-1 at 137-149) (Sealed).  The Director based his recommendation to terminate Plaintiff's employment on the OPR Report of Investigation and the above-described adverse personnel actions.  *Id.*

25.     On September 17, 2020, the former Attorney General of the United States issued a decision terminating Plaintiff's employment.  The Removal Decision relied on the OPR Report of Investigation in finding that Plaintiff had engaged in professional misconduct that implicated, but did not necessarily violate, Rules 8.4 and 4.4 of the Model Rules of Professional Responsibility. The Removal Decision also referenced the above-described adverse personnel actions as aggravating factors that justified his decision to terminate Plaintiff's employment.  *See* Exhibit 1 (ECF No. 63-1 at 196-224) (Sealed).

### The OPR Investigation

26.     Beginning in 2017, EOIR began laying the groundwork for the OPR investigation that ultimately led to Plaintiff's removal from DOJ and the federal service.  The architect of this scheme was an EOIR OGC attorney, Marlene Wahowiak.  Wahowiak supervised the litigation of

Plaintiff's EEOC action.  In August 2017, she referred Plaintiff to OPR for an investigation and then played an active role in the investigation. She then used information that she obtained from the investigation to defeat Plaintiff's EEOC action.  *See* Attachment E.

27.     In January 2017, Plaintiff learned that EOIR had released sensitive, privacy-protected information from her personnel file to the American Immigration Lawyers Association ("AILA"), a voluntary bar association of immigration attorneys.  Plaintiff immediately demanded that EOIR retract or claw back the information, but EOIR refused.  *See* Exhibit 3 (ECF 63-3 at 28-29); Exhibit 14 (ECF No. 64-4 at 4-30); Exhibit 24 at 4 (ECF No. 64-4 at 1-13).

28.     Less than two months later, attorney Paul L. Knight filed two complaints of misconduct against Plaintiff, on behalf of his clients, immigration bar attorneys Eileen P. Blessinger and Carmen A. Boykin.  The two complaints were filed with Plaintiff's immediate supervisor, ACIJ Nadkarni, in March 2017.  *See* Exhibit 27 (ECF No. 62-3 at 7-15).  The complaints contained explosive accusations of judicial bias, improper demeanor, bullying behavior, and gross incompetence.  *Id.* at 12.  An ensuing two-year investigation by OPR would substantiate only one of those charges.  Nevertheless, the complaint set in motion a chain of events that ultimately led to Plaintiff's removal from DOJ and the federal service.

29.     The first complaint filed on March 1, 2017, stated that "Judge Bain has been counseled in the past but that apparently has not been sufficient to instill the necessary dignity and decorum required in her proceedings."  *See* Exhibit 27 at 10 (ECF No. 62-3 at 12).  Plaintiff understood this comment to be a reference to the privacy-protected information that EOIR had released to AILA two months earlier.  *See* Exhibit 3 (ECF No. 63-3 at 28-20).

30.     The March 1, 2017 complaint was the first such complaint filed against Plaintiff, then in her ninth year of service as an immigration judge.

31.     Plaintiff's supervisor, ACIJ Nadkarni, did not apprise Plaintiff of Knight's March 1, 2017 complaint.  Plaintiff learned about the complaint at the start of a March 7, 2017 court hearing, when attorney Blessinger presented a Motion for Recusal that attached the Knight complaint as the main exhibit.  *See* Exhibit 30 (ECF No. 53-31 at 775-793) (Sealed).  Blessinger informed Plaintiff that a copy of the complaint had been emailed to the court administrator, Deborah Castro, the day before the hearing, and that she expected Plaintiff to immediately recuse. *See* ECF No. 53-2 at 88-89.

32.     Concerned that the court administrator might have engaged in an impermissible *ex parte* communication, Plaintiff asked the court administrator to testify concerning that communication in open court.  *See* ECF No. 53-2 at 90.  The court administrator's testimony served two purposes: (1) to cure the *ex parte* nature of the communication by divulging it to government counsel; and (2) to confirm that, prior to the March 7, 2017 court hearing, Plaintiff did not receive from the court administrator the Knight March 1, 2017 complaint or the motion for recusal.  *Id.* Calling the court administrator to testify openly about the *ex parte* communication satisfied Plaintiff's disclosure obligations under the Immigration Judges' Ethics and Professionalism Guide.

33.     On March 28, 2017, Knight filed a second complaint with Plaintiff's supervisor. *See* Exhibit 27 at 14-15 (ECF No. 62-3 at 16-17) (the "second Knight complaint").  The second complaint alleged that Plaintiff abused her judicial authority by refusing immediately to recuse from all Blessinger and Boykin cases, and by requiring the court administrator to testify about the *ex parte* communication with Blessinger.  *Id.*  The second complaint also falsely accused Plaintiff of witness intimidation because she had invited a court security officer to submit an affidavit describing the officer's impressions of Blessinger's conduct during a February 17, 2017 court hearing.  *Id.*

34.    Plaintiff's supervisor, ACIJ Nadkarni, directed Plaintiff to respond to the recusal motion and the March 2017 Knight complaints.  Exhibit 20 (ECF No. 64-3 at 40).

35.    On June 8, 2017, Plaintiff issued an order denying the recusal motion.  The June 8, 2017 Order applied the recusal procedure and standards prescribed in EOIR's policy memorandum, known as OPPM 05:02.  Promulgated in 2005, OPPM 05:02 was modeled after the recusal procedure for federal judicial officers in 28 U.S.C. § 455(a) & (b), and the United States Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994).  In addition, Plaintiff's Recusal Order applied the Immigration Judges' Ethics and Professionalism Guide, which is a code of judicial ethics and conduct for immigration judges.  The Recusal Order was subsequently affirmed by the Board of Immigration Appeals ("BIA").  *See* Exhibit 25 (ECF No. 63-15).

36.    In early August 2017, EOIR referred Plaintiff to OPR for an investigation, based on Knight's recommendation.  Wahowiak prepared the referral email.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 83-85) (Sealed).  Upon information and belief, Wahowiak had worked in OPR for 12 years.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 281-284) (Sealed).  She used her contacts in OPR to initiate the investigation.

37.    On August 29, 2017, Plaintiff received a Letter of Inquiry from former OPR Chief Counsel Robin Ashton.  *See* Exhibit 27 (ECF No. 62-3 at 3-6).  Confrontational and accusatory in tone, the letter directed Plaintiff to submit a response to the inquiry in two weeks' time.  *See id.*

38.    On the same date, Ashton sent Knight a letter advising him that OPR had opened an inquiry into his March 2017 complaints.  Ashton advised Knight that OPR investigative counsel was Leslie A. Gerardo.  Ashton authorized Knight to contact Gerardo directly if he had any questions.  *See* Attachment B at 4.

*39.*    At the time that she received the OPR Letter of Inquiry, Plaintiff was unaware that Knight had filed a third complaint of misconduct against her on June 16, 2017.  *See* Attachment B at 2.  In February 2023, OPR released a redacted copy of the third complaint to Plaintiff, in response to her August 5, 2019 FOIA and Privacy Act request.  The third complaint was directed to Plaintiff's supervisor, ACIJ Nadkarni.  *See id.*  ACIJ Nadkarni, however, never showed Plaintiff a copy of that complaint.

