**Bain v. U.S. Department of Justice,**
No. 21-cv-1751 (D.D.C.) (RDM)

## ATTACHMENT C

## To Plaintiff's Proposed Second Amended Complaint

## Filed on August 2, 2023



**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue, N.W., Suite 3266*
*Washington, D.C. 20530*
*(202) 514-3365*

January 31, 2023

Quynh Vu Bain
quynhbain75@outlook.com

    Re:    OPR FOIA No. F19-00105 JAN 2023 Interim Response

Dear Ms. Bain:

    This is the January 2023 interim response from the Office of Professional Responsibility (OPR) to your August 5, 2019 Freedom of Information Act (FOIA)/Privacy Act request seeking any and all information that OPR received, gathered, or compiled in the course of conducting the OPR inquiry and investigation into your conduct and in preparing the OPR July 22, 2019 report of investigation. Please refer to OPR FOIA number **F19-00105** in any correspondence pertaining to this matter.

    For this January 2023 interim response, OPR processed a total of 500 pages of records potentially responsive to your request. Of the 500 processed pages, 15 pages (Bates-numbered F19-00105 003152 to 003166) were withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5) (Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process privilege); 6 pages were nonresponsive to your request; and 352 were duplicate pages containing information already processed and provided, as appropriate, to you.

    Enclosed please find 89 pages of responsive records. These 89 pages have been Bates-numbered F19-00105 003025 to 003113 and are appropriate for release with excisions made pursuant to Exemptions 6 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(6) and (b)(7)(C). Exemption 6 pertains to information the release of which would constitute a clearly unwarranted invasion of the personal privacy of third parties. Exemption 7(C) pertains to information compiled for law enforcement purposes which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties. Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions.\*

    Because the remaining 38 pages of responsive records contained information of interest to the Executive Office for Immigration Review (EOIR), OPR sent these pages for consult to the EOIR (Bates-numbered F19-00105 003114 to 003151) pursuant to 28 C.F.R. § 16.4(d). Upon receipt of the EOIR consultation responses, OPR will finalize and provide these pages, as

---

\*    *For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 § U.S.C. 552(c) (2006 & Supp. IV 2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.*

appropriate, to you. For your convenience in tracking our production, please refer to the following processing and production tracking chart.

| OPR Request No. F19-00105 Processing and Production Tracking Chart | | | | |
|:---:|:---:|:---:|:---:|:---:|
| *(Bain v. Office of the Attorney General, et. al., 1:21-cv-01751-RDM)* | | | | |
| Interim Production | No. of Pages Processed* | Processed Bates-numbered Pages | Production Date | Disposition |
| *The 1st, 2nd, and 3rd interim responses (totaling 1,546 pages) have been excluded from this chart to allow space for reporting future interim releases as they are produced.* | | | | |
| **OPR Monthly Production (2022)** | | | | |
| SEPT | 314 | 001733 to 002046** | 09/30/2022 | Partially Released |
| | 114 | 001619 to 001732 | 10/31/2022 | Consult - EOIR Partially Released |
| | 77 | 001547 to 001618 001899 to 001903 | | Consult - DHS |
| | 5 | 001899 to 001903 | | Consult - FBI |
| OCT | 399 | 002047 to 002445 | 10/31/2022 | Partially Released |
| | 38 | 002446 to 002483 | 11/30/2022 | Consult - EOIR |
| | 3 | 002484 to 002486 | | Withheld in Full |
| NOV | 174 | 002487 to 002660 | 11/30/2022 | Partially Released |
| | 157 | 002661 to 002817 | | Consult - EOIR |
| | 3 | 002818 to 002820 | | Consult - OIG |
| | 5 | 002821 to 002825 | | Withheld in Full |
| DEC | 151 | 002826 to 002976 | 12/29/2022 | Partially Released |
| | 47 | 002977 to 003023 | | Consult - EOIR |
| | 1 | 003024 | | Withheld in Full |
| **OPR Monthly Production (2023)** | | | | |
| JAN | 89 | 003025 to 003113 | 1/31/2023 | Partially Released |
| | 38 | 003114 to 003151 | | Consult - EOIR |
| | 15 | 003152 to 003166 | | Withheld in Full |
| | | | | |
| TOTAL Processed | | **3,415** | 1/31/2023 | |
| * Does not include blank or duplicated pages. | | | | |
| ** In this release to you, Bates-numbered pages F19-00105 00189 to 001903 appear as placeholders because these 5 pages were sent each to the DHS and FBI for consultation. As such, ten pages (5 each) are included above only in the page counts for the DHS and FBI consultations and are not included in the total pages processed to date. | | | | |

Because you requested access to your own records, OPR has also processed your request under the Privacy Act, 5 U.S.C. § 552(a). The Department has promulgated rules exempting

- 2 -

OPR's database from the Privacy Act under 5 U.S.C. § 552a(k)(2), *see* JUSTICE/OPR-001, 76 Fed. Reg. 66752, and therefore your access to and our disclosure of those records are limited to what the FOIA does not exempt (5 U.S.C. § 552b(b)(1)-(b)(9)). By processing your request under both acts, as required, we are able to provide you with the most access allowable.

Please be advised that OPR is continuing to process the remaining voluminous records responsive to your request and will release interim responses at various intervals until our response is complete. We will provide all responses, including responsive records, electronically, unless you advise us that you prefer to receive them in hard copy.

Although I am aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted on in such situations, I am required by statute and regulation to inform you of your right to file an administrative appeal with the Office of Information Policy.

Sincerely,

*Carmen Smith Carter*

Carmen Smith Carter
Assistant Counsel for the Freedom of Information
and Privacy Acts


Enclosures

cc: Joshua Ontell, Assistant U.S. Attorney

PLAINTIFF'S ATTACHMENT C   0004

Case 1:21-cv-01751-RDM   Document 87-5   Filed 08/03/23   Page 5 of 46

117 A.D.3d 117
Supreme Court, Appellate Division, Fourth Department, New York.

Matter of J. Michael SHANE, an Attorney, Respondent.
Grievance Committee of the Eighth Judicial District, Petitioner.

April 4, 2014.

**Synopsis**
**Background:** In attorney disciplinary proceeding, Grievance Committee moved to confirm referee's report.

**Holdings:** The Supreme Court, Appellate Division, held that:

[1] attorney's acts constituted violations of several Rules of Professional Conduct, and

[2] censure was appropriate sanction.

Censure ordered.

West Headnotes (2)

[1]     **Attorney and Client** ⇐ Character and conduct
        **Attorney and Client** ⇐ Deception of court or obstruction of administration of justice
        **Attorney and Client** ⇐ Misconduct as to Client
        Attorney's acts of agreeing to represent a client on a contingent fee basis in a zoning matter, falsely informing client that papers had been served on the municipality, falsely stating to client that he was prosecuting the matter and bolstering those misrepresentations with several false documents, including a purported court order and notice of appeal, and offering client various false reasons for the substantial delay in concluding the purported matter, constituted violations of Rules of Professional Conduct prohibiting conduct involving dishonesty, fraud, deceit or misrepresentation, conduct that is prejudicial to the administration of justice, conduct adversely reflecting on attorney's fitness as a lawyer, as well as violations of Disciplinary Rules previously in effect. 22 NYCRR 1200.3(a)(4, 5, 7).

        Cases that cite this headnote

[2]     **Attorney and Client** ⇐ Public Reprimand;Public Censure;Public Admonition
        Censure was appropriate sanction for attorney who, after agreeing to represent a client in a zoning matter, violated several Rules of Professional Conduct by repeatedly misinforming his client as to status of the case and reasons for the lengthy delay; mitigating factors included attorney's otherwise unblemished record after more than 50 years in the practice of law and facts that he did not commit the misconduct for personal gain or profit, that he self-reported the misconduct to the client and expressed remorse before the misconduct was discovered, that there was no proof that client suffered a financial loss as result of the misconduct, and that attorney fully

PLAINTIFF'S ATTACHMENT C   0005

In re Shane, 117 A.D.3d 117 (2014)
984 N.Y.S.2d 517, 2014 N.Y. Slip Op. 02529

cooperation with Grievance Committee's investigation and expressed sincere remorse. 22 NYCRR 1200.3(a) (4, 5, 7).

Cases that cite this headnote

**517 PRESENT: SMITH, J.P., FAHEY, CARNI, SCONIERS, and VALENTINO, JJ.

Opinion

PER CURIAM:

*118 Respondent was admitted to the practice of law by this Court on March 11, 1959. During the time period relevant to this proceeding, respondent maintained an office for the practice of law in either the City of Olean or the Town of Allegany. The Grievance Committee filed a petition alleging that, in 1986, respondent neglected a client matter and, for approximately 25 years thereafter, respondent deceived the client regarding the status of the matter. Respondent filed an answer denying material allegations of the petition, and this Court appointed a referee to conduct a hearing. During the proceeding before the Referee, the parties entered into a stipulation eliminating the need for a hearing with respect to the charges of misconduct, and the Referee received evidence in mitigation of the charges. The Referee has filed a report incorporating the stipulation of the parties, which the Grievance Committee moves to confirm. Respondent **518 filed a response to the motion setting forth matters in mitigation, and he subsequently appeared before this Court and was heard in mitigation.

[1] Based on the stipulation, the Referee found that, in 1986, respondent agreed to represent a client on a contingent fee basis to recover damages from a municipality on the ground that the municipality had enacted certain zoning regulations that reduced the value of a business owned by the client. The Referee found that, in July 1986, respondent falsely informed the client that papers had been served on the municipality. The Referee further found that, from 1986 through 2012, respondent on numerous occasions falsely stated to the client that respondent was prosecuting the matter, and respondent bolstered those misrepresentations with several false documents, including a purported court order and notice of appeal. The Referee found that respondent additionally offered to the client various false *119 reasons for the substantial delay in concluding the purported matter. In July 2012, respondent informed the client in writing that respondent had never filed suit on behalf of the client and that respondent's prior representations regarding the matter were false.

We confirm the factual findings of the Referee and conclude that respondent has violated the following former Disciplinary Rules of the Code of Professional Responsibility and the following Rules of Professional Conduct:

DR 1–102(a)(4) (22 NYCRR 1200.3[a][4] ) and rule 8.4(c) of the Rules of Professional Conduct (22 NYCRR 1200.0)— engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

DR 1–102(a)(5) (22 NYCRR 1200.3[a][5] ) and rule 8.4(d) of the Rules of Professional Conduct (22 NYCRR 1200.0)— engaging in conduct that is prejudicial to the administration of justice; and

DR 1–102(a)(7) (22 NYCRR 1200.3[a][7] ) and rule 8.4(h) of the Rules of Professional Conduct (22 NYCRR 1200.0)— engaging in conduct that adversely reflects on his fitness as a lawyer.

We additionally conclude that, prior April 1, 2009, respondent violated the following former Disciplinary Rules of the Code of Professional Responsibility:

F19-00105 - 003026
PLAINTIFF'S ATTACHMENT C   0006

DR 1–102(a)(3) (22 NYCRR 1200. 3[a][3] )—engaging in illegal conduct that adversely reflects on his honesty, trustworthiness or fitness as a lawyer;

DR 6–101(a)(3) (22 NYCRR 1200.30[a][3] )—neglecting a legal matter entrusted to him; and

DR 7–101(a)(2) (22 NYCRR 1200.32[a][2] )—intentionally failing to carry out a contract of employment entered into with a client for professional services.

[2]   In determining an appropriate sanction, we have considered in mitigation of the charges respondent's otherwise unblemished record after more than 50 years in the practice of law. We have additionally considered that respondent did not commit the misconduct for personal gain or profit, and that respondent self-reported the misconduct to the client and expressed remorse before the misconduct was discovered. We have further considered the numerous letters of support submitted to this Court by individuals attesting to respondent's generosity, good character and standing in the community. We also note that the record **\*120** contains no proof that the client suffered a financial loss as a result of respondent's misconduct. Rather, it appears that respondent sought to avoid advising the client that respondent believed that the proposed claims against the municipality lacked merit. Finally, we have **\*\*519** considered respondent's full cooperation with the Grievance Committee's investigation and his expression to this Court of extreme remorse, which we find to be sincere. Accordingly, after consideration of all of the factors in this matter, we conclude that respondent should be censured.

Order of censure entered.

**All Citations**

117 A.D.3d 117, 984 N.Y.S.2d 517, 2014 N.Y. Slip Op. 02529

---

**End of Document**                                                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

PLAINTIFF'S ATTACHMENT C    0007

**In re Schank, 152 A.D.3d 39 (2017)**

57 N.Y.S.3d 309, 2017 N.Y. Slip Op. 04751

152 A.D.3d 39

Supreme Court, Appellate Division, Fourth Department, New York.

Matter of Martin J. SCHANK, An Attorney, Respondent.

Grievance Committee of the Seventh Judicial District, Petitioner.

June 9, 2017.

**Synopsis**

**Background:** Disciplinary proceeding was brought against attorney.

**Holdings:** The Supreme Court, Appellate Division, held that:

[1] attorney committed misconduct by practicing law in Florida in violation of regulation of legal profession in that jurisdiction and by making false statements during investigation;

[2] three-year suspension from practice of law was warranted; but

[3] restitution to Florida homeowner associations in the amount of $3,500 was not warranted as sanction.

Suspension ordered.

West Headnotes (3)

[1]     **Attorney and Client** ⟜ Grounds for Discipline

    **Attorney and Client** ⟜ Deception of court or obstruction of administration of justice

    Attorney committed misconduct by practicing law in Florida in violation of regulation of legal profession in that jurisdiction, engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, engaging in conduct that was prejudicial to administration of justice, and engaging in conduct that adversely reflected on his fitness as a lawyer; attorney agreed to review and revise bylaws for two homeowner associations that governed condominium complex where he maintained a residence in Florida, he sent to the associations proposed bylaws containing numerous references to Florida law and received $3,500 form the associations, and he failed to cooperate in grievance committee's investigation by failing to appear for scheduled interview, failing to produce documents in a timely manner, and making false statements. Rules of Prof.Conduct, Rule 8.4.

    Cases that cite this headnote

[2]     **Attorney and Client** ⟜ Definite Suspension

    Three-year suspension from practice of law was warranted for attorney who committed misconduct by practicing law in Florida in violation of regulation of legal profession in that jurisdiction and making false statements in grievance committee's investigation; attorney had previously received several letters of caution concerning his failure to cooperate in prior grievance investigations, and he obstructed disciplinary process by failing to file timely answer to the petition, failing to serve timely responses to discovery requests, failing

F19-00105 - 003938   PLAINTIFF'S ATTACHMENT C   0008

to comply with directives of the referee concerning discovery and other prehearing matters, and making unsubstantiated claims that he either had complied with certain of those directives or was unable to do so for medical reasons. Rules of Prof.Conduct, Rule 8.4.

Cases that cite this headnote

[3]     **Attorney and Client** ⬅ Restitution

Restitution to Florida homeowner associations in the amount of $3,500 was not warranted as sanction for attorney who committed misconduct by practicing law in Florida in violation of regulation of legal profession in that jurisdiction by reviewing and revising bylaws for two homeowner associations that governed condominium complex where he maintained a residence in Florida, since there was no evidence that attorney wilfully misappropriated or misapplied those funds. McKinney's Judiciary Law § 90(6–a); Rules of Prof.Conduct, Rule 8.4.

Cases that cite this headnote

**\*\*309** PRESENT: SMITH, J.P., CARNI, DeJOSEPH, NEMOYER, AND TROUTMAN, JJ.

**Opinion**

**\*\*310** PER CURIAM:

**\*40** Respondent was admitted to the practice of law by this Court on February 18, 1981, and formerly maintained an office in Rochester. In February 2016, the Grievance Committee filed a petition containing two charges of misconduct against respondent, including practicing law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction and making false statements during the investigation of the Grievance Committee. Respondent filed an answer denying material allegations of the petition, and this Court appointed a referee to conduct a hearing. The Referee has filed a report sustaining the charges and making findings in aggravation, which the Grievance Committee moves to confirm. Although respondent failed to file a written response to the motion, he appeared before this Court on the return date thereof, at which time he was heard in response to the motion.

