<u>Bain v. U.S. Department of Justice</u>,
No. 21-cv-1751 (D.D.C.) (RDM)

## ATTACHMENT F

## To Plaintiff's Proposed Second Amended Complaint

## Filed on August 2, 2023



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Quynh V. Bain, a/k/a
Tammi W.,[1]
Complainant,

v.

Merrick B. Garland,
Attorney General,
Department of Justice,
Agency.

Request No. 2021003097

Appeal No. 2020002553

Hearing No. 570-2016 01466XX

Agency No. EOI-2016-00137

DECISION ON REQUEST FOR RECONSIDERATION

Complainant timely requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in Tammi W. v. Dep't of Justice, EEOC Appeal No. 2020002553 (Mar. 24, 2021). EEOC regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(c).

During the period at issue, Complainant worked as an Immigration Judge, SL-04, at the Agency's Executive Office for Immigration Review, Immigration Court in Arlington, Virginia.

On December 10, 2015, Complainant filed a formal EEO complaint consisting of the following claims:

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

2021003097

A. Was Complainant subjected to a hostile work environment based on reprisal (prior EEO activity) and/or discrimination based on race (Asian), sex (female), national origin (Vietnamese), or disability (migraines/ record of medical conditions requiring Family Medical Act (FMLA) leave) when, from March 11, 2015 to January 2016:

1. She was the only one of the four Headquarters Immigration court judges who was required to work on a detained docket full-time. The other judges were assigned to handle a combination of detained and non-detained cases, or only non-detained cases. Her detained docket consisted of aged detained cases (i.e., pending more than 60 days) that other detained judges were allowed to reassign to her. Such aged detained cases often involved challenges to long-term detention by habeas corpus and other litigation risks.

2. In those aged detained cases (i.e., detained cases pending over 60 days), Complainant was not permitted to hold status conferences or conduct bond hearings to manage her caseload. She was expected to complete each evidentiary hearing on the same day. If she did not, Assistant Chief Immigration Judge (ACIJ1) chided her from being inefficient. She was not allowed to see the case files ahead of time and often received a case file the day before the hearing. Pleadings filed with the York court were not delivered to the Complainant in time for the hearings.

3. She was denied the eight hours of administrative time per pay period to which every judge was entitled under the Agency's Collective Bargaining Agreement with the union in order to work on written motions and orders and prepare for hearings.

4. Rather than providing her with a functional VTC (Video Tele-Conference) system to conduct hearings for York detainees, ACIJ1 required Complainant to travel to York to conduct hearings in person. Complainant made seven such trips during June and July 2015.

5. Though Complainant was asked to make two additional trips to York, Pennsylvania and received approval from other Agency personnel, ACIJ1 refused to approve her travel for those trips after she had completed the travel, and Complainant was accordingly denied reimbursement for approximately $400 in travel expenses.

6. ACIJ1 then issued Complainant a letter of counseling in which he falsely claimed that she had violated the Agency's travel regulations by making the two trips to York.

7. Though Complainant pointed out that she had received authorization for the two additional trips from other Agency personnel and that the letter of counseling cited a repealed regulation, ACIJ1 refused to rescind the letter of counseling.

8. Complainant's similarly situated co-workers were allowed to assign her cases from their dockets that were aged (i.e., pending more than five years) and/or complex, and she was forced to conduct hearings and issue oral or written decisions in their cases. The cases were then returned to the other judges' dockets once Complainant had done all of the work to complete the cases, with the result that the other judges' case completion statistics were significantly higher than Complainant's.

9. For cases that were assigned to Complainant, the York court repeatedly postponed hearings in Complainant's cases in order to open up time slots for hearings in cases that were assigned to four identified judges so that she had to complete cases assigned to those judges before she could complete cases that were assigned to her.

10. When Complainant pointed out the unfairness of being forced to hear and complete large numbers of other judges' cases and asked for additional administrative time, ACIJ1 issued a reprimand letter in March 2015, accusing her of displaying intemperate and unprofessional behavior. In August 2015, ACIJ1 incorporated that letter into an unfavorable performance evaluation that cited a lack of professionalism as a deficiency needing correction.

11. After ACIJ1 was promoted to Acting Deputy Chief Immigration Judge for the East Coast in July 2015, he was succeeded by an identified ACIJ (ACIJ2) in Arlington and another identified ACIJ (ACIJ3) in York. Due to the high number of York cases which had been transferred to her docket for the benefit of other judges that involved habeas corpus petitions, Complainant was required by ACIJ2 to cancel her two week Christmas vacation in late 2015, to early 2016, in order to complete all of her York cases by the end of the year. In early 2016, the Agency finally agreed to transfer Complainant to the Arlington court.

12. Following Complainant's transfer to the Arlington court, ACIJ2 continued the practice of assigning Complainant a substantially higher number of cases than her colleagues.

13. In July 2016, during the investigation of the instant complaint, ACIJ2 emailed Complainant and her colleagues a plan for an equitable distribution of cases going forward. She then failed to implement that plan and instead modified Complainant's case assignment plan twice more.

4                                    2021003097

14. The first modified plan had Complainant handle aged non-detained cases (i.e., pending more than 5 years) for several colleagues who were unable to complete their caseloads within a reasonable time. Complainant was the only judge who had this case assignment plan. The second modified plan required Complainant to conduct hearings in approximately 200 new or reassigned "family unit" cases a week. In just two years, Complainant accrued approximately 6,000 family unit cases and completed 1,400 cases. Because cases involving family units were prioritized, Complainant had to schedule hearings in a timely fashion and complete the cases expeditiously.

B. Was Complainant subjected to disparate treatment based on reprisal (prior EEO activity) and/or discrimination based on race (Asian), sex (female), national origin (Vietnamese), or disability (record of medical condition requiring FMLA leave) when:

15. In August 2015, ACIJ1 issued Complainant a performance evaluation that included a deficiency rating for professionalism, included numerous inaccuracies, and did not reflect her actual performance. The rating was issued to Complainant on August 29, 2015.

16. ACIJ1 cited the August 2015 rating as a basis for denying Complainant permission to participate in special work opportunities, including serving as a guest speaker at a training conference and serving as a pro bono liaison judge.

17. In November 2015, shortly after Complainant filed the instant EEO complaint, the Agency denied her application to work for the Board of Immigration Appeal (BIA) as a Board Member.

18. On July 28, 2016, Complainant received a letter of counseling based on her objections to the continuing unfair distribution of cases by ACIJ2.

C. Complainant was subjected to the following additional adverse acts that were a continuation of the alleged hostile work environment based on race (Asian), sex (female), national origin (Vietnamese), and/or reprisal (for prior EEO activity) when:

19. From January 2016 to present: ACIJ2 has continued the practice of assigning to Complainant a disproportionate number of cases compared to her colleagues such that from April 2016, to April 2018, her caseload went from zero to 4,500 Arlington cases. By contrast, ACIJ2 made similarly situated judges' case statistics look better by placing many of their cases on "visiting judges" dockets known as VJI, JV2, and VJ3, though there were no visiting judges detailed to the Arlington court to hear those cases.

20. From January 2016, to present: ACIJ2 and the Court Administrator (CAI) have continued to assign aged cases (some between 15 and 20 years old) to

2021003097

Complainant for completion and allowed other Arlington judges to assign their unwanted aged cases to Complainant.

21. From March 2016, to present: By having other judges reassign their cases to Complainant, ACIJ2 created schedule conflicts that Complainant must then resolve on her own.  When Complainant asked that one judge take back a case that caused a double-booking on her calendar ACIJ2 sided with the other judge.

22. From March 2016, to present: ACIJ2 instructed court staff to structure Complainant's calendar such that she had to hear many more master calendar cases per day than her colleagues in the Arlington court.  For example, during Sumer 2016, Complainant heard approximately 100+ master calendar hearings every Monday and Tuesday, while her colleagues heard between 15 and 50 master calendar hearings on their master calendar days.

23. From March 2016, to present: When Complainant requested that CA1 reduce the number of master calendar hearings on her hearing calendar, CA1 complained to ACIJ2 that Complainant had complained about the workload.  She also complained to ACIJ2 that Complainant was being unprofessional when she reported the chronic problems of missing case files, double-booking, and not having enough time to hear all 100+ cases on her calendar in a single day.  ACIJ2 later used CA1's complaints as support for an unfavorable October 2016 performance evaluation.

24. August 2016: In a counseling letter ACIJ2 threatened Complainant with termination.

25. August 2016: Consistent with ACIJ1's practice, ACIJ2 initially refused to authorize travel expenses that Complainant legitimately incurred for required work travel.  Specifically, she refused to reimburse parking expenses for Complainant's attendance at the Immigration Judge training conference because of some undisclosed policy about carpooling or use of Metrorail.

26. During September 2016: ACIJ2 and CA1 developed a court hearing schedule that dedicated two days a week of Complainant's time to hearing aged cases on the dockets of two identified judges.  This allowed other Arlington judges to shed their unwanted aged cases by having those cases transferred to Complainant's docket. Complainant was the only judge who had that schedule.

27. October 2016: ACIJ2 issued Complainant an unfavorable performance evaluation, stating Complainant needs improvement in the area of "professionalism."  She cited her August 2016 counseling letter and ACIJ1's August 2015 performance evaluation as support.

28. Throughout 2016 and 2017: ACIJ2 rarely responded to Complainant's emails asking for guidance or instructions. As the most recent FOIA (Freedom of Information Act) request will show, she usually ignores Complainant's emails. When she does respond, she either misses the point or fails to answer the question.

29. Throughout 2017: ACIJ2 denied Complainant's requests for time off the bench to prepare written decisions. She then criticized Complainant for not finishing her written decisions in a timely fashion though Complainant repeatedly explained that she is in court five days a week, about 7 hours a day and had no time to prepare written opinions. While denying Complainant's request for time off the bench to write decisions, ACIJ2 has assisted similarly situated three identified judges by writing opinions for them.

30. March 28, 2017: ACIJ2 finally alerted Complainant to the ethics complaint that was filed with OCIJ (the Office of Chief Immigration Judge) on March 1, 2018. She requested a response to the complaint within 2 weeks. When Complainant requested an extension of time, she gave an additional 2 weeks, until April 30, 2017.

31. March 2017: After two judges' aged cases had been transferred to Complainant, ACIJ2 switched to yet another new hearing schedule which allowed her to transfer more than 2,000 cases that had been parked on the three inactive dockets known as "visiting judges' dockets" to Complainant's docket.

32. May 2017: ACIJ2 sent Complainant on a two-week detail to New Mexico which prevented Complainant from responding to the recusal motions in a timely fashion.

33. May 2017: ACIJ2 required Complainant to listen to the audio recordings of the hearings that were the subject of the ethics complaint in her office, and refused to authorize the Court Administrator to give Complainant CD copies of the audio-recordings until Complainant copied the Director of EOIR (Executive Office of Immigration Review) and the Chief Immigration Judge on an email exchange about the denial.

34. May 2017: ACIJ2's Executive Administrative Assistant accused Complainant of being late in paying her government credit card balance. In fact, the Agency was responsible for paying the travel expenses because Complainant had to sign over her rights to reimbursement when she used the on-line travel service to make travel arrangement.

35. August 1, 2017: ACIJ2 issued a final performance evaluation stating that Complainant needed improvement in the area of professionalism. The

performance evaluation relied on the ethics complaint that two private bar attorneys filed with OCIJ on March 1, 2017, but which OCIJ had not resolved by the time ACIJ2 issued the performance evaluation. The final performance evaluation criticized Complainant for "unprofessional exchanges" in court hearings.

36. August 29, 2017: Complainant was notified that the Office of General Counsel received a letter of inquiry from the Agency's Office of Professional Responsibility (OPR) about the ethics complaint by two private attorneys. Complainant was required to submit a written response to the OPR.

37. September and October 2017: After the Board of Immigration Appeals dismissed 7 interlocutory appeals that the two private attorneys, identified claim 35 above, filed from Complainant's decisions to deny their motions for recusal, on remand ACIJ2 nevertheless reassigned the 7 cases to other Arlington judges for handling. This effectively overruled Complainant's decision to deny recusal and the Board's decision to dismiss the two private attorneys' interlocutory appeals.

38. October 2017: ACIJ2 sent Complainant on another two week detail to Jena, Louisiana, so that Complainant had to work on the OPR response while on the detail away from home, without all of her documents, and unable to communicate with her attorneys because she was in court 9 hours a day and stayed late into the evening to write opinions.

39. November 2017: Complainant was not selected for a six-month detail to the Board of Immigration Appeals. Instead, a white male judge who was less efficient than Complainant in disposing of his cases was selected. Before he went on detail, ACIJ2 transferred many of his aged cases to Complainant's docket. She also prepared orders and opinions in some of his cases, so that he would not fall behind on his caseload while he is on detail.

40. May 1, 2018: ACIJ2 accused Complainant of taking leave without approval, when in fact she had previously approved the leave.

On February 26, 2020, an EEOC Administrative Judge (AJ) issued a decision by summary judgment, over Complainant's objection, in favor of the Agency. In doing so, the AJ acknowledged that Complainant alleged numerous facts were in dispute. However, the AJ determined that Complainant's disputes were either not material or relied on assertions not supported by the record. Consequently, the AJ adopted and incorporated by reference the Agency's motion for summary judgment.

8                                                2021003097

Based on the evidence of record, the AJ determined that Complainant failed to demonstrate that the discrete acts identified in claim B were based on discriminatory or retaliatory animus.[2] The AJ further determined, regarding Complainant's harassment claims, that the record lacked evidence of discriminatory motive.[3]

On April 2, 2020, the Agency issued a final order adopting the AJ's finding of no discrimination. Complainant appealed.

In EEOC Appeal No. 2020002553, we determined that Complainant failed to identify any material facts in dispute. The decision further determined that the AJ correctly concluded that the preponderance of the evidence did not establish that Complainant was discriminated against by the Agency as alleged.

In the instant request for reconsideration, Complainant submits statements expressing her disagreement with the appellate decision and reiterates arguments previously made during the original appeal. The Commission emphasizes that a request for reconsideration is not a second appeal to the Commission. Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), Chap. 9 § VI.A (Aug. 5, 2015); see, e.g., Lopez v. Dep't of Agric., EEOC Request No. 0520070736 (Aug. 20, 2007). Rather, a reconsideration request is an opportunity to demonstrate that the appellate decision involved a clearly erroneous interpretation of material fact or law, or will have a substantial impact on the policies, practices, or operations of the Agency. Complainant has not done so here.

