**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
QUYNH VU BAIN,

      **Plaintiff**

      v.

U.S. DEPARTMENT OF JUSTICE, et al.

      **Defendants**

Case No. 21-cv-1751 (RDM)

**STATEMENT OF THE COURT'S JURISDICTION**

Pursuant to the Court's May 26, 2026 Minute Order, Plaintiff respectfully submits this statement in support of her request that the Court exercise jurisdiction to review the legality and Constitutionality of her removal from federal service. The Court's jurisdiction arises under the federal question statute, 28 U.S.C. § 1331, and applicable provisions of the Civil Service Reform Act, 5 U.S.C. § 7701, *et seq.*

**A.      The Removal Action**

Plaintiff was employed in the U.S. Department of Justice for 29 years, as an attorney in the career civil service. In her last twelve years, she worked in the Executive Office for Immigration Review (EOIR), serving as an immigration judge in two northern Virginia courts. On September 17, 2020, Defendants terminated her employment. The removal directly resulted from an investigation that the Justice Department's Office of Professional Responsibility (OPR) conducted between August 2017 and September 2019.

The investigation centered on two complaints of judicial bias and improprieties that two immigration bar attorneys, and their attorney, filed with EOIR in March 2017. ECF No. 16, at 17 ¶¶ 61-62, 71. Following the two-year investigation, OPR concluded that Plaintiff had engaged in professional misconduct that violated two of her state bar rules. Based on OPR's findings and conclusions, the deciding officials in the Office of the Deputy Attorney General recommended that her employment be terminated, and the former United States Attorney General concurred. ECF No. 53-2 at 194-222 (Seal).

The removal decision provides that "Plaintiff has a right to appeal this action to the MSPB [Merit Systems Protection Board] no later than 30 calendar days after the effective date of this action . . . ."[1] ECF No. 53-2 at 222 (Sealed). The removal decision further provides that upon the completion of any appeal and the entry of a final determination, Defendants may refer Plaintiff to her state bar authorities for further disciplinary proceedings, unless such a referral will constitute a manifest injustice. *Id.*

**B.    Plaintiff's Statutory Claims**

Under Section 7701(c)(1)(B) of Title 5 of the United States Code, Defendants have the burden of proving that the removal decision was supported by a preponderance of the evidence. *See id.* *See also* 5 C.F.R. § 1201.56(c)(2) (2025). The decision may not be sustained if the employee shows that (1) harmful errors in the application of the agency's procedures in arriving at such decision; (2) the decision was based on a prohibited personnel practice described in Section

---

[1] Section 7701(a) of Title 5 of the United States Code states: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." *Id.* "Appeals shall be processed in accordance with regulations prescribed by the Board." *Id.*

2302(b) (such as discrimination or whistleblower retaliation); or (3) the decision was not in accordance with law. *See* 5 U.S.C. § 7701(c)(2).

The Court may rescind the imposed penalty of removal if it exceeds the "tolerable limits of reasonableness." *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 302 (1981). In this context, reasonableness means the penalty was not clearly excessive; disproportionate to the sustained charges; or arbitrary, capricious, or unreasonable. *Id.* at 284. A penalty is unreasonable if it is "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion. . . ." *Villela v. Department of the Air Force*, 727 F.2d 1574, 1576 (Fed. Cir. 1984) (internal quotations omitted).

The CSRA's statutory scheme precludes district courts from taking jurisdiction over CSRA-related claims, unless the plaintiff has first exhausted her administrative remedies under the CSRA. *See Spagnola v. Mathis*, 859 F.2d 223, 229 (D.C. Cir. 1988) (declining to hold that the CSRA precludes the exercise of federal jurisdiction over the constitutional claims of federal employees and job applicants altogether, while leaving open the possibility of federal court review of constitutional claims arising from major personnel actions such as removal). Plaintiff is prepared to show that she has exhausted her administrative remedies before the MSPB to the fullest extent possible. *See* discussion at Section E below. Accordingly, the Court has jurisdiction to review her statutory and Constitutional claims.

### C.    Plaintiff's Fifth Amendment Property Interest Claim

The United States Supreme Court has held that government employees who are subject to removal for cause have a protectible property interest under the Fifth Amendment to the United States Constitution. *See Board of Regents v. Roth*, 408 U.S. 564, 557 (1972). That property

3

interest may not be terminated in violation of the employee's right to procedural due process. *Id.* at 571. A federal employee's property interest in continuing employment is defined by existing rules or understandings that stem from an independent source such as state or federal law. *Id.* at 577.

Here, Plaintiff points to the removal decision itself as recognizing her protectible property interest in continuing federal employment. This right is grounded in the Collective Bargaining Agreement (CBA) that governed the day-to-day work of immigration judges. Adopted in 2012, the CBA recognizes that immigration judges do have statutory appeal rights when they face adverse actions, such as removal. ECF No. 53-23 at 4. The CBA prescribes three avenues for appealing or contesting an adverse personnel action. ECF No. 53-30 at 3-4. The first is an appeal pursuant to the CBA's negotiated grievance procedures. *Id.* The second is a direct appeal to the MSPB. The third is a direct appeal to the EEOC. *Id.* Because the removal action violated federal anti-discrimination statutes, Plaintiff opted to file a mixed case appeal with the MSPB. ECF No. 63-6.

The removal decision recognizes this protectible property interest by stipulating that Plaintiff has a right of direct appeal to the MSPB. ECF No. 53-2 at 221-22 (Sealed). This recognition, in turn, triggered the application of CSRA review procedures in 5 U.S.C. § 7701(a)-(b). Having recognized her protectible property interest in continuing employment, Defendants are now estopped from denying it. *See generally Wilkinson v. Legal Services Corp.*, 80 F.3d 535 (D.C. Cir. 1996). Indeed, a retroactive deprivation of that property interest would raise a serious Constitutional question. *See Webster v. Doe*, 486 U.S. 592 (1988) (citing *Johnson v. Robinson*, 415 U.S. 361, 373-74 (1974), for the proposition that where Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear).