*40.*    In the third complaint, Knight accused Plaintiff of making false statements about his law firm, Nossaman LLP, and one of his clients (Boykin).  *See* Attachment B at 2.  Knight claimed that Plaintiff had wrongfully accused his firm of representing the interests of the Government of Iran.  Knight claimed that if that accusation were true, then Knight's firm could be subject to felony prosecution.  *See id.*

41.    Plaintiff categorically denies that she had made a false statement about Knight and his law firm.  Had she received his June 16, 2017 complaint at the time it was filed, she would have immediately responded and explained why she believed the statement was accurate.

42.    At the time, the firm's on-line profile indicated that Nossaman LLP had represented individuals facing criminal prosecutions for violating the Iran sanctions:

> "The Departments of Justice, State, Commerce, Treasury, and Homeland Security continue to enforce vigorously embargo-related criminal statutes.  Such prosecutions include the transshipment of goods, weapons, and economic espionage to Iran, North Korea, and other countries subject to trade embargoes under Executive Orders. . . .  Nossaman attorneys have significant experience in the defense of these prosecutions.  They have represented clients charged with the transshipment of goods to Iran, including the acquittal of one such client in a jury trial."

*See* Exhibit 23 at 14 (ECF No. 63-14 at 16).

43.    Given the broad definition of "Government of Iran" in the various Executive Orders, Plaintiff believed that the individuals whom Knight's law firm had represented in criminal

11

proceedings were connected to that government.  Plaintiff believed that the statement was true

when it was made.  She did not make the statement to impugn Knight's professional reputation.

Her point was that he was ill-suited to the task of disqualifying Plaintiff from hearing his clients'

cases, because he was neither an immigration practitioner nor an administrative judge.

44.     Plaintiff prepared a response to the OPR Letter of Inquiry while on work-related

travel to Louisiana, where she did not have access to her counsel or her paper records or her

courtroom audio-recordings.  *See* Exhibit 20 (ECF No. 64-3 at 44).

45.     Upon her return to the office, Plaintiff filed a 97-page written response to the OPR

Letter of Inquiry on November 15, 2017.  *See* Exhibit 27 (ECF No. 62-3 at 65-161).  Thereafter,

Plaintiff sat for a rather hostile seven-hour interview with OPR investigative counsel, Leslie A.

Gerardo, on June 29, 2018.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 349-770) (Sealed).

46.     In her November 2017 written response, Plaintiff documented the abuse of EOIR's

Immigration Judge Complaint Resolution Program ("CRP") by which Plaintiff was referred to

OPR for an investigation.  *See* Exhibit 27 (ECF No. 62-3 at 71-74).  Plaintiff described the

structural and Constitutional infirmities of the program and explained how litigants misused it to

gain a litigation advantage over their opponents.  Using hearing records from the four court cases

that OPR was investigating, Plaintiff showed that her referral to OPR for an investigation lacked

sufficient predication, because the BIA had affirmed her June 8, 2017 Recusal Order in seven

cases.  *See* Exhibit 25 (ECF No. 63-15).  Plaintiff, however, did not discuss the June 16, 2017

Knight complaint, because at the time she did not know that Knight had filed that third complaint

with EOIR.

47.     Plaintiff also did not know that Knight had filed a fourth complaint with OPR on

December 11, 2017.  *See* Attachment B at 6.  In December 2022, OPR released a copy of the fourth

complaint to Plaintiff, in response to her August 5, 2019 FOIA and Privacy Act request. By then, it was too late for Plaintiff to oppose the fourth complaint or to demonstrate why it contained demonstrably false claims.

48.     The fourth Knight complaint was a December 11, 2017 email from the Nossaman LLP law firm that was directed to OPR investigative counsel, Leslie A. Gerardo. The December 11, 2017 email addressed Gerardo by her first name, Leslie Ann. Although the FOIA-released copy of the complaint is redacted, the complaint clearly accused Plaintiff of mishandling certain immigration matters that arose in December 2017. Knight requested that Gerardo intervene in the judicial proceedings that, he claimed, Plaintiff had scheduled for later that month, *i.e.*, December 2017. *See* Attachment B at 6.

49.     Upon reading the fourth Knight complaint, Plaintiff immediately realized that the allegations in that complaint were patently false. As of August 30, 2017, all of Blessinger and Boykin cases on Plaintiff's docket had been reassigned to other judges for handling. *See* Attachment B at 3. Therefore, Knight's claim that Plaintiff had acted abusively toward his clients in conducting court hearings in December 2017 was demonstrably false.

50.     Neither OPR nor EOIR had informed Plaintiff of the fourth Knight complaint at the time of its filing in December 2017. ECF No. 62-3 at 50-54. OPR did not ask Plaintiff to respond to the fourth Knight complaint. OPR did not inquire about the fourth complaint when it interviewed Plaintiff for seven hours in June 2018. There is no mention of the fourth complaint in OPR's September 2019 Report of Investigation (ECF No. 53-2 at 55-134) (Sealed), or in EOIR's February 2020 proposal to terminate Plaintiff's employment (ECF No. 53-2 at 135-147) (Sealed), or in the Attorney General's September 2020 Removal Decision (ECF No. 53-2 at 195-222) (Sealed).

51.     The December 11, 2017 complaint provides the clearest indication that Knight had made patently false claims about Plaintiff.  The fourth complaint casts serious doubt on Knight's credibility and the veracity of his other complaints.  Because the fourth complaint was not disclosed to Plaintiff until five years after it was filed, Plaintiff did not have an opportunity to confront the charges in that complaint and to show that Knight was not a credible, trustworthy witness.

52.     OPR's suppression of the third and fourth Knight complaints had the effect of unnecessarily prolonging OPR's investigation of Plaintiff.  By November 2017, the Board of Immigration Appeals had affirmed Plaintiff's June 8, 2017 Recusal Order in seven cases.  *See* Exhibit 25 (ECF No. 63-15).  The investigation should have concluded at that point.  Knight's fourth complaint, however, gave OPR additional cause to continue the investigation.  The month after Knight filed his fourth complaint on December 11, 2017, the Board of Immigration Appeals (BIA) adjudicated an appeal in one of the four cases that EOIR had referred to OPR for an investigation.

53.     On January 2, 2018, the BIA issued an order in case 050/051 that vacated Plaintiff's decision on the merits and remanded the case to another immigration judge for a new hearing.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 225-229) (Sealed).  According to the BIA, Plaintiff had displayed unprofessional behavior toward Blessinger while conducting the February 17, 2017 court hearing in case 050/051.  *See* Attachment D.  The BIA found that Plaintiff had berated and screamed at Blessinger during an off-record exchange that Knight claimed lasted "over five minutes," and that Blessinger's paralegal, Nicolas Ahumada, claimed lasted five to ten minutes.  *See* Exhibit 27 at 94-100.  The BIA also found that Plaintiff unreasonably denied Blessinger's request for a break in the middle of her client's cross-examination.  *See id*.

14

54.     Plaintiff promptly filed a Motion for Reconsideration, asserting that the BIA's findings and conclusions were erroneous.  The BIA, however, denied the motion upon concluding that Plaintiff lacked standing to bring it.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 266-278) (Sealed).  The BIA also denied Plaintiff's request to certify the matter to the Attorney General for his review.  *Id*.