[1]     With respect to charge one, the record establishes that, in 2012, respondent agreed to review and revise the bylaws for two homeowner associations that govern the condominium complex where he maintains a residence in Florida. The Referee found that, in February 2012, respondent sent to the homeowner associations a retainer agreement, which was printed on the letterhead for respondent's Rochester law office, wherein respondent agreed to review and revise those bylaws for the "discounted sum" of $5,500. The Referee further found that respondent subsequently received from the homeowner associations funds in the amount of $3,500 and, in March 2013, he sent to the homeowner associations proposed bylaws that contain numerous references to Florida law and citations to certain Florida statutes. Although respondent throughout this proceeding has asserted that he was hired by the homeowner **\*41** associations in his capacity as a "real estate professional" to prepare draft documents to be finalized by a Florida attorney, the Referee found that those assertions were not credible based on the documentary proof and testimony received in evidence during the hearing.

With respect to charge two, the Referee found that, from December 2015 through March 2016, respondent failed to cooperate in the investigation of the Grievance Committee by failing to appear for a scheduled interview with counsel for the Committee, failing to produce relevant documents in a timely manner, and making false statements in response to the allegations set forth in charge one.

PLAINTIFF'S ATTACHMENT C    0009

Inasmuch as the factual findings of the Referee are supported by the record, we grant the Grievance Committee's motion to confirm them, find respondent guilty of professional misconduct, and conclude that he has violated the following Rules of Professional Conduct (22 NYCRR 1200.0):

rule 5.5 (a)—practicing law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction;

rule 8.4 (c)—engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

rule 8.4 (d)—engaging in conduct that is prejudicial to the administration of justice; and

rule 8.4 (h)—engaging in conduct that adversely reflects on his fitness as a lawyer.

Although the Referee made advisory findings that respondent has violated certain other disciplinary rules, we decline to sustain those alleged violations inasmuch as they are not supported by the record.

[2]   [3]   We have considered, in determining an appropriate sanction, that respondent has previously received from the Grievance Committee several letters of **311 caution concerning, inter alia, his failure to cooperate in prior grievance investigations. We have also considered the Referee's findings in aggravation of the charges, including that respondent obstructed the disciplinary process by failing to file a timely answer to the petition, failing to serve timely responses to discovery requests of the Grievance Committee, failing to comply with directives of the Referee concerning discovery and other prehearing matters, and making unsubstantiated claims that he either had complied with certain of those directives or was unable to do so for medical reasons. Accordingly, after consideration of all of the factors *42 in this matter, we conclude that respondent should be suspended from the practice of law for a period of three years and until further order of this Court. Although the Grievance Committee requests that the Court direct respondent to make restitution to the homeowner associations in the amount of $3,500, we deny that request inasmuch as the record does not establish that respondent "wilfully misappropriated or misapplied" those funds within the meaning of Judiciary Law § 90(6–a).

Order of suspension entered.

**All Citations**

152 A.D.3d 39, 57 N.Y.S.3d 309, 2017 N.Y. Slip Op. 04751

---

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

F19-00105 - 003030

PLAINTIFF'S ATTACHMENT C   0010

109 A.D.3d 1077
Supreme Court, Appellate Division, Third Department, New York.

In the Matter of Robert W. TECLER, an Attorney.
Committee on Professional Standards, Petitioner;
Robert W. Tecler, Respondent.

Sept. 26, 2013.

Synopsis
**Background:** Disciplinary proceeding was initiated, charging attorney with failing to promptly pay or deliver funds as requested, engaging in fraudulent, deceitful or dishonest conduct prejudicial to the administration of justice and adversely reflecting on his fitness as a lawyer, and failing to cooperate with investigation.

**Holding:** The Supreme Court, Appellate Division, held that suspension of attorney from practice of law for one year was warranted.

Ordered accordingly.

West Headnotes (1)

[1]    **Attorney and Client** ⟜ Definite Suspension

**Attorney and Client** ⟜ Mishandling of trust account or client funds

Suspension of attorney from practice of law for one year was warranted for failing to promptly pay or deliver funds as requested, engaging in fraudulent, deceitful or dishonest conduct prejudicial to the administration of justice and adversely reflecting on his fitness as a lawyer, and failing to cooperate with investigation; attorney participated in two unrelated real estate closings, failing on each occasion to timely pay off an existing mortgage from closing proceeds, he subsequently made misrepresentations to various parties, including Committee on Professional Standards, about doing so, and then failed to timely respond to committee's requests for information and applicable records. N.Y.Ct.Rules, § 1200.46 [DR 9–102]; Rules of Prof.Conduct, Rule 8.4.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*110** Michael G. Gaynor, Acting Chief Attorney, Committee on Professional Standards, Albany (Jevon L. Garret of counsel), for petitioner.

Robert W. Tecler, Northville, respondent pro se.

Before: PETERS, P.J., LAHTINEN, STEIN and GARRY, JJ.

PLAINTIFF'S ATTACHMENT C   0011

In re Tecler, 109 A.D.3d 1077 (2013)
972 N.Y.S.2d 109, 2013 N.Y. Slip Op. 06063

**Opinion**

**PER CURIAM.**

**\*1077** Respondent was admitted to practice by this Court in 2001. He maintains an office for the practice of law in the Village of Northville, Fulton County.

Petitioner commenced this disciplinary proceeding against respondent charging him with failing to promptly pay or deliver funds as requested (*see* former Code of Professional Responsibility DR 9–102[c][4] [22 NYCRR 1200.46]; [1] Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.15[c] [4] ), engaging in fraudulent, deceitful or dishonest conduct prejudicial to the administration of justice and adversely reflecting on his fitness as a lawyer (*see* Rules of Professional Conduct [ **\*1078** 22 NYCRR 1200.0] rule 8.4[c], [d], [h] ), and failing to cooperate with petitioner's investigation (*see* Rules of Professional Conduct [22 NYCRR 1200.0] rule 8.4[d] ).

Respondent admitted the allegations, and we have since granted petitioner's motion for an order declaring that the pleadings raise no factual issues (*see* 22 NYCRR 806.5). Now, having considered respondent's submission in mitigation, we find him guilty of professional misconduct as charged and specified in the petition. In particular, respondent participated in two unrelated real estate closings, failing on each occasion to timely pay off an existing mortgage from the closing proceeds. He subsequently made misrepresentations to various parties, including petitioner, about doing so, and then failed to timely respond to petitioner's requests for information and applicable records. In aggravation of respondent's misconduct, we note that petitioner issued a letter of caution to him in 2012.

Under all of the circumstances presented, we conclude that, in order to protect the public, deter similar misconduct and preserve the reputation of the bar, respondent should be suspended from the practice of law for a period of one year.

ORDERED that respondent is found guilty of the professional misconduct set forth in the petition of charges; and it is further

**\*\*111** ORDERED that respondent is suspended from the practice of law for a period of one year, effective 20 days from the date of this decision, and until further order of this Court; and it is further

ORDERED that, for the period of suspension, respondent is commanded to desist and refrain from the practice of law in any form, either as principal or as agent, clerk or employee of another; and respondent is hereby forbidden to appear as an attorney or counselor-at-law before any court, judge, justice, board, commission or other public authority, or to give to another an opinion as to the law or its application, or any advice in relation thereto; and it is further

ORDERED that respondent shall comply with the provisions of this Court's rules regulating the conduct of suspended attorneys (*see* 22 NYCRR 806.9).

**All Citations**

109 A.D.3d 1077, 972 N.Y.S.2d 109, 2013 N.Y. Slip Op. 06063

Footnotes

1        One of the allegations involves conduct that occurred prior to the April 1, 2009 effective date of the Rules of Professional Conduct.

End of Document                                                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

F19-00105 - 003032
PLAINTIFF'S ATTACHMENT C    0012

556 S.W.3d 153
Supreme Court of Tennessee,
AT JACKSON.

BOARD OF PROFESSIONAL RESPONSIBILITY

v.

Larry Edward PARRISH

No. W2017-00889-SC-R3-BP
|
April 4, 2018 Session
|
FILED 08/14/2018

**Synopsis**
**Background:** Board of Professional Responsibility instituted attorney disciplinary proceedings. Hearing panel made findings of fact and conclusions of law and recommended public censure as sanction for attorney's misconduct. Board petitioned for writ of certiorari. The Circuit Court, Shelby County, No. CT-001608-16, Robert E. Lee Davies, J., affirmed hearing panel's findings but determined that six-month suspension was appropriate sanction for attorney's misconduct. Attorney appealed.

**Holdings:** The Supreme Court, Lee, J., held that:

[1] pejorative statements attorney made about judges in recusal motions filed in state court were not protected by First Amendment, and provided basis for finding that attorney violated professional conduct rules, and

[2] six-month suspension, rather than public censure, was appropriate sanction for attorney's misconduct.

Affirmed.

West Headnotes (15)

[1]    **Attorney and Client** ⇌ Power and duty to control
       **Attorney and Client** ⇌ Review
       The Supreme Court, as the source of authority for the Board of Professional Responsibility and all of its functions, bears the ultimate responsibility for enforcing the Rules of Professional Responsibility and the ultimate disciplinary responsibility for violations of the ethical rules governing attorneys practicing in the state.

       Cases that cite this headnote

[2]    **Attorney and Client** ⇌ Review

PLAINTIFF'S ATTACHMENT C    0013

The Supreme Court reviews judgments in disciplinary proceedings against attorneys in light of its inherent power and fundamental right to prescribe and administer rules pertaining to the licensing and admission of attorneys.

Cases that cite this headnote

[3]     **Attorney and Client** ⟜ Review

When reviewing a judgment in an attorney disciplinary proceeding, the Supreme Court's standard of review is the same as that applied by the trial court; just as the trial court did, the Supreme Court reviews the transcript of the evidence presented before the hearing panel, as well as the hearing panel's findings and judgment.

Cases that cite this headnote

[4]     **Attorney and Client** ⟜ Review

In an attorney disciplinary proceeding, the trial court reviews questions of law de novo, but shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact.

Cases that cite this headnote

[5]     **Attorney and Client** ⟜ Review

Like the trial court, the Supreme Court will reverse or modify the hearing panel's decision in an attorney disciplinary proceeding only when the rights of the party filing the petition for review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Cases that cite this headnote

[6]     **Attorney and Client** ⟜ Review

In determining whether substantial and material evidence supports the hearing panel's decision in an attorney disciplinary case, the Supreme Court evaluates whether the evidence furnishes a reasonably sound factual basis for the decision being reviewed.

Cases that cite this headnote

[7]     **Attorney and Client** ⟜ Trial or hearing

A hearing panel's decision in an attorney disciplinary case is arbitrary and capricious if it is not based on any course of reasoning or exercise of judgment, or disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.

Cases that cite this headnote

[8]     **Attorney and Client** ⟜ Trial or hearing

A hearing panel abuses its discretion at an attorney disciplinary proceeding if it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining.

F19-00105 - 003034
PLAINTIFF'S ATTACHMENT C   0014

Cases that cite this headnote

[9] **Attorney and Client** ⟜ Deception of court or obstruction of administration of justice

**Constitutional Law** ⟜ Statements regarding judge or court officials

Pejorative statements attorney made about judges in recusal motions filed in state court were not protected by First Amendment, and provided basis for finding at attorney disciplinary proceeding that attorney violated professional conduct rules prohibiting conduct intended to disrupt a tribunal, the making of statements known to be false or with reckless disregard for truth concerning qualifications or integrity of a judge, conduct involving dishonesty, fraud, deceit, or misrepresentation, and conduct prejudicial to administration of justice; statements were in-court statements, reasonable attorney would believe statements in question to be false, and attorney made statements with reckless disregard as to truth or falsity. U.S. Const. Amend. 1; Tenn. Const. art. 1, § 19; Sup.Ct.Rules, Rule 8, Rules of Prof.Conduct, Rules 3.5(e), 8.2(a), 8.4(c), 8.4(d).

Cases that cite this headnote

[10] **Attorney and Client** ⟜ Deception of court or obstruction of administration of justice

Under the objective standard for determining whether an attorney's accusations of judicial impropriety violate any professional conduct rules, the court assesses the statements in terms of what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances and focusing on whether the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made; it is the reasonableness of the belief, not the state of mind of the attorney, that is determinative.

Cases that cite this headnote

[11] **Attorney and Client** ⟜ Character and conduct

The objective "reasonable attorney" standard is the appropriate standard to apply in a disciplinary proceeding involving an attorney's in-court speech.

Cases that cite this headnote

[12] **Attorney and Client** ⟜ Definite Suspension

Six-month suspension, rather than public censure, was appropriate sanction for attorney's misconduct in making pejorative statements about judges in recusal motions he filed in state court, which misconduct violated professional conduct rules prohibiting conduct intended to disrupt a tribunal, the making of statements known to be false or with reckless disregard for truth concerning qualifications or integrity of a judge, conduct involving dishonesty, fraud, deceit, or misrepresentation, and conduct prejudicial to administration of justice; attorney made such statements knowingly, not negligently, accusing judges of being dishonest and ignoring established law, skewing and ignoring facts, and violating their oaths to decide cases fairly and impartially. Sup.Ct.Rules, Rule 8, Rules of Prof.Conduct, Rules 3.5(e), 8.2(a), 8.4(c), 8.4(d).

Cases that cite this headnote

[13] **Attorney and Client** ⟜ Standards and guidelines

In determining the appropriate sanction in an attorney disciplinary matter, the American Bar Association (ABA) Standards serve as guideposts, and they direct the court, in applying the Standards, to consider: (1) what

PLAINTIFF'S ATTACHMENT C 0015

ethical duty the lawyer violated, (2) the lawyer's mental state, (3) the extent of the actual or potential injury caused by the lawyer's misconduct, and (4) any aggravating or mitigating circumstances.

Cases that cite this headnote

[14]    **Attorney and Client** ⟵ Factors in aggravation

    **Attorney and Client** ⟵ Factors in mitigation

    **Attorney and Client** ⟵ Presumptive, baseline, or preliminary potential sanction

Generally speaking, the American Bar Association (ABA) Standards suggest the appropriate baseline sanction in an attorney disciplinary case, and aggravating and mitigating factors may justify an increase or reduction in the degree of punishment to be imposed.

Cases that cite this headnote

[15]    **Attorney and Client** ⟵ Review

The Supreme Court evaluates each instance of attorney discipline in light of its particular facts and circumstances, even as it considers the sanctions that have been imposed in prior cases that present similar circumstances so as to maintain consistency and uniformity in disciplinary proceedings.

Cases that cite this headnote

**\*155** Direct Appeal from the Circuit Court for Shelby County, No. CT-001608-16, Robert E. Lee Davies, Senior Judge

**Attorneys and Law Firms**

Larry E. Parrish, Memphis, Tennessee, Pro Se.

Alan D. Johnson, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility.

Sharon G. Lee, J., delivered the opinion of the Court, in which Jeffrey S. Bivins, C.J., and Cornelia A. Clark and Roger A. Page, JJ., joined. Holly Kirby, J., not participating.

## OPINION

Sharon G. Lee, J.

This is a direct appeal of a disciplinary proceeding involving a Memphis attorney who filed motions to recuse containing pejorative statements about three appellate judges. A hearing panel of the Board of Professional Responsibility found that the attorney had violated multiple Rules of Professional Conduct and that his sanction should be a public censure. The trial court agreed that the attorney was guilty of misconduct but modified the hearing panel's decision, determining that the appropriate sanction was a six-month suspension, with thirty days served on active suspension and the remainder on probation. We hold that the attorney's pejorative statements in the motions to recuse were not protected by the First Amendment and there was material and substantial evidence of noncompliance with the Rules of Professional Conduct. In addition, we hold that the hearing panel acted arbitrarily **\*156** and capriciously in determining that the attorney should receive a public censure rather than suspension. We affirm the judgment of the trial court.

F19-00105 - 003036
PLAINTIFF'S ATTACHMENT C  0016

**I.**

This disciplinary action arises from pejorative statements made by attorney Larry E. Parrish in motions to recuse three judges on the Tennessee Court of Appeals after an adverse decision.