After reviewing the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is the decision of the Commission to deny the request.

---

[2] Although the AJ did not analyze these claims individually, the Agency's April 5, 2019 motion for summary judgement, which the AJ summarily adopted, indicated that: (1) Complainant's August 2015 rating was based on an assessment of Complainant's performance against the standards set forth in the rating criteria; (2) Complainant was denied permission to speak at a training conference based on her recent displays of unprofessional conduct; (3) Complainant was not selected to be a BIA Board Member because she was not one of the most qualified candidates, she was not selected for an interview, and the selection panel had made interview determinations in September 2015 which occurred before Complainant contacted the EEO office in October 2015; and (4) Complainant was issued a Letter of Counseling because of her unprofessional conduct with a co-worker.

[3] While the AJ did not specifically address each harassment claim in the decision, the Agency's April 5, 2019 motion for summary judgment, which the AJ summarily adopted, indicated that these claims involved Complainant's disagreements with her supervisors' decisions, their perceptions about her behavior, and their actions taken to correct Complainant's behavior. The Agency noted that Complainant failed to demonstrate that any of these actions had discriminatory animus.

9                                              2021003097

The decision in EEOC Appeal No. 2020002553 remains the Commission's decision. There is no further right of administrative appeal on the decision of the Commission on this request.

Because we find that the criteria of 29 C.F.R. § 1614.405(c) has not been met, we need not address the Agency's alternative argument, stated on appeal, for dismissal of Complainant's request for reconsideration. Additionally, we deny Complainant's request to reopen the instant proceedings and hold in abeyance pending resolution of Complainant's subsequent termination claim filed with the Merit Systems Protection Board.[4]

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests.

---

[4] Complainant states on appeal that the Agency issued a proposal to terminate her employment on February 27, 2020, one day after the AJ issued the instant February 26, 2020 decision. Complainant states that her termination was completed on September 17, 2020.

10                                        2021003097

Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations


August 19, 2021
Date

11                                          2021003097

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was made available to the parties.** I certify that on the date below this decision was provided to the following recipients via the means identified for each recipient:

Quynh V. Bain
213 3rd Street, SE
Washington, DC  20003
Via U.S. Mail

Richard Toscano, Director, EEO Staff
Department of Justice
Via FedSEP

August 19, 2021
Date

Compliance and Control Division

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS
WASHINGTON, DISTRICT OF COLUMBIA

| | |
|---|---|
| QUYNH VU BAIN, | APPEAL NO. 2020002553 |
| | HEARING NO. 570-2016-01466XX |
| Appellant | |
| | ON APPEAL FROM DECISIONS AND |
| v. | ORDERS OF ADMINISTRATIVE |
| | JUDGE GRANTING SUMMARY |
| U.S. DEPARTMENT OF JUSTICE, | JUDGMENT AND PROTECTIVE |
| U.S. ATTORNEY GENERAL & | ORDER |
| EXECUTIVE OFFICE FOR | |
| IMMIGRATION REVIEW, | DATE:  April 28, 2021 |
| | |
| Appellee | HEARING REQUESTED |

## MOTION FOR RECONSIDERATION AND MOTION TO REOPEN AND HOLD IN ABEYANCE THE EEOC PROCEEDING PENDING RESOLUTION OF RELATED ISSUES OF DISCRIMINATION BY THE MERIT SYSTEMS PROTECTION BOARD

Pursuant 29 C.F.R. 1614.405 (2021), the *pro se* Complainant-Appellant respectfully seeks reconsideration of the EEOC Office of Federal Operations' March 24, 2021 decision to affirm the February 26, 2020 Decision and Order of the Honorable Antoinette Eates granting the Agency's Motion for Summary Judgment, and Protective Order. *See* Attachment A. In addition, Complainant-Appellant requests that the EEOC reopen the instant proceedings and hold it in abeyance pending resolution of related issues of continuing discrimination and retaliation arising from events occurring after the Administrative Judge entered her Order granting Summary Judgment on February 26, 2020.[1]

---

[1] A paper copy of the March 24, 2021 OFO decision was mailed to the Complainant-Appellant's home address and was received on April 8, 2021. Although Complainant-Appellant's time period for replying by EEOC Public Portal was set at 30 days from the date of the OFO Order, Complainant is entitled to the presumption that the paper copy of the OFO decision was received within five days of mailing, or by March 29, 2021. On April 28, 2021, Complainant attempted to file the entire Motion for Reconsideration and accompanying attachments through the EEOC Public Portal. However, she discovered that the file had been closed. Accordingly, Complainant is filing this Motion for Reconsideration by express mail or delivery service, scheduled for delivery

The related issues of discrimination and retaliation are raised in a timely Notice of Appeal filed with the Merit Systems Protection Board on October 19, 2020. Those related issues of continuing discrimination and retaliation for prior EEO activity are being asserted as an affirmative defense to an adverse action that the Agency proposed on February 27, 2020   one day after the EEOC Administrative Judge granted summary judgment to the Agency. *See* Attachment B. The adverse action was finalized seven months later, on September 17, 2020, and resulted in the termination of Complainant-Appellant's employment in the Justice Department after 29 years.

In support of this Motion, Complainant-Appellant asserts the following under penalty of perjury.

## BACKGROUND AND PROCEDURAL HISTORY

1.      Until September 17, 2020, I was a 29-year career employee of the U.S. Department of Justice whose work was dedicated to upholding the rule of law. Upon graduating from law school in 1991, I began working for the Justice Department as an Honor Law Graduate. Over the next 29 years, I worked in five different DOJ offices, defending the United States government in civil immigration enforcement actions and appeals, as well as environmental tort lawsuits. After the September 11 terrorist attacks, I volunteered for a detail to the Office of the Deputy Attorney General, to work on counter-terrorism matters. In March 2008, I was appointed an immigration judge in the Executive Office for Immigration Review (EOIR). Over the next 12 years, I served in two immigration courts—the Headquarters Immigration Court in Falls Church, Virginia, and the Arlington, Virginia Immigration Court. *See* Attachment J, at BAIN 1000-1028. *See also* Attachment I.

2.      After performing my job satisfactorily for seven years, I became the target of an Agency scheme to dispossess me of my immigration judge position, so that it could be given to internal or external immigration judge candidates the Agency favored. This scheme began in March 2015 and ended with my discharge in September 2020. Throughout that five-year period, the Agency took a series of discriminatory and retaliatory actions that created a hostile work environment. These maneuvers put tremendous pressure on me to quit my job or accept a demotion so that my job could be given to a favored immigration judge candidate. They also were meant to retaliate against me for pursuing an EEO complaint against the Agency after my reasonable accommodation request was denied. Those discriminatory and retaliatory actions are

---

to the OFO and Agency counsel within one business day, or by April 29, 2021. *See* 29 C.F.R. 1614.604.

Because I have elected to appeal the termination of my employment to the MSPB, *see* Attachments B and K, not all of the evidentiary materials that are or will be presented to the MSPB are included in this submission because they are too voluminous. Only those evidentiary materials that are intended to satisfy the standard for reconsideration are provided.

well-documented in my December 2015 Complaint of Discrimination and May 2018 Amended Complaint of Discrimination, which are the subject of the instant EEO action. *See* Attachment C.

3.       The scheme to purge me from EOIR began in March 2015, with the issuance of a reprimand letter by former supervisory Immigration Judge Christopher A. Santoro. The letter criticized me for displaying intemperate behavior toward ACIJ Santoro after I objected to a work assignment that would have caused me to violate the law governing immigration detention. *See* Attachment J, at BAIN 1099-1018. At that point, I had been employed with DOJ for 24 years and as an immigration judge for 7 years. Never before had I been the subject of a reprimand, nor did I have a disciplinary record. *See* Attachment I.

4.       The effect of the reprimand letter was to bar me from securing a reassignment to the Arlington Immigration Court's non-videoconference court for a period of three years. *See* Attachment J, at BAIN 1099. During that three-year period, ACIJ Santoro assisted a friend and colleague in applying for an immigration judge position in the Arlington Immigration Court. *See* Attachment J, at BAIN 1225. The same month that ACIJ Santoro issued the reprimand letter to me (March 2015), his friend and colleague Vance Spath applied for an immigration judge position in the Arlington court as an external candidate. *See* Attachment J, at BAIN 1224.

5.       Over the next five years, the Agency continued perpetrating the scheme to oust me from the Agency. Acting through management officials, including former EOIR Director James McHenry, former Deputy Director Marlene Wahowiak, former Chief Immigration Judge Mary Beth Keller, former Assistant Chief Immigration Judge Christopher A. Santoro, former Assistant Chief Immigration Judge Deepali Nadkarni, and Arlington Court Administrator Deborah Castro, EOIR discriminated against me on the basis of my race, national origin, sex, and temporary disability or non-disabling medical condition. They also were motivated to retaliate against me for pursuing an EEO complaint after my request for a reasonable accommodation was denied. *See* Attachment C. *See also* Attachment Y (Letter of Phuong Dinh Vu, dated April 24, 2021).

6.       In August 2016, another supervisor, ACIJ Deepali Nadkarni, continued to retaliate against me for engaging in EEO activity. On August 28, 2016, ACIJ Nadkarni issued to me a bogus counseling letter that threatened to terminate my employment for a relatively minor incident. I had requested that Roxanne Hladlylowycz, a fellow immigration judge, not schedule court hearings directly on my hearing calendar as she had no apparently authority to do so, and her action caused numerous schedule conflicts that I must then resolve on my own. *See* Attachment J, at BAIN 1145-1147. At the time, I was not aware that, on the same day that ACIJ Nadkarni issued the counseling letter to me, ACIJ Nadkarni also issued to Judge Hladlylowycz a similarly-worded counseling letter that faulted her for the same incident. *See* Attachment J, at BAIN 1148-1150. The Hladlylowycz counseling letter was not disclosed to me until the close of discovery in this EEO action (in March 2019). Even worse, ACIJ Nadkarni deceptively referenced my counseling letter in an October 2016 performance rating that     while crediting me with satisfactory

3

performance   criticized me for "unprofessional exchanges" with supervisors and colleagues. When asked to explain what she meant by the "unprofessional exchanges" language, ACIJ Nadkarni refused to provide and explanation or divulge the identity of the person or persons who allegedly complained and the nature of that complaint. *See* Attachment O.

7.   Upon receiving my August 2016 counseling letter, my first employment counsel, Heather White, filed a Motion for Sanctions, because the Agency had unjustifiably delayed the investigation of my December 2015 EEO complaint of discrimination and retaliation. In response, the Agency hastily conducted an investigation in August 2016 and filed the Record of Investigation with the EEOC, without giving me an opportunity to respond or to file objections or corrections. Notably, the Record of Investigation contains the August 2016 counseling letter that I received, but the counseling letter that Judge Hladylowycz received was omitted. As stated, the Agency refused to disclose a copy of the Hladylowycz counseling letter until the end of discovery in the instant proceeding, when it was too late to challenge the propriety and accuracy of my August 2016 counseling letter and my October 2016 performance rating, except to raise them in the instant EEOC proceeding. AJ Eates ultimately denied my Motion for Sanctions and permitted the Agency to file the Record of Investigation out of time. As it stands today, the Record of Investigation that is on file with the EEOC contains many factual errors like the one just described. *See* Attachment M.

8.   In May 2018, I moved to amend the EEO complaint to lodge additional allegations of discrimination, retaliation, and hostile work environment. AJ Eates accepted all of the additional allegations, except those allegations that related to the Agency's refusal to release responsive records in response to my FOIA requests.[2] The FOIA requests sought release of information that I intended to use in the instant EEOC action. In excluding the FOIA-related allegations, AJ Eates reasoned that she had no authority to review the Agency's decision to withhold or release records under the FOIA statute, nor did she have the authority under that statute to compel production of the requested documents. *See* Attachment M.

9.   The Agency did not conduct an additional investigation of the allegations in the May 2018 Amended Complaint that AJ Eates approved. Nor did it release any responsive documents that I sought through the two FOIA requests. Instead, the Agency used the EEOC discovery process to wage a discovery war that was time-consuming and costly. *See* Attachment M.

_____

[2] I filed two FOIA requests in September 2015 and January 2018 that sought information relating to the allegations of discrimination, retaliation, and hostile work environment. Between November 2015 and August 2017, the Agency released only 100 pages, on a rolling basis. The 100 pages were clearly inadequate.

10.     Discovery in the EEO action was a very contentious process. Although discovery lasted more than one-and-a-half-years, the Agency used most of that time to litigate a claim of privilege that it asserted over approximately 1,000 pages of digital documents that I had obtained from a shared drive that was mapped to my office computer. Because access to the shared drive was universal, AJ Eates initially determined that the documents I obtained from the shared drive were not privileged, and that the Agency had waived any claimed privilege by making the documents accessible to other Agency personnel. Accordingly, AJ Eates permitted the use of those documents in the EEOC action. One downside to this time-consuming, expensive protracted discovery dispute was that many factual disputes remained unresolved by the close of discovery in March 2019. *See* Attachment M.

11.     In April 2019, the Agency moved for summary judgment, arguing that there was no genuine dispute of material facts and that the law clearly favored a grant of summary judgment. In support of the summary judgment motion, the Agency filed a Statement of Undisputed Facts that actually contained many disputed facts. The Agency attached to its Motion for Summary Judgment a compilation of approximately 450 pages of supporting documents. Some of those documents, such as the Hladylowycz counseling letter described in paragraph 7 above, had not been produced in the Record of Investigation or before the close of discovery. *See* Attachment C.

12.     In response to the Agency's Motion for Summary Judgment, my former counsel filed an Opposition along with a Statement of Disputed Material Facts and a Supplemental Statement of Disputed Material Facts. The two Statements highlighted genuine disputes of material facts that needed to be resolved before AJ Eates could dispose of the Agency's Summary Judgment Motion. Finally, my former counsel requested a hearing to resolve the outstanding factual disputes. *See* Attachments D and E.

13.     On February 26, 2020, AJ Eates granted the Agency's Motion for Summary Judgment without a hearing. Her decision did not set forth detailed, meaningful findings of facts and was merely a rote recitation of the 39 accepted allegations. Nor did the decision meaningfully articulate the reasons that she resolved the factual disputes in the Agency's favor. Her legal analysis of the issues consisted of a recitation of the standards of proof for claims of discrimination, retaliation, and hostile work environment, followed by a one-page conclusory statement of opinion that adopted wholesale all of the arguments in the Agency's Motion for Summary Judgment and its Statement of Undisputed Facts, by incorporating both in their entirety. *See* Attachment C.