### D.  Plaintiff's Fifth Amendment Liberty Interest Claim

The United States Supreme Court has also recognized a Fifth Amendment liberty interest in a federal employee's professional reputation. *Roth,* 408 U.S. at 573. That substantive right exists independently of any property interest afforded by the Fifth Amendment Due Process Clause. A terminated employee's protectible liberty interest is violated when a stigmatizing charge against the character of the employee is publicized, and there is a subsequent denial of procedural due process. *See Roth*, 408 U.S. at 573. Stigmatization occurs when the government acts to injure the employee's good name, reputation, honor or integrity, or imposes a stigma that effectively forecloses the terminated employee's future employment opportunities. *Id.*

The Supreme Court has established two tests to determine whether a plaintiff has established a protected liberty interest. Under the first test, known as the "reputation-plus" test, a plaintiff can show a protected liberty interest if he establishes that "the government changed his status and accompanied such a change with defamation that 'seriously damage[d] his standings and associations in the community." *Peter B. v. CIA*, 620 F. Supp. 2d 58, 70 (D.D.C. 2009) (quoting *M.K. v. Tenet*, 196 F. Supp. 2d 8, 15 (D.D.C. 2001) (citing *O'Donnell v. Barry*, 148 F.3d 1126, 1139-40 (D.D.C. Cir. 1998)). "'For a defamation to give rise to a right to procedural due process, it is necessary . . . that the defamation be accompanied by a discharge from government employment' or other adverse personnel action." *Id.* at 71. *See also Mosrie v. Barry*, 718 F.2d 1151, 1161-62 (D.C. Cir. 1983) (To establish a deprivation of his liberty interest, the employee must show that the government was the source of the defamatory allegations, and the resulting "stigma" involved some tangible change of status such as loss of employment).

Under the second test, known as the "stigma or disability test," a protectible liberty interest is implicated if the government alters the employee's status and such a change 'foreclose[s] his

5

freedom to take advantage of other employment opportunities by either (a) automatically excluding him from a definite range of employment opportunities with the government, or (b) broadly precluding him from continuing his chosen career." *Peter B.*, 620 F. Supp. 2d at 71.  A disability arises when the government takes adverse action that forecloses an employee's future employment prospects.  *Id.*

The remedy for deprivation of an employee's protected liberty interest is a name-clearing hearing.  *Roth*, 408 U.S. at 573.  *See also Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985) (holding that because a Fifth Amendment liberty interest claim implicates an interest in one's "post-employment reputation rather than any right to continued employment," the "well-settled remedy" is a name-clearing hearing).  This type of hearing is similar to the post-termination hearing contemplated in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), for public employees with a property interest in continued employment).

Plaintiff is prepared to demonstrate that the removal action irreparably damaged her professional reputation.  Like the plaintiff in *Doe*, Plaintiff's removal rested on charges of misconduct and lack of candor that were stigmatizing.  Aggravating this injury were the premature referrals to her state bar authorities for further disciplinary actions.  The state bar referrals have imposed a legal disability that forecloses employment opportunities in the foreseeable future.

### E.    The Court Has Jurisdiction Under 28 U.S.C. § 1331 To Consider Plaintiff's Statutory and Constitutional Claims.

Previously, this Court ruled that it has subject matter jurisdiction to review the legality of Plaintiff's removal under 28 U.S.C. § 1331.  This ruling resolved a jurisdictional dispute that erupted shortly after Plaintiff filed her mixed case appeal at the MSPB in October 2020. As soon as she filed the appeal notice (ECF No. 63-4), Defendants moved to dismiss the appeal for lack of

jurisdiction. ECF Nos. 63-6 at 14-19. They argued that the MSPB administrative judges assigned to hear the appeal had not been properly appointed under Article II of the United States Constitution. *See* ECF No. 63-6 at 3-13. The MSPB agreed and dismissed Plaintiff's appeal multiple times over the next two years. *Id.*; ECF Nos. 63-7, 63-8.

The dismissals prompted Plaintiff to file the instant civil action seeking judicial review of the legality of the removal action and her affirmative defenses to the removal action. *See* ECF No. 16 (Amended Complaint). In the two-year period that followed, Plaintiff attempted to press her statutory and Constitutional claims in this forum, while attempting to exhaust her administrative remedies under the CSRA. *See* ECF No. 112 at 3-7 (summarizing the procedural history of this case). This effort proved quite challenging.

Before the MSPB, agency counsel argued that this Court has no jurisdiction over the MSPB appeal and that Plaintiff must dismiss her MSPB appeal if she wished to pursue this federal court action. ECF No. 74-1 at 3-4. Before this Court, government counsel conceded that the Court has primary jurisdiction, but the appeal should be heard by the MSPB in the first instance. ECF No. 76 at 3. At one point, the assigned MSPB judge also weighed in and determined that the MSPB had concurrent jurisdiction. ECF No. 63-12. Finally, in July 2023, this Court conclusively decided that it has jurisdiction over all of the issues presented in this case. ECF No. 112 at 3. This ruling was premised on both parties' concessions. *See* ECF Nos. 80, 86, 112 at 3; July 17, 2023 Minute Order.

After the MSPB regained a quorum, Plaintiff made another attempt to exhaust her CSRA remedies before the MSPB. In August 2024, she returned to the MSPB for discovery. After the parties completed discovery, the MSPB administrative judge scheduled an evidentiary hearing to begin on March 17, 2025. A few days before the hearing, however, Defendants resurrected the

jurisdictional dispute.  They questioned whether the MSPB administrative judge had the authority to hear MSPB appeals in general and Plaintiff's appeal in particular.  *See* ECF No. 112 at 4.