55.     Plaintiff subsequently called OPR's attention to the BIA's erroneous January 2, 2018 decision.  After completing its investigation in July 2019, OPR agreed that two of the BIA's findings were clear errors.  First, OPR determined that Plaintiff did not berate and scream at Blessinger for five minutes during the off-record exchange, because the courtroom's audio recordings indicated that Plaintiff went off-the-record for only 31 seconds.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 305-306, 28) (Sealed).  Second, OPR determined that Plaintiff did not mistreat Blessinger by denying her request for a recess in the middle of her client's cross-examination.  OPR concluded that it was reasonable to make Blessinger wait until after cross-examination was completed to take a break.  *See id.* at EOIR 28 (Sealed).

56.     The BIA's January 2, 2018 unpublished decision was swiftly dispatched to the news media.  It was published in a Law360 news article on January 5, 2018.  *See* Exhibit 26 (ECF No. 62-2 at 48).  The publication has caused much embarrassment and mental anguish for Plaintiff, because she has been unable to obtain its retraction or rescission.  The publication of the errant January 2, 2018 decision has severely harmed Plaintiff's professional reputation and has impeded her ability to find another job.  Moreover, the Attorney General's eventual decision to terminate Plaintiff's employment rested, in part, on a mistaken belief that Plaintiff herself had disseminated the BIA's January 2, 2018 decision to the news media.  *See* Exhibit 1 at 217 (ECF No. 53-2 at 197-225) (Sealed).

57.     The two-year investigation that OPR undertook was concluded in July 2019, with the issuance of an OPR draft report of investigation that was quite lengthy.  Upon reviewing the very lengthy draft report, Plaintiff noticed that it cited, referenced, incorporated, or discussed evidence that Plaintiff did not have.  Plaintiff requested that OPR counsel immediately release the full OPR investigative record, so that Plaintiff could prepare a fulsome response to the draft report.  *See* Exhibit 2 (ECF No. 63-2 at 21).  OPR investigative counsel denied the request, stating that OPR had not prepared a "designated" Record of Investigation.  *Id*. at 33.  OPR counsel also denied Plaintiff's request to access the transcripts or audio recordings of 13 eyewitness interviews.  OPR counsel stated that "OPR does not disclose transcripts or recordings of witness interviews."  *Id*. at 35.  "In preparing your response to the draft report, you could identify any witness statements described in the draft report and explain why you believe those statements are inaccurate."  *Id*.

58.     OPR's denial of access to the Record of Investigation violated Plaintiff's statutory and Constitutional right to confront adverse evidence.  *See* 5 U.S.C. § 552a(g)(1)(B).  Without access to the full OPR record of evidence, Plaintiff was unable to provide a fulsome response to the OPR draft Report.

59.     On September 27, 2019, OPR issued its final Report of Investigation, which spanned 80 single-spaced pages and contained 475 footnotes.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 1-81) (Sealed).  The OPR Final Report quoted, referenced, or discussed the testimonies of 13 eyewitnesses whom OPR or EOIR had interviewed in the course of the two-year investigation.  Of the 13 interviews, OPR released to Plaintiff only one interview transcript – Plaintiff's.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 349-770) (Sealed).

60.     Since that time, OPR has released nine more interview transcripts.  Some of the transcripts are so heavily redacted that Plaintiff is unable comprehend the substance of the

16

witnesses' testimonies.  Other transcripts confirm that OPR's fact findings as stated in the Report of Investigation are seriously deficient.  OPR investigative counsel interviewed several witnesses by telephone and kept the interviews brief.  OPR counsel asked misleading, suggestive questions to elicit the responses she desired.  OPR counsel failed to ask questions that went directly to the heart of the investigation.  OPR counsel allowed the witnesses to avoid answering questions that they did not want to answer.

61.    Of the numerous allegations that Knight lodged through the March 2017 complaints, OPR sustained one.  OPR found that Plaintiff displayed improper demeanor in conducting the February 17, 2017 court hearing in case 050/051.  OPR found that Plaintiff insulted Blessinger's law school training when she overruled Blessinger's evidentiary objection and said: "Hearsay, as you know because you've gone to law school, is a very weak form of evidence."  *See* Attachment D at 8.  OPR concluded that Plaintiff's invitation to withdraw from the hearing after Blessinger declared that she was incapable of continuing to represent her client, "given the manner in which the Court has addressed me," was improper.  *See id.* at 19-20.  OPR found that Plaintiff rolled her eyes, pursed her lips, mimicked Blessinger's voice, and looked down at her watch whenever Blessinger spoke.  *See* Exhibit 1 (ECF No. 53-2 at 74).  OPR acknowledged, however, that these findings conflict with the testimony of one independent eyewitness, former DHS counsel Thai Tran.  According to OPR, "Tran did not remember IJ Bain making any gestures, exhibiting any other non-verbal communications, or slamming anything down on the bench.  Specifically, Tran did not recall IJ Bain rolling her eyes, checking her watch, pursing her lips, or otherwise non-verbally communicating her impatience with Blessinger."  *See* Exhibit 30  (ECF No. 53-31 at 1070) (Sealed).

62.     As of today, OPR has continued to withhold Tran's interview transcript.   The suppression of Tran's potentially exculpatory testimony violated Plaintiff's statutory right to access records about Plaintiff.   *See* 5 U.S.C. 552a(g)(1)(B).   It deprived Plaintiff of an opportunity to refute OPR's seriously flawed "improper demeanor" finding, before the former Attorney General relied on it to terminate Plaintiff's employment.   *See* 5 U.S.C. 552a(g)(1)(C) & (D).

63.     The demeanor evidence that OPR gathered did not support its conclusion that Plaintiff had engaged in reckless misconduct.   See Exhibit 1 (ECF No. 53-2 at 132).   OPR acknowledged that Plaintiff's peers described her as "typically very soft-spoken, patient, and nice to everyone," "usually very kind," "easygoing, "in a good mood," "very pleasant," and "very nice." *See* Exhibit 1 (ECF No. 53-2 at 163).   OPR also failed to consider the peculiarities of an immigration law practice and the adversarial nature of immigration court hearings, which often require diligent and resourceful courtroom management.   *Id.* at 131.   OPR overlooked the fact that Immigration judges have no sanctions authority.   To be effective, they must work collaboratively with litigants in completing court hearings.   They would accomplish very little if they act abusively and are mean-spirited.

64.     In finding reckless misconduct, OPR counsel resorted to speculation and conjecture.   Typical background noises are skewed as improprieties.   The sound of keystrokes transforms into chuckling.   Normal breathing becomes impatient sighs.   Questions abound about the significance of lips pursing and eyes rolling.   By asking leading, suggestive questions, OPR counsel deduced demeanor evidence that is insulting and denigrating.[1]

---

[1] Of court interpreter Cherilyn Varela, OPR counsel asked:

- Did you notice -- let me ask you this, did you notice anything else about -- besides Judge Bain's voice sounding angry and being a little elevated, did you notice anything else about

65.     OPR's intentional misconduct finding is similarly unsupported.  OPR found that Plaintiff did not knowingly violate the Immigration Judges' Ethics Guide (a code of ethics for immigration judges).  ECF No. 53-2 at 132.  OPR also found that Plaintiff did not knowingly make false statements in her June 8, 2017 Recusal Order.  ECF No. 53-2 at 126.  OPR even credited Plaintiff's explanation that she believed it was proper to include in the June 8 Order "extrinsic evidence" relating to the individuals' credibility.  *Id.*  OPR, however, found that Plaintiff did not make reasonable efforts to vet the extrinsic evidence before she used it.  *Id.*  On this score, Plaintiff acknowledges that she was laboring under some very difficult circumstances and regrets the mistakes.  In her zeal to defend herself against the unrelenting hostility, she delved into subject matters that she ought to have stayed out of.  But she categorically denies that she had misled OPR in any way.  She used reliable public source information, such as pacer.gov, to locate impeachment evidence.  She double checked the information and was reasonably certain about its accuracy before she used it.