Mr. Parrish represented David Morrow and Judy Wright, the nephew and niece of Helen Goza, regarding a trust Ms. Goza had established for her son, John Goza. Under the terms of the trust, any assets remaining in the trust after the death of Mr. Goza were to be disbursed to various charities. After Mr. Goza's death, Mr. Parrish, on behalf of Mr. Morrow and Ms. Wright, filed an action in the Shelby County Chancery Court seeking a declaratory judgment that the trust was not valid and that they were entitled to the trust's remaining assets. The chancery court granted summary judgment, finding that the trust was valid. The Court of Appeals affirmed. *Morrow v. SunTrust Bank*, No. W2010-01547-COA-R3-CV, 2011 WL 334507 (Tenn. Ct. App. Jan. 31, 2011) ("*Goza I*").

While the appeal in *Goza I* was pending, Mr. Morrow was appointed administrator of the Estate of John Goza. Mr. Parrish, representing the Estate and Mr. Morrow as administrator, filed a petition in probate court to require SunTrust Bank to turn over to the Estate the assets of the trust based on the asserted invalidity of the trust. Soon after, the Court of Appeals issued its ruling in *Goza I*, affirming the validity of the trust. SunTrust Bank then asserted that the probate case was barred by res judicata. The probate court denied the petition on that basis, and the Court of Appeals affirmed. *In re Estate of Goza*, 397 S.W.3d 564 (Tenn. Ct. App. 2012) ("*Goza II*").

Next, Mr. Parrish, as attorney for the Estate, sued SunTrust Bank in the Shelby County Circuit Court. The circuit court dismissed that action, finding that the validity of the trust was res judicata and that it lacked subject matter jurisdiction. The Court of Appeals affirmed the circuit court in a memorandum opinion [1] authored by Judge David Farmer and joined by Judge Steven Stafford and (then-)Judge Holly Kirby. The Court of Appeals also determined the appeal was frivolous and awarded SunTrust Bank its attorney's fees and costs. *Goza v. Wells*, No. W2012-01745-COA-R3-CV, 2013 WL 4766544 (Tenn. Ct. App. Sept. 4, 2013) ("*Goza III*"). Mr. Parrish moved for a rehearing and to recuse Judge Farmer. Mr. Parrish later filed motions to recuse Judges Stafford and Kirby. [2]

The judges submitted the recusal motions to the Board of Professional Responsibility ("the Board"). [3] The motions include the following statements by Mr. Parrish:

**\*157** • Estate's motion is grounded on Estate's contention that Estate has been denied access to indisputable organic law of Tennessee applied to indisputable facts, and that access has been denied because of a prejudicial and baseless bias, evidently the result of personal sympathies/sensitivities of Judge Farmer.

• In contrast, if Estate shows that Judge Farmer (1) ruled the opposite of what he knew undebatable law to be, (2) wrote as fact that which he knew not to be fact to avoid the effect he knew would be required, if he acknowledged what he knew to be fact, (3) ruled as if *ipse dixit* was a holding and decision, (4) gave *obiter dictum* preclusive effect, (5) used half-truths to fabricate justification for judicial misconduct, (6) without the slightest justification, demeaned counsel for Estate to create a scapegoat for his judicial misconduct, (7) used the Memorandum Opinion as a vehicle to include unnecessary *obiter dictum* as a means, practically speaking, to prejudge case-dispositive issues pending in trial courts and, thereby, usurp the role of the trial courts to adjudge the issue independently and, finally, (8) awarded attorney's fees against Estate based on fabrication, Estate will have established that Judge Farmer is serving, in this case, encumbered by a prejudice and bias against Estate to manufacture an outcome against Estate, in the teeth of indisputable organic law and indisputable fact that dictate the opposite.

• This is not about miscalling balls and strikes; this is about rigging the game.

PLAINTIFF'S ATTACHMENT C   0017

- Estate's motion further is grounded [sic] how that Judge Farmer adjudicated the appeal in the instant case so as to violate the rights of Estate guaranteed by the *Tennessee Constitution*, Art. I, Section 17 (open courts), thereby, engaging in judicial misconduct which requires Judge Farmer's recusal. The same judicial misconduct violates the procedural and substantive due process rights of Estate and the heirs guaranteed by the *United States Constitution*, Fifth Amendment and Fourteenth Amendment.

- There is absolutely no way under the sun for Estate to fail to prevail in the instant appeal, except by judges deciding the appeal to turn a deaf ear and blind eye to the clearest possible provisions of § 35-15-203.

- Judge Farmer has victimized Estate by saying of a statute, i.e. *Tennessee Code Annotated* § 35-15-203, that it divests circuit court of subject matter jurisdiction, even though a person minimally literate in the English language could very easily read the statute and know, without hesitation, that the statute does exactly the opposite.

- This is an aberrant misstatement of clear law known to Judge Farmer....

- Placing the subject erroneous *ipse dixit* in Judge Farmer's Memorandum Opinion, in practical effect, is a prejudgment designed to prejudice Estate in cases not before Judge Farmer.

- **\*158** • Additionally, the erroneous *ipse dixit* in Judge Farmer's Memorandum Opinion is a setup, i.e., the point is to forewarn Estate not to exercise its right to an appeal in the case where the erroneous *ipse dixit* is dispositive and, if Estate exercises Estate's right to appeal, Judge Farmer is poised to punish Estate for not heeding Judge Farmer's forewarnings.

- Though it takes slightly more acumen than minimal literacy in the English Language, any person trained in the law and minimally versed in how the law treats *ipse dixit* and *obiter dictum*, at once, can see that the court of appeals never before has "held" or "decided" that the putative trust exists.

- The repeated statements in Judge Farmer's Memorandum Opinion that the court of appeals, twice before, "held" or "decided" that the putative trust exists, for Judge Farmer, is a convenient and illegitimately purposeful fabrication.

- In an effort to provide a façade of legitimacy to Judge Farmer's inclusion about the putative trust, Judge Farmer builds a construct on the false presupposition that § 35-15-203 divests circuit court of subject matter jurisdiction, if the putative trust exists.

- The illegitimate purpose for Judge Farmer injecting commentary into Judge Farmer's Memorandum Opinion on the subject of the putative trust is to prejudge, erroneously, if (which is certain to occur) the issue is presented to the court of appeals in the future.

- By use of a memorandum opinion, Judge Farmer insulates his manipulation/rigging of the legal system from review by the Tennessee Supreme Court, i.e., the Supreme Court, even moreso [sic] than in the past, reiterates that it is not an error-correcting court. Therefore, a memorandum opinion, which has zero effect on Tennessee law, has zero chance of being reviewed by the Supreme Court. Knowing this, Judge Farmer is confident that Judge Farmer's patent error and abuse of Judge Farmer's judicial power will remain effective to accomplish Judge Farmer's illegitimate objectives.

- Judge Farmer has done a masterful job of covering up the fact that Judge Farmer has stepped out of Judge Farmer's role as an even-handed Judge and into the role of adversary of the Estate, willing to abuse the power of his judicial office to deny Estate's access to unexceptional organic law of Tennessee well-known to Judge Farmer.

- Many authors, among them Alfred Lord Tennyson, have observed that the half-truth is the most sinister of all deception. The point is that sprinkling into deception particles of truth, misused and taken out of context, makes it much harder to detect deception than a straight out misstatement of objective fact. Judge Farmer has used the

F19-00105 - 003038
PLAINTIFF'S ATTACHMENT C   0018

half-truth in constructing Judge Farmer's Memorandum Opinion. Judge Farmer's Memorandum Opinion is a patchwork of snippets of truth glued together by adhesive design to close to Estate access to controlling organic law.

• It is the contention of appellant, the Estate of John J. Goza, Deceased (hereinafter "Estate"), as a litigant in the instant appeal and in related proceedings, has been and continues to be denied access to the benefit of *159 the organic law of Tennessee by a demonstrated bias and/or appearance of bias, seemingly anchored in Judge Farmer's personal sympathies/sensitivities that dictate an outcome inconsistent with Tennessee's organic law.

• Let it be clear that Estate finds no fault with Judge Farmer's personal sympathies/sensitivities. The fault Estate finds is in Judge Farmer permitting his personal sympathies/sensitivities to prejudice him in exercise of his undeviating *duty* to apply organic law, even if doing so produces a judgment that offends Judge Farmer's personal sympathies/ sensitivities.

• [T]he personal sympathies/sensitivities are visceral, i.e., based on pure assumptions and presumptions without a scintilla of evidence on which to base a finding of fact consistent with Judge Farmer's personal sympathies/ sensitivities. Maybe Judge Farmer's [sic] excuses the lack of evidence with what reasonably would be described as a "Come on now, you know and I know" approach appropriate for common parlance and unknown to the legal system and legal process.

• [T]he rights of heirs to receive their inheritance from a predeceased ancestor has been part of the organic law of Tennessee, uninterruptedly, since 1796 and part of Anglo-American jurisprudence since time *in memoriam* [sic], the personal sympathies/sensitivities of Judge Farmer to the contrary notwithstanding.

• [F]or Judge Farmer to be influenced to ignore organic law by his personal sympathies/sensitivities in order to manipulate an outcome to deny the heirs of John J. Goza their inheritance and get the Cash to charities is usurpation of the value judgment of the General Assembly and violates separation of powers guaranteed by *Tennessee Constitution*, Art. I, Section 17 (constraints on the judiciary) and Art. VI.

• Judge Farmer knows the ropes as well as anybody. These characteristics make Judge Farmer's Memorandum Opinion in this case stand out as uncharacteristic. Only the most simpleminded person would conclude that, in this case, Judge Farmer made inadvertent mistakes.

• To all of the undebatable propositions of law and fact, Judge Farmer effectively turns a deaf ear fixated on making a result that satiates Judge Farmer's sympathies.

• Estate does not wish to create the impression that there is naiveté which keeps Estate from reading between the lines of Judge Farmer's Memorandum Opinion; indeed, Estate perceives that Judge Farmer intended the non-subtle message between the lines be received and headed [sic] as a shot over the bow. The loud message that bleeds through comes [sic] from between the lines is unmistakable and threatening to Estate.

• In a nutshell, what rings clear, on reading Judge Farmer's Memorandum Opinion's commentary, concerning what is tagged *Goza I* and *Goza II*, is that Judge Farmer does not feel Estate's case, insofar as it seeks distribution of the residue of Mrs. Goza's revocable trust to John Goza's heirs, is "right" or "just," and Judge Farmer does not intend, no matter what, ever to render a decision that mandates what Judge Farmer feels is "wrong" or "unjust."

*160 • Added to this feeling, what rings true from what is on the lines of Judge Farmer's Memorandum Opinion is that, if Estate can prove the fraud and the conversion by the individuals who are defendants in the instant case, collecting damages from the individuals would deplete neither the fee income to SunTrust or the amount to be dribbled out, presumably, to charity, does not offend the [sic] Judge Farmer's feelings about what is "right" and "just."

PLAINTIFF'S ATTACHMENT C 0019

- What role does a judge's oath, practically speaking, play in the day-to-day functioning of a judge? Are there times when it is permissible for judges to lay aside their oath to render a judgment that, though not what the law dictates, is what the judge feels is the "right" thing to do.

- From the outset, Estate makes it clear that Estate has no evidence, has looked for no evidence and makes no accusation that Judge Farmer has taken a bribe; this is completely out of the question. By this, Estate means that there is no evidence that Judge Farmer, in exchange for cash or any other thing of value, has agreed with another person to do what Estate accuses Judge Farmer of having done.

- Having said that, Estate takes note of the fact that money received by a bribe-taking judge is not the harm such a bribe wreaks on the legal system, on legal process and on the litigants who are victimized by a bribe.

- The harm a bribe wreaks on the legal system and the litigant-victims is what happens when a judge abandons his/her oath of office, surrenders up the impartiality that is essential to a judge functioning in an adjudicative role evenhandedly applying law to facts found from evidence adduced according to rules of evidence.

- While Estate has sought no evidence and has no evidence that Judge Farmer sold his oath and surrendered his impartiality in exchange for money, Estate respectfully suggests that Judge Farmer, in order to victimize Estate as a litigant, has abandoned the loyalty to his oath of office, has surrendered his impartiality and has abused the power entrusted to him by the judicial office he holds and has switched from his role as a judge to become an adversary of Estate. This, in Estate's opinion, is official action of the kind referenced in Rule 8 (RPC), Preamble, section 5.

- Otherwise stated, although there is no evidence that Judge Farmer received a bribe to do what he is doing, Judge Farmer is doing what a bribe-taking judge would do to victimize a litigant who was targeted by a bribe. To a litigant who is targeted, it is totally immaterial what caused the judge to victimize the litigant.

Based on Mr. Parrish's statements in the recusal motions, the Board filed a Petition for Discipline against Mr. Parrish alleging violations of Rules of Professional Conduct 3.5(e),[4] 8.2(a)(1),[5] 8.4(a), 8.4(c), and **161** 8.4(d).[6] In July 2015 after an evidentiary hearing, a Board hearing panel issued a written decision finding that Mr. Parrish had violated:

- Rule 3.5(e) by including statements in the motions to recuse that "constituted abusive and obstreperous conduct intended to disrupt the Tennessee Court of Appeals proceedings involving [Mr. Parrish's] client";

- Rule 8.2(a)(1) by making "statements about the integrity of Judges Farmer, Kirby and Stafford that a reasonable attorney would believe were false" and making those statements "with reckless disregard as to their truth or falsity";

- Rule 8.4(d) by making statements in the motions to recuse that "were prejudicial to the administration of justice"; and

- Rule 8.4(a) by violating Rules 3.5(e), 8.2(a)(1), and 8.4(d).

After a subsequent evidentiary hearing in January 2016, the hearing panel issued a written decision stating that it "considered the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions," and therefore had considered "the duty violated; [Mr. Parrish's] mental state, the injury caused by [Mr. Parrish's] misconduct, and the existence of aggravating and mitigating factors." Without identifying which of the ABA Standards for Imposing Lawyer Sanctions ("ABA Standards") it had applied, the hearing panel concluded that a public censure was the appropriate sanction for Mr. Parrish's conduct.

The Board appealed by filing a Petition for Writ of Certiorari in the Shelby County Circuit Court. Following a hearing, the trial court affirmed the hearing panel's findings that Mr. Parrish had violated Rules 3.5(e), 8.2(a)(1), 8.4(a), and 8.4(d). The trial court also determined that although the hearing panel did not articulate the particular ABA Standard(s) on which it had relied, ABA Standards section 6.0—Violations of Duty Owed to the Legal System—applied.

F19-00105 - 003040

PLAINTIFF'S ATTACHMENT C   0020

Under section 6.0, ABA Standard 6.13 provides that "[r]eprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false ... and ... causes an adverse or potentially adverse effect on the legal proceeding." Under ABA Standard 6.12, "[s]uspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court ... and takes no remedial action, and ... causes an adverse or potentially adverse effect on the legal proceeding."

After reviewing the record, the trial court found that ABA Standard 6.12 (suspension) applied because Mr. Parrish knew the statements in the motions to recuse were false. The trial court also found that ABA Standard 6.32 applied because Mr. Parrish's statements were "prejudicial to the administration of justice and significantly undermine[d] the integrity and public confidence in the administration of justice." ABA Standard 6.32 provides that "suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the **\*162** lawyer knows that such communication is improper, and ... causes interference or potential interference with the outcome of the legal proceeding."

The trial court then identified the mitigating and aggravating factors that it considered in determining the appropriate sanction for Mr. Parrish's misconduct. The trial court cited Mr. Parrish's positive reputation in the community and the lack of prior discipline as mitigating factors. As aggravating factors, the trial court considered Mr. Parrish's substantial experience in the practice of law and his refusal to acknowledge the wrongful nature of his conduct.

Based on ABA Standards 6.12 and 6.32 and the mitigating and aggravating factors, the trial court held that Mr. Parrish should be suspended for six months, with one month to be served on active suspension and the remaining five months on probation. Mr. Parrish appealed to this Court.