14.     On the same day that she issued the Summary Judgment decision (February 26, 2020), AJ Eates also granted the Agency's renewed Motion for Protective Order. The protective order covered the approximately 1,000 pages that I had obtained from the shared drive, as well as other documents that I obtained independently. Those 1,000 pages comprised the approximately 300 documents that I had produced during discovery. This Order was quite puzzling because AJ

Eates previously determined that the documents were not privileged or that any applicable privilege had been waived by the Agency's intentional or inadvertent disclosure of the same documents to a large group of EOIR personnel. *See* Attachment F.

15.     The very next day, on February 27, 2020, the Agency proposed to terminate my 29-year employment with DOJ and in the federal service.   The temporal connection between the dismissal of my EEO action and the proposed termination of my employment suggests that the Agency was motivated to retaliate against me for pursuing the instant EEOC action.  Indeed, this temporal connection was the clearest evidence that in seeking to terminate my employment, the Agency acted with discriminatory and retaliatory motives.

16.     On March 27, 2020, I filed with the Justice Department's Complaint Adjudications Office (CAO) a response to the February 26, 2020 decision of AJ Eates granting the Agency's Motion for Summary Judgment and renewed Motion for a Protective Order. Through that response letter, I invited the Justice Department to join in a request to hold the instant EEOC proceeding in abeyance pending the Attorney General's resolution of the proposed termination of my employment. *See* Attachment G. The Agency, however, declined the request.

17.     On May 1, 2020, I filed a timely Notice of Appeal of AJ Eates's Orders granting summary judgment and protective order with the EEOC Office of Federal Operations.  Through a letter brief that accompanied the Notice of Appeal, I requested that the EEOC reconsider and rescind AJ Eates's February 26, 2020 decision granting the Agency's Motion for Summary Judgment, on two grounds. *See* Attachment H.

        a.      First, the Agency failed to produce material evidence that would have demonstrated no existence of genuine disputes of material fact.  For example, I noted that through its Summary Judgment Motion the Agency introduced a court order that I had issued on June 8, 2017, which denied a Motion for Recusal filed by two immigration bar attorneys.  The two attorneys sought to disqualify me from hearing all their cases, on the ground that they were pursuing a complaint of judicial bias and misconduct that they had filed with my supervisor in March 2017. In moving for summary judgment, the Agency cited the March 2017 complaint and June 8, 2017 Order as examples of professional misconduct. The Agency, however, failed to advise AJ Eates that the June 8, 2017 Order had been affirmed on interlocutory appeal by the Board of Immigration Appeals.  As a direct result of that material omission, AJ Eates found that the Agency was justified in referring the June 8, 2017 Order to the DOJ Office of Professional Responsibility (OPR) for an investigation.  She further concluded that the June 8, 2017 Order showed that management officials such as ACIJ Nadkarni needed to rein me in for professionalism and conduct issues.  I brought this outrageous failure to disclose material evidence to the EEOC's attention in my May 1, 2020 letter appeal brief. *See* Attachment H.

6

b.      Second, in anticipation that the Agency would move forward with its proposal to terminate my employment one day following AJ Eates's issuance of the February 26, 2020 summary judgment decision and protective order, I requested that the EEOC reopen the evidentiary record for further discovery and fact finding. *See* Attachment H.

c.      The Agency opposed the above requests.

18.      While my administrative appeal to the EEOC OFO was pending, the Agency moved forward with its plan to terminate my 29-year DOJ legal career. In the February 27, 2020 Notice of Proposed Removal, the Agency alleged that I had engaged in "conduct unbecoming an immigration judge" because of the manner in which I responded to the two immigration attorneys' Motion for Recusal (i.e., the June 8, 2017 Order discussed in paragraph 17.a above), as well as their underlying March 2017 complaint of judicial bias and misconduct. The Agency also alleged that I lacked candor in responding to two interview questions that OPR investigative counsel asked me during an exhausting, seven-hour interview.

19.      With the assistance of private counsel          ), I refuted the allegations of "conduct unbecoming an immigration judge" and the lack-of-candor charge. *See* Attachment I.

20.      Nevertheless, after seven months and several unsuccessful attempts to negotiate an appropriate settlement, I was discharged from DOJ after 29 years of distinguished service. *See* Attachment J, at BAIN 1000-1028. The termination decision was prepared by Associate Deputy Attorney General Bradley G. Weinsheimer in the Office of the Deputy Attorney General. It was prepared on August 17, 2020, or within 180 days after AJ Eates issued her summary judgment decision. However, Attorney General Barr did not sign the decision to indicate his concurrence until September 17, 2020, more than 180 days after AJ Eates's decision.

21.      On October 19, 2020, with the assistance of my second employment counsel (the Alden Law Firm), I filed a timely Notice of Appeal of the termination decision with the Merit Systems Protection Board. *See* Attachment B. That appeal is still pending.[3]

---

[3]

22.     The MSPB appeal notice asserts that the termination of my 29-year DOJ legal career was an act of continuing discrimination and new discrimination that violated the Civil Service Reform Act, as amended. In addition, the MSPB appeal notice asserts that my discharge was a new discrete act of discrimination that violated Title VII of the 1964 Equal Employment Opportunity Act, the 1973 Rehabilitation Act (as amended), and the Anti-Age Discrimination in Employment Act (as amended). Finally, the MSPB appeal notice asserts that the removal decision was retaliation for protected whistleblowing activity, and that my discharge violated the Whistleblower Protection Act (as amended). *See* Attachment B.

23.     The affirmative defense of discrimination involves two related but distinct claims. The first claim asserts continuing discrimination that related back to the events described in my EEO complaints of December 2015 and May 2018, which are the subject of this EEOC proceeding. The second claim asserts a new discrete act of discrimination based on the September 17, 2020 removal decision, which post-dates AJ Eates's summary judgment decision.

24.     The factual basis for my continuing and new discrimination claims is as follows:

a.     My discharge from EOIR, DOJ, and the federal service constitutes continuing discrimination that directly flowed from the acts of discrimination and retaliation described in my December 2015 Complaint and May 2018 Amended Complaint of discrimination, retaliation, and hostile work environment. Those discriminatory and retaliatory acts were part of a scheme to divest me of my job so that it could be given to an internal or external immigration judge candidate whom the Agency favored. In this case, the favored judge who was hired to replace me in the Arlington Immigration Court was a white male named Vance Spath, who had virtually no prior immigration knowledge or practice experience when he was hired. The timing of his job application and appointment to the Arlington Immigration Court closely correlated with the timing of the various personnel matters that my former supervisors undertook to make a record for my removal and the decision to terminate my employment with DOJ and the federal service.

b.     In March 2015, I received a reprimand from ACIJ Santoro the same month that Vance Spath applied for an immigration judge position in the Arlington court. The reprimand prevented me from obtaining a transfer to the Arlington court for a period of three years. *See* Attachment J, at BAIN 1224. The same month in which my transfer request was official denied (November 2015), Vance Spath reapplied for a judgeship in the Arlington Immigration Court. *See* Attachment J, at BAIN 1220.

c.     During the three-year period in which I was barred from obtaining a transfer to the Arlington court under the terms of the union contract, the Agency processed Vance Spath's

_____

As of now, I am representing myself in both the MSPB and the instant EEOC proceedings.

job application with the goal of onboarding him quickly. But his job application hit a snag in April 2016, when he reportedly turned down a job offer from former Attorney General Loretta Lynch because the salary that he was offered was too low. *See* Attachment J, at BAIN 1220-1224.

        d.    In March 2017, former Attorney General Jeff Sessions appointed Vance Spath as an immigration judge to the Arlington Immigration Court. That month, I received a complaint from two immigration bar attorneys who had filed a complaint with ACIJ Nadkarni, alleging that I had manifested improper judicial bias and conduct during four separate court hearings. At ACIJ Nadkarni's direction, I responded to the attorneys' Motion for Recusal as well as the underlying March 2017 complaint of judicial bias and misconduct. (As stated earlier, the June 8, 2017 Order was affirmed by the Board of Immigration Appeals on interlocutory appeal).

        e.    In August 2017, the Agency referred the complaint of judicial bias and misconduct to OPR for an investigation. In June 2018, I sat for a seven-hour OPR interview during which OPR asked a barrage of questions about the March 2017 complaint of judicial bias and misconduct, and the June 8, 2017 Order that denied the two attorneys' Motion for Recusal.

        f.    In September 2018, Vance Spath was invested as an immigration judge and began conducting court hearings in the Arlington Court. At the time, there were not enough courtrooms in the Arlington Immigration Court to accommodate him. Nevertheless, he was assigned a courtroom of his own, while I had to share my courtroom with another incumbent judge.

        g.    In April 2019, barely seven months into his two-year probationary period, a federal court of appeals found that Vance Spath had violated the rules of ethical conduct and professional responsibility in the most fundamental way: He pursued the immigration judge position while presiding over a military commission trial in which Justice Department lawyers from the National Security Division were party to the case. The court of appeals determined that Spath's failure to divulge his job application to defense counsel was a serious ethical breach, as well as conduct that was prejudicial to the administration of justice. The court of appeals further concluded that Spath's failure to divulge his job application to defense counsel constituted a lack of candor. Astoundingly, Vance Spath did not face any sort of disciplinary or adverse action. *See* Attachment J, at BAIN 1227-1233. Instead, he was allowed to complete his two-year probationary period and keep his job.[4]

        h.    On September 27, 2019, the DOJ Office of Professional Responsibility issued a Final Report of Investigations. The Report found that I had engaged in professional

---

    [4] Upon information and belief, in December 2020 Spath was promoted to the position of supervisory immigration judge. Shortly thereafter, he was granted a transfer to the Miami, Florida Immigration Court where he currently works.

misconduct because of the manner in which I had responded to the two immigration lawyers' March 2017 complaint of judicial bias and misconduct through the June 8, 2017 Order denying their Motion for Recusal. OPR also determined that I lacked candor in answering two of the hundreds of interview questions that OPR investigative counsel posed during the exhausting seven-hour OPR Interview. *See* Attachment W. As a result of that OPR Report, the Agency placed me on administrative leave, effective October 8, 2019.

        i.      In September 2020, the same month that Vance Spath completed his two-year probationary term, I was discharged from DOJ.

        j.      As a result, I was deprived of an immigration judge position that I had been performing satisfactorily and enjoyed for 12 years. My 29-year DOJ legal career was extinguished, and my life is in shambles. The life and health insurance that I had been carrying for 29 years were cut off amid the raging covid-19 pandemic. Approximately six years' worth of retirement benefits were forfeited because I was fired one year shy of accruing minimum retirement eligibility (*i.e.*, at age 55, with 30 years of service). I had spent more than $287,000 in attorneys fees to defend myself against the discrimination, retaliation, and hostile work environment as well as the OPR investigation. This was a devasting loss from which I am still trying to recover.

        k.      Furthermore, not only was my livelihood taken away so discriminately and cruelly, but my future earning potential is also threatened. Although the Attorney General's letter of termination acknowledged that my conduct of the court hearings and ruling on the Motion for Recusal merely implicated, but did not necessarily violate, my state bar rules of professional responsibility, DOJ has pledged to refer me to my state bar for disciplinary action if I do not prevail in the MSPB appeal. All of this is premised on its highly flawed analysis of the facts and law that govern the work of immigration judges, as well as its very questionable lack-of-candor finding which does not meet legal and evidentiary standards. *See* Attachment I.

        l.      To my knowledge, the Agency has never disciplined any other immigration judge in this manner. My discharge from EOIR, DOJ, and the federal service is highly suspect, for no other reason than that the alleged misconduct occurred in the context of my performing judicial duties. Indeed, the Attorney General's removal decision wholly ignored the presumption of impartiality that attaches to administrative judge decisions, *see* Schweiker v. McClure, 456 U.S. 188, 195 (1982) ("We must start . . . from the presumption that the hearing officers . . . are unbiased."). The removal decision fails to acknowledge, much less discuss, that I was merely following the Agency's own process for recusal of immigration judges and the Supreme Court's standards of judicial conduct that apply directly to judicial officers' adjudication of recusal motions in Liteky v. United States, 510 U.S. 554 (1994), which the Agency's process adopted. Finally, the

10

termination decision wholly overlooks administrative and federal court case law governing judicial proceedings in general and immigration court proceedings in particular.[5]

m.      Furthermore, during the pre-MSPB process, the Agency admitted that it had not maintained a Table of Penalties for imposing disciplinary or adverse action. It also had not kept accurate and complete disciplinary records and thus was unable to provide reliable data for comparison. *See* Attachment I. That the Agency would then select the most severe penalty possible is clear evidence of its discriminatory and retaliatory motives. Even Mr. Weinsheimer had to acknowledge that the penalty of removal from DOJ and the federal service would have no comparable in this situation, but for OPR's lack-of-candor finding which I submit is flimsy and overreaching. In any event, Vance Spath was not disciplined in any way for violating clear rules of ethical and judicial conduct that should have resulted in his termination with cause, or even without cause because he was still on probation. Likewise, other Arlington Immigration Court judges were not disciplined in any way for conduct that was far more egregious than anything that I have ever been accused of, much less engaged in. *See* Attachment J, at BAIN 1039-1044, 1047-1048, 1051-1056. *See also* Attachments P, Q, R, S, T, U, V, and Z (all subject to AJ Eates's February 26, 2020 Protective Order).

n.      Given that the events leading up to my removal from DOJ and the federal service relate back to the time period covered by AJ Eates's summary judgment decision, my removal is an act of continuing discrimination for which the Agency should have to account.

---

[5] For example, in Hassan v. Holder, 640 F.2d 915 (6th Cir. 2010), the court of appeals rejected a similar claim of judicial bias and misconduct filed against a female immigration judge of color.

At different points in their brief, Petitioners point to three different alleged defects in the process they received: 1) the immigration judge's failure to recuse herself due to her previous job as a DHS trial attorney and later as Chief Counsel of the Detroit DHS office; 2) the IJ's failure to recuse herself due to her previous "close working relationship" with Officer Wells; and 3) the IJ's active questioning of the witnesses during the merits hearing.