Concerned that the jurisdictional rug was being pulled out from under the MSPB, Plaintiff moved for voluntary dismissal.  She planned to return to this Court to continue pressing her claims and defenses in this Article III forum.  The MSPB judge granted the dismissal motion with prejudice. *Id.*  A week after the voluntary dismissal of her appeal, the MSPB lost its quorum.  Most recently, the MSPB Board held that, under Article II, immigration judges are inferior officers who lack removal protection.  Consequently, the CSRA does not afford immigration judges a process for appealing adverse personnel actions such as removal.

The jurisdictional dispute has greatly impeded the resolution of this case, but it has also made the Court's exercise of jurisdiction more imperative.  As Plaintiff has exhausted her CSRA remedies in a timely manner, the Court should continue to exercise jurisdiction under 28 U.S.C. § 1331 to consider her statutory and Constitutional due process claims.  *See Spagnola v. Mathis*, 859 F.2d at 229-30 (holding that the availability of a comprehensive remedial scheme in the CSRA does not preclude constitutional claims that are based on violation of an established legal right, whether that right arises under a statute or the Constitution).

Through the arguments below Plaintiff provides further support for the Court's exercise of jurisdiction to review her statutory and Constitutional claims.  Plaintiff notes that Defendants have not provided a privilege log or an updated Vaugh index.  To avoid violating the Court's protective order (ECF No. 132), Plaintiff will discuss pertinent facts in general terms, without providing record citations.  She will doing so in summary judgment briefing.

**F.        Defendants Committed Harmful Errors in Applying Agency Processes.**

OPR's findings and conclusions rest largely on secondary evidence that it compiled during the investigation, rather than on primary evidence which included the immigration court hearing records of the four court hearings that OPR investigated.  When OPR issued the final Report of Investigation in September 2019 (ECF No. 53-31 at EOIR 1-82) (Sealed), it refused to provide the secondary evidence to Plaintiff, claiming that she had no right to access such evidence.  *See* ECF No. 92 at 3-4.  This improper withholding deprived Plaintiff of a meaningful opportunity to defend herself against the charges before and after her removal.  *Id*.

On July 25, 2022, this Court directed OPR to begin processing and releasing approximately 14,500 pages of records to Plaintiff, at a rate of 500 pages per month.  *See* ECF No. 49.  By August 2024, OPR finished processing the records and released the final tranche.  However, it produced only 4,660 pages, and many of those pages were heavily redacted.  *See* ECF No. 112 at 6.  OPR withheld the remaining 11,000 pages as duplicative or non-responsive records.

On May 6, 2026, OPR provided a search declaration that again asserted it had withheld 11,000 duplicative or non-responsive pages.  *See* Attachment B.  But on May 15, 2026 – <u>four days after discovery closed</u>, Defendants produced 16,225 pages of OPR records by copying them onto a thumb drive that Plaintiff had supplied.  *See* Attachment .  Approximately 6,000 of the 11,000 of records that OPR designated as duplicative or non-responsive are records that Plaintiff had never seen before.

Perusing the newly produced 6,000 pages for the first time last week, Plaintiff quickly realized that some of them contained potentially outcome-determinative information that favored her claims and defenses.  The new records confirm what Plaintiff had suspected all along: Defendants' failure to comply with the Court's July 25, 2022 record release order and August 6,

2025 discovery order has deprived her of a meaningful opportunity to refute the charges of misconduct before and after her removal. *See* ECF No. 131-1 at 3. See also ECF No. 92 at 5-7.

Had Defendants produced the 6,000 pages when Plaintiff first requested them in August 2019, she would not have had to spend the past six years fighting for access to those records.

Had Defendants produced the 6,000 pages before October 2021, Plaintiff would have used them to mount a stronger defense to Defendants' Rule 12(b) partial motion to dismiss.

Had Defendants produced the 6,000 pages before August 2024, the parties could have avoided a time-consuming discovery battle in the MSPB proceeding. Even when Plaintiff moved to compel, OPR produced only 3,000 pages. It continued to assert that the remaining 11,500 or so pages were duplicative or non-responsive.

Had Defendants produced the 6,000 pages before the close of discovery three weeks ago, Plaintiff would have used the records to conduct discovery.

Defendants' deliberate withholding of that large number of potentially outcome-determinative records was an egregious deprivation of due process. Should the Court be inclined to grant sanctions, Plaintiff respectfully requests the entry of default judgment under Federal Rule of Civil Procedure 37(b)(2)(vi). This rule provides that when a party fails to obey a discovery order, the court may render a default judgment against the disobedient party.[2]

### G.  Defendants Committed Prohibited Personnel Practices That Irreparably Damaged Plaintiff's Reputation.

---

[2] Contrary to their representation to the Court, *see* ECF No. 137, Defendants have not produced all of the records Plaintiff requested. They also have failed or refused to answer all of her interrogatories. Plaintiff will be prepared to discuss this concern at the next status conference on June 29, 2026.

Since the inception of this court proceeding, Plaintiff has consistently maintained that her termination was a Constitutional deprivation of her property and liberty interests that directly stemmed from defamatory statements made by agency personnel. *See* ECF No. 53-30 at 2. *See also* note 4, below. The defamatory statements have utterly destroyed Plaintiff's standing in the legal community, rendering her unemployable for most of the past six years.

It is difficult to imagine a more vicious smear campaign than the one Defendants perpetrated on Plaintiff. Shortly after she filed an EEOC complaint to challenge the denial of a reasonable accommodation in 2014, EOIR set out to destroy her good reputation. Between 2015 and 2017, Plaintiff's supervisors issued in rapid succession a series of counseling letters or emails, a reprimand, and three unfavorable performance ratings that criticized her professionalism. ECF Nos. 53-16 (Sealed), 53-18 (Sealed), 53-19 (Sealed), 53-20 (Sealed), 53-21 (Sealed). To tarnish her reputation even more, they subjected her to a career-ending Office of Professional Responsibility (OPR) investigation in 2017.