---

her physical demeanor? Like, did she, did she roll her eyes? Did she make any facial expressions? Did she make any, you know, like – (EOIR 1618).

- How did that strike you, Judge Bain imitating what Ms. Blessinger was saying?  Did you think that that was appropriate or inappropriate, or did you think it was sort of mocking or belittling or just maybe a little bit – (EOIR 1620).

Of Mr. Ahumada, OPR counsel asked:

Q:      Is there any chance that, you know, what you perceived as her pursing her lips, for example, was simply her trying to moisten them?  . . . Moisten them, like my lips are dry, I'm trying to –

A:      Sure.  I mean, I understand how that could be perceived, or could come across, or that could be an option, but it was one of those where you were very -- it's not where you're trying to moisten your lips and like put the lips on the inside of your mouth, it's more so like have your lips are still on the exterior and you're clenching them very tightly to the point where there's like little wrinkles on your lip, you know, like – (EOIR 1638).

66.     OPR's lack-of-candor finding also rests on unsubstantiated assumptions.  It yields ill-fitting rationales that cannot be reconciled with federal court case law.  *See, e.g.*, Liteky v. United States, 510 U.S. 510 (1994).  OPR's legal research on this topic does not support its application of Rules 8.4 and 4.4 to this situation.  *See* Attachment C.  OPR lowered the standard of proof for itself, requiring only a finding that Plaintiff "knew or should have known" that her statements were false.  This objective standard is ill-suited to a "lack of candor" finding.  The former requires only a false statement.  The latter demands actual knowledge of the falsity of the statement and an intent to deceive.

67.     As explained, Plaintiff did not falsely accuse Knight's firm of representing the interests of the Government of Iran.  *See* ECF No. 53-31 at 1068.  Owing to a change in DOJ policy, any ambiguity in the laws can now be resolved in the firm's favor.  In December 2021, after the filing of this lawsuit, the Justice Department's National Security Division published a notice of proposed final rulemaking that would codify DOJ policy to broaden the exemption of certain law firm activities from the lobbying disclosure and registration requirements.  *See* https://www.justice.gov/nsd-fara/fara-index-and-act#613(g).

68.     Plaintiff did not falsely accuse Ms. Boykin of bankruptcy fraud.  Available public source information connected Ms. Boykin to a 2013 bankruptcy proceeding.  *See* Exhibit 23.  Plaintiff did not hide this information from OPR.  She did not confess error during the OPR interview because, at the time, she was not sure that she had erred.  *See* Exhibit 30, at EOIR 660-665.  Since there was a reasonable factual basis for the statement, Plaintiff violated no code of conduct in using the bankruptcy information for impeachment purposes.  *See* Fed. R. Evid. 806 & 608.  Furthermore, when she realized that she might have made a mistake, Plaintiff apologized for

the error.  Plaintiff acknowledged that the statement was inaccurate and personally regretted having made it.  *See* Exhibit 30 (ECF No. 53-31 at 1063).

69.     Plaintiff did not falsely accuse Ms. Blessinger of unethical behavior.  She used publicly available information to discredit Blessinger's complaint of judicial misconduct.  According to a March 2017 Washington Post article, Blessinger filed a complaint against a bail bonding company that she claimed charged her clients excessive fees.  The Department of Homeland Security investigated the complaint that but found no wrongdoing.  Blessinger then pursued the same complaint with Fairfax County Police, which also declined to investigate.  When asked why she filed the complaint, Blessinger was unable to state what the company was doing that was against the law.  Exhibit 30 (ECF No. 53-31 at 1066) (Sealed).  This is the very definition of a frivolous complaint.  The news article speaks for itself.  It was reputational evidence, and its use was permissible under Fed. R. Evid. 806 and 608.

70.     Plaintiff did not falsely accuse Mr. Ahumada of having an ulterior motive for testifying against her.  His motive was a relevant consideration in her adjudication of the recusal motions.  The February 17, 2017 court hearing was the very first court hearing Ahumada attended.  Two weeks after the hearing, he executed a sworn affidavit that was used to disqualify Plaintiff from all Blessinger and Boykin cases.  During her OPR interview, Blessinger admitted that she was upset with Plaintiff's handling of her client's case, and that, going into the February 17, 2017 hearing, she was prepared to confront Plaintiff if she had to, to make a record for appeal.  *See* Exhibit 30, at EOIR 1514-1517, 1536.  From that admission a reasonable inference can be drawn that Ahumada's presence as an eyewitness that day was not happenstance.  It served to buttress Blessinger's contentions on appeal.

71.     Further confirmation that Plaintiff did not engage in intentional or reckless misconduct can be found in the final pages of the OPR Report of Investigation.  There, an unsuspecting reader will find absolution for the other charges in Knight's March 2017 complaints. OPR found that Plaintiff did not knowingly or intentionally violate any statute, regulation, rule of court, or the Immigration Judges' Ethics and Professionalism Guide in conducting the four court hearings that OPR investigated.  *See* Exhibit 30 (ECF No. 53-31 at EOIR 130) (Sealed).  OPR found that Plaintiff was not biased against Blessinger or Boykin.  *Id.* at EOIR 130 n. 460 (Sealed). OPR did not find that Plaintiff had mistreated Blessinger during the February 1 and March 7, 2017 court hearings.  *Id.* at EOIR 130 n. 445 (Sealed).  OPR did not find that Plaintiff had mistreated Boykin during a February 16, 2017 hearing.  *Id.* at EOIR 130 n. 467, n. 448 (Sealed).  OPR did not find that Plaintiff had engaged in witness intimidation or evidence tampering when she invited a court security officer to prepare an affidavit describing that officer's observations of Blessinger's conduct during the February 17, 2017 court hearing.  *Id.* at EOIR 130 n. 475 (Sealed).  OPR did not find that Plaintiff had engaged in misconduct when she called the court administrator to testify about an *ex parte* communication between the court administrator and Blessinger that occurred the day before a March 7, 2017 court hearing, and the subject matter of that communication was the March 1, 2017 Knight complaint.  *Id.*

72.     OPR did conclude that Plaintiff exhibited poor judgment in calling the court administrator to testify in open court about the *ex parte* communication with Blessinger.  *See* ECF No. 53-2 at 133 (Sealed).  But this conclusion directly contradicts an advisory opinion of the DOJ Professional Responsibility Advisory Office (PRAO), which states that a complaint of misconduct that one party files against an immigration judge is an *ex parte* communication that must be

disclosed to the other party at the earliest possible moment, to avoid prejudice to the opposing party.  *See* Exhibit 27 (ECF No. 62-3 at 176-186).