## II.

**[1]  [2]**  The Supreme Court of Tennessee, as the source of authority for the Board of Professional Responsibility and all of its functions, bears the ultimate responsibility for enforcing the Rules of Professional Responsibility and the ultimate disciplinary responsibility for violations of the ethical rules governing attorneys practicing in Tennessee. *Garland v. Bd. of Prof'l Responsibility*, 536 S.W.3d 811, 816 (Tenn. 2017) (citations omitted); *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 612 (Tenn. 2010) (citing *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 469–70 (Tenn. 2003) ). This Court reviews judgments in disciplinary proceedings against attorneys "in light of our 'inherent power ... [and] fundamental right to prescribe and administer rules pertaining to the licensing and admission of attorneys.' " *Bd. of Prof'l Responsibility v. Allison*, 284 S.W.3d 316, 321 (Tenn. 2009) (quoting *In re Burson*, 909 S.W.2d 768, 773 (Tenn. 1995) ).

**[3]  [4]  [5]  [6]  [7]  [8]**  When reviewing a judgment in a disciplinary proceeding, this Court's standard of review is the same as that applied by the trial court. *Long v. Bd. of Prof'l Responsibility*, 435 S.W.3d 174, 178 (Tenn. 2014) (citing *Hoover v. Bd. of Prof'l Responsibility*, 395 S.W.3d 95, 103 (Tenn. 2012) ). Just as the trial court did, we review the transcript of the evidence presented before the hearing panel, as well as the hearing panel's findings and judgment. *Garland*, 536 S.W.3d at 816 (citing Tenn. Sup. Ct. R. 9, § 33.1(b) ).[7] The trial court reviews questions of law de novo, but "shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact." *Sallee v. Bd. of Prof'l Responsibility*, 469 S.W.3d 18, 36 (Tenn. 2015) (quoting Tenn. Sup. Ct. R. 9, § 1.3 (2010) and citing *Bd. of Prof'l Responsibility v. Cowan*, 388 S.W.3d 264, 267 (Tenn. 2012) ). Like the trial court, we will reverse or modify the hearing panel's decision only when

the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory

F19-00105 - 003041

PLAINTIFF'S ATTACHMENT C    0021

provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

**\*163** *Long*, 435 S.W.3d at 178 (quoting Tenn. Sup. Ct. R. 9, § 1.3 and citing *Bd. of Prof'l Responsibility v. Love*, 256 S.W.3d 644, 653 (Tenn. 2008) ). "In determining whether substantial and material evidence supports the panel's decision, the Court evaluates whether the evidence 'furnishes a reasonably sound factual basis for the decision being reviewed.' " *Sneed*, 301 S.W.3d at 612 (quoting *Threadgill v. Bd. of Prof'l Responsibility*, 299 S.W.3d 792, 807 (Tenn. 2009) ). A hearing panel's decision is arbitrary and capricious if it "is not based on any course of reasoning or exercise of judgment, or ... disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d 631, 641 (Tenn. 2008) (quoting *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007) ). A hearing panel abuses its discretion if it "appl[ies] an incorrect legal standard or reach[es] a decision that is against logic or reasoning that causes an injustice to the party complaining." *Sallee*, 469 S.W.3d at 42 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) ).

## First Amendment

**[9]** Mr. Parrish contends that the statements he made in the motions to recuse are protected speech under the First Amendment of the United States Constitution and Article 1, § 19 of the Tennessee Constitution. Both the hearing panel and the trial court concluded that Mr. Parrish's statements in the motions to recuse violated Rules of Professional Conduct 3.5(e), 8(a), 8.2(a)(1), and 8.4(d) and are not entitled to constitutional protection. We agree.

This Court has in past disciplinary proceedings distinguished between in-court and out-of-court statements in determining whether the First Amendment protects an attorney's speech. In *Board of Professional Responsibility v. Slavin*, 145 S.W.3d 538 (Tenn. 2004), we held that pejorative statements made by an attorney in motions and other pleadings filed in state and federal courts were not entitled to First Amendment protection.

In *Ramsey v. Board of Professional Responsibility*, 771 S.W.2d 116, 121 (Tenn. 1989), the Court applied the subjective "actual malice" standard established by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), [8] to determine whether the attorney's out-of-court statements to the media were constitutionally protected. There, we held that an attorney's out-of-court statements to the media were protected by the First Amendment, explaining that after a case has concluded, an attorney has the right to make statements that criticize the court and the judiciary, "so long as the criticisms are made in good faith with no intent ... to willfully or maliciously misrepresent the persons and institutions or bring them into disrepute."

In *Slavin*, we explicitly distinguished *Ramsey* because the statements at issue in *Slavin* were made during in-court judicial proceedings, and "[i]n the context of judicial proceedings, an attorney's First Amendment rights are not without limits." *Slavin*, 145 S.W.3d at 549 & n.9 (emphasis added). Notably, in *Ramsey*, we held that although the attorney's out-of-court comments to news media were protected by the First Amendment, the attorney's conduct **\*164** during in-court judicial proceedings—refusing to obey the court's orders, slamming the courtroom door, and refusing to answer the judge's questions—was sanctionable because it was "prejudicial to the administration of justice." *Ramsey*, 771 S.W.2d at 122–23.

In *Slavin*, we noted that the United States Supreme Court has stated that "during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." 145 S.W.3d at 549 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1071, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) ). The distinction between in-court and out-of-court speech is supported by the rationale that "[a]lthough litigants and lawyers do not check their First Amendment rights at the

F19-00105 - 003042

PLAINTIFF'S ATTACHMENT C    0022

courthouse door, those rights are often subordinated to other interests inherent in the judicial setting." *Slavin*, 145 S.W.3d at 549. We also quoted with approval the observation made by the Supreme Court of Kentucky that the statements at issue need not be false to constitute attorney misconduct because "[t]here can never be a justification for a lawyer to use such scurrilous language with respect to a judge in pleadings or in open court." *Slavin*, 145 S.W.3d at 549 (quoting *Ky. Bar Ass'n v. Waller*, 929 S.W.2d 181, 183 (Ky. 1996) ). [9]

By our holding in *Slavin* that the attorney's in-court speech was not entitled to First Amendment protection, "we intend[ed] to limit an attorney's criticisms of the judicial system and its officers to those criticisms which are consistent in every way with the sweep and the spirit of the Rules of Professional Conduct." *Id.* at 550 (citing *Fla. Bar v. Ray*, 797 So.2d 556, 560 (Fla. 2001) ). [10]

This Court's rulings in similar cases, including cases that were not analyzed in terms of the First Amendment, are consistent with our holding in *Slavin*. In *Farmer v. Board of Professional Responsibility*, 660 S.W.2d 490, 491 (Tenn. 1983), we affirmed discipline for an attorney for "scurrilous and improper language" in briefs that he had filed accusing the Court of Appeals of making intentionally false findings of fact and calling the judges and opposing counsel liars. In affirming the sixty-day suspension imposed by the hearing panel, we noted that the attorney had written the "briefs and other documents in question and deliberately chose to use language and tactics which cannot be tolerated in the legal profession." *Id.* at 493. More recently, in *Bailey v. Board of Professional Responsibility*, 441 S.W.3d 223 (Tenn. 2014), we affirmed a sixty-day suspension where an attorney's misconduct in court—repeatedly violating the court's orders and admonitions during a jury trial—resulted in a mistrial. We noted that "[e]ven if an attorney believes that the court has issued an erroneous ruling, zealous representation of a client 'never justifies the use of disrespectful, unprofessional or indecorous language to the court.' " *Id.* at 234 (quoting *In re Moncier*, 550 F.Supp.2d 768, 807 (E.D. Tenn. 2008) ). In *Hancock v. Board of Professional Responsibility*, 447 S.W.3d 844, 853 (Tenn. 2014), we found an attorney had violated Rule of Professional Conduct 3.5 by stating in an e-mail to a judge that he was a "bully" and **\*165** a "clown" because "[t]he conduct need not occur inside a courtroom to be disruptive to a tribunal." *See also Ward v. Univ. of the South*, 209 Tenn. 412, 354 S.W.2d 246, 249 (1962) (stating that although it is proper for an attorney to point out the court's errors in a brief, it is not acceptable for the attorney to "insert matters which are defamatory, scandalous, impertinent and untrue" into a brief, and the court will not "tolerate, either orally or by brief, ... abuse of the ... judge....").

In cases analyzed in terms of the First Amendment, courts in numerous other jurisdictions, as well as the United States Supreme Court, have rejected the proposition that the First Amendment provides absolute protection to attorney speech. *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 793 N.E.2d 425, 439 (2003) (citing *In re Sawyer*, 360 U.S. 622, 646, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959) (Stewart, J., concurring in result) ) ("Thus, attorneys may not invoke the federal constitutional right of free speech to immunize themselves from even-handed discipline for proven unethical conduct."); *In re Shearin*, 765 A.2d 930, 938 (Del. 2000) (ethical obligations imposed on attorneys qualify their constitutional right to freedom of speech); *In re Pyle*, 283 Kan. 807, 156 P.3d 1231, 1243 (2009) (holding that attorneys' constitutional free speech rights are "tempered by their obligations to the court and bar"); *In re Disciplinary Action Against Graham*, 453 N.W.2d 313, 321 (Minn. 1990) (First Amendment protection of attorney speech is not absolute); *Matter of Westfall*, 808 S.W.2d 829, 835 (Mo. 1991) (the state may restrict a lawyer's constitutional rights where there is a threat to a significant state interest); *Lawyer Disciplinary Bd. v. Hall*, 234 W.Va. 298, 765 S.E.2d 187, 196 (2014) (First Amendment protection of statements critical of judges is not absolute).

A majority of courts that have dealt with attorney speech in disciplinary proceedings have not drawn a distinction between in-court and out-of-court statements in considering the issue and have adopted an objective standard in determining whether attorney speech is entitled to First Amendment protection. *The Florida Bar v. Ray*, 797 So.2d 556, 559–60 (Fla. 2001); *In re Dixon*, 994 N.E.2d 1129, 1136–37 (Ind. 2013); *Attorney Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 81–82 (Iowa 2008); *In re Cobb*, 445 Mass. 452, 838 N.E.2d 1197, 1213 (Mass. 2005); *Graham*, 453 N.W.2d at 322–23; *Mississippi Bar v. Lumumba*, 912 So.2d 871, 884 (Miss. 2005); *Matter of Westfall*, 808 S.W.2d 829, 837 (Mo. 1991); *Gardner*, 793 N.E.2d at 431–32; *Hall*, 765 S.E.2d at 197 (quoting *Graham*, 453 N.W.2d at 322). The Court of Appeals

F19-00105 - 003043

PLAINTIFF'S ATTACHMENT C    0023

of New York pointed out in *Matter of Holtzman*, 78 N.Y.2d 184, 573 N.Y.S.2d 39, 577 N.E.2d 30, 34 (1991), that the United States Supreme Court has never extended the *Sullivan* standard to attorney discipline. The *Holtzman* court noted that the application of the subjective "actual malice" standard of *Sullivan* to attorney discipline "would immunize all accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts about their truth." *Id.* The use of a different standard—the objective standard—is supported by "the state's interest in protecting the public, the administration of justice, and the legal profession...." *Disciplinary Counsel v. Shimko*, 134 Ohio St.3d 544, 983 N.E.2d 1300, 1305 (2012) (citations omitted).

[10]  Under the objective standard, the court assesses the statements in terms of "what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances ... [and] focus[ing] on whether  *166  the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made." *Gardner*, 793 N.E.2d at 431 (citations omitted). "It is the reasonableness of the belief, not the state of mind of the attorney, that is determinative." *Holtzman*, 573 N.Y.S.2d 39, 577 N.E.2d at 34.

In *Gardner*, the attorney had moved to reconsider, accusing the appellate court of being dishonest and ignoring well-established law, claiming that it had "issued an opinion so 'result driven' that 'any fair-minded judge' would have been 'ashamed to attach his/her name to it' and that the panel did not give a 'damn about how wrong, disingenuous, and biased its opinion is.' " *Gardner*, 793 N.E.2d at 427. The Ohio Supreme Court rejected the attorney's claim that his statements were merely opinions and thus immune from discipline as in the context of a defamation case. Instead, the Ohio Supreme Court adopted the majority approach that the First Amendment does not protect an attorney from discipline "for expressing an opinion, during court proceedings, that a judge is corrupt when the attorney knows that the opinion has no factual basis or is reckless in that regard." *Id.* at 428–29. The *Gardner* court explained that a state's "compelling interest in preserving public confidence in the judiciary supports applying a standard in disciplinary proceedings different from that in a defamation case." *Id.* at 432.

The Massachusetts Supreme Court explained its rationale for adopting the objective standard for attorney discipline cases as opposed to the subjective, or "actual malice," standard applied in defamation actions in terms of the differences in the societal interest served by the two bodies of law. *Cobb*, 838 N.E.2d at 1213. While a defamation action addresses a wrong directed against an individual, in a professional disciplinary action, "the wrong is against society as a whole, the preservation of a fair, impartial judicial system, and the system of justice as it has evolved for generations...." *Id.* Unwarranted statements criticizing judges only serve to weaken the public's trust in the judicial system. *Id.*

The court in *Graham* reasoned that the objective standard was appropriate in attorney disciplinary cases because "[t]he standard applied must reflect that level of competence, of sense of responsibility to the legal system, of understanding of legal rights and of legal procedures to be used only for legitimate purposes and not to harass or intimidate others, that is essential to the character of an attorney...." 453 N.W.2d at 322. Under the objective standard, the fact that the attorney's feelings as expressed in his statements were "genuine" did not negate the finding that he had acted with reckless disregard as to the truth or falsity of his statements. *Id.* at 322–23.

[11]  We hold that the objective "reasonable attorney" standard is the appropriate standard to apply in a disciplinary proceeding involving an attorney's in-court speech. Utilizing this objective standard, [11]  *167  the hearing panel found that Mr. Parrish had made statements in the motions to recuse about the integrity of the judges on the Court of Appeals that a reasonable attorney would believe to be false, and that Mr. Parrish had made those statements with reckless disregard as to their truth or falsity.

In sum, the in-court statements that Mr. Parrish made in the recusal motions were not protected by the First Amendment. [12] The hearing panel's decision that these statements violated Rules of Professional Conduct 3.5(e), 8.2(a)(1), and 8.4(a), and 8.4(d) is supported by material and substantial evidence.

*Appropriate Sanction*

**[12]** **[13]** Next, we consider whether the appropriate sanction for Mr. Parrish's misconduct is a public censure as found by the hearing panel or suspension as determined by the trial court. In determining the appropriate sanction in an attorney disciplinary matter, the ABA Standards serve as guideposts, and they direct the court, in applying the Standards, to consider:

(1) What ethical duty did the lawyer violate? (A duty to the client, the public, the legal system, or the profession?);

(2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?);

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?); and

(4) Are there any aggravating or mitigating circumstances?

*Bailey*, 441 S.W.3d at 232 (citing *Maddux v. Bd. of Prof'l Responsibility*, 409 S.W.3d 613, 624 (Tenn. 2013) ).

The hearing panel found that the statements made by Mr. Parrish in the motions to recuse "constituted abusive and obstreperous conduct intended to disrupt the Court of Appeals proceedings involving [his] client," and thus violated Rule 3.5(e). The hearing panel also determined that a reasonable attorney would believe that the statements made in the motions to recuse about the integrity of the judges were false, and so those statements violated Rule 8.2(a)(1). The hearing panel also concluded that the statements were prejudicial to the administration of justice, and thus violated Rule 8.4(d). Finally, Mr. Parrish's violations of Rules 3.5(e), 8.2(a)(1), and 8.4(d) violated Rule 8.4(a).

**[14]** Although the hearing panel stated in its Final Order Imposing Sanction that it had considered the applicable provisions of the ABA Standards, it did not identify which of the ABA Standards it considered. The trial court affirmed the findings of fact made by the hearing panel regarding the violations of the Rules of Professional Conduct. The trial court then looked to ABA Standard 6.0 applicable to violation of duties owed to the legal system to determine what level of sanction was warranted. "Generally speaking, '[t]he ABA Standards suggest the appropriate baseline sanction, and aggravating and mitigating factors may justify an increase or reduction in the degree of punishment to be imposed.' " *Bd. of Prof'l Responsibility v. Barry*, 545 S.W.3d 408, 422 (Tenn. 2018) (quoting *In re Vogel*, 482 S.W.3d 520, 534 (Tenn. 2016) ).