Immigration judges, however, have "broad discretion in conducting" removal proceedings. Castellano-Chacon, 341 F.3d at 553. Furthermore, IJs are statutorily authorized to "interrogate, examine, and cross-examine the alien and any witness." 8 U.S.C. § 1229a(b)(1); *see* Abdulahad, 581 F.3d at 296. Judge Nettles' behavior did not amount to an abuse of this broad discretion or of Petitioners' due process rights. Although the record indicates that the judge took a somewhat active role in the examination of several, if not all, of the witnesses, the judge was well within her rights to do so. Accordingly, we affirm the Board's decision rejecting Petitioners' claim that the IJ should have recused herself.

25.     In addition, my discharge on September 17, 2020, pursuant to Attorney General Barr's decision issued on that date, constitutes a discrete new act of discrimination. Consistent with the administrative claim/exhaustion requirement, I notified the EOIR EEO Program Director, Andrew Press, within 45 days of the discharge that I intended to pursue a new claim of discrimination in an MSPB "mixed case" appeal. *See* Attachment K. This notice sufficiently preserved the discrimination issue for litigation before the EEOC, if necessary.

**B.     THE EEOC SHOULD RECONSIDER ITS DECISION TO AFFIRM THE ADMINISTRATIVE JUDGE'S FEBRUARY 26, 2020 DECISION GRANTING SUMMARY JUDGMENT.**

26.     The EEOC Administrative Judge's decision granting summary judgment to the Agency is clear error. *See* Celotex v. Catreet, 477 U.S. 317, 322-23 (1986).

a.     First, the Administrative Judge incorporated into her decision the Agency's Summary Judgment Motion and a 450-page compilation of exhibits in their entirety. She did not just reference the Agency's arguments or evidence, she adopted them wholesale as reflecting her own analysis of the facts and law. Her decision granting summary judgment thus suffers from a failure to exercise independent judicial decision-making authority as well as a failure of articulation.

b.     Second, AJ Eates's summary judgment decision does not adequately reflect a proper balancing of the evidence. She accepted as true all the facts asserted in the Agency's Statement of Undisputed Facts, even though many of those facts were still in dispute. This decisional error had the effect of shifting the burden of proof to the non-moving party (me) to demonstrate that there were genuine disputes of material facts that counsel against a grant of summary judgment, when that burden should have been borne by the moving party (the Agency). This impermissible shifting of the burden of proof is plain error. It also violates substantive and procedural due process.

c.     Third, the Administrative Judge erred by not holding a hearing to resolve outstanding material facts in dispute, and by not requiring the Agency to show why those material facts should be resolved in its favor. As it stands, the Administrative Judge's fact findings are deficient. They do not adequately examine and resolve all 39 of the allegations of discrimination, retaliation, and hostile work environment that she accepted. Without a meaningful of analysis of the evidence, the decision merely states that AJ Eates adopted the Agency's version of undisputed facts as credible, and that any facts still in dispute were not material enough to foreclose summary judgment. Although AJ Eates stated that she had considered all of the evidence I introduced into evidence, including my Statement of Disputed Material Facts and Amended Statement of Disputed Material Facts, her decision does not adequately explain the weight (if any) that she assigned to

12

my compilation of evidence, or why the preponderance of evidence weighs in the Agency's favor. These inadequate fact findings will make judicial review exceedingly difficult and will likely result in a remand for further fact finding and articulation of the judge's reasoning.

       d.    Fourth, the Administrative Judge's legal reasoning also suffers from a lack of articulation. It does not adequately explain why she concluded that each element of the summary judgment standard has been satisfied by the Agency, as the moving party. Previously, AJ Eates ruled that the compilation of 300 documents that I obtained from a shared drive that was accessible by EOIR personnel were not privileged materials that had to be returned to the Agency or destroyed. However, on the same day that she granted the Agency's Summary Judgment Motion on February 26, 2020, she inexplicably reversed course and granted the Agency's renewed Motion for Protective Order. The effect of the Protective Order was to treat the more than 300 documents as sensitive information that may not be disclosed without taking the necessary precaution of placing the documents under seal. The protective order, however, does not disturb AJ Eates's prior ruling on the admissibility of the 300 documents as non-privileged materials that she may consider, as the trier of fact. Thus, AJ Eates's failure to discuss her analysis of the 300 protected documents and to assign the proper weight to them in her summary judgment decision is clear error. Due to this failure of articulation, judicial review of AJ Eates's decision in the United States District Court would be exceedingly difficult and would likely result in a remand for further fact finding and proper articulation of her legal reasoning.

       e.    For all these reasons, the EEOC should reconsider its decision to affirm AJ Eates's summary judgment decision and protective order. A reconsideration would facilitate judicial review in the event AJ Eates's decisions and orders are appealed to the federal district court.

### C.    THE EEOC SHOULD REOPEN AND HOLD IN ABEYANCE THIS EEOC PROCEEDING, PENDING THE MSPB'S RESOLUTION OF THE AFFIRMATIVE DEFENSE BASED ON DISCRIMINATION.

27.    In addition, the EEOC should reopen the underlying evidentiary record and hold the instant EEOC proceeding in abeyance, pending the MSPB's resolution of an affirmative defense based on the discriminatory acts described above. This would allow for discovery in the MSPB proceeding to go forward on the continuing discrimination claim and the new claim of discrimination, without regard to the potential preclusive effect that AJ Eates's superficial fact findings and minimal, conclusory legal analysis might pose in the MSPB appeal.

28.    The affirmative defense of discrimination relates back to the 39 allegations contained in my December 2015 EEO complaint and May 2018 amended EEO complaint that AJ Eates disposed of in the Agency's favor. Although AJ Eates dismissed all 39 allegations through

ATTACHMENT F     0024

her summary judgment decision, she did not consider or anticipate the impact that her decision would have on the Agency's future course of action, namely its move to terminate my employment the very next day. Had the termination of my employment occurred before the Motion for Summary Judgment was presented to AJ Eates, her decision might have been different. She might have reopened the evidentiary record to allow for an amendment of the EEO complaint. For this reason, the proposed termination of my employment one day after AJ Eates granted the Agency's Summary Judgment Motion provides the clearest evidence of the Agency's long-standing discriminatory and retaliatory animus toward me.

29.     Reopening the underlying evidentiary record is warranted to allow for additional discovery in the MSPB proceeding and the presentation of the affirmative defense before the MSPB. Doing so will also preserve for the MSPB judge the option of referring the affirmative defense to the EEOC for resolution in the first instance. In addition, this approach would preserve an avenue of appeal to the EEOC, in the event the MSPB administrative judge rules against the discrimination-based affirmative defense.

30.     The Agency might oppose this request to reopen the EEOC proceeding by contending that there is no clear temporal connection between the past acts of discrimination and the termination of my employment, insofar as I was discharged more than 180 days after AJ Eates's summary judgment decision. This argument fails for several reasons.

a.     First, a temporal connection between the past acts of discrimination and the recent termination of my employment is clearly established by the Agency's issuance of a Notice of Proposed Removal the very next day after AJ Eates granted the Agency's Summary Judgment Motion. The temporal proximity of the two events gives rise to a reasonable inference that the Agency had planned to retaliate against me for pursuing the instant EEO action.

b.     Second, the Agency delayed the resolution of the proposed removal past the six-month period. On August 17, 2020, approximately six months after the Notice of Proposed Removal was issued, Associate Deputy Attorney General Bradley G. Weinsheimer prepared a written decision recommending my removal. Although the Weinsheimer decision was prepared within the 180-day window, a copy of that decision was not provided to me right away. Instead, it was delivered to the Office of former Attorney General William P. Barr for his concurrence. Mr. Barr did not sign the decision until a full month later, on September 17, 2020. By then, more than 180 days had elapsed since AJ Eates issued the summary judgment decision in this EEOC proceeding. Given the Agency's slowness in finalizing the removal decision, I should not be penalized for missing the statutory deadline for seeking to amend the original 2015 Complaint and 2018 Amended Complaint of discrimination. Surely, this is a situation in which equitable estoppel or equitable tolling of the regulatory amendment deadline is warranted. *See* Attachment L.

14

c.      Consequently, and on the advice of former counsel, I elected the broader remedy of an MSPB appeal. I reached out to EOIR's Program Director, Andrew Press, to let him know about the remedy election. *See* Attachment K. As of this time, I intend to pursue the MSPB appeal and assert an affirmative defense based on discrimination.

31.     The Agency might oppose reopening and holding the instant EEOC proceeding by arguing that discovery will yield no new probative evidence. It might even assert that my removal rested on an intervening OPR Report of Investigation issued on September 27, 2019. *See* Attachment W.

a.      The OPR Report concluded that I had engaged in professional misconduct because of how responded to the two immigration bar attorneys' March 2017 complaint and their blanket Motion for Recusal. As stated earlier, the Board of Immigration Appeals had affirmed my June 8, 2017 Order on interlocutory appeal. This is clear evidence that the Agency lacked a proper motive for referring me to OPR for an investigation into a judicial ruling that the Board had affirmed. At a minimum, reopening the evidentiary record is warranted because AJ Eates's decision rested on an incomplete and inaccurate record of evidence.

b.      In addition, the OPR Report is rife with factual and legal errors that I intend to challenge on appeal to the MSPB. As of today, the Agency still has refused to release the full OPR Record of Investigation. I intend to assert that this unreasonable, obstinate refusal to give me the very evidence that it has used to terminate my employment is an egregious due process violation as well as a discriminatory prohibited personnel practice. There is also every reason to believe that once the MSPB or a federal district court compels the Agency to produce the full OPR investigative record, additional discoverable evidence will come to light and will show that the OPR investigation itself and the consequential decision to terminate my 29-year legal career with DOJ were motivated by discriminatory and retaliatory animus. *See* Attachments X & Y.

For the above-stated reasons, the EEOC should reconsider its March 24, 2021 decision, reopen the evidentiary record, and hold the instant proceeding in abeyance to allow for discovery in the pending MSPB appeal to proceed unimpeded by considerations of the preclusive effect that AJ Eates's February 26, 2020 decisions and orders might pose.

Dated:   April 28, 2021                                  Respectfully submitted,

Quynh Vu Bain
*Pro Se* Complainant-Appellant

15

## CERTIFICATE OF SERVICE

I certify that, on April 29, 2021, I served the foregoing Motion for Reconsideration and the 975-page Compilation of Supporting Documents on the Agency by express mail or same-day delivery courier, addressed to the following:

Richard Toscano, Director
EEO Staff
Justice Management Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC  20530-0001
Richard.Toscano@usdoj.gov
(202) 616-4800

At Mr. Toscano's request, I also served the following Agency personnel in the same manner, but also with a courtesy copy of the Motion delivered by email:

Andrew Press, EEO Director
Executive Office for Immigration Review
U.S. Department of Justice
Executive Office for Immigration Review
Office of the Director
Equal Employment Opportunity Program
5107 Leesburg Pike, Suite 2160
Falls Church, VA  22041
Andrew.Press@usdoj.gov
(703) 605-1285 (direct line)

Dated: April 28, 2021

Quynh Vu Bain,
*Pro Se* Complainant-Appellant
213 Third Street, SE
Washington, DC  20003
(202) 910-8553

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
**Washington Field Office**

131 M Street, N.E.
Suite 4NW02F
Washington, DC 20507
(202) 419-0713
1-800-669-4000

Quynh V. Bain
      Complainant,

           v.

William P. Barr, Attorney General,
U.S. Department of Justice,
      Agency

)
)
)
)
) EEOC No.  570-2016-01466XX
) Agency No. EOI-2016-00137
)
) Administrative Judge Antoinette Eates
)
)
) Date:   February 26, 2020
)
)

## DECISION

For the reasons set forth below, this Decision is being issued without a hearing pursuant to 29 C.F.R. § 1614.109(g)(2019). Quynh V. Bain ("Complainant") filed a formal complaint of discrimination against the U.S. Department of Justice, Executive Office of Immigration Review ("Agency" or "EOIR") on December 10, 2015, alleging the Agency discriminated against her in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e and Section 501 of the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 791. Following the Agency's investigation, Complainant requested a hearing on her complaint with the Equal Employment Opportunity Commission (EEOC), Washington Field Office (WFO).

On March 23, 2018, I issued an Order of Acknowledgment and Scheduling of Initial Teleconference, and held an Initial Teleconference on May 1, 2018. On May 2, 2018, I issued a Case Management Order, setting forth hearing procedures and deadlines for discovery, dispositive motions and responses. In the Case Management Order, I also denied Complainant's motion for sanctions for an untimely investigation by the Agency and granted Complainant's first motion to amend. By Order dated June 5, 2018, I granted in part and denied in part Complainant's second motion to amend, filed on May 7, 2018, and opposed by the Agency. The discovery process was lengthy because the parties had numerous disputes requiring significant attention and resources. My orders on the parties' disputes and

1

sanctions motions have been uploaded to the electronic portal for this case and are part of the record in this matter.

After discovery, the Agency filed a Motion for Summary Judgment ("Agency's MSJ" or "Agency's Motion") on April 5, 2019. Complainant filed an Opposition to the Agency's Motion on May 6, 2019. On May 9, 2019, Complainant filed "Corrected Exhibits" to her Opposition. On May 20, 2019, the Agency filed a Reply to Complainant's Opposition. Also on May 20, 2019, the Agency filed a Motion to Strike the "Corrected Exhibits" and a Renewed Motion for Protective Order.[1] On May 23, 2019, Complainant filed an Opposition to the Agency's motion to strike and a Motion for Leave to Amend Statement of Facts, which included an amended statement of disputed facts and a new Exhibit 9 to the statement of facts. On May 30, 2019, the Agency filed an Opposition to Complainant's motion for leave to file an amended statement of facts. After consideration of all of these filings, and despite Complainant's clear untimeliness in filing her "Corrected Exhibits," Amended Statement of Disputed Facts and new Exhibit 9, I will exercise my discretion to consider the untimely filings and include them as part of the record for the sake of full consideration of Complainant's arguments.

The record consists of the Report of Investigation ("ROI") and the parties' summary judgment filings and other filings, as outlined above. After consideration of the entire record, and viewing the facts in the light most favorable to Complainant, I hereby GRANT the Agency's Motion and issue this Decision without a hearing.[2]

## **Issues and Claims for Adjudication**[3]

A. Was Complainant subjected to a hostile work environment based on reprisal (prior EEO activity) and/or discrimination based on race (Asian), gender (female), national origin (Vietnamese) or disability (migraines/record of medical conditions requiring FMLA leave) when, from March 11, 2015 to January 2016:

1. She was the only one of the four Headquarters Immigration court judges who was required to work on a detained docket full-time. The other judges were assigned to handle a combination of detained and non-detained cases, or only non-detained cases. Her detained

---

[1] By separate order, I am granting the Agency's Renewed Motion for Protective Order.