In January 2017, Plaintiff learned that EOIR had released to AILA a list of immigration judges who had received complaints of misconduct, and her name was on that list. ECF No. 53-25. This news was quite baffling. Plaintiff was not aware of any complaint that had been filed against her. Then, two months later, two immigration bar attorneys, and their attorney, filed two complaints of misconduct against Plaintiff, seeking to disqualify her from all of their cases. ECF No. 53-29 at 17-17 (Sealed). She was astonished by the attorneys' brazen, dishonest attempt to unseat her simply because they disagreed with her rulings.

Even more bewildering was Plaintiff's supervisor's response. The supervisor interviewed the complaining attorneys and a dozen other individuals, jotted down their grievances, and later provided her interview notes to OPR investigative counsel. OPR did not produce the supervisor's

interview notes until after discovery closed on May 11, 2026.  Perusing the interview notes for the first time last week, Plaintiff was struck by how depraved the "office mobbing" was.  Two attorneys whom the supervisor interviewed had never appeared in Plaintiff's courtroom, yet they still complained.

Following the interviews, the supervisor recommended that the March 2017 complaints be referred to OPR for an investigation.  On the day OPR commenced an inquiry into the two complaints (August 29, 2017), the supervisor reassigned all of the complaining attorneys' cases on Plaintiff's docket to other judges for handling.  *See* ECF No. 53-28.  In seven of the reassigned cases, the Board of Immigration Appeals had affirmed Plaintiff's orders denying the attorneys' motions for recusal, which were predicated on their complaints of misconduct.  ECF No. 53-26.

The newly produced OPR records further reveal that an EOIR OGC attorney had pressed OPR to investigate other false claims of misconduct.  The EOIR attorney claimed that Plaintiff had improperly accessed records that were stored in a shared drive to which many EOIR employees had access.  After Plaintiff denied that she was responsibility for the apparent data breach, the EOIR attorney referred her to the DOJ Office of Inspector General (OIG) for an investigation, only to have the OIG refer the complaint back to EOIR's Office of Security, which then accepted responsibility for the data breach.  Undeterred, the EOIR attorney then complained that Plaintiff had used a government-paid Pacer.gov account to locate information about the complaining attorneys.  This, too, was a false claim.  Plaintiff used her own Pacer.gov account to locate information that spoke to the attorneys' credibility and motives for pursuing the complaints.  She used that information to discredit their complaints.  In April 2019, after the OPR investigation was completed, EOIR moved to dismiss Plaintiff's EEO complaint, using information that the investigation generated.  Because the information was subject to a confidentiality agreement

between Plaintiff and OPR, the EOIR attorney's use of it constituted an egregious invasion of Plaintiff's privacy. The information influenced the EEOC, prompting it to dismiss Plaintiff's EEO complaint.

OPR investigative counsel also employed questionable interview techniques that stacked the deck in the agency's favor. Counsel waited a year to interview witnesses. She spoke with nine of the witnesses by telephone, did not place them under oath, and kept their interviews brief. She asked very suggestive and misleading questions that elicited the responses she desired. She openly criticized Plaintiff while interviewing witnesses. Most consequentially, she failed to investigate two additional complaints that the immigration bar attorneys had lodged in 2017, which contained patently false accusations of misconduct. Plaintiff was not apprised of those additional complaints and was not given an opportunity to respond. If Plaintiff had known, she would have insisted on shutting down the investigation before it got out of hand.

Once the investigation was completed, OPR published a summary of investigation that broadcasted its findings of intentional and reckless misconduct on its website and in an annual report. The published summary of investigation deliberately misrepresented OPR's findings and conclusions. Contrary to its public pronouncement that serious misconduct had occurred, OPR found that Plaintiff did not knowingly violate the Immigration Judges' Professionalism and Ethics Guide. *See* ECF No. 53-28 at 37-46.

OPR further concluded that:

- Plaintiff did not mistreat attorney 552(b)(6) during the February 1, 2017 hearing in case 271. *Id.* at EOIR 76 n. 445 (Sealed).

- Plaintiff did not mistreat attorney 552(b)(6) during the March 7, 2017 hearing in case 050/051. *Id.* at EOIR 76 n. 445 (Sealed).

13

- Plaintiff did not manifest improper bias against attorney 552(b)(6) or her client during the court hearings. *Id.* at EOIR 79 n. 460 (Sealed).

- Plaintiff did not manifest improper bias against attorney 552(b)(6) or mistreat her during the February 16, 2017 hearing in case 452/453. *Id.* at EOIR 79 n. 468 (Sealed).

- Plaintiff did not mistreat the two attorneys in the manner that they claimed. Rather, her interactions with the attorneys were appropriate to the circumstances. *Id.* at 132 n. 453, 133 n. 466 (EOIR 78 n. 453; EOIR 79 n. 466) (Sealed).

These findings and conclusions should have ended the inquiry. The complaints should have been dismissed, and the investigation, closed. Instead, the OPR investigation marked the beginning of the end of Plaintiff's 29-year DOJ legal career, in the most painful and humiliating way.

### H.    Defendants' Misapplication of The Law Deprived Plaintiff of Her Constitutionally Protected Property and Liberty Interests.

The two March 2017 complaints were the first complaints of judicial misconduct that Plaintiff had received in her then-ninth year of service as an immigration judge. She immediately suspected foul play but did not have enough information to refute the malicious, outrageously false claims. Now that she has received all 16,225 pages of OPR records, she remains firm in the belief that Defendants misapplied the law in finding professional misconduct.

OPR found that Plaintiff lacked candor because she knew or should have known certain statements in her order denying the attorneys' recusal motions were false. As soon as the mistakes were called to Plaintiff's attention, she acknowledged them and expressed her regret. She did this multiple times before OPR prepared its report of investigation which concluded that she "doubled down" on the mistakes and refused to confess error. *See* ECF No. 53-2 at 119 n. 401 (EOIR 66 n. 401) (Sealed).