**The September 2020 Removal Decision**

73.     On February 26, 2020, the former EOIR Director proposed to terminate Plaintiff's employment, based on the findings and conclusions stated in OPR's Report of Investigation. Exhibit 1 at 133-145 (ECF No. 53-2 at 138-150) (Sealed).  The two charges were "conduct unbecoming an immigration judge" and lack of candor.

74.     On August 17, 2020, G. Bradley Weinsheimer, a career Associate Deputy Attorney General in the Office of the Deputy Attorney General, issued a recommendation to terminate Plaintiff's 29-year employment in the Justice Department.  Exhibit 1 (ECF No. 53-2 at 196-224) (Sealed).  The decision acknowledged that this was Plaintiff's first encounter with the attorney discipline process in nearly 29 years of employment.  It further acknowledged that Defendants failed to maintain a Table of Penalties and to keep complete records of disciplinary and adverse actions involving immigration judges.  It stated that Plaintiff's conduct implicated, but did not necessarily violate, Rules 8.4 and 4.4.  It concluded, however, that Plaintiff's removal from federal service was the most appropriate penalty.  In addition, the decision further acknowledged that Plaintiff was denied access to the OPR record of evidence.  However, it concluded that Plaintiff suffered no resulting prejudice.

75.     On September 17, 2020, former Attorney General William Barr signed the proposed Removal Decision to indicate his concurrence.  *See* Exhibit 1 (ECF No. 53-2 at 224) (Sealed).  The decision took effect immediately.  In terminating Plaintiff's employment, the Attorney General also authorized the Department of Justice to refer Plaintiff to her state bars for further disciplinary proceedings, but he conditioned the referral on Plaintiff not prevailing on her

appeal of the Removal Decision to the Merit Systems Protection Board. *Id.* at 206, 219 n. 64 (Sealed).  This thinly veiled threat to take away Plaintiff's sole means of livelihood amounted to an unconstitutional infringement of her protected property interest in maintaining her professional licensing, and her protected liberty interest in continuing to practice law as her chosen profession.

### The MSPB Mixed Case Appeal And This Court's Jurisdiction

76.     On October 19, 2020, within 30 days after her wrongful termination, Plaintiff timely filed a "mixed case appeal" with the Merit Systems Protection Board ("MSPB"), challenging her removal on the merits.  Exhibit 5 (ECF No. 63-4 at 2-15).  The appeal notice asserted that Defendants failed to prove the charges by a preponderance of the evidence, and, in selecting an appropriate penalty, failed to properly weigh the mitigating and aggravating factors in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981).  In addition, Plaintiff asserted that the Attorney General's Removal Decision relied on information that Defendants refused to produce to Plaintiff, in violation of 5 U.S.C. §§ 7701(c)(2)(A) & (C).  *See also* 5 U.S.C. § 7701(c)(3).  Finally, Plaintiff asserted two affirmative defenses to removal, one based on violations of federal anti-discrimination laws, and the other, on violations of the Whistleblower Protection Act.

77.     Regarding her affirmative defense based on discrimination, Plaintiff asserted that her removal violated Title VII of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and the Anti-Age Discrimination in Employment Act.  *See* Exhibit 5 (ECF No. 63-4 at 2-15).  (Plaintiff is no longer pursuing an age-based discrimination claim).

78.     Regarding her affirmative defense based on whistleblower retaliation, Plaintiff asserted that her removal violated the Whistleblower Protection Act of 1989.  *See* 5 U.S.C. §§ 2308 & 2309.  *See* Exhibit 5 (ECF No. 63-4 at 2-15).

79.     Defendants immediately moved to dismiss the MSPB appeal, arguing that the MSPB judges assigned to hear the appeal had not been properly appointed in accordance with *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018).  Plaintiff opposed the dismissal motion.  *See* Exhibit 8 (ECF No. 63-6 at 20-25).

80.     On November 16, 2020, the MSPB granted Defendants' motion to dismiss for lack of jurisdiction without prejudice to reinstatement, based on the reasoning of *Lucia.*  The Order of Dismissal provided that Plaintiff's appeal will automatically be reinstated within 180 days of the date of the Order.  *See* Exhibit 8 (ECF No. 63-6 at 3-13).  Thereafter, the MSPB reinstated and dismissed the mixed case appeal several more times.  *See* Exhibit 9 (ECF No. 63-7 at 3-5); Exhibit 10 (ECF No. 63-8 at 3-12).

81.     On July 14, 2023, this Court determined that it has primary subject matter jurisdiction over the issues in this case.  *See* 5 U.S.C. § 7702(e).  *See* July 14, 2023 Minute Order. This Court may review *de novo* the EEOC administrative judge's decision to dismiss Plaintiff's EEO complaint under 5 U.S.C. § 7702(e).  See Attachment F at 28-41.  In reviewing the EEOC decision, the Court may exercise *de novo* fact finding authority.  *See* 5 U.S.C. § 7703(e)(3).  *See also Kloeckner v. Solis*, 568 U.S. 41, 46 (2012) (holding that a federal employee who claims that an agency action appealable to the MPSB violate an anti-discrimination statute listed in 5 U.S.C. § 7702(a)(1) should seek judicial review of the dismissal of her complaint in federal district court, not in the Federal Circuit).

82.     Personal jurisdiction and venue are proper in the District of Columbia, because this is the district in which Plaintiff resides and in which a substantial number of the acts or omissions giving rise to Plaintiff's claims occurred.  5 U.S.C. § 552(a)(4)(B), 5 U.S.C. § 552a(g)(5), and 28 U.S.C. § 1391.

**COUNT I:  Violations of the Freedom of Information Act and the Privacy Act**

83.     This cause of action arises under the Freedom of Information Act and Privacy Act, 5 U.S.C. §§ 552 & 552a *et. seq.*

84.     Section 552a(e)(4) of Title 5 of the United States Code defines the term "record" to mean "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his . . . employment history. . . ." *Id.*

85.     Section 552a(e)(5) requires a government agency to maintain accurate, relevant, timely, and complete records for an individual.  *See also* 5 U.S.C. § 552a(g)(1).

86.     Section 552a(e)(6) requires a government agency to ensure the dissemination of records about an individual that are accurate, relevant, timely, and complete.  *See also* 5 U.S.C. § 552a(g)(1).

87.     Section 552a(g)(1)(A) provides for amendment of records that are not "accurate or complete as to ensure its fairness to [the individual]."  *Holz v. Westphal*, 217 F. Supp. 2d 50, 56-57 (D.D.C. 2022).

88.     Section 552a(g)(1)(B) provides a right of access to records that the government maintains about an individual.

89.     Section 552a(g)(1)(C) provides a cause of action for civil remedies when the government's failure to maintain any record with "such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual."  *See also* 5 U.S.C. § 552a(e)(5) & (g)(4).

90.     Section 552a(g)(1)(D) provides a cause of action for civil remedies when the government fails to comply with any other provision of Section 552a(g)(1) in such a way as to have an adverse effect on an individual.  *See also* 5 U.S.C. § 552a(e)(5) & (g)(4).

91.     This Court has original jurisdiction over Plaintiff's complaint under the FOIA and Privacy Act and reviews *de novo* Defendants' decisions regarding the withholding or release of information.  5 U.S.C. §§ 552a(g)(3), 552a(g)(1)(B).