**\*168** Citing the definition of "knowledge" in the ABA Standards, [13] the trial court found evidence in Mr. Parrish's testimony before the hearing panel and in the voluminous pleadings that Mr. Parrish knew the statements in the motions to recuse were false. The trial court then noted that the ABA Standards that recommend a reprimand are conditioned upon a finding that the attorney was negligent, and that the hearing panel "at the very least" had found Mr. Parrish to be "reckless" with regard to the truth or falsity of the statements made in the motions to recuse. The trial court concurred with the finding of the hearing panel that Mr. Parrish made false statements that the appellate judges had "purposefully ignored binding law, purposefully fabricated facts, manipulated and rigged the legal system, acted in a manner that indicated they had taken bribes, abused their judicial power, surrendered their impartiality, and ruled against his clients due to personal sympathies and bias." The trial court found that there was no factual basis for such statements and that the only "fact" Mr. Parrish had was that the Court of Appeals had ruled against his client. Because the trial court determined that the pleadings and the proof submitted to the hearing panel showed that Mr. Parrish acted knowingly, it found that a suspension was appropriate under ABA Standards 6.12 and 6.32, applicable when a lawyer knows that false statements are being submitted to the court and when a lawyer engages in communication with an individual in the legal system that the lawyer knows to be improper. The trial court further looked to the definition of "injury" in the ABA Standards, [14] and stated that "it goes without saying that statements of this nature by an attorney which falsely accuse

PLAINTIFF'S ATTACHMENT C 0025

a judge of this type of misconduct are prejudicial to the administration of justice and serve to significantly undermine the integrity and public confidence in the administration of justice."

The trial court next considered the applicable aggravating and mitigating factors that it had identified—Mr. Parrish's substantial experience in the practice of law and his refusal to acknowledge the wrongful nature of his conduct as aggravating factors; the absence of prior discipline and Mr. Parrish's positive reputation in the community as mitigating factors. After deciding that the aggravating factors outweighed the mitigating factors, the trial court determined that a six-month suspension was the appropriate sanction, with one month to be served on active suspension and the remaining five months to be served on probation.

We conclude that the hearing panel acted arbitrarily and capriciously in finding that a public censure was warranted. Mr. Parrish made the statements in the recusal motion knowingly, not negligently. Therefore, ABA Standard 6.12 applies, not ABA Standard 6.13. Under ABA Standard 6.12, the presumptive sanction is suspension, not a reprimand. The hearing panel offered no explanation as to why it did not apply ABA Standard 6.12 and no reason is apparent from the record. *See Barry*, 545 S.W.3d at 425 (finding that the hearing panel's decision to impose suspension instead of the presumptive sanction of disbarment under the ABA Standards, in the absence of mitigating factors, was arbitrary *169 or capricious). The hearing panel's decision "seems at odds with the factual findings and assessment ... of the level of intent and culpability found by the hearing panel." *Id.*

[15]  Mr. Parrish argues that a public censure rather than suspension is warranted, not based on the ABA Standards or any precedent in prior cases, but because a suspension would be an unconstitutional suppression of his right to free speech on the subject of judicial reform. The Board contends that the suspension imposed by the trial court is appropriate under the ABA Standards. To determine the appropriate sanction, it is helpful to consider sanctions we have imposed in cases with similar facts. "This Court 'evaluate[s] each instance of attorney discipline in light of its particular facts and circumstances,' even as it 'consider[s] the sanctions that have been imposed in prior cases that present similar circumstances so as to maintain consistency and uniformity in disciplinary proceedings.' " *Bailey*, 441 S.W.3d at 236 (quoting *Bd. of Prof'l Responsibility v. Maddux*, 148 S.W.3d 37, 40 (Tenn. 2004) ). *See also Napolitano v. Bd. of Prof'l Responsibility*, 535 S.W.2d 481, 502 (Tenn. 2017) (quoting *Bd. of Prof'l Responsibility v. Reguli*, 489 S.W.3d 408, 424 (Tenn. 2015) ) ("When reviewing disciplinary sanctions, this Court reviews comparable cases to ensure consistency in discipline.").

In *Bailey*, the attorney received a sixty-day suspension for misconduct in court–repeatedly violating the court's orders–resulting in a mistrial. 441 S.W.3d at 237. The attorney in *Farmer* received a sixty-day suspension for statements in an appellate brief calling judges on the Court of Appeals and another attorney liars. 660 S.W.2d at 491. In *Slavin*, we imposed a two-year suspension for pejorative statements made in motions and other pleadings filed in state and federal courts. 145 S.W.3d at 551. In *Ramsey*, we affirmed an attorney's suspension for six months, with forty-five days on active suspension and the remaining 135 days on probation for his in-court behavior of slamming courtroom doors, refusing to obey court orders, and refusing to answer questions from the judge. 771 S.W.2d at 123.

Sanctions imposed in similar cases in other jurisdictions are also instructive. In *Gardner*, the Ohio Supreme Court imposed a six-month suspension for the attorney's comments in a motion accusing the court of being "dishonest and ignoring well-established law" and "so 'result-driven' that 'any fair-minded judge' would have been ashamed to attach his/her name" to the opinion. 793 N.E.2d at 433. The attorney in *Waller* was suspended for six months for comments made in a pleading filed with the trial court calling the previous judge in the case a "lying incompetent ass-hole [sic]" and stating that the new judge would be much better than the previous one if he graduated from the eighth grade. 929 S.W.2d at 181, 183.

Like the attorney in *Slavin*, Mr. Parrish made in-court statements impugning the integrity of the judges, albeit without the repeated misconduct present in *Slavin*. Like the attorney in *Farmer*, Mr. Parrish "deliberately chose to use language

PLAINTIFF'S ATTACHMENT C    0026

and tactics which cannot be tolerated in the legal profession." 660 S.W.2d at 493. And, like the attorney in *Gardner*, Mr. Parrish accused the Court of Appeals judges of being dishonest and ignoring established law, skewing and ignoring the facts, and violating their oaths to decide cases fairly and impartially. 793 N.E.2d at 427.

Although Mr. Parrish claims that his statements were justified by his steadfast belief in judicial reform, attorneys who cross the line from tolerable criticism to unacceptable speech "may not avoid punishment **\*170** by claiming that their misconduct served the greater good or the interest of their clients, as such exceptions would overwhelm the rules." *Bailey*, 441 S.W.3d at 237 (quoting *Slavin*, 145 S.W.3d at 551). Mr. Parrish's argument in that regard is much like the defense raised by John J. Hooker who was disciplined for filing "frivolous lawsuits using the most baseless invectives." *In re Hooker*, 340 S.W.3d 389, 392 (Tenn. 2011). According to the trial court, Mr. Hooker considered himself a "constitutional warrior for the people" and believed that his lawsuits could not be frivolous for that reason. We noted that Mr. Hooker completely missed the point—the disciplinary proceeding concerned only the question of whether the attorney in fulfilling his perceived role as "constitutional warrior" was subject to the Rules of Professional Conduct. *Id.* at 393.

Likewise, Mr. Parrish's attempt to justify his conduct by claiming that he is on a crusade for judicial reform misses the point. This case is not about Mr. Parish's beliefs in judicial reform. Rather, this case involves Mr. Parrish's in-court derogatory statements about the integrity of three appellate court judges in violation of the Rules of Professional Conduct.

### III.

We hold that Mr. Parrish's pejorative statements in the motions to recuse were not protected by the First Amendment. The hearing panel's decision that Mr. Parrish violated Rules of Professional Conduct 3.5(e), 8.2(a)(1), 8.4(a), and 8.4(d) is supported by material and substantial evidence. The hearing panel, however, acted arbitrarily and capriciously in determining that the appropriate sanction for Mr. Parrish's misconduct was a public censure rather than suspension. Thus, we affirm the judgment of the trial court imposing a six-month suspension, with one month served on active suspension and the remaining five months on probation. We tax the costs of this appeal to Larry E. Parrish, for which execution may issue if necessary.

**All Citations**

556 S.W.3d 153

Footnotes

1    Rule 10 of the Rules of the Court of Appeals of Tennessee provides that the Court of Appeals
     with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

2    The motions to recuse Judge Kirby and Judge Stafford were substantially identical to the motion to recuse Judge Farmer.

3    Rule of Professional Conduct 8.3(a) provides that "[a] lawyer who knows that another lawyer has committed a violation of the Rules of Professional conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the Disciplinary Counsel of the Board of Professional Responsibility." Tenn. Sup. Ct. R. 8, RPC 8.3(a) (2013).

4    "A lawyer shall not: ... (e) engage in conduct intended to disrupt a tribunal." Tenn. Sup. Ct. R, 8, RPC 3.5(e) (2013).

5    "A lawyer shall not make a statement that the lawyer knows to be false or that is made with reckless disregard as to its truth or falsity concerning the qualifications or integrity of ... (1) a judge...." Tenn. Sup. Ct. R. 8, RPC 8.2(a)(1) (2013).

6    It is professional misconduct for a lawyer to:

PLAINTIFF'S ATTACHMENT C    0027

Board of Professional Responsibility v. Parrish, 556 S.W.3d 153 (2018)

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

....

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice[.]

Tenn. Sup. Ct. R. 8, RPC 8.4 (2013).

7 Because this disciplinary action was initiated in October 2013, we apply the pre-2014 version of Rule 9. *See Garland*, 536 S.W.3d at 816.

8 In the context of a defamation action, the United States Supreme Court held in *Sullivan* that a public official could not recover damages without proving that "the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. 254, 279–80, 84 S.Ct. 710.

9 The attorney in *Waller* filed numerous "scandalous and bizarre" pleadings, including one stating in its opening paragraph that the current judge was "much better than that lying incompetent ass-hole [sic] [he] replaced if [the current judge] graduated from the eighth grade." 929 S.W.2d at 181–82.

10 This case, like *Slavin*, is distinguishable from the situation in *Ramsey*, which involved out-of-court speech. Whether an attorney's out-of-court speech continues to be subject to an actual malice standard in a disciplinary proceeding is not presently before the Court.

11 The hearing panel, in its order ruling on motions argued during the telephonic hearing of June 29, 2015, began its analysis by stating that the parties had agreed, both in their filings and in oral argument, that in the context of a disciplinary proceeding, the objective standard set forth in *Gardner* applies to evaluate an attorney's statements about the judiciary. Mr. Parrish later claimed in post-hearing filings with the hearing panel and in the trial court proceedings that he had not agreed that the objective standard was correct. The record before this Court does not contain a transcript of the June 29, 2015 telephonic hearing. Although Mr. Parrish did not appeal the ruling of the hearing panel, the trial court held that he had not waived the issue during the hearing before the panel because the Board acknowledged the possibility that there might have been some misunderstanding there between the parties.

12 Our resolution of the First Amendment claim also resolves Mr. Parrish's claim under Article I, § 19 of the Tennessee Constitution.

13 The ABA Standards define "knowledge" as: "conscious awareness of the nature of attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards, Black Letter Law, Definitions.

14 The ABA Standards define "injury" as: "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." ABA Standards, Black Letter Law, Definitions.

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

F19-00105 - 003048
PLAINTIFF'S ATTACHMENT C   0028

808 S.E.2d 920
Court of Appeals of North Carolina.

The NORTH CAROLINA STATE BAR, Plaintiff,

v.

Jennifer Nicole FOSTER, Attorney, Defendant.

No. COA17-443
|
Filed: December 19, 2017

**Synopsis**
**Background:** The State Bar initiated disciplinary proceedings against attorney. The Disciplinary Hearing Commission determined attorney violated the Rules of Professional Conduct and imposed a two-year suspension, which was stayed with conditions. Attorney appealed.

**Holdings:** The Court of Appeals, Elmore, J., held that:

[1] attorney's conduct in disrespecting and swearing at magistrate violated the rule of professional conduct that prohibited a lawyer from engaging in conduct intended to disrupt a tribunal, and

[2] attorney's conduct in making vulgar and profane statements toward and in the presence of magistrate violated the rules of professional conduct.

Affirmed.

West Headnotes (8)

[1]    **Attorney and Client** ⟺ Review
       Attorney disciplinary actions are reviewed under the whole record test.

       Cases that cite this headnote

[2]    **Attorney and Client** ⟺ Review
       The whole record test for reviewing attorney disciplinary actions requires the reviewing court to determine if the Disciplinary Hearing Commission's (DHC) findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law.

       Cases that cite this headnote

[3]    **Attorney and Client** ⟺ Weight and sufficiency
       In addition to being substantial, the evidence the Disciplinary Hearing Commission (DHC) uses to support its findings and conclusions in an attorney disciplinary proceeding must be clear, cogent, and convincing.

PLAINTIFF'S ATTACHMENT C    0029

Cases that cite this headnote

[4]    **Attorney and Client** ⬅ Review

Although the reviewing court in an attorney disciplinary case must consider contradictory evidence, the presence of such evidence does not eviscerate challenged findings, and the reviewing court may not substitute its judgment for that of the Disciplinary Hearing Commission (DHC).

Cases that cite this headnote

[5]    **Attorney and Client** ⬅ Trial or hearing

In an attorney disciplinary case, the Disciplinary Hearing Commission (DHC) determines the credibility of the witnesses and the weight of the evidence.

Cases that cite this headnote

[6]    **Attorney and Client** ⬅ Review

When there are two reasonably conflicting views in an attorney disciplinary case, the whole record test does not allow the reviewing court to replace the Disciplinary Hearing Commission's (DHC) judgment even though the court could justifiably have reached a different result had the matter been before it de novo.

Cases that cite this headnote

[7]    **Attorney and Client** ⬅ Deception of court or obstruction of administration of justice

Attorney's conduct in disrespecting and swearing at magistrate, a judicial officer capable of rendering a binding legal judgment, violated the rule of professional conduct that prohibited a lawyer from engaging in conduct intended to disrupt a tribunal, including undignified or discourteous conduct. State Bar Rules, Ch. 2, Rule 1.0(n), 3.5(a)(4)(B); N.C. Gen. Stat. Ann. §§ 7A-292(a)(2), 15A-243.

Cases that cite this headnote

[8]    **Attorney and Client** ⬅ Deception of court or obstruction of administration of justice

Attorney's conduct in making vulgar and profane statements toward and in the presence of magistrate violated the rule of professional conduct that prohibited a lawyer from engaging in conduct that was prejudicial to the administration of justice. State Bar Rules, Ch. 2, Rule 8.4(d).

Cases that cite this headnote

Appeal by defendant from order entered 13 September 2016 by the Disciplinary Hearing Commission of the North Carolina State Bar. Heard in the Court of Appeals 18 October 2017. Disciplinary Hearing Commission of the North Carolina State Bar, No. 14 DHC 7

**Attorneys and Law Firms**

*921 The North Carolina State Bar, by Counsel Katherine Jean and Deputy Counsel David R. Johnson, for plaintiff-appellee.

PLAINTIFF'S ATTACHMENT C   0030

Jennifer Nicole Foster, pro se, Asheville, for defendant-appellant.

**Opinion**

ELMORE, Judge.

Attorney Jennifer Nicole Foster ("defendant") appeals from an order of discipline issued by the Disciplinary Hearing Commission ("DHC") of the North Carolina State Bar. In its order, the DHC determined that defendant violated Rules of Professional Conduct 3.5 and 8.4. The DHC thus imposed a two-year suspension of defendant's law license, stayed for the duration of the suspension so long as defendant complies with certain conditions. After careful review, we affirm the order of the DHC.