[2] In reaching this decision, I have considered all documents and arguments presented by the parties in this matter, even if they are not specifically referenced herein.

[3] As previously determined, and as set forth by Complainant, the claims listed under section A are background evidence for the hostile work environment claim, and claims listed under section B are discrete acts raising individual claims for relief. Claims under section C, which were added pursuant to Complainant's second motion to amend, are additional examples of harassment in support of Complainant's hostile work environment claim.

docket consisted of aged detained cases (*i.e.* pending more than 60 days) that other detained judges were allowed to reassign to her. Such aged detained cases often involved challenges to long-term detention by habeas corpus and other litigation risks;

2. In those aged detained cases (*i.e.* detained cases pending over 60 days), Complainant was not permitted to hold status conferences or conduct bond hearings to manage her caseload. She was expected to complete each evidentiary hearing on the same day. If she did not, Assistant Chief Immigration Judge (ACIJ) Santoro chided her for being inefficient. She was not allowed to see the case files ahead of time and often received a case file the day before the hearing. Pleadings filed with the York court were not delivered to the Complainant in time for the hearings;

3. She was denied the eight hours of administrative time per pay period to which every judge was entitled under the Agency's Collective Bargaining Agreement (CBA) with the union in order to work on written motions and orders and prepare for hearings;

4. Rather than providing her with a functional VTC system to conduct hearings for York detainees, ACIJ Santoro required Complainant to travel to York to conduct hearings in person. Complainant made seven such trips during June and July 2015;

5. Though Complainant was asked to make two additional trips to York, PA and received approval from other Agency personnel, ACIJ Santoro refused to approve her travel for those trips after she had completed the travel, and Complainant was accordingly denied reimbursement for approximately $400 in travel expenses;

6. ACIJ Santoro then issued Complainant a letter of counseling in which he falsely claimed that she had violated the agency's travel regulations by making the two trips to York;

7. Though Complainant pointed out that she had received authorization for the two additional trips from other agency personnel and that the letter of counseling cited a repealed regulation, ACIJ Santoro refused to rescind the letter of counseling;

8. Complainant's similarly-situated coworkers were allowed to assign her cases from their dockets that were aged (*i.e.* pending more than five years) and/or complex, and she was forced to conduct hearings and issue oral or written decisions in their cases. The cases were then returned to the other judges' dockets once Complainant had done all of the work to complete the cases, with the result that the other judges' case completion statistics were significantly higher than Complainant's;

9. For cases that were assigned to Complainant, the York court repeatedly postponed hearings in Complainant's cases in order to open up time slots for hearings in cases that were assigned to Judges Durling, Arthur, Owens, and Hladylowycz, so that she had to complete cases assigned to those judges before she could complete cases that were assigned to her;

10. When Complainant pointed out the unfairness of being forced to hear and complete large numbers of other judges' cases and asked for additional administrative time, ACIJ Santoro issued a reprimand letter in March 2015 accusing her of displaying intemperate and

unprofessional behavior. In August 2015, ACIJ Santoro incorporated that letter into an unfavorable performance evaluation that cited a lack of professionalism as a deficiency needing correction;

11. After ACIJ Santoro was promoted to Acting Deputy Chief IJ for the East Coast in July 2015, he was succeeded by ACIJ Nadkarni in Arlington and ACIJ Weil in York. Due to the high number of York cases that had been transferred to her docket for the benefit of other judges that involved *habeas corpus* petitions, Complainant was required by ACIJ Nadkarni to cancel her two-week Christmas vacation in late 2015 to early 2016 in order to complete all of her York cases by the end of the year. In early 2016, the Agency finally agreed to transfer the Complainant to the Arlington court;

12. Following Complainant's transfer to the Arlington court, ACIJ Nadkarni continued the practice of assigning Complainant a substantially higher number of cases than her colleagues; and,

13. In July 2016, during the investigation of the instant complaint, ACIJ Nadkarni emailed Complainant and her colleagues a plan for an equitable distribution of cases going forward. She then failed to implement that plan and instead modified the Complainant's case assignment plan twice more. The first modified plan had Complainant handle aged non-detained cases (*i.e.* pending more than 5 years) for several colleagues who were unable to complete their caseloads within a reasonable time. Complainant was the only judge who had this case assignment plan. The second modified plan required Complainant to conduct hearings in approximately 200 new or reassigned "family unit" cases a week. In just two years, Complainant accrued approximately 6,000 family unit cases and completed 1,400 cases. Because cases involving family units were prioritized, Complainant had to schedule hearings in a timely fashion and complete the cases expeditiously.

B. Was Complainant subjected to disparate treatment based on reprisal (prior EEO activity) and/or discrimination based on race (Asian), gender (female), national origin (Vietnamese) or disability (record of medical condition requiring FMLA leave) when:

    14. In August 2015, ACIJ Santoro issued Complainant a performance evaluation that included a deficiency rating for professionalism, included numerous inaccuracies, and did not reflect her actual performance. The rating was issued to Complainant on August 29, 2015;

    15. ACIJ Santoro cited the August 2015 rating as a basis for denying Complainant permission to participate in special work opportunities, including serving as a guest speaker at a training conference and serving as a pro bono liaison judge;

    16. In November 2015, shortly after Complainant filed the instant EEO complaint, the Agency denied her application to work for the Board of Immigration Appeals as a Board Member; and,

    17. On July 28, 2016, Complainant received a letter of counseling based on her objections to the continuing unfair distribution of cases by ACIJ Nadkarni.

C. Complainant was subjected to the following additional actions that were a continuation of the alleged hostile work environment based on race (Asian), gender (female), national origin (Vietnamese), and/or reprisal (for prior EEO activity):

18. From January 2016 to present: ACIJ Nadkarni has continued the practice of assigning to Complainant a disproportionate number of cases compared to her colleagues such that from April 2016 to April 2018, her caseload went from zero to 4,500 Arlington cases. By contrast, ACIJ Nadkarni made similarly situated judges' case statistics look better by placing many of their cases on "visiting judges" dockets known as VJ1, VJ2, and VJ3, though there were no visiting judges detailed to the Arlington court to hear those cases;

19. From January 2016 to present: ACIJ Nadkarni and Court Administrator Deborah Castro have continued to assign aged cases (some between 15 and 20 years old) to Complainant for completion and allowed other Arlington judges to assign their unwanted aged cases to Complainant;

20. From March 2016 to present: By having other judges reassign their cases to Complainant, ACIJ Nadkarni created schedule conflicts that Complainant then must resolve on her own. When Complainant asked that one judge take back a case that caused a double-booking on her calendar ACIJ Nadkarni sided with the other judge;

21. From March 2016 to present: ACIJ Nadkarni instructed court staff to structure Complainant's calendar such that she had to hear many more master calendar cases per day than her colleagues in the Arlington court. For example, during Summer 2016, Complainant heard approximately 100+ master calendar hearings every Monday and Tuesday, while her colleagues heard between 15 and 50 master calendar hearings on their master calendar days;

22. From March 2016 to present: When Complainant requested that the court administrator (CA Castro) reduce the number of master calendar hearings on her hearing calendar, Ms. Castro complained to ACIJ Nadkarni that Complainant had complained about the workload. She also complained to ACIJ Nadkarni that Complainant was being unprofessional when she reported the chronic problems of missing case files, double-booking, and not having enough time to hear all 100+ cases on her calendar in a single day. ACIJ Nadkarni later used Ms. Castro's complaints as support for an unfavorable October 2016 performance evaluation.

23. August 2016: In a counseling letter ACIJ Nadkarni threatened Complainant with termination.

24. August 2016: Consistent with ACIJ Santoro's practice, ACIJ Nadkarni initially refused to authorize travel expenses that Complainant legitimately incurred for required work travel. Specifically, she refused to reimburse parking expenses for Complainant's attendance at the IJ training conference because of some undisclosed policy about carpooling or use of Metrorail.

25. During September 2016: ACIJ Nadkarni and Court Administrator Castro developed a court hearing schedule that dedicated two days a week of Complainant's time to hearing aged cases on the dockets of Judges Larry Burman and Paul Schmidt (ret.). This allowed other Arlington judges to shed their unwanted aged cases by having those cases transferred to Complainant's docket. Complainant was the only judge who had that schedule.

26. October 2016: ACIJ Nadkarni issued Complainant an unfavorable performance evaluation, stating Complainant needs improvement in the area of "professionalism." She cited her August 2016 counseling letter and ACIJ's Santoro's August 2015 performance evaluation as support.

27. Throughout 2016 and 2017: ACIJ Nadkarni rarely responded to Complainant's emails asking for guidance or instructions. As the most recent FOIA request will show, she usually ignores Complainant's emails. When she does respond, she either misses the point or fails to answer the question.

28. Throughout 2017: ACIJ Nadkarni denied Complainant's requests for time off the bench to prepare written decisions. She then criticized Complainant for not finishing her written decisions in a timely fashion though Complainant repeatedly explained that she is in court five days a week, about 7 hours a day and has no time to prepare written opinions. While denying Complainant's request for time off the bench to write decisions, ACIJ Nadkarni has assisted similarly-situated judges (such as Judges Snow, Burman, and Owens) by writing opinions for them.

29. March 28, 2017: ACIJ Nadkarni finally alerted Complainant to the ethics complaint that was filed with OCIJ on March 1, 2018. She requested a response to the complaint within 2 weeks. When Complainant requested an extension of time, she gave an additional 2 weeks, until April 30, 2017.

30. March 2017: After Judges Burman's and Schmidt's aged cases had been transferred to Complainant, ACIJ Nadkarni switched to yet another new hearing schedule which allowed her to transfer more than 2,000 cases that had been parked on the three inactive dockets known as "visiting judges' dockets" to Complainant's docket.

31. May 2017: ACIJ Nadkarni sent Complainant on a two-week detail to New Mexico which prevented Complainant from responding to the recusal motions in a timely fashion.

32. May 2017: ACIJ Nadkarni required Complainant to listen to the audio recordings of the hearings that were the subject of the ethics complaint in her office, and refused to authorize the Court Administrator to give Complainant CD copies of the audio-recordings until Complainant copied the Director of EOIR (James McHenry) and the Chief Immigration Judge (Mary Beth Keller) on an email exchange about the denial.

33. May 2017: ACIJ Nadkarni's Executive Administrative Assistant, Susana Ortiz-Ang, accused Complainant of being late in paying her government credit card balance. In fact, the agency was responsible for paying the travel expenses because Complainant had to sign over her rights to reimbursement when she used the on-line travel service to make travel arrangements.

34. August 1, 2017: ACIJ Nadkarni issued a final performance evaluation stating that Complainant needed improvement in the area of professionalism. The performance evaluation relied on the ethics complaint that two private bar attorneys filed with OCIJ on March 1, 2017 but which OCIJ had not resolved by the time ACIJ Nadkarni issued the performance evaluation. The final performance evaluation criticized Complainant for "unprofessional exchanges" in court hearings.

35. August 29, 2017: Complainant was notified that the OGC received a letter of inquiry from the DOJ Office of Professional Responsibility about the ethics complaint by Blessinger and Boykin. Complainant was required to submit a written response to the OPR.

36. September and October 2017: After the Board of Immigration Appeals dismissed 7 interlocutory appeals that attorneys Blessinger and Boykin filed from Complainant's decisions to deny their motions for recusal, on remand ACIJ Nadkarni nevertheless reassigned the 7 cases to other Arlington judges for handling. This effectively overruled Complainant's decision to deny recusal and the Board's decision to dismiss attorneys Blessinger and Boykin's interlocutory appeals.

37. October 2017: ACIJ Nadkarni sent Complainant on another two-week detail to Jena, Louisiana, so that Complainant had to work on the OPR response while on the detail - away from home, without all of her documents, and unable to communicate with her attorneys because she was in court 9 hours a day and stayed late into the evening to write opinions.

38. November 2017: Complainant was not selected for a six-month detail to the Board of Immigration Appeals. Instead, a white male judge who was less efficient than Complainant in disposing of his cases was selected. Before he went on detail, ACIJ Nadkarni transferred many of his aged cases to Complainant's docket. She also prepared orders and opinions in some of his cases, so that he would not fall behind on his caseload while he is on detail.

39. May 1, 2018: ACIJ Nadkarni accused Complainant of taking leave without approval, when in fact she had previously approved the leave.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other evidence establish no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* 29 C.F.R. § 1614.109(g); *see also Murphy v. Dep't of the Army*, EEOC Appeal No. 01A04099 at 3 (July 11, 2003) (noting that the regulation governing decisions without a hearing is modeled after the Federal Rules of Civil Procedure, Rule 56). Only disputes over facts that might affect the outcome of the suit under governing law, and not irrelevant or unnecessary factual disputes, will preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue of material fact if the relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not return a verdict for the party opposing summary judgment. *Id.* Where the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Where the factual context renders his position implausible, the party opposing summary judgment must come forward with strong persuasive evidence to defeat it. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In doing so, a complainant "may not rest upon ... mere allegations." *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c). Instead, he "must set forth specific facts showing that there is a genuine issue" that requires a hearing. *Id.* To establish a factual dispute, affidavits must "be made on personal knowledge, ...set[ting] [forth such] facts as would be admissible in evidence." Fed. R. Civ. P. 56(c)(4); *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Issues of material fact are not "genuine" merely because there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

In this administrative process, summary judgment may only be granted when the record is sufficiently developed to support a decision without a hearing, keeping in mind the quasi-investigative nature of these proceedings. *See Petty v. Dep't of Defense*, EEOC Appeal No. 01A24206 (July 11, 2003); *Murphy, supra*. Here, I find that the record has been adequately developed, and both parties have had the opportunity to engage in discovery. Complainant was given ample notice of the Agency's MSJ, the Agency provided a comprehensive statement of the undisputed facts, and Complainant had the opportunity to respond, and did respond, to the Agency's MSJ. Because there are no genuine issues of disputed material fact or credibility in this case, I find that summary judgment in favor of the Agency is appropriate.