14

Among the newly produced OPR records is an early draft of the OPR Report of Investigation.  It confirms Plaintiff's suspicion that the lack-of-candor finding was invented out of whole cloth.  The draft Report states:



OPR 1241-1242 (ellipses in the original, emphasis added).

OPR had no reasonable factual basis for making this pejorative statement about Plaintiff. That it did so reveals much about OPR investigative counsel's professional judgment, which reflected a tendency to overreach on the facts.  The offending statement was stricken from the final Report, on orders of a supervisor.  *See* OPR 1239.  Although OPR counsel deleted the statement, she kept the lack-of-candor finding and asserted a new rationale for it.  In the final version of the Report, counsel concluded that Plaintiff lacked candor because she refused to acknowledge that the statements in her court order were false.  But this finding also lacks a factual basis.  It conflicts with Plaintiff's repeated acknowledgment of the mistakes, for which she expressed sincere regret.

OPR's professional misconduct finding is a gross distortion of the facts, compounded by a seriously flawed analysis of the law.  *See* ECF No. 87-5 at 5-35.  If given the opportunity, Plaintiff will explain why the two rules of professional responsibility that OPR sustained, Rules 4.4 and 8,4, are inapplicable.  For now, Plaintiff simply notes that the deciding officials in the Offices of the Deputy Attorney General and Attorney General disagreed with OPR's misconduct finding, too. They concluded that Plaintiff's conduct of court hearings "implicated" but did not necessarily violate Rules 4.4 and 8.4.  *See* ECF No. 53-2 at 221 (Sealed).

This brings us to the removal decision's rationale. ECF No. 53-2 at 194-222 (Sealed). Although they rejected OPR's misconduct finding, the deciding officials did not dismiss the charges outright. Instead, they pressed forward with removal. They applied a standard of conduct that OPR did not apply. They admitted that the standard "conduct unbecoming an immigration judge" has "no specific elements of proof." *Id*. at 203. They distorted OPR's fact findings and invented new facts that fit their preconceived narrative of Plaintiff, who they portrayed as angry and verbally abusive. In doing so, they ignored OPR's finding that Plaintiff did not mistreat the attorneys. If given the opportunity, Plaintiff will introduce rebuttal evidence to show that other Justice Department attorneys who had worked with her on some of the most consequential matters did not have the same opinion. *See* Attachment A.

In addition, Plaintiff is prepared to show that the penalty of removal exceeded the "tolerable limits of reasonableness." *Douglas*, 5 M.S.P.R. at 302. In this context, reasonableness means the penalty was not clearly excessive; disproportionate to the sustained charges; or arbitrary, capricious, or unreasonable. *Id.* at 284. A penalty is unreasonable if it is "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion. . . ." *Villela,* 727 F.2d at 1576.

Defendants have failed to respond to Plaintiff's request for information about the nine individuals who were identified in the removal decision as her comparators. *See* ECF No. 53-2 at 173-174 (Sealed). Information that Plaintiff has independently obtained, however, confirms the penalty she received (removal) was grossly disproportionate to the penalty, if any, that the comparators received. Immigration judges who were the subject of similar complaints of misconduct, who had the same supervisors, but who did not share her protected characteristics were not referred to OPR, not investigated, and not disciplined or removed. Even judges who had

16

been found to have engaged in egregious misconduct, such as sexual harassment and assault, were not terminated.

## I.        Defendants Have Deprived Plaintiff of Due Process.

The termination of her employment deprived Plaintiff of a protected property interest in continued federal employment.  This could not have come at a worst time.  At the height of the covid-19 pandemic, it left her without the health and life insurance that she had banked on for 29 years.  Because she was fired a year shy of regular retirement eligibility, she lost approximately $412,000 in retirement pension pay and benefits.  Moreover, because of the misconduct finding, she was rendered ineligible for early retirement, even though she had worked at least 25 years and had reached the minimum age.  As a result, she has experienced severe economic hardships that have triggered debilitating emotional distress.

The termination also destroyed the good reputation that Plaintiff had worked hard to build over 29 years, making it harder for her to secure employment as she gets older.  Her professional reputation has been shattered by the web of lies that prospective employers hesitate to consider her job applications.[3]  The referrals to her state bars have all but foreclosed her ability to practice law in the foreseeable future.

---

[3] Over the past six years since her removal, Defendants have continued to publicize Plaintiff's personnel records without her knowledge or consent.  In May 2022, Defendants released the OPR summary of investigation and certain confidential OPR records to a non-party FOIA requestor who happened to be an immigration lawyer.  ECF No. 45-2 at 3.  In July 2022, Defendants released her OPR records to another federal agency, prompting that agency to revoke a job offer she had received five months earlier.  ECF No. 87-9.  In January 2023, Defendants filed the two March 2017 Knight complaints on the Court's public docket (ECF No. 62-1 at 15-22), over Plaintiff's objection.  In May 2025, OPR referred Plaintiff to her state bars for further disciplinary proceedings, without disclosing the fact that this court proceeding was still pending.  ECF No. 128 at 10 ¶ 35.  In response, her state bars have opened inquiries.  Most recently, in

Despite these challenging circumstances, Plaintiff managed to avail herself of the "administrative machinery" that Congress created in the CSRA, before discovery closed on May 11, 2026. *See Wallace v. Lynn*, 507 F.2d 1186, 1189-90 (D.C. Cir. 1974). Having exhausted her statutory and Constitutional claims, she respectfully requests an opportunity to tell her side of the story -- to show that her removal was arbitrary and capricious, as well as manifestly contrary to law.