92.     This Court also has original jurisdiction over Plaintiff's claims arising from the denial of substantive and procedural due process under the Civil Service Reform Act and the Fifth Amendment of the United States Constitution.  *See* 28 U.S.C. § 1331; 5 U.S.C. § 702.  *See also Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 n. 12 (1972).

**Defendants' Continuing Denial of Record Access Prevents
Plaintiff From Moving Forward With This Lawsuit.**

93.     Subsection 552a(g)(1)(B) of Title 5 permits an individual to gain access to "his record or to any information pertaining to him" that is contained in a system of records and retrieved by his name or personal identifier.  5 U.S.C. 552a)(d)(1).  Where the requested information contained in a system of records and retrieved by the requestor's name is "about" that requestor within the meaning of subsection (a)(4)'s definition of "record," all such information is subject to the subsection (d)(1) access provision.  *Voelker v. IRS*, 646 F.2d 332, 334 (8ᵗʰ Cir. 1981).

94.     Under the laws of this Circuit, Plaintiff indisputably has a right to access OPR records that were compiled during the two-year OPR investigation, which records were later used for a managerial-supervision purpose.  *See also Bartko v. U.S. Dept. of Justice*, 898 F.3d 51 (D.C. Cir. 2018); *Jefferson v. U.S. Dept. of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002) (holding that DOJ is legally obligated to release records of OPR investigations to a first-party requestor, where

27

the information was not compiled for law enforcement purposes but rather for managerial-supervision purposes).

95.     Plaintiff has properly and timely exhausted the August 5, 2019 FOIA and Privacy Act request. *See* 5 U.S.C. § 552(a)(4)(B).

96.     On August 5, 2019, Plaintiff filed the FOIA and Privacy Act request with OPR, seeking the release of information that OPR generated and compiled during the two-year investigation. *See* Exhibit 2 (ECF No. 63-2 at 3-11, 12-30, and 31-50).

97.     On March 30, 2020, OPR replied that it had identified 575 responsive pages and released 45 of those pages.  OPR withheld 530 pages on a claim of exemption but did not provide a Vaughn Index. *See* Exhibit 2 (ECF No. 63-2 at 47-48).  This record release was inadequate. *See* Exhibit 2 (ECF No. 63-2 at 44-45).

98.     On June 3, 2020, Plaintiff filed an administrative appeal with the DOJ Office of Information Policy ("OIP"). *See* Exhibit 2 (ECF No. 63-2 at 49-50).  The appeal requested that OIP release the remaining 530 pages of OPR records or provide a Vaughn Index.  OIP did not respond.

99.     On June 22, 2021, Plaintiff filed this lawsuit to compel OPR to disclose the records of the investigation to her. *See* ECF No. 1.  This cause of action is timely commenced within six years after Plaintiff became aware of the non-disclosure of the requested information and materials. *See Spannaus v. U.S. Department of Justice*, 824 F.2d 52, 56 (D.C. Cir. 1987).

100.     On September 13, 2021, the OIP notified Plaintiff that it had ceased the processing of her FOIA and Privacy Act appeal, in response to the filing of this lawsuit. *See* ECF No. 63-13.

101.     During a status conference held on July 25, 2022, counsel for Defendants advised the Court and Plaintiff that OPR had identified approximately 14,500 pages of responsive records,

and that OPR's processing capacity was limited to 500 pages per month.  Based on that estimate, the Court directed OPR to begin processing and releasing records in September 2022.  As of today, OPR has released approximately 40 percent of its records.  Plaintiff cannot confirm this estimate, but even assuming that it is accurate, many of the records that Plaintiff needs to advance her claims are still being withheld.

102.    Defendants also have refused to provide a Vaughn Index, in violation of this Court's July 6, 2021 Standing Order.  Without an index or privilege log, Plaintiff is unable to determine whether Defendants are properly withholding records that they claim are exempt or privileged, and whether redactions of segregable information have been properly made.   In addition, without an index or privilege log, Plaintiff cannot determine whether Defendants' claim that OPR has processed and released duplicative records is valid.

### Defendants' Denial of Record Access Deprived Plaintiff of a Fundamentally Fair EEOC Hearing.

103.    Section 552a(e)(5) requires a government agency to maintain accurate, relevant, timely, and complete records for an individual.  *See also* 5 U.S.C. § 552a(g)(1).

104.    Defendant EOIR has failed to comply with the statutory requirement to maintain an accurate and complete set of personnel records for Plaintiff.  As a result, EOIR released records about Plaintiff to the public (the American Immigration Lawyers Association) and the EEOC administrative judge that were inaccurate or incomplete, in violation of Section 552a(e)(5).

105.    Defendant's dissemination of records that they knew contained inaccurate, incomplete, or potentially false information also violated Section 552a(e)(6), which requires a government agency to ensure the dissemination of records about an individual that are accurate, relevant, timely, and complete.  *See also* 5 U.S.C. § 552a(g)(1).

106.    In January 2017, EOIR released privacy-protected records from Plaintiff's personnel file to AILA.  *See* Attachment E at 2-6.  EOIR refused to claw back the records.  *Id.* Two months later, attorney Knight used the misappropriated information to file two complaints of misconduct against Plaintiff in March 2017.  As a direct result of EOIR's failure to claw back the information, Plaintiff faced unnecessary expenses and hardships in having to defend against those complaints.

107.    EOIR and OPR withheld the third and fourth Knight complaints from Plaintiff. This improper withholding of those records prevented Plaintiff from properly and adequately responding to Knight's March 2017 complaints.  Had those complaints been disclosed to Plaintiff, she would have used them to oppose Knight's other complaints while the investigation was ongoing.  She also would have opposed EOIR's motion for summary judgment, which was based, in part, on the March 2017 Knight complaints.  The third and fourth Knight complaints were exculpatory evidence, in that they showed Plaintiff was wrongfully accused of misconduct that she did not commit.  The failure to disclose the third and fourth Knight complaints to Plaintiff and to the EEOC administrative judge violated Plaintiff's statutory right under Sections 552a(g)(1)(B), (C), and (D).  As a direct result of EOIR's denial of record access, Plaintiff suffered a dismissal of her EEO complaint on February 26, 2020.  *See* Attachments D & E.

108.    Between 2017 and 2019, EOIR placed privacy-protected information from Plaintiff's personnel file in a folder labeled "BAIN FOIA 2015" on a shared drive that was accessible to other EOIR employees.  *See* Attachment E.  When Plaintiff objected, EOIR accused Plaintiff of hacking into the shared drive and stealing her own privacy-protected information for her own personal use.  EOIR even referred Plaintiff to OIG for an investigation on this ludicrous theory.  *See* Attachment E at 10-15.  EOIR's insidious motive in initiating an investigation of

Plaintiff caused her to suffer much consternation, mental anguish, and expenses as she had to worry about defending herself against an OIG investigation, on top of the OPR investigation. *Id.* When Plaintiff brought those records to the EEOC administrative judge's attention, EOIR moved for sanctions and argued that her EEOC action should be dismissed. *See id.*

109.    To remedy these egregious statutory violations, the Court should award monetary damages, attorney's fees, and costs. *See* 5 U.S.C. §§ 552(a)(3)(A), 552a(d)(1), and 552a(g)(1)(B). *See also* 5 U.S.C. § 7701(c)(2)(A) & (C).