## I. Background

Defendant was admitted to the North Carolina State Bar in 1995 and was practicing law in Asheville as of 2011. On the evening of 5 November 2011, defendant entered the magistrate's office in the Buncombe County Detention Center to inquire about arrest warrants that had been issued for several members of the Occupy Asheville movement. Defendant encountered Magistrate Amanda Fisher, one of two magistrates on duty at the time, and identified herself as an attorney there on behalf of the movement. Defendant then asked Magistrate Fisher "what the hell is going on around here" regarding the warrants. Magistrate Fisher warned defendant to watch her language and told her that she was in a courtroom. Defendant, however, maintains that Magistrate Fisher never mentioned the word "court" or warned defendant to watch her language.

Office policy prohibited Magistrate Fisher from providing defendant with information regarding outstanding warrants on other individuals, but she did inform defendant there were no outstanding warrants on defendant herself. Defendant responded "what the f*** is going on around here," prompting Magistrate Fisher to renew her warning to defendant, but defendant nevertheless repeated the profanity multiple times. As Magistrate Fisher told defendant she was being held in contempt of court, defendant walked out of the magistrate's office, loudly repeating more vulgarities as she left.

At Magistrate Fisher's request, detention officers stopped defendant from leaving the premises and returned her to the magistrate's office. The second magistrate on duty that evening appeared and witnessed the remainder of defendant's profanities while Magistrate Fisher entered the order for contempt. On 17 January 2012, defendant was convicted of direct criminal contempt of court following a 1 December 2011 hearing in Buncombe County Superior Court. Defendant appealed, and this Court ultimately reversed her conviction on procedural grounds. *In re Foster*, 227 N.C. App. 454, 744 S.E.2d 496, 2013 WL 2190072 (2013) (unpublished).

Based on these events, the State Bar filed a complaint against defendant with the DHC on 25 March 2014. The proceedings were continued pending federal action initiated by defendant against Magistrate Fisher, among others, and the DHC eventually held a hearing on 8 July 2016. In its order of discipline dated 13 September 2016, the DHC found that defendant's conduct violated Rules of Professional Conduct 3.5(a)(4)(B) and 8.4(d), and it stayed a two-year suspension of her license pending compliance with certain conditions (e.g., that defendant follow the recommendations and treatment program of her therapist). Defendant filed timely notice of appeal.

## II. Discussion

Any attorney admitted to practice law in this state is subject to the disciplinary jurisdiction of the DHC for, *inter alia,* violation of the Rules of Professional Conduct adopted by the State Bar. N.C. Gen. Stat. §§ 84-28(a)–(b)(3) (2015). Either

PLAINTIFF'S ATTACHMENT C    0031

party may appeal a final order from the DHC to this Court, where our review is limited to "matters of law or legal inference." N.C. Gen. Stat. § 84-28(h).

[1]   [2]   [3]   [4]   [5]   [6]   Disciplinary actions are reviewed under the whole record test. *N.C. State Bar v. Talford*, 356 N.C. 626, 632–33, 576 S.E.2d 305, 309–10 (2003). The whole record test **\*922** "requires the reviewing court to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law. Such supporting evidence is substantial if a reasonable person might accept it as adequate backing for a conclusion." *Id.* (citation omitted). In addition to being substantial, the evidence the DHC uses to support its findings and conclusions must be clear, cogent, and convincing. *Id.* (citing *In re Suspension of Palmer*, 296 N.C. 638, 648, 252 S.E.2d 784, 790 (1979)). Although the reviewing court must consider contradictory evidence, the presence of such evidence "does not eviscerate challenged findings, and the reviewing court may not substitute its judgment for that of the DHC. The DHC determines the credibility of the witnesses and the weight of the evidence." *N.C. State Bar v. Adams*, 239 N.C. App. 489, 495, 769 S.E.2d 406, 411 (2015). Thus, when there are two reasonably conflicting views, " 'the whole record test does not allow the reviewing court to replace the DHC's judgment ... even though the court could justifiably have reached a different result had the matter been before it *de novo*.' " *N.C. State Bar v. Sutton*, ⸺ N.C. App. ⸺, ⸺, 791 S.E.2d 881, 890 (2016) (brackets omitted) (quoting *N.C. State Bar v. Nelson*, 107 N.C. App. 543, 550, 421 S.E.2d 163, 166 (1992)).

### A. Rule 3.5(a)(4)(B) Violation

[7]   Rule of Professional Conduct 3.5 states in relevant part that "a lawyer shall not ... engage in conduct intended to disrupt a tribunal, including ... undignified or discourteous conduct that is degrading to a tribunal." N.C. R. Prof. Conduct 3.5(a)(4)(B). While defendant admits to disrespecting Magistrate Fisher, she argues that a magistrate is not a "tribunal" as defined in Rule 1.0(n), and thus denies disrespecting a tribunal in violation of Rule 3.5(a)(4)(B). At issue then is what constitutes a tribunal and whether a magistrate fits within the meaning of that definition as applied in Rule 3.5.

Rule of Professional Conduct 1.0 defines certain terms that appear within the substantive rules. Under Rule 1.0(n),

> "Tribunal" denotes a court, an arbitrator in a binding arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. The term encompasses any proceeding conducted in the course of a trial or litigation, or conducted pursuant to the tribunal's rules of civil or criminal procedure or other relevant rules of the tribunal, such as a deposition, arbitration, or mediation. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, may render a binding legal judgment directly affecting a party's interests in a particular matter.

N.C. R. Prof. Conduct 1.0(n). While Rule 1.0 does not include the term "magistrate," a magistrate may be defined as a "judicial officer with strictly limited jurisdiction and authority, often on the local level and often restricted to criminal cases," and a magistrate's court is a "court with limited jurisdiction over minor criminal and civil matters." *Black's Law Dictionary* (10th ed. 2014).

The North Carolina Constitution describes our General Courts of Justice to include appellate, superior, and district courts. N.C. Const. art. IV, § 2; *see also* N.C. Gen. Stat. § 7A-4 (2015). Magistrates are created in this article and declared "officers of the District Court." N.C. Const. art. IV, § 10; *see also* N.C. Gen. Stat. § 7A-170. They are nominated by the clerk of superior court and appointed by the senior resident superior court judge. N.C. Const. art. IV, § 10; N.C.

F19-00105 - 003052   PLAINTIFF'S ATTACHMENT C   0032

Gen. Stat. § 7A-171(b). Magistrates must retire and may be removed on the same grounds as a judge of the General Courts of Justice. N.C. Gen. Stat. §§ 7A-170, 173. In sum, magistrates are judicial officers. *See Bradshaw v. Admin. Office of Courts*, 320 N.C. 132, 133, 357 S.E.2d 370, 370 (1987) (holding that magistrates are "members of the judiciary" for limited purpose of statute making members ineligible for employment benefits).

Most powers of magistrates are rooted in criminal law. *See* N.C. Gen. Stat. § 7A-273. Magistrates have the power to enter judgments for pre-determined infractions and **\*923** misdemeanors; to issue arrest warrants, search warrants, and grant bail in certain cases; to conduct initial appearances; to accept waivers, pleas, and enter judgments for certain worthless check cases. *Id.*; *see also* N.C. Gen. Stat. §§ 15A-243, 304, 305 (2015). Additionally, magistrates have the power "[t]o punish for direct criminal contempt." N.C. Gen. Stat. § 7A-292(a)(2). Although the general statutes are silent about the physical office for magistrates, these can vary from small offices to large courtrooms, depending on the needs and budget of the district. John M. Conley & William M. O'Barr, *Fundamentals of Jurisprudence: An Ethnography of Judicial Decision Making in Informal Courts*, 66 N.C. L. Rev. 467, 477 (1988).

The definitions and core functions described above and applied here indicate that a magistrate is a tribunal as that term appears in Rule 3.5. Consistent with Rule 1.0, the State Bar defines "tribunal" as a court or other adjudicative body that administers justice. Like a tribunal, a magistrate is an adjudicative body led by a judicial officer, but typically with limited jurisdiction over criminal or civil matters. However, it is clear based on the powers conferred upon them by our legislature that magistrates administer justice within their limited jurisdiction.

The State Bar's definition of tribunal also includes "a court *or other body acting in an adjudicative capacity*." N.C. R. Prof. Conduct 1.0(n) (emphasis added). "A ... body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, *may render a binding legal judgment* directly affecting a party's interests in a particular matter." *Id.* (emphasis added). Like a tribunal, a magistrate can render a binding legal judgment; she possesses the power to enter judgments for pre-determined infractions, misdemeanors, and worthless check cases. After the presentation of evidence by a law enforcement officer, a magistrate may issue search warrants and arrest warrants, which directly affect a party's liberty interests. When a magistrate enters an order for contempt, as Magistrate Fisher did here, it is based on a magistrate's own observations of the party in contempt. The order itself carries penalties including fines and imprisonment. N.C. Gen. Stat. § 5A-12 (2015).

The nature of our state constitution and general statutes also indicates that magistrates are intended to be a court. Significantly, magistrates are created in the same constitutional article as the state's judicial branch and are declared officers of the district court. The laws that establish the confines of magistrates—such as method for appointment, qualifications, age limits, hours, and salary—are listed in the same chapter of the general statutes as the laws of the judicial department. Moreover, the rules governing the removal and retirement of magistrates are the same as those for any judge of the appellate, superior, or district courts. *In re Kiser*, 126 N.C. App. 206, 208, 484 S.E.2d 441, 442 (1997). Thus, a magistrate appears to be a tribunal according to the definition set forth in Rule 1.0 and applied in Rule 3.5.

Defendant first contends that a magistrate does not constitute a tribunal here because the signage at the detention center only indicated an office and not a court. However, whether the signs indicated an office or a court is not dispositive of this issue. Depending on the jurisdiction, a magistrate in this state may have a courtroom or an office. Conley & O'Barr, *Fundamentals of Jurisprudence*, at 477. Defendant also argues that a magistrate is not a tribunal because the comments to Rule 3.5 indicate that a judge, as opposed to a judicial official, presides over a tribunal. This assertion is simply incorrect. Although comment 8 to Rule 3.5 states that "a lawyer should not communicate with a judge relative to a matter pending before ... a tribunal over which the judge presides," a great leap in logic is required to conclude from this comment that a tribunal only exists when presided over by a judge.

PLAINTIFF'S ATTACHMENT C 0033

For the reasons stated above, we find defendant's contention that a magistrate is not a tribunal to be unpersuasive. We therefore hold that the DHC did not err in concluding that defendant disrespected a tribunal in violation of Rule 3.5(a)(4)(B).

**\*924  B.  Rule 8.4(d) Violation**

[8]  Rule of Professional Conduct 8.4 states that "[i]t is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice[.]" N.C. R. Prof. Conduct 8.4(d). Defendant does not deny her conduct itself; rather, she contends that the DHC "rendered wholly conclusory findings of fact" that her conduct harmed the administration of justice and interfered with the ability of the magistrates to perform their duties on the night at issue. We disagree.

"Threats, bullying, harassment, and *other conduct serving no substantial purpose* other than to intimidate, humiliate, or embarrass anyone associated with the judicial process including judges, opposing counsel, litigants, witnesses, or court personnel violate the prohibition on conduct prejudicial to the administration of justice." N.C. R. Prof. Conduct 8.4, cmt. 5 (emphasis added).

A showing of actual prejudice to the administration of justice is not required to establish a violation of paragraph (d). Rather, it must only be shown that the act had a reasonable likelihood of prejudicing the administration of justice.... The phrase "conduct prejudicial to the administration of justice" in paragraph (d) should be read broadly to proscribe a wide variety of conduct, including conduct that occurs outside the scope of judicial proceedings.

N.C. R. Prof. Conduct 8.4, cmt. 4. Rule 3.5, which prohibits disrespectful conduct toward a tribunal as described above, discusses similar conduct.

Therefore, the prohibition against conduct intended to disrupt a tribunal applies to conduct that does not serve a legitimate goal of advocacy or a requirement of a procedural rule and includes angry outbursts, insults, slurs, personal attacks, and unfounded personal accusations as well as to threats, bullying, and other attempts to intimidate or humiliate judges, opposing counsel, litigants, witnesses, or court personnel.... "Conduct of this type breeds disrespect for the courts and for the legal profession. Dignity, decorum, and respect are essential ingredients in the proper conduct of a courtroom, and therefore in the proper administration of justice." *Attorney Grievance Comm'n v. Alison*, 317 Md. 523, 536, 565 A.2d 660, 666 (1989).

N.C. R. Prof. Conduct 3.5, cmt. 10.

In *Attorney Grievance Comm'n v. Alison*, the defendant was found guilty of misconduct by the Maryland State Bar for, *inter alia*, directing vulgarities and profanities at two judges separately in open court, opposing counsel in open court, and two clerks of court. 317 Md. at 536, 565 A.2d at 666. The defendant appealed and alleged that his conduct was not prejudicial to the administration of justice. *Id.* at 525, 565 A.2d at 661. The Maryland Court of Appeals disagreed, reasoning that it does not matter if the conduct "delay [s] the proceedings or cause[s] a miscarriage of justice" because "[c]onduct of this type breeds disrespect for the courts and for the legal profession." *Id.* at 536, 565 A.2d at 666. With respect to the clerks, the court determined the analysis is the same even though clerks do not have courtrooms. *Id.* at 538, 565 A.2d at 667. The court ultimately upheld the defendant's disciplinary sanctions, noting "[i]t is not difficult to visualize the damage to the court system and to the reputation of the legal profession that would result if attorneys were free to conduct their daily business with court clerks in the manner employed by [the defendant]." *Id.*

Defendant's case is similar to *Alison*. Here, defendant made vulgar and profane statements toward and in the presence of Magistrate Fisher, who is a judicial officer of the district court. As to defendant's criminal contempt conviction, this Court reversed her conviction on procedural grounds while expressing serious concern with defendant's underlying behavior, which is at issue in this action.

F19-00105 - 003054
PLAINTIFF'S ATTACHMENT C   0034

We are, however, very troubled by defendant's use of profanity in the magistrate's office while conducting court-related business despite warnings by the magistrate about the inappropriate language. Such disrespect, particularly by an attorney familiar with proper courtroom practices, is wholly inappropriate.... Given defendant is a lawyer practicing in our State's courts, we find defendant's attitude offensive and incomprehensible.

**\*925** *Foster*, 2013 WL 2190072, at \*8. We again emphasize that defendant's conduct—regardless of whether it occurred in a courtroom or a magistrate's office—was clearly offensive and inappropriate. Further, there is a reasonable likelihood that such conduct encourages disrespect for our court system and damages the reputation of the legal profession. We thus hold that the DHC did not err in finding that defendant exhibited conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

### III. Conclusion

Because the definitions and core functions of tribunals and magistrates are similar, and in light of the nature of our state constitution and general statutes, the DHC did not err in finding that defendant disrespected a tribunal in violation of Rule of Professional Conduct 3.5(a)(4)(B). Additionally, because defendant disrespected a judicial officer and damaged the reputation of the legal profession, the DHC did not err in finding that defendant exhibited conduct prejudicial to the administration of justice in violation of Rule of Professional Conduct 8.4(d). Accordingly, we affirm the disciplinary order of the DHC.

AFFIRMED.

Judges DIETZ and INMAN concur.

**All Citations**

808 S.E.2d 920

---

End of Document                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

PLAINTIFF'S ATTACHMENT C   0035

U.S. Department of Justice
Office of Professional Responsibility

CASE CLOSING FORM

*(Revised December 2017)*

Case Number: **201700568**

Date of Final Report or Closing Letter/Memo: **9/27/19**

Instructions: Provide complete information for *each* subject and *each* allegation per subject. Resolve *each* allegation with a corresponding closing code.