Upon review of the Agency's Statement of Undisputed Material Facts at Exhibit 1 of the MSJ and the entire record, I find that the Agency accurately sets forth the undisputed material facts in this case. Although Complainant alleges numerous disputes of fact, I find that the alleged disputes are either not material or rely on assertions that are entirely unsupported by legally sufficient evidence. Therefore, I adopt and incorporate by reference the Agency's statement of undisputed material facts. The Agency's MSJ including the Statement of Undisputed Material Facts, is attached to this Decision. The exhibits to the MSJ are too voluminous to attach, but have been uploaded to EEOC's electronic portal for this case.

## APPLICABLE LAW

### Disparate Treatment

In the absence of direct evidence of discrimination, a disparate treatment claim is examined under the three-part test set forth in *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792 (1973). Under this analysis, a complainant initially must establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination. *See St Mary's Honor Center. v. Hicks,* 509 U.S. 502, 507 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981); *McDonnell-Douglas,* 411 U.S. at 802.

To establish a *prima facie* case of reprisal a complainant must show that: (1) she engaged in a protected activity; (2) the agency was aware of the protected activity; (3) subsequently, she was subjected to adverse treatment by the agency that is reasonably likely to deter the charging party or others from engaging in protected activity; and, (4) a nexus exists between the protected activity and the adverse treatment. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)*; McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973); *Hochstadt v. Worcester Foundation for Experimental Biology*, 425 F. Supp. 318, 324 (D. Mass.), *aff'd*, 545 F.2d 222 (1st Cir. 1976); *Elmore v. United States Postal Serv.*, EEOC Appeal No. 01997056 (Dec. 21, 2001); *Whitmire v. Department of the Air Force*, EEOC Appeal No. 01A00340 (September 25, 2000); *see also* EEOC Enforcement Guidance on Retaliation and Related Issues § II-B-1 (Aug. 25, 2016).

Once a *prima facie* case is established, the burden shifts to the agency to articulate a legitimate, nondiscriminatory reason for the challenged actions. *Burdine*, 450 U.S. at 253; *McDonnell-Douglas*, 411 U.S. at 802. Ultimately, a complainant must prove, by a preponderance of the evidence, that the agency's articulated reason for its action was not its true reason, but a sham or pretext for unlawful

133, 143 (2000); *Hicks,* 509 U.S. at 511; *McDonnell-Douglas,* 411 U.S. at 804.

The *prima facie* inquiry may be dispensed with when an agency, as in this case, articulates legitimate and non-discriminatory reasons for its conduct. *See USPS Bd. of Governors v. Aikens,* 460 U.S. 711, 714 (1983) (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981)); *Holley v. Dep't of Veterans Affairs,* EEOC Request No. 05950842 (Nov. 13, 1997). To ultimately prevail, a complainant must prove, by a preponderance of the evidence, that an agency's explanation is a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000) (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

## Hostile Work Environment Harassment

To warrant a hearing on her claim of discriminatory hostile work environment harassment, a complainant must present legally sufficient evidence that because of her protected bases, she was subjected to conduct so severe or pervasive that a reasonable person in her position would have considered it hostile or abusive. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22 (1993); *see also* Enforcement Guidance on Harris v. Forklift Systems, Inc., EEOC Notice No. 915.002 (March 8, 1994).

Regarding her claim of retaliatory harassment, a complainant must show that the alleged harassment was "materially adverse," *i.e.,* that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," regardless of whether the harassment is severe or pervasive enough to create a hostile work environment. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. at 68; *see also* EEOC Enforcement Guidance on Retaliation and Related Issues, EEOC Notice 915.004, Section I-B, II-B (August 26, 2016).

Regardless of whether a harassment claim is predicated on reprisal or a complainant's protected bases, if the record fails to present genuine issues of material fact that the actions were motivated by unlawful intent, summary judgment will be appropriate, and no further inquiry into liability will be necessary. *See Nicki D. v. Dep't of Veterans Affairs,* EEOC Appeal No. 0120133247 (October 15, 2015); *Complainant v. Dep't of Veterans Affairs,* EEOC Appeal No. 0120132783 (Sept. 11, 2015).

## **CONCLUSION AND ORDER**

The Agency's MSJ and Reply to Complainant's Opposition (attached and incorporated in this decision) accurately identify the issues and outline the factual background, establish that there are no genuine disputes of material fact, and provide sound and persuasive analysis of the claims and

Complainant's arguments. I hereby adopt the Agency's Motion and Reply in their entirety. The dispositive motion filings include exhibits that are too voluminous to attach to this decision, but the full filings, including Complainant's Opposition and Amended Statement of Facts, are uploaded to the EEOC electronic portal, to which both parties have access.

In summary, I find that Complainant's allegations amount to mere disagreements and dissatisfaction with the exercise of management authority by her supervisors. With respect to each of her allegations, Complainant presents only unsupported assertions of unlawful motivation and fails to provide legally sufficient evidence that creates an inference of unlawful retaliation or discrimination based on her national origin, race, sex or disability. In other words, although Complainant is deeply dissatisfied with many of the Agency's actions, she has failed to present evidence of a nexus between these actions and her protected bases or her EEO activity. Nor is such evidence contained in the record. Moreover, I find that Complainant has failed to present, nor does the record contain probative evidence that the Agency's reasons for its actions are pretextual.

Here, Complainant disputes a plethora of actions taken by the Agency, as outlined in her complaint, affidavits and Opposition. While Complainant is clearly upset about much of the way she has been supervised and actions to which she has been subjected, her differences of opinion with Agency managers about these actions and her subjective belief of bias on the part of the Agency officials, without more, will not create genuine issues of material fact that warrant a hearing. Contrary to her assertions, my review of the record and the evidence she presents reveals no support for her claims of discrimination and retaliation arising from the challenged actions. Moreover, as accurately and thoroughly presented in the Agency's MSJ and Reply, the record is replete with evidence supporting the Agency's actions, including their efforts to manage intense hearings caseloads, to address Complainant's deficiencies in professionalism, and to respond to attorney complaints against Complainant, among other concerns. Complainant's bare assertions of pretext in response to the Agency's actions will not suffice to establish genuine issues of material fact to warrant a hearing.

With respect to her harassment claims, the Commission has held that disagreement over "routine work assignments, instructions, and admonishments [are by definition] neither severe nor pervasive enough to rise to the level of abuse on par with a racial slur or otherwise engender a hostile work environment." *Complainant v. Dep't. of State*, EEOC Appeal No. 0120123299 (Feb. 25, 2015). The Court in *Greene v. Dalton* held that, "[a]lthough, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." 164 F.3d 671, 675 (1999). In

*Greene,* the Court found the retaliation claim "conclusory," because plaintiff had offered nothing more than a mere generalized representation of retaliation in her affidavit. *Id.* My review of Complainant's arguments and the entire record reveals such conclusory assertions and insufficient evidence from which a reasonable fact-finder could find in her favor.

The Commission cannot second-guess agency decisions involving personnel unless there is evidence of a discriminatory motivation on the part of the officials responsible for making those decisions. *See Burdine,* 450 U.S. at 259. Here, such evidence is wholly lacking.

After a review of the entire record in the light most favorable to Complainant, the Agency's Motion for Summary Judgment is **GRANTED.**

For the Commission:

Antoinette Eates
Administrative Judge

## NOTICE TO THE PARTIES

### *TO THE AGENCY:*

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110, August 5, 2015, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

### *TO THE COMPLAINANT:*

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision.

days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

## *WHERE TO FILE AN APPEAL:*

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

BY MAIL:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
O. Box 77960
Washington, D.C. 20013

BY PERSONAL DELIVERY:

U.S. Equal Employment Opportunity Commission
Office of Federal Operations
131 M Street, NE
Suite 5SW12G
Washington, DC 20507

BY FACSIMILE:

Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*

## **COMPLIANCE WITH AN AGENCY FINAL ACTION**

Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency. If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The agency shall resolve the matter and respond to the complainant in writing. If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of

non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

| | | |
|---|---|---|
| QUYNH V. BAIN,<br>Complainant, | )<br>)<br>)<br>)<br>)<br>) | EEOC No. 570-2016-01466X<br>Agency No. EOI-2016-00137 |
| WILLIAM BARR,<br>Attorney General,<br>Department of Justice,<br>Agency. | )<br>)<br>)<br>)<br>) | AJ: Antoinette Eates<br><br>Date: April 22, 2019 |

## OPPOSITION TO AGENCY MOTION FOR PROTECTIVE ORDER

Pursuant to MD-110, Complainant Quynh Bain, through counsel, hereby files her

Opposition to the Motion for Protective Order filed by the U.S. Department of Justice [agency].

This Opposition is timely filed on or before April 22, 2019 (the first business day ten days after

receipt of the Motion).

As Complainant below shows, the draft protective order submitted by the agency would

impose unwarranted and burdensome requirements for a series of documents produced by

Complainant for which the agency has not made the requisite showing of an applicable privilege

or other basis for restrictions or sealed filings. While Complainant is willing to agree to some

reasonable restrictions, the agency's request for a burdensome blanket protective order for

thousands of documents is without merit and should be denied.

## I.    PROCEDURAL HISTORY/FACTS

1. In December 2017 or early January 2018, Complainant found a folder of documents
labeled BAIN-FOIA on her agency's G: drive, to which she and all Office of Chief
Immigration Judge [OCIJ] employees have access. *See* 9/28/2018 Opposition to
Sanctions, Attachment 1, Complainant's Declaration, ¶¶12-14. Complainant had recently
received the agency's response to a FOIA request and was unpleasantly surprised to find

ATTACHMENT F    0042

a folder on a shared drive accessible to all OCIJ employees which exposed her FOIA request. Id., ¶14. Furthermore, when she opened the folder, she found that it was full of documents that she believed were responsive to her FOIA request, but which had not been produced to her and which had not been disclosed in an index which would explain the agency's decisions to redact or withhold documents responsive to her FOIA request. Id., ¶15.

2. Complainant was distressed to discover the BAIN-FOIA folder on the G: drive where others could see it, as well as by the fact that the agency had not provided complete responses to her FOIA request. She also regarded it as a further act of reprisal for her protected EEO activity and sought to add it to her existing hostile work environment complaint in the Second Motion to Amend filed on May 7, 2018. The relevant claim was #42, worded as follows:

> **November 2017:** Sometime after Complainant filed a FOIA appeal in November 2017 challenging the agency's incomplete or deficient disclosures, the agency posted on the OCIJ intranet webpage a folder named "BAIN FOIA" containing 500 pages of documents responsive to Complainant's FOIA request but not released to her. Complainant discovered the folder in December 2017 when she went onto OCIJ's webpage to view ethics training videos. The cache of documents was on the OCIJ webpage and available to all EOIR employees. **Due to her earlier involvement in Issue 30, *supra*, Complainant believes agency representative Scheinkman is at least partly responsible for this action.**

5/7/2018 Second Motion to Amend at 8. (Complainant's Motion was denied with respect to Claim 42 because the administrative judge held that it was a collateral attack on the FOIA process.)

3. The agency admits that Complainant most likely had access to the G: drive between at least November 2017 and May 2018, because

> After investigating the Chief Judge's [May 2018] inquiry, the Office of Information Technology (OIT) identified a security vulnerability in that every EOIR user had the ability to access the OCIJ internal management shared drive (OCIJ HQ G:drive) if the user was given the specific file path to the drive. Additionally, if a user was sent a link to a particular file, that user would be able to access the entire OCIJ internal management shared drive (OCIJ HQ G:drive) and its files, regardless of whether he or she had been explicitly provided rights to the drive or file(s).

Sanctions Motion Attachment 2, ¶ 3. The agency exhibits show that, on November 8, 2017, the agency sent links to various files on the G: drive to "all immigration judges"

2

and "all of OCIJ LJC." Sanctions Motion Attachment 3 at 1.

4. On January 18, 2018, Complainant's supervisor, Assistant Chief Immigration Judge Nadkarni sent Complainant screenshots of directories on the G: drive where training videos could be found. Sanctions Motion Attachment 2, Ex. A at 1-2. (It is not clear whether the screenshots contain active links or merely explained the path to find the videos in question.)

5. Complainant found the BAIN-FOIA folder in December 2017 or early January 2018, before the Nadkarni email was sent. Sanctions Opp. Attachment 1, ¶14. Thus, to the extent there are areas of the G: drive that are sectioned off only for management access, the agency apparently gave Complainant and all of her coworkers access to same in November 2017 through the links sent to all Immigration Judges and all OCIJ employees in the November 8, 2017 email. *See* Sanctions Motion Attachments 2, 3.

6. Complainant raised the impropriety of the agency leaving such materials visible and accessible on a shared drive in her May 7, 2018 Motion to Amend. The agency exhibits show that, in fact, the agency did take note of this allegation in May 2018 and at that time took steps to revoke Complainant's access to the G: drive. Motion Attachment 2, ¶2 (May 14 request for IT review of Complainant's access to G: drive). The agency did not at that time request that Complainant identify the documents at issue or provide any clarifying information about her discovery.

7. Agency counsel contacted undersigned counsel on August 30, 2018 to demand that Complainant immediately delete an unspecified number of documents associated with the trove of documents from the BAIN-FOIA folder. Motion Attachment 1 at 5. Complainant responded with an explanation yet again of how she had discovered the documents as well as an explanation that the privileges being asserted by the agency either do not exist (Employee Labor Relations privilege) or not supported by the facts or the law (Attorney-client privilege waived by failure to hold confidential). Id. at 3-4.

8. The agency sought sanctions against Complainant for her possession of the BAIN-FOIA documents, which was denied. Pursuant to the AJ's Order, Complainant provided the agency with a copy of each BAIN-FOIA document as well as her notes regarding same. Complainant further responded to the agency's questions regarding those documents in writing and in her deposition on February 28, 2019.

9. The parties were directed to confer regarding any protective order, and the agency presented the terms in the proposed order to Complainant. Complainant explained her objections to the proposed requirements, e.g., for filing under seal (onerous and unnecessary, because there are no classified or novel documents at issue) and to

3

destroying all copies of the BAIN-FOIA documents after the instant matter is resolved (she has a pending FOIA appeal to which the documents at issue are obviously relevant), while offering to stipulate to redact Personally Identifiable Information and even to use pseudonyms for individuals whose information was included in the BAIN-FOIA documents. *See* Proposed Stipulated Protective Order, ¶¶2-10, at pages 7-10; *but see* Attachment B, at 1.

10. The agency did not accept Complainant's alternate stipulations, and instead filed the instant motion. This opposition followed.