In determining the precise contours of a *Codd* hearing, the Court should note that Plaintiff's private interests are substantial, as is the risk of erroneous deprivation. Defendants relied on unreliable, hearsay to initiate an investigation that dragged on for two years. They used the same evidence to support the removal decision but hid it from her for seven years. Some of the evidence appears to have been altered or spoliated, while other evidence contains patently false claims. Furthermore, the deciding officials and OPR disagreed on the standard of conduct that applied to Plaintiff, with the result that they reached contradictory conclusions. The extent to which they targeted Plaintiff for removal stands in stark contrast to their treatment of similarly situated judges who did not possess her characteristics. Finally, the administrative burdens involved in a post-termination name-clearing hearing are minimal. The Court has jurisdiction to award equitable relief. *See Doe*, 753 F.2d at 1102. The Court also has jurisdiction to grant legal remedies. Defendants have conceded that Plaintiff has exhausted her Privacy Act record amendment claim and, therefore, the Court has jurisdiction to consider her record amendment claim. *See* ECF No. 118 at pp. 3-4 ¶ 12. *See* 5 U.S.C. § 552a(g)(1)(A), (C), and (D).

---

January 2026, Defendants gave a prospective employer negative job references, which led to the revocation of the job offer.

Accordingly, and for the foregoing reasons, Plaintiff respectfully requests that the Court exercise jurisdiction under 28 U.S.C. § 1331 to review her statutory and Constitutional claims. Plaintiff further requests a name-clearing hearing or a comparable opportunity to refute the charges of misconduct and lack of candor.

Date:   June 5, 2026                                            Respectfully submitted,


_____
Quynh Vu Bain, Pro Se Plaintiff
Washington, DC  20003
Quynhbain75@outlook.com
(202) 910-8553

**<u>Bain v. U.S. Department of Justice, et al.</u>**
**No. 21-cv-1751 (D.D.C.) (RDM)**

**PLAINTIFF'S STATEMENT OF JURISDICTION**

**ATTACHMENT A**

Honorable Randolph D. Moss
United States District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue
Washington, D.C. 20001

       Re: *Bain v. Office of the Attorney General*, No. 1:21-CV-01751
          (D.D.C.)

Dear Judge Moss,

I am writing this letter in support of Quynh Vu Bain.  Quynh and I were colleagues at the Department of Justice's Office of Immigration Litigation ("OIL") for several years.  I joined OIL in July 1999 and retired as a Senior Litigation Counsel in February 2025, after 32 years of federal service.  My recollection is that Quynh left OIL in March 2008.

It is my understanding that questions have been raised about Quynh's judicial temperament.  During my time as Quynh's colleague at OIL, I have never known her to be intemperate, abusive, derisive, disrespectful, mean-spirited; nor have I seen her mistreat, scream or yell at, or lose her temper with anyone.

To the contrary, I have known Quynh to be generous with her time, intellect, and litigation experience.  Indeed, when I joined OIL in 1999, Quynh was a leader in nationwide post-order detention litigation in the district courts that led to the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001).  I too have led nationwide litigation in several district courts in a matter that led to the Supreme Court's decision in *Jama v. ICE*, 543 U.S. 335 (2005).  As such leaders, you are the focal point for contact with senior DoJ and OIL leadership and line attorneys across the country in litigation critical to the department's objectives.  In all my experience with Quynh during her tenure as a leader in nationwide post-order detention litigation, with its attendant load and responsibility, I never saw or even

heard that she was intemperate, abusive, disrespectful or discourteous toward anyone.  In short, Quynh conducted herself appropriately, professionally, patiently, and with respect for herself and others.

It is my understanding that this letter may be used in connection with Quynh's ongoing litigation in this matter.  My comments are based solely on my experience with her when we were OIL colleagues.  This letter is a truthful recollection based on my experience with Quynh.

Respectfully,


/s/ Greg D. Mack
Greg D. Mack


<u>**Bain v. U.S. Department of Justice, et al.**</u>
**No. 21-cv-1751 (D.D.C.) (RDM)**

**PLAINTIFF'S STATEMENT OF JURISDICTION**

**ATTACHMENT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

QUYNH VU BAIN,

        Plaintiff,

      v.

OFFICE OF THE ATTORNEY GENERAL,
*et al.*,

        Defendants.

Civil Action No. 21-1751 (RDM)

## DECLARATION OF MARGARET MCCARTY

I, Margaret McCarty, hereby declare as follows:

## I.    INTRODUCTION

1.    I am a Senior Associate Counsel for the Office of Professional Responsibility (OPR), U.S. Department of Justice (DOJ). I have been employed as an attorney with OPR since January 1999. Prior to joining OPR, I served as a trial attorney in the Department of Justice's Civil Division where, among other things, I defended federal agencies in litigation arising under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. I have been licensed to practice law in the state of Illinois since 1987. In my current position as OPR Senior Associate Counsel, in addition to supervising a team of OPR attorneys conducting misconduct inquiries and investigations, I supervise OPR's FOIA government information specialist and serve as agency counsel in litigation to which OPR is a party.

2.    In responding to FOIA litigation to which OPR is a party, I work closely with and supervise OPR's government information specialist, who is responsible for processing requests for access to OPR records pursuant to the FOIA and the Privacy Act (PA), 5 U.S.C. § 552a; searching for potentially responsive records; de-duplicating the records; and determining whether such records are responsive to the request and whether they can be released in accordance with the FOIA and PA. During the period relevant to this litigation, OPR experienced significant staffing changes among its FOIA staff, which posed challenges in processing Plaintiff's FOIA request. In March 2019, OPR's government information specialist was detailed to the Bureau of Prisons. OPR subsequently hired a temporary contractor to assist with the processing of FOIA and PA requests. In June 2019, OPR's government information specialist and the attorney who had been supervising her work, OPR's Special Counsel for Freedom of Information and Privacy Acts, resigned from employment with OPR. Thus, when Plaintiff filed her FOIA request in August 2019, it was initially handled by the temporary contractor, supervised by me. OPR hired a new government information specialist in October 2019. The temporary contractor's contract with OPR ended at

the beginning of February 2020. In June of 2020, OPR hired an attorney to serve as Assistant Counsel for FOIA and PA matters. OPR's government information specialist resigned from OPR in May 2021. Again, OPR hired a temporary contractor to assist with processing FOIA and PA requests in May 2021, for one year. OPR hired its current government information specialist in May 2022. OPR's Assistant Counsel for FOIA and PA matters retired from OPR in September 2025.