### Defendants' Denial of Record Access Deprived Plaintiff of a Fundamentally Fair OPR Investigation and Pre-Termination Hearing.

110.    Subsection 552a(g)(1)(B) permits an individual to gain access to "his record or to any information pertaining to him" that is contained in a system of records and retrieved by his name or personal identifier. 5 U.S.C. 552a)(d)(1). Where the requested information contained in a system of records and retrieved by the requestor's name is "about" that requestor within the meaning of subsection (a)(4)'s definition of "record," all such information is subject to the subsection (d)(1) access provision. *Voelker v. IRS*, 646 F.2d 332, 334 (8th Cir. 1981).

111.    Plaintiff has satisfied the administrative exhaustion requirement for the "adverse determination" and "adverse effect" provisions in 5 U.S.C. §§ 552a(g)(1)(C) & (D). Plaintiff timely responded to the draft OPR Report of Investigation, using what little OPR evidence was available to her at that time. *See* ECF No. ECF No. 53-2 at 148-170. Plaintiff timely responded to the EOIR Director's Notice of Proposed Removal. *See* ECF No. 53-2 at 178-186. Following the July 16, 2020 pre-termination hearing before the Office of the Deputy Attorney General, Plaintiff filed a Supplemental Response that pointed out more factual errors in EOIR's proposal to terminate her employment. *See* ECF No. 53-2 at 187-193.

112.     Plaintiff has satisfied the two-year statute of limitations for application of the "adverse determination" provision in 5 U.S.C. §§ 552a(g)(1)(C) & (D).  She filed this suit on June 22, 2021, within two years after OPR issued its Report of Investigation on September 27, 2019; within two years after EOIR proposed to terminate her employment on February 27, 2020; and within two years after the Attorney General issued the Removal Decision on September 17, 2020.

113.     The denial of access to OPR records violated Plaintiff's statutory and Constitutional due process right to a fundamentally fair OPR investigation.  In conducting the investigation, OPR compiled a voluminous record that it failed to process and release to Plaintiff in a timely fashion.  Without access to the full record of OPR evidence when she needed it, Plaintiff was unable to respond adequately to OPR's draft and final Report of Investigation.  She was unable to marshal sufficient evidence to oppose OPR's proposed findings of professional misconduct.

114.     The denial of record access also violated Section 552a(g)(1)(B), in that it deprived Plaintiff of a fundamentally fair pre-termination hearing.  Plaintiff was denied access to arguably the most critical OPR evidence, including the Tran interview transcript and the third and fourth Knight complaints.  The improper withholding of OPR records deprived Plaintiff of a meaningful opportunity to defend herself against the charges of misconduct.  *See* 5 U.S.C. §§ 552a(g)(1)(B), (C)-(D).

115.     Without good reason, OPR failed to disclose the interview transcript of former DHS counsel Thai Tran and another independent eyewitness, former DHS counsel Juliana Bae.  OPR acknowledged that those individuals' testimonies are favorable to Plaintiff, but OPR would not release their interview transcripts.  The withholding of their interview transcripts deprived Plaintiff of critical evidence with which to oppose, challenge, or test OPR's misconduct findings.

116.    Without good reason, OPR failed to disclose the June 2017 and December 2017 Knight complaints to Plaintiff.  The concealment of Knight's admission against interest in his June 2017 complaint and the false claims that he made in his December 2017 complaint deprived Plaintiff of an opportunity to confront the false charges and to show that Knight was not a credible, trustworthy witness.  The concealment of such exculpatory evidence likely influenced the outcome of the investigation, in that OPR did not expressly discount Knight's false claims but it did not give Plaintiff an opportunity to refute them.

117.    Plaintiff did not know about the fourth Knight complaint, which was filed with OPR on December 11, 2017.  Had she been given a copy of it at the time of its filing, Plaintiff would have argued for a closure of the OPR investigation.  Even if the OPR investigation had been properly predicated on Knight's March 2017 complaints, by November 2017 there was no longer sufficient justification.  The Board of Immigration Appeals had just affirmed the June 8, 2017 Recusal Order in seven cases.  There is good reason to believe that the fourth Knight complaint persuaded the Board to take a second look at Blessinger cases.  By January 2018, the BIA had reversed itself and issued the opinion in case 050/051.  If the fourth Knight complaint had been given to Plaintiff when it was filed, she would have argued for a different result.  OPR's concealment of the fourth Knight complaint derpived Plaintiff of her statutory right to confront the charges and evidence against her.  *See* 5 U.S.C. § 552a(g)(1)(C) & (D).  As a result, Plaintiff's employment in the Justice Department was terminated.

118.    The undue  delays in releasing  responsive OPR records, particular the third  and fourth Knight complaints, have deprived Plaintiff of her right to confront the evidence on which the Attorney General based his Removal Decision.  The third complaint was not released until February 2023, and the fourth complaint was not released until December 2022.  By failing to

promptly identify and release the requested OPR records to Plaintiff in a timely fashion, Defendants effectively prevented Plaintiff from mounting the best possible defense against the termination of her employment.

119.    To remedy these statutory and Constitutional violations, the Court should enter an order declaring null and void the September 27, 2019 OPR Report of Investigation; the February 27, 2020 EOIR Director's Notice of Proposed Removal, and the September 17, 2020 Attorney General's Removal Decision.  The Court also should aware monetary damages.  *See* 5 U.S.C. §§ 552(a)(3)(A), 552a(d)(1), and 552a(g)(1)(B).  *See also* 5 U.S.C. § 7701(c)(2)(A) & (C).

**Defendants' Failure To Maintain Accurate And Complete Records About Plaintiff Resulted in the Revocation of a Job Offer That Plaintiff Received in October 2022.**

120.    Section 552a(g)(1)(C) provides a cause of action for civil remedies when the government's failure to maintain any record with "such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual."  *See also* 5 U.S.C. § 552a(e)(5) & (g)(4).

121.    Section 552a(g)(1)(D) provides a cause of action for civil remedies when the government fails to comply with any other provision of Section 552a(g)(1) in such a way as to have an adverse effect on an individual.  *See also* 5 U.S.C. § 552a(e)(5) & (g)(4).

122.    After her employment in DOJ was terminated in September 2020, Defendants failed to exercise reasonable care in maintaining Plaintiff's personnel records, to ensure fairness in determinations by third parties that affect Plaintiff's interests.  In this instance, Defendants' failure to properly and adequately maintain Plaintiff's personnel records caused a prospective employer to revoke a job offer that Plaintiff had accepted in May 2022.

123.    Plaintiff received the offer after undergoing three rounds of interviews and a five-month background investigation.

124.    In October 2022, the prospective employer approved Plaintiff for employment. However, the employer informed Plaintiff that it had received negative feedback from her last employer to the effect that Plaintiff had engaged in "misconduct and negligence" while employed at DOJ.   The prospective employer required Plaintiff to sign a letter acknowledging that she had engaged in such "misconduct and negligence" or that she could be fired if she engages in such conduct.  The letter was phrased in such as a way as to make Plaintiff vulnerable to termination if she signed the letter, so she declined.  *See* Attachment G.

125.    Because she declined to sign the letter, the conditional offer of employment was revoked.

126.    Defendants' failure to maintain accurate and complete records for Plaintiff caused the prospective employer to revoke the conditional job offer.  The job revocation in October 2022 violated Plaintiff's statutory right to proper record maintenance.  *See* 5 U.S.C. § 552a(g)(1)(C) & (D).