---

SUBJECT NAME, TITLE, AND DISTRICT/OFFICE: Quynh Vu Bain, EOIR

| Allegation Code: 4 0 0 | Closing Code: 0 1 | Refer to State Bar? Check One: Yes ___ No ___ |
| Allegation Code: 7 2 6 | Closing Code: 0 2 | Subject Resigned/Retired? Check One: Yes ___ No ___ |
| Allegation Code: 7 2 7 | Closing Code: 0 2 | If YES, check one: During Inv. ___ After Inv. ___ |
| Allegation Code: 7 3 0 | Closing Code: 0 5 | Subject Notified? Yes ___ No ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | |

** *If Closing Code 24 or 29 for investigations, or Code 19 for inquiries and Non-DOJ bar referrals is selected, please give specifics below.*

---

SUBJECT NAME, TITLE, AND DISTRICT/OFFICE:

| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | Refer to State Bar? Check One: Yes ___ No ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | Subject Resigned/Retired? Check One: Yes ___ No ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | If YES, check one: During Inv. ___ After Inv. ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | Subject Notified? Yes ___ No ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | |

** *If Closing Code 24 or 29 for investigations, or Code 19 for inquiries and Non-DOJ bar referrals is selected, please give specifics below.*

---

SUBJECT NAME, TITLE, AND DISTRICT/OFFICE

| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | Refer to State Bar? Check One: Yes ___ No ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | Subject Resigned/Retired? Check One: Yes ___ No ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | If YES, check one: During Inv. ___ After Inv. ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | Subject Notified? Yes ___ No ___ |
| Allegation Code: ___ ___ ___ | Closing Code: ___ ___ | |

** *If Closing Code 24 or 29 for investigations, or Code 19 for inquiries and Non-DOJ bar referrals is selected, please give specifics below.*

---

Primary Attorney/Signature and Date: _Rishi Oin Guardo_ 10/2/19

Secondary Attorney or Co-Counsel/Signature and Date:

Associate or Deputy Counsel/Signature and Date: _Peggy McCarty_ 10/1/19

*(Over for complete list of OPR allegation codes)*

F19-00105 - 003069

PLAINTIFF'S ATTACHMENT C   0036

**OPR ALLEGATION CODES AND DESCRIPTIONS** - *COMPLETE LIST*

**ABUSE OF AUTHORITY**

| | |
|---|---|
| 001 | Abuse of authority or misuse of official position |
| 002 | Abuse of prosecutive or investigative authority |
| 005 | Failure to comply w/ Principles of Fed Prosec. |
| 009 | Abuse of grand jury or indictment process |
| 010 | Selective prosecution |
| 011 | Overzealous prosecution |
| 012 | Improper assistance by/to a private party in lit |
| 150 | Failure to honor plea agreement |
| 370 | Interference with a criminal investigation |
| 750 | Interference with a criminal prosecution |
| 412 | Improper coercion/intimidation of a witness |
| 414 | Improper use of peremptory strikes during jury selection |
| 415 | Improper coercion of a guilty plea |
| 418 | Ex parte communication |
| 419 | Improper introduction of evidence |
| 540 | Improper use of official information |
| 701 | Failure to honor immunity/non-prosec agreement |
| 703 | Improper threats to prosecute defense witnesses |
| 707 | Failure to disclose terms of plea to court |
| 751 | Recommendation of illegal/improper sentence |

**LEAK OR DISCLOSURE**

| | |
|---|---|
| 530 | Unauth disclosure to media: classified info |
| 531 | Unauth disclosure to media: 6(e) material |
| 532 | Unauth disclosure to media: other - including Privacy Act and sensitive info |
| 752 | Unauth disclosure to media: tax info |
| 533 | Unauth disclosure (non-media): classified info |
| 534 | Unauth disclosure (non-media): 6(e) - including misuse of grand jury material in a civil proc |
| 535 | Unauth disclosure (non-media): other - including Privacy Act and sensitive info |
| 753 | Unauth disclosure (non-media): tax info |

**MISREPRESENTATION**

| | |
|---|---|
| 400 | Lack of candor to OPR |
| 404 | Misrepresentation/misleading the court |
| 405 | Misrepresentation to opposing counsel |
| 462 | Suborn perjury/failure to correct false testimony |

**IMPROPER REMARKS**

| | |
|---|---|
| 409 | Improper opening argument |
| 410 | Improper closing or rebuttal argument |
| 411 | Improper examination of a witness |
| 413 | Improper statement to a grand or petit jury |
| 416 | Improper voir dire examination |
| 417 | Overzealous allocution/request for harsh sentence |

**CONFLICT OF INTEREST**

| | |
|---|---|
| 062 | Conflict: General, including appearance |
| 063 | Conflict of interest or violation of post-employ restrictions - criminal (18 USC §§ 203-209) |
| 064 | Conflicting financial interests |
| 065 | Conflicting personal interests |
| 066 | Conflicting outside activities |
| 067 | Conflict: improperly seeking outside employ |
| 068 | Conflict: compensation from non-government source |

**FITNESS TO PRACTICE LAW/REPRESENT THE GOVERNMENT**

| | |
|---|---|
| 536 | Unprofessional or unethical behavior |
| 539 | Unprofessional statements or comments |

**LATENESS**

| | |
|---|---|
| 422 | Lateness (missed deadlines, etc.) |

**WHISTLEBLOWER**

| | |
|---|---|
| 722 | Whistleblower allegations |
| 723 | Retaliation for protected disclosure |

**UNAUTHORIZED PRACTICE OF LAW**

| | |
|---|---|
| 537 | Inside unauthorized practice of law |
| 538 | Outside unauthorized practice of law |

**FAILURE TO PERFORM**

| | |
|---|---|
| 152 | Failure to report misconduct |
| 253 | Failure to competently represent the interest of the client |
| 341 | Failure to diligently represent the interest of the client |
| 631 | Failure to properly supervise a non-attorney |
| 632 | Failure to properly supervise another attorney |
| 754 | Failure to keep the client informed |

**FAILURE TO COMPLY WITH DISCOVERY**

| | |
|---|---|
| 406 | Discovery - Rule 16 |
| 407 | Discovery - Brady/exculpatory info |
| 408 | Discovery - impeachment/Jencks |
| 424 | Discovery - civil |
| 630 | Failure to comply with Congressional discovery requests, including subpoenas |

**FAILURE TO COMPLY W/ DOJ POLICIES, RULES AND REGULATIONS**

| | |
|---|---|
| 008 | Failure to comply w/ legal requirements or policies re search warrant |
| 420 | Failure to comply w/ plea agreement policies |
| 425 | Failure to comply w/ sent recommendation policy |
| 529 | Failure to comply w/ DOJ press guidelines |
| 541 | Failure to cooperate in an administrative inquiry |
| 542 | Failure to comply w/ DOJ policy, rule or reg. |
| 600 | Failure to comply w/ policies re wiretaps and electronic surveillance |
| 702 | Failure to comply w/ policies re immunity or non-prosecution agreement |
| 711 | Failure to comply w/ guidelines re OEO or Tax Division approval |
| 712 | Failure to comply w/ death penalty protocol |
| 713 | Failure to comply w/ USAM provision (specify) |
| 714 | Failure to abide by DOJ investigative guidelines |
| 715 | Failure to comply w/ Petite Policy |
| 716 | Failure to comply w/ EEO policies |
| 717 | Failure to comply w/ sexual harassment policies |

**FAILURE TO COMPLY WITH FEDERAL LAW**

| | |
|---|---|
| 220 | Failure to comply with Hatch Act |
| 633 | Failure to comply with Speedy Trial Act |
| 721 | Failure to comply with other fed law (specify) |

**FAILURE TO COMPLY WITH COURT ORDERS, FEDERAL RULES**

| | |
|---|---|
| 421 | Failure to comply w/ court order |
| 742 | Failure to comply w/ Fed Rules of Criminal Proc |
| 743 | Failure to comply w/ Fed Rules of Evidence |
| 744 | Failure to comply w/ Fed Rules of Civil Proc |
| 745 | Failure to comply w/ Fed Rules of Appellate Proc |

**INTERFERENCE WITH DEFENDANT'S RIGHTS**

| | |
|---|---|
| 061 | Constitutional or Civil Rights violations |
| 252 | Improper contacts with represented party or interference with attorney-client relationship |
| 423 | Interference with defendant's right to counsel |

**IMMIGRATION JUDGE**

| | |
|---|---|
| 724 | IJ - General |
| 725 | IJ - Violation of right to counsel |
| 726 | IJ - Improper remarks |
| 727 | IJ - Bias, appearance of partiality |
| 728 | IJ - Failure to follow proper procedures |
| 729 | IJ - Failure to recuse, conflict of interest |
| 730 | IJ - Demeanor |
| 731 | IJ - Violation of alien's due process rights |

**BAR RELATED**

| | |
|---|---|
| 543 | Failure to maintain active bar membership |
| 800 | Possible bar referral of finding(s) by other DOJ component |
| 997 | Proposed referral of Judge to the bar |
| 998 | Proposed referral of non-DOJ attorney to the bar |

**OTHER**

| | |
|---|---|
| 999 | Other (Specify) |

PLAINTIFF'S ATTACHMENT C   0037

## INVESTIGATION CLOSING CODES

### SUBSTANTIATED FOR PROFESSIONAL MISCONDUCT
01. Substantiated - Intentional Misconduct.
02. Substantiated - Reckless Disregard Misconduct.

### SUBSTANTIATED FOR POOR JUDGMENT
05. Substantiated for Poor Judgment. Report of inquiry referred to management.

### UNSUBSTANTIATED
09. Unsubstantiated. Allegation not sustained for Professional Misconduct.
12. Unsubstantiated. Allegation not sustained for Poor Judgment.
13. Unsubstantiated. Allegation not sustained for Poor Judgment or Prof. Misconduct.
14. Unsubstantiated. Allegation not sustained. Subject made a mistake.
15. Unsubstantiated. Allegation not sustained. Subject acted appropriately.
16. Unsubstantiated. Allegation sustained for _____ (Specify).

### CLOSED ADMINISTRATIVELY
19. Closed Administratively. Issues previously addressed. No further action required by OPR.
20. Closed Administratively. Referred to Criminal Division/Public Integrity Section (PIN).
21. Closed Administratively. Referred to the FBI.
22. Closed Administratively. Referred to the DEA.
23. Closed Administratively. Referred to the OIG.
24. Closed Administratively. Referred. More appropriately handled by _____ (Specify).
25. Closed Administratively. No merit to allegation based on review. Improvidently opened.
26. Closed administratively. Case consolidated with another open matter.
27. Closed administratively. Complaint withdrawn.
28. Closed Administratively. Allegation code improvidently assigned.
29. Closed administratively. Other. Specify. _____
30. Investigation tolled with OPR Counsel or Deputy Counsel approval.
40. ODAG approved OPR recommendation to terminate investigation of a former DOJ employee.
41. Source of unauthorized disclosure could not be determined.

### NON-SUBJECT
31. Non-subject. Referred to Management.

### FBI WHISTLEBLOWER CLAIM
36. Non-cognizable.
37. Reviewed by OPR. Referred to OIG for handling.
38. OPR Investigation completed. No retaliation found.
39. OPR Investigation completed. Retaliation found. Referred to _____.

## INQUIRY CLOSING CODES (and Non-DOJ Attorney Bar Referrals)

10. Performance or management matter. Refer to employing component.
11. Referred. More appropriately handled by another component or agency. _____.
12. Issues previously addressed. No further action required by OPR at this time.
13. No merit to allegation based on review of matter.
14. No merit to matter based on preliminary inquiry.
15. Consolidated with already open matter. Give Case# _____.
16. Convert to an investigation.
17. FBI or DEA matter - resolved administratively.
18. Preliminary inquiry completed. Further inquiry not warranted.
19. Other. Specify. _____
20. Matter being monitored. Log code. (Return file to Assistant Counsel. Yes ___ No ___)
21. FBI Employee Whistleblower Claim.
    21A - Non-cognizable
    21B - Reviewed by OPR. Referred to OIG for handling.
    21C - OPR Inquiry. No retaliation found.
    21D - OPR Inquiry. Retaliation found. Referred to _____.

PLAINTIFF'S ATTACHMENT C   0038

## Records Management and Retention Disposition

### Instructions

Please review this record in its entirety and use the sections below to circle the record type and disposition.

### Record Type

Inquiry          Investigation          Whistleblower Matter          Other

### Record Disposition

Temporary – Retain record for 15 years from date of closing, then destroy.

Permanent – Retain record for 15 years from date of closing, then transfer to National Archives and Record Administration (NARA). Permanent records must have **a historical value, Congressional or Executive Branch interest, or attract national media attention.**

Comments:

_____

_____

_____

### Approving Supervisor

I have reviewed this record in its entirety and concur with the record type and disposition identified.

_____

(print name)                    (signature)                    (date)

PLAINTIFF'S ATTACHMENT C   0039

U.S. v. Ferguson, 550 F.Supp. 1256 (1982)

KeyCite Yellow Flag - Negative Treatment
Distinguished by McGrath v. Everest Nat. Ins. Co., N.D.Ind., December 10, 2009

550 F.Supp. 1256
United States District Court,
S.D. New York.

UNITED STATES of America,
v.
Cecil FERGUSON and Edward Joseph, Defendants.

No. S 82 Cr. 312.
|
Nov. 15, 1982.

**Synopsis**

Defendants charged with, inter alia, a racketeering conspiracy, moved to disqualify the judge. The District Court, Edward Weinfeld, J., held that because the truthfulness of the judge's former law clerk in t estifying before the grand jury was a vital issue in the case, continuing to preside might present the appearance of partiality and the judge was required to disqualify himself.

Motion granted.

See also, D.C, 548 F.Supp. 1390.

West Headnotes (3)

[1] **Judges**
 ⇐ Rights and duties of judge as to recusal
 Judge has independent duty to disqualify himself in any proceeding in which his impartiality might reasonably be questioned and issue is not court's own introspective capacity to sit in fair and honest judgment with respect to controverted issues, but whether reasonable member of public at large, aware of all facts, might fairly question court's impartiality. 28 U.S.C.A. § 455(a).

 16 Cases that cite this headnote

[2] **Judges**
 ⇐ Bias and Prejudice

Where question is close, judge whose impartiality might reasonably be questioned must recuse himself from trial. 28 U.S.C.A. § 455(a).

20 Cases that cite this headnote

[3] **Judges**
 ⇐ Relationship to party or person interested

Where truthfulness of grand jury testimony of judge's former law clerk was crucial issue in criminal case, appearance of partiality might arise and district judge was required to disqualify himself from case, even though judge believed that he could in fact decide every motion upon facts and law regardless of his relationship with his former law clerk. 28 U.S.C.A. § 455(a).

14 Cases that cite this headnote

**Attorneys and Law Firms**

*1256 John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for U.S.; Stacey J. Moritz, Robert S. Litt, Asst. U.S. Attys., New York City, of counsel.

William Mogulescu, New York City, for defendant Joseph.

Jesse Berman, New York City, for defendant Ferguson.

OPINION

EDWARD WEINFELD, District Judge.

The movant defendants are named together with others in an indictment which charges that they were engaged in a racketeering conspiracy which, among other matters, involved a series of armed robberies and murders, including what is now referred *1257 to as the Brinks robbery at Nanuet, New York, during which a Brinks guard was killed and thereafter during a getaway attempt two state troopers were also killed.[1] Other counts of the indictment charge the substantive crime of actually conducting the affairs of a criminal enterprise through

F19-00105 - 003081

PLAINTIFF'S ATTACHMENT C   0040

U.S. v. Ferguson, 550 F.Supp. 1256 (1982)

a pattern of racketeering activity (18 U.S.C., sections 1962(c) and 2); robbery of a federally insured bank (18 U.S.C., section 2113(a)); and one count charges murder during the course of a bank robbery (18 U.S.C., sections 2113(d), (e) and 2).

This Court previously denied two separate motions for disqualification made by the defendants. One was based upon the ground that since this Court had granted one of the seven wiretap applications at issue, it would, on the defendants' motion to suppress the evidence derived by reason thereof, be passing upon the validity of its own previously approved order. The other was upon the ground that a former law clerk, Robert S. Litt, an Assistant United States Attorney, had recently been assigned to assist in the pending prosecution.[2] The Court is now presented with a third application for disqualification.

Following the denial of the first two motions, there remained for consideration a series of substantive motions which were scheduled for argument.[3] One of these sought dismissal of the indictment for what the defendants termed "government abuse of the grand jury." Among other matters, the defendants charged that the prosecution had withheld from the grand jury information that an informant had recanted an extensive written statement incriminating these defendants and others. The informant is referred to as CS 1, whose real identity the defendants say is Samuel Brown ("Brown"), an alleged participant in one or more of the crimes charged against the defendants. Brown claimed the statement as well as his cooperation with the federal authorities had been the result of physical beatings, threats upon his life and other coercive conduct by agents of the Federal Bureau of Investigation ("FBI"). The basic contention with respect to the grand jury abuse charge was that although the grand jury had been informed of Brown's incriminating statements it was not advised of their repudiation.[4] Brown's reliability is a major item in support of the defendants' separate motion to suppress evidence obtained as a result of wiretap orders and search warrants.