## II.   ARGUMENTS

The agency's Motion is premised on two inaccurate notions:

(1) that the BAIN-FOIA folder contains "privileged and protected" categories of evidence

that are not typical of EEO complaints and which warrant special handling; and

(2) that Complainant unreasonably refused to delete the documents therein once asked to do

so by the agency.

Neither proposition is accurate and the onerous conditions the agency would have the AJ impose on a large number of documents enumerated in the draft order at pages 2-7 – without any description of the documents or any explanation why each warrants special handling - would unreasonably burden Complainant's ability to present evidence in support of her claims and is simply not warranted by the nature of the documents themselves.

## A. **THERE IS NEITHER ANY NEED NOR ANY BASIS FOR HEIGHTENED PROTECTIONS FOR THE DOCUMENTS AT ISSUE**

The agency describes the documents which it wishes to subject to the protective order as follows:

- internal Agency communications;

- communications between Agency counsel and Agency management officials revealing

  legal advice related to, for example:  draft personnel actions taken or contemplated to be

4

taken against employees (other than Complainant);

- communications regarding the Agency's settlement positions in previous EEO actions Complainant had pending before the Agency; and attorney-client communications regarding Agency matters not involving Complainant;

- communications and documents covered by the attorney-work product doctrine;

- confidential health-related information of employees (other than Complainant) and their family members;

- documents containing unredacted alien numbers and names; and

- documents containing personally identifiable information (PII)—including home addresses, phone numbers, and social security numbers—of employees, applicants for employment, and personal and professional references.

Motion at 4. Complainant addresses the second and third categories - allegedly privileged communications and work product, in section II.B *infra*. For the remaining categories of documents, the agency's concerns are either misplaced – "internal agency communications" are not entitled to any special protections – or would be adequately addressed by Complainant's offer to redact PII in order to protect addresses, phone numbers and social security numbers; irrelevant names; and alien numbers and names.

As a practical matter, Complainant's redaction-based approach is more proportionate and effective since the parties have been ordered to file electronically, making the requirements for sealed envelopes and signed certifications onerous and unduly cumbersome to the hearing process.

Third, it is also worth noting that this matter is administrative, as opposed to being heard in open court. Unless there is an appeal to the Office of Federal Operations, there will be no

5

publication of any aspect of the instant compliant; and even then, OFO now uses pseudonyms.
Accordingly, the danger of PII leakage into the public sphere through this hearing process is
minimal.

## B. **THE AGENCY HAS AGAIN FAILED TO SHOW THAT ANY PRIVILEGE IS APPLICABLE TO ANY OF THE DOCUMENTS AT ISSUE**

The agency alleges that Complainant and her counsel had an obligation to return or
destroy documents once the agency notified them about allegedly privileged communications,
but makes no response to Complainant's point that the agency (a) has not identified which
specifi documents it believes are privileged or work product and (b) in any case, waived any
privilege or other doctrine which might have been applicable when it placed these documents on
a shared drive to which many employees – not just managers – were given access.

As the Procedural History & Facts section, *supra*, shows, the agency gave Complainant – and
all of her coworkers in OCIJ – access to many of the documents at issue when it imprudently
sent out a set of direct links to specific files on the G: drive in November 2017. *See* Agency
Motion for Sanctions Attachment 3, Nov. 8, 2017 email containing several G: drive links.
Complainant was also sent to the G: drive by her supervisor to look for videos on more than one
occasion and instead found the BAIN-FOIA folder visible and accessible, not only to herself but
to her OCIJ coworkers. To the extent the agency gave Complainant - and all of her coworkers -
access to an allegedly protected part of the G: drive, allowing her to find the folder at issue by
happenstance, it failed to preserve the confidentiality of anything privileged among the BAIN-
FOIA documents.

Complainant has consistently explained her basis for rejecting the agency's broad,
informal assertions of privilege with respect to any of her document production. Specifically,

6

undersigned counsel noted in her August 31, 2018 email that the agency's sweeping assertions of

privilege are contrary to the applicable case law:

> … To the extent there has been any Privacy Act violation, it would appear to have been committed by the agency in placing these materials, unredacted and with no password protection, on a publicly accessible webpage where any employee could view them. Complainant is providing these documents obtained from the agency's webpage accessible to all employees back to the agency through counsel, in compliance with the applicable discovery rules.

> … To the extent these documents were left on a publicly available webpage for any OCIJ employee to view, any claim of attorney-client privilege has been waived. *See e.g.,* Permian Corp. v. U.S., 665 F.2d 1214, 1222 (D.C.Cir.1981)("[A] litigant who wishes to assert confidentiality must maintain genuine confidentiality").

> …While it is correct that the deliberative process privilege shields internal agency predecisional policy deliberations from discovery, that privilege is not applicable to Employee and Labor Relations documents generally or to deliberations about individual personnel actions where the government's intent is at issue, as in the instant EEO complaint. *See e.g.,* Convertino v. U.S. Dept of Justice, 674 F. Supp. 2d 97, 102 (D.D.C. 2009)(*citing* In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency, 145 F.3d 1422, 1424 (D.C.Cir.1998); In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency (In re Subpoena Duces Tecum II), 156 F.3d 1279, 1279 (D.C.Cir.1998)). Furthermore, as explained, the agency placed these materials on a publicly available website, thereby waiving any privilege. See [], supra.

Sanctions Motion Attachment 1 at 4. The agency has not refuted, or even responded to, any of

these points of law. Furthermore, yet again the agency has not made any of the necessary

showings to establish that any privilege was ever, much less still is, applicable to any of the

documents at issue.

Under the federal common law, the proponent bears the burden of demonstrating the

applicability of any asserted privilege. *See e.g.,* Judicial Watch, Inc. v. U.S. Dep't of Homeland

Sec., 841 F. Supp. 2d 142, 153 (D.D.C. 2012) (*citing* In re Subpoena Duces Tecum Issued to

Commodity Futures Trading Comm'n, 439 F.3d 740, 750 (D.C.Cir.2006)). The nature of

that burden is clear: the proponent must establish the claimed privilege with "reasonable

certainty." Id. (citing Fed. Trade Comm'n v. TRW, Inc., 628 F.2d 207, 213 (D.C.Cir.1980)). To

do so, the proponent must adduce competent evidence in support of "each of the essential

elements necessary to support a claim of privilege.[1]" Id. (citing Alexander v. Fed. Bureau of

Investigation, 192 F.R.D. 42, 45 (D.D.C.2000)). Consistent with these strictures,

the proponent "must offer more than just conclusory statements, generalized assertions, and

unsworn averments of its counsel." Id. (quoting In re Application of Veiga, 746 F.Supp.2d 27, 34

(D.D.C.2010)). Where the proponent fails to adduce sufficient facts to permit the district court to

conclude with reasonable certainty that the privilege applies, its burden has not been met. Id.

(citing TRW, 628 F.2d at 213).

The agency is the proponent of the allegedly applicable privileges and/or doctrines in the

complaint at bar. It therefore has the burden of identifying exactly which documents it believes

are privileged or otherwise protected, and explaining why. The agency has again failed to take

the opportunity to do so.

At this point, months after Complainant made the agency aware of her discovery, the

agency's continuing failure to make any showing that any privilege is applicable to any of the

communications at issue constitutes a second waiver, even if strictly *arguendo* exposing them on

---

[1] "In order to demonstrate the applicability of the privilege, the proponent must establish each of the
following essential elements: (1) the holder of the privilege is, or sought to be, a client; (2) the person to
whom the communication is made is a member of the bar or his subordinate and, in connection with the
communication at issue, is acting in his or her capacity as a lawyer; (3) the communication relates to a
fact of which the attorney was informed by his client, outside the presence of strangers, for the purpose of
securing legal advice; and (4) the privilege has been claimed by the client." Judicial Watch, *supra*, 841 F.
Supp. 2d at 153–54 (citing In re Sealed Case, 737 F.2d 94, 98–99 (D.C.Cir.1984). **Additionally, a
"fundamental prerequisite to the assertion of the privilege" is "confidentiality both at the time of
the communication and maintained since."** Id. at 154 (citing Coastal States Gas Corp. v. Dept of
Energy, 617 F.2d 854, 863 (D.C.Cir.1980))(emphasis added).

8

shared drive did not already have that effect.  Because any privilege or other anti-discovery doctrine has long since been waived by the agency's failure since August 2018 to make the requisite showing to support its broad assertions, at this point there are in fact no "privileged" documents or "work product" which might in theory have once been subject to a claw-back.

## CONCLUSION

Based on the foregoing points and authorities, Complainant respectfully submits that the agency's motion for a protective order should be denied.

Respectfully submitted,

_____/s/_____

Heather White
THE FEDERAL PRACTICE GROUP
1750 K Street, NW, Suite 900
Washington, DC 20006

*Attorneys for Complainant*

9

## ANTOINETTE EATES

| | |
|---|---|
| **From:** | ANTOINETTE EATES |
| **Sent:** | Thursday, April 25, 2019 11:34 AM |
| **To:** | Heather White; Coleman, Maria (EOIR); Scheinkman, Rena (EOIR) |
| **Subject:** | Agency's Motion for Protective Order   Bain, Quyhn v. DOJ - EEOC No. 570-2016 01466X; Agency No. EOI-2016 00137 |

Dear Parties:

By order dated October 29, 2018, I authorized the Agency to move for a Protective Order and directed that any motion for a Protective Order "shall be a consent motion...." Here, the Agency has failed to comply with my order. It proposed a Protective Order to Complainant, and then upon Complainant's objections to specific provisions of the order, subsequently filed an opposed motion without attempting resolution of the objections. See Agency Motion, Attachment B. I am thus rejecting the Agency's proposed Protective Order and deferring my ruling on the motion.

Because of the Agency's failure to present a consent motion or to attempt to address Complainant's objections, I hereby direct Complainant to produce a red-line, marked up version of the Agency's proposed Protective Order, which contains Complainant's edits. The Complainant's version shall incorporate the determinations set forth below, as well as any provisions from the Agency's proposed order to which Complainant does not object.  Complainant's draft proposed Protective Order shall be presented as a clean version and a red line version in MS Word format, for my consideration, on or before **May 9, 2019.**  After consideration of the parties' respective versions of the proposed Protective Order, I will issue an appropriate protective order.

Upon consideration of the Agency's motion and Complainant's objection, I have determined the following:

1) The new proposed Protective Order shall not contain a requirement for filing documents under seal, as the EEOC administrative process is not a public process, and documents filed in this process do not become a matter of public record.  Rather, the proposed Protective Order shall state that any documents that fall within the scope of the Protective Order shall be marked as such and filed electronically only, with a secure password;

2) The new proposed Protective Order shall provide that PII, alien numbers, and names will be redacted from any filed documents;

3) The EEOC lacks authority to limit or control how information obtained by Complainant from the Agency's G: drive is used outside of the EEOC process, including in any FOIA appeal. Thus, the new proposed Protective Order shall not address the use of such documents by Complainant in any litigation other than that which is before the EEOC.  If the Agency wishes to limit Complainant's use of such documents outside of the EEOC process, it should address that matter in the appropriate forum and/or before the appropriate officials; and,

4) The Agency has failed to meet its burden of establishing that the documents at issue are privileged; thus, the final Protective Order will not reflect such conclusions.

As stated previously, to the extent that either party presents any of the G:Drive documents in support of the allegations in the instant case, I will address issues of admissibility at that time.   Thank you.

Antoinette Eates
Administrative Judge
Washington Field Office

1

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
**Washington Field Office**

131 M Street, N.E.
Suite 4NW02F
Washington, DC 20507
(202) 419-0713
1-800-669-4000

|   |   |
|---|---|
| Quynh V. Bain,<br>  Complainant,<br><br>  v.<br><br>Jeff Sessions, Attorney General,<br>  U.S. Department of Justice,<br>  Agency. | )<br>)<br>)<br>) EEOC No.  570-2016-01466X<br>) Agency No. EOI-2016-00137<br>)<br>) Administrative Judge Antoinette Eates<br>)<br>)<br>) Date:  October 29, 2018<br>)<br>) |

## ORDER DENYING AGENCY'S MOTION FOR SANCTIONS
## AND DISCOVERY ORDER

After consideration of the Agency's Motion for Dismissal Sanctions filed on September 21, 2018, and Complainant's Opposition to the Agency's motion filed on September 28, 2018, the Agency's motion is DENIED for lack of good cause shown.  The Agency has failed to demonstrate improper action or misconduct on the part of Complainant that warrants a sanction pursuant to 29 C.F.R. § 1614.109(f)(3).

As I informed the parties during today's teleconference, based on my review of the filings, Complainant is ORDERED to provide to the Agency copies of all documents that she obtained from November 2017 through May 2018 from the secure shared drive (OCIJ HQ G: drive) that was meant to be accessible only to management officials in the OCIJ.  Complainant is further ORDERED to provide copies of all notes and other documents that she created related to documents obtained or reviewed in the referenced secure shared drive.  This order is not limited to documents contained in a folder entitled "Bain FOIA Folder" or other related title, and includes documents in any other folders accessed by Complainant from the referenced secure shared drive, including any documents related to Immigration Judge hiring.  Such documents and notes shall be provided to the Agency on or before **November 16, 2018,** along with all other outstanding responses to the Agency's discovery requests.

Once the Agency reviews the documents provided by Complainant, it may decide to move for a Protective Order.  Any motion for a Protective Order shall be a consent motion presented in Microsoft Word format for my signature.

1

On or before **November 30, 2018**, the parties shall file a consent motion with a new schedule for the discovery deadline, which includes the taking of Complainant's deposition, and dispositive motion filings.

Failure to follow this Order or other orders of the Administrative Judge may result in sanctions pursuant to 29 C.F.R. § 1614.109(f)(3), including dismissal of the hearing request.

It is so ORDERED.

For the Commission:

Antoinette Eates
Administrative Judge
Telephone:

The foregoing Order was sent by email on October 29, 2018, to the following:

**Complainant**
Quynh V. Bain

**Complainant's Representative**
Heather G. White, Esq.
The Federal Practice Group

**Agency Representatives**
Rena Scheinkman and Maria N. Coleman

**UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**

| | |
|---|---|
| QUYNH V. BAIN,<br>Complainant, | EEOC No. 570-2016-01466X<br>Agency No. EOI-2016-00137 |
| JEFF SESSIONS III,<br>Attorney General,<br>Department of Justice,<br>Agency. | AJ: Antoinette Eates<br><br>Date: September 28, 2018 |

### OPPOSITION TO AGENCY MOTION FOR DISMISSAL AS SANCTION

Pursuant to MD-110, and the administrative judge's emailed order dated September 21, 2018, Complainant Quynh Bain, through counsel, hereby files her Opposition to the Motion to Dismissal as Sanction filed by the U.S. Department of Justice [agency].