3.      Due to the nature of my official duties, I am familiar with the records systems and procedures used to search for, gather, and process records in response to Plaintiff's FOIA/PA request. I make the statements contained in this declaration based upon my personal knowledge, information provided to me in my official capacity, and conclusions and determinations reached and made in accordance therewith.

## II.      OPR'S INVESTIGATION OF PLAINTIFF

4.      On August 3, 2017, the Executive Office for Immigration Review (EOIR) Office of General Counsel notified OPR of two complaints it received from a private attorney alleging that EOIR Immigration Judge Quynh Vu Bain of the Arlington Immigration Court had engaged in misconduct during immigration court proceedings involving two attorneys whom the complainant-attorney represented. The allegations raised concerns about whether IJ Bain engaged in professional misconduct by (1) mocking, berating, and disparaging the attorneys who appeared in her court, (2) making false and derogatory statements about the attorneys in a written order denying a recusal motion, and (3) compelling the immigration court administrator to testify under oath concerning the complaint filed against her.

5.      During the course of OPR's investigation, OPR also investigated whether Plaintiff made false statements to OPR. After conducting an extensive investigation, including several written responses from Plaintiff, document review, and witness and subject interviews, OPR issued a draft report to Plaintiff, through counsel, on July 24, 2019, in which OPR found that Plaintiff had engaged in professional misconduct and exercised poor judgment. OPR provided Plaintiff an opportunity to comment on OPR's factual findings and conclusions.

6.      After receiving comments from Plaintiff's attorney, OPR issued a final report of investigation on September 27, 2019, in which OPR concluded that 552(b)(6)



## III.      PLAINTIFF'S FOIA/PA REQUEST

7.      On August 5, 2019, Ms. Bain submitted a FOIA/PA request to OPR seeking

any and all information that OPR received, gathered, or compiled in the course of conducting the OPR inquiry and investigation, and in preparing the July 22, 2019 report of investigation. The term 'information' includes paper and electronic documents, electronic or digital media, audio or digital recordings, and similar materials.

8.    OPR acknowledged receipt of Plaintiff's request on October 4, 2019 in a letter signed by me.  I advised Plaintiff that her request had been assigned to the complex processing track because, after a comprehensive search for potentially responsive records, a voluminous amount of records were located.  Due to the need to examine those records, OPR would be unable to respond to her request within the statutorily mandated twenty-day statutory time limit.  I also advised that OPR processes its FOIA requests in the order they are received, *i.e.*, on a first-in, first-out basis in relation to other requests on the same track.

9.    OPR produced its first interim response to Plaintiff on March 20, 2020.  On June 3, 2020, Plaintiff filed an administrative appeal with the Office of Information Policy (OIP).

10.    On June 22, 2021, Plaintiff served the complaint that initiated this litigation.

11.    On September 13, 2021, OIP issued an appeal determination that closed Plaintiff's administrative appeal, advising that a FOIA appeal ordinarily will not be adjudicated if the underlying request becomes the subject of litigation.  Once Plaintiff filed a court complaint, a resolution to her FOIA request through the OIP appeal process became moot.  28 C.F.R. § 16.8(b)(2).

12.    OPR produced a second interim response to Plaintiff on September 2, 2021 and a third interim response on July 22, 2022.  Beginning in September 2022, pursuant to the Court's July 25, 2022 order, OPR made regular monthly productions to Plaintiff until June 2024, when all potentially responsive, non-exempt records were produced.

## IV.    THE SEARCH FOR RESPONSIVE RECORDS

### A.    OPR's Privacy Act System of Records

13.    OPR tracks, stores, and maintains records in a Privacy Act system of records, JUSTICE/OPR-001, 76 Fed. Reg. 66752.  During the time relevant to this litigation, OPR's system comprised two integrated electronic document and case management databases, Hummingbird Document Manager (DM) and Law Manager (LM).  Records stored and maintained in DM included records created in Word/Excel/PowerPoint, WordPerfect, Adobe, and Outlook software programs.  LM provided all associated administrative tracking data for the records stored in DM.

14.    OPR used the LM database to input all incoming matters by type of matter, complainant name, subject name, and matter and allegation-type codes.  On data input, LM automatically assigned a case/subject or matter tracking number to each incoming complaint.  No documents were stored in LM; it was purely a tracking system providing the case/subject matter number used to search for and access the DM-stored records associated with that case/subject matter number.

15.     The DM database served as OPR's repository, reference, and search tool for identifying, tracking, and storing documents created during the course of misconduct investigations and inquiries; in response to and intake of miscellaneous matters, including complaints; during the processing of FOIA/PA requests; and in response to or in receipt of OPR correspondence, including emails.  When OPR received a FOIA/PA request in which the requester sought records concerning a subject matter or containing terms relating to a person or subject matter, OPR routinely searched DM to determine whether responsive records existed.  If responsive records were located in DM, the files associated with the located documents were reviewed for responsiveness and processed accordingly.

**B.     OPR's Electronic Records Search**

16.     Because Plaintiff's request sought "any and all information that OPR received, gathered, or compiled in the course of conducting the OPR inquiry and investigation, and in preparing the draft July 22, 2019 Report of Investigation," OPR searched for all records associated with the case/subject matter number automatically assigned to Plaintiff Quynh Vu Bain as subject, and to the investigation of allegations charged against her, Matter No. 201700568.

17.      All information input into DM must be associated with a "Case/Subject" number. Matter No. 201700568, which was a matter arising from a notification to OPR from EOIR Office of General Counsel, originated with allegations of professional misconduct against Plaintiff.