127.    Three years ago, Plaintiff's employment in DOJ was terminated.  The wrongful discharge has already occasioned innumerable professional and economic hardships.  Her health insurance coverage and her life insurance coverage were cut off amid the very deadly Covid-19 pandemic.  She stands to lose approximately six years of retirement pension payments and associated benefits.  In addition, she will likely have to expend additional resources, time, and money on fighting disciplinary bar proceedings if she does not prevail in this lawsuit.

128.     To remedy this violation, the Court should nullify the Attorney General's Removal Order, the EOIR Director's removal proposal, and the OPR Report of Investigation.  The Court should also award monetary damages.

### COUNT  II:  Discrimination, Retaliation, and Hostile Work Environment

129.     Plaintiff has properly exhausted this cause of action with the administrative agencies authorized to adjudicate her discrimination complaint.  Her administrative complaint was filed with the EEOC on December 10, 2015 and was amended twice on August 25, 2016 and May 18, 2018, respectively.  *See* Exhibit 3 (ECF No. 63-3 at 3-42).  The complaint challenges EOIR's discriminatory and retaliatory practices that began in January 2015, which contributed to a hostile work environment in the Arlington court and led to her removal from the Justice Department on September 17, 2020.  Plaintiff argued before the EEOC that these discriminatory and retaliatory practices violated Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.

130.     On February 26, 2020, the EEOC administrative judge dismissed her complaint by summary judgment without a hearing.  *See* Attachment F.  The following day, the former EOIR Director proposed to terminate Plaintiff's employment.

131.     Previously, on December 23, 2022, this Court disposed of Defendants' partial Motion to Dismiss by dismissing some of the discrimination claims in Plaintiff's first amended complaint.  The Court ruled that certain claims may proceed to the next phase of litigation because they have been timely exhausted or plausibly stated.  ECF No. 56.  Without waiving her right to pursue those viable claims through civil discovery, Plaintiff asserts the following new retaliation and discrimination claims that are based on the Attorney General's Removal Decision.

### New Retaliation Claim

132.    To establish a claim of retaliation, Plaintiff must establish that she suffered (1) a materially adverse action; (2) because she had brought or threatened to bring a discrimination claim.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008).  *See also* 42 U.S.C. 2000e-3(a).  A "materially adverse action" is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53, 68 (2006).

133.    Defendants' February 27, 2020 proposal to terminate her 29-year employment at the Justice Department was a new act of retaliation that was motivated by her protected characteristics of race (Asian), sex (female), national origin (Vietnamese), medical condition or disability status, and reprisal.

134.    The proposal to terminate her employment constituted retaliation for her having engaged in EEOC activity immediately before EOIR proposed to terminate her employment.  The clearest evidence of this retaliatory action is that the proposal to terminate her employment came just <u>one day</u> after the EEOC administrative judge dismissed the EEOC action by granting EOIR's motion for summary judgment without a hearing.  *See* Exhibit 3 (ECF No. 53-2 at 137-149); Exhibit 1 at 133-145 (ECF No. 53-2) (Sealed).

**New Discrimination Claim**

135.    To establish a prima facie case of disparate treatment, Plaintiff must show that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Douglas v. Pierce*, 707 F. Supp. 567, 571 (D.D.C. 1998), *aff'd sub nom. Douglas v. Kemp*, 906 F.2d 783 (D.C. Cir. 1990) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13 (1973)).  *See also Chambers v. District of Columbia*, 35 F.4th 870, 873 (D.C. Cir. 2022) (*en banc*).

A reasonable inference of unlawful discrimination can be drawn from disparate treatment of Plaintiff as compared with others who are not members of her protected class who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Roberts v. Segal Company*, 125 F. Supp. 2d 545 (D.D.C. 2000) (quoting *Phillips v. Holladay Property Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996)).

136. Defendants' September 17, 2020 Removal Decision is a new act of discrimination that was motivated by Plaintiff's protected characteristics of race (Asian), sex (female), national origin (Vietnamese), medical condition or disability status, and reprisal.

137. The Removal Decision was discriminatory in that the deciding official failed to properly weigh the <u>Douglas</u> factors. The deciding official acknowledged that EOIR had not kept complete and accurate records of disciplinary actions against immigration judges, and that EOIR had no Table of Penalties to ensure uniformity. The eight anonymized scenarios of immigration judge discipline that the deciding official cited do not support his claim that removal was the most appropriate penalty. Though the precise contours of those cases are unknown, none of the judges was removed. *See* ECF No. 53-2 at 172-174 (Sealed).

138. Defendants improperly tethered the Removal Decision to one particular case involving an EOIR senior executive who was not an immigration judge. He was terminated for sexually abusing his co-workers, demanding favors and gifts from subordinates, and seeking *quid pro quo* treatment from contractors. Defendants' reliance is misplaced. Plaintiff's situation is not analogous, and drawing an analogy is highly insulting. Plaintiff was a public servant of 29 years. She labored for each day's wages and spoke the truth even when it was unpopular. She excelled

in her job because she was dedicated and worked hard at it.  She treats others with kindness.  She does not need adulation or admiration.  It is enough that people know she is conscientious, decent, and fair.  *See*  Exhibit 16 (Sealed).

139.    The termination of Plaintiff's 29-year DOJ career speaks volumes about discriminatory treatment of women of color at DOJ.  White male and female judges who have engaged in far more serious misconduct have remained on the bench.  *See* Exhibit 14 (ECF No. 53-15 at 179-209).  *See also* Exhibit 21.  In Plaintiff's case, the penalty of removal is grossly disproportionate to the penalties imposed on other immigration judges.  OPR records indicate that, in the past ten years, no immigration judge has been discharged for failing to maintain impartiality, displaying improper demeanor, or using impeachment evidence that turned out to be wrong.  Even when such misconduct is established, the sanction imposed is relatively lenient, ranging from oral counseling to light suspension.  When viewed against this backdrop, the penalty of removal raises the specter of discrimination simply because it is so disproportionate.  *See* Exhibit 22 at 40-48, 49, 56, 58 (ECF No. 63-22).

### COUNT  III:  Whistleblower Retaliation

140.    Plaintiff asserts the following whistleblower retaliation claim which the Court has recognized as valid on its face.  *See* December 23, 2022 Decision and Order (ECF No. 56 at 16).

141.    In November 2017, Defendants EOIR and OPR retaliated against Plaintiff for disclosing to OPR her concerns regarding what she perceived to be constitutional infirmities with EOIR's Immigration Judge complaint resolution program.  *See* ECF No. 56 at 16, citing ECF No. 16 at 49.  *See also* ECF No. 53-2 at 810-814 (Sealed).  OPR, which had regulatory authority over disciplinary matters involving immigration judges, responded with hostility and unduly harsh

criticisms of Plaintiff's conduct because she called attention to the problematic immigration judge complaint resolution program that it was supposed to have overseen.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court award declaratory, injunctive, and monetary relief.  Plaintiff further requests that the Court award any other relief that the Court deems just and proper.

Dated:  August 2, 2023

Respectfully submitted,

Quynh Vu Bain
Plaintiff, *pro se*
213 Third Street, SE
Washington, DC  20003
Quynhbain75@outlook.com
(202) 910-8553