The prosecution, in response to the motion to dismiss for "grand jury abuse," submitted to the Court in camera a portion of the grand jury testimony. The defendants' counsel were advised of the submission but were not informed what testimony had been submitted

or of its nature or substance. The in camera submission included the grand jury testimony of Mark F. Pomerantz ("Pomerantz"), then an Assistant United States Attorney. He had served as a law clerk to this Court from 1975–76.

In preparation for hearing argument of the outstanding motions, the Court read a multitude of affidavits submitted on behalf of the prosecution and defense and extensive exhibits numbering hundreds of pages and, in the process, came across the testimony of Pomerantz. The Court thereupon *1258 called an in camera session attended by the two Assistant United States Attorneys in charge of this matter, which took place Friday morning, November 5, 1982, three days before the pending motions were to be argued.[5] The Court suggested that as a matter of fairness the United States Attorney either inform the defense counsel that Pomerantz had testified before the grand jury and the nature of his testimony or release it in its entirety. Later that day the United States Attorney decided to make the entire transcript of Pomerantz's testimony available and it was forthwith delivered to the defense.

On Monday morning, November 8, the return date for the argument of the outstanding motions, defendants made the third and current application for recusal based upon the nature of Pomerantz's testimony and his relationship to this Court. The prosecution, in opposing the application, stressed that the sole and only purpose for which the testimony had been submitted was to rebut the charge of grand jury abuse for failure to disclose Brown's repudiation of his prior incriminating statements and of his refusal to continue to cooperate with the prosecution. The government stressed that the testimony had not been submitted in opposition to the separate motions to suppress evidence. In fact, it appears that the grand jury had been informed of Brown's change by Pomerantz. However, the defendants contend, and correctly so, that Pomerantz went much beyond informing the grand jury of Brown's recantation and of his refusal of further cooperation with the federal authorities. In his opening statement Pomerantz told the grand jury that he had met Brown for the first time only the evening before together with Jane Parver, an Assistant United States Attorney, and Special Agents Robert Cordier and Kenneth Maxwell of the FBI; that Brown greeted the agents in a friendly manner; that Brown stated he remained willing to cooperate with the federal authorities in the ongoing investigation and that he discussed his

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

F19-00105 - 003082

PLAINTIFF'S ATTACHMENT C    0041

previous relationship with the agents and said he had no complaints about the way he had been treated by them; that Brown referred to them as "great" or "wonderful guys" and at one point he hugged one of the agents and indicated that everything he had ever told them was "the hundred per cent truth"; that his attitude was one of friendship with the agents, and that Brown also stated that he had willingly cooperated with the FBI agents.

Pomerantz further testified that Brown acknowledged that his handwritten statement, previously referred to, was "the truth and remained the truth" and that he was prepared to continue to cooperate with the federal authorities, whereupon arrangements were made to meet the following morning. However, that morning Brown refused to meet with the prosecution authorities and a letter was delivered from him in which he stated he no longer wanted to cooperate with the government authorities or speak to its representatives. On the same morning, in a pending habeas corpus proceeding brought on behalf of Brown, attorneys representing him made similar statements. The grand jury minutes of Pomerantz's testimony establish that he explicitly informed the grand jury of Brown's change of heart; thus, the defendants' contention that the information was withheld is without factual support. Accordingly, the prosecution contends that since Pomerantz's testimony was submitted solely on the grand jury abuse issue, which upon this record has not been challenged, his credibility is not involved and inquiry should end. The prosecution therefore argues that Pomerantz's relationship to this Court is not a ground for recusal. But the defense contends that Pomerantz's testimony, although not offered by the prosecution in opposition to other motions, is likely to influence the Court's determination of those motions, particularly in view of the sharp and divergent contentions of the FBI agents and Brown.

The motion which seeks to suppress evidence derived as a result of seven separate wiretap orders covering an extensive period may be said to be the major one advanced **\*1259** by the defendants and is of prime importance to their interests. Essentially, it rests upon Brown's claim that his written statement, a thirteen-page document, was copied by him from one previously prepared by FBI Agents Cordier and Maxwell and was signed by him under threats of physical violence, beatings and other coercive conduct by the FBI agents. The defendants contend that the prosecution in applying for the wiretap orders failed

to disclose the alleged coercive conduct to the Court; failed to inform the Court that Brown was not a reliable witness and thus that in fact there was no probable cause to justify the wiretap orders, and accordingly all evidence derived thereunder should be suppressed.[6] The FBI agents vehemently deny Brown's charges; in addition, the prosecution points to inherent inconsistencies with respect to his allegations and notes that during the course of a state habeas corpus proceeding where he made accusations of misconduct by *state* authorities, neither he nor his attorney ever made any complaint of misconduct by the federal authorities.

What this points up is a sharp issue of credibility between the FBI agents and Brown, the resolution of which, whether upon the existing record or upon a hearing if one is required, will in effect determine the motion to suppress the wiretap evidence as well as several other related motions. Pomerantz is not involved in that controversy, had no direct knowledge of the events then at issue, and the government does not intend to call him as a witness if there is a hearing and so his credibility is not involved with respect to those motions. Moreover, the government urges that his grand jury testimony not be considered on the substantive issues raised by defendants' suppress motion since, as already noted, it was offered solely on the defendants' separate motion with respect to "grand jury abuse."

There is sufficient matter before the Court consisting of prosecution and defense affidavits and exhibits, exclusive of Pomerantz's grand jury testimony, to resolve the disputed issues under the wiretap suppression motions. Further, the Court does not doubt that it can bring to bear a disciplined mind so that the determination of that motion and any related motion will be made solely upon the evidence exclusive of Pomerantz's testimony. But is that the answer? More is required. The defendants express great concern of a spillover effect of Pomerantz's testimony of Brown's admissions which so strongly negates his present position and supports the FBI agents' version that his statements incriminating himself, the defendants and others of several crimes charged against him were voluntary and free of any coercion. The reality is that Pomerantz's testimony not only seriously challenges, if indeed it does not destroy, Brown's contention that his cooperation had been coerced.

PLAINTIFF'S ATTACHMENT C   0042

U.S. v. Ferguson, 550 F.Supp. 1256 (1982)

The defendants contend that despite the Court's announced exclusion of Pomerantz's testimony, since the Court is aware of its content, it will have a subtle if not sublimal influence not only in the consideration of the wiretap suppression motion, but also upon their numerous other motions where Brown's claims are at issue. The Court does not doubt that in fact it can hold the "balance nice, clear and true" [7] between the prosecution and the defense and decide every motion solely upon the facts and the law. But the issue on the defendants' motion for disqualification is not whether the Court can be impartial in fact; there are other matters to be considered.

[1]  [2]  [3]  Despite the Court's subjective view that all matters can be resolved impartially, a judge has an independent duty to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." [8] The issue then is not the *1260 Court's own introspective capacity to sit in fair and honest judgment with respect to the controverted issues, but whether a reasonable member of the public at large, aware of all the facts, might fairly question the Court's impartiality. This is an objective standard and "where the question is close, the judge whose impartiality might reasonably be questioned must recuse himself from the trial." [9] My relationship to Pomerantz is so intimate and my esteem for him so high, as it is for all my many clerks through the years, that the "average person on the street" [10] might reasonably conclude that no matter how strongly the Court states that Pomerantz's testimony will not enter into its judgment, nonetheless, in some imperceptible manner his testimony will intrude itself and be considered with respect to the suppression motions.

This situation is quite unlike the prior motion to disqualify because a former law clerk had been assigned to prosecute the case. The mere fact of close relationship did not require disqualification. In this instance, however, credibility is a vital issue.

The Court concludes that under all the circumstances here presented it is required to disqualify itself on the ground that its impartiality might reasonably be questioned. It does so with reluctance since many long days and hours have been expended in studying the voluminous affidavits, exhibits and briefs submitted by the parties; in addition, this Court remains of the school that adheres to the "duty to sit" [11] concept, notwithstanding which the case must now be reassigned to one of my colleagues, all of whom are heavily burdened with other matters. But the Court's reluctance and its "duty to sit" concept must yield to a higher authority—the majesty of the law. A cardinal principle of our system of justice is that not only must there be the reality of a fair trial and impartiality in accordance with due process, but also the appearance of a fair trial and impartiality. [12] In sum, in the words of Mr. Justice Frankfurter, "justice must satisfy the appearance of justice." [13]

The defendants' motion for the Court to disqualify itself is granted. The case is referred to the Assignment Committee for transfer by lot pursuant to the Individual Assignment System rule of this Court. [14]

**All Citations**

550 F.Supp. 1256

**Footnotes**

1    These are the subject of a pending state indictment in which the movants herein are not named as defendants.
2    *United States v. Ferguson and Joseph*, No. S 82 Cr. 312 (S.D.N.Y. Oct. 26, 1982).
3    These included motions (1) to suppress evidence derived from authorized wiretaps; (2) to suppress pretrial and prospective trial identification; (3) to suppress evidence of searches of 4 separate apartments; (4) to suppress evidence seized from the person of one of the defendants at the time of his arrest; (5) to dismiss certain counts in the indictment; (6) to have the government elect between different counts in the indictment; (7) for disclosure of lineup results; (8) for disclosure of hair sample analysis results; (9) to produce a copy of the transcript of testimony of a pretrial hearing being conducted in the state court proceeding (*see* note 1, *supra* ), as well as others.
4    A further charge was made that Brown was "crazy," as was another informant, and that such information had not been revealed to the grand jury.
5    The record is sealed and subject to opening upon Court order.
6    All the wiretap orders except one were issued by Judge Haight; one was signed by this Court.

F19-00105 - 003084
PLAINTIFF'S ATTACHMENT C   0043

7   *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting *Tumey v. Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927).

8   28 U.S.C. § 455(a):
    Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

9   *Roberts v. Bailar,* 625 F.2d 125, 129 (6th Cir.1980). *See id.* at n. 17; *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1111 (5th Cir.1980); *United States v. Gigax,* 605 F.2d 507, 511 (10th Cir.1979) (and cases cited therein).

10  *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1111 (5th Cir.1980).

11  *Wolfson v. Palmieri,* 396 F.2d 121, 124 (2d Cir.1968); *Rosen v. Sugarman,* 357 F.2d 794, 797–98 (2d Cir.1966); *United States v. Corr,* 434 F.Supp. 408, 412 (S.D.N.Y.1977). *See also Laird v. Tatum,* 409 U.S. 824, 837, 93 S.Ct. 7, 14, 34 L.Ed.2d 50 (1972) (memorandum of Rehnquist, J.).

12  *See Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242–43, 100 S.Ct. 1610, 1613–1614, 64 L.Ed.2d 182 (1980); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). *See also Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974).

13  *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).

14  *See* Rules for the Division of Business Among District Judges of the Southern District of New York, Rule 18 (1982).

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

F19-00105 - 003085

PLAINTIFF'S ATTACHMENT C   0044

4/27/2018                                         Quynh Vu Bain — Arlington

**TRACImmigration**

City:                    Judge:                              Report Series:
All Cities        ▼    Quynh Vu Bain -- Arlington    ▼    Latest Report (2017) ▼

Frequently Asked Questions

# Judge Quynh Vu Bain

## FY 2012 - 2017, Arlington Immigration Court

Judge Bain was appointed as an immigration judge in March 2008. Shereceived a bachelor of arts degree in 1988 from Dickinson College and ajuris doctorate in 1991 from the Dickinson School of Law of thePennsylvania State University. From 2006 to 2008 and 1996 to 2001,Judge Bain served as senior litigation counsel and an appellate lawyerin the Department of Justice, Civil Division, Office of ImmigrationLitigation. From July 2003 to September 2006, she worked as a trialattorney in the Civil Division, Torts Branch, Environmental TortsSection. From 2001 to 2003, Judge Bain was detailed to the Office ofthe Deputy Attorney General where she served as counsel to the DeputyAttorney General. From 1991 to 1996, she was a trial attorney with theformer Immigration and Naturalization Service (INS), entering on dutythrough the Attorney General?s Honors Program in 1991. From 2000 to2006, Judge Bain also served as an adjunct professor at AmericanUniversity, Washington College of Law, where she taught two courses inasylum and immigration law. She is a member of the Pennsylvania andNew York State bars.

## Deciding Asylum Cases

Detailed data on Judge Bain decisions were examined for the period covering fiscal years 2012 through 2017. During this period, Judge Bain is recorded as deciding 193 asylum claims on their merits. Of these, she granted 111, gave no conditional grants, and denied 82. Converted to percentage terms, Bain denied 42.5 percent and granted (including conditional grants) 57.5 percent. Figure 1 provides a comparison of Judge Bain's denial rate fiscal year-by-year over this recent period. (Rates for years with less than 25 decisions are not shown.)



Figure 1: Percent of Asylum Matters Denied

## Nationwide Comparisons

Compared to Judge Bain's denial rate of 42.5 percent, nationally during this same period, immigration court judges denied 52.8 percent of asylum claims. In the Arlington Immigration Court where Judge Bain was based, judges there denied asylum 34.3 percent of the time. See Figure 2.

Judge Bain can also be ranked compared to each of the 293 individual immigration judges serving during this period who rendered at least one hundred decisions in a city's immigration court. If judges were ranked from 1 to 293 - where 1 represented the highest denial percent and 293 represented the lowest - Judge Bain here receives a rank of 210. That is 209 judges denied asylum at higher rates, and 83 denied asylum at the same rate or less often. Ranks are tallied separately for each immigration court. Should a judge serve on



Figure 2: Comparing Denial Rates (percents)

EX19-00105 - 003086                    PLAINTIFF'S ATTACHMENT C    0045

1/2

more than one court during this period, separate ranks would be assigned in any court that the judge rendered at least 100 asylum decisions in.

## Why Do Denial Rates Vary Among Judges?

Denial rates reflect in part the differing composition of cases assigned to different immigration judges. For example, being represented in court and the nationality of the asylum seeker appear to often impact decision outcome. Decisions also appear to reflect in part the personal perspective that the judge brings to the bench.

### Representation

If an asylum seeker is not represented by an attorney, almost all (91%) of them are denied asylum. In contrast, a significantly higher proportion of represented asylum seekers are successful. In the case of Judge Bain, 6.7% were not represented by an attorney. See Figure 3. For the nation as a whole, about 20.2% of asylum seekers are not represented.



☐no  ▨yes

**Figure 3: Asylum Seeker Had Representation**

### Nationality

Asylum seekers are a diverse group. Over one hundred different nationalities had at least one hundred individuals claiming asylum decided during this period. As might be expected, immigration courts located in different parts of the country tend to have proportionately larger shares from some countries than from others. And, given the required legal grounds for a successful asylum claim, asylum seekers from some nations tend to be more successful than others.

For Judge Bain, the largest group of asylum seekers appearing before her came from El Salvador. Individuals from this nation made up 53.9 % of her caseload. Other nationalities in descending order of frequency appearing before Judge Bain were: Honduras (23.3 %), Guatemala (13%), Ethiopia (4.7%), China (1%). See Figure 4.

In the nation as a whole during this same period, major nationalities of asylum seekers, in descending order of frequency, were China (23.4%), El Salvador (11.7%), Mexico (11.0%), Honduras (8.3%), Guatemala (8.2%), India (2.9%), Nepal (2.0%), Haiti (2.0%), Ethiopia (1.7%), Somalia (1.4%), Eritrea (1.4%), Egypt (1.2%), Cameroon (1.0%).



☐China  ▨El Salvador
☐Ethiopia  ☐Guatemala
■Honduras  ☐Other

**Figure 4: Asylum Decisions by Nationality**

Copyright 2017, TRAC Reports, Inc.

PLAINTIFF'S ATTACHMENT C   0046