As Complainant below shows, there has been no improper action or misconduct that would warrant the imposition of any sanction, and the motion should be denied. Instead, the parties need a ruling on the discovery issue that has arisen.

### I.    PROCEDURAL HISTORY/FACTS

1.  In December 2017 or early January 2018, Complainant found a folder of documents labeled BAIN-FOIA on her agency's G: drive, to which she and all Office of Chief Immigration Judge [OCIJ] employees have access. *See* Opposition Attachment 1, Complainant's Declaration, ¶¶12-14. Complainant had recently received the agency's response to a FOIA request and was unpleasantly surprised to find a folder on a shared drive accessible to all OCIJ employees which exposed her FOIA request. Id., ¶14. Furthermore, when she opened the folder, she found that it was full of documents that she believed were responsive to her FOIA request, but which had not been produced to her and which had not been disclosed in an index which would explain the agency's decisions to redact or withhold documents responsive to her FOIA request. Id., ¶15.

2.  Complainant was distressed to discover the BAIN-FOIA folder on the G: drive where

1

others could see it, as well as by the fact that the agency had not provided complete responses to her FOIA request. She also regarded it as a further act of reprisal for her protected EEO activity and sought to add it to her existing hostile work environment complaint in the Second Motion to Amend filed on May 7, 2018. The relevant claim was #42, worded as follows:

> **November 2017:** Sometime after Complainant filed a FOIA appeal in November 2017 challenging the agency's incomplete or deficient disclosures, the agency posted on the OCIJ intranet webpage a folder named "BAIN FOIA" containing 500 pages of documents responsive to Complainant's FOIA request but not released to her. Complainant discovered the folder in December 2017 when she went onto OCIJ's webpage to view ethics training videos. The cache of documents was on the OCIJ webpage and available to all EOIR employees. **Due to her earlier involvement in Issue 30, *supra*, Complainant believes agency representative Scheinkman is at least partly responsible for this action.**

Second Motion to Amend at 8. (Complainant's Motion was denied with respect to Claim 42 because the administrative judge held that it was a collateral attack on the FOIA process.)

3.  The agency admits that Complainant most likely had access to the G: drive between at least November 2017 and May 2018, because

> After investigating the Chief Judge's [May 2018] inquiry, the Office of Information Technology (OIT) identified a security vulnerability in that every EOIR user had the ability to access the OCIJ internal management shared drive (OCIJ HQ G:drive) if the user was given the specific file path to the drive. Additionally, if a user was sent a link to a particular file, that user would be able to access the entire OCIJ internal management shared drive (OCIJ HQ G:drive) and its files, regardless of whether he or she had been explicitly provided rights to the drive or file(s).

Motion Attachment 2, ¶ 3. The agency exhibits show that, on November 8, 2017, the agency sent links to various files on the G: drive to "all immigration judges" and "all of OCIJ LJC." Motion Attachment 3 at 1.

4.  The agency exhibits also show that on January 18, 2018, Complainant's supervisor, Assistant Chief Immigration Judge Nadkarni sent Complainant screenshots of directories on the G: drive where training videos could be found. Motion Attachment 2, Ex. A at 1-2. (It is not clear whether the screenshots contain active links or merely explained the path to find the videos in question.)

2

5. Complainant found the BAIN-FOIA folder in December 2017 or early January 2018, before the Nadkarni email was sent. Opp. Attachment 1, ¶14. Thus, to the extent there are areas of the G: drive that are sectioned off only for management access, the agency apparently gave Complainant and all of her coworkers access to same in November 2017 through the links sent to all Immigration Judges and all OCIJ employees in the November 8, 2017 email. *See* Motion Attachments 2, 3.

6. Complainant raised the impropriety of the agency leaving such materials visible and accessible on a shared drive in her Second Motion to Amend, filed on May 7, 2018. The agency exhibits show that, in fact, the agency did take note of this allegation in May 2018 and at that time took steps to revoke Complainant's access to the G: drive. Motion Attachment 2, ¶2 (May 14 request for IT review of Complainant's access to G: drive). The agency did not at that time request that Complainant identify the documents at issue or provide any clarifying information about her discovery.

7. In August 2018, Complainant produced documents in two tranches to the agency. Initially, she tried to make the files available to the agency via a secure, password protected large file transfer protocol accessible only by agency counsel via their .gov email accounts, but agency representative Maria Coleman, Esq., indicated that the agency does not permit file transfers via that method, so the files were burned to compact disks and delivered to the agency. The copies of the files uploaded to the large file transfer protocol expired after 7 days and were automatically deleted.

8. Agency counsel contacted undersigned counsel on August 30, 2018 to demand that Complainant immediately delete an unspecified number of documents associated with the trove of documents from the BAIN-FOIA folder. Motion Attachment 1 at 5. Complainant responded with an explanation yet again of how she had discovered the documents as well as an explanation that the privileges being asserted by the agency either do not exist (Employee Labor Relations privilege) or not supported by the facts or the law (Attorney-client privilege waived by failure to hold confidential). Id. at 3-4.

9. The agency sent a follow-up message on September 4 asking whether the materials in the BAIN-FOIA folder had been exposed to third parties by Complainant and counsel. Motion Attachment 1 at 2. Counsel promptly responded that there had been no such exposure and explained the working of the large file transfer program where the files were (1) accessible only using agency counsel's email accounts; (2) password protected and (3) had been deleted automatically no later than August 11, 2018. Id. at 1.

10. On September 21, 2018, the agency filed the instant motion. This opposition followed.

3

## II.    ARGUMENTS

### A. SANCTIONS ARE NOT WARRANTED IN THE ABSENCE OF ANY MISCONDUCT.

EEO Management Directive 110 unquestionably authorizes the administrative judge to issue sanctions as appropriate as part of the inherent powers to supervise the hearing process. MD-110, ch.7, §III(D). However, there can be no basis for issuing sanctions where there has been no misconduct, including the violation of an order, the Commission's regulations, or the rules of discovery as borrowed from the federal case law. Far from violating any Orders, Complainant produced the documents at issue in obedience to the rules of discovery. Further, when the agency first expressed alarm in late August about the information Complainant disclosed in May 2018, undersigned counsel explained, *inter alia*, that deletion did not appear warranted, much less required, given the agency's failure to safeguard the documents at issue, but indicated that Complainant would of course comply with **a contrary order**. *See e.g.*, Motion Attachment 1 at 4. The agency did not seek a protective order, but instead waited almost a month and then filed the "Emergency" Motion for a Stay and the instant motion seeking the ultimate sanction of dismissal.

The agency's Motion is premised on the notion that Complainant somehow improperly accessed the BAIN-FOIA folder and then unreasonably refused to delete the documents therein once asked to do so by the agency. This is simply inaccurate. As the Procedural History & Facts section, *supra*, shows, the agency essentially concedes that it gave Complainant – and all of her coworkers in OCIJ – access to the file at issue when it imprudently sent out a set of direct links to specific files on the G: drive in November 2017. *See* Motion Attachment 3, Nov. 8, 2017 email containing several G: drive links. (Complainant has also explained that she had access to

4

the G: drive for years before November 8, 2017.) This, of course, confirms rather than undermines Complainant's consistent account of how she found the folder in question. These facts also debunk any notion that misconduct has occurred, at least on Complainant's part. Complainant was sent to the G: drive to look for videos on more than one occasion and instead found the BAIN-FOIA folder visible and accessible, not only to herself but to her OCIJ coworkers. To the extent the agency inadvertently gave Complainant - and all of her coworkers - access to an allegedly protected part of the G: drive, allowing her to find the folder at issue entirely by happenstance, this in no way refutes Complainant's account, nor is it evidence of any misconduct on her part.

Oddly, the agency simultaneously advances a theory that Complainant (also?) gained access to the G: drive in January 2018 via an email from ACIJ Nadkarni, but this does not explain the fact that Complainant found the BAIN-FOIA folder sitting unprotected on the G: drive in December 2017 or early January 2018. It was the very fact that the file was present, visible and accessible on the G: drive for Complainant and anyone else to discover at their leisure that she found so outrageous, and that prompted her to move to amend her complaint to include it as a further act of reprisal against her. Complainant disclosed her discovery in May 2018 and then provided responsive documents from that discovery to the agency as part of her document production, as required by the rules of discovery.

**On these facts – which are not disputed by the agency - there is no factual basis whatsoever for sanctions**.

## B. THE AGENCY HAS THE BURDEN OF SHOWING THAT ANY PRIVILEGE IS APPLICABLE TO ANY OF THE DOCUMENTS AT ISSUE

The agency describes the civil exchanges reproduced at Motion Attachment 1 as

5

"contumacious," but in fact, the current disagreement is a classic discovery dispute for which the
parties should be seeking a ruling from the administrative judge as to which if any materials are
protected by any privilege. To that end, Complainant has already provided the agency with a
preliminary explanation for rejecting the agency's broad, informal assertions of privilege with
respect to any of her document production. Specifically, undersigned counsel noted in her
August 31, 2018 email that the agency's assertions were contrary to the applicable case law:

> … To the extent there has been any Privacy Act violation, it would appear to have been
> committed by the agency in placing these materials, unredacted and with no password
> protection, on a publicly accessible webpage where any employee could view them.
> Complainant is providing these documents obtained from the agency's webpage
> accessible to all employees back to the agency through counsel, in compliance with the
> applicable discovery rules.

> … To the extent these documents were left on a publicly available webpage for any OCIJ
> employee to view, any claim of attorney-client privilege has been waived. *See e.g.,*
> Permian Corp. v. U.S., 665 F.2d 1214, 1222 (D.C.Cir.1981)("[A] litigant who wishes to
> assert confidentiality must maintain genuine confidentiality").

> …While it is correct that the deliberative process privilege shields internal agency
> predecisional policy deliberations from discovery, that privilege is not applicable to
> Employee and Labor Relations documents generally or to deliberations about individual
> personnel actions where the government's intent is at issue, as in the instant EEO
> complaint. *See e.g.,* Convertino v. U.S. Dept of Justice, 674 F. Supp. 2d 97, 102 (D.D.C.
> 2009)(*citing* In re Subpoena Duces Tecum Served on the Office of the Comptroller of the
> Currency, 145 F.3d 1422, 1424 (D.C.Cir.1998); In re Subpoena Duces Tecum Served on
> the Office of the Comptroller of the Currency (In re Subpoena Duces Tecum II), 156 F.3d
> 1279, 1279 (D.C.Cir.1998)). Furthermore, as explained, the agency placed these
> materials on a publicly available website, thereby waiving any privilege. See [], supra.

Motion Attachment 1 at 4. The agency has not refuted, or even responded to, any of these points
on the merits. Furthermore, to date the agency has not made any of the necessary showings to
establish that any privilege is applicable to the documents at issue.

6

Under the federal common law, the proponent bears the burden of demonstrating the applicability of any asserted privilege. *See e.g.*, Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec., 841 F. Supp. 2d 142, 153 (D.D.C. 2012) (*citing* In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n, 439 F.3d 740, 750 (D.C.Cir.2006)). The nature of that burden is clear: the proponent must establish the claimed privilege with "reasonable certainty." Id. (*citing* Fed. Trade Comm'n v. TRW, Inc., 628 F.2d 207, 213 (D.C.Cir.1980)). To do so, the proponent must adduce competent evidence in support of "each of the essential elements necessary to support a claim of privilege.[1]" Id. (*citing* Alexander v. Fed. Bureau of Investigation, 192 F.R.D. 42, 45 (D.D.C.2000)). Consistent with these strictures, the proponent "must offer more than just conclusory statements, generalized assertions, and unsworn averments of its counsel." Id. (*quoting* In re Application of Veiga, 746 F.Supp.2d 27, 34 (D.D.C.2010)). Where the proponent fails to adduce sufficient facts to permit the district court to conclude with reasonable certainty that the privilege applies, its burden has not been met. Id. (*citing* TRW, 628 F.2d at 213).

The agency is the proponent of the allegedly applicable privileges and/or doctrines in the complaint at bar. It therefore has the burden of identifying exactly which documents it believes are privileged or otherwise protected, and explaining why. The agency has not yet done so.

---

[1]  "In order to demonstrate the applicability of the privilege, the proponent must establish each of the following essential elements: (1) the holder of the privilege is, or sought to be, a client; (2) the person to whom the communication is made is a member of the bar or his subordinate and, in connection with the communication at issue, is acting in his or her capacity as a lawyer; (3) the communication relates to a fact of which the attorney was informed by his client, outside the presence of strangers, for the purpose of securing legal advice; and (4) the privilege has been claimed by the client." Judicial Watch, *supra*, 841 F. Supp. 2d at 153–54 (*citing* In re Sealed Case, 737 F.2d 94, 98–99 (D.C.Cir.1984). **Additionally, a "fundamental prerequisite to the assertion of the privilege" is "confidentiality both at the time of the communication and maintained since."** Id. at 154 (*citing* Coastal States Gas Corp. v. Dept of Energy, 617 F.2d 854, 863 (D.C.Cir.1980))(emphasis added).

7

Accordingly, it has not even begun to take the necessary steps to shield the documents from disclosure, much less obtain an order to Complainant - with which she would immediately comply - to destroy or delete anything on the basis of a privilege.

## CONCLUSION

Based on the foregoing points and authorities, Complainant respectfully submits that the agency's motion for sanctions is not supported by the facts, and should be denied.

Respectfully submitted,

_____/s/_____

Heather White
THE FEDERAL PRACTICE GROUP
1750 K Street, NW, Suite 900
Washington, DC 20006

*Attorneys for Complainant*

8

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **OPPOSITION TO AGENCY MOTION FOR DISMISSAL AS SANCTION** has been sent by the methods below, this 28th day of September 2018, to the following:

Administrative Judge Antoinette Eates,          **BY EMAIL**
EEOC Washington Field Office

Rena Scheinkman and Maria Coleman, Esqs.        **BY EMAIL**
EOIR Office of General Counsel
*Agency Representatives*

_____/s/_____
Heather White

9