18.     Between February 6 to March 12, 2020, Government Information Specialist Casie Matter searched DM for Matter No. 201700568 and recorded that the search took 4.5 hours, resulting in 213 "hits" or documents – all of which were facially determined to be responsive to Plaintiff's FOIA request.

**C.     OPR's Search for Physical Records**

19.     When OPR receives records in paper form, they are routinely scanned, logged in LM and saved in DM.  In that way, all OPR case-associated records could be located and retrieved through searches on LM and DM by using the associated case/subject matter number.

20.     Two OPR line attorneys were assigned to investigate the allegations against Plaintiff:  Leslie Ann Gerardo, who acted as lead attorney, and James Vargason, who served as second chair.  I directed OPR's temporary contractor to ask both Ms. Gerardo and Mr. Vargason for any physical records associated with Matter No. 201700568 in their possession.  They each produced stacks of physical records, which OPR's government information specialist scanned into DM over several days.

21.     In addition to paper records retrieved from the investigating attorneys, Plaintiff hand-delivered binders of paper records to Ms. Gerardo in response to OPR's requests for written responses and documents.  In some cases, Plaintiff's paper submissions were also delivered by mail or email, so that duplicate copies were received.  All paper records, whether hand-delivered

or delivered by mail, and regardless of whether they were duplicative, were scanned and saved to DM under Matter No. 201700568.

22.     Altogether, OPR identified 16,229 pages of potentially responsive records, which included all electronic records stored in DM; emails; physical records scanned into DM from Mr. Vargason and Ms. Gerardo; and all interview transcripts.

## V.     OPR PROCESSES THE RECORDS

23.     Given the unusual turnover of OPR's FOIA staff and OPR's growing FOIA backlog between 2019-2022, OPR staff did not have the opportunity to review the 16,229 pages for responsiveness at the time those records were identified.  Instead, OPR initially made three interim responses to Plaintiff of records it readily identified as responsive.  Beginning in September 2022, under the court-ordered production schedule, OPR processed at least 500 pages per month.  Processing the 500 pages meant that OPR staff reviewed the 500 pages for responsiveness; removed any blank pages, duplicate pages, or nonresponsive records; redacted any exempt material from the remaining responsive pages or identified pages that were entirely exempt from production and therefore should be withheld in full; and produced the responsive pages, with any exempt material redacted, to Plaintiff.  Through this process, OPR produced in full or part 3,622 pages of records to Plaintiff and withheld in full 943 pages.  The remaining 11,664 pages were determined to be duplicates, non-responsive, or blank pages.

## VI.    SEGREGABILITY AND FORESEEABLE HARM

24.     OPR has conducted a line-by-line segregability analysis of the responsive records.  After careful and extensive examination, OPR released to Plaintiff all information that was reasonably segregable without revealing matters disclosing privileged deliberative process and attorney work product information or invading the personal privacy of a third party.

25.      In withholding information pursuant to FOIA exemptions, OPR considered whether the disclosure of the exempt material would cause foreseeable harm to the interests the exemptions were intended to protect.  Disclosure of the withheld materials would cause foreseeable harm to the interests Exemption 5 is designed to protect. With respect to the deliberative process privilege, release of the draft reports of investigation and internal communications at issue would expose the predecisional thinking, recommendations, and evaluative judgments of OPR personnel prior to the finalization of those investigations. Disclosure of such materials would chill the frank and candid exchange of views necessary to sound agency deliberation, undermine OPR's ability to conduct thorough and unimpeded investigations, and risk confusing the public by conflating preliminary assessments with final agency determinations.  To the extent the attorney-client privilege and attorney work product doctrine are also implicated, disclosure of the withheld materials would reveal confidential communications among Executive Office for Immigration attorneys made for the purpose of obtaining or providing legal advice or in anticipation of litigation in handling employee misconduct matters.  Release of such communications would foreseeably harm the integrity of the attorney-client relationship within the agency, discourage candid legal consultation, and compromise the agency's ability to receive and act upon informed legal guidance in future matters.

26.     OPR has withheld only those portions of the responsive materials for which it reasonably foresees that disclosure would cause harm to these protected interests. Where OPR determined that segregable, non-exempt material could be released without implicating these concerns, it has done so.  In particular, in preparing its *Vaughn* index, OPR reviewed again draft reports of investigation and correspondence, and other records, that OPR initially withheld in full pursuant to Exemption 5, and determined that some of those documents can be released to Plaintiff in full or part without causing foreseeable harm.  OPR will make these additional releases to Plaintiff, so that only exempt material that OPR reasonably foresees would harm an interest that is protected by the exemption is withheld.

27.     With respect to Exemptions 6 and 7(C), disclosure of the withheld materials would cause foreseeable harm to the personal privacy interests of the individuals identified therein. The materials at issue contain personally identifiable information—including names, titles, and other identifying details—pertaining to federal employees, complainants, witnesses in OPR's investigation, respondents and witnesses in immigration matters, and other private citizens connected to OPR's investigation.  Release of such information would foreseeably subject those individuals to unwarranted invasions of personal privacy, including potential reputational harm, harassment, or other adverse consequences arising from public association with pending or concluded disciplinary or investigative proceedings. In applying Exemptions 6 and 7(C), OPR balanced the privacy interests of the affected individuals against any cognizable public interest in disclosure. OPR determined that the public interest in disclosure of the specific identifying information at issue does not outweigh the substantial privacy interests implicated. The withheld information would not shed meaningful light on the agency's performance of its statutory duties or otherwise inform the public's understanding of agency operations in a manner that justifies the foreseeable harm to individual privacy that disclosure would cause.  OPR has applied Exemptions 6 and 7(C) narrowly, withholding only those specific identifying details for which the privacy interest is concrete and the potential for harm upon disclosure is reasonably foreseeable. Where identifying information could be redacted without implicating these concerns, OPR has released the remaining, non-exempt portions of the responsive documents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May 2026.

*Margaret McCarty*
Margaret McCarty